```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     WESTERN DIVISION

 3  CITY OF ROCKFORD,              ) Docket No. 17 C 50107
                                   )
 4                  Plaintiff,     ) Rockford, Illinois
                                   ) Tuesday, August 8, 2017
 5     vs.                         ) 9:00 o'clock a.m.
                                   )
 6  MALLINCKRODT ARD, INC.,        )
    et al.,                        )
 7                                 )
                    Defendants.    )
 8
                    TRANSCRIPT OF PROCEEDINGS
 9          BEFORE THE HONORABLE IAIN D. JOHNSTON

10  APPEARANCES:

11  For the Plaintiff:       HAVILAND HUGHES
                             (201 South Maple Avenue,
12                            Suite 110,
                              Ambler, PA  19002) by
13                           MR. DONALD E. HAVILAND, JR.
                             MR. WILLIAM H. PLATT, II
14
                             MEYERS & FLOWERS, LLC
15                           (3 North Second Street,
                              Suite 300,
16                            St. Charles, IL  60174) by
                             MR. PETER J. FLOWERS
17                           MR. JONATHAN P. MINCIELI

18                           CITY OF ROCKFORD
                             DEPARTMENT OF LAW
19                           (425 East State Street,
                              Rockford, IL  61104) by
20                           MR. IFEANYICHUKWU C. MOGBANA

21  For the Defendant        BRYAN CAVE LLP
    Mallinckrodt ARD, Inc.:  (211 North Broadway,
22                            Suite 3600
                              St. Louis, MO  63102) by
23                           MR. HERBERT R. GIORGIO
                             (1201 West Peachtree Street,
24                            14th Floor,
                              Atlanta, GA  30309) by
25                           MR. GEORGE P. WATSON
```

```
 1                              WILLIAMS McCARTHY LLP
                                (120 West State Street,
 2                               Rockford, IL  61105) by
                                MR. SCOTT C. SULLIVAN
 3
      For the Defendant         SKADDEN ARPS SLATE MEAGHER & FLOM
 4    United BioSource          (155 North Wacker Drive,
      Corporation:               Suite 2700,
 5                               Chicago, IL  60606) by
                                MR. ERIC J. GORMAN
 6                              (4 Times Square,
                                 New York, NY  10036)
 7                              MR. JAMES A. KEYTE
                                MR. EVAN R. KREINER
 8
      Also Present:             MR. DONALD LOHMAN
 9                              In-House Counsel
                                Mallinckrodt ARD, Inc.
10
      Court Reporter:           HEATHER M. PERKINS-REIVA
11                              327 South Church Street
                                Rockford, IL  61101
12                              (779) 772-8309

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (The following is from a tape-recording of proceedings:)

2         THE CLERK:  Calling 17 CV 50107, City of Rockford vs.

3    Mallinckrodt ARD, Inc., et al.

4         THE COURT:  All right.  So the first thing we are

5    going to do is plaintiffs go on that side and defendants go on

6    that side.

7         All right.  Let's try to do this in an orderly

8    fashion.  Let me get appearances for the City of Rockford.  I

9    see Mr. Mogbana.

10        MR. FLOWERS:  Good morning, your Honor.  Pete Flowers

11   on behalf of the City of Rockford.

12        THE COURT:  Okay.

13        MR. HAVILAND:  Don Haviland for the City of Rockford.

14        MR. MINCIELI:  Jonathan Mincieli for the City of

15   Rockford.

16        MR. PLATT:  Bill Platt, City of Rockford.

17        THE COURT:  Okay.  And Mr. Mogbana.

18        All right.  I can't find you on this list,

19   Mr. Sullivan.

20        There you are.  Okay.  Go ahead.

21        MR. SULLIVAN:  Good morning.  Your Honor, on behalf

22   of the Mallinckrodt defendants, Scott Sullivan.  With me is

23   Pat Watson, Herbert Giorgio, and in-house counsel Don Lohman.

24        THE COURT:  And then Don.  Do I have an appearance?

25        MR. SULLIVAN:  He is just here observing, your Honor.

1          THE COURT:  Okay.  All right.

2          United BioSource?

3          MR. GORMAN:  Good morning, your Honor.  Eric Gorman,

4    Skadden Arps, on behalf of United BioSource, and with me is my

5    partner James Keyte as well as my colleague Evan Kreiner.

6          MR. KREINER:  Good morning.

7          THE COURT:  Good morning.  Okay.

8          All right.  I have circled with a star and three

9    exclamation points in my notes "Need to keep case under

10   control."  So we are going to do that -- or I'm going to do

11   that.  I clearly haven't done it very well so far.

12         We had a status or a motion previously.  We set a

