## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **CITY OF ROCKFORD and ACUMENT GLOBAL TECHNOLOGIES, INC.** *on behalf of themselves and all others similarly situated*, | Civil Action No.: 3:17-cv-50107 |
| Plaintiffs, | |
| v. | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| **MALLINCKRODT ARD, INC.,** *formally known as* **QUESTCOR PHARMACEUTICALS, INC.; MALLINCKRODT PLC; EXPRESS SCRIPTS HOLDING COMPANY; EXPRESS SCRIPTS, INC.; CURASCRIPT, INC.,** *doing business as* **CURASCRIPT, SD; ACCREDO HEALTH GROUP, INC.,** *and* **UNITED BIOSOURCE CORPORATION** | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

NATURE OF THE CASE ...................................................................................................1

JURISDICTION AND VENUE .........................................................................................3

PLAINTIFFS .......................................................................................................................5

DEFENDANTS ...................................................................................................................6

FACTUAL BACKGROUND ..............................................................................................9

RELEVANT MARKETS AND MONOPOLY POWER, ..................................................29

CLASS ACTION ALLEGATIONS ..................................................................................40

COUNT I
CITY OF ROCKFORD v. EXPRESS SCRIPTS
UNJUST ENRICHMENT ................................................................................................44

COUNT II
CITY OF ROCKFORD v. MALLINCKRODT
UNJUST ENRICHMENT ................................................................................................45

COUNT III
ACUMENT v. MALLINCKRODT
UNJUST ENRICHMENT ................................................................................................47

COUNT IV
PLAINTIFFS v. ALL DEFENDANTS
FRAUD .............................................................................................................................49

COUNT V
PLAINTIFFS v. ALL DEFENDANTS
CONSPIRACY TO DEFRAUD/CONCERTED ACTION ...............................................50

COUNT VI
PLAINTIFFS v. ALL DEFENDANTS
MAINTENANCE OF MONOPOLIZATION OF
THE ACTH MARKET (15 U.S.C. § 2) ...........................................................................52

COUNT VII
PLAINTIFFS v. ALL DEFENDANTS
ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE
RESTRAINT OF TRADE (15 U.S.C. § 1) ......................................................................56

i

COUNT VIII
PLAINTIFFS v. ALL DEFENDANTS
STATE ANTITRUST LAW CLAIMS .......................................................................................59

COUNT IX
PLAINTIFFS v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(c) ...........................................................................................78

COUNT X
PLAINTIFFS v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(a) ...........................................................................................85

COUNT XI
PLAINTIFFS v. ALL DEFENDANTS
Violation of 18 U.S.C. § 1962(d)) ..........................................................................................86

COUNT XII
CITY OF ROCKFORD V. EXPRESS SCRIPTS
BREACH OF CONTRACT
BREACH OF THE ESI PBM AGREEMENT ...........................................................................88

COUNT XIII
CITY OF ROCKFORD V. EXPRESS SCRIPTS
PROMISSORY ESTOPPEL.......................................................................................................89

COUNT XIV
CITY OF ROCKFORD V. EXPRESS SCRIPTS
DECLARATORY JUDGMENT THE ESI PBM AGREEMENT .................................................90

COUNT XV
CITY OF ROCKFORD V. EXPRESS SCRIPTS
BREACH OF THE IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING.......................................................................................91

PRAYER FOR RELIEF ............................................................................................................92

JURY DEMAND ......................................................................................................................93

## SECOND AMENDED CLASS ACTION COMPLAINT

The City of Rockford ("the City" or "Rockford") and Acument Global Technologies, Inc. ("Acument") (collectively the "Plaintiffs") on behalf of themselves and the Class described below, allege as follows:

## NATURE OF THE CASE

1. Plaintiffs bring this action on their own behalf and on behalf of all other government payors and private payors similarly situated, excepting those expressly excluded from the Class, to challenge an unjust, unfair, and anti-competitive scheme by Defendants, Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. ("Questcor") and its parent company, Mallinckrodt plc (collectively "Mallinckrodt") as well as Mallinckrodt's exclusive agent for the delivery of its products, Express Scripts Holding Company and Express Scripts, Inc., including their three (3) wholly-owned subsidiaries, CuraScript, Inc., doing business as CuraScript, SD., Accredo Health Group, Inc., and United BioSource Corporation (collectively referred to as "Express Scripts"). The scheme alleged herein sought to maintain and enhance Mallinckrodt's monopoly power in the U.S. market for adrenocorticotropic hormone (ACTH) drugs in violation of the antitrust laws.

2. Mallinckrodt manufactures, markets, distributes and sells H.P. Acthar, NDC No. 63004871001 ("Acthar"). Acthar is the only therapeutic ACTH product sold in the United States. Mallinckrodt is the sole provider in the U.S. of approved ACTH drugs. Thus, Mallinckrodt is a monopolist.

3. Mallinckrodt acquired its Acthar monopoly in 2001 when Questcor purchased Acthar from Aventis for $100,000. By 2014, when Mallinckrodt purchased Questcor, the value of that Acthar monopoly was $5.9 billion—the price paid for the single-product company.

1

4.      This case does not seek to challenge the lawfulness of Mallinckrodt's monopoly. It seeks to challenge the lawfulness of Mallinckrodt's exercise of its monopoly power by taking actions to maintain and enhance that monopoly power in violation of the antitrust laws.

5.      The issue is not whether Mallinckrodt possessed monopoly power for Acthar.  It is whether its actions in contracting with the agent of its leading customers, Express Scripts, and in acquiring the only competitive product in the marketplace, Synacthen, constitute unlawful efforts to retain, maintain and enhance Mallinckrodt's monopoly power over Acthar in the ACTH market.

6.      Acthar is a "specialty pharmaceutical".  It is not sold in retail pharmacies, nor is it distributed through wholesalers to retail pharmacies, as with many prescription drugs.  Instead, it is distributed only through "specialty pharmacy distributors".

7.      One of the largest specialty pharmacy distributors in America is ESI's CuraScript, which ESI has owned since 2004.  In 2007, Mallinckrodt decided to embark on a "new strategy" and it changed its distribution of Acthar.  Rather than continue to distribute Acthar to the existing distribution network available for specialty drugs, Mallinckrodt decided to limit Acthar distribution exclusively through ESI's CuraScript.  In effect, Mallinckrodt contracted with the agent of its leading customers in order to create an exclusive arrangement whereby both companies would share the financial rewards of the Acthar monopoly.

8.      Immediately after signing the exclusive agreement, Mallinckrodt and Express Scripts agreed to raise the price of Acthar from $1,980 to over $27,927.80 per vial.  As a result, Mallinckrodt was able to charge inflated prices for Acthar to Express Scripts' clients, including the Plaintiffs.

9.      In 2015, Rockford spent $489,057.84 for just nine administrations of Acthar given

2

to two infant patients at a gross cost per vial of $54,339.76.  When Mallinckrodt acquired the

Acthar monopoly from Aventis, the cost of an individual vial was just $40.00.  Just prior to

Mallinckrodt's exclusive agreement with Express Scripts, the cost of an individual Acthar vial

was $1,980.  That means the total cost to Rockford would have been less than $15,000, rather

than nearly $490,000, in the absence of the exclusive agreement.  As a result, Rockford and other

members of the Class paid more for Acthar than they otherwise would have paid in the absence

of Mallinckrodt's unlawful actions with Express Scripts to maintain and enhance its monopoly

power, and to conspire and agree with Express Scripts to defraud Rockford and the Class of

Acthar purchasers.

10.     In a 13-month period between December 2015 and December 2016, Acument

spent $894,617.75 for just 13 administrations of Acthar given to the spouse of one of Acument's

employees.

11.     For this reason, Plaintiffs bring this case on behalf of themselves and a Class of

all similarly-situated purchasers of Acthar, to obtain declaratory and injunctive relief, and to

recover money damages.  Rockford sues all Defendants for unjust enrichment, fraud, conspiracy

to defraud, federal antitrust and RICO violations, and violations of Illinois and other states' laws.

Rockford also sues Express Scripts for breach of contract, promissory estoppel, declaratory

judgment, and breach of the duty of good faith and fair dealing implied by law.  Acument sues

all Defendants for unjust enrichment, fraud, conspiracy to defraud, federal antitrust and RICO

violations, and violations of Tennessee and other states' laws.

## JURISDICTION AND VENUE

12.     Plaintiffs bring this action pursuant to sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15(a) and 26, to recover treble damages, costs of suit, and reasonable attorneys' fees

for the Defendants' violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.
This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a).

13.     This Court also has subject matter jurisdiction over this action pursuant to the
Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the Plaintiffs and members of
the Class are diverse from the Defendants and over two-thirds of the Class is situated outside of
Illinois.  Due to the exorbitant prices charged by Defendants for Acthar to the Class, the
aggregate amount in controversy far exceeds $5,000,000.

14.     Further, the Court has supplemental jurisdiction over the Plaintiffs' state common
law and statutory claims pursuant to 28 U.S.C. § 1367 because these claims arise from the same
occurrence or transaction and are related to the Plaintiffs' federal antitrust and RICO claims as to
form part of the same controversy.

15.     This Court has personal jurisdiction over the parties because the Defendants
conduct substantial business in this State, have had systematic and continuous contacts with this
State, and have agents and representatives that can be found in this State.

16.     The Court has jurisdiction over the Defendants because they have had sufficient
minimum contacts with and/or have purposefully availed themselves of the laws and markets of
the State of Illinois through, among other things, their conspiratorial communications between
themselves and with others (including telephonic and electronic communications) and their
distribution, marketing and sales of Acthar to the residents of Illinois.

17.     Furthermore, by the Express Scripts, Inc. Pharmacy Benefit Management
Agreement (hereinafter the "ESI PBM Agreement") at issue here, Express Scripts and Rockford
agreed that the ESI PBM Agreement "will be construed and governed in all respects according to
the laws in the State of Illinois, without regard to the rules of conflict of laws thereof".

18.     Venue is proper in this District pursuant to section 12 of the Clayton Act, 15 U.S.C. § 22, because the Plaintiffs are situated in this District, and the Defendants transact business in this District.  Venue is also proper because a substantial part of the events giving rise to the Plaintiffs' claims occurred in this District.  Defendants engaged in substantial conduct relevant to the claims of the Plaintiffs and the Class, and caused harm to members of the Class in this District. Venue is also proper pursuant to 28 U.S.C. §1391.

19.     Acthar is sold in interstate commerce and the unlawful activities alleged in this Second Amended Class Action Complaint have occurred in, and have had a substantial effect upon, interstate commerce.

## THE PARTIES

### PLAINTIFFS

20.     The City of Rockford, Illinois, (the "City" or "Rockford"), employs over a thousand individuals in the service of its citizens.  Two such employees have children who had a serious medical condition, for which Acthar was indicated as a treatment option.  These employees received Acthar directly from Mallinckrodt's authorized agent, Express Scripts.  The City, which pays the health care benefits of its employees, including specialty pharmacy drugs, then paid for these administrations of Acthar.  The sum total of these 9 prescriptions (14 administrations) was $489,057.84. The City paid $488,787.84 directly to Express Scripts, as agent for Mallinckrodt.  These monies were then directly transferred by Express Scripts to Mallinckrodt, after Express Scripts deducted its agreed-upon share of the revenues.

21.     Acument Global Technologies, Inc. ("Acument") employs individuals in 12 locations in the United States and Mexico, including in Belvedere, Illinois and Spencer, Tennessee.  The spouse of one of Acument's employees suffers from a condition for which

5

Acthar was indicated as a treatment option. Between December 17, 2015 and December 6, 2016, Acument paid a minimum of 80% of its employees' health care benefits, including specialty pharmacy drugs. Acument paid for the administrations of Acthar to its employee's spouse. The sum total of these administrations/prescriptions was $894,617.75 or $68,816.75 per prescription, for which Acument paid the largest share. The employee's co-pay was $2,600.00 in total.

## DEFENDANTS

22.     Questcor Pharmaceuticals, Inc. ("Questcor") was acquired by Mallinckrodt on August 14, 2014 for $5.9 billion, after paying only $100,000 for Questcor's lone product 13 years earlier. Following the acquisition, Questcor became a wholly-owned subsidiary of Mallinckrodt and its name was changed to Mallinckrodt ARD Inc. Mallinckrodt ARD is a biopharmaceutical company incorporated in California, with offices located at 675 McDonnell Blvd., Hazelwood, Missouri 63042. Mallinckrodt ARD now has locations in Hampton, New Jersey and Bedminster, New Jersey. For clarity, where necessary, the entity that existed prior to the Mallinckrodt acquisition is herein referred to as "Questcor".

23.     At the time of the Mallinckrodt acquisition, Questcor's only product sold in the United States was Acthar. As of the date of this Second Amended Class Action Complaint, Mallinckrodt continues to manufacture, distribute and sell Acthar directly to patients, exclusively through Express Scripts, by a program known as the "Acthar Support and Access Program" ("ASAP") described below.

24.     Defendant, Mallinckrodt plc ("Mallinckrodt plc"), is an Irish public limited company, with its corporate headquarters in Staines-upon-Thames, United Kingdom. Its principal executive offices are located at 3 Lotus Park, the Causeway, Staines-upon-Thames, Surrey, TW18 3 AG.

6

25.     Mallinckrodt plc, Mallinckrodt ARD and Questcor are collectively referred to as "Mallinckrodt".

26.     Defendants Express Scripts, Inc. and Express Scripts Holding Company are Delaware Corporations with their principle executive offices located at 1 Express Way, Saint Louis, Missouri 63121.  Collectively, Express Scripts, Inc. and Express Scripts Holding Company are referred to as "ESI".

27.     Defendant CuraScript, Inc., *d/b/a* CuraScript, SD, *f/k/a* CuraScript Pharmacy, Inc., ("CuraScript") is a wholly-owned subsidiary of ESI.  CuraScript was acquired by ESI in January 2004, and its operation was expanded when ESI acquired Priority Healthcare Corporation ("Priority") in October 2005.  The combined Priority and CuraScript became one of the nation's largest specialty pharmacy and distribution companies with more than $3 billion in annual revenue.

28.     CuraScript's corporate headquarters are located at 255 Technology Park, Lake Mary, Florida 32746.  This is the same address patients are required to mail any revocation of the broad authorization granted by patients to Mallinckrodt and ESI via the Acthar Start Form (attached to the Complaint, Amended Complaint and this, Second Amended Class Action Complaint as Exhibit "A").  CuraScript is Mallinckrodt's exclusive specialty pharmacy distributor for Acthar.

29.     Defendant Accredo Health Group, Inc. ("Accredo") is a wholly-owned subsidiary of ESI.  Accredo became a wholly-owned subsidiary of Medco Health Solutions, Inc. ("Medco") on August 18, 2005, months before ESI acquired Priority, and then became part of ESI when ESI acquired Medco in 2012.

30.     Accredo is a Delaware corporation with its corporate headquarters at 1640

7

Century Center Parkway, Memphis, Tennessee 38134. Accredo also has operations in Warrendale, Pennsylvania, Corona, California, Greensboro, North Carolina, Orlando, Florida, Indianapolis, Indiana, and Nashville, Tennessee.

31.     Defendant United BioSource Corporation ("UBC") is a Delaware corporation with its corporate headquarters at 920 Harvest Drive, Blue Bell, Pennsylvania 19422. When Rockford filed its initial Class Action Complaint on April 6, 2017, as well as when it filed its subsequent First Amended Class Action Complaint on October 9, 2017, UBC was a wholly-owned subsidiary of ESI. UBC was acquired by ESI in 2012 as part of the Medco merger.

32.     On November 27, 2017, ESI announced that it sold UBC to Avista Capital Partners, a private equity firm. As of the date of this filing, Plaintiffs do not know if the sale has been completed.

33.     UBC is described as Mallinckrodt's "agent" on the ASAP form (Exhibit "A" hereto) which Mallinckrodt employs exclusively to operate the ASAP program and to manage ESI's exclusive distribution, sales and reimbursement of Acthar by its 3 operating arms, CuraScript, Accredo and ESI.

34.     As stated in Paragraph 1, ESI, CuraScript, Accredo and UBC are collectively referred to herein as "Express Scripts".

35.     Mallinckrodt and Express Scripts are collectively referred to herein as "Defendants", as appropriate.

36.     The Defendants' acts alleged in this Second Amended Class Action Complaint to have been done by each of the Defendants were authorized, ordered, done and/or ratified by their respective officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of their respective business affairs.

8

## FACTUAL BACKGROUND

37.    "I have a Cadillac in my refrigerator."  That is how one Acthar patient named Sharon Keller described an unused 5-ml vial of the medication sitting in her kitchen refrigerator.

38.    The tale of how a 65 year-old brand medication could rise in price from $40 per vial in 2001, to $40,840.80 per vial by 2015, raising that value of the brand from $100,000 to $5.9 billion, is a story of perhaps the most egregious fraud and monopolistic conduct in U.S. history by a prescription drug company.

39.    The issue in this case is how Mallinckrodt achieved such a startling outcome.

### History of Acthar Development, Distribution and Pricing
### Acthar Development

40.    Acthar was approved by the Food and Drug Administration ("FDA") in 1952 for over fifty conditions, ranging from alcoholism, poison ivy, and radiation sickness to nephrotic syndrome.  Over time, with additional evidence-based requirements for prescription drugs, the list was winnowed to the fewer, present-day nineteen indications.

