## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| CITY OF ROCKFORD, et al., | Case No. 3:17-cv-50107 |
| Plaintiffs, | Hon. Frederick J. Kapala, Judge |
| v. | |
| MALLINCKRODT ARD, INC., et al., | Hon. Iain D. Johnston, Magistrate Judge |
| Defendants. | Oral Argument Requested |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS EXPRESS SCRIPTS HOLDING COMPANY'S, EXPRESS SCRIPTS, INC.'S, CURASCRIPT, INC.'S, ACCREDO HEALTH GROUP, INC.'S, AND UNITED BIOSOURCE CORPORATION'S MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

FACTUAL ALLEGATIONS .............................................................................................4

    A.    Mallinckrodt's Alleged Monopoly in the Purported Market for ACTH
          Drugs..............................................................................................................4

    B.    Questcor's Acquisition of Synacthen..........................................................5

    C.    The Services Provided By CuraScript, Accredo, and UBC.........................6

    D.    ESI Is Rockford's Pharmacy Benefit Manager...........................................7

    E.    CVS Caremark Is Acument's Pharmacy Benefit Manager.........................8

ARGUMENT ......................................................................................................................8

I.     THE ANTITRUST CLAIMS (COUNTS VI-VIII) AGAINST THE EXPRESS
      SCRIPTS ENTITIES SHOULD BE DISMISSED................................................9

    A.    Plaintiffs Do Not Plausibly Allege That the Agreements Related to the
          Distribution of Acthar Have Harmed Competition....................................9

    B.    Plaintiffs Do Not Plausibly Allege That ESI and Mallinckrodt Conspired
          To Fix Prices for Acthar ...........................................................................13

    C.    Acument Does Not Have Standing To Seek Damages Under Federal
          Antitrust Law...........................................................................................15

    D.    Plaintiffs Also Lack Standing To Seek Relief Under the Antitrust Laws of
          States Other Than Illinois or Tennessee ...................................................16

II.    THE FRAUD AND RICO CLAIMS (COUNTS IV-V, IX-XI) AGAINST THE
      EXPRESS SCRIPTS ENTITIES SHOULD BE DISMISSED...............................17

    A.    Plaintiffs Do Not Adequately Allege Any Fraudulent Statement or
          Reliance.....................................................................................................18

    B.    Plaintiffs Lack Standing To Maintain Their RICO Claims .......................21

    C.    Plaintiffs Have Not Alleged That Any Express Scripts Entity Participated
          in the Conduct of the Purported "Enterprise's" Affairs..........................23

III.   THE CONTRACT AND QUASI-CONTRACT CLAIMS AGAINST THE
      EXPRESS SCRIPTS ENTITIES (COUNTS XII-XV) SHOULD BE DISMISSED ........24

    A.    Rockford Fails To State a Claim for Breach of Contract...........................24

i

B.     Rockford's Quasi-Contract and Declaratory Judgment Claims Are Duplicative of Its Breach of Contract Claim ........................................................27

IV.    THE UNJUST ENRICHMENT CLAIM AGAINST THE EXPRESS SCRIPTS ENTITIES (COUNT I) SHOULD BE DISMISSED.........................................................28

V.     ALL CLAIMS AGAINST THE EXPRESS SCRIPTS ENTITIES SHOULD BE DISMISSED WITH PREJUDICE ...................................................................29

CONCLUSION..................................................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Ackerman v. Northwest Mutual Life Insurance Co.*,
   172 F.3d 467 (7th Cir. 1999) ...................................................................................18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................................8

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) .................................................................................................10

*Baldwin v. Star Scientific, Inc.*,
   78 F. Supp. 3d 724 (N.D. Ill. 2015) ....................................................................16, 20

*Bank of America, N.A. v. Knight*,
   725 F.3d 815 (7th Cir. 2013) .................................................................................6, 14

*Banks v. NCAA*,
   977 F.2d 1081 (7th Cir. 1992) ..................................................................................10

*Baxter Healthcare Corp. v. O.R. Concepts*,
   69 F.3d 785 (7th Cir. 1995) ......................................................................................27

*BCS Services, Inc. v. Heartwood 88, LLC*,
   637 F.3d 750 (7th Cir. 2011) ....................................................................................22

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ..............................................................................................8, 13

*Bigsby v. Barclays Capital Real Estate, Inc.*,
   170 F. Supp. 3d 568 (S.D.N.Y. 2016) .......................................................................20

*Bogie v. Rosenberg*,
   705 F.3d 603 (7th Cir. 2013) ...............................................................................28, 29

*Braman v. The CME Group, Inc.*,
   149 F. Supp. 3d 874 (N.D. Ill. 2015) ...................................................................17, 18

*In re Brand Name Prescription Drugs Antitrust Litigation*,
   123 F.3d 599 (7th Cir. 1997) ....................................................................................15

*Bryant v. Jackson Nat. Life Distributors, LLC*,
   No. 12-cv-9391, 2013 WL 1819927 (N.D. Ill. Apr. 30, 2013) ..................................27

*Bryce Co. v. Blue Buffalo Co.*,
   No. 15-cv-2684, 2016 WL 8376599 (W.D. Tenn. June 29, 2016) ...................................18

*CAE Inc. v. Gulfstream Aerospace Corp.*,
 203 F. Supp. 3d 447 (D. Del. 2016)............................................................10

*Cannon v. Forest Preserve District of Cook County*,
 No. 14-cv-5611, 2016 WL 26205015 (N.D. Ill. May 9, 2016)........................19

*In re Capacitors Antitrust Litigation*,
 106 F. Supp. 3d 1051 (N.D. Cal. 2015) .......................................................14

*Carter v. Berger*,
 777 F.2d 1173 (7th Cir. 1985) ...................................................................22

*Cinecoe v. Boeing Co.*,
 No. 16-cv-8443, 2017 WL 3872459 (N.D. Ill. Sept. 5, 2017).........................29

*Cinema Village Cinemart, Inc. v. Regal Entertainment Group*,
 No. 15-cv-5488, 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016) ......................16

*Cohen v. American Security Insurance Co.*,
 735 F.3d 601 (7th Cir. 2013) .....................................................................28

*Cohn v. Guaranteed Rate Inc.*,
 130 F. Supp. 3d 1198 (N.D. Ill. 2015) .........................................................27

*Cromeens, Holloman, Sibert, Inc. v. AB Volvo*,
 349 F.3d 376 (7th Cir. 2003) .....................................................................26

*District 1199P Health & Welfare Plan v. Janssen, L.P.*,
 No. 06-cv-3044, 2008 WL 5413105 (D.N.J. Dec. 23, 2008)...........................22

*E & L Consulting, Ltd. v. Doman Industries Ltd.*,
 472 F.3d 23 (2d Cir. 2006).........................................................................11

*E. Food Services, Inc. v. Pontifical Catholic University Services Ass'n*,
 357 F.3d 1 (1st Cir. 2004)......................................................................10, 11

*Epic Systems Corp. v. Tata Consultancy Services Ltd.*,
 No. 14-cv-748, 2017 WL 4386456 (W.D. Wis. Sept. 29, 2017) .................11, 16

*Evans v. City of Chicago*,
 434 F.3d 916 (7th Cir. 2006) .....................................................................21

*Farag v. Health Care Service Corp.*,
 No. 17-cv-2547, 2017 WL 2868999 (N.D. Ill. July 5, 2017) ..........................15

*Fiala v. Wasco Sanitary District*,
 No. 10-cv-2895, 2012 WL 971851 (N.D. Ill. Mar. 16, 2012) .........................22

*Fuchs v. Menard, Inc.*,
    No. 17-cv-1752, 2017 WL 4339821 (N.D. Ill. Sept. 29, 2017)..........................................28

*In re Graphics Processing Units Antitrust Litigation*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................16

*Greenberger v. GEICO General Insurance Co.*,
    631 F.3d 392 (7th Cir. 2011) ...............................................................................20

*Hemi Group, LLC v. City of New York*,
    559 U.S. 1 (2010).................................................................................................21

*In re Honey Transshipping Litigation*,
    87 F. Supp. 3d 855 (N.D. Ill. 2015) .....................................................................24

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
    No. 11-cv-7834, 2014 WL 6845862 (N.D. Ill. Dec. 4, 2014)........................................13

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977)............................................................................................15

*Insulate SB, Inc. v. Advanced Finishing System, Inc.*,
    797 F.3d 538 (8th Cir. 2015) ...............................................................................16

*Jepson, Inc. v. Makita Corp.*,
    34 F.3d 1321 (7th Cir. 1994) ...............................................................................18

*Kincaid v. SouthTrust Bank*,
    221 S.W.3d 32 (Tenn. App. Ct. 2006) .................................................................17

*Kingray, Inc. v. NBA, Inc.*,
    188 F. Supp. 2d 1177 (S.D. Cal. 2002).................................................................11

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..............................................................................................9

*Long v. Federal Home Loan Mortgage Corp.*,
    No. 16-cv-3072, 2017 WL 1178531 (N.D. Ill. Mar. 30, 2017) .........................................7

*Maio v. Aetna, Inc.*,
    221 F.3d 472 (3d Cir. 2000).................................................................................22

*McMahon v. Hines*,
    697 N.E.2d 1199 (Ill. App. Ct. 1998) ..............................................................24, 25

*My Baps Construction Corp. v. City of Chicago*,
    87 N.E.3d 987 (Ill. App. Ct. 2017) ......................................................................25

