```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        WESTERN DIVISION

 3  CITY OF ROCKFORD,            )  Docket No. 17 C 50107
                                 )
 4                 Plaintiff,    )  Rockford, Illinois
                                 )  Tuesday, January 30, 2018
 5     v.                        )  1:30 o'clock p.m.
                                 )
 6  MALLINCKRODT ARD, INC.,      )
    et al.,                      )
 7                               )
                   Defendants.   )
 8
                       TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE IAIN D. JOHNSTON

10  APPEARANCES:

11  For the Plaintiff:        HAVILAND HUGHES
                              (201 South Maple Avenue,
12                             Suite 110,
                               Ambler, PA  19002) by
13                            MR. DONALD E. HAVILAND, JR.

14                            MEYERS & FLOWERS, LLC
                              (3 North Second Street,
15                             Suite 300,
                               St. Charles, IL  60174) by
16                            MR. JONATHAN P. MINCIELI

17                            CITY OF ROCKFORD
                              DEPARTMENT OF LAW
18                            (425 East State Street,
                               Rockford, IL  61104) by
19                            MR. IFEANYICHUKWU C. MOGBANA

20  For the Defendant         BRYAN CAVE LLP
    Mallinckrodt ARD, Inc.:   (211 North Broadway,
21                             Suite 3600
                               St. Louis, MO  63102) by
22                            MR. HERBERT R. GIORGIO
                              (1201 West Peachtree Street,
23                             14th Floor,
                               Atlanta, GA  30309) by
24                            MR. GEORGE P. WATSON

25
```

```
 1                                    WILLIAMS McCARTHY LLP
                                      (120 West State Street,
 2                                     Rockford, IL  61105) by
                                      MR. SCOTT C. SULLIVAN
 3
     For the Defendants             SKADDEN ARPS SLATE MEAGHER & FLOM
 4   United BioSource              (155 North Wacker Drive,
     Corporation and                Suite 2700,
 5   Express Scripts:                Chicago, IL  60606) by
                                    MR. ERIC J. GORMAN
 6                                   (4 Times Square,
                                      New York, NY  10036) by
 7                                    MR. MATTHEW M. MARTINO

 8   Also Present:                  MR. DAVID HUNDLEY
                                    Counsel for MSP Plaintiffs
 9
     Court Reporter:                HEATHER M. PERKINS-REIVA
10                                   327 South Church Street
                                     Rockford, IL  61101
11                                   (779) 772-8309

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1      (The following is from a tape-recording of proceedings:)

 2              THE CLERK:  Calling 17 CV 50107, City of Rockford v.

 3      Mallinckrodt ARD, Inc., et al.

 4              THE COURT:  All right.  Hold on one second.  I need

 5      to make a scorecard again.

 6              All right.  Let's have people step up and get

 7      appearances.  Plaintiff on that side, Defendants on that side.

 8              MR. MOGBANA:  Good morning, Judge.  Ifean Mogbana for

 9      the City of Rockford.

10              THE COURT:  Good morning, Mr. Mogbana -- or good

11      afternoon, Mr. Mogbana.

12              MR. HAVILAND:  Good morning, your Honor.  Don

13      Haviland for the City of Rockford.

14              THE COURT:  Hold on one second.

15              Okay.

16              MR. MINCIELI:  Jonathan Mincieli, Meyers & Flowers,

17      for the City of Rockford.

18              THE COURT:  Where did you go?  There you are.

19              Okay.

20              MR. HUNDLEY:  Good afternoon, your Honor.  David

21      Hundley on behalf of the MSP Plaintiffs in the related case

22      that's part of the motion in front of you this morning.

23              THE COURT:  You know what is going to be a problem?

24      When just the attorney list goes on double digits -- eight

25      pages -- or nine pages.
```

```
 1              Okay.  What was that again?
 2              MR. HUNDLEY:  David Hundley, H-u-n-d-l-e-y.
 3              THE COURT:  Hundley, okay.
 4              MR. HUNDLEY:  Okay.
 5              THE COURT:  All right.  For the -- we will call
 6  you the "new folks."
 7              MR. HUNDLEY:  Fair enough.
 8              THE COURT:  MSP.  Okay.
 9              MR. SULLIVAN:  Good afternoon, your Honor.  Scott
10  Sullivan for the Mallinckrodt Defendants.
11              THE COURT:  Good afternoon, Mr. Sullivan.
12              MR. WATSON:  Tom Watson from Bryan Cave for the
13  Mallinckrodt Defendants.
14              MR. GIORGIO:  Good afternoon, your Honor.  Herb
15  Giorgio, Bryan Cave, for the Mallinckrodt Defendants.
16              MR. GORMAN:  Good afternoon, your Honor.  Eric
17  Gorman, Skadden Arps, on behalf of the Express Scripts
18  Defendants.
19              THE COURT:  Hold on one second.
20              MR. MARTINO:  Good afternoon.  Matthew Martino from
21  Skadden Arps on behalf of the Express Scripts Defendants.
22              THE COURT:  Okay.  So we have got Mallinckrodt,
23  Express Scripts.  That's on that.
24              Then we have the City of Rockford and then the new
25  folks.
```

