# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| City of Rockford, et al., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No: 17 C 50107 |
| | ) | |
| Mallinckrodt ARD, Inc., et al., | ) | |
| | ) | |
| *Defendants*. | ) | Judge Frederick J. Kapala |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, City of Rockford, Illinois, and Acument Global Technologies Inc., filed a second amended complaint (the "SAC") against two groups of defendants: (1) Mallinckrodt plc and Mallinckrodt ARD, Inc. (including its acquisition of "Questcor Pharmaceuticals, Inc.") (collectively, "Mallinckrodt"); and (2) Express Scripts Holding Company and its four wholly-owned subsidiaries, Express Scripts, Inc. ("ESI"), Curascript, Inc., Accredo Health Group, Inc., and United Biosource Corp. ("UBC") (collectively, "Express Scripts"), pursuant to federal and state antitrust and consumer protection laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), various state-law claims, and 28 U.S.C. §§ 2201-2202 for declaratory judgment. Before this court are defendants' motions to dismiss. For the reasons that follow, defendants' motions to dismiss are granted in part and denied in part.

## I. BACKGROUND

The following facts are drawn from the allegations in the SAC. Because this case comes before the court pursuant to a motion to dismiss, the court accepts all non-conclusory allegations in the SAC as true.

## A. Acthar and the Exclusive Dealing Arrangement

Acthar is an adrenocorticotropic hormone ("ACTH") drug, which causes the body to produce cortisone and other steroid hormones. SAC ¶ 41. In 1952, the Food and Drug Administration approved Acthar's application to over fifty conditions. Id. ¶ 40. One of those conditions is infantile spasms, a serious condition but one with an annual patient population of less than 2,000 children. Id. ¶ 45. In 2001, Questcor Pharmaceuticals, Inc. acquired the rights to Acthar. In 2014, Mallinckrodt plc, another pharmaceutical company, acquired Questcor and, with it, Acthar. Id. ¶ 44. As a result of the acquisition Questcor's name was changed to Mallinckrodt ARD, Inc. Id. ¶ 22.[1]

Before 2007, Acthar was distributed to any doctor, hospital, wholesaler, or specialty pharmacy who requested the drug to treat seriously ill patients. Id. ¶ 47. On August 27, 2007, Mallinckrodt embarked on a "new strategy" that sought to limit Acthar's distribution by designating Express Scripts[2] as Mallinckrodt's sole distributor of Acthar. Id. ¶¶ 48-49, 221.[3] Plaintiffs allege

---

[1]At times the SAC refers to Mallinckrodt when it actually meant Questcor. For example, plaintiffs allege that Mallinckrodt acquired the Acthar monopoly from Aventis, SAC ¶ 9, when in actuality Questcor purchased Acthar. Because the SAC alleges that Mallinckrodt is responsible for Questcor's actions before 2014—a proposition which neither Mallinckrodt plc nor Mallinckrodt ARD, Inc. contest—the court will treat Questcor's actions as Mallinckrodt's actions for purposes of these motions to dismiss. The court's references to Mallinckrodt before 2014 refer to Questcor's conduct.

[2]Express Scripts argues that the various Express Scripts entities named in this action are distinct corporate entities, and accordingly, plaintiffs cannot "group plead" their allegations against all of the Express Scripts entities because "[a] complaint based on a theory of collective responsibility must be dismissed," even in cases of alleged conspiracy, where plaintiffs do not allege that each particular defendant joined the conspiracy and knew of its scope. Bank of Am., N.A. v. Knight, 725 F.3d 815, 818 (7th Cir. 2013). But the SAC contains various allegations about the roles of each Express Script entity such that each entity is put on notice as to which defendants engaged in which acts that allowed Express Scripts to effectuate the alleged antitrust violations. See Guaranteed Rate, Inc. v. Conn, 264 F. Supp. 3d 909, 931 (N.D. Ill. 2017) (differentiating the facts in that case from Knight where there were no allegations about which defendant did what, whereas the allegations in Conn laid out how each entity played a particular role in the conspiracy). It may come about in discovery that there are insufficient facts to support claims against the specific Express Scripts entities. But at this stage, the court accepts plaintiffs' allegations that the Express Scripts entities worked together, through various lines of business, to effectuate the Synacthen Acquisition, and does not find that plaintiffs' group pleading provides the Express Scripts defendants insufficient notice of the claims against them.

[3]In ¶ 48 of the SAC, plaintiffs allege that Mallinckrodt's announcement of the "new strategy" was "[e]ffective August 1, 2001," when it appears that plaintiffs meant August 1, 2007.

that the "new strategy" is in fact a vertical price-fixing conspiracy, in which Mallinckrodt used Express Scripts as its exclusive distributor of Acthar through a program called the "Acthar Support & Access Program" (the "ASAP") to raise prices, restrict distribution, and stifle competition. According to plaintiffs, the structure of the ASAP allows defendants to restrict the distribution of Acthar to just one distributor, Express Scripts, thereby eliminating other distributors from negotiating for lower prices for Acthar.  Id. ¶¶ 48, 90, 231.

Express Scripts' role is to provide "integrated specialty services" to facilitate every other facet of the distribution chain, where each Express Scripts entity plays different roles at different levels of this process.  Id. ¶ 58.  UBC, a pharmaceutical support services company,[4] acts as the "hub" between these entities, coordinating Acthar's sale, distribution, and reimbursement between Mallinckrodt, ESI, CuraScript, and Accredo.  Id. ¶ 51.  Specifically, after being contacted directly by patients or notified by Mallinckrodt that a patient wants to purchase Acthar, UBC confirms the medical necessity of the prescription through Accredo (a specialty pharmacy services company) and then arranges payment through ESI (the pharmacy benefit manager ("PBM")) for shipment of Acthar to patients through CuraScript (the wholesale pharmacy/distributor).[5]  Id. ¶¶ 57-62, 67.  This allows Mallinckrodt to simply ship Acthar directly to patients and receive payments directly from the patients' third-party payors, while Express Scripts handles the rest.  Id. ¶ 50.

Plaintiffs further allege various anticompetitive acts that enabled defendants to use the ASAP to price-fix and maintain Mallinckrodt's monopoly.  One example is the timing of Acthar's first

---

[4]Plaintiffs allege that Express Scripts Holding Company announced on November 27, 2017, that it sold UBC to a private equity firm.

[5]Express Scripts notes in their motion to dismiss that CuraScript, Inc. is actually a specialty pharmacy, whereas the pertinent entity is Priority Healthcare Distribution, Inc., doing business as CuraScript SD.

large price increase. As soon as defendants implemented the ASAP, Mallinckrodt increased the price of Acthar from approximately $1,980 to $27,922.80—a 1,310% increase in the span of a month, and a 69,707% increase from 2001. Id. ¶¶ 89-90. Arguing that this price increase was made possible by an unlawful conspiracy between defendants, plaintiffs allege that Express Scripts did not push back on this price increase despite acknowledging that Acthar was vastly overpriced, and still has not pushed back on even higher prices as of the filing of the SAC. Id. ¶¶ 94, 97-99. Express Scripts was in a unique position to negotiate the most competitive prices for specialty drugs in the United States as a result of its representation of the largest number of buyers in the pharmaceutical marketplace. Id. ¶¶ 56, 73, 96, 100-102, 239. Plaintiffs provide an example of a time where Express Scripts used its bargaining power to extract lower prices from a manufacturer, Daraprim, which had increased the price of another drug 5000% in one year. Id. ¶¶ 85-86. Specifically, in December 2015, Express Scripts partnered with a different manufacturer to offer its purchasers a low-cost alternative to the drug as a response to Daraprim's manufacturer's pricing decision. Id. ¶¶ 87-88. But in the case of Acthar, Express Scripts "had no interest in lowering the price for Acthar because it was making money off all aspects of its exclusive arrangement with the manufacturer. In other words, by helping Mallinckrodt maintain and enhance its monopoly power in the ACTH market, Express Scripts along with Mallinckrodt realized greater profits at the expense of payors, like Plaintiffs." Id. ¶ 96. As a result, from the time Mallinckrodt acquired Acthar in 2001 to the commencement of this action, the cost of Acthar grew 109,046%. Id. ¶ 93.

### B. The Synacthen Acquisition

Plaintiffs also contend that the purported conspiracy allowed Mallinckrodt to keep Acthar's price high by eliminating potential competition to Acthar. By 2013, the only significant alternative

to Acthar was Synacthen Depot ("Synacthen"), a synthetically derived ACTH medication manufactured by Novartis AG. Id. ¶ 106. Mallinckrodt was aware of Novartis as a competitive threat for years, including when defendants implemented the ASAP in 2007. Id. ¶¶ 127-129. Mallinckrodt unsuccessfully attempted to buy the rights to Synacthen in 2009. Id. ¶¶ 106, 132. In October of 2012, Mallinckrodt learned that at least one other company was attempting to buy the rights to Synacthen from Novartis to compete with Mallinckrodt in the ACTH drug market in the United States. Id. ¶ 141. Three firms proceeded through several rounds of negotiations with Novartis, submitted formal offers, and drafted near-final agreements. Id. ¶ 136. Each firm planned to commercialize Synacthen in the United States, having taken affirmative steps to do so by independently conducting due diligence, and crafting business plans and regulatory approval strategies. Id. ¶ 137.

In 2013, Novartis agreed to sell the rights of Synacthen to Retrophin, Inc., for $16 million. Id. ¶ 108. However, on June 11, 2013, the day Retrophin was to sign its contract with Novartis, Mallinckrodt "swept in at the eleventh hour" and agreed with Novartis to pay a minimum of $135 million for the exclusive rights to Synacthen (the "Synacthen Acquisition"). Id. ¶¶ 108, 144-145, 147. Unlike the three alternative bidders, Mallinckrodt had only incomplete plans for Synacthen and conducted limited due diligence when it submitted its initial offer to Novartis. Id. ¶ 143. Upon purchasing the rights to Synacthen, Mallinckrodt chose not to bring it to market. Id. ¶¶ 108, 145. Mallinckrodt never sought FDA approval for Synacthen. Id. ¶ 145. Acthar was and continues to be the only viable product in the market for infantile spasms and certain other conditions. Id. ¶ 122. Because ACTH drugs require Food and Drug Administration approval to be sold to consumers, there are significant barriers to entry for ACTH drugs. Id. ¶ 124.

In January 2014, Retrophin sued Mallinckrodt for antitrust violations in the United States District Court for the Central District of California. Retrophin alleged that there was no procompetitive aspect of Mallinckrodt's acquisition of Synacthen. Id. ¶ 146. The Federal Trade Commission sued Mallinckrodt on January 18, 2017, similarly alleging that Mallinckrodt exercised, and continued to exercise, monopoly power in the United States and did so unlawfully based on the Synacthen Acquisition. Id. ¶¶ 115-116. Mallinckrodt chose to settle the Retrophin lawsuit for $15.5 million and the FTC lawsuit for $100 million. Id. ¶¶ 91, 150, 155. Plaintiffs point to the Retrophin and FTC complaints against Mallinckrodt to support their claims that Mallinckrodt violated antitrust laws by eliminating the only viable competition to Acthar.[6]

## C. The Instant Action

Rockford provides its employees with a health plan that includes prescription insurance coverage for two Acthar patients. The health plan has a contract with ESI, which requires ESI to collect payments for the price of Acthar. In a contract between Rockford and ESI (the "PBM Agreement" or the "contract") that the parties entered into on January 1, 2015, ESI agreed to provide Rockford certain services, including "cost containment," although "cost containment" is not defined in the agreement. Mallinckrodt charged Rockford for Acthar at a discounted rate of 13.5% off the "average wholesale price" as set forth in the PBM Agreement. Mallinckrodt set the average wholesale prices of Acthar used by Express Scripts for reimbursement. Accordingly, on April 1, 2015, Mallinckrodt had Acthar shipped directly to the children of two Rockford employees. ESI

---

[6]The consent order between the FTC and Mallinckrodt notes: "This Order shall not be used as evidence in any proceedings other than a proceeding by Plaintiffs or the Synacthen Sublicensee regarding enforcement or modification of this Order." Order for Permanent Injunction and Equitable Monetary Relief, FTC v. Mallinckrodt ARD Inc., F.T.C. No. 1310172, at 8 (D.D.C. Jan 30, 2017). Accordingly, the court does not consider the Order for its analysis in this opinion, but does consider the FTC and Retrophin complaints.

then charged Rockford $100,457.64 for the 30-day supply of Acthar, pursuant to the terms of the PBM Agreement.

In contrast, Acument has a contract with CVS Caremark ("CVS") which covered the spouse of one of Acument's employees because the spouse suffers from a condition for which Acthar was prescribed as a treatment option. Plaintiffs allege that CVS stepped into the place of ESI in the Acthar distribution chain, but was still coordinated by UBC. CVS charged Acument $894,617.75 for thirteen administrations of Acthar in a thirteen-month period between December 2015 and December 2016. Id. ¶ 10.

The SAC alleges claims by Rockford against Express Scripts for unjust enrichment (Count I); Rockford against Mallinckrodt for unjust enrichment (Count II); Acument against Mallinckrodt for unjust enrichment (Count III); plaintiffs against all defendants for fraud (Count IV), conspiracy to defraud (Count V), maintenance of monopolization under 15 U.S.C. § 2 (Count VI), unreasonable restraint of trade under 15 U.S.C. § 1 (Count VII), violation of state antitrust and consumer protection laws (Count VIII), participation in racketeering activity under 18 U.S.C. § 1962(c) (Count IX), use of investment funds from racketeering activity under 18 U.S.C. § 1962(a) (Count X), and agreement to participate in racketeering activity under 18 U.S.C. § 1962(d) (Count XI); and Rockford against Express Scripts for breach of contract based on the PBM Agreement (Count XII), promissory estoppel (Count XIII), declaratory judgment based on the PBM Agreement (Count XIV), and breach of the implied covenant of good faith and fair dealing (Count XV). Mallinckrodt and Express Scripts have separately moved to dismiss the SAC pursuant to Federal Rule of Civil

Procedure 12(b)(6) for failure to state claims against them.[7]

## II. ANALYSIS

When deciding a motion to dismiss, the court accepts all of the well-pleaded allegations of the complaint as true and draws all reasonable inferences in favor of the plaintiff. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Under the Federal Rules, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but the plaintiff must allege facts that, when "accepted as true . . . state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In analyzing whether a complaint has met this standard, the "reviewing court [must] draw on its judicial experience and common sense." Id. at 679. Further, plaintiffs' claims for fraud, conspiracy to defraud[8] and RICO conspiracy are subject to a heightened pleading standard that requires plaintiffs to plead their allegations with specificity. See Fed. R. Civ. Proc. 9(b); Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co., 412 F.3d 745, 749 (7th Cir. 2005).