13   briefing schedule on a 12(b)(2) and a 12(b)(6) motion.  I

14   don't know if I had everybody present.  I don't think I had

15   anybody from United BioSource.  For that, you can just send up

16   Roy Leaf.  He can come up.  He can say a couple of words.  He

17   can see his mom.  Everybody will be happy, okay?

18         So let's talk about the 12(f), potential 12(f), which

19   are disfavored and can be useless, and the MJOP.  So the

20   judgment on the pleadings, what are you talking about?

21         Wait.  That came out the wrong way.  What would that

22   entail?  What would be the issues?

23         MR. FLOWERS:  We think it is a pretty straightforward

24   issue in terms of what Mallinckrodt has already agreed to as

25   part of its resolution with the FTC case.  Obviously, there is

1    going to be some factual issues that we were hoping to see

2    their motion to dismiss to be able to gauge whether, in fact,

3    we are going to file that motion, but we wanted to put it out

4    there for the court that if the facts are as we have pled,

5    that we think a motion for judgment on the pleadings might be

6    appropriate.

7            THE COURT:  Okay.  Well, if they are filing just a

8    motion to dismiss and there is no answer, what would you be

9    waiting to see?

10           MR. FLOWERS:  We don't know -- we just saw in their

11   Rule 26 report statement some of the bases for the Rule 12

12   motion, despite having a couple of conferences about it.  We

13   now know that they are challenging standing, Illinois Brick,

14   and a couple of other fact-laden issues.  So, again, when we

15   had the conference, your Honor, we thought that it was

16   appropriate to raise that issue because we think the fact

17   issues are pretty straightforward, but I do see some factual

18   contested issues coming down the line, especially our status

19   as a direct purchaser.  We now see they are going to challenge

20   that.  We expect they are probably going to put some factual

21   proffer out there in their Rule 12 motion, and we are going to

22   want discovery on that.

23           THE COURT:  Well, the only thing they can add facts

24   to would be the 12(b)(2).  12(b)(6), they are stuck with

25   whatever you pled.  So unless you pled really bad things, and

1    I don't know, what would the factual disputes be?

2          MR. FLOWERS:  We are comfortable with the pleading.

3    When I saw Illinois Brick and I saw standing in their

4    defensive posture, which is the statement -- I suppose we are

5    going to see an argument on that.  The facts pled support our

6    theory.

7          THE COURT:  Okay.  On the standing, since it is -- I

8    mean, that can be a 12(b)(1) or a 12(b)(6).  It sounds like

9    you are doing it as a 12(b)(6).

10         MR. WATSON:  We are doing it as a 12(b)(6).  It is

11   Illinois Brick, so it is more the elements of a claim than

12   constitutional standing.

13         THE COURT:  Right.

14         MR. WATSON:  And we are not intending to put any

15   factual evidence in.  We are going to attack the pleadings as

16   pled.

17         THE COURT:  Okay.  Okay.  Who was thinking about

18   doing a motion to strike?

19         MR. WATSON:  That was Mallinckrodt.

20         THE COURT:  And what would be the basis?

21         MR. WATSON:  It was going to be a narrow motion to

22   strike the allegations that were taken from the FTC complaint.

23   There is some very good authority from the Northern District

24   of Illinois on that point recognizing that all the -- such

25   motions are generally disfavored, that in that circumstance, a

1   motion to strike is appropriate, and I would note that the

2   consent order in this case specifically says on its face that

3   it is not to be used in evidence in any civil proceeding or

4   other proceeding going forward.  So that's what the motion to

5   strike would deal with.

6          THE COURT:  Okay.  All right.  If you win on a motion

7   to strike, does it advance the case?

8          MR. WATSON:  It narrows the issues in our opinion.

9          THE COURT:  Can't they just come back with something

10  else?

11         MR. WATSON:  Possibly.  They could replead it in a

12  certain way, but that's always the danger on a motion to

13  dismiss in general.

14         THE COURT:  Well, that's true.

15         So if there were going to be cross motions, I just

16  would have had a briefing schedule and had everybody hit the

17  launch button at the same time, and then you guys can throw

18  the paper back and forth at each other for however long it

19  takes to work out the pleadings, and then hopefully it will be

20  one organized, giant stack of paper before Judge Kapala

21  instead of a series of different ones he has got to wade

22  through.

23         Do you still anticipate a judgment on the pleadings

24  motion?

25         MR. FLOWERS:  No, your Honor --