41.    Acthar is adrenocorticotropic hormone ("ACTH"), which causes the body to produce cortisone and other steroid hormones.  Two Mayo Clinic researchers, Drs. Philip Hench and Edward Kendall, developed the treatment, which won them the Nobel Prize for medicine at the time it was developed.  Acthar was developed by Armour Pharmaceutical Company.  As described by the Seventh Circuit in *Armour & Co. v. Wilson & Co.*, 274 F.2d 143, 145-46 (7th Cir. 1960):

> In a human being, . . . (ACTH) appears in the anterior lobe of the pituitary gland located at the base of the brain. When the human body is under stress or attacked by certain diseases, control centers in the brain excite the pituitary, and the pituitary secretes ACTH. In the blood stream the ACTH thus secreted is carried to the adrenal glands situated in the human body above the kidneys. As the ACTH hits the outer wall of the adrenal glands, it stimulates

9

the adrenals to produce a set of chemical substances such as steroids, including the hormones, cortisone and hydrocortisone.

The cortisone hormones then act in the tissues of the body to suppress inflammations and allergic reactions. ACTH thus is used to relieve such conditions as rheumatoid arthritis and allergies. ACTH does not, itself, directly attack disease. However, it stimulates the adrenals which produce more than twenty-eight steroids, and these hormones attack the diseased tissues. When the human body itself does not supply sufficient ACTH, pharmaceutical ACTH can fill the gap.

42. By the 1960s, injectable ACTH medications faced a variety of competing products. *See id.* at 145 ("Both Armour and Wilson manufacture and sell gelatin-ACTH preparations . . . . Gelatin-ACTH now constitutes more than 80% [o]f all forms of ACTH products sold by Armour and Wilson. Other companies . . . produce similar products").

43. For the majority of the drug's lifespan, however, generic corticosteroids, such as prednisone, effectively treated the majority of the indications for which Acthar was approved. That factor tended to limit the market for Acthar to treating infantile spasms ("IS") which was originally an "off-label" indication. Consequently, because of the limited, off-label market for Acthar, by 2001, the drug was priced at $40 per vial and accounted for less than a million dollars of revenue for Aventis Pharmaceuticals, Inc. ("Aventis"), the then-owner.

44. In 2001, Questcor acquired Acthar from Aventis for only $100,000, but in 2014 Mallinckrodt acquired Questcor for $5.9 billion.

45. Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS"). IS is a serious condition in infants, but one with annual patient population of less than 2,000 children per year. However, Acthar was not originally approved by the FDA to treat IS, further limiting its value. A few years later, the IS indication was approved by the FDA, and orphan drug status was granted.

**Acthar Distribution: Mallinckrodt Adopts a "New Strategy" to Restrict Acthar Distribution to Maintain and Enhance its Monopoly Power over Acthar**

46.     Acthar is a specialty pharmaceutical distributed directly to patients, like the beneficiaries of the Plaintiffs and the Class in this case.

47.     For decades, Acthar was distributed to any doctor, hospital, wholesaler or specialty pharmacy who requested the drug to treat seriously ill patients.  After Questcor acquired the rights to Acthar, it initially maintained that broad distribution network.

48.     However, on July 2, 2007, Mallinckrodt restricted its distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to just Express Scripts, the agent of its largest customers.  Mallinckrodt's announcement stated, **"[e]ffective August 1, 2001, Acthar…will be available exclusively through Specialty Pharmacy Distribution**.  Acthar Gel will no longer be available from traditional pharmaceutical wholesalers or retail pharmacies." *See* July 2, 2017, "Urgent Product Alert H.P. Acthar Gel" (attached to the Amended Complaint and this, Second Amended Complaint at Exhibit "B").  All distribution would now be done exclusively through CuraScript.  "[A]ll new Acthar Gel prescriptions should be submitted to the Acthar Support & Access Program." *Id.*  All aspects of Acthar distribution were handled by Express Scripts.

49.     The goal of this "new strategy" was to lock patients into receiving Acthar through one distribution channel controlled by Mallinckrodt and Express Scripts, and to ensure prescription distribution and payment through one source, Express Scripts.  Mallinckrodt has maintained this exclusive arrangement with Express Scripts since 2007 up through the present.  Throughout this time, title, dominion and risk for Acthar remained with Mallinckrodt.

50.     Mallinckrodt manages its exclusive arrangement with Express Scripts through a program known as the "Acthar Support & Access Program" or "ASAP."  This program is

structured so that Mallinckrodt ships Acthar directly to patients and receives payment directly from the associated third party payors.

51.     Once the patient (or their physician) contacts Mallinckrodt for a prescription of Acthar, they are directed to UBC.  Otherwise, patients and/or their providers contact UBC directly, as directed by the Acthar Start Form at Exhibit "A" hereto.  UBC then serves as the "HUB" for Mallinckrodt and Express Scripts.  It confirms the patient's insurance coverage or other source of payment, and then arranges for Acthar to be delivered directly to the patient by CuraScript.

52.     The process, which is laid out in a form provided by Mallinckrodt, the "Acthar Start Form", requires patient, physician and payor authorization before Mallinckrodt agrees to ship Acthar to patients via ESI/CuraScript.  *See* Exhibit "A" hereto.  Thus, Express Scripts is not at risk.  The Acthar Start Form consists of 3 sections: (1) a section requiring signature by the "HCP" (or health care professional); (2) a patient authorization requiring signature by the "patient or legal representative"; and (3) information form concerning Acthar indications and usage.  The required signature of the patient authorizes "Mallinckrodt and its agents" to do a number of things in relation to the prescription and distribution of Acthar.  It further authorizes Mallinckrodt and its agents, "including Mallinckrodt reimbursement support personnel and United BioSource Corporation ("UBC") or any other operator of the Acthar Support Access Program on behalf of Mallinckrodt (collectively, 'Designated Parties')" to provide Acthar and receive payment, among other things.

53.     Specifically, the patient authorizes Mallinckrodt, UBC, "or any other operator" of ASAP on behalf of Mallinckrodt, "collectively ('Designated Parties'), to provide certain services to [the patient], including reimbursement and coverage support, patient assistance and access

programs, medication shipment tracking, and home injecting training." In other words, the patient directly authorizes Mallinckrodt and its agents to ship Acthar to them directly via CuraScript, and authorizes payment by both the patient and any third party payor prior to obtaining the medication. So, the patient authorizes ESI to bill the payor for Acthar.

54.     Similarly, the physician must "authorize[ ] United BioSource Corporation ("UBC"), the current operator of the Acthar Support and Access Program ("Program"), and other designated operators of the program, to perform a preliminary assessment of benefit verification for this patient…". The physician also "agree(s) that the designated specialty pharmacy receive this prescription via a designated third party, the Program and that no additional confirmation of receipt of prescription is required by the designated specialty pharmacy."

55.     The interaction of all 4 elements of Express Scripts' functions on behalf of Mallinckrodt are described below.

56.     Express Scripts is the largest buyers' agent for pharmaceuticals in the United States. Express Scripts has substantial buying power as a result of its representation of the largest number of buyers in the pharmaceutical marketplace.

57.     Express Scripts styles itself as a "pharmacy benefit manager" or "PBM", but it does more than simply process claims for prescriptions filled at retail pharmacies. In addition to "retail pharmacy claims processing, formulary management, utilization management and home delivery pharmacy services", Express Scripts offers "specialty services that deliver . . . high-cost injectable, infused, oral or inhaled drugs," and "compliance programs, . . . drug therapy management programs, [] data analysis, and [] distribution services."[1] Acting "either directly or through its subsidiaries", Express Scripts acts as a direct pipeline from a pharmaceutical

---

[1] Express Scripts Holding Company Annual Report on Form 10-K for the Fiscal Year Ending December 31, 2012.

manufacturer to the patient, facilitating the direct distribution of a prescription drugs from the factory to the patient's home.

58.     Express Scripts is able to act as a manufacturer's direct distributor of specialty drugs to patients because it provides what it calls "integrated specialty services." (emphasis in original).[2] As one Express Scripts' executive put it "we're family." These integrated services include a PBM (ESI), a specialty pharmacy distributor (CuraScript), and a specialty pharmacy provider (Accredo).

59.     Express Scripts coordinates all of these functions through its so-called pharmaceutical support services unit, UBC. UBC acts as a "'hub,' that serves as a centralized point of contact for [] patients [] and prescribers"[3] by "[w]orking hand-in-hand with Express Scripts' specialty pharmacy and specialty distribution organizations, Accredo and CuraScript [],"[4] to coordinate delivery of and reimbursement for specialty pharmaceuticals.

60.     In total, UBC operates "an integrated service model that involves UBC . . . manag[ing] multiple system applications that support one product. [UBC's] services include the UBC coordinating center, nurse coordination . . . product fulfillment through Accredo and wholesale fulfillment through CuraScript[]. When a patient is prescribed [a specialty] medication, the doctor sends a referral to the Reimbursement Hub. [UBC's] team serves as the liaison among doctors, patients, and insurance companies as [UBC] . . . navigate[s] the coverage process. [UBC] . . . ensure[s] a smooth transition from enrollment through shipment of the medication."

61.     Part of the reimbursement hub process is coordination with ESI's CuraScript,

---

[2] https://curascriptsd.com/corporate-overview

[3] http://www.ubc.com/services/loyalty/reimbursement-patient-assistance

[4] http://www.ubc.com/about/about-ubc

which acts as an "integrated delivery network" connecting patients to manufacturers through "end-to-end distribution services."[5]  Simply put, CuraScript is similar to a FedEx, DHL, or UPS for specialty prescription drugs.  CuraScript advertises that it is "recognized by the manufacturing community as [] a reliable partner in the management of brands" through CuraScript's "integrated specialty services," which deliver medications to patients "alongside sister organizations Accredo and UBC."[6]

62.     To facilitate these end-to-end distribution services, UBC coordinates CuraScript's activities with Accredo, which provides so-called specialty pharmacy services.  By acting as the hub, UBC ensures that a patient whose pharmacy benefits are managed by ESI can get a specialty medication delivered to him or her by coordinating direct shipment through CuraScript and Accredo and direct payment through ESI.  "As one UBC executive has explained "if UBC is the Hub and Accredo is the [specialty pharmacy] . . . we can send the patient's prescription over to Accredo, and they will not have to duplicate any of our efforts, which another pharmacy would be compelled to do because of risk. Accredo trusts us."

63.     Accredo provides specialty pharmacy and related services for patients with certain complex and chronic health conditions.  Accredo's staff is comprised of a team of specialty-trained pharmacists, nurses, patient care advocates, social workers and insurance coordinators whom, among other things, "handle everything about" a patients' medications and/or specialty therapy.

64.     Along with UBC, Accredo provides: (a) support to orphan and ultra orphan patient populations; (b) HUB employees to navigate insurance requirements, like prior authorizations, for patients and prescribers; (c) clinicians who are available 24/7 to address

_____

[5] https://curascriptsd.com/Rare-Disease-Specialty-Distribution-Program

[6] https://curascriptsd.com/supplier-relations

patient concerns and provide guidance on mitigating adverse events; (d) reimbursement HUB specialists to steer patients to funding solutions, and (e) an integrated solution allowing patients to start therapy twice as fast.

65.     The Rockford patients at issue dealt with Accredo for her fulfillment of Acthar. Accredo publicly represents that by using Accredo's specialty pharmacy services, plan sponsors, like Rockford, can save money by managing their specialty spend through Accredo. Accredo further promises patients the most effective and affordable medications while ensuring appropriate utilization, manage unit costs, drive out waste and reduce related medical expenses.

66.     The Acument patient at issue dealt with CVS Caremark for their fulfillment of Acthar. It is believed, and therefore averred, that UBC coordinated the shipment of Acthar directly to the spouse of Acument's employee via the same integrated "hub" network with the lone exception being that Acument's payment was made to its PBM, CVS Caremark, before being routed to Mallinckrodt.

67.     In simple terms, through UBC's coordination with Accredo, CuraScript, and ESI, Express Scripts delivers a prescription drug directly from the manufacturer to the patient, removing all impediments to delivery and payment, whether medical, logistical or financial.

68.     With respect to Acthar, Mallinckrodt has a contract with UBC to coordinate the delivery of Acthar through what it has called the ASAP Program. Beginning with its July 2, 2007 announcement, Mallinckrodt directed physicians to prescribe Acthar through the ASAP program. *See* Exhibit "B". In this announcement, Mallinckrodt directed physicians that "all new Acthar [] prescriptions should be submitted to the [ASAP program]." Prescriptions are submitted to the ASAP program through the "Acthar Start Form." *See* Exhibit "A". This form authorizes UBC to coordinate reimbursement with ESI and direct the prescription to a

16

"designated specialty pharmacy." This designated specialty pharmacy is Accredo. Accredo

dealt with the Acument patients in 2015. Part of UBC's activities involve coordinating the

shipment of Acthar from CuraScript through Accredo to the patient. Indeed, in order to revoke

UBC's authorization to perform these services, the patient must mail a letter to CuraScript's

address in Florida. It is believed and therefore averred that Acument's patient provided a similar

authorization to UBC for shipment from CuraScript.

69.     The Acthar distribution arrangement between Express Scripts and Mallinckrodt is

illustrated in the following two figures. In Figure 1, the distribution arrangement is described in

aggregate.



**Figure 1**

70.     Figure 2, below, illustrates how Acthar is prescribed, authorized, distributed and

paid for through Express Scripts. Payment flows are represented by green arrows traveling from

payor and patient to Mallinckrodt, while product flows are represented by black chevrons

flowing from Mallinckrodt to the patient. Although these payments pass through Express

Scripts, payment flows and products flows are ultimately aligned between Mallinckrodt and UBC, Express Scripts' reimbursement hub, through a contract with Mallinckrodt to operate the ASAP program, which ostensibly operates to confirm the medical necessity of the prescription (by Accredo), to arrange payment (to ESI or CVS Caremark) for shipment (from CuraScript) of Acthar to patients. CuraScript has a contract with Mallinckrodt to ship Acthar. Through these contractual arrangements, Acthar travels from Mallinckrodt directly to the patient, and payments are channeled back to Mallinckrodt.

71.     The patient, on the other hand, has prescription insurance coverage through his or her health plan. In this case, Rockford had the health plan that covered its two employees. The health plan has a contract with ESI, which requires ESI to collect payments for the price of Acthar. Acument similarly had a contract with CVS Caremark which covered its employees and his spouse. CVS Caremark is required to collect payments for the price of Acthar.

72.     By these arrangements, Acthar product flows directly from Mallinckrodt through Express Scripts to the patient, while the money flows directly from the patient and payor through Express Scripts back to Mallinckrodt.



Figure 2

73.     Wielding both the largest collection of patients in the United States and a direct shipment channel for specialty drugs, Express Scripts is in a unique position to negotiate the most competitive, discount prices for specialty drugs in the United States.  This bargaining power has allowed Express Scripts to push back against attempts by pharmaceutical drug manufacturers to charges inflated prices for drugs above the actual market value of the drugs.

74.     Mallinckrodt leveraged and enhanced its monopoly power by limiting the distribution of its sole specialty drug to just one specialty pharmacy distributor, CuraScript, and employing as its agents, ESI's Accredo and UBC, along with CuraScript, to coordinate all aspects of the distribution and sales of Acthar: from prescription by the physician, to direct home delivery to the patient, to direct reimbursement by the payor.  This allowed Mallinckrodt to raise its prices tenfold initially, and nearly double in the ensuing years.

75.     Mallinckrodt Executive Vice-President, Steve Cartt, admitted "'[w]e did some market research,' . . . [t]alking to physicians and others about pricing 'gave us some comfort that

the [new] strategy would work, and physicians would continue to use the drug, and payers would pay' . . . . 'The reality was better than we expected.' " *See* Milt Freudenheim, *Benefit Managers Profit by Specialty Drug Rights*, New York Times, C1, April 19, 2008 (titled The Middleman's Markup in New York Print Ed.).

### Rockford's PBM Contract with Express Scripts

76.     In 2015, Rockford contracted with Express Scripts to provide pharmacy benefit services, among other things.  ESI's Vice President of its Commercial Division, David Brodsky, executed the agreement with Rockford on behalf of Express Scripts (hereinafter, the "ESI PBM Agreement").  The term of the ESI PBM Agreement was for three years, from the commencement date of January 1, 2015 and remains in force.

77.     Under the ESI PBM agreement, ESI agreed to provide Rockford the following services:

> a.   pharmacy network contracting;
>
> b.   pharmacy claims processing;
>
> c.   mail and specialty drug pharmacy;
>
> **d.   cost containment;**
>
> e.   clinical programs;
>
> f.   safety programs;
>
> g.   adherence programs, and
>
> h.   formulary and rebate administration.

These services were defined as "PBM Services" in the agreement (emphasis added).

78.     ESI bargained with Rockford to serve as Rockford's exclusive specialty pharmacy provider and distributor.  Thus, under the contract, ESI became Rockford's exclusive provider of

the above-stated PBM Services, including the supply of specialty drugs.