*In re NFL Sunday Ticket Antitrust Litigation,*
    No. 15-ml-2668, 2017 WL 3084276 (C.D. Cal. June 30, 2017) .......................................10

*NYNEX Corp. v. Discon, Inc.,*
    525 U.S. 128 (1998).........................................................................................................10

*Pennington v. Travelex Currency Services, Inc.,*
    114 F. Supp. 3d 697 (N.D. Ill. 2015) ..........................................................................24, 26

*Phillips v. WellPoint Inc.,*
    No. 10-cv-357, 2012 WL 6111405 (S.D. Ill. Dec. 10, 2012) ........................................25

*Polar Express School Bus, Inc. v. Navistar, Inc.,*
    No. 16-cv-5769, 2016 WL 7324589 (N.D. Ill. Dec. 16, 2016)......................................18

*Rao v. BP Products North America, Inc.,*
    589 F.3d 389 (7th Cir. 2009) .......................................................................................24

*Ray v. Spirit Airlines, Inc.,*
    836 F.3d 1340 (11th Cir. 2016) ...................................................................................19

*R.E. Davis Chemical Corp. v. Nalco Chemical Co.,*
    757 F. Supp. 1499 (N.D. Ill. 1990) .............................................................................20

*Reger Development, LLC v. National City Bank,*
    592 F.3d 759 (7th Cir. 2010) .......................................................................................24

*Regnery v. Myers,*
    679 N.E.2d 74 (Ill. App. Ct. 1997) .............................................................................25

*Republic Tobacco Co. v. North Atlantic Trading Co.,*
    381 F.3d 717 (7th Cir. 2004) .......................................................................................11

*Reves v. Ernst & Young,*
    507 U.S. 170 (1993).....................................................................................................23

*Roland Machinery Co. v. Dresser Industries, Inc.,*
    749 F.2d 380 (7th Cir. 1984) .......................................................................................11

*Rutman Wine Co. v. E. & J. Gallo Winery,*
    829 F.2d 729 (9th Cir. 1987) .......................................................................................10

*Schor v. Abbott Laboratories,*
    457 F.3d 608 (7th Cir. 2006) .......................................................................................11

*In re Sears, Roebuck & Co. Tools Marketing & Sales Practices Litigation,*
    No. 05-cv-2623, 2006 WL 3754823 (N.D. Ill. Dec. 18, 2006)......................................28

*Slaney v. International Amateur Athletic Federation,*
    244 F.3d 580 (7th Cir. 2001) ...................................................................17

*Spahr v. Leegin Creative Leather Products, Inc.,*
    No. 07-cv-187, 2008 WL 3914461 (E.D. Tenn. Aug. 20, 2008) ......................10

*Spinelli v. NFL,*
    96 F. Supp. 3d 81 (S.D.N.Y. 2015) ...........................................................11

*Tamburo v. Dworkin,*
    601 F.3d 693 (7th Cir. 2010) ...................................................................13

*Taylor v. JPMorgan Chase Bank, N.A.,*
    No. 15-cv-509, 2016 WL 4734644 (E.D. Tenn. Sept. 9, 2016).......................17

*The Sharrow Group v. Zausa Development Corp.,*
    No. 04-cv-6379, 2004 WL 2806193 (N.D. Ill. Dec. 6, 2004)..........................27

*Thompson's Gas & Electric Service, Inc. v. BP America Inc.,*
    691 F. Supp. 2d 860 (N.D. Ill. 2010) ..........................................................20

*Time Savers, Inc. v. LaSalle Bank, N.A.,*
    863 N.E.2d 1156 (Ill. App. Ct. 2007) .........................................................17

*United Food & Commercial Workers Unions v. Walgreen Co.,*
    719 F.3d 849 (7th Cir. 2013) ...................................................................23

*VBR Tours, LLC v. National Railroad Passenger Corp.,*
    No. 14-cv-804, 2015 WL 5693735 (N.D. Ill. Sept. 28, 2015)..........................10

*VBR Tours, LLC v. National Railroad Passenger Corp.,*
    No. 14-cv-804, 2016 WL 4945015 (N.D. Ill. Sept. 15, 2016)..........................10

*In re VTech Data Breach Litigation,*
    Nos. 15-cv-10889, 2017 WL 2880102 (N.D. Ill. July 5, 2017).........................27

*Wigley v. American Equity Mortgage,*
    No. 15-cv-2473, 2016 WL 866359 (W.D. Tenn. Mar. 3, 2016) .......................19

*Williams v. Aztar Indiana Gaming Corp.,*
    351 F.3d 294 (7th Cir. 2003) ...................................................................18

*In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices & Products Liability*
    *Litigation,* No. 09-md-02100, 2010 WL 3119499 (S.D. Ill. Aug. 5, 2010)......................22

## STATUTES

18 U.S.C. § 1962.......................................................................................*passim*

18 U.S.C. § 1964 ............................................................................................................21

Tenn. Code Ann. § 47-25-101 ........................................................................................13

## RULES

Federal Rule of Civil Procedure 9 ............................................................................18, 19

Federal Rule of Civil Procedure 12 ...............................................................................8

Defendants Express Scripts Holding Company ("ESHC"), Express Scripts, Inc. ("ESI"), CuraScript, Inc. ("CuraScript"),[1] Accredo Health Group, Inc. ("Accredo"), and United BioSource Corporation ("UBC")[2] (collectively the "Express Scripts Entities") respectfully submit this Memorandum of Law in support of their Motion to Dismiss the Second Amended Class Action Complaint (Doc. 98, the "Second Amended Complaint" or "SAC").

## **INTRODUCTION**

As with the original Complaint and the First Amended Complaint filed by the City of Rockford ("Rockford"), the allegations in the Second Amended Complaint focus on Defendant Mallinckrodt's[3] alleged exorbitant pricing of the medication Acthar. Also as with those two prior complaints, the Second Amended Complaint fails to state a claim against the Express Scripts Entities and thus should be dismissed as against them.[4]

The Second Amended Complaint asserts that Mallinckrodt has monopolized a purported market for adrenocorticotropic hormone ("ACTH") drugs used to treat infantile spasms and other rare conditions because Acthar is the only medication containing ACTH that is approved by the Food & Drug Administration ("FDA"). Plaintiffs allege that Mallinckrodt has exercised its purported monopoly power to increase the price of Acthar 85,000 percent, from $40 a vial in 2001 to more than $40,000 a vial today. The Second Amended Complaint further alleges that

---

[1] The Second Amended Complaint names CuraScript as a defendant and alleges that entity was involved in the distribution of Acthar, but CuraScript, Inc. was a specialty pharmacy. Priority Healthcare Distribution, Inc., d/b/a/ CuraScript SD is a specialty drug distributor.

[2] The Second Amended Complaint names UBC as a defendant, but that entity ceased to exist in approximately 2013 when UBC became United BioSource LLC.

[3] This brief refers to Mallinckrodt ARD, Inc. and Mallinckrodt plc collectively as "Mallinckrodt."

[4] While the First Amended Complaint added ESHC, ESI, CuraScript, and Accredo as defendants in an apparent effort to circumvent the *Illinois Brick* rule that allows only "direct purchasers" to seek monetary damages for alleged violations of the federal antitrust laws, the Second Amended Complaint now adds a new plaintiff, Acument Global Technologies, Inc. ("Acument") (collectively with Rockford, "Plaintiffs").

Mallinckrodt has maintained its monopoly by, among other things: (i) acquiring the rights to develop and market Synacthen—a synthetic version of Acthar—in the United States; (ii) not developing Synacthen for approval by the FDA; and (iii) obtaining "orphan drug" status for Acthar from the FDA to secure exclusivity as the only ACTH product approved to treat infantile spasms. Based on these allegations, Plaintiffs—on behalf of a putative class of third party payors for Acthar—bring claims against Mallinckrodt alleging violations of federal and state antitrust law and the federal Racketeer Influenced & Corrupt Organizations Act ("RICO"), and claims for fraud, conspiracy to defraud, and unjust enrichment.

Notwithstanding the absence of any allegations connecting an Express Scripts Entity to Mallinckrodt's purportedly exclusionary conduct, the Second Amended Complaint asserts claims against the Express Scripts Entities related to their alleged individual roles in Acthar distribution or as a pharmacy benefit manager ("PBM") (or in the case of ESHC, its mere corporate relationship to other Express Scripts Entities). Plaintiffs allege that three Express Scripts Entities—CuraScript, Accredo, and UBC—are involved in Acthar distribution: CuraScript is alleged to be the exclusive distributor of Acthar to specialty pharmacies; Accredo is one of the specialty pharmacies that dispenses Acthar to patients; and UBC provides services to patients through the Acthar Support & Access Program ("ASAP"). In addition, Plaintiffs allege that ESI is Rockford's PBM and that, pursuant to the terms of the parties' Pharmacy Benefit Management Agreement (the "Rockford Contract" or "Rockford Contr."), ESI charged Rockford ███████ ██████████████████████████████████ ███ Acthar.

The Second Amended Complaint does not plausibly suggest that any Express Scripts Entity has engaged in any unlawful conduct. Nevertheless, Plaintiffs bring claims against the Express Scripts Entities alleging violations of Sections 1 and 2 of the Sherman Act and RICO, as

well as claims for fraud, conspiracy to defraud, unjust enrichment, and various contract-related theories. As further explained below, Plaintiffs' claims against each Express Scripts Entity fail as a matter of law.