1    First thing -- I have got to find something easy to

2    do.  I had something easy to do.  We had a briefing schedule

3    cooking, but that might go sideways now.

4    I can't rule on the motion to transfer.  That has got

5    to be ruled on by Judge Kapala, unless you consent to me, and

6    I don't think that's going to happen.

7    Can we talk about it a little bit?  So you filed in

8    California.

9    MR. HUNDLEY:  Correct, Judge.

10   THE COURT:  Mr. Hundley, you filed in California.

11   Which district?

12   MR. HUNDLEY:  The Central District.

13   THE COURT:  Okay.  The Central District.  It is filed

14   there.  It is removed to the Northern District of Illinois

15   by -- who filed that motion?

16   MR. HUNDLEY:  The Defendants.

17   MR. WATSON:  We filed a motion to transfer -- the

18   Defendants jointly filed a motion to transfer under the

19   first-to-file doctrine.

20   THE COURT:  Okay.

21   MR. WATSON:  And so it was moved to Illinois.

22   THE COURT:  In that whatever was filed, did it

23   specify eastern or western division?

24   MR. WATSON:  I don't believe that it specified either

25   way.  I think it said Northern District of Illinois.  It gave

1    the case citation and talked about the Rockford v.

2    Mallinckrodt and Express Scripts cases.

3                THE COURT:  Okay.

4                MR. WATSON:  And --

5                THE COURT:  Was it your intent to bring it here, or

6    poor Judge Alonso probably was thinking, "Well, what did I do

7    wrong to catch this?"

8                MR. WATSON:  It was our intent to bring it here.

9                THE COURT:  Okay.  Just checking.

10               MR. WATSON:  Because we were trying to -- the whole

11   idea was judicial efficiencies and economies of scale,

12   judicial economy, and so on and so forth, and to make sure we

13   didn't end up with inconsistent rulings.  So we wanted it in

14   front of the same court is the bottom line.

15               THE COURT:  Okay.  All right.  Judge Alonso is an

16   excellent judge.  He is a good Blackhawks fan, and he has good

17   taste in music.

18               So you don't want to be in front of Judge Alonso or

19   you do?

20               MR. GORMAN:  No, Judge, I think when the assignment

21   first came out, because of the geographical interests of my

22   client and those attorneys involved, we were a bit seduced by

23   the idea of our assignment to Chicago, which is why we didn't

24   initially agree to the motion.

25               But upon reflection, I think that the intent of the

1   California court's order certainly is to have the cases

2   litigated together.  So we don't intend to file any sort of

3   opposition or to further oppose the --

4         THE COURT:  Okay.  All right.  I will break the news

5   to Judge Kapala.

6         All right.  So, good, that turned out to be easy.

7         What are you cooking up as far as a response

8   to -- now that the case is going to be here -- I haven't

9   looked at it in detail.  Are we going to have more motions?

10  Do you want to have them joined?  Do they need to be slightly

11  tweaked?  Do we need a whole new briefing schedule?  What are

12  your thoughts?

13        MR. WATSON:  And I'm speaking for Mallinckrodt right

14  now, and so I will let Express Scripts speak for themselves.

15        Our thought -- well, first of all, we had filed a

16  motion to dismiss in this case.  Under the current schedule as

17  was set in California and transferred to Chicago, and I guess

18  now will be reassigned to here, our motions in that case are

19  due on the 23rd of February, and we are perfectly willing and

20  able to meet that date, unless there is going to be some

21  consolidation or -- I don't know whether the MSP Plaintiffs

22  intend to file any amended complaint before then, but we are

23  ready to go on that.  We can file it by that deadline.

24        THE COURT:  Okay.

25        MR. WATSON:  We do think it makes sense to line up

1    the responses, though, to try to get the briefs on the same

2    schedule.