As an initial matter, defendants argue in their motions to dismiss that plaintiffs' claims are barred by applicable statutes of limitations to the extent that plaintiffs seek recovery for them and the class based on payments for Acthar that fall outside of each claim's respective limitations periods. "A plaintiff is not required to plead elements in his or her complaint that overcome affirmative defenses, such as statute-of-limitations defenses." NewSpin Sports, LLC v. Arrow

---

[7]Plaintiffs also filed supplemental authority they believe support their positions; defendants filed briefs disputing that these cases militate in favor of plaintiffs. The court acknowledges these cases and has considered them in its analysis.

[8]For purposes of this opinion only, references to a "conspiracy" in the opinion's sections on plaintiffs' federal and state antitrust claims refer specifically to an "antitrust conspiracy," whereas references to a "conspiracy" in the other sections refers instead to common-law conspiracy, the principle difference being that the court applies Rule 9(b)'s heightened pleading standard to the latter but not the former.

Elecs., Inc., No. 18-1666, 2018 WL 6295272, at \*3 (7th Cir. Dec. 3, 2018). Accordingly, defendants' statute of limitations argument may be raised in their answers and litigated later in these proceedings.

## A. Federal Antitrust Claims (Counts VI and VII)

The gravamen of plaintiffs' antitrust claims is that defendants acted and conspired to raise Acthar prices exorbitantly high as part of a vertical price-fixing scheme and did so by implementing the ASAP, restricting distribution, not seeking low-cost alternatives to Acthar, and, in the case of the Synacthen Acquisition, eliminating viable competitors from entering the ACTH market in order to unlawfully preserve Mallinckrodt's monopoly for its and Express Scripts' pecuniary benefit. The antitrust conspiracy, as plaintiffs allege, injured plaintiffs by forcing them to pay higher costs for Acthar than they would have but for defendants' conduct. For the foregoing reasons, the court finds that Rockford has plausibly stated that defendants' conduct amounted to violations of §§ 1 and 2 and that it was injured by this conduct, but that Acument does not plausibly allege that it has antitrust standing to sue.

### 1. Plaintiffs' Article III Standing for Federal Antitrust Claims

Generally, Article III standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498 (1975). All that is required to demonstrate Article III standing is "injury in fact plus redressability." Kochert v. Greater Lafayette Health Servs., Inc., 463 F.3d 710, 714 (7th Cir. 2006). There is no dispute that plaintiffs have Article III standing to bring their federal antitrust claims. Thus, the court will proceed to discuss each plaintiffs' "antitrust standing" to bring this suit.

## 2. Rockford's Antitrust Standing for Federal Claims

The Supreme Court has found two additional standing limitations born from the Sherman Act as part of a separate standing doctrine known as "antitrust standing." See Loeb Indus., Inc. v. Sumitomo Corp., 306 F.3d 469, 480 (7th Cir. 2002) (describing the range of antitrust standing limitations that have emerged from federal law). First, in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), the Supreme Court held that only direct purchasers from alleged antitrust violators may bring federal antitrust actions. Second, in Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC"), 459 U.S. 519 (1983), the Supreme Court held that courts must engage in a "proximate cause" analysis to determine whether a plaintiff is a "proper party" to bring suit. Because these limitations "are analytically distinct," Int'l Bhd. of Teamsters, Local 734 Health & Welfare Tr. Fund v. Philip Morris Inc., 196 F.3d 818, 828 (7th Cir. 1999), the court assesses each in turn, see also Loeb, 306 F.3d at 475 ("We find that Illinois Brick presents no obstacle to any of the plaintiffs' claims but that the claims of the scrap copper dealers are precluded under AGC.").

### a. Illinois Brick

As alleged, Rockford directly purchased Acthar from Express Scripts, so the "indirect purchaser" limitation of Illinois Brick does not affect Rockford's antitrust standing to sue Express Scripts. As for its claims against Mallinckrodt as an indirect purchaser,[9] Illinois Brick's "indirect purchaser" rule denies Rockford antitrust standing unless it fits into one of the recognized exceptions to Illinois Brick. One such exception is the "co-conspirator" exception, which allows indirect purchasers to sue middlemen-conspirators if the plaintiffs can establish a conspiracy and

---

[9]The court leaves open the possibility after discovery that Rockford can prove that it stands in a direct purchasing relationship with Mallinckrodt, depending on what the evidence uncovers about the structure of the exclusive distribution arrangement—for example, if plaintiffs can prove that Express Scripts is really Mallinckrodt's agent.

overcharges:

> Illinois Brick does not limit suits by consumers against a manufacturer who illegally contracted with its dealers to set the latter's resale price. The consumer plaintiff is a direct purchaser from the dealer who, by hypothesis, has conspired illegally with the manufacturer with respect to the very price paid by the consumer. There is no problem of duplication or apportionment because the consumer is the only party who has paid any overcharge. Although the manufacturer did not sell directly to the consumer, he is a fellow conspirator with the direct-selling dealer and therefore jointly and severally liable with the dealer for the consumer's injury.

2 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW 264 (rev. ed. 1995) (footnotes omitted); see Paper Sys. Inc. v. Nippon Paper Indus. Co., 281 F.3d 629, 634 (7th Cir. 2002). The "crucial question" for courts assessing this exception is whether the alleged anticompetitive conduct stems from an agreement between the alleged co-conspirators. Tamburo v. Dworkin, 601 F.3d 693, 699 (7th Cir. 2010).

A plaintiff alleging conspiracy to fix prices in violation of the Sherman Act must allege "enough factual matter (taken as true) to suggest that an agreement was made"—that is, "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Twombly, 550 U.S. at 556. This standard is not the same as the "heightened" pleading standard of Rule 9(b), and accordingly, plaintiffs can allege an antitrust conspiracy by pleading circumstantial evidence of an illegal agreement. See id. at 569 n.14 (affirming dismissal of antitrust conspiracy allegations and noting that "[i]n reaching this conclusion, we do not apply any 'heightened' pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9. . . . Here, our concern is not that the allegations in the complaint were insufficiently 'particular[ized]'; rather, the complaint warranted dismissal because it failed in toto to render plaintiffs' entitlement to relief plausible" (citation omitted)). Indeed, "circumstantial evidence is the lifeblood of antitrust law"

because direct evidence will rarely be available to prove the existence of a price-fixing conspiracy. In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1147 (N.D. Cal. 2009) (quoting United States v. Falstaff Brewing Corp., 410 U.S. 526, 534 n.13 (1973)) ("Plaintiffs alleged that [the] agreements were used as the means to maintain and achieve the end result of the conspiracy by controlling the supply, and thereby permitting increases in the price for the products. While these allegations may not expressly state that the agreements themselves were illegal, they nonetheless may be considered with the pleadings as a whole in determining the existence of a 'plausible' conspiracy." (citations and footnote omitted)).

As the court accepts all allegations at the Rule 12 stage as true, the court finds that a reasonable inference could be drawn that defendants conspired to unlawfully boost the price of Acthar, restrict its output, and eliminate competition in violation of federal antitrust law when Mallinckrodt instituted its "new strategy." The goal of the exclusive dealing arrangement was "to lock patients into receiving Acthar through one channel and prevent a competitive product from entering the market." SAC ¶ 222 (emphasis added). Express Scripts employed its market power to effectuate these goals, allowing Mallinckrodt to maintain its monopoly, thereby increasing both their profits, and prevent competitors from challenging that monopoly. Thus, Mallinckrodt's decision to purchase the rights to Synacthen "at the eleventh hour" only to "shelve" the product upon acquiring it was simply an intended goal of the ASAP, effectuated by both defendants. Id. ¶¶ 111-114, 145, Specifically, Express Scripts agreed not to push back on Mallinckrodt's decisions to inflate Acthar's price beyond the competitive level, in contrast to when Express Scripts took the opposite approach in 2015 with respect to Turing's drug, Daraprim. Id. ¶¶ 86-88. While defendants appear to isolate the exclusive dealing arrangement from the Synacthen Acquisition, taking the allegations in the SAC

as true, plaintiffs allege that these anticompetitive acts were part of the same conspiracy. Id. ¶¶ 231, 250. The court anticipates that further discovery will shed light on Express Scripts' knowledge of and role in the Synacthen Acquisition, if any. But at this stage of litigation, the court draws all reasonable inferences from the complaint in favor of plaintiffs and taking the SAC as a whole finds that plaintiffs have sufficiently alleged a conspiracy.

Defendants cite In re ATM Fee Antitrust Litigation to argue that allegations of a vertical conspiracy pursuant to the "co-conspirator" exception must include the allegation that "the conspiracy must fix the price paid by the plaintiffs," and because plaintiffs failed to allege that defendants fixed the price paid by plaintiffs, Illinois Brick still applies. 686 F.3d 741, 750 (9th Cir. 2012) (emphasis added); see also Dickson v. Microsoft Corp., 309 F.3d 193, 214-215 (4th Cir. 2002) (noting in dicta that "the rationale for concluding that Illinois Brick does not apply to a price-fixing conspiracy is that no overcharge has been passed on to the consumer: When a dealer has illegally conspired with a manufacturer with respect to the price paid by a consumer, then the consumer is the only party who has paid any overcharge"). In particular, Mallinckrodt argues that the SAC contains "no plausible allegations that the prices that Plaintiffs paid were set by an agreement between [defendants]" because "ESI charged Rockford for Acthar pursuant to the terms of a separate agreement between Rockford and ESI," and "Acument contracted with CVS for the provision of speciality drugs like Acthar and made direct payments to CVS. Similarly, Express Scripts argues that plaintiffs "repeatedly plead[ ] facts illustrating that Mallinckrodt unilaterally sets the [average wholesale price] for Acthar." (emphasis in original).

But ATM Fee expressly noted that the Seventh Circuit takes a different approach. See ATM Fee, 686 F.3d at 755 n.7 (citing Paper Systems, 281 F.3d at 631-32) (noting that the Seventh and

Third Circuits "restrict <u>Illinois Brick</u>'s influence by allowing an exception when the direct purchaser conspires with the seller, even though the price illegally set is an upstream cost that is passed-on to the plaintiffs"). In <u>Paper Systems</u>, for example, the Seventh Circuit explained that the crux of the "co-conspirator" exception is the joint-and-several liability of conspiring defendants: "If [the defendant] was among those conspirators, then it is responsible for the <u>entire</u> overcharge of <u>all five</u> <u>[defendant] manufacturers</u>—and any direct purchaser from any conspirator can collect its own portion of damages (that is, the damages attributable to its direct purchases) from any conspirator." 281 F.3d at 632 (emphasis in original); <u>see also</u> <u>In re Brand Name Prescription Drugs Antitrust</u> <u>Litig.</u>, 186 F.3d 781, 787 (7th Cir. 1997) ("[I]t was necessary for [plaintiffs] to present economic evidence that would show that the hypothesis of collusive action was more plausible than that of individual action. They did not, however, as the defendant manufacturers rather absurdly argue, have to exclude all possibility that the manufacturers' price discrimination was unilateral rather than collusive."); <u>Fontana Aviation, Inc. v. Cessna Aircraft Co.</u>, 617 F.2d 478, 481 (7th Cir. 1980) ("Standing separately some of the allegations may be of no antitrust concern, but if all of [the defendant's] alleged activities were combined and coordinated with the intent to destroy [the plaintiff], its target, as a competitor, the allegations, whatever their merit, should be judged as a whole and not separately."); <u>Kleen Prod. LLC v. Int'l Paper</u>, 306 F.R.D. 585, 608 (N.D. Ill. 2015) <u>aff'd sub nom.</u> <u>Kleen Prod. LLC v. Int'l Paper Co.</u>, 831 F.3d 919, 930 (7th Cir. 2016) (stating axiomatically that plaintiffs may also sue co-conspirators that are vertically connected to an upstream defendant in antitrust actions because co-conspirators are jointly and severally liable for alleged antitrust violations). Plaintiffs allege that defendants are jointly and severally liable for the alleged antitrust violations that plaintiffs (and the class) directly and wholly felt. <u>Paper Systems</u>, 281 F.3d

at 632-34 (noting that joint and several liability is a "vital instrument for maximizing deterrence," so "[a]s long as [defendants'] direct customers hold the exclusive right to [100% of] damages for its own output, the holding and goals of <u>Illinois Brick</u> have been satisfied").  That plaintiffs contracted directly with Express Scripts on Acthar's price does not negate the inference that Express Scripts allegedly agreed with Mallinckrodt to price-fix.

Further, the three concerns highlighted by <u>Illinois Brick</u> are not of concern in the instant case. First, there is no risk of duplicative liability or potentially inconsistent judgments because plaintiffs and Express Scripts would not be suing for the same injury given plaintiffs' allegations that Express Scripts took part in the price-fixing that allegedly injured plaintiffs.  Second, permitting plaintiffs to sue would not cause inefficient enforcement of the antitrust laws by diluting the ultimate recovery and thus decreasing direct purchasers' incentive to sue.  Though the court notes that there are no allegations that would lead Express Scripts to seek recovery for any such overcharge in subsequent lawsuits, it would still be able to recover the same amount on their hypothetical lost profits claim even if plaintiffs recovered on their separate price-fixing claims.  Third, <u>Illinois Brick</u> warned against requiring courts to ascertain the portion of an overcharge that was passed on.  But here, plaintiffs do not allege that defendants' agreement in fact included a "pass-on" payment.  Rather, plaintiffs allege that defendants agreed on what share of the payment Express Scripts would receive, and then Express Scripts would simply deduct its agreed-upon share before forwarding the remainder to Mallinckrodt, <u>see</u> SAC ¶ 20; the court would simply look to the amount deducted by Express Scripts to ascertain the portion of the overcharge.  While plaintiffs do not allege what that amount is, defendants do not explain why that amount would be difficult to ascertain.

In sum, plaintiffs allege circumstantial evidence to support their argument that defendants agreed to a vertical price-fixing scheme. Discovery may illuminate that Express Scripts did not in fact play a role in the Synacthen Acquisition, that defendants had no intention of effecting harm to the market through the exclusive dealing arrangement, and/or that Mallinckrodt conducted its allegedly unlawful conduct separate and apart from its business associations with Express Scripts. Indeed, plaintiffs will be required later in litigation to provide evidence "that tends to exclude the possibility that the alleged conspirators acted independently." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 588 (1988). But at the Rule 12 stage, the court draws all reasonable inferences in favor of plaintiffs, and finds that Illinois Brick is not a bar to plaintiffs' claims.