```
1              THE COURT:  Okay.

2              MR. FLOWERS:  -- based on what we have seen through

3    our Rule 26(f) conference.

4              THE COURT:  All right.  Let's see if I can get the

5    complaint up.

6              The class -- obviously, the City of Rockford is the

7    class rep in this case.  Are there going to be -- when I read

8    the class rep definition, it seemed like it could include

9    other Illinois municipal bodies.  Could it?

10             MR. FLOWERS:  That's correct, your Honor.

11             THE COURT:  All right.  How about other municipal

12   bodies outside Illinois?

13             MR. FLOWERS:  Yes.

14             THE COURT:  Okay.  I don't know municipal law outside

15   Illinois.  I only know Illinois municipal law.  So under

16   Illinois municipal law, can a municipal body be included in a

17   class action when it is only an opt-out class?

18             MR. FLOWERS:  So there have been --

19             THE COURT:  Municipal body needs to -- can only act

20   through the corporate authorities -- village board, city

21   council, those types of things, county board -- and it needs

22   to take an affirmative step to enter litigation.  If it is

23   knocked out, how do we work that?

24             MR. FLOWERS:  So they are having classes certified in

25   the drug arena for just that.  There has been a case where the
```

1    City of San Francisco sued, was certified as a class

2    representative in an opt-out (b)(3) situation where the

3    municipal authority has to elect to opt out of the case in

4    order to capture the entire marketplace.

5           THE COURT:  And would that be San Francisco?  Unless

6    there is a city of San Francisco in Illinois, and I don't know

7    of one.  Did that include Illinois municipalities?  I mean, I

8    don't know California law --

9           MR. FLOWERS:  Yes, your Honor.

10          THE COURT:  -- municipal law.

11          MR. FLOWERS:  What I'm suggesting is this is a very

12   finite group of people.  The class is not as expansive as you

13   may see in other cases.  We have got about 800 or so patients

14   a year.  So the payors are very limited, too.  So I would say

15   that the vast majority of municipalities are likely not in the

16   class.  So we are dealing with a very finite group of people.

17   It just so happens the City of Rockford has two patients in

18   one calendar year.  So it has a very strong position as a

19   representative plaintiff in this case.

20          THE COURT:  Okay.  What I don't want

21   happening -- going back to my "keep the case under control,"

22   what I don't want happening is municipalities coming in at the

23   end of the process saying, "Hey, we didn't want to be part of

24   this class.  We got notice."  Anybody who did Illinois

25   municipal law knew there was a whole thing with the Ford

1    Intruders and Ford deciding not to sell Intruders to municipal

2    bodies, and then they all said, "Well, we didn't know we were

3    part of a class member," and there was a huge dustup, and it

4    sent the case into chaos.  I don't want the case ever going

5    into chaos, so that's why I'm raising it now.

6          All right.  There is three other cases that may or

7    may not be a parallel proceeding.  Do you think they are?

8          MR. FLOWERS:  We think they are.

9          THE COURT:  Okay.

10         MR. FLOWERS:  The obvious one is the FTC case where

11   Mallinckrodt was prosecuted by the FTC and settled, and that

12   gets us right to the body of the evidence that we think we

13   should have at this point in time so we can stand in the shoes

14   where the FTC left off.

15         The next case is the civil action that was brought by

16   a competitor, Retrophin, which takes us back to the beginning

17   of where we think the monopolization happened because Questcor

18   came in and took the competitive drug from Retrophin, and they

19   were accused by none other than Martin Shkreli as being a

20   price gouger.

21         And then the last case is the prosecution of

22   Mr. Shkreli himself, which if you read the headlines, he was

23   convicted on three counts, and he is awaiting sentencing.

24   This morning I saw a calendar, your Honor, that kind of

25   tracked our schedule, for briefing on posttrial issues in the

1    Shkreli case, on our track into October.  Our main concern

2    with that -- I know your Honor wants to hear issues -- is we

3    think Mr. Shkreli is a fact witness, and we would rather have

4    him out of jail rather than in jail, and we would like to

5    reach out to his counsel about scheduling a deposition at a

6    convenient time.

7         So we think all of those cases are related because

8    they all revolve around the Acthar monopolization claim that

9    we brought.

10        THE COURT:  Can he take 5 at this point?

11        MR. FLOWERS:  I don't believe so.  He has been

12   prosecuted.