79.     One of the specialty medications Rockford contracted for ESI to supply exclusively was Mallinckrodt's Acthar Gel injection.  Acthar was listed as a "specialty drug" in the agreement, and was identified for use to treat "CNS disorders".  Infantile spasms is a type of CNS disorder.

80.     Rockford agreed to pay ESI certain reimbursement rates for specialty pharmacy drugs as established by ESI for each such drug.  The reimbursement rates for each drug varied from a discount of 0% to 54.25%.  For Acthar, Mallinckrodt charged Rockford at a discounted rate of 13.5% off the "average wholesale price", as set forth in the ESI PBM Agreement.  Mallinckrodt set the average wholesale prices of Acthar used by Express Scripts for reimbursement.

81.     In 2015, Mallinckrodt had Acthar shipped directly to the children of two Rockford employees (hereinafter identified as "Employee 1" and "Employee 2").  ESI then charged Rockford for the Acthar, pursuant to the terms of the ESI PBM Agreement.  Rockford paid ESI such charges.

82.     Despite its express obligation to provide "cost containment" as one of the contracted PBM Services, on April 1, 2015, ESI caused Acthar to be delivered to one of Rockford's employees and Rockford was charged $100,457.64 for the 30-day supply of Acthar.

83.     While "cost containment" is not a defined term in the ESI PBM Agreement, the plain meaning of the words denotes the act, process or means of keeping something within limits, and preventing the expansion of something.  Here, the "something" which ESI contracted to "contain" was the "cost" of specialty pharmacy drugs, like Acthar.  However, ESI charged Rockford $488,787.84 for the sale of nine Acthar prescriptions to Rockford employees.  These

charges by ESI were in breach of the obligation under the ESI PBM Agreement to provide cost containment.

84.     Because Express Scripts had entered into an exclusive arrangement with the manufacturer of Acthar for direct distribution of Acthar to patients, ESI had no incentive to fulfill its contractual obligation to obtain a lower cost for Acthar than Mallinckrodt wished to charge.  In other instances, including with other specialty pharmaceuticals covered by the ESI PBM Agreement, Express Scripts used its bargaining power to extract lower prices from the manufacturers.  One such example, described below, involved Turing's Daraprim.

**ESI and Daraprim**

85.     Turing Pharmaceuticals, LLC ("Turing") acquired the rights to Daraprim, and proceeded to increase the price 5000% from $13.50 to $750.00 per pill.  One year's course of treatment rose from $6,500 to $361,000.

86.     Strikingly, ESI employed its market power to counter Turing's action.  It worked to create an alternative that was much less expensive than Daraprim.

87.     On December 1, 2015, ESI announced that it would "partner with Imprimis Pharmaceuticals to drive access to a low-cost alternative to Daraprim." ESI, ESI Champions $1 per Pill Access to an Alternative for Daraprim, Dec. 1 2015, http://lab.express-scripts.com/lab/insights/drug-options/express-scripts-champions-1-per-pill-access-to-an-alternative-for-daraprim. In partnership with ESI, "Imprimis [] offer[ed] a compounded oral formulation of pyrimethamine and leucovorin (a form of folic acid) for as low as $1 per capsule for people whose pharmacy benefit is managed by ESI."  *Id*.  When it is in ESI's interest, it acts to "improve access and affordability."  *Id*.

88.     ESI's Chief Medical Officer, Dr. Steve Miller, stated that ESI had found a way to

deliver "a safe, high-quality and extremely cost-effective way to provide access to a Daraprim alternative." However, because of its agreement with Mallinckrodt, ESI has not served as an effective agent for pharmaceutical buyers to seek to lower the cost of Acthar, or the availability of reasonably priced alternatives.

### Acthar Pricing

89.     Mallinckrodt acquired the rights to Acthar from Aventis in 2001. At acquisition, the end payor price of a vial of Acthar was approximately $40.00. After acquisition, Mallinckrodt raised the per vial, end payor price of Acthar to approximately $748.00. From 2001 until Mallinckrodt executed its new strategy in 2007, the end payor price of Acthar grew to $1,980.00.

90.     When Mallinckrodt implemented its new strategy on August 27, 2007, the end payor price of Acthar rose to a staggering $27,922.80 – a 1,310% increase in the span of a month, and a 69,707% increase from the time Mallinckrodt acquired the drug.

91.     Until Mallinckrodt obtained FDA approval for the IS indication, the price of Acthar remained stable. However, in 2011, Mallinckrodt increased the price of Acthar 5% on January 3, 2011, another 5% on June 1, 2011, and executed a third price increase on December 27, 2011. In 2012, Acthar's end payor price was $34,150.00.

92.     Near in time to Mallinckrodt plc's $5.9 billion acquisition of Questcor, in 2014, the price of Acthar rose to $40,840.80. Under Mallinckrodt plc's stewardship, the end payor price of Acthar rose in 2016 to $42,942.60, and to $43,658.40 in 2017.

93.     Since the acquisition of Acthar in 2001, the end payor price of Acthar has grown 109,046% reflecting the precipitous rise in the value of the Acthar assets from $100,000 in 2001 to $5.9 billion in 2014 – a 5,899,900% increase in value. The dramatic increase in value of the

Acthar assets, coupled with the durable and repeated ability to raise the price of Acthar,
underscore the monopoly power wielded by Mallinckrodt in the ACTH market.  Mallinckrodt's
tactics described in this Complaint, however, reflect Mallinckrodt's willingness to undertake
actions to maintain and grow its monopoly in the ACTH market, in violation of the antitrust
laws.

### The Views of Express Scripts' Chief Medical Officer, Dr. Steve Miller, on Express Scripts' Market Power

94.     Beginning in 2007, Express Scripts became the exclusive agent of Mallinckrodt
for the distribution of Acthar.  *See* Freudenheim*, supra*.  When Mallinckrodt chose to increase
the price of this 50-plus year old medication, Express Scripts did not push back.  Instead, when
confronted with the 2007 price increase, ESI's Chief Medical Officer Steve Miller stated that
"[t]he increase was a manufacturing decision.  I can't comment on it."  *Id*.

95.     The circumstances demonstrate why Dr. Miller chose to stay silent in the face of
Express Scripts' decision to join Mallinckrodt in overcharging payors for Acthar.

96.     By the time the Plaintiffs' beneficiaries were prescribed Acthar in 2015, Express
Scripts was handling each and every aspect of Acthar distribution through the above-described
functions.  CuraScript was the exclusive specialty pharmaceutical distributor, Accredo was the
specialty pharmacy provider, and UBC coordinated both the product and money flows through
the ASAP Program.  As Mallinckrodt's exclusive agent, Express Scripts had no interest in
lowering the price for Acthar because it was making money off all aspects of its exclusive
arrangement with the manufacturer.  In other words, by helping Mallinckrodt maintain and
enhance its monopoly power in the ACTH market, Express Scripts along with Mallinckrodt
realized greater profits at the expense of payors, like Plaintiffs.

97.     In the spring of 2017, ESI's Senior Vice President, Supply Chain and Specialty

24

Pharma, Everett Neville, stated "I don't think [Acthar is] a very great [drug] – it's a pretty poor drug with a very limited need and certainly [Express Scripts Chief Medical Officer, Dr,] Steve[Miller] could comment."  He went on to say "I think [Dr. Miller] and I both would agree, and **I think everybody in our company would agree, that [Acthar] is vastly overpriced for the value**."  (emphasis added).  Mr. Neville went on to state that he "personally told [Mallinckrodt's] management team that their drug is hugely overpriced and that he "know[s] [Dr. Miller] has as well."

98.     In the same public setting, Dr. Miller stated, "[i]f you look at the data, the indications for the drug are . . . in the compendium, it's listed under a lot of indications, its real use should be very, very limited.  It's an old drug.  There's better products in the marketplace and so we're going to continue to be very vigilant in our utilization management."

99.     Despite this express acknowledgment by Express Scripts' Chief Medical Officer, in the weeks and months following Mallinckrodt's settlement with the FTC, Express Scripts has not acted or made any efforts to contain costs or provide a reasonable alternative for Acthar.

100.    Dr. Miller, Express Scripts Chief Medical Officer, has articulated the power of Express Scripts in the prescription drug marketplace to extract lower prices for its customers, using its tremendous buying power and influence.  He has made all of the following public comments:

> "When I joined the company, we represented 12 million members.  We're at 85 million today.  That gives us extraordinary sway in the marketplace. If you think about any other aspect of health care, no one else has that many lives that they can represent."[7]

---

[7] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

"We have tremendous scale, which allows us to get the best deals for our plan sponsors from both the pharmaceutical manufacturers and also the pharmacies. If any pharmacy chain ever becomes too large, we're able to move our patients and … get the lowest cost."[8]

"I think that because of the continued escalation of cost, you need a PBM now more than ever. And what a best-in-class PBM like Express Scripts does really ensure is great health outcomes and more affordable costs."[9]

"Pharma has shown that they feel very emboldened with their pricing power. We're using our clout in the marketplace to really tamp these down for our clients."[10]

"There are pharma companies that recognize this is in their best interest," he says. "They, like us, want to get to a sustainable marketplace. They know if they're overcharging for drugs that have very little efficacy, that puts them in a competitive disadvantage."[11]

"Discussions to control costs have never been more important, as recent estimates put global drug spend at $1.5 trillion by 2021, according to data from Quintiles IMS Holding. Yet sometimes, in the drug pricing debate, blame is placed on one part of the drug distribution system when, in fact, all of us – pharmaceutical companies, pharmacy benefit managers (PBMs), policymakers and payers – have a role to play in achieving better affordability and accessibility for medicine. As the largest PBM, our job is to make sure our patients, and our clients who provide them a pharmacy benefit, are getting medicines at the lowest net cost while working with

---

[8] *Business Insurance*, "Q&A: Dr. Steve Miller, Express Scripts Holding Co.," by Shelby Livingston, May 22, 2016, http://www.businessinsurance.com/article/00010101/STORY/305229991/Q&A-Dr-Steve-Miller,-Express-Scripts-Holding-Co

[9] *Managed Care Magazine Online*, "A Conversation with Steve Miller, MD: Come in and Talk With Us, Pharma," by Peter Wehrwein, April 2015, https://www.managedcaremag.com/archives/2015/4/conversation-steve-miller-md-come-and-talk-us-pharma

[10] *Nightly Business Report*, "Express Scripts Looks to Limit Drug Price Increases," by Meg Tirrell, October 2, 2015, http://nbr.com/2015/10/07/express-scripts-looks-to-limit-drug-price-increases/

[11] *Medical Marketing and Media*, "Express Scripts' Steve Miller Takes on Drug Industry in Pricing Battle," by Jaimy Lee, February 1, 2015, http://www.mmm-online.com/payersmanaged-markets/express-scripts-steve-miller-takes-on-drug-industry-in-pricing-battle/article/460559/

our industry partners to make that possible."[12]

"…[I]t is incumbent upon the pharmacy benefits managers to more forcefully illustrate the critical role we play in making medicine more affordable and accessible.  For example, we partnered with a drug maker who was willing to lower the price of its hepatitis C drug.  In doing so, we were able to provide 50,000 patients affordable access to this medication."[13]

"The biggest problem is not new expensive drugs but repricing old ones, and not just ones being purchased by Martin Shkreli or Valeant. 'You have no new research.  You have no innovation.  You have nothing but increased drug prices."[14]

"We are constantly trying to be vigilant and chase the bad actors out of the marketplace."[15]

101.    Through such statements, Express Scripts acknowledged its strong influence on pharmaceutical markets.  The striking feature of the current circumstance is that Express Scripts has not asserted its influence to effectuate lower prices for Acthar.

102.    While acknowledging the "value" of the medication does not warrant its high prices, Express Scripts has facilitated, rather than forestalled, Mallinckrodt's desire for ever growing profits by "repricing" an "old drug".

---

[12] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017,
http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110550.html

[13] *Real Clear Health*, "Is Drug Pricing at an Inflection Point?" by Dr. Steve Miller, April 14, 2017,
http://www.realclearhealth.com/articles/2017/04/14/is_drug_pricing_at_an_inflection_point_110550.html

[14] *Forbes, Pharma & Healthcare*, "Solving Pharma's Shkreli Problem," by Matthew Herper, January 20, 2016, https://www.forbes.com/sites/matthewherper/2016/01/20/solving-pharmas-shkreli-problem/#6dcce78c6be3

[15] The New York Times, "Specialty Pharmacies Say Benefit Managers Are Squeezing Them Out," by Katie Thomas, January 9, 2017,
https://www.nytimes.com/2017/01/09/business/specialty-pharmacies-say-benefit-managers-are-squeezing-them-out.html

103.    With Acthar, "[y]ou have nothing but increased drug prices," due in large part to Express Scripts' decision to withhold its market power to effectuate cost containment through lower prices.

## THE MALLINCKRODT SYNACTHEN ACQUISITION

104.    Since 2007, Acthar has represented 98% or more of Mallinckrodt's revenue. Acthar was so important to Questcor that its then-CEO, Don Bailey told investors it "is basically a single product company."

105.    Through its exorbitant price increases, Mallinckrodt was able to grow its revenue from Acthar sales from less that $1 million in 2001 to $798.9 million in 2013.  Much of this increase occurred between 2011 and 2013 when Mallinckrodt's revenues increased $218.2 million to $798.9 million.

106.    However, by 2013, Mallinckrodt had identified a competitive threat.  Novartis AG ("Novartis") had developed Synacthen Depot (cosyntropin depot) ("Synacthen"), a synthetically derived ACTH medication, which, like Acthar, could be injected intra-muscularly.  While it was used outside the United States, it was not yet approved by the FDA for use in the United States. Recognizing that the entry of Synacthen in the U.S. market for ACTH drugs would threaten its exercise of its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009.  It failed.

107.    As of 2013, Novartis agreed to sell Synacthen to Retrophin, Inc., which at the time was helmed by Mr. Shkreli.  Mr. Shkreli founded Turing (the maker of Daraprim) after he departed Retrophin.

108.    When faced with a competitive threat to its monopoly, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had

been offered by three competitors, including Retrophin. Retrophin had agreed to buy Synacthen for $16 million. Upon learning of this imminent threat, Mallinckrodt acted to protect and enhance its monopoly power by licensing Synacthen for a minimum of $135 million from Novartis. It licensed the U.S. exclusive rights to Synacthen from Novartis, not to bring this viable synthetic alternative to Acthar to market, but to eliminate the nascent competitive threat posed by an independently owned Synacthen.

109. These actions allowed Mallinckrodt to maintain and enhance its monopoly power in the ACTH market. The Synacthen acquisition had the purpose and effect of suppressing competition and allowing Mallinckrodt to continue to raise prices for Acthar, which it did.

110. From 2013 through 2017, Mallinckrodt raised the price of Acthar from $36,144 to $43,658.

## RELEVANT MARKETS AND MONOPOLY POWER, AND THE FTC COMPLAINT AGAINST MALLINCKRODT

111. The supracompetitive and exorbitant prices that Mallinckrodt charges for Acthar, and its limitations on distribution through the entry into an exclusive distribution arrangement with Express Scripts in 2007, are direct evidence of Mallinckrodt's monopoly power and actions to maintain and enhance such monopoly power, in violation of the antitrust laws. That Acthar holds a dominant share of the relevant market for ACTH drugs in the United States shows Mallinckrodt's monopoly power by indirect evidence.

112. The relevant product market is the sale of ACTH drugs, dominated by just one product, Acthar. The geographic market is the United States. In this market, Mallinckrodt is the single seller, and the third party payors are the leading buyers.

113. That market is and has been characterized by significant barriers to entry.

114. There are no medical or reasonably available substitutes for Acthar. The only

29

potential substitute was Synacthen, which Mallinckrodt purchased the rights to from Novartis in 2013, only to shelve the product rather than seek to bring it to market in the United States.

115. On January 18, 2017, the Federal Trade Commission ("FTC") sued Mallinckrodt, alleging that Mallinckrodt exercised, and continues to exercise, monopoly power in the United States in the sale of Acthar. *See generally*, Complaint for Injunctive Relief and Other Equitable Relief ("FTC Complaint") at Exhibit "B" to the original Complaint (Dkt. No. 1-2, filed 04/06/17).

116. The FTC alleged that such purchases "extinguished a nascent competitive threat to [Mallinckrodt's] monopoly." FTC Complaint, ¶ 1.

117. At all relevant times material to this case, Mallinckrodt possessed monopoly power—the ability to profitably raise price significantly above competitive levels without losing significant sales—in the relevant product market. None of the vast price increases taken by Mallinckrodt between 2007 and the present have caused a significant loss of sales. To the contrary, Mallinckrodt's sales have increased during that time.

118. Mallinckrodt has repeatedly and profitably raised Acthar's price from the time it acquired the product for $100,000 in 2001 from Aventis to the present. Mallinckrodt has been able to raise prices unchecked, as set forth above, and achieve corresponding revenue growth to more than $1 billion.

119. Mallinckrodt has encountered no competitive constraints on its ability to repeatedly increase Acthar's price and, by extension, its revenue and profit margins. Mallinckrodt does not set the price of Acthar in reference to the price of any of the other drugs that are prescribed to treat the same indications that Acthar treats. Acthar is priced significantly higher than non-ACTH drugs used to treat the same indications, except for IS.