*First*, Plaintiffs' federal and state antitrust claims related to Acthar distribution (Counts VI-VIII) should be dismissed because Plaintiffs do not plausibly allege that any agreement involving the Express Scripts Entities has harmed competition. The Second Amended Complaint does not—and cannot—plead facts that could establish that the manner in which Acthar is distributed has inhibited other pharmaceutical companies from developing an ACTH product to compete with Acthar. Similarly, while Plaintiffs allege that ESI conspired with Mallinckrodt to fix prices for Acthar (Counts VII-VIII), those claims should be dismissed because Plaintiffs do not plead facts to support their wholly conclusory allegations. Moreover, Acument's claims for damages under federal antitrust law also should be dismissed for lack of standing because Acument did not purchase Acthar directly from any Defendant, but instead allegedly made payments to CVS Caremark.

*Second*, Plaintiffs' claims for common law fraud (Count IV), conspiracy to defraud (Count V), and RICO (Counts IX to XI) should be dismissed because Plaintiffs do not allege that any Express Scripts Entity made (or conspired to make) any fraudulent statement, or that Plaintiffs relied on, or suffered damages as a result of their reliance on, any such statement— necessary elements of each of those claims. The RICO claims alleging violations of 18 U.S.C. §§ 1962(c) and (d) (Counts IX and XI) also should be dismissed for lack of standing and because Plaintiffs fail to plead that any Express Scripts Entity conducted the affairs of a RICO enterprise, as opposed to simply carrying out arm's-length contractual obligations.

*Third*, Rockford's breach of contract claim (Count XII) should be dismissed because

Rockford does not point to a single contractual provision that was breached. Instead, the contractual language on which Rockford relies is a vague reference to "cost containment" in the general description of ESI's business in the Recitals. As a matter of settled Illinois law, such a general statement in a prefatory clause does not—and cannot— create a binding contractual obligation. In addition, Rockford's quasi-contract and declaratory judgment claims (Counts XIII-XV) should be dismissed because they are duplicative of its breach of contract claim.

*Fourth*, the unjust enrichment claim (Count I) should be dismissed because it is predicated on the same deficient theories as Rockford's antitrust, RICO, and fraud claims.

## FACTUAL ALLEGATIONS[5]

### A.    Mallinckrodt's Alleged Monopoly in the Purported Market for ACTH Drugs

"Mallinckrodt manufactures, markets, distributes and sells" Acthar. (SAC ¶ 2.) Mallinckrodt acquired the rights to Acthar in 2014 when it bought Questcor Pharmaceuticals, Inc. ("Questcor"), which obtained those rights in 2001. (*Id.* ¶¶ 3, 22, 44.) Among other conditions, Acthar is prescribed to treat infantile spasms, a rare seizure disorder. (*Id.* ¶¶ 41-43.)

Acthar is an injection containing ACTH that is the only therapeutic ACTH product sold in the United States. (*Id.* ¶ 2.) According to the Second Amended Complaint, "Acthar has a 100% share of the market for ACTH drugs in the United States. No other ACTH drug is FDA-approved for therapeutic use." (*Id.* ¶ 123.)

Plaintiffs further allege that the purported "ACTH market is characterized by high barriers to entry" because:

> Developing a long-acting, depot-injection formulation of a drug product
> containing ACTH (natural or synthetic) that is stable, safe, and effective would

---

[5] The Express Scripts Entities accept Plaintiffs' factual allegations as true only for purposes of this Motion.

require **significant time, costs, and effort**, with no guarantee of success. The
requirements for entry include sourcing the active pharmaceutical ingredient,
formulating a sustained-release depot-injection formulation, scaling production to
clinical scale, and successfully conducting clinical trials necessary for FDA
approval.

(*Id.* ¶ 124 (emphasis added).) Moreover, a potential competitor attempting to copy Acthar's

chemical composition (which is "undisclosed" and a "trade secret") would have to reverse

engineer Mallinckrodt's "manufacturing process," which is "complex, . . . unique," and also a

"trade secret." (*Id.* ¶ 125.) In 2010, the FDA granted Acthar "orphan drug status." (*Id.* ¶ 45.)[6]

Because "Mallinckrodt is the single seller" of Acthar (*id.* ¶ 112) and purportedly "has

encountered no competitive constraints," Plaintiffs allege that Mallinckrodt has been able "to

repeatedly increase Acthar's price" (*id.* ¶ 119). Since 2001, Questcor and Mallinckrodt allegedly

have increased the price of Acthar from $40 per vial to $43,658.40. (*Id.* ¶¶ 43, 92.)

## B.    Questcor's Acquisition of Synacthen

Questcor allegedly maintained its monopoly in the purported market for ACTH drugs by

acquiring the rights to develop, market, and sell Synacthen, "a synthetically derived ACTH

medication, which, like Acthar, could be injected intra-muscularly." (*Id.* ¶¶ 106, 226-27.)

Although it has not been approved by the FDA, Synacthen allegedly is used as an alternative to

Acthar in other countries. (*Id.* ¶ 106.)

According to the Second Amended Complaint, Questcor "identified [Synacthen as] a

competitive threat" and first attempted (and failed) to acquire the rights to Synacthen from

Novartis in 2009. (*Id.* ¶¶ 106, 132; *see also id.* ¶¶ 114, 145.) As of 2013, Novartis had engaged

three other companies in a bidding process for Synacthen, which allegedly resulted in an

---

[6] With orphan drug status, the FDA granted Questcor an exclusivity period of seven years during which
no other ACTH product could receive FDA approval to treat infantile spasms. (Doc. 1, Compl. ¶ 36.)

agreement to sell Synacthen to Retrophin, Inc. ("Retrophin") for $16 million. (*Id.* ¶¶ 107-08.) Questcor, however, "intervene[d] at the last minute to pay multiple times what had been offered," ultimately "licensing Synacthen for a minimum of $135 million" (*id.* ¶ 108), with total payments likely to reach $300 million (*id.* ¶ 144). Plaintiffs allege that neither Questcor nor Mallinckrodt ever sought "FDA approval to bring [Synacthen] to market." (*Id.* ¶ 145.)

In January 2017, the Federal Trade Commission ("FTC") sued Mallinckrodt for unlawful monopolistic conduct based on Questcor's acquisition of the Synacthen rights and entered a consent decree pursuant to which Mallinckrodt paid $100 million. (*Id.* ¶ 155.) Mallinckrodt also paid $15.5 million to settle a lawsuit with similar claims brought by Retrophin. (*Id.* ¶ 150.)

## C.     The Services Provided By CuraScript, Accredo, and UBC[7]

Plaintiffs allege that CuraScript has been the exclusive distributor of Acthar since July 2007. (*Id.* ¶ 48.) It purchases Acthar from Mallinckrodt and distributes the drug to specialty pharmacies, including Accredo, which dispense the product to patients. (*See id.* ¶ 72, Fig. 2.) Plaintiffs allege that Rockford's two employees whose children were prescribed Acthar "dealt with Accredo for their fulfillment of Acthar" (*id.* ¶ 65), and the "Acument patient at issue dealt with CVS Caremark for their [*sic*] fulfillment of Acthar" (*id.* ¶ 66; *see also id.* ¶ 196 ("Acument's covered beneficiary received direct shipments of Acthar from Mallinckrodt via CVS Caremark.")).[8]

---

[7] Plaintiffs refer to the Express Scripts Entities collectively as "Express Scripts" throughout the Second Amended Complaint. (*See* SAC ¶ 34.) Such group pleading is impermissible because "[e]ach defendant is entitled to know what he or she did that is asserted to be wrongful." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) (even in cases involving conspiracies, a "complaint based on a theory of collective responsibility must be dismissed").

[8] Elsewhere, Plaintiffs allege that UBC "arranges for Acthar to be delivered *directly* to the patient *by CuraScript*" (SAC ¶ 51 (emphasis added)), which contradicts the allegations that patients "deal[] with Accredo" and other specialty pharmacies to fill their Acthar prescriptions (*id.* ¶¶ 65-66) and that "the

*(cont'd)*

In July 2007, Questcor allegedly began requesting that doctors submit new Acthar prescriptions through ASAP, which is administered by UBC. (*Id.* ¶ 68.) UBC "confirms the patient's insurance coverage or other source of payment, and then arranges for Acthar to be delivered" to the patient. (*Id.* ¶ 51.) The patient authorizes UBC "to provide certain services to [the patient], including reimbursement and coverage support, patient assistance and access programs, medication shipment tracking, and home injection training." (*Id.* ¶ 53 (alteration in original); *see also id.* ¶ 59.)

## D.    **ESI Is Rockford's Pharmacy Benefit Manager**

"In 2015, Rockford contracted with [ESI] to provide pharmacy benefit services, among other things," for a term of three years. (*Id.* ¶ 76.) The Rockford Contract thus governed ESI's relationship with Rockford at the time Rockford paid for the Acthar prescribed to its employees' children, which allegedly was in 2015. (*See id.* ¶¶ 81, 366d.)

Prior to the "Terms of Agreement," the prefatory "Recitals" of the Rockford Contract include the following general description of ESI's business:

> ESI, either directly or through its subsidiaries, engages in pharmacy benefit management services, including among other things, pharmacy network contracting; pharmacy claims processing; mail and specialty drug pharmacy; cost containment, clinical, safety, adherence, and other like programs; and formulary and rebate administration ("PBM Services").