3              THE COURT:  Yes.

4              MR. WATSON:  And we, at least from our perspective,

5    are willing to give the Rockford Plaintiffs more time, if

6    that's what's necessary, to get that done, and we have not

7    talked to them about a briefing schedule yet.

8              THE COURT:  Okay.

9              MR. HAVILAND:  Your Honor, Don Haviland for the City

10   of Rockford.

11             So we have amended our complaint, as the court may

12   have seen.  We added a Plaintiff called "Acument" --

13             THE COURT:  Yes.

14             MR. HAVILAND:  -- who has a substantial stake in the

15   case.  We don't intend to amend again, and I don't think that

16   consolidation is in the cards for us.  The MSP Plaintiffs'

17   case is different in terms of their standing.  Their role in

18   this case is different from Rockford and Acument.  Their

19   allegations were gleaned off of ours, so there is some

20   parallel.  I don't disagree that we should have those briefs

21   move pace.

22             We have the motion to dismiss of the Defendants, and

23   we are currently preparing our opposition, which I think is

24   about that time frame that they would be filing the motion

25   against the MSP Plaintiffs.

1          So we are probably looking, if you adopt that

2    schedule, at about a month delay, which puts the hearing off

3    into the summertime.

4          But I would be amenable --

5          THE COURT:  There will be a hearing, just so you

6    know.

7          MR. HAVILAND:  Okay.

8          THE COURT:  I'm not ruling on it.  Judge Kapala -- it

9    will get put on Judge Kapala's giant stack, and he will rule

10   on it.

11         MR. HAVILAND:  So our briefing probably goes to about

12   April, May, and then the matter will be ready for a ruling by

13   the court.

14         Yes, our response is due March 5th currently, per the

15   court's order, and replies due April the 3rd.  So if the

16   defense were to file on February the 23rd, and we backed up

17   our opposition to the end of March, we could put the replies

18   to the end of April just to stay on track.

19         MR. WATSON:  I think that's right.

20         MR. HAVILAND:  I would note that there are some

21   differences in the case in terms of Express Scripts.  We have

22   an array of Express Scripts companies, the MSP Plaintiffs.  I

23   don't know if that is going to necessarily impact the motions,

24   but I'm sure Express Scripts will raise that for the court in

25   their papers.

1    THE COURT:  I was going to ask them what their view

2    was.

3    Express Scripts, what do you --

4    MR. GORMAN:  We have no objection to that schedule.

5    That works for us.

6    THE COURT:  What I would really like to avoid is

7    having the Defendants start looking at things and they look at

8    a slightly different method.  I'm not saying that in a

9    pejorative way.  It is just when you have had the opportunity,

10   you start thinking about it, you start putting pen to paper,

11   and you go, "It is kind of a little different.  I want to

12   do -- I'm viewing things, I'm viewing litigation differently,"

13   and then you want to file something different.

14   If we just scrap the briefing schedule, we are not

15   going to lose any ground on anything, you are not going to

16   lose your place in line, and we can start up with a whole new

17   briefing schedule, if that makes sense.  I'm just throwing it

18   out there.  I don't want to make any additional -- I don't

19   want to make any additional work for anybody, but what I don't

20   want happening is midstream all of a sudden we start amending

21   briefings and we end up taking longer than we would have if we

22   would have just started from scratch again.

23   MR. HAVILAND:  If it is helpful, your Honor, from the

24   City's perspective, we don't intend to amend the complaint

25   again.  We spent some time on that amendment.

1        THE COURT:  Okay.

2        MR. HAVILAND:  We had the first motion to dismiss to

3   guide us, and of course we added a new client, and that's

4   going to be the sum total for this point.  So we have their

5   motion to dismiss.  So I don't think there is going to be any

6   changes.

7        THE COURT:  And the motion to dismiss isn't going to

8   change at all with the addition of the new Plaintiff?

9        MR. WATSON:  Well, our motion to dismiss reflected

10  the new Plaintiff in the Rockford case.  I don't foresee any

11  changes that would need to be made to the Rockford briefing as

12  a result of the MSP complaint.

13       THE COURT:  Okay.

14       MR. WATSON:  If MSP, as I said earlier, wants to

15  amend their complaint for whatever reason, that might change

16  something, but I can't envision how it would possibly change

17  what we have already said in our Rockford motion to dismiss.

18       THE COURT:  Does MSP have any inkling on filing an

19  amended complaint?

20       MR. HUNDLEY:  Judge, I wish I could report that with

21  specificity.  I have jumped into this, being the Chicago

22  lawyer in our group, so I can't say one way or the other.