### b. AGC

Aside from Illinois Brick, another antitrust standing limitation imposed on parties bringing antitrust actions comes from AGC. In determining whether an antitrust plaintiff is a "proper party" to bring suit under AGC, courts look at the following factors: (1) the causal connection between the violation and the harm; (2) the presence of improper motive; (3) the type of injury and whether it was one Congress sought to redress; (4) the directness of the injury; (5) the speculative nature of the damages; and (6) the risk of duplicate recovery or complex damage apportionment. 459 U.S. at 537-45.

The court finds that Rockford alleges that it is a proper party to bring its federal antitrust claims and thus satisfies the AGC factors.[10] Rockford has plausibly alleged that, as a direct cause

---

[10]Defendants do not argue that plaintiffs fail to meet the AGC factors with respect to their federal antitrust claims.

of defendants' purported conspiracy, it was injured by being forced to pay higher prices for Acthar than it would have but for the agreements of the defendants and the Synacthen Acquisition which together prevented a low-cost alternative entering the market. <u>See</u> SAC ¶ 151. Further, as detailed below in the court's discussion of plaintiffs' § 2 claims, Rockford has plausibly alleged that defendants had the specific intent to create anticompetitive effects through the conspiracy, thus establishing an improper motive. And at this time, the court finds no concerns such as speculative damages, duplicative recovery, or apportionment issues that cast doubt on the propriety of Rockford bringing its federal antitrust claims against either defendant. The injuries alleged in the SAC are precisely the types of injuries that Congress sought to redress in creating the Sherman Act—those being, "reduced output and higher prices," as well as the unlawful elimination of competition. <u>U.S. Gypsum Co. v. Ind. Gas Co., Inc.</u>, 350 F.3d 623, 626-27 (7th Cir. 2003). Consequently, the court finds that Rockford has antitrust standing to brings it federal antitrust claims.

### 3. Acument's Antitrust Standing for Federal Claims

While the court finds that the SAC plausibly alleges an antitrust conspiracy between Mallinckrodt and Express Scripts, there is an additional wrinkle concerning the "directness" of Acument's purchasing relationship to Express Scripts because plaintiffs allege that Acument paid CVS for Acthar and not ESI. Specifically, they allege that,

> when Acument contracted with CVS Caremark for the provision of specialty drugs, like Acthar, to its employee beneficiaries, CVS Caremark simply charged the same prices based on the prices set by Mallinckrodt in agreement with Express Scripts, as the product continued to flow directly from Express Scripts to the patients of other PBMs, like CVS Caremark. . . . "[S]uch payments were transferred by CVS Caremark to Mallinckrodt pursuant to a <u>likely understanding between the two</u> that the total amount would be forwarded to Mallinckrodt, less a certain amount previously agreed to by Mallinckrodt and CVS Caremark."

SAC ¶¶ 70, 72, 196, 246 (emphasis added).

Plaintiffs do not sufficiently plead that CVS was a member of the conspiracy merely by alleging that CVS operated in the same fashion as Express Scripts, see id. ¶¶ 233-234, or that Mallinckrodt had a "likely understanding" with CVS, which mirrored the arrangement it had with Express Scripts, id. ¶ 196. Otherwise, the SAC contains scant mentions of CVS and its role as part of the dealing arrangement alleged in all other respects to be exclusive.[11] As currently formulated, plaintiffs do not plausibly allege that Acument was a direct purchaser from a member of the alleged conspiracy, nor does Acument plausibly allege any other theory which would furnish antitrust standing to it. As such, Acument cannot state a claim against either Mallinckrodt or Express Scripts.

AGC also presents a problem here, albeit less of a problem than Illinois Brick. It appears that the allegations in the SAC may satisfy the AGC factors as applied to Acument. But until we know the contours of CVS' role in supplying Acthar to Acument's employee's spouse, the court is not able to engage in a complete application of the AGC factors to Acument.

---

[11] Taking plaintiffs' allegations as true, the assertions that Acument paid CVS for Acthar appear to contradict the exclusivity of ESI as the only PBM as part of the alleged ASAP. Additionally, Acument's explanation of CVS' role in defendants' alleged scheme is cryptic. Acument alleges that it had a contract with CVS which provided prescription drug insurance coverage for its employee's spouse. SAC ¶ 71. But it is unclear whether CVS is acting as a prescription drug insurance carrier or something else. CVS is elsewhere described as an entity which performs a function similar to that of ESI. Id. ¶¶ 66, 70, 233. The SAC states that CVS is required to collect payments for the purchase of Acthar, but figures 1 and 2, which are presumably designed to clarify the text, shows that patient payments go directly from the patient to ESI. This situation is further muddled by plaintiffs' allegation that CVS deducts an agreed-upon share of money it receives before forwarding it to Mallinckrodt, while figures 1 and 2 of the SAC show money from the health plans, which may or may not refer to CVS, going to ESI. See id. ¶ 233. Notably, Acument's role is not shown on the figures at all. Rockford is self-insured, but it is unclear how in this scenario in which Acument's employee's spouse has prescription insurance coverage that Acument still pays 80% of the cost of the spouse's specialty pharmacy drugs, which comes to $894,617.75, to obtain Acthar. Id. ¶¶ 10, 21. The dearth of information makes it difficult to understand the precise relationship of Acument, CVS, and the patient. Curiously, the SAC claims that payments for Acthar flow directly from Acument to CVS, id. ¶ 233, which is described as one of the "co-conspirators," id. ¶ 234, yet no details are provided anywhere else in the SAC as to how CVS participates in the alleged conspiracy.

Thus, the court dismisses without prejudice Acument's federal antitrust claims against Mallinckrodt and Express Scripts. The court grants plaintiffs leave to replead to correct Counts VI and VII's deficiencies.[12]

The court now turns to the merits of Rockford's §§ 1 and 2 claims under the Sherman Act.[13]

## 4. § 1 (Count VII)

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Only those agreements that are unreasonable restraints on trade are actionable under § 1. See Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 705 (7th Cir. 2011) (citing State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)). To state § 1 claims, plaintiffs must plead facts plausibly suggesting: (1) a contract, combination, or conspiracy (meaning, an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying "antitrust injury." See Agnew v. NCAA, 683 F.3d 328, 335 (7th Cir. 2012). As the court detailed in the section on antitrust standing, plaintiffs satisfied the first prong by alleging with sufficient factual support that defendants contracted among themselves and conspired to vertically fix Acthar's price and maintain Mallinckrodt's monopoly. See, e.g., SAC ¶¶ 5, 7-8, 48-49, 111-114, 145, 222. The court will turn to the remaining two prongs.

---

[12]Defendants argue that the court should not exercise its discretion and allow plaintiffs to replead for a third time. The court notes that while another amended complaint will be plaintiffs' fourth total complaint filed in this action, a subsequent complaint would be the first incident to the court's ruling on a Rule 12(b) motion. As plaintiffs requested leave to amend in their oppositions to defendants' motions to dismiss, the court will allow plaintiffs to replead to correct the deficiencies detailed in this opinion if counsel can do so in accordance with the obligations imposed by Rule 11 of the Federal Rules of Civil Procedure.

[13]The remainder of this opinion's analysis of plaintiffs' federal antitrust claims deals only with Rockford because the court has found that Acument has not shown that it has antitrust standing to bring its federal antitrust claims. However, Acument may have viable claims should it choose to sufficiently replead antitrust standing to bring its federal antitrust claims. The court makes no finding at this stage as to whether Acument has adequately stated a claim.

### a. Unreasonable Restraint of Trade

The "unreasonable restraint of trade" prong asks courts to assess "the competitive effects of challenged behavior relative to such alternatives as its abandonment or a less restrictive substitute." Id. Courts use one of three tests to determine the challenged behavior. Courts use a "per se" test for conduct such as horizontal price fixing, market allocation, group boycotts, or tying arrangements that are so inherently anticompetitive, they are considered illegal per se. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984). In contrast, vertical arrangements such as exclusive distribution agreements are analyzed under the "rule of reason" test, which assigns the burden to plaintiffs to sufficiently allege that an agreement has an anticompetitive effect on a given market within a given geographic area. See Methodist Health Servs. Corp. v. OSF Healthcare Sys., No. 1:13-cv-01054-SLD-JEH, 2016 WL 5817176, at *8 (C.D. Ill. Sept. 30, 2016) (citing Roland Machinery Co. v. Dresser Indus., Inc., 749 F.2d 380, 393 (7th Cir. 1984)). More often than not, courts use the "rule of reason" test and not the "per se" test. See State Oil, 522 U.S. at 10. Courts sometimes employ a third test, known as the "quick-look" test, for conduct that is not plainly anticompetitive but where "no elaborate industry analysis is required to demonstrate the anticompetitive character of . . . an agreement." Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978).

Rockford alleges two anticompetitive understandings—the exclusive dealing arrangement and the Synacthen Acquisition—that together form the basis of their § 1 claims. While courts generally assess exclusive dealing arrangements under the rule of reason analysis, it is less clear that the rule of reason analysis applies here where plaintiffs have alleged that the conspiracy included both the exclusive dealing arrangement and the Synacthen Acquisition, which plaintiff argues

deserves a "per se" analysis. However, the court agrees with plaintiffs that the court need not make this determination at this time. See In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig., No. 17-MD-2785-DDC-TJJ, 2018 WL 3973153, at *19 n.8 (D. Kan. Aug. 20, 2018) ("In ruling [on a motion to dismiss], the court just needs to determine whether the class plaintiffs have alleged a plausible conspiracy under the antitrust laws."); CSR Ltd. v. Fed. Ins. Co., 40 F. Supp. 2d 559, 564 (D.N.J. 1998) ("At this early [motion to dismiss] stage of the proceeding, the court does not find it necessary to determine which mode of analysis [per se or rule of reason] it will ultimately employ in evaluating the defendants' activities."); 2 AREEDA & HOVENKAMP, ANTITRUST LAW 264 ¶ 305(e), at 69 ("Often, however, the decision about which rule is to be employed will await facts that are developed only in discovery."). After discovery, the court can better determine whether and how to take a more detailed look at the effects of defendants' conduct. See, e.g., EpiPen, 2018 WL 3973153, at *16 (noting that if the court applied a rule of reason analysis to the exclusive dealing arrangement in that case, it would consider a "number of factors" from Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961), to determine whether a "substantial foreclosure of the market" occurred, making the conduct unreasonable). Discovery will elucidate whether the purported conspiracy as a whole is patently anticompetitive "such as would always or almost always tend to restrict competition and decrease output." See id. at 565 (citing Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289 (1985). At this stage, it is sufficient for plaintiffs to plausibly allege that defendants engaged in conduct that resulted in an unreasonable restraint of trade.

Rockford alleges that defendants conspired to keep prices high, restrict output, and prevent competition from entering the market. The "new strategy" reduced the number of wholesale

distributors of Acthar from three to one, thereby restricting patient's access to Acthar, and employed Express Scripts' market power not to push for lower-cost alternatives. SAC ¶¶ 48, 103. The ASAP thus allowed Mallinckrodt to maintain its dominant monopoly power in the ACTH drug market, maintain prices at artificially high levels, and exclude less expensive competitive products from the ACTH drug market. The other focus of the SAC is the exclusion of competitive alternatives to the market and highlights the Synacthen Acquisition. Because Retrophin planned to bring Synacthen to market as the first viable competitor to Acthar, keeping Synacthen from the United States market resulted in complaints filed by the FTC and Retrophin for depriving the market of a lower-cost alternative with no procompetitive justifications. Id. ¶ 151. The elimination of competition with no procompetitive justification is the type of conduct that the antitrust laws were designed to guard against. See In re Dealer Mgmt. Sys. Antitrust Litig., 313 F. Supp. 3d 931, 950 (N.D. Ill. 2018) (citing Havoco of Am., Ltd. v. Shell Oil Co., 626 F.2d 549, 556 (7th Cir. 1980) (citation omitted)). Consequently, the court finds that Rockford's assertions of anticompetitive conduct are sufficient to adequately plead the "unreasonable restraint of trade" prong of Rockford's § 1 claim.

### b. Antitrust Injury

The third prong requires that an antitrust plaintiff must allege that the "claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation of or anticompetitive acts made possible by the violation." Kochert, 463 F.3d at 716; see also Agnew, 683 F.3d at 334-35 ("The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition. Thus the plaintiff must allege, not only an injury to himself, but an injury to the market as well." (citation omitted)); Gypsum, 350 F.3d at 626-27 ("A private plaintiff must show antitrust injury—which is to say, injury by reason of those things that

22

make the practice unlawful, such as reduced output and higher prices."). Rockford alleges that defendants were able to charge higher prices for Acthar by restricting distribution of Acthar through the ASAP. SAC ¶ 8. "Paying higher prices as a result of coordinated output restrictions is a paradigmatic antitrust injury." Wash. Cty. Health Care Auth., Inc. v. Baxter Int'l Inc., 328 F. Supp. 3d 824, 845 (N.D. Ill. 2018). Further, Rockford alleges that Retrophin planned to bring Acthar to market and that defendants' decision to shelve Synacthen rather than bring it to market stifled competition. Had Novartis sold the rights to Synacthen to one of the other bidders that planned to bring Acthar to market, Rockford alleges that purchasers would have had a low-cost alternative to Acthar. See SAC ¶¶ 146-147. This is the type of injury that antitrust laws were intended to prevent. See Gypsum, 350 F.3d at 627 ("The antitrust-injury doctrine was created to filter out complaints by competitors and others who may be hurt by productive efficiencies, higher output, and lower prices, all of which the antitrust laws are designed to encourage."); Teamsters, 196 F.3d at 825 ("To recover under the antitrust laws, the plaintiff must show that its injury flows from that which makes the conduct an antitrust problem: higher prices and lower output."). Thus, Rockford has satisfied the "antitrust injury" prong and, accordingly, the court finds that Rockford has stated a § 1 claim.

### 5. § 2 (Count VI)

Rockford alleges that defendants acted and conspired to monopolize the ACTH drug market in violation of § 2.[14] See 15 U.S.C. § 2. A conspiracy to monopolize consists of (1) the existence of a combination or conspiracy, (2) overt acts in furtherance of the conspiracy, (3) an effect upon a substantial amount of interstate commerce, and (4) the existence of specific intent to monopolize.