13        THE COURT:  Are they going to -- was he found not

14   guilty on those other five counts or was it a mistrial?

15        MR. FLOWERS:  He was found not guilty on three

16   counts, but there is a civil action by the company against him

17   individually, which was stayed, I believe, pending the

18   resolution of the criminal case.

19        THE COURT:  Okay.  All right.  You say they are not

20   parallel?

21        MR. WATSON:  We say they are not parallel.  Start

22   with the easy ones.  The Shkreli criminal prosecution,

23   obviously, has nothing to do with this litigation.  It is a

24   different company.  The charges have nothing to do with the

25   allegations in this case, which have to do with a distribution

1    system that Mallinckrodt has for its drug Acthar and the

2    acquisition of a potentially competitive drug by a license

3    agreement.

4        The civil case that they are talking about, the

5    Retrophin case, it is -- again, in some far off sense you

6    could say it is relevant because they have copied the

7    allegations from that case in some ways.  We think those get

8    knocked out on the motion to dismiss.

9        And then the third one is the FTC investigation,

10   which is, as we have already said, the consent order on its

11   face can't be used in this litigation.  So this isn't like a

12   DOJ investigation with the guilty plea where you have some

13   legal significance of the guilty plea and follow-on antitrust

14   litigation.  The FTC consent order has no such effect.

15       THE COURT:  Okay.  The FTC litigation, there is a

16   consent order.  It sounds like it settled.  Is there a

17   judgment in that or does the consent order have a period of

18   time by which it extends into the future?

19       MR. WATSON:  Do you know the answer to that one, Don?

20       MR. LOHMAN:  Six months.

21       MR. WATSON:  It is just a consent order.  There is no

22   judgment.  We had, as part of the consent order, the company

23   had to pay a fine, and they had to license the product at

24   issue, which has now been done.

25       THE COURT:  Okay.  Has the case been terminated?  If

1    I were to go onto the docket system, would it show terminated?

2              MR. WATSON:  I was not involved in that, your Honor.

3              MR. LOHMAN:  I don't know, your Honor.

4              THE COURT:  Okay.  All right.  Okay.  Those were my

5    questions.  It looks like you have got a lot of fact

6    witnesses, potential experts.  I assume you are going to have

7    retained experts on if the antitrust matter goes forward.  You

8    are going to have experts on that.

9              Are the parties interested in a settlement conference

10   at all?  We don't have to have one, but if you want one, I

11   will make myself available.

12             MR. FLOWERS:  Your Honor, from the plaintiff's

13   perspective, we are open and available to discuss anything at

14   any point in time.  We were under the impression that at least

15   one of the defendants wasn't interested at this point,

16   although they put something in their Rule 26 disclosure which

17   seems to indicate that we hadn't given a concrete settlement

18   proposal, but, in fact, we were of the opinion based on our

19   conversation that they weren't interested in having

20   discussions at this stage.

21             THE COURT:  Okay.  I'm not going to -- look,

22   Mr. Sullivan will tell you I don't make anybody come to a

23   settlement conference.  If both sides want to have a

24   settlement conference, you can have a settlement conference.

25             MR. WATSON:  And I think he was talking about UBC and

1    not Mallinckrodt, but we -- I think both -- our position is we

2    are always willing to consider settlement offers.  We think

3    the chances of this case settling prior to ruling on the

4    motion to dismiss is remote.  So I wouldn't think that having

5    a formal ADR process or anything like that would be worthwhile

6    at this point.

7            THE COURT:  Okay.  All right.  Those are my

8    questions.

9            Tell me whatever you want to tell me.

10            MR. FLOWERS:  Your Honor, I think one issue is this

11    whole issue of discovery at this stage.  So we both kind of

12    agree that the timetable of this case, assuming it goes

13    forward, is about 14 months.  The question is --

14            THE COURT:  Let me pause you right there.

15            MR. FLOWERS:  Sure.

16            THE COURT:  I'm looking at a sea of lawyers.  Just

17    scheduling depositions with this many attorneys -- I figure

18    you all have probably a couple other cases pending -- 14

19    months seems pretty optimistic.

20            So go ahead.  That's just my word of caution.

21            MR. FLOWERS:  Possibly, your Honor, you are right, it

22    is a scheduling nightmare.  The question, though, in that

23    respect is when does the 14 months begin.  I mean, we have