120.     Indeed, one Mallinckrodt executive commented that the price for Acthar "was chosen by looking at the prices of other specialty drugs and estimating how much insurers and employers would be willing to bear."  Mallinckrodt took "some comfort that the strategy would work, and physicians would continue to use the drug, and payers would continue to pay."  In fact, according to Mallinckrodt, "reality was better than expected."

121.     In its Annual Report on Form 10-K for the Fiscal Year ended December 31, 2007,





| | Cumulative Total Return* | | | | | |
|---|---|---|---|---|---|---|
| | 12/02 | 12/03 | 12/04 | 12/05 | 12/06 | 12/07 |
| QUESTCOR PHARMACEUTICALS, INC. | 100.00 | 75.51 | 54.08 | 106.13 | 151.02 | 588.78 |
| AMEX COMPOSITE INDEX | 100.00 | 143.18 | 175.20 | 215.26 | 257.04 | 299.37 |
| NASDAQ PHARMACEUTICAL INDEX | 100.00 | 144.89 | 160.46 | 160.65 | 163.42 | 154.46 |

*   $100 invested on 12/31/02 in stock or index-including reinvestment of dividends. Fiscal year ended December 31.

        This stock performance graph shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended, or the Exchange Act, except as expressly set forth by specific reference in such filing.

Questcor illustrated the effect of its monopolization strategy on its "5 Year Cumulative Total Return", illustrating a 290% return between 2006 and 2007 as follows:

122.     FDA approval is required to market pharmaceuticals to U.S. consumers.  As a result, drugs sold outside of the United States are not viable competitive alternatives for U.S. consumers, even in the event of a significant price increase for ACTH drugs available in the

31

United States.

123.    Acthar has a 100% share of the market for ACTH drugs in the United States.  No other ACTH drug is FDA-approved for therapeutic use.

124.    The United States ACTH market is characterized by high barriers to entry. Developing a long-acting, depot-injection formulation of a drug product containing ACTH (natural or synthetic) that is stable, safe, and effective would require significant time, cost, and effort, with no guarantee of success. The requirements for entry include sourcing the active pharmaceutical ingredient, formulating a sustained-release depot-injection formulation, scaling production to clinical scale, and successfully conducting clinical trials necessary for FDA approval.  Mallinckrodt's former CEO Don Bailey assured investors that Acthar "has significant durability in the marketplace" because "it will be very difficult for this product to be replicated in any way [by] a generic."

125.    Former CEO Don Bailey also claimed that one of the barriers to entry is the Acthar drug formulation.  While Acthar is a biologic extraction of porcine pituitaries, Bailey claimed, "[i]t's an undisclosed composition, so that's a trade secret."  He also claimed "[t]he manufacturing process is also a trade secret.  It's complex, it's unique, and we own all elements of the manufacturing process.  …The composition of Acthar that comes out of the manufacturing process is tied to the process, so if you don't know the process you can't figure out what's actually in Acthar."

126.    If what the former CEO was saying was that Questcor enjoyed a natural monopoly, that does not necessarily imply the absence of market constraints.  These constraints can come from a new competitive product or from a dominant buyer on the other side of the market.  Both of these factors are relevant here.

### Mallinckrodt Engaged in Anticompetitive Conduct By Acquiring the Only Competitor Drug, Synacthen

127.     Synacthen posed a threat to Mallinckrodt's ACTH drug monopoly, so Questcor intervened at the time when other firms were attempting to acquire the U.S. rights to Synacthen from Novartis. Questcor submitted a bid that included substantially more guaranteed money than the other bidders had offered, effectively ending the bidding process. By acquiring Synacthen, Questcor eliminated the possibility that another firm would develop it and compete against Acthar.

128.     Synacthen constituted a nascent competitive threat to Questcor's ACTH drug monopoly, notwithstanding the uncertainty that Synacthen, a preclinical drug, would be approved by the FDA.

129.     For years, Questcor viewed Synacthen as a significant potential competitive threat to its monopoly.

130.     When Questcor first decided to pursue an "orphan drug" (*i.e.*, high) pricing model for Acthar, it recognized the potential threat Synacthen posed to Acthar's revenue growth.

131.     Nevertheless, in 2007, it adopted and pursued the above-described "new strategy", consolidating Acthar distribution to just one distributor and streamlining its control over sales and distribution through the implementation of ASAP. These functions were consolidated in one significant company, Express Scripts.

132.     In 2009, Questcor approached Novartis about acquiring Synacthen. At that time, Questcor continued to view Synacthen as a possible future competitor, especially given the increasing prices Questcor was commanding for Acthar. Unsuccessful in that initial attempt, Questcor continued to monitor the competitive threat from Synacthen.

133.     Then in 2012, Questcor again concluded that Synacthen posed a more immediate

threat to Acthar if Synacthen was approved for sale in the United States.

134. By 2013, Questcor feared that if another company were to acquire Synacthen and obtain FDA approval, it could undermine its business model.

135. On information and belief, as long as Questcor believed no other firm was seeking to bring Synacthen to the United States, Questcor did not make further attempts to acquire it. Indeed, just months before Questcor began pursuing the acquisition of Synacthen, top Questcor officials questioned whether Synacthen would provide any affirmative value to Questcor.

**Other Bidders Planned to Use Synacthen to Challenge Acthar's Monopoly**

136. Unbeknownst to Questcor at the time, Novartis decided in late 2011 to divest exclusive rights to seek FDA approval for Synacthen and commercialize it in the United States, along with the marketing rights for Synacthen in over thirty-five other countries where the drug was already approved and sold. Dozens of companies contacted Novartis and expressed interest in acquiring Synacthen. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements.

137. It is alleged that each of the three firms planned to develop Synacthen for IS and to use Synacthen to compete directly with Acthar. With this indication, each firm expected to capture a significant share of the U.S. ACTH market from Questcor by pricing Synacthen below Acthar's prices. Having the requisite pharmaceutical expertise and financing, the three firms independently conducted due diligence, crafted business plans and regulatory approval strategies, and took other affirmative steps in furtherance of developing Synacthen for the U.S. ACTH market.

## The Value of the Synacthen Assets

138.     The Synacthen assets and related rights provide a proven formulation for a long-acting, depot-injection drug containing synthetic ACTH.  The drug product manufactured using the Synacthen formulation has been safely and effectively used to treat patients suffering from IS and other conditions worldwide for decades.  The Synacthen assets would therefore facilitate commercializing a synthetic ACTH therapy in the United States.

139.     The asset package being sold by Novartis included valuable trade secrets, including technical documentation detailing both the precise formulation for the Synacthen drug product and the manufacturing process.

140.     In possession of the Synacthen assets, a buyer would not need to create a synthetic ACTH drug formulation *de novo*, nor would it need to develop from scratch the manufacturing and testing protocols necessary for production of the drug product.

## Questcor Disrupted the Synacthen Bidding Process

141.     It is alleged that, on October of 2012, Questcor learned that at least one unidentified firm was attempting to acquire Synacthen from Novartis to develop it to compete with Questcor for the U.S. ACTH market.  Questcor immediately reached out to Novartis, signed a confidentiality agreement with Novartis, and submitted a confidential offer for the purchase of Synacthen.

142.     Novartis negotiated with the three alternative bidders in parallel with Questcor. By the spring of 2013, all three of the alternative bidders had submitted offers for Synacthen, with plans to develop and launch Synacthen in the United States in direct competition with Acthar. At the point where those negotiations left off, each company exchanged deal terms with Novartis and submitted formal offers.  The offers by the three alternative bidders were

35

comparable in value and structured similarly, and included an upfront payment, milestone payments upon FDA approval, and significant royalties on U.S. sales of Synacthen.

143.    Unlike the three alternative bidders, Questcor had only incomplete plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. Retrophin ultimately prevailed in the bidding war with a bid of $16 million.

144.    However, on June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor and Novartis entered into a Licensing Agreement, Asset Purchase Agreement, and Supply Agreement (collectively, "the Agreements").  By the Agreements, Questcor gained the exclusive rights to develop, market, and sell Synacthen in the United States and over thirty-five other countries.  Under the Agreements, Questcor is obligated to pay a minimum of $135 million, and likely will pay $300 million to Novartis for Synacthen.

145.    In other words, Questcor swept in at the eleventh hour to overpay—at least 8 times more than the market had determined—for the only immediate competitive threat to its monopoly for Acthar.  Despite paying this amount, they did not seek FDA approval to bring the product to market.

**The Lawsuit Between Retrophin and Questcor for Questcor's Antitrust Violations**

146.    In January 2014, Retrophin sued Questcor for antitrust violations in the United States Federal District Court for the Central District of California.  *See* Retrophin, Inc., v. Questcor Pharmaceuticals, Inc., CV-14-00026-JLS (C.D.Cal) ("Retrophin Complaint") (attached to the Complaint and this, Second Amended Complaint at Exhibit "C"). (To the extent relevant to Plaintiff's Complaint, the averments of antitrust conduct interposed by Retrophin are incorporated by reference herein).

147.    In the Retrophin Complaint, Retrophin claimed,

> "[i]n June of 2013, plaintiff Retrophin was poised to challenge Questcor's monopoly.  It had negotiated an agreement to purchase from Novartis AG ("Novartis"), the rights to sell in the US a product called Synacthen.  ...
>
> Retrophin planned to obtain FDA approval to sell Synacthen in the US and compete head to head against Questcor by dramatically undercutting Questcor's price for Acthar.  It had negotiated and was ready to sign an agreement to purchase the US rights to Synacthen from Novartis.  The signing was scheduled for June 11, 2013.  The signing of the agreement was so imminent that a press release had been prepared to announce the deal.
>
> On June 11, 2013, the day Retrophin was to sign its agreement with Novartis, Questcor swept in and acquired the rights to Synacthen.  In doing so, it preserved and entrenched its ACTH monopoly in US and eliminated the competitive threat posed by Retrophin's acquisition of Synacthen.  There was no procompetitive aspect of Questcor's acquisition of Synacthen.

Retrophin Complaint, ¶¶ 4-6, at Exhibit "C" to the original Complaint (Dkt. No. 1-3, filed 04/07/17).

148.    The FTC apparently agreed with Retrophin's assessment.

149.    Nevertheless, the government, in its 2017 FTC complaint, mirrored Retrophin's 2014 allegations that Questcor engaged in anticompetitive conduct in violation of the antitrust laws.

150.    Mallinckrodt chose to settle the Retrophin lawsuit for $15.5 million, slightly less than the $16 million Retrophin bid to purchase Synacthen from Novartis.

### **Mallinckrodt's Acquisition of Synacthen Harmed Competition**

151.    Mallinckrodt's strategy to protect its monopoly power in the market for ACTH drugs was successful.  But for Mallinckrodt's acquisition of Synacthen, one of the three alternative bidders, including Retrophin, would have acquired Synacthen and pursued its plan to

37

develop Synacthen for IS to compete directly with Acthar at a lower price. With the acquisition of Synacthen, Mallinckrodt was able to thwart an imminent threat to its Acthar monopoly and thereby harmed competition.

152. Mallinckrodt claimed that it acquired Synacthen to develop it for new, non-Acthar indications, but given the similarities between the two drugs, any therapeutic indication that Mallinckrodt was to pursue for Synacthen could easily have been pursued for Acthar.

153. Fourteen months after acquiring Synacthen, Mallinckrodt acquired Questcor for $5.9 billion. The vast majority of Questcor's value was attributable to Acthar and Synacthen.

154. However, despite its claims, Mallinckrodt has not brought Synacthen to market for any indication. Instead, it keeps Synacthen off the market to protect its monopoly power and high prices for Acthar.

## Mallinckrodt settles with the FTC

155. On January 18, 2017, the FTC announced that Questcor and its parent Mallinckrodt agreed to pay $100 million to settle FTC charges that Questcor and Mallinckrodt violated antitrust laws when Questcor acquired the rights to Synacthen from Novartis in 2013.

156. According to FTC Chairwoman Edith Ramirez, "Questcor took advantage of its monopoly to repeatedly raise the prices of Acthar, from $40 in 2001 (when it acquired the rights to sell Acthar for $100,000) to more than $34,000 per vial today – an 85,000 percent increase."

157. The brunt of these monopoly prices was borne by self-funded payors, like Plaintiffs, located throughout the country, whose employees and beneficiaries whom were at the mercy of Mallinckrodt and treated with Acthar.

158. From the time it sought FDA approval for the treatment of IS, Mallinckrodt has raised the price of Acthar to over $43,000.

159. Questcor claimed that these exorbitant price increases were in response to demand. But its former Chief Executive Officer, Don Bailey, acknowledged in 2009 that "we only have about 800 patients a year. It's a very, very small – tiny – market." Consequently, the limited use of the product did not justify an over 58,000% price increase from acquisition until 2009.

160. Since the Acthar market for the treatment of IS was so limited, Questcor sought to expand its use. By 2012, Acthar was prescribed for Medicare recipients 3,387 times. To Medicare alone, this represented a cost of $141,500,000 in 2012.

161. Quantified another way, Dr. William Shaffer, a neurologist in Greeley, Colorado who was the highest prescriber of Acthar in 2012, wrote only 78 prescriptions for the drug, but the prescribed Acthar cost Medicare $4,000,000.

162. Acthar represented 98% or more of Questcor's sales and revenue from sales since 2007. Its manipulation of the market has resulted in a 266% increase in revenue year-over-year from 2011 to 2013. Total net sales for Questcor in 2011 were $218.2 million, $509.3 million in 2012, and $798.9 million in 2013. In each of those years, Acthar represented at least 95% of Questcor's net sales – over $1.45 billion in revenue.

163. In the words of former CEO Don Bailey "Questcor is basically a single-product company." But, by flexing its monopoly power, Questcor has been able to raise Acthar prices and increase revenue from Acthar in a "tiny market" from less than $1 million for fiscal 2001 to $799 million for fiscal 2013 - a nearly 80,000% increase. It did so in conjunction with Express Scripts.

164. Mallinckrodt's decision to exclusively contract with the agent for its largest customer to provide limited distribution for Acthar removed ESI's competitive pressure in the

39

marketplace to cause Acthar prices to be lower. Instead, by entering into an exclusive arrangement with Express Scripts, Mallinckrodt was able to enhance its monopoly power and to raise its Acthar prices above competitive prices throughout the relevant time period from 2007 through the present.

## CLASS ACTION ALLEGATIONS

165.    Plaintiffs bring this action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and other similarly-situated persons and entities, and their beneficiaries, in Illinois and throughout the country. The proposed Class includes:

> All third party payors and their beneficiaries in the United States and its Territories that paid for Acthar from August 2007 through the present.

Excluded from the above Class are: (a) Defendants and any entity in which Defendants have a controlling interest, and their legal representatives, offices, directors, assignees and successors, (b) any co-conspirators with Defendants, (c) any Medicare Advantage Organization ("MAU"), their representatives, assignors, assignees or related entities, and (d) the States of Alaska, Maryland, New York, Texas and Washington.

### *Numerosity*

166.    The proposed Class consists of potentially hundreds of public and private payors in the proposed Class located throughout Illinois and the United States, based on the fact that Mallinckrodt has sold thousands of vials of Acthar in each quarter over the last few years alone. Thus, the Class is so numerous that joinder of all of its members is impractical.

167.    Despite the size of the Class, its members are easily identifiable, as each patient was required by Defendants since 2007 to fill out an Acthar Start Form (Exhibit "A" hereto) which forms were returned to, and have been maintained by, Express Scripts and/or UBC. As a

result, the records needed to identify the members of the Class are in the hands of the Defendants.

*Typicality*

168.    Plaintiffs' claims are typical of the claims of the Class, in that the representative Plaintiffs are entities whom, like other Class Members, paid for Acthar at the inflated prices due to the unlawful conduct of the Defendants.  Plaintiffs, like all similarly-situated Class members, are damaged and sustained or continue to sustain economic injuries in the form of overcharges by the misconduct of the Defendants, because it paid higher prices than it would have paid absent Defendants' improper actions.

*Adequacy of Representation*

169.    Plaintiffs can and will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interest that conflicts with or is antagonistic to the interests of the Class.

170.    Plaintiffs are represented by counsel who are experienced and competent in the prosecution of complex actions, including antitrust, RICO and consumer fraud class actions.