(Declaration of Matthew M. Martino in Support of Defendants Express Scripts Holding Company's, Express Scripts, Inc.'s, CuraScript, Inc.'s, Accredo Health Group, Inc.'s, and United BioSource Corporation's Motion to Dismiss, Ex. 1 ("Rockford Contr.") at 1; *see also* SAC

---

*(cont'd from previous page)*
shipment of Acthar [goes] from CuraScript through Accredo to the patient" (*id.* ¶ 68). (*See also id.* ¶ 72, Fig. 2 (showing "product flows" from Mallinckrodt to CuraScript to Accredo to the patient).)

¶ 77.)[9]  In contrast to this general description, ████████████████████████████
██████████████████████████████████████████████████████████████

█████████████████████

        ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████  Rockford

reimbursed ESI at this contract rate.  (*Id.* ¶ 81.)

**E.    CVS Caremark Is Acument's Pharmacy Benefit Manager**

        Unlike Rockford, when Acument paid for Acthar, Acument's PBM was CVS Caremark,

a competitor of ESI.  (*Id.* ¶ 66.)  Under the terms of Acument's agreement with CVS Caremark,

"CVS Caremark is required to collect payments for the price of Acthar," and CVS Caremark

"deducts its agreed-upon share of [Acument's] payments before forwarding them to

Mallinckrodt."  (*Id.* ¶¶ 71, 233.)

**ARGUMENT**

        To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "Threadbare recitals of the elements of a

---

[9] The Court may consider the Rockford Contract when deciding the instant Motion under the incorporation-by-reference doctrine because Rockford refers to that contract throughout the Second Amended Complaint (*see, e.g.*, SAC ¶¶ 76-83), and it is central to several claims, including Rockford's breach of contract claim. *See Long v. Fed. Home Loan Mortg. Corp.*, No. 16-cv-3072, 2017 WL 1178531, at *5 (N.D. Ill. Mar. 30, 2017) ("The incorporation-by-reference doctrine allows a defendant moving for dismissal under Rule 12(b)(6) to submit a document to the court without converting the defendant's 12(b)(6) motion to a motion for summary judgment, where the plaintiff mentions that document in his complaint and it is central to his claim." (internal quotation marks omitted)).

cause of action, supported by merely conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted).

## I.  THE ANTITRUST CLAIMS (COUNTS VI-VIII) AGAINST THE EXPRESS SCRIPTS ENTITIES SHOULD BE DISMISSED

Plaintiffs challenge two separate categories of alleged agreements between Mallinckrodt and individual Express Scripts Entities. *First*, Plaintiffs assert that agreements related to the distribution of Acthar—Mallinckrodt's exclusive distribution agreement with CuraScript and its use of UBC as the "exclusive agent to operate the ASAP Program"—"prevent a competitive product from entering the market" and thus "allow Mallinckrodt to maintain and enhance its monopoly power in the ACTH market." (SAC ¶¶ 222, 224.) *Second*, Plaintiffs conclusorily allege that ESI agreed with Mallinckrodt to fix the price of Acthar, which is "set by Mallinckrodt." (*Id.* ¶¶ 243-52.) Based on these allegations, Plaintiffs bring claims against the Express Scripts Entities under Sherman Act § 1 (conspiracy to unreasonably restrain trade), Sherman Act § 2 (conspiracy to monopolize), and various state antitrust laws.

As shown below, these claims fail as a matter of law and should be dismissed.[10]

## A.  Plaintiffs Do Not Plausibly Allege That the Agreements Related to the Distribution of Acthar Have Harmed Competition

To survive a motion to dismiss, a plaintiff alleging that an agreement violates the Rule of Reason under Sherman Act § 1,[11] constitutes an unlawful conspiracy to monopolize under

---

[10] Rockford does not allege that ESHC or Accredo has been a party to any agreement that violates the Sherman Act or state antitrust laws. For this reason alone, Counts VI-VIII of the Second Amended Complaint fail to state a claim against either ESHC or Accredo.

[11] The Rule of Reason, which requires a plaintiff to demonstrate that a challenged agreement causes anticompetitive effects outweighing its procompetitive benefits, applies to vertical agreements (i.e., those between firms at different levels of the distribution chain) like the alleged relationship between Mallinckrodt and any Express Scripts Entity. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551

*(cont'd)*

Sherman Act § 2, or violates the Illinois or Tennessee antitrust statutes[12] must plead facts plausibly suggesting that the challenged agreement harms competition. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 139 (1998) ("Unless those agreements harmed the competitive process, they did not amount to a conspiracy to monopolize."); *Banks v. NCAA*, 977 F.2d 1081, 1093-94 (7th Cir. 1992) (affirming dismissal of Sherman Act § 1 claim that "fail[ed] to explain how the[] alleged restraints diminish competition"); *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-cv-804, 2016 WL 4945015, at *7 (N.D. Ill. Sept. 15, 2016) (dismissing Illinois antitrust claims where Sherman Act claim also was dismissed for lack of allegations suggesting anticompetitive conduct); *Spahr v. Leegin Creative Leather Prods., Inc.*, No. 07-cv-187, 2008 WL 3914461, at *13-14 (E.D. Tenn. Aug. 20, 2008) (dismissing Tennessee antitrust claim for failure to plausibly allege agreement harmed competition in a plausible product market).[13]

Courts routinely dismiss antitrust claims challenging exclusive distribution agreements for failure to plausibly allege harm to competition.[14] Indeed, exclusive agreements between an

---

(cont'd from previous page)
U.S. 877, 907 (2007).

[12] Plaintiffs' claims for violations of state antitrust laws focus on purported violations of Illinois and Tennessee statutes because the Acthar prescriptions for which Plaintiffs paid were allegedly filled in those states. (*See* SAC ¶ 255.) Plaintiffs' claims arising under all other state antitrust statutes fail for multiple reasons. *See infra* Section I.D.

[13] In addition, plaintiffs asserting antitrust claims must allege facts plausibly suggesting that they have suffered antitrust injury, i.e., that their "loss stems from a competition-***reducing*** aspect or effect of the defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).

[14] *See, e.g., E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 8-9 (1st Cir. 2004) (affirming dismissal of complaint with prejudice because plaintiff "does not remotely suggest that so many potential outlets are foreclosed to it or other competitors by long-term exclusive dealing contracts or other tactics that survival or new entry is infeasible"); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 734-36 (9th Cir. 1987) ("[A]n agreement between a manufacturer and a distributor to establish an exclusive distributorship is not, standing alone, a violation of antitrust laws, and in most circumstances does not adversely affect competition in the market."); *In re NFL Sunday Ticket Antitrust Litig.*, No. 15-ml-2668, 2017 WL 3084276, at *9-13 (C.D. Cal. June 30, 2017) (dismissing Sherman Act claim because "Plaintiffs have failed to plead facts indicating that the vertical exclusive distributorship arrangement

*(cont'd)*

alleged upstream monopolist—like Mallinckrodt—and a distributor generally cannot harm competition because they "provide[] no monopolistic benefit to [the monopolist] that it does not already enjoy and would not continue to enjoy" absent the exclusive agreement. *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 29 (2d Cir. 2006). A monopolist can control its own pricing and output to the same extent regardless of the number of distributors it employs or its distribution method. *See id.* at 30 ("The power to restrict output to maximize profit is complete in the manufacturing monopoly, and there is no additional monopoly profit to be made by creating a monopoly in the retail distribution of the product."); *see also Schor v. Abbott Labs.*, 457 F.3d 608, 611 (7th Cir. 2006) ("[A] monopolist can take its monopoly profit just once.").

In fact, "vertical exclusive distributorships . . . are presumptively legal . . . because of their procompetitive benefits," *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 736 (7th Cir. 2004), such as incentivizing the distributor to invest in the distribution system. *See E. Food*, 357 F.3d at 8. Accordingly, without factual allegations plausibly suggesting that the exclusive distributorship prevented a competitor of the upstream monopolist from entering the market, there can be no harm to competition. *See Epic Sys. Corp. v. Tata Consultancy Servs. Ltd.*, No. 14-cv-748, 2017 WL 4386456, at *4 (W.D. Wis. Sept. 29, 2017) (to show

---

*(cont'd from previous page)*
between DirecTV and the NFL Defendants has harmed competition"); *CAE Inc. v. Gulfstream Aerospace Corp.*, 203 F. Supp. 3d 447, 454-55 (D. Del. 2016) (dismissing Sherman Act claim because "Gulfstream's exclusive arrangement with FSI does not result in any greater anticompetitive effect than would be present if Gulfstream had elected to develop its *own* flight simulator and training services for the G650"); *VBR Tours, LLC v. Nat'l R.R. Passenger Corp.*, No. 14-cv-804, 2015 WL 5693735, at *12-13 (N.D. Ill. Sept. 28, 2015) (dismissing Sherman Act claim based on exclusive agreement between Amtrak and tour operator because Amtrak "could have accomplished the same effect by acquiring a tour operator or creating its own in-house tour operator"); *Spinelli v. NFL*, 96 F. Supp. 3d 81, 116 (S.D.N.Y. 2015) (dismissing Sherman Act claim because "these agreements cannot harm competition; an exclusive license is something that the [defendant] can legally achieve without the aid of a licensee"); *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1196-98 (S.D. Cal. 2002) (dismissing Sherman Act claim based on exclusive distribution agreement for NBA games to satellite dish owners for lack of plausible allegations of competitive harm).

11

anticompetitive effects from vertical agreement, plaintiff must plausibly allege that "anti-competitive conduct 'is likely to keep at least one significant competitor . . . from doing business'" (quoting *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984)) (ellipses in original)).