23       I know that we have made some amendments with regard

24  to just more sort of housekeeping matters as it relates to the

25  Plaintiff entities.

```
 1          So I can't say right now if those have already been
 2   made in this particular case.  I believe that they have.  So
 3   my guess is that we do not intend to file an amendment.
 4          THE COURT:  Okay.  So tell me your folks' proposed
 5   briefing schedule.  How do you want to handle it?  It sounds
 6   like you are all in agreement.  We can do it this way.  I'm
 7   not going to force dates on you right now because there is too
 8   many lawyers, too many calendars.  Why don't you look at it
 9   and tell me.  You start proposing what it looks like, and we
10   will go with that.
11          MR. HAVILAND:  So, again, your Honor, for the City of
12   Rockford, we are prepared to file our opposition on March the
13   5th.  Any additional time is not going to make a difference in
14   our world.
15          If Mallinckrodt wants to hold the schedule from
16   California, I guess we are going to key off of that in terms
17   of the two rounds of briefs.
18          THE COURT:  All right.  And you want to use that
19   February 23rd date and jump off of that?
20          MR. WATSON:  We are fine -- we are fine with filing
21   on the 23rd and keying the responses off of that date and the
22   reply off of that date.
23          THE COURT:  Okay.  And what's your -- I have a reply
24   date for you to the 3rd, April 3rd?
25          MR. WATSON:  April 3rd.  I think it is, yes,
```

1    March 5th and April 3rd.

2           THE COURT:  That's correct.  I got it.  Okay.

3    April 3rd.

4           So 2/23/2018 for that motion.

5           And then how much time to respond to the motion?

6           MR. HAVILAND:  Your Honor, consulting the electronic

7    calendar to my left, I see --

8           THE COURT:  That's why you print them out.  Never

9    bring your -- just print them out when you come in.

10           MR. HAVILAND:  The 30th falls on a Friday, of March,

11   and then April 30th is a Monday.  So that avoids some weekends

12   in terms of pushing back, roughly, three and a half weeks.

13           THE COURT:  Okay.  So what day do you want?

14           MR. HAVILAND:  I just proposed March 30th and

15   April the 30th, March 30th for the oppositions, April 30th for

16   the replies.

17           THE COURT:  Does that work?

18           MR. WATSON:  That's fine with us.

19           THE COURT:  March 30th, 2018.

20           April 30th for replies.

21           All right.  We have got a new party in one case, a

22   whole new case.  What type -- I don't know if that changes any

23   of your initial disclosures, maybe a little bit, tweaks it a

24   little bit.

25           What do we do for initial disclosures with the new

1    Plaintiffs?

2           MR. HAVILAND:  So we have done our disclosures.  Your

3    Honor's order was clear about that.  And from both Acument's

4    standpoint and Rockford's, we have amended, and then we have

5    done the disclosures for Acument.  So we are done.

6           THE COURT:  Okay.

7           MR. WATSON:  And in Mallinckrodt, we filed our

8    disclosures, and I don't foresee any changes that will be

9    needed to the disclosures we did for Rockford because of MSP.

10          THE COURT:  Okay.

11          MR. WATSON:  We have not done an MSP disclosure.

12          THE COURT:  Okay.  All right.

13          MR. GORMAN:  That's the same for the Express Scripts

14   Defendants.

15          THE COURT:  Okay.  New folks, what are you looking at

16   as far as 26(a)(1) disclosures?  When can you get those over

17   to the Defendants?

18          MR. HUNDLEY:  I'm thinking, Judge, if you could give

19   us like somewhere in the neighborhood of 21 days?  That would

20   be the 20th of February.

21          THE COURT:  February 28th, 2018, 26(a)(1)s.

22          Okay.  Anybody anticipate anybody else joining the

23   fray?

24          MR. HAVILAND:  Not in this case, your Honor, but we

25   have made clear to the court and to the Defendants we do

1  represent other clients, municipalities, third-party payors.

2  At this point, we don't want to turn the pleadings into a

3  never-ending case of amendments, but those clients are making

4  decisions about what to do.

5        You see that with Acument, it is a Detroit-based

6  company that has operations in Belvidere, down the road.

7  That's where their HR is.  So it made a lot of sense to have

8  them join here.

9        There may be other cases filed in state court since

10  some of those clients have smaller claims, but we would talk

11  with the Defendants first about coordinating all efforts here.

12  The intent is not to get ahead of this case or to conflict

13  with it, but we have got our clients that are dealing with

14  this situation on a granular basis.  I just wanted to echo

15  what I said to the defense all along, that we have those

16  clients that we are representing, and this is the case that we

17  are proceeding with on a class-wide basis.