---

[14]Section 2 claims may be plead under three different theories: (1) monopolization, (2) attempted monopolization, and (3) conspiracy to monopolize. Plaintiffs proceed under the third theory only.

See The Great Escape, Inc. v. Union City Body Co., 791 F.2d 532, 540-41 (7th Cir. 1986).

The first prong of this test is sufficiently pled. Plaintiffs allege that Mallinckrodt initiated its "new strategy" to limit Acthar's distribution to one distributor, Express Scripts. Id. ¶¶ 48-49, 221, 231. Plaintiffs allege that Mallinckrodt was acting in concert with Express Scripts in an exclusive dealing arrangement well before the Synacthen Acquisition, and thus, plaintiffs plausibly allege that defendants' conspiracy encompassed and facilitated the Acquisition. As to the third prong, the parties do not dispute that as pled the alleged conspiracy affects a substantial amount of interstate commerce. See SAC ¶ 19. With respect to the fourth prong, in cases such as this that involve exclusive dealing arrangements, courts typically infer a sufficient allegation of specific intent when overt acts are adequately pled. See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 459 (1993) (explaining that anticompetitive conduct "may be sufficient to prove the necessary intent to monopolize"). The court agrees with this inferential analysis, particularly because "[c]ourts are wary to dismiss antitrust cases on intent solely on the pleadings because evidence of intent is often in the control of the defendants." Wagner v. Magellan Health Servs., Inc., 121 F. Supp. 2d 673, 681 (N.D. Ill. 2000).

In addressing the second prong, similar to § 1's "anticompetitive effects" requirement, plaintiffs must allege that the overt acts constitute "anticompetitive conduct." See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) ("To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." (emphasis in original)); Endsley v. City of Chicago, 230 F.3d 276, 283 (7th Cir. 2000) ("Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means."); Am.

Acad. Suppliers, Inc. v. Beckley-Cardy, Inc., 922 F.2d 1317, 1320 (7th Cir. 1991) ("The offense of monopolization is the acquisition of monopoly by improper methods or, more commonly . . . the abuse of monopoly." (emphasis in original)). The acts from which the court can infer anticompetitive conduct must be essentially "predatory" in nature. See Mercatus Grp., LLC v. Lake Forest Hosp., 641 F.3d 834, 854 (7th Cir. 2011). Exclusionary, predatory, or anticompetitive conduct for purposes of § 2 claims is broadly defined as "conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." The Great Escape, 791 F.2d at 541; DSM Desotech Inc. v. 3D Sys. Corp., No. 08 CV 1531, 2009 WL 174989, at *9 (N.D. Ill. Jan. 26, 2009).

While analysis of this prong can in some cases differ greatly from claims under § 1, for exclusive dealing claims brought under § 2, the analysis nearly the same as that for § 1 claims. This makes sense given that a plaintiff alleging an "unreasonable restraint of trade" would typically be required to allege that a defendant undertook "overt acts" to effectuate the restraint. Methodist Health, 2016 WL 5817176, at *8 (noting that § 2 claims that allege antitrust violations based on exclusive dealing arrangements "are analyzed in much the same way as § 1 claims"). The court will await discovery to determine how to best characterize defendants' conduct. But at this stage, the court finds that Rockford has plausibly alleged that defendants' conduct was anticompetitive under the Seventh Circuit's broad definition of exclusionary, predatory, or anticompetitive conduct. As noted with respect to Rockford's § 1 claims, Rockford alleged that defendants conspired to price-fix and prevent competitors from entering the market, implemented through a joint-effort (the ASAP) that allowed Mallinckrodt to unlawfully acquire the rights to Synacthen. One can plausibly infer that the Synacthen Acquisition and Mallinckrodt's immediate "shelving" of Synacthen had no legitimate

business justification and resulted in the maintenance and entrenchment of Mallinckrodt's monopoly.

Further, like claims under § 1, a plaintiff alleging a § 2 claim must also allege an "antitrust injury."  See O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc., 36 F.3d 565, 573 (7th Cir. 1994); see also Magnetar Techs. Corp. v. Intamin, Ltd., 801 F.3d 1150, 1158, 1158 n.2 (9th Cir. 2015) (noting the § 2 requirement of antitrust injury under a conspiracy-to-monopolize theory specifically).  As noted in the section concerning Rockford's § 1 claims, Rockford has satisfied that requirement.  See Wagner, 121 F. Supp. 2d at 681 (analyzing "antitrust injury" under § 1 and § 2 together).  Thus, at this stage, all the § 2 prongs are sufficiently pled, and accordingly, Rockford has stated a § 2 claim.

Accordingly, the court denies defendants' motions to dismiss Counts VI and VII as to Rockford, finding that Rockford has antitrust standing to bring these claims and has met its burden at the Rule 12 stage.[15]  The court grants defendants' motions to dismiss Counts VI and VII as to Acument without prejudice, and grants plaintiffs leave to replead to correct the deficiencies noted by the court related to Acument's antitrust standing to bring its federal antitrust claims if it can do

---

[15]Plaintiffs also seek injunctive relief under § 16 of the Clayton Act, SAC ¶ 12, which provides in part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.  Aside from very brief and passing references in the SAC, see id. ¶¶ 12, 254, and their prayers for relief, plaintiffs only raise the issue of injunctive relief pursuant to its federal antitrust claims in its briefing opposing the motion to dismiss.  Defendants do not dispute plaintiffs' claims for injunctive relief separate from their arguments opposing plaintiffs' §§ 1 and 2 claims.

Plaintiffs are correct to point out that Illinois Brick does not foreclose plaintiffs' equitable relief claims.  See In re Broiler Chicken Antitrust Litig., 290 F. Supp. 3d 772, 813 (N.D. Ill. 2017) (quoting U.S. Gypsum Co. v. Ind. Gas Co., Inc., 350 F.3d 623, 627 (7th Cir. 2003). ("[T]he [in]direct-purchaser doctrine does not foreclose equitable relief."); Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111 n.6 (1986) (explaining that Clayton Act claims under § 16 do not implicate Illinois Brick because "standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries").  And while plaintiffs' allegations concerning injunctive relief under § 16 of the Clayton Act must also allege antitrust standing in line with AGC, see Teamsters, 196 F.3d at 823, because the court has determined that Rockford satisfied the AGC factors with respect to its §§ 1 and 2 claims, the court finds that Rockford also has antitrust standing to sue defendants for injunctive relief under § 16.  The court defers on ruling on Acument's antitrust standing under AGC until Acument repleads, if it chooses to do so.

26

so consistent with its obligations under Rule 11 of the Federal Rules of Civil Procedure.

## B. State-Law Antitrust and Consumer Protection Claims (Count VIII)

Plaintiffs bring various state-law antitrust and consumer protection claims against defendants. Defendants put forth three separate arguments as to why plaintiffs' state-law claims should be dismissed. Their first argument is that plaintiffs lack constitutional standing under Article III to bring claims of unnamed class members. Second, defendants claim that plaintiffs are not the "proper parties" to bring suit under AGC.[16] Third, defendants maintain that certain limitations germane to specific states implicated by plaintiffs' claims act as additional barriers to plaintiffs bringing suit under those states. The court will assess these arguments in turn.

### 1. Article III Standing for Claims of Unnamed Class Members

Although defendants do not dispute plaintiffs' Article III standing to pursue their federal claims, defendants challenge plaintiffs' Article III standing to bring state-law claims on behalf of the unnamed class members.[17] The issue before the court then is whether Article III standing is properly alleged for plaintiffs' state-law claims based in jurisdictions in which a named plaintiff is not alleged to have suffered injury and thus Rockford and Acument cannot be said to have personally experienced injury based on defendants' conduct. But first the court must decide whether it should rule on plaintiffs' Article III standing to represent these claims now or as an alternative defer that

---

[16]In California v. ARC Am. Corp., 490 U.S. 93 (1989), the Supreme Court held that state legislatures could pass laws "repealing" Illinois Brick (known as "Illinois Brick repealer statutes"), thus allowing for indirect plaintiffs to sue upstream antitrust defendants. Some of the states implicated in the SAC passed these statutes with the explicit intention of repealing Illinois Brick as applied to those respective states; other states passed antitrust or consumer protection statutes that effectually allow for such suits. Here, defendants put forth no argument that Illinois Brick works to prevent any indirect-purchaser suits in these states.

[17]The parties agree that Rockford and Acument have Article III standing to pursue state-law antitrust and consumer protection claims of Illinois and Tennessee, respectively.

ruling until the class certification stage.

Courts across this country are split on this timing issue. See McDonnell v. Nature's Way Prods., LLC, No. 16 C 5011, 2017 WL 1149336, at *5 (N.D. Ill. Mar. 28, 2017) (collecting cases and noting that "[c]ourts in this district . . . are divided as to whether these decisions require a plaintiff to establish standing at the pleading stage to pursue claims under state laws in which that plaintiff does not reside or cannot claim to have personally suffered an injury"); see also 1 WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 2: 6 (5th ed. 2013) (noting that the issue of whether a plaintiff may represent a class of another state's residents that plaintiff was not herself injured within is not a pure question of standing, but rather, a hybrid of both standing and class representation). Plaintiffs point to the decisions of courts that hold that, "at the pleading stage and prior to analysis of the class allegations under Rule 23," where a named plaintiff is able to establish Article III standing and injury-in-fact in its own jurisdiction, this "suffices to establish the named plaintiffs' standing to assert the claims of class members in other states." In re Broiler Chicken Antitrust Litigation, 290 F. Supp. 3d 772, 809-10 (N.D. Ill. 2017) ("[N]amed plaintiffs who represent a class must allege and show that they have personally been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." (quoting In re Plasma-Derivative Protein Therapies Antitrust Litig., No. MDL 2109, 09 C 7666, 2012 WL 39766, at *6 (N.D. Ill. Jan. 9, 2012))); see also Payton v. Cty. of Kane, 308 F.3d 673, 680 (7th Cir. 2002) (explaining that only "once a class is properly certified" should "standing requirements . . . be assessed with reference to the class as a whole" as opposed to "the individual named plaintiffs" (emphasis added)); Supreme Auto Trans. LLC v. Arcelor Mittal, 238 F. Supp. 3d 1032, 1038 (N.D. Ill. 2017) ("For now, whether named plaintiffs can bring claims under the laws of

other states and whether plaintiffs are adequate class representatives do not pose Article III barriers to subject-matter jurisdiction.").

One court in this district discussed Halperin v. International Web Services, LLC, 123 F. Supp. 3d 999, 1009 (N.D. Ill. 2015), and noted that the defendant's argument in Halperin (that the plaintiff lacked standing to raise claims under the nine state consumer protection laws other than Illinois') was "more accurately characterized as an attack not on Halperin's Article III standing per se . . . but rather on his ability under Rule 23 to represent the multi-state class." In re Herbal Supplements Mktg. & Sales Practices Litig., No. 15-cv-5070, 2017 WL 2215025, at *6 (N.D. Ill. May 19, 2017) (St. Eve, J.) (emphasis in original). The court finds the analysis contained within Herbal Supplements persuasive. What defendants here are really challenging is the adequacy of Rockford and Acument to represent the unnamed class members' state-law antitrust claims. Plaintiffs' "capacit[ies] to represent individuals from other states depends upon obtaining class certification, and the standing issue would not exist but for their assertion of state law claims on behalf of class members in those states. These standing issues therefore arise from [plaintiffs'] attempt to represent the multistate class, making class certification issues 'logically antecedent' to the standing concerns." McDonnell, 2017 WL 1149336, at *5. The court is persuaded that plaintiffs' argument adheres best to the Supreme Court's holding that "the standing issue focuses on whether the [named] plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court," and applies that reasoning to this case. Lewis v. Casey, 518 U.S. 343, 395 (1996); accord. Morrison v. YTB Int'l, Inc., 649 F.3d 533, 535-36 (7th Cir. 2011); In re Fluidmaster, Inc., 149 F. Supp. 3d 940, 957-58 (N.D. Ill. 2016) (Dow, J.). Thus, the court need not address Article III standing with respect to claims based on injuries incurred by

unnamed class members until some later appropriate stage of the proceedings.

## 2. Rockford's Antitrust Standing for State-Law Claims

Defendants also argue that the proximate-cause limitation under <u>AGC</u> applies to plaintiffs' attempt to bring state-law claims for the unnamed class members.[18]  Unlike Article III standing, for the state-law antitrust and consumer protection claims, the parties do not direct the court to any authority that suggests the court should defer ruling on this issue until the Rule 23 stage.  Thus, the court will determine this issue now.

Generally, in deciding whether to apply <u>AGC</u> to state-law antitrust claims, courts look to whether the relevant states' highest courts have ruled on the issue.  <u>Broiler Chicken</u>, 290 F. Supp. 3d at 814-15 (citing <u>ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.</u>, 672 F.3d 492, 498 (7th Cir. 2012)).  However, federal courts have tied themselves in knots attempting to interpret the decisions of state courts on this issue.  <u>See</u> <u>id.</u>; <u>Dairy Farmers</u>, 2015 WL 3988488, at *7; <u>In re Lithium Ion Batteries Antitrust Litig.</u>, No. 13-MD-2420 YGR, 2014 WL 4955377, at *9 (N.D. Cal. Oct. 2, 2014); <u>see also</u> Kelly S. Dwyer, <u>With the Illinois Brick Wall Down, What's Left?: Determining Antitrust Standing Under State Law</u>, 3 J. BUS. ENTREPRENEURSHIP & L. 255 (2010) (noting that the complexity of this issue has resulted in a "number of splintered opinions").  Many courts that embark upon the endeavor do so in relative cursory fashion, relying heavily on the parties' briefings.  <u>See, e.g.</u>, <u>Arcelor</u>, 238 F. Supp. 3d at 1038-39.  Some courts eschew the task all-together, and instead assume arguendo that each state at issue has adopted the full <u>AGC</u> test and conclude that if plaintiffs' antitrust allegations pass muster under the full <u>AGC</u> test then it follows that they will

---

[18]The parties put forth no argument that <u>AGC</u> is irrelevant to state-law consumer protection claims.  For purposes of this order only, the court considers all of the state laws invoked by the SAC as state laws that implicate plaintiffs' antitrust standing.

comply with the "proper party" test of any state, including those that have less stringent requirements. See, e.g., Lithium, 2014 WL 4955377, at *11 & n.13 (listing cases that have taken the same approach). Here, the court has already determined that Rockford satisfies the full AGC test for their federal claims. Thus, for Rockford, the court need not embark on the "back-breaking labor involved in deciphering the state of antitrust standing in each of th[e] states," Flash Memory, 643 F. Supp. 2d at 1153, because the court has already determined that plaintiffs satisfied the federal proximate-cause standard.[19] Courts especially take this approach where "[n]either party has provided the [c]ourt with the requisite, individualized analysis on a per state basis to enable the [c]ourt to render such a determination." Id. Defendants argue that Mallinckrodt "devoted over a page of argument to the issue, with supporting authorities." But nowhere in defendants' briefs is there a state-by-state analysis of how AGC interacts with the respective states' statutes; Mallinckrodt's only related argument to this point is a footnote summarily stating that "[a] number of [these] state courts have expressly adopted AGC or held that at least some of the AGC factors should be applied to state antitrust claims." Thus, because the court has already concluded that Rockford satisfies the AGC factors with respect to its federal claims, finding that it would be a "proper party" under AGC's proximate-cause analysis, the court presumes that Rockford would satisfy each states' "proper party" test.