24    issued our Rule 26 disclosures even though we couldn't get an

25    agreement on how to do that.  We have issued discovery.

1          THE COURT:  Okay.  So that would be another good

2    piece of evidence as to whether 14 months is really reliable

3    if you can't agree on stuff like that.  But go ahead.

4          MR. FLOWERS:  True, true.

5          The issue really is when does discovery begin, does

6    it begin after the motion to dismiss is dealt with or does it

7    begin at this stage.  Our position, at least, is some of the

8    simple discovery should begin at this stage so that we can get

9    the process moving.  It isn't discovery that requires probably

10   a lot of action on their behalf because it is mostly documents

11   that have been gathered in these other cases, so they have

12   been previously produced.  So we are of the opinion and hope

13   that we could begin at least the simple part of the discovery

14   at this stage so that the case can move along, assuming we get

15   over the motion to dismiss.

16         MR. HAVILAND:  And, your Honor, if I may, to follow

17   on that, what Mr. Flowers pointed out, there are buckets of

18   documents.  I don't want to oversimplify it.  But in the FTC

19   litigation where Mallinckrodt PLC agreed to jurisdiction, we

20   believe there is a body of documents that led to that

21   decision.  They ultimately did settle with the FTC over those

22   charges.  We expect in the 12(b)(2) motion to hear that there

23   is no jurisdiction here and the reasons for it.  That's going

24   to beg the question about jurisdictional discovery.  But if we

25   can at least start where the government left off with a

1    consent that the company was here for purposes of that case,

2    we think we can at least get down the pathway of helping the

3    court to resolve that jurisdictional motion, among other

4    things, but it is a body of documents that exists somewhere in

5    counsel's office.

6         THE COURT:  Okay.  Let's go down the jurisdictional

7    rabbit hole.  They are going to be filing a 12(b)(2) motion,

8    its motion unopposed, all motions to dismiss by 8/22.  Okay.

9         In a couple weeks, he will be filing a 12(b)(2).  You

10   haven't seen it yet?

11        MR. HAVILAND:  Correct.

12        THE COURT:  I assume your crystal ball is at the

13   shop.  It isn't working.  But do you think you are going to

14   ask for or need jurisdictional discovery or do you need to see

15   the motion first?

16        MR. HAVILAND:  Likely.

17        THE COURT:  Bad question by me because it is

18   compound.

19        Do you think you will need jurisdictional discovery?

20        MR. HAVILAND:  More than likely, your Honor, based on

21   what we expect they are going to claim about the Irish

22   company's presence in the United States and the jurisdiction

23   of this court.

24        THE COURT:  Okay.

25        MR. GORMAN:  Your Honor, if I could just have a word

1    on United BioSource.

2             THE COURT:  Sure.

3             MR. GORMAN:  You know, frankly, we don't even

4    understand why we are named in this case.  There is really no

5    antitrust theory that has us in here.  We will have a very

6    strong 12(b)(6) motion.  We don't think there should be any

7    discovery for any defendant going forward, but certainly until

8    those motions are decided.  But certainly for UBC, it makes no

9    sense whatsoever.

10            THE COURT:  Well, are you raising a 12(b)(2) motion?

11            MR. GORMAN:  12(b)(6).

12            THE COURT:  You are just -- you are 12(b)(2),

13   12(b)(6).  You are 12(b) --

14            MR. GORMAN:  12(b)(6).

15            MR. WATSON:  Right.  We are 12(b)(2) for the parent

16   company only, 12(b)(6) for both.

17            THE COURT:  Okay.

18            MR. WATSON:  And I obviously join in the position

19   that the defendants should not be subject to discovery until

20   the motions to dismiss are ruled on.  The court and everyone

21   who practices in federal court is familiar with the Twombly

22   case, and this is what the Twombly case was all about,

23   stopping the runaway train that can become antitrust discovery

24   before the court has had an opportunity to rule on the

25   plausibility of the allegation, and we have a relatively quick

1   schedule here.  I think briefing will be complete by

2   October 31st.  So there is a very short time period during

3   which discovery can be stayed, but it is not -- the discovery

4   requests that have been served on us to date are anything but

5   simple.  It goes far beyond anything that was produced in

6   prior cases.  And even with respect to things that were

7   produced in prior cases or to the FTC, it is not as easy as

8   just pushing a button, and they are certainly not sitting in

9   counsel's office.

10          But nonetheless, it has to do with more than how fast