*Commonality*

171.    The factual and legal bases for the Defendants' misconduct are common to Class members and represent a common thread of antitrust racketeering and consumer fraud resulting in injury to Plaintiffs and the Class.  Common questions of law and fact in this case include, but are not limited to, the following:

> a.    whether the Defendants artificially inflated the prices of Acthar;
>
> b.    whether Plaintiffs and the Class have been overcharged and thus damaged by paying artificially inflated prices for Acthar as a result of the unlawful conduct of Defendants;

c.  whether the Defendants have been unjustly enriched by their unlawful conduct;

d.  whether the Defendants defrauded Plaintiffs and the Class;

e.  whether the Defendants engaged in a conspiracy and/or concerted conduct in deceiving and defrauding Plaintiffs and the Class about Acthar and Acthar pricing, and concealing the truth about their unlawful conduct in colluding to artificially inflate the prices of Acthar;

f.  whether Defendants had a monopoly in the market for ACTH drugs;

g.  whether Mallinckrodt exercised monopoly power with respect to Acthar;

h.  whether Defendants took actions to maintain and enhance Mallinckrodt's monopoly power in the ACTH market;

i.  whether Defendants unlawfully impaired or impeded competition in the market for ACTH drugs;

j.  whether Defendants engaged in anticompetitive conduct in order to disadvantage Mallinckrodt's competitors and maintain Mallinckrodt's monopoly power in the market for ACTH drugs;

k.  the effects of Mallinckrodt's anticompetitive conduct on Acthar prices;

l.  whether Mallinckrodt formed the ASAP enterprise with Express Scripts for the purpose of carrying out the scheme to overcharge patients and payors for Acthar;

m.  whether Defendants used the U.S. mails and interstate wire facilities to carry out an unfair ASAP scheme;

n.  whether the Defendants are liable to Plaintiffs and the Class for statutory damages for conduct actionable under the Illinois Consumer Fraud and Deceptive Practices Act, and the antitrust and consumer protection laws of other states;

o.  whether Plaintiffs and members of the Class are entitled to declaratory and injunctive relief as to Defendants' conduct;

p.  whether Plaintiffs and members of the Class are entitled to compensatory damages, and, if so, the nature of such damages;

q.  whether Plaintiffs and members of the Class are entitled to statutory damages, including treble damages;

r.   the proper measure of damages; and

s.   whether Plaintiffs and members of the Class are entitled to an award of punitive damages, reasonable attorneys' fees, prejudgment interest, post-judgment interest, costs of suit, and other appropriate relief under the circumstances of this case.

*Predominance*

172.   These questions of law and fact common to the members of the Class predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive conduct in monopolizing and attempting to monopolize the ACTH drug market, and other conduct as more fully alleged herein.

*Superiority*

173.   A class action is superior to any other available method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

174.   The prosecution of separate actions by individual members of the Plaintiffs Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class.  These adjudications would establish incompatible standards of conduct for the Defendants which would, as a practical matter, be disparities of the claims of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

175.     The Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

176.     Accordingly, class certification is appropriate under Rule 23(b)(1)(A), 23(b)(1)(B), 23(b)(2) and 23(b)(3).

**COUNT I**
**CITY OF ROCKFORD v. EXPRESS SCRIPTS**
**UNJUST ENRICHMENT**

177.     Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

178.     This Count alleges unjust enrichment against Express Scripts.

179.     Rockford agreed to retain Express Script's services exclusively and in good faith and in reasonable reliance on Express Script's conduct and representations described herein.

180.     Among other things, Rockford at all times had a reasonable expectation that Express Scripts' conduct would result in affordable services, including "cost containment"  for specialty drugs like Acthar.

181.     Rockford and its beneficiaries made direct payments to Express Scripts which were valuable to Express Scripts, and Express Scripts was unjustly enriched by such direct payments, in that, the reimbursement rates charged by Express Scripts at extremely high prices with inequitable discounts were valuable and beneficial to Express Scripts.

182.     By engaging in the conduct described in this Second Amended Class Action Complaint, Express Scripts has knowingly obtained benefits from Rockford and the Class, namely grossly inflated revenue from its direct involvement in coordinating all aspects of Rockford's receipt of and payments for Acthar, under circumstances such that it would be

inequitable and unjust for Express Scripts to retain such benefits.

183.     By engaging in the unlawful conduct described herein, Express Scripts has been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market, wherein Express Scripts would use its market power to extract lower prices from Mallinckrodt, in fulfillment of its obligation to contain costs, what it could have charged if it had engaged in appropriate cost containment measures.

184.     By assisting Mallinckrodt in maintaining and enhancing its monopoly, and its exercise of monopoly power through increasing prices over a decade, and engaging in other unlawful acts and practices, Express Scripts was able to extract exorbitant revenue from Rockford and the Class beyond what it could have received in the absence of such unlawful conduct.  This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Illinois and other states and, as such, interfered with the legally protected interests of Rockford and the Class.

185.     Rockford and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Rockford demands that judgment be entered in its favor, and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT II**
**CITY OF ROCKFORD v. MALLINCKRODT**
**UNJUST ENRICHMENT**

186.     Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

187.    This Count alleges unjust enrichment against Mallinckrodt.

188.    Rockford's covered beneficiaries received direct shipments of Acthar from Mallinckrodt via its exclusive distribution mechanism established with Express Scripts.  In exchange for such Acthar, Rockford made direct payments to Express Scripts for the benefit of Mallinckrodt.  Indeed, such payments were transferred by Express Scripts to Mallinckrodt pursuant to an understanding between the two that the total amount would be forwarded to Mallinckrodt, less a certain amount previously agreed to by Mallinckrodt and Express Scripts. The amount charged by Mallinckrodt for the Acthar was the amount paid by Rockford, pursuant to its agreement with Express Scripts.

189.    The amounts paid by Rockford were valuable to Mallinckrodt and Mallinckrodt was unjustly enriched by such direct payments, in that, the reimbursement rates charged by Mallinckrodt at extremely high prices were valuable and beneficial to Mallinckrodt.

190.    By engaging in the conduct described in this Second Amended Class Action Complaint, Mallinckrodt has knowingly obtained benefits from Plaintiffs and the Class, namely grossly inflated revenue from its direct involvement in coordinating all aspects of Rockford's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for Mallinckrodt to retain such benefits.

191.    By engaging in the unlawful conduct described herein, Mallinckrodt has been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market and what it could have charged if it had engaged in appropriate cost containment measures.

192.    By maintaining and enhancing its monopoly, and its exercise of monopoly power through increasing prices over a decade, and engaging in other unlawful acts and practices,

46

Mallinckrodt was able to extract exorbitant revenue from Rockford and the Class beyond what it could have received in the absence of such unlawful conduct. This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Illinois and other states and, as such, interfered with the legally protected interests of Rockford and the Class.

193. Rockford and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Rockford demands that judgment be entered in its favor, and in favor of the Class, and against Mallinckrodt, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT III**
**ACUMENT v. MALLINCKRODT**
**UNJUST ENRICHMENT**

194. Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

195. This Count alleges unjust enrichment against Mallinckrodt.

196. Acument's covered beneficiary received direct shipments of Acthar from Mallinckrodt via CVS Caremark. In exchange for Acthar, Acument made direct payments to CVS Caremark for the benefit of Mallinckrodt. Indeed, such payments were transferred by CVS Caremark to Mallinckrodt pursuant to a likely understanding between the two that the total amount would be forwarded to Mallinckrodt, less a certain amount previously agreed to by Mallinckrodt and CVS Caremark. The amount charged by Mallinckrodt for the Acthar was the amount paid by Acument, less any applicable co-pays by the beneficiary.

197. The amounts paid by Acument were valuable to Mallinckrodt and Mallinckrodt was unjustly enriched by such payments, in that, the prices charged by Mallinckrodt at extremely high prices were valuable and beneficial to Mallinckrodt.

198. By engaging in the conduct described in this Second Amended Class Action Complaint, Mallinckrodt has knowingly obtained benefits from Plaintiffs and the Class, namely grossly inflated revenue from its coordination all aspects of Acument's receipt of and payments for Acthar, under circumstances such that it would be inequitable and unjust for Mallinckrodt to retain such benefits.

199. By engaging in the unlawful conduct described herein, Mallinckrodt has been knowingly enriched by the amount charged for Acthar over and above what it could have charged in a competitive market.

200. Mallinckrodt was able to extract exorbitant revenue from Acument and the Class beyond what it could have received in the absence of such unlawful conduct. This conduct violated the federal and state antitrust laws, federal RICO and state consumer fraud and antitrust laws, as well as the common law of Tennessee and other states and, as such, interfered with the legally protected interests of Acument and the Class.

201. Acument and each member of the Class are therefore entitled to an award of compensatory damages in an amount to be determined at trial, or the imposition of a constructive trust upon the monies derived by the Defendants by means of the above-described actions.

**WHEREFORE,** Acument demands that judgment be entered in its favor, and in favor of the Class, and against Mallinckrodt, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT IV
## PLAINTIFFS v. ALL DEFENDANTS
## <u>FRAUD</u>

202.     Plaintiffs hereby incorporate by reference the averments of the foregoing

paragraphs as if fully set forth herein and further allege as follows.

203.     Defendants' acts violate the common law against negligent misrepresentation and

fraud.

204.     In setting the prices for Acthar, which prices Plaintiffs paid, the Defendants made

material misrepresentations that those prices represented a calculation of real and fact-based

prices for their drugs, and that they represented the actual value of the product in the

marketplace.

205.     These representations were material to the transactions at hand in that Plaintiffs

and the Class used and relied upon these prices as the amount to pay and/or reimburse for

Acthar.

206.     As set forth more fully above, these prices were artificial prices, unrelated to any

actual, reasonable price in the marketplace, or actual value of Acthar, but created and

manipulated by the Defendants for the purpose of generating exorbitant revenue, thus

constituting false representations which the Defendants knew or, in the absence of recklessness,

should have known to be false.

207.     The Defendants made these false representations about the prices of Acthar with

the intent of misleading Plaintiffs and the Class into relying on the prices as real and fact-based

prices, rather than artificially inflated prices.

208.     Plaintiffs and the Class justifiably relied upon these false misrepresentations in

purchasing and/or reimbursing Acthar at the amount charged by Express Scripts and CVS

Caremark based on the price set by Mallinckrodt.

209.    Rockford's and the Class' contracts with Express Scripts all provide for "cost containment" and all provide for discounted prices for specialty drugs at varying rates, intended to reflect the efforts of Express Scripts to provide cost containment.  The prices for Acthar set forth in such contracts were prices set by Mallinckrodt and set forth by Express Scripts in its contracts.  Acument's and the Class' contracts with CVS Caremark also provide for cost containment, and the prices for Acthar in such contracts were the prices set by Mallinckrodt.  As such, all Defendants communicated these false prices directly to Plaintiffs and the Class for the Acthar sold.

210.    As a direct and proximate result of the false representations of the Defendants, as set forth above, Plaintiffs and the Class were harmed in that they were unaware of the artificial, inflated prices of Acthar, would not have paid and/or reimbursed the artificially inflated prices for Acthar had they known of the false representations and, in fact, overpaid for the Acthar because of the false representations.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

### COUNT V
### PLAINTIFFS v. ALL DEFENDANTS
### CONSPIRACY TO DEFRAUD/CONCERTED ACTION

211.    Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

212.    As set forth more fully above, beginning at least as early as 2007, the exact date being unknown to Plaintiffs, and continuing thereafter until the present, Defendants and other

unnamed co-conspirators, between and among themselves and others, entered into an agreement and/or otherwise engaged in a continuing conspiracy to defraud and deceive Plaintiffs and the Class by causing them to pay more for Acthar than they otherwise would have paid in the absence of the Defendants' conspiracy and concerted action.

213. Pursuant to the unfair and deceptive scheme to distribute, market and sell Acthar to derive substantial profits, and the conspiracy alleged herein, and in furtherance thereof, Defendants and their co-conspirators engaged in a wide range of activities, the purpose and effect of which was to deceive Plaintiffs and the Class, and acted or took substantial steps in furtherance of the conspiracy. Those acts include the following:

> a. discussing and agreeing among themselves and with their co-conspirators that they would directly control the price at which Plaintiffs and the Class paid for Acthar;
>
> b. discussing and agreeing among themselves and with their co-conspirators that they would increase the price at which Plaintiffs and the Class paid for Acthar;
>
> c. discussing and agreeing among themselves and with their co-conspirators that they would directly control the ASAP program materials and website which enrolled patients into an exclusive distribution network for the administration of Acthar, allowing Defendants to conduct their unfair pricing scheme for Acthar;
>
> d. discussing and agreeing among themselves and with their co-conspirators that they would directly control the exclusive distribution network for Acthar through the ASAP Program;
>
> e. discussing and agreeing among themselves and with their co-conspirators that they would rely on employees to promote the ASAP Program through the marketing alleged herein, and through use of the mail and the wires;
>
> f. discussing and agreeing among themselves and with their co-conspirators that they would participate in the affairs of the ASAP program by using a fraudulent scheme to market and sell Acthar at inflated prices; and
>
> g. discussing and agreeing among themselves and with their co-conspirators that they would conceal and suppress the truth about the Acthar inflated prices, the

monies earned from payors, like Plaintiffs and the Class, and their exclusive arrangement to maintain and enhance Mallinckrodt's monopoly power as alleged herein.

214.    In addition to the specific facts set forth above, it is alleged the Defendants and their co-conspirators engaged in conspiratorial meetings, among the purposes of which meetings were to discuss the importance of controlling the direct distribution, marketing, sale and administration of Acthar to Plaintiffs and the Class, and deriving substantial profits from these activities.

215.    The Defendants performed the conspiratorial acts set forth herein intending to injure payors of Acthar, like Plaintiffs and the Class, by causing them to pay inflated prices so that the Defendants could derive substantial profits.

216.    The Defendants performed the acts alleged herein in furtherance of the common plan or design for the conspiracy with intent and/or with knowledge of the injury and damage it would cause to the Plaintiffs and the Class, and with knowledge and intent to cause such injuries and/or with reckless disregard for the consequences.

217.    As a direct and proximate result of the Defendants' conspiracy as alleged herein, Plaintiffs and the Class have been injured and damaged, and the Defendants are jointly and severally liable for such injuries and damages.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT VI**
**PLAINTIFFS v. ALL DEFENDANTS**
**MAINTENANCE OF MONOPOLIZATION OF**
**THE ACTH MARKET (15 U.S.C. § 2)**

218.    Plaintiffs hereby incorporate by reference the averments of the foregoing

52

paragraphs as if fully set forth herein and further allege as follows.

219.     Mallinckrodt has, and at all relevant times, had, monopoly power in the market for the sale of ACTH drugs in the United States.  While the genesis of this monopoly power may be natural, since 2007 Mallinckrodt has acted and conspired with Express Scripts to maintain and enhance its monopoly power in the ACTH market.

220.     As described above, Acthar's value was limited because it was the "gold standard" for treating only one condition, infantile spasms ("IS").  IS is a serious condition in infants, but one with an annual patient population of less than 2,000 patients per year.  However, by 2015, Mallinckrodt was able to grow sales of Acthar to approximately $1.1 billion.

221.     In 2007, Mallinckrodt announced a "New Strategy" in order to maintain and enhance its monopoly.  This new strategy could not have succeeded without the involvement of Express Scripts as Mallinckrodt's exclusive agent.

### Anticompetitive Act 1: Restricted Distribution

222.     On July 2, 2007, Mallinckrodt decided to restrict distribution from three wholesalers, termed Wholesalers "A", "B", and "C" in its 2007 10-K, to Express Scripts.  The goal of this strategy was to lock patients into receiving Acthar through one channel and prevent a competitive product from entering the market.

223.     When Mallinckrodt began its new strategy on July 16, 2007, it established the ASAP Program.  *See* Exhibit "B". July 2, 2007 Urgent Product Alert H.P. Acthar Gel.  The ASAP Program allowed Mallinckrodt to limit its direct distribution of the drug to the patient to just one avenue, through Express Scripts.  Mallinckrodt entered an exclusive arrangement with Express Scripts to provide Acthar directly to patients, and to receive payments for Acthar directly from patients.  *See* Freudenheim, *supra.*

224. Express Scripts was Mallinckrodt's exclusive agent to operate the ASAP Program. Through ASAP, UBC facilitated all aspects of Acthar's distribution and payment as Mallinckrodt's exclusive agent. UBC's utilized Express Script's pharmacy arrangement services (Accredo), specialty drug distribution (CuraScript) and direct billing and payment (ESI) functions to allow Mallinckrodt to maintain and enhance its monopoly power in the ACTH market.

225. Mallinckrodt has willfully maintained its monopoly power in the ACTH drug market through its exclusive arrangement with Express Scripts from 2007 through 2017. Having Express Scripts as its exclusive agent, Mallinckrodt was able to raise its prices tenfold initially, and nearly double in the ensuing years.

## Anticompetitive Act 2: The Synacthen Acquisition

226. By 2013, Mallinckrodt had identified a competitive threat to its monopoly power, despite its exclusive arrangements with Express Scripts. When Novartis decided to sell Synacthen Depot to a competitor, Mallinckrodt acted to protect its monopoly. Recognizing that the entry of Synacthen to the ACTH market would threaten its monopoly power, Mallinckrodt first attempted to buy the rights to Synacthen in 2009, it was unable to do so.

227. When Novartis agreed to sell Synacthen to Retrophin in 2013, Mallinckrodt disrupted the bidding process for Synacthen by intervening at the last minute to pay multiple times what had been offered by Retrophin. Retrophin had agreed to buy Synacthen for $16 million, Mallinckrodt paid $135 million. It licensed the U.S. rights to Synacthen from Novartis, but did not bring this viable synthetic alternative to market. Instead, it acted only to eliminate the nascent competitive threat to its monopoly posed by an independently owned Synacthen.

228. This conduct contributed to Mallinckrodt's maintenance of monopoly power.

Both anticompetitive acts – the exclusive arrangement with Express Scripts and the Synacthen acquisition had the purpose and effect of suppressing rather than promoting competition in the ACTH market. Mallinckrodt was able to raise prices at will.

229.     Mallinckrodt used its enhanced monopoly power to inflate the prices of Acthar as set forth herein. Today the prices stand at over $43,000.

230.     The challenged conduct caused Plaintiffs and the Class to pay artificially inflated prices for Acthar in the ACTH drug market.