Here, Plaintiffs do not plausibly allege that the agreements between Mallinckrodt and either CuraScript or UBC have harmed competition. While the Second Amended Complaint alleges—without explanation—that these agreements supposedly have "prevent[ed] a competitive product from entering the market" (SAC ¶ 222) and "allow[ed] Mallinckrodt to maintain and enhance its monopoly power in the ACTH market" (*id.* ¶ 224), Plaintiffs *fail to provide any factual allegations* to support these conclusory assertions. As alleged, CuraScript's role in the sale of Acthar is "similar to a FedEx, DHL, or UPS" (*id.* ¶ 61)—it merely delivers Acthar to the specialty pharmacies that dispense it. (*Id.* ¶ 48.) And UBC's role, through its operation of ASAP, is to coordinate Acthar delivery and provide other services to patients, such as confirming insurance coverage. (*Id.* ¶¶ 51, 53, 59-60.) The Second Amended Complaint does not allege any connection between these services and any pharmaceutical company's inability to develop a competing ACTH drug. Nor do Plaintiffs allege that another pharmaceutical company would have developed a competing ACTH product but for Mallinckrodt's use of CuraScript as an exclusive distributor or the patient support services UBC provides through ASAP.

To the contrary, the Second Amended Complaint pleads facts alleging that Mallinckrodt has maintained its purported ACTH monopoly through conduct independent of any agreement involving, or action taken by, an Express Scripts Entity. Specifically, Plaintiffs allege that Mallinckrodt has maintained its purported monopoly because of the difficulty of developing therapeutic ACTH drugs and receiving FDA approval (*id.* ¶¶ 124-26), the exclusivity the FDA

granted Questcor as part of the orphan drug designation (*see id.* ¶¶ 45, 123), and Questcor's acquisition of the rights to Synacthen and refusal to "bring this viable synthetic alternative to market" (*id.* ¶¶ 108, 226-27). Plaintiffs do not allege that any Express Scripts Entity was involved in—or "conspired" with Questcor or Mallinckrodt concerning—any of this conduct.[15]

Accordingly, the Second Amended Complaint fails to plausibly allege harm to competition resulting from any agreement involving an Express Scripts Entity and, therefore, Plaintiffs' antitrust claims challenging these agreements should be dismissed.

**B.    Plaintiffs Do Not Plausibly Allege That ESI and Mallinckrodt Conspired To Fix Prices for Acthar**

"[A] complaint alleging an antitrust claim [under Section 1 of the Sherman Act] must contain 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Tamburo v. Dworkin*, 601 F.3d 693, 699 (7th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556); *see also House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11-cv-7834, 2014 WL 6845862, at *5-6 (N.D. Ill. Dec. 4, 2014) (dismissing Illinois Antitrust Act claim in part due to absence of plausible allegations suggesting an agreement); Tenn. Code § 47-25-101 (prohibiting certain "arrangements, contracts, agreements, trusts, or combinations"). Factual allegations couched as legal conclusions (e.g., that defendants conspired) need not be accepted as true. *See Twombly*, 550 U.S. at 553-56. A complaint can allege a conspiracy directly by alleging a "specific time, place, [and] person involved in the alleged conspiracies," *id.* at 565 n.10, or by alleging facts "in a context that [plausibly] raises a suggestion of a preceding agreement," *id.* at 557.

---

[15] When they sued Mallinckrodt, neither the FTC nor Retrophin brought any claim against an Express Scripts Entity. In fact, neither made any allegations regarding the distribution of Acthar or ASAP. (*See* Doc. 1, Compl., Ex. B (FTC complaint); SAC, Ex. C (Retrophin complaint).)

Here, Plaintiffs assert that "Express Scripts conspired and agreed with Mallinckrodt to fix and charge artificially inflated prices for Acthar to Express Scripts clients, like Rockford" (SAC ¶ 247) and that other PBMs, like CVS Caremark, "simply charged the same prices based on the prices set by Mallinckrodt in agreement with Express Scripts" (*id.* ¶ 246). However, Plaintiffs do not allege facts to plausibly suggest an agreement between ESI and Mallinckrodt as to the prices Mallinckrodt charges for Acthar, or the reimbursement rates ESI and other PBMs charge Rockford, Acument, or any other third party payor. (*See id.* ¶¶ 244-46.)[16]

Indeed, far from alleging that ESI has any role in setting the price that Mallinckrodt charges for Acthar, the Second Amended Complaint repeatedly pleads facts illustrating that *Mallinckrodt unilaterally* sets the AWP for Acthar. (*See, e.g., id.* ¶ 80 ("*Mallinckrodt set the average wholesale prices* of Acthar ██████████████ (emphasis added)); *id.* ¶ 91 ("[I]n 2011, *Mallinckrodt increased* the price of Acthar 5% on January 3, 2011, another 5% on June 1, 2011, and executed a third price increase on December 27, 2011." (emphasis added)); *id.* ¶ 209 ("The prices for Acthar set forth in [putative class members'] contracts were *prices set by Mallinckrodt . . . .*" (emphasis added)).) Moreover, Plaintiffs do not allege any facts to demonstrate that ESI agreed *with Mallinckrodt* as to any component of the reimbursement rate in the Rockford Contract ████████████████████

████████████████████████████████████

---

[16] As noted above, the Second Amended Complaint refers to the Express Scripts Entities collectively as "Express Scripts," *see supra* n.7, and the only (threadbare and conclusory) allegations regarding price fixing refer to ESI. To the extent Plaintiffs purport to assert that any entity other than ESI conspired with Mallinckrodt regarding the price of Acthar, the Second Amended Complaint is devoid of allegations supporting any such claim and, therefore, it should be dismissed. *See Knight*, 725 F.3d at 818 (even in cases involving conspiracies, a "complaint based on a theory of collective responsibility must be dismissed"); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1066-71 (N.D. Cal. 2015) (dismissing Sherman Act claims for lack of plausible conspiracy allegations against corporate relatives of entities against which Sherman Act claims survived).

███████████████████████████████████████████████████.

Rather, the Second Amended Complaint alleges that Rockford and ESI agreed—without any

involvement from Mallinckrodt—that ██████████████████████████

████████████████████████████████

And while Rockford alleges that ESI "did not push back against *[Mallinckrodt's]*

*decision* to raise prices" and has "accepted the inflated end payor prices *set by Mallinckrodt*" (*id.*

¶¶ 243, 245 (emphases added)), these allegations do not plausibly suggest any agreement

between ESI and Mallinckrodt.[17]  Rather, they are consistent with the Second Amended

Complaint's other allegations illustrating that Mallinckrodt unilaterally sets the AWP for Acthar.

C.     **Acument Does Not Have Standing To Seek Damages Under Federal Antitrust Law**

Even disregarding the aforementioned deficiencies in Plaintiffs' antitrust allegations,

Acument's damages claims under federal antitrust law should be dismissed for lack of standing.

Pursuant to the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720

(1977), a plaintiff must purchase directly from an antitrust defendant to have standing to seek

damages under federal antitrust law.  *Id.* at 728-29, 735.  Under the *Illinois Brick* doctrine, courts

routinely dismiss damages claims brought by indirect purchasers—i.e., plaintiffs that did not

purchase directly from a defendant.  *See, e.g., In re Brand Name Prescription Drugs Antitrust

Litig.*, 123 F.3d 599, 605-07 (7th Cir. 1997) (*Illinois Brick* doctrine barred pharmacies' federal

---

[17] Plaintiffs also fail to allege facts to support their inactionable and conclusory allegation that ESI "did not push back against [Mallinckrodt's] decision to raise prices." (SAC ¶ 243.)  The Second Amended Complaint speculates that ESI could have "wield[ed] its market power" to halt Acthar price increases because it supposedly was successful in doing so for a different high-priced specialty drug, Daraprim. (*Id.* ¶ 241; *see also id.* ¶ 103.)  But Plaintiffs' own allegations concerning Daraprim are to the contrary.  According to Plaintiffs, ESI did not "wield its market power" to cause the manufacturer of Daraprim to halt price increases.  Rather, ESI worked with another manufacturer to develop a low-cost alternative, which had the effect of reducing Daraprim prices. (*Id.* ¶¶ 87-88.)  In contrast, Plaintiffs allege that creating an alternative to Acthar is not feasible because of the difficulty of developing ACTH drugs and receiving FDA approval (*see id.* ¶¶ 124-26), as well as Acthar's orphan drug status (*see id.* ¶¶ 45, 123).

antitrust claims against pharmaceutical manufacturers because pharmacies are indirect purchasers vis-a-vis manufacturers); *Farag v. Health Care Serv. Corp.*, No. 17-cv-2547, 2017 WL 2868999, at *5 (N.D. Ill. July 5, 2017) (dismissing Sherman Act damages claims against pharmaceutical company because individuals "who purchased [product] at pharmacies or through intermediary health plans" are indirect purchasers).

Here, Plaintiffs do not allege that Acument provided reimbursement directly to any Defendant. Instead, Plaintiffs allege that Acument paid CVS Caremark for its employee's purchases of Acthar. (*See* SAC ¶¶ 71, 233.) Thus, Acument does not have standing under the *Illinois Brick* doctrine, and its damages claims under federal antitrust law should be dismissed for this reason alone.