18        THE COURT:  Okay.  What are your guys' thoughts?

19        MR. WATSON:  Other than what counsel just said, we

20  don't have any knowledge of any other potential cases being

21  filed.

22        MR. HAVILAND:  And we haven't heard of any either,

23  your Honor, outside of the parties represented here.

24        THE COURT:  It has been a while since I looked at

25  your motions to dismiss.  I know they are -- Judge Rowland

1    uses the word "fulsome."

2              What were the issues?

3              MR. WATSON:  Well, in the first one, from the

4    Mallinckrodt standpoint, was Illinois Brick, which I think we

5    talked about a lot the last time --

6              THE COURT:  Yes.

7              MR. WATSON:  -- and the whole standing issue.

8              And then there were failure-to-state-a-claim

9    arguments with respect to both the distribution system

10   arguments and their arguments relating to the acquisition of

11   an allegedly competing drug.

12             And then with respect to the state law antitrust

13   claims, there are standing arguments and some substantive and

14   procedural arguments depending on the state.

15             And then RICO, it was essentially failure to

16   state -- or to prove our alleged enterprise and causation,

17   various failure-to-state-a-claim arguments.

18             THE COURT:  Okay.

19             MR. GORMAN:  For Express Scripts, your Honor, we

20   moved on many of the same grounds.  In addition, we moved to

21   dismiss the breach-of-contract claim that Rockford has brought

22   against Express Scripts, Inc.

23             THE COURT:  I'm going to kick myself for asking this:

24   Other than 26(a)(1) disclosures, do you want to move forward

25   with discovery; and, if so, on what issues?  Do you want to

1   phase it, do you not want to phase it, both as far as

2   procedure and subject matter?

3          MR. HAVILAND:  The good news is, your Honor, we have

4   made progress.  When we were last in front of you, we thought

5   we were going to get a motion from the foreign company, the

6   PLC, that would have raised jurisdictional discovery issues.

7   So we did not get a 26(b)(2) motion or a 12(b)(2) motion.  So

8   that's off the table.

9          When I last spoke with the court, I framed it as

10  three different buckets that we were interested in, that I

11  think are very simple and straightforward and actually go to

12  the issues that we just raised, and I will make that point.

13         The number one group of documents is the contracts

14  between the Defendant parties, beginning with the 2007

15  contract.  I believe there was an amendment in '08.  And then

16  there may or may not have been extensions of those agreements.

17  And I think they are readily available.

18         Why they would be helpful at this juncture while we

19  are in the Rule 12 is a lot of the motion arguments go to what

20  those contracts mean and the distribution system, and I think

21  that would answer a lot of questions for all the parties.

22         Obviously, the court saw the motion by Express

23  Scripts to seal the contract with Rockford.  We didn't weigh

24  in on that at the time, but we do believe that there is

25  portions of that contract that should be publicly revealed.

1    But we have that contract, and obviously ESI has it.  But we

2    are interested in the contracts between these parties because

3    it is going to help with standing.  We argue that Rockford

4    buys direct through Express Scripts because the drugs come to

5    our employees through Curascript, through some consignment or

6    other basis for the manufacturer, and this agreement has been

7    around since 2007, so it is over ten years.

8              It is a finite request.

9              THE COURT:  Let me pause you right there.

10             MR. HAVILAND:  Yes.

11             THE COURT:  So are you saying you need the contracts,

12   amendments, extensions -- contract issues -- to respond to the

13   motion to dismiss?

14             MR. HAVILAND:  I don't need them.  I think our

15   allegations cover that.  But they are raising factual issues

16   that go to the contracts, and I do think it advances the cause

17   of the court to get them sooner rather than later.

18             THE COURT:  Okay.

19             MR. HAVILAND:  The two other issues I raised with the

20   court before were the FTC file documents that led to the

21   settlement with the FTC for 100 million, and, more

22   importantly, the licensure of Synacthen, a competitive

23   product.  We don't have eyeballs from the Plaintiffs' vantage

24   as to where that license is, and it is important for antitrust

25   arguments that that product be licensed and to know where it

1   is going, to know what it is doing in terms of its sales or

2   coming to fruition.

3           Then finally is the Retrophin-Shkreli documents.

4   That's the company, your Honor will remember, that tried to

5   buy Synacthen before Mallinckrodt came in.  Both of those

6   cases, the FTC case and the Retrophin case, were settled by

7   Mallinckrodt, and we believe that those files are finite,

8   available.