### 3. Acument's Antitrust Standing for State-Law Claims

Conversely, the court finds that Acument would not meet even the least stringent state's

---

[19]Without any analysis or citation to authority by any of the parties, the court notes in passing its strong skepticism that any state that passed an "Illinois Brick repealer" statute to make indirect-purchaser standing easier would have made that indirect-purchaser's antitrust standing harder under a "proximate cause" analysis. Thus, the court assumes that the federal AGC standard represents the most stringent "proper party" standard that could apply to a state's "proximate cause" analysis for a plaintiff's antitrust standing. See Lithium, 2014 WL 4955377, at *11 & n.13.

"proximate cause" test. To reiterate this opinion's section on the application of AGC to Acument's federal antitrust claims, the SAC lacks sufficient allegations to allow the court to determine how Acument's injuries in Tennessee are connected to defendants' conduct. Thus, the court grants defendants' motions to dismiss Count VIII as it pertains to Acument. The court grants plaintiffs leave to replead to correct the deficiencies associated with Acument's "proper party" status concerning its state-law claims.

### 4. Statutory Limitations[20]

In addition to the aforementioned standing arguments, defendants also bring a litany of challenges to plaintiffs' state-law claims based on plaintiffs' failure to comply with or allege requirements particular to each state's antitrust laws. The twenty-four state statutes invoked in the SAC are those of Arizona, Arkansas, California, Florida, Hawaii, Illinois, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, and Wisconsin. Defendants cite limitations specific to some of these states that defendants contend defeat most of plaintiffs' state-law claims. The court will address these specific limitations in turn.[21]

---

[20]The court couches the language in this section as applying to both Rockford and Acument, but it is relevant to Acument only if it chooses to replead.

[21]The parties' arguments concerning these requirements are styled as arguments about whether plaintiffs have plausibly "stated a claim" with respect to each states' antitrust laws. Cf. Broiler Chicken, 290 F. Supp. 2d at 816 (discussing threshold issues concerning state antitrust laws on a motion to dismiss in terms of whether "Plaintiffs have failed to state claims"). But the court does not take the parties' arguments on these points to be on the "merits"; neither party engages the elements of any states' antitrust laws or whether the SAC contains allegations that sufficiently plead what is required for such elements. Rather, the court will address these arguments as pertaining to the threshold requirements for plaintiffs to bring claims under each specific state. See Dairy Farmers, 2015 WL 3988488, at *33 ("[B]ecause Defendants do not allege that Indirect Plaintiffs failed to state a claim under the Arkansas, California, and Florida consumer-protection statutes (or at least Defendants failed to provide the relevant legal standards under those states' laws), the Court will not address such arguments.").

### a. Arizona, California, Florida, Hawaii, Iowa, Kansas, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, and Wisconsin

Defendants' briefing on this issue is cursory. Mallinckrodt simply argues that "[t]he antitrust laws of these states limit their reach to activities which occur within the state. Because Plaintiffs fail to allege conduct within those states that would violate the respective statutes, each claim should be dismissed." Similarly, for the consumer protection statutes, defendants argue that those statutes only concern "intrastate" activity. The court finds that plaintiffs have met their bare pleading requirements at this stage that unnamed class members purchased Acthar in these states. See SAC ¶¶ 260-266, 269-289, 293-336, 341-348, 353-356. Later stages in this litigation, including the Rule 23 stage, will allow the court to more definitively determine whether any unnamed class members purchased Acthar in these states.[22]

However, as noted in the previous section, the SAC does not sufficiently allege that Acument is a proper party to bring any antitrust or consumer protection claims (federal or state). Thus, with leave to replead, the court dismisses Count VIII to the extent Acument seeks to represent the claims of unnamed class members—including those in Tennessee.

### b. Arkansas

The Arkansas Deceptive Trade Practices Act (the "ADTPA") prohibits a variety of conduct, including "[d]eceptive and unconscionable trade practices." Ark. Code Ann. § 4-88-107(a). However, the ADTPA contains a "safe harbor" provision that does not apply the law to practices "which are subject to and comply with any rule, order, or statute administered by the Federal Trade Commission." Id. § 4-88-101(1). Defendants argue that because Mallinckrodt is subject to the

---

[22]For Kansas and Oregon, defendants offer no state-specific limitations.

consent order from the FTC complaint against it that it falls within the safe harbor provision. Thus, before determining whether the ADTPA covers defendants' conduct, the court must first determine whether the existence of the FTC consent order removes defendants' liability under the ADTPA.

Defendants do not cite any authority supporting its argument that the consent order between the FTC and Mallinckrodt—which defendants ask this court to ignore as evidence connected to a different argument pursuant to their motions to dismiss—falls within the statutory exemption of the ADTPA. In the court's view, the exemption appears inapplicable to the consent order here, as the safe harbor provision is meant to exempt "conduct that is permitted under laws administered" by the FTC, see DePriest v. AstraZeneca Pharms., L.P., 351 S.W.3d 168, 176 (Ark. 2009), and defendants' alleged price-fixing and monopolization conduct was not permitted by the consent order, cf. Godfrey v. Toyota Motor N. Am., Inc., No. 07-5132, 2008 WL 2397497, at *3 (W.D. Ark. June 11, 2008) ("Clearly, the FTC regulations require the use of EPA estimates in fuel economy advertisements. . . . It is, therefore, no great jump for this Court to find that plaintiffs' claim under the ADTPA should be dismissed as the ADTPA has clearly exempted 'advertising or practices which are subject to and which comply with any rule, order, or statute administered by the Federal Trade Commission.'" (citations omitted) (emphasis added)). Thus, with no direction from the Supreme Court of Arkansas, the court will not apply the safe harbor provision to plaintiffs' claims, and will instead determine how the ADTPA relates to defendants' alleged conduct.

In Arkansas, unconscionable trade practices include "conduct violative of public policy or statute." Universal Coops., Inc. v. AAC Flying Serv., Inc., 710 F.3d 790, 795 (8th Cir. 2013). This requires something more than merely alleging that the price of a product was unfairly high. See State v. R & A Inv. Co., 336 Ark. 289, 296 (1999) ("Two important considerations are whether there is

a gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question."). While price-fixing or monopolization are not listed in the Act, the statute does contain a catch-all provision that proscribes "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Id. § 4-88-107(a)(10). Another court in this district has found that "allegations of price fixing . . . are not the kind of conduct prohibited under the[ ] statute" because price-fixing, within the meaning of the ADTPA, does not "affront[ ] the sense of justice, decency, or reasonableness." Dairy Farmers, 2015 WL 3988488, at *35 (quoting In re Graphics Processing Units Antitrust Litig., 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007)); cf. Baptist Health v. Murphy, 365 Ark. 115, 128 (2006) (affirming as unconscionable for ADTPA purposes a hospital's policy of denying practice rights to physicians who held ownership interests in another local hospital, where the defendant hospital had the "upper hand because of exclusive-provider contracts" and the "power to disrupt the relationships between patients, who are at [the hospital's] mercy, with their physicians"). However, that same court found that monopolization claims are actionable under the ADTPA. Dairy Farmers, 2015 WL 3988488, at *33 ("[C]ourts have interpreted the catchall provision of the Arkansas Deceptive Trade Practices Act—which prohibits any 'unconscionable, false, or deceptive act or practice in business, commerce, or trade'—broadly so as to encompass monopolization claims." (citation omitted)) (citing Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 404-05 (E.D. Pa. 2010)). Here, the court infers from the SAC that plaintiffs mean to incorporate its § 2 monopolization claims into their claims under Arkansas law. SAC ¶ 267. Accordingly, the court denies defendants' motions to dismiss plaintiffs' claims under the ADTPA.

**c. Illinois**

Defendants argue that plaintiffs cannot bring their claims under the Illinois Antitrust Act because, while it allows for recovery by indirect purchasers, it provides that "no person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General." 740 ILCS 10/7(2). Rockford contends that, under Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393 (2010), this is a procedural rule that does not apply to class action claims brought in federal court.

In Shady Grove, the Supreme Court held that a New York statute prohibiting class actions "in suits seeking penalties or statutory minimum damages" did not bar the class action in that case under New York law in federal court. See id. at 408. A plurality of the Court held that Federal Rule of Civil Procedure 23 "neither change[s] plaintiffs' separate entitlements to relief nor abridge[s] defendants' rights; [but] alter[s] only how the claims are processed," and thus, the New York statute was a procedural, not substantive rule. Id. Importantly, Justice Stevens' concurrence would have allowed state procedural rules to control in federal court only when they are "part of a State's framework of substantive rights or remedies." Shady Grove, 559 U.S. at 419 (emphasis added); see Broiler Chicken, 290 F. Supp. 3d at 817 (noting that both the plurality and Justice Stevens' concurrence were "primarily focused on the fact that both Rule 23 and the New York statute governed when a class action was permissible, and this was a procedural, not substantive conflict").

There is a split of authority on the issue of whether the Illinois Antitrust Act's class action prohibition is part of Illinois' "substantive rights or remedies." Some courts have answered in the affirmative. See, e.g., In re Opana ER Antitust Litig., 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016)

(citing In re Wellbutrin XL Antitrust Litig., 756 F. Supp. 2d 670, 677 (E.D. Pa. 2010) ("The Illinois restrictions on indirect purchaser actions are intertwined with Illinois substantive rights and remedies.")); In re Lipitor Antitrust Litig., No. 3:12-cv-2389, 2018 WL 4006752, at *14 (D.N.J. Aug. 21, 2018) ("[A] majority of courts have held that the Act is distinguishable from the New York law in Shady Grove and that it prohibits indirect purchaser class actions."); In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 415-16 (S.D.N.Y. 2011). Others have not. See, e.g., Broiler Chicken, 290 F. Supp. 3d at 818 ("The availability of the class action procedure does not change the substantive rights or remedies available to [plaintiffs] under Illinois law."); In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig., No. 17-MD-2785-DCC-TJJ, 2018 WL 3973153, at *31 (D. Kan. Aug. 20, 2018)); In re Propranolol Antitrust Litig., 249 F. Supp. 3d 712, 728 (S.D.N.Y. 2017); In re Aggrenox Antitrust Litig., No. 14-MD-2516(SRU), 2016 WL 4204478, at *6 (D. Conn. Aug. 9, 2016)

While the court recognizes the split in authority on this issue, the court agrees with the reasoning of Aggrenox, which casts doubt on whether Justice Stevens' "framework of substantive rights or remedies" concurrence controls. The Court noted the doctrine from Marks v. United States, 430 U.S. 188 (1977)—that "[w]hen no single rationale garners a majority, the holding of the Court is that position taken by those Members who concurred in the judgments on the narrowest grounds," but "only when one opinion is a logical subset of other, broader opinions . . . a common denominator of the Court's reasoning," id. at *5—and acknowledged that some courts have used it to find that Justice Stevens' concurrence controlled, see, e.g., Wellbutrin, 756 F. Supp. 2d at 675; Aggrenox, 2016 WL 4204478, at *6. Nevertheless, the Court pointed out that these courts did not address whether Stevens' concurrence was actually the "common denominator" of the judgment such that

the Marks doctrine applies:

> The Stevens concurrence is "narrower" than the position of the other Justices who made up the Shady Grove majority only in the sense that it would reject state procedural rules in fewer cases. It is not logically narrower, however, because it is not a logical subset of the opinion of the other Justices in the majority. Those Justices do not implicitly approve of its rationale for sometimes allowing state procedural rules to control—on the contrary, they explicitly reject that rationale—and it therefore does not represent the common denominator of the Court's reasoning. The courts that have taken the Stevens concurrence to be controlling have generally not addressed that problem . . . [E]ven though Stevens joined the majority to hold that Rule 23 trumps New York's class-action bar, he agreed with the dissent that some state procedural rules—when sufficiently intertwined with the state's substantive rights and remedies—can control in federal court. The Wellbutrin Court infers from that agreement that there were five votes for Stevens's approach. The problem is that no other Justice joined his concurrence, and even if we nevertheless infer agreement, the common denominator of a concurrence and a dissent does not support the judgment.

Aggrenox, 2016 WL 4204478, at *5-6. Thus, the Aggrenox Court concluded that "it may be that in a case where a state procedural rule is part of the state's framework of substantive rights, there simply is no controlling Supreme Court holding." Id. at *6.

But even to the extent that Justice Stevens' concurrence could be construed as persuasive "Marks-doctrine dicta," the Court found that the Illinois Antitrust Act did not alter the scope of any substantive right or remedy—and is thus not substantive for purposes of Shady Grove—"because any indirect purchaser procedurally blocked from participation in a class action would still have the same remedy in an individual action." Id. The Court acknowledged that the Illinois Antitrust Act's class action limitation hewed more closely to a particular substantive right (indirect-purchaser antitrust claims) than the New York state-law limitation in Shady Grove, but ultimately found that "if New York's state-law bar is not a procedural rule that alters the scope of a substantive right or remedy, then the narrower scope of Illinois's state-law bar does not make it one that does." Id.; see

also In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2011 WL 13152270, at *5 (N.D. Cal. Aug. 24, 2011) (citing Califano v. Yamasaki, 442 U.S. 682, 699-700 (1979)) ("Rule 23 explicitly empowers a federal court to certify a class in every case that satisfies its criteria. Like the rest of the Federal Rules of Civil Procedure, Rule 23 automatically applies in all civil actions and procedures in the United States district courts."). Thus, agreeing with the reasoning laid out in Aggrenox, defendants' motions to dismiss plaintiffs' class action antitrust claims based on the Illinois Antitrust Act are denied.