11  it is or how expensive it is.  It is also intrusive discovery.

12  There is no legitimate reason to begin discovery now as

13  opposed to after a ruling on the motion to dismiss, when it is

14  our belief that the entire case will be dismissed.  But even

15  if it wasn't, the issues would be significantly narrowed.

16          THE COURT:  Okay.  I never knew a defendant who filed

17  a motion to dismiss that didn't think it would be successful,

18  even when I filed them.  I would cross my fingers.

19          MR. WATSON:  We strenuously think it will be

20  successful.

21          THE COURT:  You do have a briefing schedule on those

22  motions, even if the 12(b)(6) moves forward.  It takes you all

23  of November, all of December.  My best guess -- there is a lot

24  of other motions that are in the queue in front of your

25  motion, including one of yours -- a couple of yours.  You have

1    got a changeover in personnel over there.  Optimistically, you

2    are looking the end of February.  That's my best guess.

3           MR. GORMAN:  I think, your Honor -- sorry to

4    interrupt -- in the context of what will not be a 14 months'

5    case, I think it will be a couple year case, waiting for these

6    motions to be decided, I think, is very much and probably the

7    most efficient way to approach what will become quite a

8    complex and long case, and can be very much informed whether

9    it is a complete dismissal or a narrowing of the issues from

10   these motions.

11          MR. HAVILAND:  Your Honor, one of the --

12          THE COURT:  Hold on.  I don't think he's finished.

13          MR. HAVILAND:  I'm sorry.

14          MR. GORMAN:  So I think in this type of very

15   complex -- again, from our perspective, UBC's perspective, it

16   is not complex, but looking at the overall case, an antitrust

17   case, you know, it does very often make great sense to hear

18   these motions, get decisions on these motions before you

19   launch into a very long, complex litigation involving experts,

20   fact issues.  It can be informed quite a bit by the motion

21   practice.

22          THE COURT:  Okay.  What are we talking about as far

23   as ESI goes?  Are they going to be electronically stored

24   information?

25          MR. HAVILAND:  We have broached the topic.  We didn't

1   get very far on it.  We don't have an EDP plan in place.  We

2   have imposed a litigation hold.  I expect defense counsel has

3   done the same.  But we haven't moved forward other than we

4   have done our due diligence on the plaintiff's side.  We have

5   actually produced, as Mr. Flowers said, our Rule 26

6   disclosures.  We have propounded discovery, interrogatories

7   and requests for production of documents, which are due next

8   week.  And I wanted to say, your Honor, that there is

9   disclosed in the Rule 26(f) report a motion for a stay of

10  discovery.  We have not seen that.  I expect it is along the

11  lines of what we have heard today that there is a motion

12  coming to dismiss.  We would like to stay discovery, but we

13  are going to have a deadline on discovery responses coming due

14  next week and a motion to stay that hasn't been filed yet.  We

15  don't want to file a motion to compel and start the flood of

16  more motions for the court.  So we would like to kind of --

17          THE COURT:  I haven't even set a case management

18  order.  So now you can file your Rule 34 motions -- or

19  motions -- or requests for documents early, but

20  interrogatories, you need to wait.  I think you kind of jumped

21  the gun on that one, right?

22          MR. HAVILAND:  Yes, your Honor.

23          MR. GORMAN:  They actually filed interrogatories and

24  document requests while we were on the 26(f), which shows you

25  how aggressive they want to be on discovery.  I'm not faulting

1    them on that.

2          I would say that we are happy to brief this issue.

3    We are happy to file the motion.

4          THE COURT:  We don't --

5          MR. WATSON:  I think the idea was if they got the

6    ball rolling, maybe it won't stop, but, again, it makes

7    perfect sense not to even have that ball start to roll.

8          THE COURT:  I don't want briefs on a stay because

9    then you will file, and then they will file, and then you will

10   have a reply.  I pretty much know what I'm going to do on

11   this, but I want to hear from the parties before I make a

12   decision.

13         MR. FLOWERS:  So, your Honor --

14         THE COURT:  It is kind of the right way to do it.

15         MR. FLOWERS:  -- the discovery that we have

16   propounded, it has a dozen or so requests.  The first couple

17   were tailored to those files in the FTC action, in the

18   Retrophin action, as I said.  They were litigated cases to

19   resolution.  The discovery in those cases is finite.  It has

20   been produced.  It is not burdensome to reproduce it.

21         We believe in those two case files we are going to