231.     There is no procompetitive justification for the conduct of Mallinckrodt and Express Scripts. Rather these two companies combined to lock Acthar into a restricted distribution model, overseen by the ASAP program, to ensure enhanced monopoly profits for both of them. The Synacthen acquisition only prevented competition, and preserved the enhanced monopoly power Mallinckrodt enjoyed due to Express Scripts' collusion.

## Plaintiffs are Direct Purchasers of Acthar Harmed by Defendants' Anti-Competitive Conduct

232.     The Plaintiffs have been directly injured in their businesses and property by reason of Mallinckrodt's unlawful monopolization in concert with Express Scripts. Plaintiffs' injuries consist of paying higher prices to purchase Acthar than they would have paid absent the conduct of Mallinckrodt and its exclusive agents, Express Scripts. Plaintiffs' injuries are the type of harm the antitrust laws were designed to prevent and flow from which makes Mallinckrodt's and Express Scripts' conduct unlawful.

233.     The product ships from Mallinckrodt's agent directly to the patient. Payments flow directly from Rockford to Express Scripts, for the benefit of Mallinckrodt, from Acument to CVS Caremark, for the benefit of Mallinckrodt. Express Scripts only deducts its agreed-upon share of Rockford's payments before forwarding them to Mallinckrodt. CVS Caremark does the

same.

234.     Plaintiffs are also direct purchasers because of the conspiracy between Express Scripts and Mallinckrodt, as Rockford and Acument are direct purchasers from co-conspirators.

235.     As described herein Defendants' acts and practices constitute monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT VII**
**PLAINTIFFS v. ALL DEFENDANTS**
**ANTI-COMPETITIVE AGREEMENTS IN UNREASONABLE**
**RESTRAINT OF TRADE (15 U.S.C. § 1)**

236.     Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

237.     As set forth above, Mallinckrodt has entered into exclusive agreements with the agent for its largest customers, Express Scripts.  These agreements preserved and extended Mallinckrodt's monopoly power, and allowed both Mallinckrodt and Express Scripts to raise the prices for Acthar to Express Scripts' clients, including Rockford.

**The Role of Express Scripts in the Specialty Drug Market**

238.     The maintenance of Mallinckrodt's monopoly over the ACTH market would not be possible without its agreement in restraint of trade with Express Scripts.

239.     Express Scripts is the largest buying agent of pharmaceuticals in the country.  It has substantial buying power as a result of its position as the largest representative of pharmaceutical purchasers.

240.     ESI has developed a consolidated network of specialty pharmaceutical

56

management, distribution and reimbursement that creates a direct pipeline between the manufacturer and the patient. Express Scripts operates a specialty pharmaceutical distributor, a specialty pharmacy, and a reimbursement HUB, all of which operate in service of the specialty drug manufacturer concomitantly with ESI's service as a pharmacy benefit manager for health plans and patients.

241.    Because ESI represents more than 80% of pharmaceutical buyers in the United States, it has the unique position to push back against high pharmaceutical prices, especially specialty drugs like Acthar. Express Scripts has demonstrated its ability to wield its market power to effectuate lower costs for high priced specialty drugs.

242.    The example of Turing's Daraprim is stark in that Express Scripts has produced a comparable drug for $1. Instead of the $750.00 per pill charged by Turing, Express Scripts charges its clients $1. Instead of one year's course of treatment costing $361,000, it costs less than $100.

### Express Scripts' Agreement with Mallinckrodt to Fix Prices for Acthar

243.    In 2007, when Express Scripts entered its exclusive arrangement with Mallinckrodt's predecessor Questor, it did not push back against Questcor's decision to raise prices. Instead, when confronted with the price increase, Dr. Miller asserted that "[t]he increase was a manufacturing decision. I can't comment on it." *Id*.

244.    There was no legitimate business justification on the part of Express Scripts to agree to charge the inflated end payor prices set by Questcor to its clients, but it so agreed.

245.    By 2015, Express Scripts contracted with Rockford to be its exclusive agent for specialty drugs, including Acthar. But, Express Scripts accepted the inflated end payor prices set by Mallinckrodt, and included them in the ESI PBM Agreement with Rockford.

246.     It is believed and therefore averred that when Acument contracted with CVS Caremark for the provision of specialty drugs, like Acthar, to its employee beneficiaries, CVS Caremark simply charged the same prices based on the prices set by Mallinckrodt in agreement with Express Scripts, as the product continued to flow directly from Express Scripts to the patients of other PBMs, like CVS Caremark.  As a result, the Mallinckrodt-ESI agreement to fix prices preserved and enhanced Mallinckrodt's monopoly power and injured payors like Acument being charged the same artificially inflated prices for Acthar.

247.     As a result, Express Scripts conspired and agreed with Mallinckrodt to fix and charge artificially inflated prices for Acthar to Express Scripts clients, like Rockford.

248.     At all relevant times, Mallinckrodt's exclusive agreements with Express Scripts assisted Mallinckrodt in: (a) effectively excluding less expensive, potentially superior competitive products from the ACTH drug market; (b) maintaining Mallinckrodt's dominant market share and monopoly power in the ACTH drug market; (c) maintaining prices at artificially high levels for Acthar; and (d) otherwise reaping the benefits of its Mallinckrodt's enhanced monopoly power.

249.     There is no procompetitive justification for the conduct of either Mallinckrodt or Express Scripts.

250.     Plaintiffs have been injured in their businesses and property by reason of the alleged collusion and conspiracy between Mallinckrodt and Express Scripts, its exclusive agent, which had the purpose and effect of raising and stabilizing inflated prices for Acthar.  Express Scripts facilitated, enabled, assisted, and furthered Mallinckrodt's substantial foreclosure and exclusion of competition and monopolization of the ACTH drug market.

251.     Plaintiffs' injuries consist of paying higher prices to purchase Acthar than they

would have paid absent the unlawful conduct of Mallinckrodt and Express Scripts. Plaintiffs'
injuries are the type the antitrust laws were designed to prevent and flow from that which makes
Defendants`' conduct unlawful.

252.     Defendants' acts and practices constitute anti-competitive agreements in
unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

**WHEREFORE,** Plaintiffs demand that judgment be entered in its favor, and their favor
of the Class, and against Defendants, in an amount to be determined at trial, including but not
limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT VIII**
**PLAINTIFFS v. ALL DEFENDANTS**
**STATE ANTITRUST LAW CLAIMS**

253.     Plaintiffs hereby incorporate by reference the averments of the foregoing
paragraphs as if fully set forth herein and further allege as follows.

254.     In the event the Court finds the Acthar purchases of either Plaintiff were indirect
as to Mallinckrodt, they remain direct as to Express Scripts, and Plaintiffs' aforesaid federal
antitrust claims may be maintained against Express Scripts. In such event, alternatively,
Plaintiffs and the Class seek relief as indirect purchasers as allowed by state and federal law.
Under federal antitrust law, as indirect purchasers, Plaintiffs and the Class are allowed to seek an
injunction against both Mallinckrodt and Express Scripts for their anticompetitive conduct.

255.     Under the statutory and decisional law of the states identified below, Plaintiffs
and the Class are also permitted to seek damages as indirect purchasers against Defendants,
including but not limited to the laws of Illinois and Tennessee where the patients covered by
Plaintiffs reside and were treated.

256.     Plaintiffs set forth the following allegations in this state law-related section such

59

that each and every allegation as to the factual basis for the violation of the law of one state, no matter where it appears, is incorporated by reference as support for the violation of the law of every state identified herein. Plaintiffs also incorporate the preceding factual allegations of antitrust conduct by the Defendants.

257. Illinois: 740 ILCS 10/7(2) authorizes any person, including municipalities, townships, and any other political subdivision to seek an injunction, damages, and reasonable attorneys fees to prevent and ameliorate the anticompetitive conducted described herein.

258. The acts and circumstances described herein demonstrate that Mallinckrodt and Express Scripts acted willfully within the meaning of 740 ILCS 10/7(2), such that Plaintiffs and the class may be awarded treble damages.

259. Rockford is a political subdivision within the meaning of 740 ILCS 10/7(2) and is therefore a person within the ambit of the statute. Acument is a corporation doing business in Illinois, and made payments for Acthar out of Illinois, and is therefore a "person" within the ambit of the Illinois law. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Illinois law, and hereby seek damages.

260. Tennessee: The Tennessee Unfair Trade Practices Act declares unlawful and void "[a]ll arrangements, contracts, agreements, trusts or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article." Tenn. Code Ann. § 47-25-101. Persons injured may recover "the full consideration or sum… for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust." Tenn. Code Ann. § 47-25-106. *In Sherwood v. Microsoft Corp.*, 2003 WL 21780975, *29 (Tenn. Ct. App. July 31, 2003), the Tennessee Court of Appeal held that indirect purchasers have standing to bring an action

under the Act to recover damages resulting from price-fixing. *See Freeman Indus. LLC v. Eastman Chem Co.*, 172 S. W.3d 512, 519 (Tenn. 2005).

261.    Tennessee municipalities and TPPs, like Acument, have standing to sue within the meaning of Tenn. Code Ann. § 47-25-106. *See Metro. Gov't of Nashville & Davidson Cnty. v. Ashland Oil, Inc.*, 535 F. Supp. 328 (M.D. Tenn. 1982).

262.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Tennessee municipalities and TPPs, like Acument, to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Tennessee municipalities and TPPs are entitled to relief under Tennessee law.

263.    Acument and the Class were injured as a result of Defendants' conduct in violation of Tennessee law, and hereby seek damages.

264.    Arizona: The Arizona Uniform Antitrust Act, A.R.S. § 44-1401, et seq., makes unlawful any "contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce" and confers standing to persons and political subdivisions as indirect purchasers to bring an action for damages, injunctive relief, and attorneys fees and costs.  A.R.S. §§ 44-1402, 1408.

265.    Plaintiffs bring this action on behalf of all third party payors ("TPP"), cities, towns, municipalities, and any other state political subdivision (collectively, "municipality") that has paid for prescriptions of Acthar.  The TPP purchasers of Acthar in Arizona have standing as a class to seek relief against Mallinckrodt and Express Scripts for their scheme to fix the price of

Acthar at supracompetitve levels and maintain Mallinckrodt's monopoly power.

266.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Arizona law, and hereby seek damages.

267.     Arkansas: The Arkansas Deceptive Trade Practices Act forbids "[d]eceptive and unconscionable trade practices." A.C.A. § 4-88-107(a). It makes illegal "any [] unconscionable, false, or deceptive act or practice in business, commerce, or trade." A.C.A. § 4-88-107(a)(10). Courts have recognized a private right of action for indirect purchasers in antitrust actions.  The improper use of economic leverage qualifies as one such unconscionable business practice.

268.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Arkansas law, and hereby seek damages.

269.     California: California's antitrust law, the Cartwright Act, prohibits combinations between two or more persons to "[a]gree in any manner to keep the price of [a product] . . . at a fixed or graduated figure," or to "[e]stablish or settle the price of any [product] . . . , so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers in the sale or transportation of [the product]." Cal. Bus. & Prof. Code § 16720(e)(2)-(3).  Price-fixing is considered a business practice that, due to its pernicious effect on competition and lack of any redeeming virtue is conclusively presumed to be unreasonable and, therefore, illegal without elaborate inquiry as to the precise harm it has caused or the business excuse for its use.

270.     California TPPs and municipalities are persons within the meaning of Section 16750 and 16702.

271.     As alleged in greater detail herein, California TPPs and municipalities suffered economic injury due to Mallinckrodt's and Express Scripts' maintenance of monopoly prices.

272.    The facts alleged herein establish that California TPPs and municipalities were injured in their property by paying exorbitant prices above what would be paid in a freely competitive market.

273.    Mallinckrodt and Express Scripts created restrictions on trade and commerce through the creation of the exclusive arrangement for Acthar.

274.    Mallinckrodt and Express Scripts agreed to raise the prices of Acthar.

275.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of California law, and hereby seek damages.

276.    Florida: The Florida Deceptive and Unfair Trade Practices Act is designed to protect "the consuming public from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce," and mandates that the act be liberally construed to promote that policy.  F.S.A. § 501.202. Florida courts have interpreted this law "as a clear statement of legislative policy to protect consumers through the authorization of [] indirect purchaser actions."  *Mack v. Bristol Meyers Squibb*, 673 So. 2d 100, 108 (Fla. 1st D.C.A. 1996).

277.    As set forth herein, Florida municipalities and TPPs act as fiduciaries for their employees who receive prescription and health benefits through the TPP or municipality .  As such, they are consumers within the meaning of Fla. Stat. § 501.203(7).

278.    As consumers, Florida TPPs and municipalities have suffered losses as a result of the anticompetitive conduct of Mallinckrodt and Express Scripts.  Therefore, Florida TPPs and municipalities may recover their actual damages and their attorneys' fees and costs.

279.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Florida law, and hereby seek damages.

280.    Hawaii: Hawaii has declared unlawful "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," including one that seeks to "f]ix, control, or maintain, the price of any commodity" or engage in activities "with the result of fixing, controlling or maintaining its price." Haw. Rev. Stat. §§ 480-4(a)-(b).

281.    In addition, Hawaii law provides that "indirect purchasers injured by an illegal overcharge shall recover [] compensatory damages, and reasonable attorney's fees."

282.    Hawaii municipalities and TPPs are persons within the meaning of Haw. Rev. Stat. § 480-1.

283.    As articulated herein, Mallinckrodt possessed monopoly power in the ACTH market. Acting in concert with Express Scripts, Mallinckrodt willfully enhanced its monopoly power by limiting the distribution of Acthar and acquiring Synacthen. This conduct allowed Mallinckrodt to set the prices for Acthar far higher than the value of the product thus injuring Hawaii municipalities and TPPs. Express Scripts agreed to charge these inflated prices to its clients. Accordingly, Hawaii municipalities and TPPs are entitled to relief under Hawaii law.

284.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Hawaii law, and hereby seek damages.

285.    Iowa: The Iowa Competition Law prohibits the "attempt to establish, maintain, or use a monopoly of trade or commerce in a relevant market for the purpose of excluding competition or of controlling, fixing or maintaining prices." Iowa Code § 553.5.

286.    Iowa Code § 553.12 authorizes any "person who is injured or threatened with injury" to sue to "[p]revent or restrain conduct. . . through injunction," to "[r]ecover actual damages resulting from" prohibited conduct, the costs of suit, and reasonable attorney fees. Iowa Code § 553.12. When the prohibited conduct is willful, a person may recover twice their

damages. Id.

287. Iowa TPPs and municipalities are persons within the meaning of Iowa Code § 553.3.

288. The facts and circumstances described herein demonstrate that Mallinckrodt and Express Scripts acted willfully in their exclusive arrangement, injuring Iowa TPPs and municipalities through the maintenance and enhancement of monopoly prices for Acthar.

289. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Iowa law, and hereby seek damages.

290. Kansas: Kan. Stat. Ann. § 50-101 outlaws any "combination of capital, skill, or acts, by two or more persons" carried out for the purpose of restricting trade or commerce; increasing or reducing the price of goods; or preventing competition. Kan. Stat. Ann. § 50-101. In addition, "all arrangements, contracts, agreements, trusts or combinations between persons, designed or which tend to advance, reduce or control the price or the cost to the producer or to the consumer of any such products or articles" are unlawful under Kansas law. Kan. Stat. Ann. § 50-112. Under Kansas law, any person who has suffered a financial loss, "regardless of whether such injured person dealt directly or indirectly with the defendant" may sue. Kan. Stat. Ann. § 50-163(d)(2).

291. As described herein, Mallinckrodt and Express Scripts entered into exclusive arrangements that raised and maintained monopoly prices for Acthar and restrained competitors from entering the ACTH market, causing Kansas municipalities and TPPs to overpay for Acthar.

292. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Kansas law, and hereby seek damages.

293. Massachusetts: Massachusetts' unfair and deceptive trade practices statute

declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws, c. 93A, § 2(a). Massachusetts law allows both consumers and participants in trade or commerce to bring claims for actual damages, multiple recovery for willful violations and attorneys' fees for a prevailing plaintiffs. *See* Mass. Gen. Laws, c. 93A, §§ 9, 11. The Massachusetts Supreme Court "read[s] the language of G.L. c. 93A as a clear statement of legislative policy to" allow indirect purchasers to seek relief for antitrust conduct. *Ciardi v. F. Hoffmann-La Roche, Ltd*., 436 Mass. 53, 66-67 (2002).

294.    Massachusetts TPPs and municipalities qualify as consumers or participants in trade in commerce within the meaning of Mass. Gen. Laws, c. 93A.

295.    Within respect to the injuries suffered by Massachusetts TPPs and municipalities only, the majority of the injurious conduct occurred within Massachusetts.

296.    As alleged in this Complaint, the facts and circumstances demonstrate that Mallinckrodt and Express Scripts acted willfully within the meaning of Mass. G.L. c. 93A entitling Massachusetts TPPs and municipalities to multiple damages for the maintenance of the Acthar monopoly through their exclusive arrangement and the Synacthen acquisition. Therefore, Massachusetts municipalities and TPPs are entitled to relief under Massachusetts law.

297.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Massachusetts law, and hereby seek damages.