**D.    Plaintiffs Also Lack Standing To Seek Relief Under the
Antitrust Laws of States Other Than Illinois or Tennessee**

Because the Second Amended Complaint does not allege that any named plaintiff resides, or paid for Acthar, in any state outside of Illinois or Tennessee, Plaintiffs' claims arising under other states' antitrust laws should be dismissed for lack of standing. *See Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724, 735 (N.D. Ill. 2015) (where plaintiff did not reside or purchase product outside of Illinois, plaintiff lacked standing to pursue claims under non-Illinois state laws because he "has not suffered an injury in any state other than Illinois"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026-27 (N.D. Cal. 2007) (dismissing state law antitrust claims in class action complaint for lack of standing regarding states in which no named plaintiff resided). In any event, as explained above, the Second Amended Complaint fails to adequately plead an antitrust claim against any Express Scripts Entity under federal,

16

Illinois, or Tennessee law. Plaintiffs' claims under the antitrust laws of the other 22 states referenced in the Second Amended Complaint fail for the same reasons.[18]

## II.    THE FRAUD AND RICO CLAIMS (COUNTS IV-V, IX-XI) AGAINST THE EXPRESS SCRIPTS ENTITIES SHOULD BE DISMISSED

Plaintiffs' common law claims for fraud (Count IV) and conspiracy to defraud (Count V), and RICO claims (Counts IX-XI) also should be dismissed as a matter of law. To state a claim for common law fraud, a plaintiff must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Braman v. The CME Grp., Inc.*, 149 F. Supp. 3d 874, 893 (N.D. Ill. 2015) (applying Illinois law); *see also Taylor v. JPMorgan Chase Bank, N.A.*, No. 15-cv-509, 2016 WL 4734644, at *2 (E.D. Tenn. Sept. 9, 2016) (listing similar elements for fraud claim under Tennessee law). A claim for conspiracy to defraud under both Illinois and Tennessee law requires an overt act of fraud in furtherance of the conspiracy. *See Time Savers, Inc. v. LaSalle Bank, N.A.*, 863 N.E.2d 1156, 1167-68 (Ill. App. Ct. 2007); *Kincaid v. South Trust Bank*, 221 S.W.3d 32, 38 (Tenn. App. Ct. 2006).

To state a claim under RICO's primary provision, Section 1962(c), a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Slaney v. Int'l Amateur Athletic Fed'n,* 244 F.3d 580, 597 (7th Cir. 2001). Sections 1962(a) and (d) also require plausible allegations of racketeering activity or conspiracy to commit racketeering

---

[18] *See, e.g., Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 547 (8th Cir. 2015) (Minnesota and California antitrust claims fail for the same reason as Sherman Act claims); *Epic Sys.*, 2017 WL 4386456, at *3-4 & n.2 (same for Wisconsin antitrust claim); *Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*, No. 15-cv-5488, 2016 WL 5719790, at *6 (S.D.N.Y. Sept. 29, 2016) (same for New York antitrust claim).

activity. *See* 18 U.S.C. §§ 1962(a), (d). Plaintiffs here allege racketeering activity based on predicate acts of purported mail and wire fraud. (*See* SAC ¶ 365 (Section 1962(c) claim based on alleged "participat[ion] in the affairs of the ASAP Enterprise" through predicate acts of mail and wire fraud); *id.* ¶ 375 (Section 1962(a) claim based on "operat[ion of] the ASAP Enterprise"); *id.* ¶ 381-82 (Section 1962(d) claim based on operation of "the ASAP Enterprise" and "defraud[ing] end payors").) As set forth below, Plaintiffs' fraud and RICO claims should be dismissed as a matter of law for several separate and independent reasons.

A.     **Plaintiffs Do Not Adequately Allege Any Fraudulent Statement or Reliance**

Plaintiffs' claims for fraud, conspiracy to commit fraud, and RICO violations each require Plaintiffs to plead that an Express Scripts Entity made (or conspired to make) a fraudulent statement. *See Williams v. Aztar Ind. Gaming Corp.*, 351 F.3d 294, 298 (7th Cir. 2003) (RICO claim based on mail fraud); *Polar Express Sch. Bus, Inc. v. Navistar, Inc.*, No. 16-cv-5769, 2016 WL 7324589, at *2 (N.D. Ill. Dec. 16, 2016) (RICO claim based on wire fraud); *Bryce Co. v. Blue Buffalo Co.*, No. 15-cv-2684, 2016 WL 8376599, at *3-4 (W.D. Tenn. June 29, 2016) (Tennessee law); *Braman*, 149 F. Supp. 3d at 893 (Illinois law).

Further, Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard requiring that a complaint alleging fraud "state with particularity the circumstances constituting [the] fraud." Fed. R. Civ. P. 9(b). Plaintiffs must "state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994) (internal quotation marks omitted). "[M]erely giv[ing] the gist of" a purported misrepresentation is insufficient. *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999) (fraud claims not pleaded with sufficient particularity because the complaint

18

does not "give the dates on which any of the fraudulent representations . . . were made [to insurance policyholder-plaintiffs] . . . [nor] does the complaint reveal what exactly each agent said to each plaintiff; it merely gives the gist of the agents' spiel"). Plaintiffs also must "allege[] with particularity why the . . . statements are false and misleading, or otherwise constitute a viable fraud theory." *Braman*, 149 F. Supp. 3d at 894.

Finally, Plaintiffs must allege how they were deceived by the alleged misrepresentation, i.e., that they reasonably relied on the allegedly fraudulent statement. *See Polar Express*, 2016 WL 7324589, at *2 (dismissing RICO claims based on mail and wire fraud predicate acts, in part, because "there is no way [plaintiffs] could have relied" on purportedly fraudulent statements); *Cannon v. Forest Preserve Dist. of Cook Cty.*, No. 14-cv-5611, 2016 WL 2620515, at *6-7 (N.D. Ill. May 9, 2016) (dismissing fraud claim where "alleged damages" arise from cause independent of purported fraud); *Wigley v. Am. Equity Mortg.*, No. 15-cv-2473, 2016 WL 866359, at *5 (W.D. Tenn. Mar. 3, 2016) (dismissing fraud claim because the complaint "fails to allege how Plaintiffs relied on the misrepresentation").[19]

Here, the Second Amended Complaint fails to allege any fraudulent statement—much less with the particularity required by Rule 9(b)—or that Plaintiffs relied on any such statement to their detriment.

***First***, Plaintiffs fail to identify any specific false statement, who made it, or when or to whom it was made. Instead, Plaintiffs merely recite the threadbare elements of these claims and make vague and conclusory allegations about the price of Acthar that are devoid of specificity or factual support. (*See, e.g.*, SAC ¶ 204 ("Defendants made material misrepresentations that [the

---

[19] *See also Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1350 (11th Cir. 2016) ("The mere fact of having been misled does not ineluctably give rise to a RICO cause of action unless the act of misleading the plaintiffs actually caused them injury in their business or to their property that they would not otherwise have suffered.").

price of Acthar] represented a calculation of real and fact-based prices . . . , and that they represented the actual value of the product in the marketplace."); *id.* ¶ 366b ("Express Scripts misled Rockford by fraudulently stating over the internet and through the mail that Rockford and the Class would receive affordable healthcare and contained costs of Acthar.").)  Indeed, the Second Amended Complaint does not identify any specific statement made to Plaintiffs by any Express Scripts Entity regarding the price of Acthar being based on a "calculation of real and fact-based prices" or promising that Plaintiffs "would receive affordable healthcare and contained costs of Acthar."  Thus, Plaintiffs' generalized allegations cannot sustain a fraud-based claim.  *See Baldwin*, 78 F. Supp. 3d at 737 (allegations insufficient where they "recount[] vague, nonspecific statements made by 'Defendants' about Anatabloc's supposed benefits" because "they do not allege *specific* misrepresentations made by 16 *individual* Defendants" (emphasis added)).[20]

   Plaintiffs also acknowledge—as they must—that the Rockford Contract expressly sets the reimbursement rate ████████████████, which is exactly what Rockford alleges it paid.  ████

████████████████████████████████████████████████████████

████████████████████  There is simply no allegation that any Express Scripts Entity failed to accurately communicate the price of Acthar or the agreed-upon reimbursement rate.  And the fact that Mallinckrodt was offering Acthar at allegedly inflated prices does not render "false" the agreed-upon reimbursement rate set forth in the Rockford Contract.  *See Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc.*, 691 F. Supp. 2d 860, 870 (N.D. Ill. 2010) ("The fact that

---

[20] Plaintiffs likewise fail to plead that any Express Script Entity made any statement with the requisite intent to defraud Plaintiffs, which also warrants dismissal.  *See R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F. Supp. 1499, 1512 (N.D. Ill. 1990) (dismissing RICO claims based on mail and wire fraud where "although plaintiff has made liberal use of the term 'fraudulently,' plaintiff has failed to expressly allege that any of the defendants acted with an intent to defraud").

Defendants were offering propane for sale at inflated prices does not mean those prices were somehow 'false.'").[21]

**Second**, Plaintiffs likewise fail to allege that they justifiably relied on any such misrepresentation to their detriment. Plaintiffs do not allege that any Express Scripts Entity made (or conspired to make) any misrepresentation that caused Plaintiffs to provide prescription drug coverage for Acthar or caused certain beneficiaries of that coverage to be prescribed Acthar. Nor do Plaintiffs allege facts to plausibly suggest that Rockford chose ESI to be its PBM because of any statement related to Acthar, or that another PBM would have provided Rockford with better terms. Thus, Plaintiffs have failed to allege that they relied on any purported misrepresentation, and Plaintiffs' fraud and RICO claims should be dismissed for this reason too.