9           I reread the transcript this morning, your Honor, of

10  our hearing, and you framed it as this:  If it was ten servers

11  worth of information, that would be one thing, but if it was

12  some files in Iron Mountain, then my sense is you would be

13  more inclined to allow us to move forward so we can move

14  forward on discovery.

15          It all comes down to burden and proportionality at

16  this point.  If those files are available, we would just as

17  soon get started.

18          THE COURT:  Okay.  Three wholly different types of

19  documents here.  Contracts, amendments, agreements,

20  extensions, I would think that shouldn't be too hard.

21          MR. WATSON:  Well, let's start with the contracts.

22          THE COURT:  That seems like the easiest one to start

23  with.  Go ahead.

24          MR. WATSON:  It is our position that the motions to

25  dismiss should be decided on the allegations, and if you start

1    producing selected documents that they would like to use in

2    responding to the motion to dismiss --

3              THE COURT:  That's why I asked the question.

4              MR. WATSON:  -- it opens up a can of worms because

5    there are, obviously, documents we would then want to use to

6    respond to those, and then I think you go well beyond a motion

7    to dismiss.

8              THE COURT:  Well, now you are in a summary judgment.

9    So you have got to get your statements of fact, and you get

10   your responses, and then all of what we have done is thrown

11   out the window.

12             MR. WATSON:  So that's our position on those.

13             THE COURT:  Okay.

14             MR. WATSON:  And then the second grouping, as I

15   understand it, is the FTC and Retrophin litigation.  I group

16   those two together.  Our position remains, as it was before,

17   that we shouldn't have to produce that material until after

18   the court decides that the Defendant -- excuse me, that the

19   Plaintiffs have stated a plausible claim.

20             We think we have very good arguments in our motion to

21   dismiss, and your Honor last time said that all Defendants say

22   that, but the fact of the matter is that we believe that the

23   law is going to support us here, and there are certain costs

24   associated with those documents if we end up having to produce

25   them, namely that there were different law firms involved in

1    both of those matters.

2            Now, you may ask why that matters, and it matters

3    because if we are going to turn them over now, we are going to

4    have to review them ourselves and incur costs that we wouldn't

5    have incurred if we prevail on the motion to dismiss, without

6    those documents ever having been produced.

7            I think we talked -- or I talked a fair amount last

8    time about the fact that Twombly itself arose in the antitrust

9    context and a lot of it had to do with the fact that discovery

10   costs can get out of hand very quickly in an antitrust case,

11   and for that reason Plaintiffs should be forced to prove that

12   they have alleged plausible claims before discovery begins.

13           So we would argue that there should not be any

14   discovery at this point, other than what has already been

15   undertaken, the Rule 26, until a ruling on the motion to

16   dismiss.

17           THE COURT:  Okay.  So I wrote to myself "Where are

18   the documents kept, how are they kept, how much?"

19           Where, you answered, different firms, and we all know

20   that it is not just the --

21           MR. WATSON:  Let me clarify that just so the record

22   is clear.  There were different law firms that handled it.

23   There is an e-Discovery firm that is holding the documents

24   right now.

25           THE COURT:  Which e-Discovery firm, if you know?

1          MR. WATSON:  Greensfelder.

2          THE COURT:  Okay.  All right.  I do a lot of ESI

3    stuff, discussions, CLEs, that kind of thing.  I know

4    Greensfelder is involved in all those things.  At the CLEs,

5    when people start talking about their cases, I just get up and

6    make sure I don't want to get conflicted out.  All right.

7          So let's talk about volume of the FTC and the

8    licensure issue.  We know where they are at.  We have got them

9    at some firms.  We have got Greensfelder has some.  What's the

10   volume?

11         MR. WATSON:  Honestly, off the top of my head, I

12   can't tell you what the volume is.  It is a lot, but it is

13   available electronically.  I don't want to mislead the court.

14         THE COURT:  Sure.

15         MR. WATSON:  We are able to produce it.  It is not a

16   warehouse that's full of hard copies of documents.

17         THE COURT:  Okay.

18         MR. WATSON:  You know, there is going to be

19   additional storage costs, obviously, if we have to produce it,

20   but it is -- both of those sets of documents, as I understand

21   it, are available in electronic format.

22         THE COURT:  Okay.  You get to go to school on what

23   happened before, and the costs primarily are being borne in

24   that case, luckily, for you.