### d. Arizona, Hawaii, Nevada, and Utah

With respect to plaintiffs' claims under Arizona, Hawaii, Utah, and Nevada, defendants argue as another basis for dismissal that plaintiffs' failure to plead compliance with the notice provisions of these states' antitrust statutes necessitates dismissal. Plaintiffs have represented to the court that they have made "post-filing efforts" to provide notice. Defendants offer no authority to suggest that late notice would require dismissal. See Broiler Chicken, 290 F. Supp. 3d at 817. One court assessing Hawaii's notice provision found that "Plaintiffs are correct that nothing in the statutory scheme suggests that defendants may use the statute as a shield to avoid answering for alleged anti-competitive behavior. Accordingly, defendants' motion to dismiss the claims under the Hawaii antitrust statute is denied." In re Aftermarket Filters Antitrust Litig., No. 08 C 4883, MDL Docket No. 1957, 2009 WL 3754041, at *6 (N.D. Ill. Nov. 5, 2009). The court agrees with this approach as to Hawaii as well as Arizona, Nevada, and Utah, and chooses to defer ruling on this issue until a later stage in these proceedings when the parties have had an opportunity to collect more facts to determine what these "post-filing efforts" have been and whether any failure by plaintiffs to adhere to these notice provisions prohibits their bringing of claims under these states' relevant statutes.

Accordingly, the court denies defendants' motions to dismiss on this basis.

In sum, as to Rockford, the court denies defendants' motions to dismiss plaintiffs' state-law claims with respect to all twenty-four states named. As to Acument, the court grants defendants' motion to dismiss Count VIII without prejudice with leave to replead if Acument can properly do so. The court notes in passing that Rockford, and perhaps Acument, will be required at some later point in these proceedings to demonstrate that they have Article III standing to bring these claims by showing that Acthar was in fact purchased in these states.[23]

## C. Breach of Contract (Count XII)

Rockford alleges that Express Scripts[24] failed to provide cost containment services as enumerated in the PBM Agreement and as understood by the parties when Express Scripts failed to push back against Mallinckrodt's increase of Acthar's price. SAC ¶ 243. Because of a choice-of-law provision in the PBM Agreement, Rockford's claim will be assessed under Illinois law. To prevail on its breach of contract claim, Rockford must demonstrate: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the [plaintiff]; (3) a breach by defendants; and (4) resultant damages." Dual-Temp of Ill., Inc. v. Hench Control, Inc., 821 F.3d 866, 869 (7th Cir. 2016).

Express Scripts argues that the "cost containment" language, as "prefatory" language contained in the recitals section of the agreement, does not create a "binding obligation" capable of

---

[23]As noted earlier in this opinion, plaintiffs make only scant references to their requests for injunctive relief. Relatedly, the court does not construe the SAC to be making any claims for injunctive relief pursuant to any of the state-law antitrust and consumer protection statutes invoked in the SAC.

[24]Rockford uses the names Express Scripts and ESI interchangeably in Counts XII through XV. Recognizing that ESI is the only defendant signatory to the PBM Agreement, the court will use the name Express Scripts to include ESI.

being breached.  See McMahon v. Hines, 298 Ill. App. 3d 231, 237 (1998); First Bank & Tr. Co. of Ill. v. Vill. of Orland Hills, 338 Ill. App. 3d 35, 45 (2003).  Rockford argues that, while the term "cost containment" is not mentioned in the operative portion of the PBM Agreement, the "cost containment" term was part of the "PBM Services," which was mentioned throughout the operative part of the contract.  Specifically, the portion of the PBM Agreement titled "**RECITALS**" states in part:

> ESI, either directly or through its subsidiaries, engages in pharmacy benefit management services, including, among other things, pharmacy network contracting; pharmacy claims processing; mail and specialty drug pharmacy; cost containment, clinical, safety, adherence, and other like programs; and formulary and rebate administration ("PBM Services").

(emphasis added).

"Recitals to a contract provide explanations of those circumstances surrounding the execution of the contract."  Id.  Recitals are preliminary in nature and are generally not binding on the parties or "an effective part of their agreement unless referred to in the operative portion of their agreement."  Id.  Courts in Illinois look for the terms contained within the recitals to appear in the operative portions of the contract before assigning those terms binding power upon the parties.  For example, in McMahon, the plaintiff filed an action for declaratory judgment seeking court approval to install a driveway over an easement owned by the defendants.  298 Ill. App. 3d at 233-34.  The defendants objected, arguing that the plaintiff's proposed driveway would obliterate a curb that served as a boundary between the plaintiff's and defendants' properties for the length of the easement and which provided a means of water runoff.  Id.  The defendants claimed that the plaintiff was prohibited from removing the curb because the curb was part of their easement.  Id. at 237.  The appellate court rejected this argument, noting that in the instrument creating the defendants'

easement the only mention of a curb was in the paragraphs containing recitals. Id. The court ruled that under Illinois law, recitals "are not binding obligations unless referred to in the operative portion of the contract." Id. (emphasis added). Because there was no mention of the curb in the operative language of the easement document, the court found that "the parties did not intend to include the curb as part of the easement." Id.; see also Wilson v. Wilson, 217 Ill. App. 3d 844, 852 (1991) (holding that recitals are operative when preambles or introductions to agreements include language indicating as much); Am. Nat'l Bank & Tr. Co. of Chi. v. Chi. Title & Tr. Co., 134 Ill. App.3d 772, 776-77 (1985) (holding that recitals became operative when the contract stated "[f]or and in consideration of the premises set forth in the foregoing Recitals"). Because the term "curb" appeared nowhere in the operative clauses, and because there was no indication within the recitals that any particular terms of the recitals were to be part of the operative clauses, the appellate court affirmed the trial court.

Here, there is uncertainty as to how the "cost containment" language is referenced to in the operative portion of the contract. It is true, as Rockford contends, that "cost containment is one of the "PBM Services" noted in the recitals and the term "PBM Services" is referred to throughout the operative portion of the contract. Conversely, it is worth noting that, with the conspicuous omission of "cost containment," the other undertakings listed in the Recitals are specifically named in Section 2.4 of the Terms of Agreement.[25] "Cost containment" is never mentioned after the recitals. This may support the conclusion that any reference to "cost containment" was not intended by the parties

---

[25]Section 2.4(a) of the PBM Agreement reads:
Formulary Adherence and Clinical Programs. ESI may provide clinical, safety, adherence, and other like programs as appropriate. The Clinical Addendum described in Exhibit A-2 sets forth certain available adherence, clinical, safety and/or trend programs that require additional fees hereunder. ESI will not implement any program for which Sponsor may incur an additional fee without Sponsor's prior written approval and election of such program.

to impose an actionable obligation on Express Scripts under the terms of the contract.  In later proceedings, with the benefit of discovery and applicable rules of contract interpretation, the court may be able to determine whether "cost containment" programs were merely an example of what "PBM Services" may generally include or whether, and to what extent, they constitute an enforceable obligation of Express Scripts.[26]  But, drawing all reasonable inferences in favor of Rockford, the court concludes that "cost containment" is alluded to in the operative terms of the PBM Agreement and therefore the court will not dismiss Rockford's claim based upon Express Scripts' "prefatory language" argument.[27]

Turning to another issue, under Illinois law contractual terms that are too vague or indefinite are not enforceable.  A term that is too vague or indefinite is one that a court cannot, "under proper rules of construction and applicable principles of equity . . . ascertain what the parties have agreed to do."  Dawson v. Gen. Motors Corp., 977 F.2d 369, 373 (7th Cir. 1992) (quoting Acad. Chi. Publishers v. Cheever, 144 Ill. 2d 24, 29 (1991)); see also Pennington v. Travelex Currency Servs., Inc., 114 F. Supp. 3d 697, 703 (N.D. Ill. 2015) (finding that the promise of an "excellent" exchange rate was not enforceable); Barbara's Sales, Inc. v. Intel Corp., 227 Ill. 2d 45, 73 (2007) (holding that words of "puffery" such as a service that is "high-quality" or a price that a produce or service is the "best" are not actionable).  Rockford does not explain the meaning of "cost containment."  Instead, Rockford argues that Express Scripts already, in an unrelated case, admitted that "cost containment"

_____

[26]Even McMahon, on which Express Scripts relies, was not decided on a motion to dismiss.

[27]Further, Section III(c) of Exhibit A-1 of the PBM Agreement notes that "Specialty Products will be excluded from any price guarantees set forth in the agreement," and Acthar is listed as a Specialty Product.  Should Rockford choose to replead, the court expects Rockford to clarify that this Section does not operate to preclude its breach of contract claim in the event that Rockford can plausibly allege that "cost containment" is an actionable obligation contained within the PBM Agreement.

is a definite term because in that case Express Scripts argued that the "goal" of its decision to end insurance coverage for certain medications was based on its effort to reduce costs. See Precision Rx Compounding, LLC v. Express Scripts Holding Co., No. 4:16-CV-0069 (CEJ), 2016 WL 4446801, at *1-2 (E.D. Mo. Aug. 24, 2016). But Rockford's reference to this case in no way clarifies the meaning of "cost containment" in the context of the PBM Agreement, in large part because Precision Rx did not deal with any contract terms at all, let alone a contract term analogous to "cost containment."[28]

The court also wishes to bring the parties' attention to a discrepancy between the allegations of the SAC and the language of the PBM Agreement. The SAC states that Express Scripts breached the contract by failing to provide cost containment services. SAC ¶ 83. However, this is at odds with the plain language of the contract. The contract states only that Express Scripts engages in pharmacy benefit management services, including cost containment programs. At this stage of the proceedings, the court must accept all of the well-pleaded allegations of the SAC as true; however, in a contract action, if the language of the contract is plainly inconsistent with the plaintiff's representations, the court may decline to afford the presumption of truth. "[W]here the allegations of a pleading are inconsistent with the terms of a written contract attached as an exhibit, the terms of the latter, fairly construed, must prevail over the averments differing therefrom." Citicorp Vendor

---

[28]Along these same lines, in order to conserve time and effort, the court wishes to draw the parties attention to two other thorny issues in the breach of contract claim. The SAC charges that "ESI's failure to provide 'cost containment' repudiated its obligations under the ESI PBM Agreement." SAC ¶ 391 (emphasis added). Yet § 2.4(a) of the Agreement states only that "ESI may provide clinical, safety, adherence, and other like programs as appropriate." (emphasis added). Also, it is important to remember that the PBM Agreement applies to numerous other drugs besides Acthar. If Express Scripts engages in cost containment programs (whatever they may be) related to drugs other than Acthar, the question arises whether such involvement with other drugs would satisfy any "cost containment" obligation Express Scripts has under the PBM Agreement. At this point the court takes no position as to the parameters of Express Scripts' duties under the Agreement, but these are matters which should be addressed as soon as possible.

Fin., Inc. v. ISA Pharmacy, Inc., No. 03 C 6896, 2004 WL 406985, at *1 (N.D. Ill. Mar. 3, 2004) (quoting Foshee v. Daoust Constr. Co., 185 F.2d 23, 25 (7th Cir. 1950). There remains a question as to how cost containment services, which are what the SAC maintains Express Scripts failed to provide, relate to cost containment programs, which the contract says is an activity of Express Scripts.

Therefore, the court dismisses Count XII without prejudice, and the court grants Rockford leave to replead if it can appropriately allege that Express Scripts is in breach of their contract with Rockford by not engaging in cost containment programs. Further, should Rockford choose to replead this claim, it should specify what is meant by the contract term "cost containment . . . programs."

### D. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count XV)

The court turns to Rockford's claim based on an alleged breach of the implied covenant of good faith and fair dealing. To state a claim for breach of the implied covenant of good faith and fair dealing in Illinois, a plaintiff must plausibly allege (1) that the existence of an enforceable contract (2) "breaching a specific duty imposed by the contract other than the covenant of good faith and fair dealing"; (3) that defendant failed to exercise its contractual discretion reasonably and with proper motive; and (4) resultant damages. AAA Gaming LLC v. Midwest Elecs. Gaming, LLC, No. 16 CV 4997, 2016 WL 6476549, at *3 (N.D. Ill. Nov. 2, 2016).

However, in Illinois, "[e]very contract implies good faith and fair dealing between the parties to it, and where an instrument is susceptible of two conflicting constructions, one which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted. This good-faith principle is used only as a construction aid in determining the intent of the contracting

parties." Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc., 352 Ill. App. 3d 160, 163 (2004) (citation omitted). "The obligation of good faith and fair dealing is used as an aid in construing a contract under Illinois law, but does not create an independent cause of action." McArdle v. Peoria Sch. Dist. No. 150, 705 F.3d 751, 755 (7th Cir. 2013); see also In re VTech Data Breach Litig., No. 15 CV 10889, 2017 WL 2880102, at *9 (N.D. Ill. July 5, 2017) ("Under Illinois law the covenant of good faith and fair dealing is not an independent source of duties for the parties to contract. The implied covenant is used to interpret a contract." (citation omitted)). Nor can it be used to contradict the express terms in a contract. Continental Bank, N.A. v. Everett, 964 F.2d 701, 705 (7th Cir. 1992). Rather, a plaintiff can plead breach of the implied covenant as a theory for a breach of contract cause of action—and not as a separate, independent cause of action—in the situations where it is being used as a "gap-filler" where a contract is otherwise silent on how the parties are to perform certain terms of the contract. See LSREF3 Sapphire Tr. 2014 v. Barkston Properties, LLC, No. 14 C 7968, 2016 WL 302150, at *4 (N.D. Ill. Jan. 25, 2016) (rejecting a motion to dismiss a breach of contract claim under the theory of breach of the implied covenant of good faith and fair dealing where one party had a reasonable expectation that the breaching party would perform in a particular way based on their understanding of a relevant contractual term and alleged that the breaching party "took opportunistic advantage of [the injured party], dashed their reasonable expectations, and abused any discretion the contract may have afforded it"); AAA Gaming, 2016 WL 6476549, at *3 (allowing plaintiffs to amend their complaint to allege breach of the implied covenant of good faith and fair dealing in the same cause of action as the breach of contract claim). However, courts only allow this when the "gap-filler" is used to prevent a party from abusing discretion outlined for them in the contract. Mid-W. Energy Consultants, Inc. v. Covenant Home, Inc., 352 Ill. App. 3d 160, 165

46

(2004) ("Illinois courts have recognized that a party who does not properly exercise contractual discretion breaches the implied covenant of good faith and fair dealing that is in every contract. . . . <u>In order to plead a breach of the covenant of good faith and fair dealing, a plaintiff must plead existence of contractual discretion.</u>" (emphasis added)). "Where the contract vests one of the parties with discretion in performing an obligation, and that party exercises that discretion in bad faith, unreasonable or in a manner inconsistent with the reasonable expectations of the parties, it breaches the implied covenant of good faith and fair dealing." <u>LSREF3</u>, 2016 WL 302150, at *4.