22   find much of what we need to get down the pathway, and we

23   would like to start that process now.  That's why I was

24   curious as to the basis for the stay.  If it is burden, I

25   don't think the burden is all that oppressive to produce a

1   case file that's already in existence, and we can talk to

2   counsel about that, how we copy it if it is in electronic

3   form, all those issues, but we didn't get very far on that,

4   other than to disclose our desire to get finite discovery.

5           THE COURT:  Okay.  Look, if there is going to be ESI

6   issues, go to discoverypilot.com.  Go to the Seventh Circuit

7   ESI program.  We have got all kinds of materials on there to

8   make it a process.

9           If they are used and reviewed and thought about and

10  cooperated with by the parties, try to make it as -- I can't

11  say "un-painful" -- less painful as possible.  So that will

12  give you some guidance there.

13          If you need a protective order at any time, use the

14  model protective order that's on the court's website.  Show me

15  your changes in the tracked changes, and I will review it and

16  get that back to you that same day probably.

17          I can tell you this:  There is going to be no

18  depositions before the motions to dismiss are ruled on.  I can

19  guarantee you that.  That's not going to happen.

20          You have served -- I got the certificate of service

21  that you served your 26(a) disclosures.  That was just handed

22  to me this morning.

23          Here is what we are going to do:  I have got the

24  certificate of service.  I don't know what you got, when you

25  got it, the volume.  Did you get 26(a) disclosures?

1          MR. GORMAN:  We got the 26(a) disclosures yesterday,

2     and it was two or three pages, and then an exhibit of, I

3     think, 33 witnesses that they have identified.

4          MR. WATSON:  And, your Honor, from our perspective,

5     again, getting into document production and finding and

6     reviewing documents as opposed to, potentially, as a middle

7     ground, some disclosures with categories of documents and

8     names, we can understand that is a possibility.  But headed

9     down the road in the context of our motion to dismiss, of

10    actually searching, producing, reviewing documents, it just

11    doesn't make any sense to us.

12         THE COURT:  Okay.

13         MR. WATSON:  And we don't have the same issues, also,

14    in terms of having FTC complaints and things that people want

15    that can be gathered.  We have just a simple, straightforward

16    motion to dismiss.

17         THE COURT:  Okay.  Simple, straightforward.

18         MR. WATSON:  Wait until you see it.

19         THE COURT:  I'm not going to look at.

20         MR. WATSON:  I know.

21         THE COURT:  It is going to that chambers.  I'm not

22    touching it.

23         MR. FLOWERS:  Not that yours is not.

24         MR. WATSON:  And I just want to emphasize, again,

25    that this is the classic case where discovery is going to be

1    stayed.  It is Twombly.  This is Sulfuric Acid from the

2    Northern District of Illinois.  Antitrust cases, complex

3    antitrust cases, are cases that cry out for discovery stayed.

4            THE COURT:  I don't know how many opinions Judge Cole

5    issued in the sulfuric acid cases.  A lot.  So that's a bad

6    cite.

7            MR. WATSON:  I could probably give you the actual.

8            THE COURT:  It was a lot.

9            MR. WATSON:  It was from 2008.

10           THE COURT:  I cite Judge Cole's opinions in that case

11   all the time, so there were clearly a lot of discovery issues.

12           MR. WATSON:  Do you want -- the cite is 231 --

13           THE COURT:  I have got it.  I have got it.

14           MR. WATSON:  Okay.

15           THE COURT:  26(a)(1) disclosures by September 29th,

16   okay?  Full 26(a)(1) disclosures.

17           I have no idea if there is any insurance coverage on

18   any of this stuff.  Has a claim been made?

19           MR. WATSON:  I don't know the answer to that, but I

20   doubt it.

21           THE COURT:  Well, obviously, if there is, let them

22   see the policy.  That would be fun to have a carrier in on

23   this case.

24           And then what we will do is we will sit down.  I'm

25   going to give you October 10th.  I will put it at 1:30.  And

1   that will be -- I will put that as the only case on the 1:30

2   call that day.  And I will be tired and cranky, so I'm giving

3   you a warning, on that day.  And we will talk about what, if

4   any, additional discovery should move forward.  There will be

5   no depositions before the motions to dismiss are completed.

6   As to if and when depositions do proceed, I will put in the

7   order right now, so I don't forget, leave to depose an

8   incarcerated person will be allowed under Rule 30.

9           With this many attorneys, come up with a plan.