298.    Michigan: The Michigan Antitrust Reform Act deems any "contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in a relevant market [] unlawful." MCLS § 445.772. In addition, it prohibits the "establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting

66

competition or controlling, fixing, or maintaining prices." MCLS § 445.773. It allows any political subdivision or person "threatened with injury or injured . . . indirectly" to seek injunctive or equitable relief, damages, interest, costs, and attorneys fees for a violation of the Act.

299. Michigan municipalities and TPPs are units of government or persons within the meaning of MCLS § 445.771.

300. Mallinckrodt and Express Scripts are persons within the meaning of MCLS § 445.771.

301. The facts and circumstances, as articulated in this complaint, demonstrate that Mallinckrodt and Express Scripts agreed to maintain and enhance Mallinckrodt's monopoly in the ACTH market through their exclusive arrangement and the Synacthen acquisition. This conduct resulted in Michigan municipalities and TPPs paying far more than they would in a competitive market for Acthar. Therefore, Michigan municipalities and TPPs are entitled to relief under the Michigan Antitrust Reform Act.

302. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Michigan law, and hereby seek damages.

303. Minnesota: Under Minnesota law, "[a] contract, combination or conspiracy between two or more persons in unreasonable restraint of trade or commerce is unlawful." Minn. Stat. § 325D.51. In addition, section 325D.53 prohibits the maintenance or use of monopoly power to affect competition or control, fixe or maintain prices. *See* Minn. Stat ¶ 325D.52. By law, "any person . . . injured directly or indirectly by a violation of [section 325D.51] shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees." Minn. Stat. § 325D.57. "Minnesota

antitrust law expressly provides damages for indirect purchasers injured by antitrust violations."
*Gordon v. Microsoft Corp.*, 2001 WL 366432, at *2 (Minn. Dist. Ct. Mar. 30, 2001); *see also,*
*Lorix v. Crompton Corp.*, 736 N.W.2d 619 (Minn. 2007).

304.    Acthar is a commodity within the meaning of Minn. Stat. § 325D.50.

305.    The exclusive arrangement between Mallinckrodt and Express Scripts represents
a contract, combination, or conspiracy within the meaning of Minn. Stat. § 325D.50.

306.    Minnesota municipalities and TPPs are persons within the meaning of Minn. Stat.
§ 325D.50 with standing to seek relief from the anticompetitive practices of Mallinckrodt and the
ESI Defendants.

307.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to
maintain the supracompetitive prices of Acthar through the ASAP Program, limiting distribution
of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to
maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused
Minnesota municipalities and TPPs to pay prices for Acthar significantly greater than in a
competitive market.  Therefore, Minnesota municipalities and TPPs are entitled to relief under
Minnesota law.

308.    Plaintiffs and the Class were injured as a result of Defendants' conduct in
violation of Minnesota law, and hereby seek damages.

309.    Mississippi: Under Mississippi law trusts are unlawful, and this includes any
"combination, contract, understanding or agreement" that would be inimical to public welfare
and the effect of which would be . . . to restraint trade", including any "increase . . .  [on] the
price of a commodity."   Miss. Code. Ann. §§ 75-21-1(a)-(c).

310.    Mississippi law allows any party injured by any aforementioned form of trust to

seek their full damages and a civil penalty of $500.00 per injury, no matter whether they are a direct or indirect purchaser. Miss. Code. Ann. § 75-21-9.  As such Mississippi municipalities and TPPs have standing to sue under Mississippi law.

311.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Mississippi municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Mississippi municipalities and TPPs are entitled to relief under Mississippi law.

312.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Mississippi law, and hereby seek damages.

313.    Nebraska:  In Nebraska, the Junkin Act prohibits any "any "contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade of commerce" in Nebraska. R.R.S. Neb. § 59-801.  The Nebraska Consumer Protection Act, in relevant part, duplicates the Junkin Act's analogues of the Sherman Act and states that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful . . . . Any contract, combination, in the form of trust or otherwise, or conspiracy in restraint of trade or commerce shall be unlawful." R.R.S. Neb. §§ 59-1602-1603. Indirect purchasers injured by price-fixing practices can sue for damages under both statutes, and recover the costs of suit and a reasonable attorney's fee. *See* R.R.S. Neb. § 59-821.

314.    Nebraska municipalities are persons within the meaning of Section 59-822 and have such have standing under the Junkin and Consumer Protection Acts.

69

315.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Nebraska municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Nebraska municipalities and TPPs are entitled to relief under Nebraska law.

316.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Nebraska law, and hereby seek damages.

317.    Nevada: Nevada has declared several categories of activities that constitute a "contract, combination or conspiracy in restraint of trade, including price fixing, which consists of raising, depressing, fixing, pegging or stabilizing the price of any commodity or service." Nev. Rev. Stat. Ann. § 598A.060.  In addition, Nevada provides a right of action and treble damage remedy for "any person injured or damaged directly or indirectly" by an antitrust violation. Nev. Rev. Stat. Ann. § 598A.210.

318.    Nevada municipalities and TPPs have standing to seek relief under Nevada law.

319.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Nevada municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Nevada municipalities and TPPs are entitled to relief under Nevada law.

320.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Nevada law, and hereby seek damages.

321.     New Mexico:  The New Mexico Antitrust Act prohibits "[e]very contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within" New Mexico.  N.M. Stat. Ann. § 57-1-1.  Additionally, the statute expressly provides that indirect purchasers who are "threatened with injury or injured" have standing to assert a claim and "may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees." N.M. Stat. Ann. § 57-1-3(A).

322.     New Mexico municipalities and TPPs have standing to sue under the New Mexico Antitrust Act.  *See City of Sunland Park v. Macias*, 75 P.3d 816 (N.M. Ct. App. 2003).

323.     As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused New Mexico municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, New Mexico municipalities and TPPs are entitled to relief under New Mexico law.

324.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of New Mexico law, and hereby seek damages.

325.     New York: New York's Donnelly Act declares that every contract, agreement, arrangement or combination" that restrains, may restrain, or has for its purpose the restraint of competition, the free exercise of any commercial activity, or the performance of a service to be

71

unlawful.  N.Y. Gen. Bus. Law § 340(1). Among other provisions, the Donnelly Act specifically

extends protection to indirect purchasers.  *See* N.Y. Gen. Bus. Law § 340(6).  The statute also

provides that a successful plaintiff "shall recover threefold the actual damages sustained

thereby," as well as costs and attorneys' fees. N.Y. Gen. Bus. Law § 340(5).

326.    New York municipalities and TPPs have standing to sue under the Donnelly Act

because they are persons or political subdivisions within the meaning of N.Y. Gen. Bus. Law §§

340(5)-(6).

327.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to

maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution

of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to

maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused

New York municipalities and TPPs to pay prices for Acthar significantly greater than in a

competitive market.  Therefore, New York municipalities and TPPs are entitled to relief under

New York law.

328.    Plaintiffs and the Class were injured as a result of Defendants' conduct in

violation of New York law, and hereby seek damages.

329.    North Carolina: North Carolina's Monopolies, Trusts, and Consumer Protection

Act, N.C. Gen. Stat. §§ 75-1, et seq., declares any "conspiracy in restraint of trade or commerce"

illegal. N.C. Gen. Stat. § 75-1. To prevail under the Act, Plaintiffs must show: (1) defendants

committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) that

plaintiff was injured thereby. *Stetser v. TAP Pharmaceutical Products, Inc*., 165 N.C. App. 1

(2004). "A trade practice is 'unfair' if it is immoral, unethical, oppressive, unscrupulous, or

substantially injurious to consumers").  The Act also provides standing for individual plaintiffs

(§ 75-16), which right was specifically extended to indirect purchasers in *Hyde v. Abbott Labs.*, 123 N.C. App. 572, 584 (1996).

330.   North Carolina municipalities and TPPs have standing as indirect purchasers.

331.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused North Carolina municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, North Carolina municipalities and TPPs are entitled to relief under North Carolina law.

332.   Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of North Carolina law, and hereby seek damages.

333.   North Dakota:  The North Dakota Antitrust Act provides that, "[a] contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in a relevant market is unlawful." N.D. Cent. Code § 51-08.1-02. The statute expressly provides a cause of action for indirect purchasers, who may obtain injunctive relief and recover damages. N.D. Cent. Code § 51-08.1-08.

334.   North Dakota municipalities and TPPs have standing as indirect purchasers within the meaning of N.D. Cent. Code § 51-08.1-08.

335.   As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused

North Dakota municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, North Dakota municipalities and TPPs are entitled to relief under North Dakota law.

336.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of North Dakota law, and hereby seek damages.

337.    Oregon: Oregon's Antitrust Law declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce". Or. Rev. Stat. Ann. § 646.725.  In addition, Oregon provides a right of action and treble damages for antitrust violation, "regardless of whether the plaintiff dealt directly or indirectly with the adverse party." Or. Rev. Stat. Ann. § 646.780(1)(a).  In addition, indirect purchasers may recover "reasonable attorney fees, expert witness fees and investigative costs."  Or. Rev. Stat. Ann. § 646.780(3)(a)-(b)(A)

338.    Oregon municipalities and TPPs fall within the meaning of political subdivision and person as articulated in Or. Rev. Stat. Ann. § 646.780(1)(a), therefore they have standing to sue regardless if they are indirect purchasers.

339.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Oregon municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Oregon municipalities and TPPs are entitled to relief under Oregon law.

340.    Plaintiffs and the Class were injured as a result of Defendants' conduct in

violation of Oregon law, and hereby seek damages.

341.     Rhode Island: Rhode Island law declares "[e]very contract, combination, or conspiracy in restraint of, or to monopolize, trade or commerce" unlawful.  R.I. Gen. Laws. Ann. § 6-36-4.  That a person "has no dealt directly with the defendant" does not "bar or otherwise limit recovery".  R.I. Gen. Laws Ann. § 6-36-12(g).  Plaintiffs may obtain an injunction recovery treble damages, costs of suit, and a reasonable attorneys fee under Rhode Island law.

342.     Rhode Island municipalities and TPPs may bring suit pursuant to section 6-36-11 because they are public bodies or persons within the meaning of section 6-36.3.  *See* R.I. Gen. Laws Ann. §§ 6-36-3, 11(a).

343.     As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Rhode Island municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Rhode Island municipalities and TPPs are entitled to relief under Rhode Island law.

344.     Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Rhode Island law, and hereby seek damages.

345.     South Dakota: The South Dakota antitrust statute declares unlawful, "[a] contract, combination, or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state S.D.C.L. § 37-1-3.1. Under the statute, any person injured directly or indirectly by an antitrust violation may sue for injunctive and equitable relief as well as to recover treble damages. S.D.C.L. §§ 37-1-14.3, 37-1-33.

346. South Dakota payors have standing to seek relief within the meaning of S.D.C.L. § 37-1-3.1.

347. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused South Dakota municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market. Therefore, South Dakota municipalities and TPPs are entitled to relief under South Dakota law.

348. Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of South Dakota law, and hereby seek damages.

349. Utah: Utah law declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce". Utah Code Ann. § 76-10-3104. Persons injured by such antitrust conduct may recover three times their damages in addition to an injunction, the costs of suit, and reasonable attorneys' fees. *See* Utah Code Ann. § 76-10-3109(1). Political subdivisions may recover actual damages in addition to in addition to injunctive relief, costs of suit, and reasonable attorney fee. *See* Utah Code Ann. § 76-10-3109(3).

350. Utah municipalities and TPPs are persons or political subdivisions within the meaning of Utah Code Ann. § 76-10-3109(1) and therefore have standing to obtain relief.

351. As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market. Further, to

76

maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Utah municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Utah municipalities and TPPs are entitled to relief under Utah law.

352.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Utah law, and hereby seek damages.

353.    Wisconsin: The Wisconsin Antitrust Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is illegal." Wis. Stat. Ann. § 133.03(1). Any person injured directly or indirectly by an antitrust violation may seek injunctive relief and recover treble damages. Wis. Stat. Ann. §§ 133.16, 133.18(1)(a).

354.    Wisconsin municipalities and TPPs are persons within the meaning of Wis. Stat. Ann. § 133.02 and therefore have standing to seek relief.

355.    As described in this Complaint, Mallinckrodt and Express Scripts agreed to maintain the supracompetitive price of Acthar through the ASAP Program, limiting distribution of the drug and stifling the ability of a competitor to enter the ACTH market.  Further, to maintain these supracompetitive prices, Mallinckrodt acquired Synacthen. This conduct caused Wisconsin municipalities and TPPs to pay prices for Acthar significantly greater than in a competitive market.  Therefore, Wisconsin municipalities and TPPs are entitled to relief under Wisconsin law.

356.    Plaintiffs and the Class were injured as a result of Defendants' conduct in violation of Wisconsin law, and hereby seek damages.

**WHEREFORE,** Plaintiffs demand that judgment be entered in its favor, and in favor of the Class, and against Defendants, in an amount to be determined at trial, including but not

limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT IX**
**PLAINTIFFS v. ALL DEFENDANTS**
**Violation of 18 U.S.C. § 1962(c)**

357.     Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows:

358.     Defendants are each "persons" within the meaning of 18 U.SC. § 1961(3), who each conducted the affairs of an association in fact enterprise affecting interstate commerce through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Plaintiffs and the members of the Class are also persons.

359.     Each Defendant violated 19 U.SC. § 1962(c) as follows:

    a.  Mallinckrodt plc.  At all times relevant hereto, Mallinckrodt plc participated in the wrongful conduct of Questcor and Express Scripts as stated herein.

    b.  Questcor.  At all times relevant hereto, Questcor committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein.  Questcor's predicate acts were not limited to the allegations stated herein.

    c.  Express Scripts Holding Company.  At all times relevant hereto, Express Scripts Holding Company committed the predicate acts of mail and wire fraud through its own acts and through the ASAP Enterprise as stated herein.  Express Scripts Holding Company's predicate acts were not limited to the allegations stated herein.

    d.  Express Scripts, Inc.  At all times relevant hereto, Express Scripts, Inc. committed the predicate acts of mail and wire fraud through its own acts and

through the ASAP Enterprise as stated herein. Express Scripts, Inc.'s

predicate acts were not limited to the allegations stated herein.

e. UBC. At all times relevant hereto, UBC committed the predicate acts of mail

and wire fraud through its own acts and through the ASAP Enterprise as

stated herein. UBC's predicate acts were not limited to the allegations stated

herein.

f. CuraScript. At all times relevant hereto, CuraScript committed the predicate

acts of mail and wire fraud through its own acts and through the ASAP

Enterprise as stated herein. CuraScript's predicate acts were not limited to the

allegations stated herein.

g. Accredo. At all times relevant hereto, Accredo committed the predicate acts

of mail and wire fraud through its own acts and through the ASAP Enterprise

as stated herein. Accredo's predicate acts were not limited to the allegations

stated herein.

360. At all relevant times, in violation of 18 U.S.C. § 1962(c), Mallinckrodt plc and

Questcor, collectively Mallinckrodt, Express Scripts Holding Company, Express Scripts, Inc.,

UBC, CuraScript, and Accredo, collectively Express Scripts, and other co-conspirators

conducted the affairs of an association-in-fact enterprise within the meaning of 18 U.S.C. §

1961(4) consisting of Mallinckrodt and Express Scripts, including their directors, employees, and

agents, which is manifested in the ASAP program (the "ASAP Enterprise").

a. The ASAP Enterprise was established to streamlined and cover-up the use of

mail and wires to commit fraud so all Defendants could unfairly and illegally

profit from the monopolistic and anti-competitive sale of Acthar.

      b.   These predicated acts of wire fraud and mail fraud occurred over the course of ten (10) years.

361.    The ASAP Enterprise was established in 2007 and is an ongoing and continuing business organization consisting of both the Defendants and individuals associated for the common purpose of illegally profiting from the distribution, marketing, selling, purchasing, and administration of Acthar to Plaintiffs and the Class, and deriving substantial profits from these activities.

362.    The ASAP Enterprise through each Defendant individually and collectively engages in and affects interstate commerce because it engages in the following activities across state boundaries: the manufacture, distribution, marketing, sale, and/or purchase of Acthar, the transmission of ASAP program literature (including the Acthar Start Form at Exhibit "A" hereto), the operating of the ASAP program website, and the transmission and/or the receipt of invoices and payments related to the prescription and use of Acthar.  Through these activities the ASAP Enterprise distributes Acthar to thousands of individual patients, including those receiving prescription drug benefits from the Plaintiffs and the Class.

363.    The ASAP Enterprise itself and through each Defendant individually and collectively functioned as a continuing unit as evidenced by the continuing coordination of activities between Mallinckrodt and Express Scripts.  There is a common communication network by which Mallinckrodt and Express Scripts shared and continue to share information on a regular basis for all times relevant to this lawsuit, but beginning at least in 2007 and continuing through the present.  Typically, this communication occurred by use of the wires and mails, in which Mallinckrodt and Express Scripts all agree to charge inflated prices for Acthar to Plaintiffs and other Class members.  These entities functioned as a continuing unit for the purposes of

implementing the fraudulent scheme to inflate the prices of Acthar by and through ASAP. When issues arose during the fraudulent scheme, each agreed to take actions to hide the scheme and to continue its existence.