**B.** **Plaintiffs Lack Standing To Maintain Their RICO Claims**

In addition to their failure to allege fraud (i.e., the alleged RICO predicate act), Plaintiffs also lack standing to pursue their RICO claims. A plaintiff must plausibly allege that it was "injured in [its] business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). "RICO injury requires proof of a 'concrete financial loss' and does not encompass mere 'injury to a valuable intangible property interest.'" *Evans v. City of Chi.*, 434 F.3d 916, 932 (7th Cir. 2006) (citation omitted), *overruled on other grounds*, 724 F.3d 965 (7th Cir. 2013).

---

[21] Plaintiffs' attempt to transform their breach of contract claims based on supposed "cost containment" obligations in the Rockford Contract into fraud and RICO claims (*see* SAC ¶ 209) fails as a matter of law. First, such fraud-based claims are duplicative of the breach of contract claim, and, when fraud claims or RICO claims are based on allegations of mail and/or wire fraud that are "reformulations of the contract claim," they must be dismissed. *Greenberger v. GEICO Gen. Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011) (dismissing fraud claim under Illinois common law); *see also Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) ("The plaintiffs' mail and wire fraud allegations are nothing more than breach of contract claims, and therefore do not constitute predicate acts." (internal quotation marks omitted)). Second, as with the other fraud-related allegations, Plaintiffs do not plead facts to establish that this statement was false or that Rockford was misled to its detriment. Third, such claims fail for the same reasons as Rockford's breach of contract claim. *See infra* Section III.A.

For an injury to be "by reason of" a RICO violation, the RICO violation must be both a "but for" and proximate cause of the injury, which "requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" *Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 8-9 (2010). "A link that is 'too remote,' 'purely contingent,' or 'indirect' is insufficient." *Id.* at 9.

Here, Plaintiffs' alleged injury—overpaying for Acthar—is not a RICO injury. As other courts have recognized, the allegations that plaintiffs overpaid for a drug are "inadequate for sustaining a RICO injury, absent allegations that Defendants' drug was on some level inferior and therefore worth less than what [Plaintiffs] paid for it." *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, No. 06-cv-3044, 2008 WL 5413105, at *7 (D.N.J. Dec. 23, 2008) (internal quotation marks omitted). Rockford and Acument do not allege that Acthar failed to treat the conditions for which it was prescribed, or that it was "inferior" in any way. They simply wish that it cost less, which fails to constitute the requisite concrete financial loss. *Id.*; *see also Maio v. Aetna, Inc.*, 221 F.3d 472, 488 (3d Cir. 2000) (rejecting injury theory based on overpayment for health insurance plan because plaintiffs did not plead that the enrolled "individuals were denied medically necessary benefits [or] received inadequate, inferior or delayed medical treatment"). Further, Plaintiffs fail to plausibly allege that their purported "overpayment" was caused by reason of a RICO violation. *See supra* Section II.A (describing Plaintiffs' failure to adequately allege reliance on, or resulting damage from, any purported misrepresentation); *see also In re Yasmin and Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 09-md-2100, 2010 WL 3119499, at *6 (S.D. Ill. Aug. 5, 2010) (observing that a "majority of courts considering the issue have concluded that the [overpayment] injury for which third party payors seek reimbursement is too remote and speculative to maintain a RICO claim" and dismissing on that basis).

22

Moreover, Acument lacks RICO standing because it did not purchase Acthar directly from any Defendant. *See Fiala v. Wasco Sanitary Dist.*, No. 10-cv-2895, 2012 WL 917851, at *6-8 (N.D. Ill. Mar. 16, 2012) ("[A] plaintiff cannot seek damages under RICO where it is an indirect purchaser . . . ." (citing *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 753-57 (7th Cir. 2011); *Carter v. Berger*, 777 F.2d 1173, 1175-76 (7th Cir. 1985))).

Accordingly, Plaintiffs lack standing to pursue any of their RICO claims.

## C.   Plaintiffs Have Not Alleged That Any Express Scripts Entity Participated in the Conduct of the Purported "Enterprise's" Affairs

Finally, Plaintiffs' RICO claims should be dismissed for the independent reason that they fail to satisfy the RICO enterprise requirement. Section 1962(c) and (d) require plaintiffs to plausibly allege that a RICO defendant "conducted or participated in the conduct of the '*enterprise's* affairs,' not just [its] *own* affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (emphases added); *United Food & Commercial Workers Unions v. Walgreen Co.*, 719 F.3d 849, 856-7 (7th Cir. 2013) (applying *Reves* to dismiss Section 1962(c) and (d) claims). A complaint does not plausibly suggest such "conduct" where "the activities the complaint describes are entirely consistent with [enterprise members] each going about [their] own business." *United Food*, 719 F.3d at 855-56. For example, the Seventh Circuit has squarely rejected RICO allegations based on the operation of a pharmaceutical distribution chain:

> [W]hile it is true that [a pharmacy] does not make drugs and [a manufacturer] does not fill prescriptions, and that the two companies must therefore "cooperate" in order for drugs to reach consumers, such cooperation describes virtually every prescription pharmaceutical distribution chain. The allegations in the complaint do not indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy, and without such an indication, we cannot find a basis for inferring that [the manufacturer and pharmacy] were conducting the enterprise's affairs.

*Id.* at 856.

Here, Plaintiffs fail to plausibly allege that any of the Express Scripts Entities participated in or conducted the affairs of any purported RICO enterprise—much less that they engaged in a pattern of predicate acts through such enterprise. To the contrary, Plaintiffs' allegations merely describe the Express Scripts Entities carrying out their own independent affairs in the context of normal, arm's-length business relationships with Mallinckrodt (i.e., CuraScript's distribution of Acthar and UBC's administration of ASAP), Rockford (i.e., the Rockford Contract for PBM services), and patients (i.e., Accredo's dispensing of Acthar). As in *United Food*, the Second Amended Complaint "shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of" committing RICO violations. *Id.* at 855; *accord In re Honey Transshipping Litig.*, 87 F. Supp. 3d 855, 870-71 (N.D. Ill. 2015) (commercial sale by an importer to a packer/supplier "'shows only that [defendants] had a commercial relationship, not that they had joined together to create a ***distinct entity*** for purposes of' fraudulently transshipping [product]"). Thus, these claims fail as a matter of law.[22]

## III.   THE CONTRACT AND QUASI-CONTRACT CLAIMS AGAINST THE EXPRESS SCRIPTS ENTITIES (COUNTS XII-XV) SHOULD BE DISMISSED

### A.   Rockford Fails To State a Claim for Breach of Contract

To state a claim for breach of contract under Illinois law,[23] Rockford must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592

---

[22] Plaintiffs' claim under Section 1962(a) fails for the additional reason that they do not allege that any Express Scripts Entity received any income from "racketeering activity," how it invested that income, or how Plaintiffs were harmed by that investment. *See Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 398-99 (7th Cir. 2009) (dismissing boilerplate Section 1962(a) claim).

[23] The Rockford Contract contains ████████████████████████████████████████████ ████████████████████████████████████████

F.3d 759, 764 (7th Cir. 2010) (internal quotation marks omitted). Prefatory "clauses serve as recitals and are . . . not binding obligations." *McMahon v. Hines*, 697 N.E.2d 1199, 1204 (Ill. App. Ct. 1998). Moreover, "contract terms must be sufficiently definite or certain so as to give courts a 'basis for deciding whether the agreement has been kept or broken.'" *Pennington v. Travelex Currency Servs., Inc.*, 114 F. Supp. 3d 697, 701-02 (N.D. Ill. 2015). Where a contract term uses phrases that have "no objective criteria to determine" whether the promisor has met its obligation, the term is insufficiently definite to be enforced. *Id.* at 702. For instance, "'excellent exchange rates' is not a definite and certain term because the contract identifies no objective criteria to determine the level of 'excellence' of the rate charged." *Id.*

Rockford's breach of contract claim against ESI should be dismissed for several independent reasons.[24] *First*, Rockford asserts that ESI had an obligation to provide "cost containment" based on language found only in the prefatory Recitals of the Rockford Contract that merely describes ESI's business in general terms. (*See* SAC ¶ 77; *see also* Rockford Contr. at 1 ("ESI, either directly or through its subsidiaries, engages in pharmacy benefit management services, including, among other things, . . . cost containment . . . .").) Such generic, non-promissory language found in the Recitals *before* the "Terms of Agreement," however, does not—and cannot—create a "binding obligation" capable of being breached. *See McMahon*, 697 N.E.2d at 1204. By contrast, ESI's actual contractual obligations regarding the services it would provide ███████████████████████████████████████████ Because Rockford fails to allege that ESI breached any of the operative contractual provisions regarding

---

[24] To the extent Rockford asserts a breach of contract claim against ESHC, UBC, CuraScript, or Accredo, any such claim must be dismissed because those entities are not parties to the Rockford Contract. *See Phillips v. WellPoint Inc.,* No. 10-cv-357, 2012 WL 6111405, at *9 (S.D. Ill. Dec. 10, 2012) ("As a basic principle of contract law, a non-party cannot be held liable for a breach of contract.").

25

the services promised to Rockford, and instead relies on generalized prefatory language about ESI in the Contract's Recitals, this claim should be dismissed. *See Regnery v. Myers,* 679 N.E.2d 74, 78 (Ill. App. Ct. 1997) ("[A] recital is merely an explanation of the circumstances surrounding the execution of the contract but is not a binding obligation unless referred to in the operative portion of the contract."); *see also My Baps Constr. Corp. v. City of Chi.,* 87 N.E.3d 987, 1010 (Ill. App. Ct. 2017) ("'When a contract contains both specific and general provisions relating to the same subject, the specific provision controls.'").