25         So I'm going to bounce back to you folks, and that's

1    why I asked, do you -- I said -- I think I said do you need

2    the contract documents to respond.  You said no or you didn't

3    think so.  Again, I don't want to -- we have got a whole

4    briefing schedule going.  You said yourself you don't want to

5    end up in a never-ending-pleadings battle.

6             If those documents get attached, and then they want

7    to respond with documents in the reply, well, now it is going

8    to get converted to a summary judgment motion, and now the

9    whole thing is a complete waste of time because they have to

10   do their statement of facts under 56.1, you have to respond,

11   they have to respond to yours and then any additional ones you

12   raised.  And then it will be June, and we will be doing

13   pleadings.

14            MR. HAVILAND:  So it is not a need, your Honor,

15   because I believe that the complaint is well-detailed.

16            THE COURT:  Okay.

17            MR. HAVILAND:  It describes the product market.  It

18   describes the competition.

19            I have reviewed the arguments because, obviously, we

20   are preparing our opposition.  There is a debate about the

21   market.  There is a debate about competition, is there harm to

22   competition.  We've alleged that.  They say it is a facial

23   conclusory allegation.  And so we are going to brief that, and

24   the court is going to be presented with that.

25            The files that we are talking about help to answer

1   those questions.  The FTC was faced with the same issues in

2   charging Mallinckrodt as a monopolist.  Retrophin was arguing

3   "You took the product when we wanted it."  So there is a

4   competitor arguing that "We didn't get the product.  We would

5   have been able to bring it to market."  And as I read their

6   papers, they are arguing those factual positions.

7           So I do step back, like the court suggested.

8   Rule 12, they don't get to do that, but they are doing that.

9   So I'm here now knowing that we are fighting these factual

10  issues.

11          So the way I want to respond to the court is we are

12  going to get there.  I believe we are going to get there

13  because some of the things that they argued in the first round

14  of dismissals they are not arguing here.  Express Scripts, for

15  instance, is not arguing a lack of directness on the part of

16  Rockford.  We thought we would have that issue with them.  We

17  don't.  They are not arguing that Acument isn't indirect under

18  Tennessee law.  I thought we would have that issue.  We don't.

19          So there are some issues that have gone away, meaning

20  we are further along to getting a Rule 12 than we were the

21  last time.  We want to get moving.  We are now almost a full

22  year in this case, and we are getting calls from clients

23  wondering where we are moving.

24          I realize there is a process, and we have been

25  discussing that.  I'm trying to give the court a couple of

1    truncated areas that we can start reviewing it, no substantial

2    burden to the defense.  Since they are collected, and we all

3    know Greensfelder and these vendors, at some point that gets

4    transferred to us on our nickel, if you will.  We are hosting.

5    We are dealing with the issue of having to review.

6            We would rather start that now than start in June

7    because we are going to be that much further behind when it

8    comes to setting that deadline.  I think my colleague

9    Mr. Flowers said 14 months, and the question was when do we

10   start.

11           So if there is not a substantial burden, and the

12   documents are electronically available, and they will advance

13   the case, I hear what your Honor says, if we want to use them,

14   we are going to convert it, but we don't know what the replies

15   are yet when we frame the argument as I just did, and they may

16   go there, in which case we can point the court to what the FTC

17   did and Retrophin did.

18           But I want to get started sooner than later.  We are

19   now almost a full year, and I think that these three areas are

20   very simple, focused areas to begin discovery.  We are not

21   asking any of these companies to go back into their files.

22           THE COURT:  So just to beat this dead horse one more

23   time, if you don't need it --

24           MR. HAVILAND:  Right.

25           THE COURT:  -- the purpose of you wanting to proceed

1    on those three specific areas is for speed of the case, not

2    going to be used for responses to the motions, right?

3              MR. HAVILAND:  Correct, your Honor.

4              THE COURT:  Okay.

5              MR. HAVILAND:  Unless the replies interject a factual

6    issue, in which case we would have to make that call whether

7    we would want to go outside that record.

8              THE COURT:  If they do a reply and they start

9    throwing in new evidence outside, well, then that's dirty

10   pool, right?  I don't think they are going to do it.

11             Then you are going to come back, and you are going to

12   want to surreply, and you are going to want a rejoinder, and

13   then we will be in August, and we still haven't finished where

14   we are at.

15             MR. HAVILAND:  I hear you, your Honor.

16             MR. WATSON:  Can I add one thing in response to the

17   speed argument?  I will just remind the court that we filed a

18   motion to dismiss back in August.  Rather than responding,

19   they filed an amended complaint.  When we were about ready to

20   file our motion to dismiss the amended complaint, they filed a

21   second amended complaint.