Here, Rockford's implied-covenant claim is deficient for several reasons. First, Rockford pleads it as an independent cause of action, which it cannot do. More importantly, even if plaintiffs replead these allegations as an alternative theory in connection with its breach of contract claim, the allegations as currently formulated lack a reference to any particular section of the PBM Agreement that discusses Express Scripts' discretion to effectuate "cost containment."[29] Thus, the court grants Express Scripts' motion to dismiss Count XV without prejudice, and grants Rockford leave to replead if it can sufficiently do so.

### E. Promissory Estoppel (Count XIII)

In Count XIII, Rockford brings a claim against Express Scripts for promissory estoppel. Specifically, Rockford seeks enforcement of Express Scripts' promise to continue with its obligations under the PBM Agreement. SAC ¶ 396. Promissory estoppel is a common-law

---

[29]Section 2.4(a) of the PBM Agreement notes that Express Scripts "may provide clinical, safety, adherence, and other like programs as appropriate." The Recitals section of the PBM Agreement suggests that these are the kinds of things that Express Scripts does. If Rockford can plausibly allege that these (or different) sections of the PBM Agreement imparts discretion upon Express Scripts, and such discretion specifically includes "cost containment," Rockford may be able to state a claim under the implied covenant theory. Of course, an unenforceable provision in a contract cannot be made enforceable by the application of the implied covenant of good faith and fair dealing. As a result, Rockford still faces some of the obstacles noted in the previous breach of contract section related to the enforceability of the cost containment provisions of the PBM Agreement.

"principle that a promise made without consideration may nonetheless be enforced to prevent injustice if the promisor should have reasonably expected the promisee to rely on the promise and if the promisee did actually rely on the promise to his or her detriment." Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 233 Ill. 2d 46, 51 (2009) (quoting Black's Law Dictionary 591 (8th ed. 2004)). However, "[u]nder Illinois law, promissory estoppel and unjust enrichment are unavailable where the parties have entered into an express contract." Prodromos v. Poulos, 202 Ill. App. 3d 1024, 1032 (1991). Like plaintiffs' claims for unjust enrichment, Rockford may only plead promissory estoppel in the alternative to their breach of contract claim, such that no express contract may be invoked in its count for promissory estoppel. Guinn v. Hoskins Chevrolet, 361 Ill. App. 3d 575, 604 (2005); The Sharrow Grp. v. Zausa Dev. Corp., No. 04 C 6379, 2004 WL 2806193, at *3 (N.D. Ill. Dec. 3, 2004).

In the SAC's section on promissory estoppel, Rockford seeks relief under a promissory estoppel theory that is based on the "terms of the ESI PBM Agreement." SAC ¶ 395; see also id. ¶¶ 396-397, 399. This is fatal to Rockford's claim. However, Rockford may attempt to replead and plausibly allege alternatively that there is not an enforceable express contract and that Express Scripts is liable to Rockford under a cause of action for promissory estoppel. Cohen v. Am. Sec. Ins. Co., 735 F.3d 601, 615 (7th Cir. 2013).

To state a claim for the common-law doctrine of promissory estoppel, a plaintiff must prove that "(1) defendant made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment." Newton Tractor Sales, 233 Ill. 2d at 51. Here, the main deficiency in Rockford's pleading is with regard to the first prong. Rockford alleges that Express Scripts' conduct

"constitutes a promise to perform under the terms" of the PBM Agreement.  SAC ¶ 395.  Rockford

cites "cost containment" as one of these promises.  Id. ¶ 397.  But as discussed in the court's section

on Rockford's breach of contract claim, the PBM Agreement's reference to "cost containment" is

troublesome.

It is possible that Rockford may be able to point to an unambiguous promise made by

Express Scripts within or outside the PBM Agreement that Rockford foreseeably relied on to its

detriment.  Thus, the court grants Express Scripts' motion to dismiss Count XIII without prejudice,

and grants Rockford leave to replead if Rockford can properly do so.

## F. Unjust Enrichment (Counts I-III)

Rockford brings claims against both Express Scripts (Count I) and Mallinckrodt (Count II)

and Acument brings a claim against Mallinckrodt (Count III) for unjust enrichment.  Specifically,

plaintiffs allege that Mallinckrodt was unjustly enriched when plaintiffs paid "extremely high prices"

for Acthar.  See SAC ¶¶ 189, 198.  Rockford also alleges that Express Scripts was unjustly enriched

when it obtained "grossly inflated revenue" from its scheme with Mallinckrodt.  See id. ¶ 182.

Unjust enrichment is a product of common law that enshrines the principle that no one ought

to enrich himself unjustly at the expense of another.  Vill. of Bloomingdale v. CDG Enters., Inc., 196

Ill. 2d 484, 500 (2001); Whitehaven Cmty. Baptist Church v. Holloway, 973 S.W.2d 592, 596 (Tenn.

1998).  The doctrine enshrines both legal and equitable values, but at its core, properly alleged unjust

enrichment claims involve situations in which the benefit the plaintiff is seeking to recover

proceeded directly from him to the defendant.  See id.; HPI Health Care Servs., Inc. v. Mt. Vernon

Hosp., Inc., 131 Ill. 2d 145, 160-62 (1989).

Both Illinois and Tennessee permit a plaintiff to plead unjust enrichment as an alternative theory of liability. Cohen, 735 F.3d at 615 ("A plaintiff may plead as follows: (1) there is an express contract, and the defendant is liable for breach of it; and (2) if there is not an express contract, then the defendant is liable for unjustly enriching himself at my expense."); Meadow v. Nibco, Inc., No. 3-15-1124, 2016 WL 2986350, at *7 (M.D. Tenn. May 24, 2016) (finding that a plaintiff "can plead alternative theories, including unjust enrichment"). This is counter to defendants' wider-sweeping argument that a plaintiff may not plead both the existence of an enforceable contract and unjust enrichment in the same complaint. As such, the court will assess plaintiffs' claims under Illinois and Tennessee law, respectively.

### 1. Rockford's Claims Under Illinois Law (Counts I and II)

In order to state an unjust enrichment claim under Illinois law, a plaintiff must allege "a benefit mistakenly conferred, a benefit procured through wrongful conduct, and a benefit to which plaintiff has a better claim than the defendant for some other reason." In re Sears, Roebuck & Co. Tools Mktg. & Sales Practices Litig., No. 05 C 2623, 2006 WL 3754823, at *4 (N.D. Ill. Dec. 18, 2006). In addition, Illinois law requires that relief under an unjust enrichment theory is obtainable only when there is no adequate remedy at law available to the plaintiff. Cohen, 735 F.3d at 615 ("Because it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law."); Nesby v. Country Mut. Ins. Co., 346 Ill. App. 3d 564, 567 (2004) ("Because it is an equitable remedy, unjust enrichment is only available when there is no adequate remedy at law."). The lack of legal remedy requirement extends beyond Cohen and Nesby, both of which involved a legal remedy available through a contract. See Cleary v. Philip Morris Inc., 656 F.3d 511, 517 (7th Cir. 2011); Season Comfort Corp. v. Ben A. Borenstein Co., 281 Ill. App. 3d 648, 656 (1995).

Rockford has alleged a litany of conduct it claims entitles it to legal relief. See SAC ¶¶ 184, 192. Rockford cannot maintain an unjust enrichment claim when in that same claim it references legal remedies available to it. Rockford may plead in the alternative, but in doing so within that claim, it will have to plead that none of the many other causes of action in the SAC in which it alleges it is entitled to damages is viable. The court grants defendants' motions to dismiss Counts I and II without prejudice and grants Rockford leave to replead if it can sufficiently allege that it meets the elements of a properly stated unjust enrichment claim.

### 2. Acument's Claim Under Tennessee Law (Count III)

Under Tennessee law, the elements of an unjust enrichment claim are "1) [a] benefit conferred upon the defendant by the plaintiff; 2) appreciation by the defendant of such benefit; and 3) acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 525 (Tenn. 2005) (alteration in original). Additionally, Tennessee law dictates that a plaintiff seeking relief for unjust enrichment must demonstrate that he "exhausted all remedies against the person with whom the plaintiff enjoyed privity of contract." Spahr v. Leegin Creative Leather Prod., Inc., No. 2:07-CV-187, 2008 WL 3914461, at *14 (E.D. Tenn. Aug. 20, 2008). Under Tennessee law, the issue of exhaustion must be addressed in the complaint. Id. This exhaustion of remedies requirement only applies to entities in privity with the plaintiff. As long as the plaintiff has satisfied that exhaustion obligation it can still recover against defendants with whom the plaintiff is not in privity. Id.

With respect to the requirement that Acument must allege that it has exhausted all remedies against CVS (the entity with whom Acument may enjoy privity of contract), the court notes that the

SAC does not describe any contract that Acument might have with CVS with anywhere near the amount of specificity that it details Rockford's agreement with Express Scripts. Although that level of specificity may not be required at this stage, an explanation of the contents of such a contract would certainly assist the court in assessing the issue of exhaustion. Assuming that Acument is in privity of contract with CVS, Acument does not allege that it has exhausted any remedies against CVS. This is fatal to Acument's claim. The exhaustion requirement may be lifted if plaintiffs plausibly allege that such an effort would be "futile," but Acument has not done so. Id.; see Bristol Pres., LLC v. IGC-Bristol, LLC, No. 2:16-CV-360-TAV-MCLC, 2017 WL 2773663, at *5 (E.D. Tenn. June 26, 2017) (dismissing unjust enrichment claim where plaintiff failed to allege that it had exhausted all remedies against the entities in which it had privity of contract and failed to plead that doing so would be futile). Therefore, the court grants defendants' motions to dismiss Count III without prejudice, and grants Acument leave to replead to correct the deficiencies noted here if it can do so consistent with the proper pleading requirements.[30]

### G. RICO (Counts IX-XI)

The following sections address plaintiffs' claims under RICO. For the reasons stated below, the court grants defendants' motions to dismiss Counts IX, X, and XI without prejudice.

### 1. § 1962(c) (Count IX)

In Count IX, plaintiffs allege that defendants violated 18 U.S.C. § 1962(c). "A RICO plaintiff alleging a violation of § 1962(c) must show conduct of an enterprise through a pattern of racketeering activity," Lachmund v. ADM Inv'r Servs., Inc., 191 F.3d 777, 783 (7th Cir. 1999), and

---

[30]The court notes in passing that plaintiffs' arguments offer little in support of their unjust enrichment actions. Should plaintiffs choose to replead these claims, plaintiffs should offer more fully-developed arguments or else run the risk of the court finding that they have abandoned their claims.

that she has been injured in her "business or property by reason of" the RICO violation, <u>Sabrina Roppo v. Travelers Commercial Ins. Co.</u>, 869 F.3d 568, 590 (7th Cir. 2017).

A claim of a pattern of rackeerring activity "requires at least two [predicate] acts of racketeering activity within a ten-year period. . . . '[R]acketeering activity' is defined to include, among other things, any act indictable under specified provisions of the United States Code, including 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud)." <u>Corley v. Rosewood Care Ctr., Inc. of Peoria</u>, 142 F.3d 1041, 1048 (7th Cir. 1998).

Here, plaintiffs allege predicate acts of mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343.[31]  The elements of mail fraud under § 1341 are: "(1) the defendant's participation in a scheme to defraud; (2) defendant's commission of the act with intent to defraud; and (3) use of the mails in furtherance of the fraudulent scheme." <u>Williams v. Aztar Ind. Gaming Corp.</u>, 351 F.3d 294, 298-99 (7th Cir. 2003).  The elements of wire fraud under § 1343 are similar: "a scheme to defraud, a false representation, and use of interstate communications." <u>United States v. Pritchard</u>, 773 F.2d 873, 876 (7th Cir. 1985).  To "defraud" is to make a "false statement or material misrepresentation, or the concealment of a material fact." <u>Williams</u>, 351 F.3d at 299. Plaintiffs alleging mail and wire fraud as predicate acts to their RICO claims must allege "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." <u>Vicom, Inc. v. Harbridge Merchant Servs., Inc.</u>, 20 F.3d 771, 777 (7th Cir. 1994).

---

[31]The SAC labels its wire fraud claims as under 18 U.S.C. § "1345."  However, that section provides for the Attorney General to commence civil actions to enjoin alleged RICO violations.  This is inapplicable to plaintiffs' complaint.  Accordingly, the court construes this to be a claim pursuant to § 1343.

When ruling on a Rule 12(b)(6) motion, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to allegations of mail and wire fraud in a civil RICO complaint. See Sabrina, 869 F.3d at 587 n.56. Further, in cases with multiple defendants, "Rule 9(b) requires a RICO plaintiff to plead sufficient facts to notify each defendant of his alleged participation in the scheme." Jazbec v. Hirsch, No. 08 CV 7275, 2009 WL 3366970, at *4 (N.D. Ill. Oct. 14, 2009). The heightened pleading standard of Rule 9(b) serves an important purpose, to "ensure[ ] that a plaintiff ha[s] some basis for his accusations of fraud before making those accusations and thus discourages people from including such accusations in complaints simply to gain leverage for settlement or for other ulterior purposes." Uni*Quality, Inc. v. Infotronx, Inc., 974 F.2d 918, 924 (7th Cir. 1992).

The court agrees with defendants that plaintiffs' allegations concerning the predicate acts of mail or wire fraud are thin.[32]  Plaintiffs allege that in 2007 defendants established the ASAP to "streamline[] and cover-up the use of mail and wires to commit fraud . . . and illegally profit from the . . . sale of Acthar," but this does little to satisfy the demands of Rule 9(b). SAC ¶ 360(a).  It is true that plaintiffs need not show that every particular communication that they point out contained misrepresentations, because "even routine and innocent mailings can supply an element of the offense of mail fraud when they are used in the execution of the fraudulent scheme." Ruderman v.