10  Mr. Mogbana knows my theory on it.  Pick either the first or

11  the last week of each month, and you say, "This is going to be

12  the Mallinckrodt week where deps are."  I don't care where.

13  Just set aside some time so that you have a block of time, and

14  that will be when your deps are, so that you are not trying to

15  figure out everybody's schedule.  You just go on to your

16  system and block it off, and then you will have your deps,

17  whatever is agreeable, first, second, third week, whatever you

18  want to do, every other week, something, just so you have some

19  consistency.  Otherwise, you are going to spend countless

20  hours and a lot of your clients' time and money scheduling

21  depositions, which is not a good use of anybody's resources.

22          So we will talk on October 10th in the afternoon

23  about what, if any, additional discovery will proceed.  If

24  there are documents that are available, that are not difficult

25  to obtain, and there is not a lot of burden, if there is an

1    FTC file somewhere in Iron Mountain, and all you have got to

2    do is pull it out, and it is relevant, that doesn't seem

3    onerous and it seems proportionate.  If it is going to involve

4    searching ten mainframes for e-mails of 12 custodians, that's

5    a different issue.  So you have got the two ends of the

6    spectrum.  So we will talk about it at that point, but

7    at least you will have the opportunity to review the 26(a)(1)

8    disclosures.  You will, too.  And so I think you will be

9    better informed on what, if any, discovery would proceed on

10   that date.  You should probably talk to each other before we

11   sit down on the 10th.  Just get the protective order on file

12   so that doesn't hold you up.

13            I'm not saying that discovery is moving forward, but

14   it is not hard.  The reason we have the model protective order

15   is to save the countless hours.  I don't know how many hours

16   we used to fight over stupid protective orders and they all

17   end up looking the same anyway.

18            MR. WATSON:  Just to clarify a point, does that mean

19   that we do not need to respond to the discovery that was

20   served, that answers are due next week?

21            THE COURT:  Correct.

22            MR. WATSON:  Thank you, your Honor.  Thank you.

23            THE COURT:  But I do want to hear about that FTC

24   case, what the documents -- what the discovery looked like in

25   that case.  To the extent that there is any overlap, this

1    Retrophin, it is a 2014 case in California -- nope -- yes, is

2    that still going on?  Is that ongoing or is it --

3          MR. WATSON:  That case is over.

4          THE COURT:  Is it settled?

5          MR. LOHMAN:  It was settled two years ago, more than

6    two years ago.

7          THE COURT:  Okay.  Okay.  So the same thing with

8    that.  I don't know what the discovery requests looked like in

9    that.  I mean, if they just went to school and took a look at

10   what was filed in that case -- I don't know if you are the

11   same counsel -- and they just went, "Wow, this is good

12   discovery," and they lobbed that over to you and you had to

13   respond to it, well, again, proportionality, maybe it is not

14   disproportionate to say, "Here you go."

15         Now, if they were or if they had those documents,

16   then they don't need to get them from you again, okay?  So we

17   will talk through those things on the 10th in the afternoon.

18         Any questions you have of me?

19         MR. FLOWERS:  The only concern I wanted to raise for

20   the court is with the 12(b)(2) motion and the issue of

21   jurisdictional discovery.  If there are positions

22   taken -- typically, I'm not going to suggest what the defense

23   counsel is going to do here, but if there is an affidavit

24   about the company's lack of contacts in Illinois, we are going

25   to want to respond to that and probably be seeking discovery

1  on those issues.

2          THE COURT:  Hold on one second.

3          MR. FLOWERS:  In the context of the briefing, which

4  is due October the 3rd.

5          THE COURT:  And then your response is on the 31st.

6  So we can talk about that on the 10th as well.

7          MR. FLOWERS:  Yep.

8          THE COURT:  Okay.

9          MR. FLOWERS:  Thank you.

10         THE COURT:  Anything from you guys?

11         MR. GORMAN:  Nothing from us, your Honor.

12         THE COURT:  All right.  Have a good day.

13    (Which were all the proceedings heard.)

14                       CERTIFICATE

15    I certify that the foregoing is a correct transcript from

16  the digital recording of proceedings in the above-entitled

17  matter to the best of my ability, given the limitations of

18  using a digital-recording system.

19

20  */s/ Heather M. Perkins-Reiva*          *August 14, 2017*

21
    Heather M. Perkins-Reiva              Date
22  Official Court Reporter

23

24

25