364.     Mallinckrodt and Express Scripts exerted control over the ASAP Enterprise, have associations with the ASAP Enterprise, and have directly or indirectly conducted or participated in the conduct of the affairs of the ASAP Enterprise in the following ways:

        a.   Mallinckrodt establishes the prices of Acthar through fraudulent conduct;

        b.   Mallinckrodt and Express Scripts directly controlled the prices at which Plaintiffs and the Class reimburse for Acthar;

        c.   Mallinckrodt and Express Scripts directly controlled the ASAP Program materials and website which enroll patients in an exclusive distribution network for the administration of Acthar, allowing Mallinckrodt to conduct its unconscionable and unfair pricing of Acthar;

        d.   Mallinckrodt and Express Scripts directly controlled the exclusive distribution network for Acthar through the ASAP Enterprise;

        e.   Mallinckrodt and Express Scripts relied on their employees to promote the ASAP Program through the marketing alleged herein, through the mail and the wires; and

        f.   Mallinckrodt and Express Scripts participated in the affairs of the ASAP Enterprise by using a fraudulent scheme to market and sell Acthar at inflated prices.

365.     Mallinckrodt and Express Scripts conducted and participated in the affairs of the ASAP Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1345, relating to wire fraud.

366.     Mallinckrodt committed mail fraud when they utilized the mail and wires to defraud patients and purchases including Plaintiffs and the Class. Specific examples of the fraud are, included but not limited to:

        a.   Express Scripts explicitly advertised to all existing and prospective patients

and payors that the ASAP Program would benefit them providing lower and affordable sales prices;

b.  Mallinckrodt and Express Scripts misled Rockford by fraudulently stating over the internet and through the mail that Rockford and the Class would receive affordable healthcare and contained costs of Acthar;

c.  Despite its explicit promises to the contrary, Express Scripts refused to use its market strength and related bargaining power to convince Mallinckrodt to lower the price of Acthar, because Express Scripts was serving as Mallinckrodt's exclusive agent and conducting the ASAP Enterprise; and *inter alia*,

d.  Processing prescriptions via mail and the wire and receiving payments from Rockford as follows:

> i.  On April 30, 2015, Rockford paid $100,457.64 for 15 80-Unit (or 29 days of therapy) doses of Acthar;
>
> ii.  On September 10, 2015, Rockford paid $70,654.58 for 10 80-Unit (or 12 days of therapy) doses of Acthar;
>
> iii.  On September 24, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 16 days of therapy) doses of Acthar;
>
> iv.  On October 8, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 20 days of therapy) doses of Acthar;
>
> v.  On October 22, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 22 days of therapy) doses of Acthar;
>
> vi.  On October 29, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 10 days of therapy) doses of Acthar;
>
> vii.  On November 12, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 10 days of therapy) doses of Acthar;
>
> viii.  On November 19, 2015, Rockford paid $35,327.29 for 5 80-Unit (or 10 days of therapy) doses of Acthar and
>
> ix.  On December 3, 2015, Rockford paid $105,981.88 for 15 80-Unit (or 30 days of therapy) doses of Acthar.

f.  Processing prescriptions via mail and the wire and receiving payments from Acument as follows:

i. On December 17, 2015, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

ii. On January 4, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

iii. On January 21, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

iv. On February 18, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

v. On March 14, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

vi. On April 7, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

vii. On April 26, 2016, Acument paid $68,616.75 for 5 80-Unit (or 22 days of therapy) doses of Acthar;

viii. On May 24, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

ix. On June 15, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

x. On July 11, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

xi. On August 9, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar;

xii. On November 2, 2016, Acument paid $68,616.75 for 10 80-Unit (or 22 days of therapy) doses of Acthar and

xiii. On December 6, 2016, Acument paid $68,616.75 for 10  80-Unit (or 22 days of therapy) doses of Acthar.

367.    Defendants' pattern of racketeering activity likely involved hundreds, if not thousands, of separate instances of the use of the United States mail, private shipping services, facsimiles, or interstate wires, including the internet, in furtherance of its fraudulent and unlawful scheme.  Each of these fraudulent mailing and interstate wire transmissions separately constitutes

a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Mallinckrodt and Express Scripts intended to defraud Plaintiffs and members of the Class.

368. Each of these payments were made by electronic transfer from Rockford to Express Scripts in St. Louis, Missouri, or from Acument via CVS Caremark to Express Scripts.

369. By conducting the ASAP Enterprise via the fraudulent activities stated herein through the mail and wires, the Defendants both individually and collectively engaged in a repeated, fraudulent, and unlawful course of conduct constituting a pattern of racketeering.

370. Defendants' pattern of racketeering activity likely involved hundreds, if not thousands, of separate instances of the use of the United States mail, private shipping services, facsimiles, or interstate wires, including the internet, in furtherance of its fraudulent and unlawful scheme. Thousands of ASAP forms, like the one attached hereto as Exhibit "A" were transmitted via facsimile to Express Scripts offices in multiple states. Thousands more phone calls were conducted between physicians and patients with Express Scripts, as directed by the ASAP form (Ex. A). Each of these fraudulent mailing and interstate wire transmissions separately constitutes a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) in which the Mallinckrodt and Express Scripts intended to defraud Plaintiffs and members of the Class.

371. Mallinckrodt's and Express Scripts' violations and pattern of racketeering activity directly and proximately caused Plaintiffs harm insofar as Rockford paid $488,787.84 and Acument paid $894,617.75 in inflated reimbursements and other payments for Acthar.

84

372.    Likewise the Class is harmed by Mallinckrodt's and Express Scripts' violations and pattern of racketeering activity by making similar inflated payments for Acthar.

373.    By virtue of these violations of 18 U.S.C. § 1962(c), Mallinckrodt and Express Scripts are jointly and severally liable to Plaintiffs and the Class for three times the damages Plaintiffs and the Class have sustained, plus the costs of this suit, including reasonable attorneys fees.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Mallinckrodt and Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## COUNT X
## PLAINTIFFS v. ALL DEFENDANTS
## Violation of 18 U.S.C. § 1962(a)

374.    Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

375.    Throughout the Class Period, Defendants have violated the RICO statute by using and investing income that was derived from a pattern of racketeering activity as described herein. This income was used to acquire, establish, and/or operate the ASAP Enterprise in and affecting interstate commerce.

376.    The enterprise at issue is an association-in-fact within the meaning of 18 U.S.C. § 1961(4) consisting of Mallinckrodt and Express Scripts, including their directors, employees, and agents, which is manifested in the ASAP program (the "ASAP Enterprise"). The ASAP Enterprise is an ongoing and continuing business organization consisting of both corporations and individuals associated for the common purpose of selling, purchasing, and administering

Acthar to Plaintiffs and their individual participants, and deriving profits from these activities. Defendants engaged in a pattern of racketeering activity described in greater detail herein.

377.     Plaintiffs and members of the Class have been directly and proximately injured in their property by the Defendants' use and investment of the racketeering income in the acquisition, establishment, and operation of the ASAP Enterprise.  The injury to Plaintiffs and the Class' businesses or property stemming from these violations has been realized by the over-payment for Acthar.

378.     The use and investment of racketeering income by Mallinckrodt and Express Scripts directly and proximately injured the Plaintiffs and the Class in a manner than was distinct from the injury caused by the pattern of racketeering activity described herein.

379.     By virtue of these violations of 18 U.S.C. § 1962(a), Defendants are jointly and severally liable to Plaintiffs and the Class for three times the damages Plaintiffs and the Class have sustained, plus the costs of this suit, including reasonable attorneys fees.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT XI**
**PLAINTIFFS v. ALL DEFENDANTS**
 Violation of 18 U.S.C. § 1962(d))

380.     Plaintiffs hereby incorporate by reference the averments of the foregoing paragraphs as if fully set forth herein and further allege as follows.

381.     Mallinckrodt and Express Scripts violated 18 USC § 1962(d) by conspiring to associate with a racketeering enterprise, in violation of 18 U.S.C. § 1962(c).  Mallinckrodt

explicitly contracted with Express Scripts to have Express Scripts serve as Mallinckrodt's exclusive agent in the conduct of the ASAP Program and the ASAP Enterprise, and conspired with Express Scripts to inflate the prices and limit distribution of Acthar in violation of § 1962(c).

382.    Mallinckrodt and Express Scripts knew and adopted the criminal purpose of the ASAP Enterprise.  Mallinckrodt communications reflect an express illegal agreement between Mallinckrodt and Express Scripts to limit the distribution of Acthar in order to charge inflated prices.

383.    Additionally, Mallinckrodt's conduct in sending e-mails, faxes and other communications to Express Scripts to direct the exclusive distribution, sale and reimbursement of Acthar through ASAP is consistent with the existence of an agreement to carry out the scheme to inflate prices and maximize profits.  Express Scripts, in turn, communicated Mallinckrodt's inflated prices to its clients, including Rockford, in its contract schedules and subsequent invoices for Acthar.  These same prices were communicated to the other PBMs, like CVS Caremark, for inclusion in their contracts with payors, like Acument.

384.    Mallinckrodt and Express Scripts actively furthered the goals of the ASAP Enterprise to defraud end payors, like the Plaintiffs.  Mallinckrodt changed its distribution scheme with Acthar with the intention that the changes would affect the prices of Acthar; it engaged in frequent discussions with all other Defendants about its plan to raise Acthar prices in the marketplace; it made requests that Express Scripts change the Acthar prices charged to its clients in conjunction with its price increases; and it publicly boasted about the effects of the scheme without disclosing its details.

385.    Plaintiffs and other members of the Class have been injured in their business or

87

property because they have paid thousands of dollars in overpayments that they would not have made had Defendants not conspired to engage in racketeering activity.

386.     As co-conspirators, Mallinckrodt plc, Questcor, Express Scripts Holding Company, Express Scripts, Inc., UBC, CuraScript, and Accredo are jointly and severally liable for all damage that occurred as a result of both their actions and those of Mallinckrodt plc, Questcor, Express Scripts Holding Company, Express Scripts, Inc., UBC, CuraScript, and Accredo, respectively, in furtherance of the conspiracy to raise prices of Acthar.  All Defendants are liable for all damages arising from Mallinckrodt plc's, Questcor's, Express Scripts Holding Company, Express Scripts, Inc., UBC's, CuraScript's, and Accredo's respective conduct in furtherance of the scheme.

387.     Under the provisions of Section 1964(c) of RICO, Mallinckrodt plc, Questcor, Express Scripts Holding Company, Express Scripts, Inc., UBC, CuraScript, and Accredo are jointly and severally liable to Plaintiffs for three times the damages that Plaintiffs have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

**WHEREFORE,** Plaintiffs demand that judgment be entered in their favor, and in favor of the Class, and against Mallinckrodt and Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

### COUNT XII
### CITY OF ROCKFORD V. EXPRESS SCRIPTS
### BREACH OF CONTRACT
### BREACH OF THE ESI PBM AGREEMENT

388.     Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

389.     This Count alleges breach of the ESI PBM Agreement against Express Scripts.

390.    By its representations, manifestations of assent, customs and practices, ESI is bound to and by the terms of the ESI PBM Agreement.

391.    By the foregoing conduct, specifically ESI's failure to provide "cost containment" services either through nonfeasance or malfeasance, ESI breached the ESI PBM Agreement, repudiated its obligations under the ESI PBM Agreement, and is in default of the ESI PBM Agreement.

392.    Rockford performed and met all of its obligations under the ESI PBM Agreement to date and has a right to and is entitled to all remedies ascribed to it under the ESI PBM Agreement and Illinois law.

393.    Rockford has been damaged as a direct and proximate result of ESI's failure to perform under the terms of the ESI PBM Agreement.

**WHEREFORE,** Rockford demands that judgment be entered in its favor, and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT XIII**
**CITY OF ROCKFORD V. EXPRESS SCRIPTS**
**PROMISSORY ESTOPPEL**

394.    Rockford hereby incorporates by reference the preceding and following paragraphs hereof as if fully set forth herein.

395.    This Count alleges promissory estoppel against Express Scripts. It charges that ESI's conduct described above constitutes a promise to perform under the terms of the ESI PBM Agreement; and a promise upon which Rockford relied upon to its detriment.

396.    Rockford seeks enforcement of ESI's promise to continue with ESI's obligations under the ESI PBM Agreement.

397. ESI utterly refused and failed to fulfill its representations and promises concerning the terms and obligations under the ESI PBM Agreement, including the promise of cost containment with respect to Acthar.

398. Rockford relied on the conduct described above and in justifiable reliance thereon, and as a direct and proximate result of its reliance thereon, Rockford has been damaged.

399. Injustice can be avoided only by enforcing ESI's representations and promises concerning the expectations that it created regarding ESI's obligations under the ESI PBM Agreement, and awarding Rockford damages based on ESI's failure to fulfill its representations and promises.

**WHEREFORE,** Rockford demands that judgment be entered in its favor and in favor of the Class, and against Express Scripts, in an amount to be determined at trial, including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

**COUNT XIV**
**CITY OF ROCKFORD V. EXPRESS SCRIPTS**
**DECLARATORY JUDGMENT**
**THE ESI PBM AGREEMENT**

400. Rockford hereby incorporates by reference the preceding and following paragraphs hereof as if fully set forth herein.

401. This Count seeks declaratory judgment under 28 U.S.C. §§2201 and 2202, because an actual, present and substantial controversy exists between Rockford and Express Scripts concerning the ESI PBM Agreement, and Rockford's entitlement to continue to receive the benefit of its bargain with Express Scripts in the ESI PBM Agreement.

402. Rockford is statutorily entitled to declarations of its rights, status or relations.

403. WHEREFORE, Rockford demands that judgment be entered in its favor, and in favor of the Class, declaring that:

90

a.    ESI has repudiated its obligations to perform under the ESI PBM Agreement and is therefore in default of the ESI PBM Agreement; and

b.    ESI is estopped from denying its obligations to comply with the provisions of the ESI PBM Agreement.

**COUNT XV**
**CITY OF ROCKFORD V. EXPRESS SCRIPTS**
**BREACH OF THE IMPLIED COVENANT OF**
**GOOD FAITH AND FAIR DEALING**

404.    Rockford hereby incorporates by reference the averments of the foregoing paragraphs as if fully set forth herein and further alleges as follows.

405.    The general duty of good faith and fair dealing in the performance of a contract is found in the Restatement (Second) of Contracts, Section 205, which provides that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

406.    In Illinois and other states, the duty of good faith is defined as honesty in fact in the conduct or transaction concerned.

407.    The duty to perform contractual obligations in good faith applies to the ESI PBM Agreement and requires ESI to use its best efforts to fulfill its promise to provide "cost containment" services.

408.    By failing to provide "cost containment" services and costing Rockford $488,787.64 for 9 prescriptions of Acthar over the course of 8 months, ESI breached the covenant of good faith and fair dealing.

409.    ESI's breach of the covenant of good faith and fair dealing was the direct and proximate result of injury and damages to Rockford.

**WHEREFORE,** Rockford demands that judgment be entered in its favor and in favor of the Class, and against Mallinckrodt and Express Scripts, in an amount to be determined at trial,

including but not limited to costs, attorneys' fees, and such other relief deemed just and appropriate by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class request the Court to enter the following relief:

a. Certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and denominate Plaintiffs as an adequate representative for the Class and their undersigned counsel as counsel for the Class;

b. Declare unlawful the acts and practices alleged herein, enjoin the Defendants from committing the acts alleged herein, and restore the status quo before the unlawful conduct took place;

c. Enter judgment against all Defendants for the violations alleged herein;

d. Award the actual damages incurred by Plaintiffs and the members of the Class as a result of the wrongful acts complained of, along with pre-judgment and post-judgment interest at the maximum rate allowed by law;

e. Award statutory damages set forth herein under the statutory claims alleged;

f. Award treble damages or multiple damages by operation of law;

g. Award punitive damages;

h. Award Plaintiffs the costs of this action, including reasonable attorneys' fees, and, where applicable, expert fees; and

i. Award such other and further relief as the Court may deem just and appropriate.

## **JURY DEMAND**

Plaintiffs and the Class demand a trial by jury of all issues so triable in this cause.

Respectfully submitted,

By:    */s/ Donald E. Haviland, Jr.*
Donald E. Haviland, Jr.
*haviland@havilandhughes.com*
William H. Platt, II
*platt@havilandhughes.com*
Haviland Hughes
201 South Maple Avenue
Suite 110
Ambler, PA 19002
Phone: (215) 609-4661
Fax:    (215) 392-4400

Peter J. Flowers, Esquire
(IL Attorney ID No. 06210847)
*pjf@meyers-flowers.com*
Meyers & Flowers, LLC
3 North Second Street, Suite 300
St. Charles, IL 60174
Ph: (630) 232-6333
Fax: (630) 845-8982

Kerry F. Partridge, Esquire
City Attorney
*kerry.partridge@rockfordil.gov*
425 East State Street
Rockford, IL 61104-1068
Ph: (779) 348-7154
Fax: (815) 967-6949

*Attorneys for Plaintiffs and the Class*

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2017, a true and correct copy of the foregoing

Second Amended Class Action Complaint was electronically filed with the Clerk of Court using

the CM/ECF system, which will send notification of such filing to all counsel of record.


_s/ Donald E. Haviland, Jr._