*Second,* Rockford's breach of contract claim is based on contractual language that is insufficiently definite as a matter of law. Rockford alleges ESI breached its purported obligation to provide "cost containment" as part of its overall PBM services in the Rockford Contract. (SAC ¶ 77.) This general description of ESI's services (along with seven other general descriptions (*id.*)) is not defined in the contract (*id.* ¶ 83) and is not "sufficiently definite or certain so as to give courts a basis for deciding whether the agreement has been kept or broken." *Pennington,* 114 F. Supp. 3d at 701-02 (internal quotation marks omitted).

*Third,* Rockford's allegations do not plausibly suggest that ESI breached any conceivable obligation to "contain costs." Indeed, the Second Amended Complaint concedes that Rockford agreed to and was charged ███████████████████████████████ And notwithstanding Plaintiffs' complaint that Mallinckrodt (and its predecessor Questcor) have exponentially raised prices since 2001 (*see id.* ¶ 38), according to the Second Amended Complaint, after the Rockford Contract became effective on January 1, 2015 (*id.* ¶ 76), the price of Acthar to Rockford allegedly ███████████████████████████████ ██████ Even assuming *arguendo* that ESI was contractually obligated to "contain costs"— which it was not—Rockford does not allege facts plausibly showing ████████████████

26

███████████████████ constitutes a failure to "contain costs" within the overall

context of *all* the PBM services that ESI provides to Rockford.  (*See* SAC ¶ 77.)  Thus, the Court

should dismiss Rockford's breach of contract claim.

**B.      Rockford's Quasi-Contract and Declaratory Judgment
          Claims Are Duplicative of Its Breach of Contract Claim**

It is well settled under Illinois law that "a plaintiff may not pursue a quasi-contractual

claim where there is an enforceable, express contract between the parties." *Cromeens,*

*Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 397 (7th Cir. 2003) (applying Illinois

law).  Moreover, courts in the Northern District of Illinois "commonly exercise [their]

discretion" to decline to hear a declaratory judgment action "where the claim for declaratory

judgment substantially overlaps with Plaintiff's substantive claims," such as instances when a

breach of contract claim "would resolve the issues raised by the declaratory judgment action."

*Cohn v. Guaranteed Rate Inc.*, 130 F. Supp. 3d 1198, 1205 (N.D. Ill. 2015).

Here, the Rockford Contract directly covers the price Rockford pays for Acthar (*see* SAC

¶ 80 (the Rockford Contract specifies ████████████████████

████ ), and Rockford's claims for promissory estoppel, breach of the implied covenant of good

faith and fair dealing, and declaratory judgment rest on the same underlying factual allegations

as its breach of contract claim, i.e., that ESI purportedly failed to contain the cost of Acthar.  (*See*

*id.* ¶¶ 397, 400-01, 407.)  As such, these claims should be dismissed as duplicative.  *See In re*

*VTech Data Breach Litig.*, No. 15-cv-10889, 2017 WL 2880102, at *9 (N.D. Ill. July 5, 2017)

(dismissing good faith and fair dealing claim because "'[u]nder Illinois law the covenant of good

faith and fair dealing is not an independent source of duties for the parties to a contract'"

(quoting *Baxter Healthcare Corp. v. O.R. Concepts*, 69 F.3d 785, 792 (7th Cir. 1995))); *Bryant v.*

*Jackson Nat. Life Distribs., LLC*, No. 12-cv-9391, 2013 WL 1819927, at *3 (N.D. Ill. Apr. 30,

27

2013) (dismissing declaratory judgment claim because "[a] declaratory judgment action is not the proper vehicle for presenting what are, in essence, plaintiff's breach of contract allegations"); *The Sharrow Grp. v. Zausa Dev. Corp.*, No. 04-cv-6379, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 6, 2004) (dismissing promissory estoppel claim where plaintiff also alleged a valid and enforceable agreement covering the subject at issue).[25]

## IV. THE UNJUST ENRICHMENT CLAIM AGAINST THE EXPRESS SCRIPTS ENTITIES (COUNT I) SHOULD BE DISMISSED

While not clearly pleaded, Rockford's unjust enrichment claim against the Express Scripts Entities appears to rest on its antitrust, RICO, and fraud claims. (*See* SAC ¶ 184.) "[W]hen a plaintiff brings an unjust enrichment claim that is based on wrongful conduct, plaintiff must plead and prove that conduct." *In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig.*, No. 05-cv-2623, 2006 WL 3754823, at *4 (N.D. Ill. Dec. 18, 2006). Because Rockford has not plausibly alleged the wrongful conduct underlying its antitrust, RICO, and fraud claims, its duplicative unjust enrichment claim based on the same purported conduct should be dismissed. *See Fuchs v. Menard, Inc.*, No. 17-cv-1752, 2017 WL 4339821, at *7 (N.D. Ill. Sept. 29, 2017) (dismissing unjust enrichment claim that was predicated on insufficiently alleged fraud claims); *In re Sears*, 2006 WL 3754823, at *4 (same).

To the extent Rockford attempts to allege a quasi-contract unjust enrichment claim, that claim should be dismissed as duplicative of the breach of contract claim because it incorporates

---

[25] Although Rockford purports to assert its quasi-contractual claims against "Express Scripts" (*e.g.*, SAC ¶¶ 395, 401), which it impermissibly defines to include all of the Express Scripts Entities (*id.* ¶ 34), its allegations for these claims pertain solely to ESI and the Rockford Contract (*id.* ¶¶ 396-99, 401-03, 407-09). Thus, to the extent Rockford purports to assert quasi-contractual claims against ESHC, CuraScript, Accredo or UBC, such claims must be dismissed because the Second Amended Complaint contains no factual allegations involving ESHC, CuraScript, Accredo, or UBC in connection with the quasi-contractual claims.

all preceding paragraphs (*see* SAC ¶ 177), including those describing the Rockford Contract and its prefatory language concerning "cost containment" (*see id.* ¶¶ 76-83). *See Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601, 615 (7th Cir. 2013) (dismissing unjust enrichment claim as duplicative of breach of contract claim because plaintiff "may not include allegations of an express contract which governs the relationship of the parties in the counts for unjust enrichment").

## V. ALL CLAIMS AGAINST THE EXPRESS SCRIPTS ENTITIES SHOULD BE DISMISSED WITH PREJUDICE

"Leave to amend need not be granted . . . if it is clear that any amendment would be futile." *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013). In other words, where "no set of facts could exist consistent with the complaint that would allow these claims to survive," the court need not grant leave to amend. *Id.* at 607.

The Second Amended Complaint is Rockford's second failed attempt to plead antitrust claims based on distribution agreements that can have no plausible anticompetitive effect and conclusory allegations that ESI conspired with Mallinckrodt regarding the reimbursement rates ESI charges Rockford and other third party payors. Moreover, Plaintiffs' RICO and common law fraud claims consist of mere recitations of the elements of those claims coupled with vague and unparticularized allegations. Finally, in the over two and a half years since Rockford reimbursed the first Acthar prescription at issue in this action, the only allegation it can muster in support of its breach of contract claim is that ESI has not provided "cost containment"—an undefined term in the prefatory section of the parties' contract—because the cost of one of the drugs Rockford chose to cover for its employees ██████████████.

Acument—which is represented by the same attorneys as Rockford—has signed onto the Second Amended Complaint without alleging any additional facts that could cure the pre-existing, fatal deficiencies in the merits of the antitrust, RICO, and fraud claims against the

29

Express Scripts Entities. Moreover, even if Plaintiffs' claims could survive a motion to dismiss on the merits—which they cannot—Acument cannot recover under federal antitrust law or RICO because it is an indirect purchaser.

On the third turn of the complaint in this action, Plaintiffs have not approached plausibly alleging any claim against any Express Scripts Entity. Thus, additional amendment would be futile, and the Court should not grant leave to further amend the complaint as to the Express Scripts Entities. *See Cinecoe v. Boeing Co.*, No. 16-cv-8443, 2017 WL 3872459, at *5 (N.D. Ill. Sept. 5, 2017) (dismissing with prejudice where "Plaintiff has amended the complaint once in response to a motion to dismiss and his proposal for a second amended complaint contains the same flaws as his amended complaint").

## **CONCLUSION**

For the foregoing reasons, all claims against the Express Scripts Entities should be dismissed with prejudice.

Dated: January 22, 2018

Respectfully submitted,

/s/ Matthew M. Martino
Matthew M. Martino (admitted *pro hac vice*)
Patrick G. Rideout (admitted *pro hac vice*)
Michael H. Menitove (admitted *pro hac vice*)
Evan R. Kreiner (admitted *pro hac vice*)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
matthew.martino@skadden.com
patrick.rideout@skadden.com
michael.menitove@skadden.com
evan.kreiner@skadden.com

Eric J. Gorman
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
155 North Wacker Drive

30

Chicago, IL 60606
Telephone: (312) 407-0700
Facsimile: (312) 407-8567
eric.gorman@skadden.com

*Attorneys for Defendants Express Scripts Holding Company, Express Scripts, Inc., CuraScript, Inc., Accredo Health Group, Inc., and United BioSource Corporation*

31

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2018, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Matthew M. Martino