22             So I submit that that's why we are seven months down

23   the road, not because of anything that the Defendants did or

24   didn't do, and that's perfectly within their rights, but then

25   they shouldn't be here complaining that we are six months down

1    the road and there hasn't been any discovery.

2            THE COURT:  Okay.  The Shkreli documents, where are

3    they?  How much are -- what's the volume?  What's the status

4    of them?

5            MR. WATSON:  Well, the Shkreli documents are what we

6    called the "Retrophin documents."  I assume that's what's

7    being referred to, the documents from that case, which is the

8    civil action.  I'm not aware of any Shkreli specific

9    documents.

10           THE COURT:  That's the moniker he is using.  You can

11   call them "Retrophin."  I don't care, just as long as I know

12   it in my head.

13           MR. WATSON:  Right.  I just want to make sure we are

14   talking about the same thing.

15           THE COURT:  Are you talking about the same documents?

16           MR. HAVILAND:  That's correct.

17           THE COURT:  Okay.

18           MR. HAVILAND:  We had talked about the Shkreli

19   criminal case.  He has been prosecuted.  He is in jail.

20           We are talking about the Retrophin case.

21           MR. WATSON:  Right, yes.

22           THE COURT:  Okay.  All right.  So we are talking

23   about volume, location, how they are kept, if you know.

24           MR. WATSON:  It is the same.  When I was answering a

25   moment ago about FTC, I was talking out --

```
1              THE COURT:  It would have been all there.  Okay.
2              MR. WATSON:  Right.
3              THE COURT:  Okay.  I will allow requests to produce
4    on contracts, amendments, extensions.  I will allow that to go
5    forward on written discovery.
6              On the other two subjects, I need more information.
7    So talk to whoever you need to talk to at Greensfelder.  I
8    need to know volume, megabytes, gigabytes, terabytes.
9    Greensfelder, this is what they do.  I'm sure they are kept in
10   ways that can be sliced, diced, and all kinds of things, and
11   maybe they are using TAR and all kinds of fun tools to figure
12   out responsive documents, but I need to know the volume, all
13   right?
14             And then not just the volume, the manner in which
15   they are kept, any burdensomeness, costs to transfer,
16   warehousing, that kind of stuff, I need to know that so I can
17   make an informed decision.
18             MR. HAVILAND:  Okay.  And, your Honor, if I may, the
19   Plaintiffs are willing to bear the cost once the production is
20   ready.  It obviously becomes our discovery burden.  We are
21   ahead of ourselves on that with the Rule 12 motion pending.
22   So if we can understand that cost component well enough, we
23   might be able to make it easier to transfer.
24             THE COURT:  Okay.  There is nothing to stop you folks
25   from talking.
```

1          MR. HAVILAND:  Yes.  Thank you.

2          THE COURT:  Okay.  So you will get written out.  You

3    will respond.  That will take you to March-ish.

4          Let's have a status, if everybody is available,

5    March 15th, say at 1:30.  You will be in the middle of

6    briefing.  All 26(a)s will be out.  I assume written discovery

7    will be out and either responded to or better sense, and then

8    we will talk to you about those issues that I just addressed,

9    and we will figure out what, if anything, additional we will

10   do while this is pending, while the motions are all being sent

11   to Judge Kapala.

12         MR. HAVILAND:  That date is fine for Plaintiffs, your

13   Honor.

14         THE COURT:  Does that work?

15         Does that work?

16         MR. WATSON:  That is fine for Defendants as well.

17         THE COURT:  Mr. Sullivan, does that work for you?

18         MR. SULLIVAN:  Yes.

19         THE COURT:  Okay.  All right.  That's what we will

20   do.  That will be the plan.  Hopefully, the door is shut and

21   we have no other folks in the case until we meet on

22   March 15th, okay?

23         Anything from the Defendants?

24         MR. WATSON:  No.  Thank you, your Honor.

25         Anything from the Plaintiffs?

1          MR. HAVILAND:  No, your Honor.

2          THE COURT:  Okay.  Have a good day, everybody.

3     (Which were all the proceedings heard.)

4                         CERTIFICATE

5     I certify that the foregoing is a correct transcript from

6     the digital recording of proceedings in the above-entitled

7     matter to the best of my ability, given the limitations of

8     using a digital-recording system.

9

10    */s/ Heather M. Perkins-Reiva*          *February 12, 2018*

11    _____          _____
      Heather M. Perkins-Reiva               Date
12    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25