---

[32]In all of the counts of the SAC, plaintiffs incorporate every allegation of every preceding paragraph, and in Counts XIII and XIV, every allegation of every following paragraph.  In the RICO context, this is an improper method of satisfying the heightened pleading requirement.  See Slaney v. The Int'l Amateur Athletic Fed'n, 244 F.3d 580, 599 n.10 (7th Cir. 2001).  But even beyond the RICO counts, the court does not assume any responsibility to wade through hundreds of paragraphs of pleadings comprising fifteen counts plus a request for injunctive to cull out paragraphs or fragments of paragraphs in an effort to assist plaintiffs in plausibly alleging their causes of action.  This court has dismissed cases in certain circumstances on this basis, though the court declines to do so today.  See Stanard v. Nygren, 658 F.3d 792, 800 (7th Cir. 2011) ("A federal court is not obligated to sift through a complaint to extract some merit when the attorney who drafted it has failed to do so himself.").

<u>Freed</u>, No. 14 C 9079, 2015 WL 5307583, at *3 (N.D. Ill. Sept. 10, 2015). But here, plaintiffs allege little more than the existence of a price-fix scheme and defendants' intent to misrepresent prices, which is different than alleging the "who, what, when, where and how" of an actual misrepresentation. <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 627 (7th Cir. 1990). Plaintiffs call attention to the Acthar Start Forms mailed to existing and prospective patients and payors, <u>see</u> SAC ¶¶ 51, 362, 370, but do not specify what about those forms constitute a misrepresentation. Further, defendants' processing of prescriptions and payments related to Acthar does not evince fraud or deceit. <u>See</u> <u>id.</u> ¶ 366(d)-(f).

In the paragraph plaintiffs devote to delineating defendants' acts of mail fraud and wire fraud, plaintiffs allege that Express Scripts made fraudulent misrepresentations when it "explicitly advertised . . . that the ASAP Program would [provide] lower and affordable prices"; when Mallinckrodt and Express Scripts fraudulently stated "over the internet and through the mail that Rockford and the Class would receive affordable healthcare and contained costs of Acthar"; and when despite its "explicit promises" Express Scripts "refused to use its market strength and related bargaining power to convince Mallinckrodt to lower the price of Acthar." SAC ¶ 366(a)-(c). Plaintiffs are fatally deficient in specifying "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." <u>Vicom</u>, 20 F.3d at 777.

Plaintiffs fall short in describing the manner in which Express Scripts explicitly advertised that the ASAP would provide lower and affordable sales prices, SAC ¶ 366(a), or when, where, how, or to whom Express Scripts made explicit promises to use its market strength and bargaining power to influence Mallinckrodt, <u>id.</u> ¶ 366(c). Nor do plaintiffs adequately explain in what way defendants

55

fraudulently stated over the internet and through the mail that Rockford would receive contained costs for Acthar. Id. ¶¶ 82-83, 366(b). The SAC does not clarify what specifically was done over the internet and through the mail. If the parties are referring to Rockford's PBM Agreement with Express Scripts, from a review of the court's discussion in the breach of contract section, they should be able to anticipate formidable obstacles in relying on the cost containment language in the PBM Agreement to support an allegation of misrepresentation.

For the reasons stated in this section, the court grants defendants' motions to dismiss plaintiffs' § 1962(c) claims in Count IX without prejudice. In order to assist the parties should plaintiffs opt to replead a RICO violation, the court will also address the issue of RICO causation.

Proximate cause is one of the requirements of a cause of action for a RICO violation. See Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992). Defendants argue, regarding the proximate-cause limitation, that courts in this district have "recognized that claims by third party payors (TPPs) seeking to recoup 'losses' of prescription reimbursements pose proximate causation issues." The court agrees.

The proximate cause limitation of a properly-pled RICO violation requires "some direct relation between the injury asserted and the injurious conduct alleged." Hemi Grp., LLC v. City of New York, N.Y., 559 U.S. 1, 9 (2010) (plurality op.) (citing Holmes, 503 U.S. at 271-72). The "general tendency" in this context is for courts "not to go beyond the first step," id. at 10 (quoting AGC, 459 U.S. at 534), because "[m]ultiple steps, as we have detailed, separate the alleged fraud from the asserted injury," id. at 15. Courts have routinely dismissed § 1962(c) claims in drug cases where plaintiffs do not allege with specificity that defendants made misrepresentations directly to third-party payors like plaintiffs here. See, e.g., UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121,

134 (2d Cir. 2010) (finding failure to allege that TPPs themselves relied on misrepresentations crucial to a lack of proximate cause); In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig., No. 3:09–CV–20071–DRH, 2010 WL 3119499, at *7 (S.D. Ill. Aug. 5, 2010) (dismissing a § 1962(c) claim where there was no "mention [of] any alleged communication directed at or made to TPPs").  As stated above, it is unclear how either Mallinckrodt or Express Scripts communicated any "misrepresentations," let alone communications made directly, to either Rockford or Acument.  Should plaintiffs choose to replead, in order to properly state a claim, plaintiffs must plausibly allege Mallinckrodt and/or Express Scripts communicated misrepresentations directly to plaintiffs.

### 2. § 1962(a) (Count X)

As to Count X, "[a] section 1962(a) claim requires a showing that a defendant: (1) received income from a pattern of racketeering activity; (2) used or invested that income in the operation of an enterprise; and (3) caused the injury complained of by the use or investment of racketeering income in an enterprise." Rao v. BP Prod. N. Am., Inc., 589 F.3d 389, 398-99 (7th Cir. 2009). While prongs two and three are adequately pled, SAC ¶¶ 375, 377-378, as noted with respect to plaintiffs' § 1962(c) claims, the court finds that plaintiffs have not adequately alleged "racketeering activity," and thus, plaintiffs' claims under § 1962(a) must also fail as a matter of law. Id. at 398 (noting that plausibly alleging "racketeering activity" is a required element to state a claim under § 1962(a)). Consequently, the court grants defendants' motions to dismiss plaintiffs' § 1962(a) claims in Count X without prejudice.

### 3. § 1962(d) (Count XI)

To state a claim under § 1962(d), a plaintiff must allege the existence of an "agreement to

participate in an endeavor which, if completed, would constitute a violation" of RICO. United Food & Commercial Workers Unions and Emp'rs Midw. Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 856 (7th Cir. 2013). This requires plaintiffs to allege that (1) the defendant agreed to facilitate the operation of an enterprise through a pattern of "racketeering activity," in violation of subsections (a), (b), or (c) of RICO, and (2) the defendant agreed to effectuate at least two predicate acts that create a pattern of racketeering activity. See DeGuelle v. Camilli, 664 F.3d 192, 204 (7th Cir. 2011). Because the court has already determined that plaintiffs have failed to sufficiently plead these two requirements, plaintiffs' claims under § 1962(d) in Count XI must also fail as a matter of law, and the court dismisses those claims without prejudice. Id. at 400. Thus, the court grants plaintiffs leave to replead to correct the deficiencies related to Counts IX, X, and XI if plaintiffs can appropriately do so.

### H. Fraud and Conspiracy to Defraud (Counts IV and V)

Plaintiffs allege that defendants have committed common law fraud by making "material misrepresentations" that the prices they allegedly advertised for Acthar "represented the actual value" of Acthar when, in reality, those prices were "artificial" and "created and manipulated by the Defendants for the purpose of generating exorbitant revenue, thus constituting false representations."[33] SAC ¶¶ 204-206. Under Illinois law, the elements of common law fraud are: "(1) a false statement of a material fact; (2) knowledge or belief of falsity by the party making it; (3) intention to induce the other party to act or refrain from acting; (4) action by the other party in

---

[33]In ¶ 203 of the SAC, plaintiffs also allege that defendants' acts "violate the common law against negligent misrepresentation" in addition to fraud. "Negligent misrepresentation" is a separate cause of action from fraud in both Illinois and Tennessee. However, neither party addresses this claim in their briefs. Thus, the court concludes that neither plaintiff is pursuing a cause of action for negligent misrepresentation.

justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." <u>Newton v. Aitken</u>, 260 Ill. App. 3d 717, 720 (1994). Similarly, Tennessee law requires: "(1) an intentional misrepresentation of material fact, (2) knowledge of the representation's falsity, (3) an injury caused by reasonable reliance on the representation, and (4) the requirement that the misrepresentation involve a past or existing fact." <u>Gray v. Bank of Am., N.A.</u>, No. 3:12-CV-105, 2012 WL 3230387, at *2 (E.D. Tenn. Aug. 6, 2012). Federal Rule of Civil Procedure 9(b) applies to fraud claims. <u>See</u> <u>Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.</u>, 631 F.3d 436, 447 (7th Cir. 2011).

The heightened pleading standard of Rule 9(b) "forces the plaintiff to conduct a careful pretrial investigation and thus operates as a screen against spurious fraud claims." <u>Intercounty Nat'l</u>, 412 F.3d at 749. Plaintiffs' allegations in the SAC lack the requisite particularity imposed by the heightened pleading standard. Plaintiffs are required to state "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." <u>Camasta v. Jos. A. Bank Clothiers, Inc.</u>, 761 F.3d 732, 737 (7th Cir. 2014).

Plaintiffs allege that defendants committed fraud in two different ways. First, plaintiffs allege that defendants misrepresented that the price for Acthar represented the real and fact-based prices for their drugs. SAC ¶ 204. Second, plaintiffs assert that defendants misrepresented the price for Acthar was a result of the efforts of Express Scripts—and, although it is not clear from the SAC, perhaps CVS—to provide cost containment. <u>Id.</u> ¶ 209.

As to the first manner of committing fraud, plaintiffs fail to sufficiently plead the factual information informing defendants of the "who, when, where, what, and how" components of a valid

fraud claim. Instead, plaintiffs offer general allegations that because the "prices [for Acthar] were artificial prices," id. ¶ 206, "[d]efendants made material misrepresentations that those prices represented a calculation of real and fact-based prices for their drugs, and that they represented the actual value of the product in the marketplace," id. ¶ 204.

In regard to the second means of committing fraud, plaintiffs allege that the "cost containment" misrepresentations appear in Rockford's and the class' contracts with Express Scripts and Acument's and the class' contracts with CVS. Id. ¶ 209. As noted in the court's analysis of plaintiffs' breach of contract claim, Rockford's contract with Express Scripts furnishes only equivocal support for the proposition that Express Scripts assumed an obligation to provide for cost containment in its sale of Acthar to Rockford.[34] See id. ¶¶ 209. Plaintiffs stress that they paid inflated prices for Acthar. However, as Express Scripts points out, high prices do not in and of themselves constitute false representations. Thompson's Gas & Elec. Serv., Inc. v. BP Am. Inc., 691 F. Supp. 2d 860, 870 (N.D. Ill. 2010).[35]

Further, in Count V, plaintiffs allege that defendants conspired to defraud plaintiffs and the class by causing them to pay more for Acthar than they otherwise would have paid. Under Illinois

---

[34]As to Acument, the SAC suggests that Acument has "contracts" with CVS that provide for cost containment, SAC ¶ 209, that presumably support their contention that defendants made false representations that amount to fraud. Although it is unclear whether Acument is holding Express Scripts, Mallinckrodt, or perhaps a non-defendant, CVS, responsible for making the false representations. Plaintiffs have not provided any of these contracts and thus the court is unable to make any determination as to whether plaintiffs' allegations satisfy the heightened pleading requirements of Rule 9(b).

[35]Defendants also argue that plaintiffs have not adequately pled reliance. Plaintiffs allege that they and the class "justifiably relied upon false misrepresentations in purchasing and/or reimbursing Acthar at the amount charged by Express Scripts and CVS Caremark based on the price set by Mallinckrodt." SAC ¶ 208. But in this factual scenario that concerns only one manufacturer and one drug, the issue of the reasonableness of plaintiffs' reliance is problematic. Plaintiffs assert that they would not have paid or reimbursed the cost of Acthar if they were aware of the alleged misrepresentations. Id. ¶ 210. Are plaintiffs saying that rather than pay exorbitant prices they would have left the Acthar patients without treatment? Regardless, at this juncture the court concludes that reliance is sufficiently pled.

law, "to state a claim for civil conspiracy, the plaintiff must sufficiently allege that an underlying wrong existed."  Platinumtel Commc'ns, LLC v. Zefcom, LLC, No. 08-CV-1062, 2008 WL 5423606, at *8 (N.D. Ill. Dec. 30, 2008).  Similarly, under Tennessee law, a "claim for civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy." Lane v. Becker, 334 S.W. 3d 756, 763 (Tenn. Ct. App. 2010).  Because plaintiffs have not met their pleading requirements under Rule 9(b) for alleging fraud, plaintiffs' conspiracy to defraud claims must be dismissed as well.  The court grants defendants' motions to dismiss Counts IV and V without prejudice and grants plaintiffs leave to replead to correct the deficiencies related to these claims if plaintiffs can sufficiently do so.

## I. Declaratory Judgment (Count XIV)

Finally, regarding Rockford's claim for declaratory judgment in Count XIV, the declaratory judgment remedy "gives a means by which rights and obligations may be adjudicated in cases involving an actual controversy that has not reached the stage at which either party may seek a coercive remedy."  10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2751, pp. 568-70 (1983).  Further, courts in this district routinely dismiss claims for declaratory judgment where the claim "substantially overlaps with Plaintiff's substantive claims." Cohn v. Guaranteed Rate Inc., 130 F. Supp. 3d 1198, 1205 (N.D. Ill. 2015); see also Amari v. Radio Spirits, Inc., 219 F. Supp. 2d 942, 944 (N.D. Ill. 2002) ("Where the substantive suit would resolve the issues raised by the declaratory judgment action, the declaratory judgment action serves no useful purpose because the controversy has ripened and the uncertainty and anticipation of litigation are alleviated.").  Here, plaintiffs are seeking coercive remedies along with their suit for declaratory judgment, and all the claims will be adjudicated at the same time.  In this situation, the court sees

no benefit in addressing the claim for declaratory judgment in addition to the coinciding causes of action.  Therefore, the court dismisses Count XIV with prejudice.

### III. CONCLUSION

For the above reasons, defendants' motions to dismiss are granted in part and denied in part. Count XIV is dismissed with prejudice.  Counts I through V, IX through XIII, and XV are dismissed without prejudice.  The court denies defendants' motions to dismiss Counts VI, VII, and VIII with respect to Rockford.  Counts VI, VII, and VIII are dismissed without prejudice with respect to Acument.  The court grants plaintiffs leave to replead within 45 days of the date of this order to correct the deficiencies as noted in this opinion.

Date: 1/25/2019                                  ENTER:

_____

FREDERICK J. KAPALA

District Judge