# EXHIBIT A

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             WESTERN DIVISION

 3   CITY OF ROCKFORD,                )  Docket No. 17 CV 50107
                                      )
 4                      Plaintiff,    )  Rockford, Illinois
                                      )  Wednesday, August 3, 2022
 5      v.                            )  11:00 o'clock a.m.
                                      )
 6   MALLINCKRODT ARD, INC.,          )
     et al.,                          )
 7                                    )
                        Defendants.   )
 8
                          TRANSCRIPT OF PROCEEDINGS
 9               BEFORE THE HONORABLE LISA A. JENSEN

10   APPEARANCES:

11   For the Plaintiffs:        HAVILAND HUGHES
                                (201 South Maple Avenue,
12                               Suite 110,
                                 Ambler, PA  19002) by
13                              MR. DONALD E. HAVILAND, JR.
                                MR. WILLIAM H. PLATT, II
14
     For the Defendants         QUINN EMANUEL URQUHART &
15   United BioSource           SULLIVAN, LLP
     Corporation and            (1300 I Street NW,
16   Express Scripts:            Suite 900,
                                 Washington, DC  20005) by
17                              MR. J. MATTHEW HAMANN
                                MS. MEGHAN A. MCCAFFREY
18                              MR. MICHAEL B. SOYFER
                                (777 6th Street NW,
19                               11th Floor,
                                 Washington, DC  20001) by
20                              MR. ERIC C. LYTTLE

21                              RENO & ZAHM LLP
                                (2902 McFarland Road,
22                               Suite 400,
                                 Rockford, IL  61107) by
23                              MR. JAN H. OHLANDER

24

25
```

```
 1   For Mallinckrodt ARD,        ARNOLD & PORTER KAYE SCHOLER LLP
     Inc.:                        (777 South Figueroa Street,
 2                                 Los Angeles, CA  90017) by
                                  MR. DAVID ERIC SHAPLAND
 3
                                  WILLIAMS McCARTHY, LLP
 4                                (120 West State Street,
                                   4th Floor,
 5                                 Rockford, IL  61105) by
                                  MR. JOEL M.L. HUOTARI
 6
     For Rockford Consulting      MEYERS & FLOWERS, LLC
 7   Brokerage:                   (3 North 2nd Street,
                                   Suite 300,
 8                                 St. Charles, IL  60174) by
                                  MR. JONATHAN P. MINCIELI
 9
     Court Reporter:              Heather M. Perkins-Reiva
10                                327 South Church Street
                                  Rockford, IL  61101
11                                (779)772-8309

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Now calling Case No. 17 CV 50107, *City of*

2  *Rockford v. Mallinckrodt ARD Incorporated, et al.*

3          THE COURT:  Can I have the appearances of the

4  parties, please, starting with the plaintiff.

5          MR. HAVILAND:  Good morning, Your Honor.  Don

6  Haviland from Haviland Hughes for the City of Rockford and the

7  class.

8          MR. PLATT:  Good morning, Your Honor.  Bill Platt for

9  plaintiff, City of Rockford, and the class.

10         THE COURT:  Okay.  Good morning.

11         MS. MCCAFFREY:  Good morning, Your Honor.  Meghan

12  McCaffrey for the Express Scripts entities.  With me are my

13  colleagues Mr. Eric Lyttle, Matt Hamann, and Michael Soyfer,

14  as well as Mr. Ohlander.

15         THE COURT:  Okay.  Good morning.

16         MR. MINCIELI:  Good morning, Your Honor.  Jonathan

17  Mincieli for Rockford Consulting Brokerage with respect to the

18  motion.

19         THE COURT:  Okay.  Good morning.

20         And then we have?

21         MR. SHAPLAND:  Good morning, Your Honor.  Eric

22  Shapland with Joel Huotari on behalf of third party

23  Mallinckrodt.

24         THE COURT:  Okay.  All right.  Let's deal with the

25  Rockford Consulting matter first, since Mr. Mincieli won't

```
 1   have to hang around if we get that resolved --

 2          MR. MINCIELI:  Thank you, Your Honor.

 3          THE COURT:  -- unless he wants to.

 4          MR. MINCIELI:  I appreciate that.

 5          MS. MCCAFFREY:  And, Your Honor, my colleague

 6   Mr. Soyfer will be handling that.

 7          THE COURT:  Okay.  Great.

 8          MR. SOYFER:  So, Your Honor, as you saw last Friday,

 9   Mr. Mincieli informed us he was no longer representing

10   Rockford Consulting.  He contacted me yesterday and told me

11   that he is now again representing Rockford Consulting, has

12   been able to locate the production.  So we have a narrower

13   request for Your Honor than what is in our briefs.

14          THE COURT:  Okay.  All right.

15          MR. SOYFER:  So Mr. Mincieli has not been able to

16   commit to any date by which he will be able to produce those

17   documents.  So we are requesting that the Court set a deadline

18   of 14 days from today for Rockford Consulting to produce those

19   documents.

20          Plaintiff, City of Rockford, has also indicated that

21   it may be willing to agree to the production of documents

22   withheld under the deliberative process privilege on similar

23   terms to our prior stipulation with them, but it will need to

24   review the documents first.

25          THE COURT:  Okay.
```

1          MR. SOYFER:  So we would request that Your Honor set

2    a deadline of five days from the date the documents are

3    produced for those to happen.  That is largely because this

4    month we will be deposing our first Rockford witness, on

5    August 23rd, and so we would like to have those documents in

6    time to be able to review them and use them at the deposition

7    if necessary.

8          THE COURT:  Okay.  And what's your position on that,

9    Mr. Mincieli?

10         MR. MINCIELI:  Largely, there is -- I don't disagree

11   with much of what Mr. Soyfer said.  What I will say, Your

12   Honor, is I didn't think I would be back in this courtroom on

13   this case, I will be honest with you, although it is a

14   pleasure to see you.  You know, my firm withdrew from this

15   litigation some time ago.  I learned in, I think, June of this

16   year that ESI and its counsel had never accessed or opened up

17   the Rockford Consulting documents that were produced two years

18   ago and in compliance with this subpoena.

19         THE COURT:  My understanding is there was not a

20   passcode or something that was passed along?

21         MR. MINCIELI:  It was not passcode protected.  We

22   produced it.  The subpoena was fully complied with in

23   accordance with Your Honor's order.  It was just never opened

24   or looked at, and now this is now becoming mine and Rockford

25   Consulting's problem again.

1           So I reached out to Mr. Soyfer yesterday, and while

2    we did withdraw from the litigation, because of the motion, I

3    felt it necessary to be here on behalf of Rockford Consulting

4    again.

5           THE COURT:  Thank you for that.

6           MR. MINCIELI:  Until this week, I did not have access

7    to those documents.

8           Yesterday, I spoke to Mr. Soyfer, and I said we are

9    happy to reproduce.  I need some time to do that because they

10   are on a hard drive now.  I don't know, frankly, what format

11   they are in.  I need to get that hard drive to the same vendor

12   we used last time to tell me how can we produce these again.

13          THE COURT:  All right.  So 14 days to produce them;

14   does that seem doable?

15          MR. MINCIELI:  Well, that's the problem, is I don't

16   know if 14 days will do it because once the vendor looks at

17   it, frankly, Your Honor, I don't know if that hard drive, they

18   could say, "Oh, here is the production, we can just produce it

19   again," or if it is in some other form that requires

20   extraction and some sort of review again.  I, frankly, don't

21   know the answer to that.

22          THE COURT:  I'm going to say 14 days to get it

23   produced.  If, for some reason, it can't be produced in 14

24   days, you are going to work out an arrangement with defense

25   counsel.  I'm sure if there is a good reason why it can't be,

 1    defense counsel will be accommodating.  In the unlikely event

 2    that the parties cannot agree, then there will be a motion

 3    filed to extend that time period with the reasons for doing

 4    that.

 5          MR. MINCIELI:  Thank you, Your Honor.  I don't think

 6    that's unreasonable.

 7          That being said, because we are now reinventing the

 8    wheel, we are doing the same exact thing that was done before,

 9    there will be some cost incurred to get this to the vendor to

10    review this, to figure out how we can produce this.  I don't

11    know what that cost is going to be, but it is our position

12    that Rockford Consulting should not bear that cost because it

13    has already spent a lot of time, effort, and cost in

14    responding to the subpoena the first time, which was just

15    simply not opened by ESI.  So now we are here again to remake

16    the wheel, essentially, and it is our position that Rockford

17    Consulting should not have to bear that cost.

18          THE COURT:  I would think that that would be a

19    reasonable request; however, I don't have a motion for fees

20    and costs in front of me.  I would hope that I don't get one

21    and that the parties would work that out.  If not, bring

22    something forward.

23          Five days after the production, you are going to make

24    a decision on whether you are going to stand on your

25    objections.  I will give you a little bit of a hint of my

1   ruling and that is I'm not sure you have a deliberative

2   process privilege.  That's the City of Rockford's, and they

3   have already agreed to waive it.  So I would fully expect that

4   those documents would be produced under the same arrangement

5   that Rockford made.

6           With respect to the attorney-client privilege

7   documents, if you are going to stand on your objection, then I

8   want those produced to me for in camera inspection, and I want

9   an updated privilege log that specifically tells me with

10  respect to each of the documents the basis for the

11  attorney-client privilege, okay?

12          MR. MINCIELI:  Thank you, Your Honor.  I appreciate

13  your guidance.

14          THE COURT:  That should resolve everything on that

15  one.  Thank you.

16          I am going to turn now to the issue of Express

17  Scripts' motion to compel documents from the City of Rockford.

18          MR. PLATT:  Good morning, Your Honor.

19          THE COURT:  Good morning.

20          MR. HAMANN:  Good morning, Your Honor.  Matthew

21  Hamann on behalf of the Express Scripts entities.

22          You know, our request here, I think, is pretty

23  simple.  We need Rockford to actually go search for and try to

24  find the custodial documents for the two individuals who are

25  the subject of our motion, Ms. Jones and Ms. Johnson.

1   Rockford admits that they have custodial documents for these

2   two individuals.  They admit that they have saved employees'

3   documents and may have saved employees' documents in other

4   current employees' files.  So what we need them to do is just

5   actually go search and try to find if there are additional

6   custodial documents for these two individuals that are out

7   there.

8            Frankly, the searches so far are insufficient that

9   they have done, at least as they have relayed them to us.  You

10  know, they haven't done any search after we alerted them to

11  this issue in April.  There is no indication that the initial

12  searches that they did back in 2020 would have uncovered these

13  documents that are in other employees' files.  First of all,

14  they don't say they would have in their briefing -- or in

15  their affidavit, and, frankly, we know that they wouldn't have

16  discovered it because they didn't know about the issue until

17  we told them about it in April.

18           So I think at bottom, our primary request here is

19  that they go back and actually do an additional search to try

20  to find additional custodial documents for these two

21  individuals.  We think that also will require them to update

22  their affidavit that they had submitted pursuant to your order

23  to confirm that they do, in fact, have custodial documents for

24  these two individuals, and then, of course, certainly our view

25  at the moment, since they haven't actually gone through the

1  process of searching for their documents, they can't affirm

2  that they have collected, reviewed, and produced responsive

3  documents, all the responsive documents for the agreed upon

4  custodians, like they did in their -- stated in their

5  affidavit.

6           And I guess there is one final issue, which is the

7  metadata production issue.  So Rockford produced metadata for

8  most but not all of the documents that they had waived the

9  deliberative process privilege over.

10          THE COURT:  My understanding is they have agreed to

11 produce the remaining, and I will say -- so I think we have an

12 agreement on that.  It is just the time period.

13          MR. HAMANN:  Yes.  We would just ask Your

14 Honor -- they said, I think, they can do it by August 12th,

15 and we would just ask Your Honor to enter an order requiring

16 them to do that by August 12th.

17          THE COURT:  I will.

18          Fourteen days to get the metadata?

19          MR. PLATT:  Yes.  Your Honor, I think there was an

20 oversight on that.

21          First of all, I just want to make the record clear.

22 The City of Rockford did not waive the deliberative process

23 privilege.  To the extent it exists, they just agreed to

24 produce documents and protect the waiver for issues that might

25 come down the line.

1          THE COURT:  I understand, and I don't mean to say

2    that you waived.  What I mean is for purposes of this

3    litigation, you are not standing on the process --

4          MR. PLATT:  Correct.

5          THE COURT:  -- based on the agreement, and as a

6    result of that, that agreement should govern.

7          MR. PLATT:  Right.

8          And what we will do is we will then -- with regard to

9    Rockford Consulting, because that's our privilege, we will do

10   the same thing if it is okay with counsel.  We will just

11   submit a supplement to our non-waiver agreement with a list of

12   the documents by Bates label that are covered by the

13   non-waiver agreement.

14         THE COURT:  I think that's acceptable because I think

15   that's what you were asking for to begin with.

16         MR. HAMANN:  That is what we were asking for.

17         THE COURT:  Absolutely.

18         MR. HAMANN:  And I think Your Honor already addressed

19   the timeline for that, and we would ask for five days.

20         THE COURT:  Yes.  So we are good with that, but thank

21   you for clarifying that.  I was certainly not trying to say

22   that there was an outright waiver, but there certainly was a

23   waiver of the privilege for purposes of this litigation based

24   on your agreement.

25         Let me see if I can cut to the quick on the issue of

1    the affidavit.  So there were two affidavits, and you saw the

2    second affidavit that they filed.

3           MR. HAMANN:  Yes, that's correct.

4           THE COURT:  Mister -- I'm not even going to try to

5    pronounce his last name.

6           MR. HAMANN:  Me neither, Your Honor.

7           THE COURT:  It starts with a C.

8           My understanding is there are no -- the custodians,

9    there are no custodial files for the two persons that you are

10    looking for, that's according to both affidavits, that when

11    the requested terms were run against some of the other

12    custodial files, the terms turned up documents that involved

13    the two custodians who no longer have files and that that's

14    how those showed up.  That's my understanding.

15           Do I have it correct so far?

16           MR. HAMANN:  So I think I understand it just slightly

17    different, Your Honor, at least in terms of what we are

18    looking at.

19           So our understanding is that basically when these two

20    individuals left the City of Rockford, left their employment,

21    the City of Rockford saved their documents.  So they didn't

22    necessarily delete them, and they might have saved them with

23    other employees' files.  So, for example, that's how we came

24    to know about this issue is that these documents were saved in

25    primarily an individual named Brittany Krutz's custodial file.

1   So when you look at the file path, you see that these

2   are -- for example, it will say "Jessica's personal file."

3          THE COURT:  Well, they wouldn't be specifically

4   saved.  They would be in -- let's say Ms. Jones is the

5   custodian whose file you want searched, but they are saying

6   there is no longer a custodial file for Ms. Jones.  If they

7   run your search terms in Ms. Smith's file, they might come

8   across Ms. Jones' emails between Ms. Smith and Ms. Jones, not

9   because they specifically saved Ms. Jones' files, but because

10  they saved Ms. Smith's files, right?

11         MR. HAMANN:  Well, so as I understand it, they did

12  specifically save their documents.

13         THE COURT:  Okay.  Let me check with them.

14         MR. PLATT:  That's not true.  I made the mistake

15  during a meet-and-confer to say something similar to that.

16         When the employee leaves the city, they save the

17  files for 30 days, and another, maybe a Ms. Smith, has access

18  to those files because they replaced them in their job.  To

19  the extent that they want them saved, they keep them.  They

20  would then become Ms. Smith's custodial documents, and after

21  30 days, per the policy of the city, the rest are deleted.

22  They are gone.  The files are gone.  So these files don't

23  exist, and I have two affidavits that say that.

24         MR. HAMANN:  So what we are looking for -- and I

25  think that's helpful because we are talking about Ms. Smith,

1   for example, who is not a custodian in this case.

2           What we want them to do is check to see does

3   Ms. Smith have Jessica Jones' documents or Betty Johnson's

4   documents.  That is, at bottom, what we are looking for.

5           MR. PLATT:  Your Honor, that is a humongous burden on

6   the City of Rockford.  To expect them to -- they are going to

7   have to go through everybody's files.

8           Now, what the declaration of Mike C., as I will call

9   him, said was that they searched the email addresses, right?

10  They searched the email addresses for Ms. Jones and

11  Ms. Johnson, I think, and there was no custodial files.  They

12  went above and beyond to produce something like 8,000 or 9,000

13  documents from those email addresses.

14          THE COURT:  So if they search --

15          MR. PLATT:  So they are asking you to have us go to a

16  non-custodian, which would mean everybody else in the City of

17  Rockford, and search for files that don't exist anymore.

18          THE COURT:  So you are saying you have searched for

19  Johns and Jones -- is that the names of them?

20          MR. HAMANN:  Johnson and Jones.

21          MR. PLATT:  Johnson and Jones.

22          THE COURT:  Johnson and Jones.

23          You searched for Johnson and Jones' email address?

24          MR. PLATT:  Oh, absolutely.  It was part of the

25  search term.

1    THE COURT:  So why wouldn't that capture anything,

2  regardless of -- how would that be missing anything?

3    MR. HAMANN:  So I think the issue is probably more

4  saved documents that seem to be saved in other individuals'

5  files.

6    THE COURT:  But what would be saved in other

7  individuals' files?

8    MR. HAMANN:  So they appear to have just saved, for

9  example, Ms. Jones' documents in Ms. Krutz's files.  So, for

10  example -- and we know this is the case, like it wasn't -- for

11  example, it wasn't correspondence that Ms. Krutz had with

12  Ms. Jones.  One of the reasons we know this, for example, is

13  that Ms. Jones left before Ms. Krutz even came to the City of

14  Rockford.

15    THE COURT:  Did she take over for her?  Is that why

16  she --

17    MR. PLATT:  As I understand it, the successor

18  employee has access to the files, and they are able to take

19  from those files what they think are appropriate to do their

20  job.  Ms. Krutz -- there are a lot of HR people in this

21  custodial list, and I think these employees, these former

22  employees, were part of the HR department.  So, yes, they

23  would go into a succession.

24    THE COURT:  So who --

25    MR. PLATT:  So Kim Ryan --

```
 1            THE COURT:  Let me -- I'm sorry.  I just have a lot
 2    on my plate today, so I'm trying to streamline it.
 3            MR. PLATT:  Yes.
 4            THE COURT:  Who would be the people who would have
 5    access to Ms. Johnson and Ms. Jones' files for purposes of
 6    being able to take what they want?
 7            You should be able to figure that out.
 8            MR. PLATT:  Today, nobody.
 9            THE COURT:  Right.
10            But how about when she left?
11            MR. PLATT:  In 2010, in 2015, likely the individuals
12    where the emails appeared.  The custodians where emails
13    appeared in their search, in their files, they would be the
14    ones.  Now, a lot of them are gone.  So we are being asked to
15    go back to 2010, Your Honor.  So we have not only produced all
16    of the files, the declarations made clear everything was
17    searched using the search terms.  Everything was searched, not
18    just the custodians.  Everything.  There was like 13 gigabytes
19    worth of stuff, 5 million pages of documents.
20            THE COURT:  If everything was searched --
21            MR. PLATT:  That's what John and Kelly's affidavit
22    says.
23            THE COURT:  If everything was searched using the
24    search terms you requested across everyone, what more is there
25    to search?
```

1    MR. HAMANN:  Well, as I understand it, they didn't
2    run -- I assume they didn't run search terms across literally
3    every document in the City of Rockford.  I assume they, and I
4    think this is what the new affidavit says, is that they
5    collected the files first and then would have run the search
6    terms for the particular custodians.
7        So what would be left is if -- you know, Mr. Platt is
8    saying it's likely that the files went to these individuals.
9    At bottom, what we are asking for is that they figure out who
10   else might have had their files and look to see if those files
11   are in there.
12       THE COURT:  That's reasonable.
13       Do an investigation based upon who would have had
14   access to these folks' files -- you are telling me it is
15   typically successors -- and search those files using the
16   search terms that you have requested.  That should be
17   fairly --
18       MR. PLATT:  So, Your Honor, I will wrap this up, and
19   I will just ask you if it is okay to do the following.
20       So I will contact the head of HR for the City of
21   Rockford, who I believe was there in 2010 when the first
22   employee left, and was obviously there in 2015, and I will ask
23   her if she is able to determine who the successor was and
24   whether or not they took on some of these files of their own.
25       THE COURT:  Right.  And it would be --

 1          MR. PLATT:  And if the answer is no, that's all I can

 2    do.  I just want to stress it is very clear from

 3    Mr. Mincieli's affidavit in 2020, which was ordered by the

 4    Court, that everything was reviewed.  So we had a

 5    meet-and-confer.  I tried to figure out what they were

 6    referring to with this concept that certain people have files

 7    of other people and there must be files that exist.  I went to

 8    our vendor, for a fee -- there is a cost associated with

 9    that -- and had them do a declaration, sort of reinventing the

10    wheel from 2020 again, and this is what we got with this

11    declaration, and both of them say consistently that no more

12    documents exist.  But I will still, that having been said, go

13    back to the client.

14          I don't know if you want a status filing?

15          THE COURT:  I want an affidavit filed by the HR

16    person with respect to whether the names of the folks who were

17    the successors or otherwise, or she is -- even if they weren't

18    the successors, if she is aware that they had access to their

19    files, she is going to list those names, and they are going to

20    be searched, okay?

21          MR. PLATT:  Okay.  Thank you, Your Honor.

22          MR. HAMANN:  Thank you, Your Honor.

23          THE COURT:  Let's see.  How soon?  I would like to

24    have a time period on that.

25          MR. PLATT:  I always like more time.  If we

1      start -- how about by next Friday?

2             THE COURT:  Okay.

3             MR. PLATT:  It shouldn't take me that long, but I

4      just want to be --

5             THE COURT:  By the 12th, August 12th.

6             MR. HAMANN:  Thank you, Your Honor.

7             MR. PLATT:  Thank you, Your Honor.

8             THE COURT:  All right.  I am now going to the issue

9      of the 30(b)(6).

10            MS. MCCAFFREY:  Your Honor, may I remove my mask?

11            THE COURT:  Absolutely.

12            MR. HAVILAND:  I would like to do the same, Your

13     Honor.

14            THE COURT:  Yes.

15            MR. HAVILAND:  Thank you.

16            So, Your Honor, this is Rockford's motion, and it

17     dates back to May 6th.  It's a corporate designee motion that

18     is -- or it was a corporate designee notice that is done in

19     virtually any antitrust case starting with the data to

20     understand how the defendant company maintains data files, how

21     they are used, how they are assembled, and basic, basic

22     information.  I think you probably saw, Judge, we had asked

23     the defendant to just produce a record, lay it out, if they

24     have a dictionary, some type of flashlight.  This has come to

25     motion, Judge, because my expert had to go forward in the

1    blind, take an opinion based upon what he believes the data

2    says, and he will be subject to cross-examination this month

3    without having the facts.

4         THE COURT:  Let me do this -- and, again, I have some

5    questions.  I have spent a lot of time with everything that

6    you have provided to me.

7         When you are talking about your expert, Mr. Haviland,

8    you are talking and wanting to have some questions about the

9    data with respect to your Exhibit A.  You are talking about

10   just with that piece of it.  You are talking about those 53

11   pieces of, I guess we will call them, data sets that you have

12   identified on pages 4 and the top of page 5?

13        MR. HAVILAND:  With the additional proviso that if

14   there is additional data, and, Your Honor, the interrogatory

15   answers, which we are going to get to, in the interrogatory

16   responses, Express Scripts identified additional data.

17        So, again, we don't know what we don't know, but we

18   would want to include anything that relates to Acthar sales,

19   rebates, and the like.  So this was an attempt to tell the

20   defendant "This is what we think you produced in terms of

21   sales, reimbursement, and the like."

22        THE COURT:  All right.

23        MR. HAVILAND:  So you are correct with some

24   additional --

25        THE COURT:  I'm prepared to rule on No. 15, and I am

1    going to rule that that is an appropriate request limited to

2    the questions A through G, although I had two questions.

3         A, a record layout or legend for each data set, I

4    would assume, to the extent there is a written legend, that

5    that would be appropriate.  You are not expecting the deponent

6    to sit there and read it to you.  You would rather have the

7    legend, right.

8         MR. HAVILAND:  Judge, again, typically, the lawyers

9    get together.  They exchange this information.  We then have

10    it in advance to ask questions.  But we would need to have

11    that so our expert could then fine-tune questions.

12         And let me just -- you probably know this, Judge.

13    There is a huge data file that runs on for 160, 180 character

14    positions.  They are not self-described.  They have codes up

15    top, shorthands.  You may think that it relates to the AWP,

16    but they may not be how they are interpreting the data.  The

17    layout or the dictionary, whatever you call it, gives you that

18    window, but there are follow-up questions in terms of what

19    those fields actually populate.  So without that, it is going

20    to be a longer deposition.

21         THE COURT:  Well, it is not going to be so long

22    because it is going to be limited to the topics that are here,

23    okay?  So it may be long, but it is going to be limited to

24    these topics.

25         MS. MCCAFFREY:  Your Honor, if I may?

1            THE COURT:  Yes.

2            MS. MCCAFFREY:  We have explained to the plaintiffs

3    the Express Scripts entities don't actually maintain data

4    dictionaries.  What I offered to do back in May was to provide

5    for counsel, to identify the data fields they had questions

6    about, which, as Mr. Haviland just said, even one of these

7    files has hundreds of data fields.  That's just one.  That's

8    not the 60-plus that are identified here.  But I asked him to

9    provide that, and we would work with them to get them written

10   descriptions of what each of those fields are.  That was

11   rejected.  Express Scripts doesn't maintain data dictionaries

12   in the ordinary course.

13           What I have been able to locate and which was

14   produced to plaintiffs in 2020 is a version of a data

15   dictionary maintained by UBC, which we obviously will point

16   them to in connection with that, but even that is, I believe,

17   old.

18           THE COURT:  And by "data dictionary," you are

19   referring to what would be responsive to A, a record layout or

20   legend?

21           MS. MCCAFFREY:  To A, that's correct, Your Honor.

22           THE COURT:  So you can only produce what you have,

23   right?

24           MS. MCCAFFREY:  But my concern -- I will tell you

25   what my concern is with this.  Each one of these files can

1   literally have hundreds of data fields, and so what this is

2   asking for is to prepare a witness to sit and testify on,

3   like, possibly thousands of data fields.  So I'm concerned

4   that this will be difficult for us to do.

5          What I have suggested and what I think is the best

6   course of action, at least as to that, is that the plaintiffs

7   provide specific data fields that they have questions on

8   because all of these data fields are not relevant to what is

9   happening with class certification and what their expert needs

10  to do.  So if they can identify the specific data fields that

11  they would like information on, we can provide a written

12  summary of what each of those fields is meant to be, like the

13  definition, and then they can have that in advance of the

14  deposition, which I think would resolve A.

15         I have a concern because it is going to

16  be -- actually, a memory test is right -- extremely difficult

17  for a witness sitting in a deposition to be able to do that.

18         THE COURT:  So, Mr. Haviland, I am already ruling

19  that you get the information B through F, right?  I would

20  assume that you want this witness prepared to be able to

21  answer these questions for you because if he is not prepared,

22  and he doesn't have an idea of what you are going to ask, you

23  are not going to get the information you ask.

24         So why wouldn't it be appropriate for you to further

25  limit these documents that you are going to be asking about to

1   let the witness know within this field what parts are you

2   going to be asking about so he is prepared?

3       MR. HAVILAND: So, Judge, we did that. We actually

4   thought about this for a long time. You notice it didn't go

5   out until May, and if you read topics 1 through 14, you will

6   see what we did. We said, "Give us a total volume of sales by

7   year, but indication, by state." It is a nationwide class

8   with individual state classes. And you can read what we did.

9   There is a logical presentation: Sales between government and

10  private, the identities of the payors, rebates.

11      THE COURT: Right. And I'm going to get to all of

12  that. But I'm talking about -- here's the problem: I don't

13  know what these documents are. I mean, what are they?

14      MR. HAVILAND: They are data fields, Judge, and they

15  are very difficult to understand, but it is a data dump. So

16  we asked interrogatories on this. We asked requests for

17  production on this. We are not getting simple answers.

18      THE COURT: Tell me what it is. Tell me what is

19  "Express Scripts 0582508, Where TRC Low-Margin Drug Claims."

20      MR. HAVILAND: I have no idea.

21      THE COURT: What is that?

22      MR. HAVILAND: I know that it is --

23      THE COURT: What did you get? Did you get like a

24  spreadsheet?

25      MR. HAVILAND: A massive database, Judge. A

1    massive -- some of these are 50, 60, 100 gigabyte or

2    megabyte --

3          THE COURT:  What are these, Ms. McCaffrey?

4          MS. MCCAFFREY:  This is the data files that are

5    responsive to plaintiff's 400-plus discovery requests that are

6    a burned, scorched-earth method to find anything and

7    everything relating to Acthar.  So this is exactly what

8    plaintiff has requested.  There are five Express Scripts

9    entities, three or four of whom independently maintain all the

10   different sets of data on Acthar.  That is exactly what this

11   is.  So this is claims data.  This is rebates data.  This is

12   historical claims data.  This is CuraScript distribution data.

13   This is Accredo pharmacy claims data, the UBC database, the

14   hub operation.  That's what this data is.

15          This is not a data dump.  Frankly, the suggestion

16   that it is is simply wrong.  What this is is the data that is

17   responsive to Mr. Haviland's request.

18          So, again, if 1 through 14, for example, are the

19   fields that they are looking for to be able to do that, maybe

20   that is how we answer 15(a), so which field relates to sales,

21   which field relates to government, how do you identify

22   government purchasers, commercial purchasers.  But that's not

23   what plaintiff has told us.

24          We have tried to meet and confer.  We have tried to

25   get this down to a reasonable subset, and we are just not

1      there.

2              THE COURT:  I mean, I just don't know, Mr. Haviland,

3      how -- you are not going to get a -- you are just not going to

4      get what you want this way, I don't think.  I mean, I don't

5      know how you could.

6              MR. HAVILAND:  Judge, I'm struggling with the tools

7      that I have.  I have an interrogatory where I have asked these

8      specific questions.  I have requests for production.  Counsel

9      said data dump.  That's what it is.

10             THE COURT:  So --

11             MR. HAVILAND:  And so there is going to be an expert,

12     Your Honor, for that side who is going to have the benefit of

13     all you are hearing.  It is going to be streamlined, and that

14     expert, after the close of discovery, is going to come forward

15     with a position on the economics of this case.  It will be too

16     late for the plaintiff to figure it out.

17             THE COURT:  Right.  But you can tell me that, and you

18     can be upset, and you can get all frustrated, but I am trying

19     to help both parties here.  I'm trying to help you get the

20     information you want and Ms. McCaffrey to know how to prepare

21     her witnesses, and if I just say present somebody who can talk

22     about all these giant data sets, without knowing specifically

23     what you want to know about them, you are not going to get

24     what you want.

25             MR. HAVILAND:  Judge, there is somebody in each

1    company that knows this information.  That's how

2    Ms. McCaffrey can speak to that.

3              THE COURT:  Knows what information?  Knows what's in

4    these files?

5              MR. HAVILAND:  So, Your Honor, you asked about the

6    low-margin drug claims, okay?

7              THE COURT:  All right.

8              MR. HAVILAND:  Now, what I can point out to you, it

9    is a standalone series, low-margin drug claims, okay?  It is

10   Acthar sales.  What does "low margin" mean, okay?  Is it

11   because of a discount?  Is it because of a rebate, a

12   charge-back?  We have no idea from the data.  It doesn't speak

13   for itself.  But then if you follow the rest, "Acthar WAC by

14   month," okay, I know that the WAC is the wholesale acquisition

15   cost.  Now we are getting somewhere.  I can say to this

16   witness, "If you are looking for the transaction sales between

17   the manufacturer and CuraScript, is this the data?"  "Yes."

18   Okay.  Let's just go through and understand what it is.

19             But this data dump makes it very difficult, and we

20   have talked about it, and we have tried to say we want the

21   sales by indication, we want discounts, we want rebates

22   because all that factors into the calculation of damages.

23             MS. MCCAFFREY:  Right.  He is asking a 30(b) --

24             MR. HAVILAND:  And we have asked for a witness with

25   knowledge to testify about those issues.

1        MS. MCCAFFREY:  Judge --

2        MR. HAVILAND:  I can't give you a better flashlight,

3   Judge.  These are massive data sets that were produced, as she

4   says, responsive to our requests.  Now we want to understand

5   what they mean.

6        THE COURT:  And they have a right to understand what

7   they mean, Ms. McCaffrey.  They do.

8        MS. MCCAFFREY:  I agree.  We are trying to do that.

9   Judge, I, 100 percent, agree with you, but their expert

10  certainly had enough information to submit a class

11  certification in July.  Their expert presumably -- their

12  expert has sat for -- has been an antitrust expert --

13       THE COURT:  It doesn't matter.  It doesn't matter.

14       MS. MCCAFFREY:  But they have --

15       THE COURT:  They have a right to this information.

16  The question becomes how can you prepare your witness --

17       MS. MCCAFFREY:  Correct.

18       THE COURT:  -- to give them that information.

19       I am going to say that both of you will benefit from

20  further defining these issues, and if not, I will just

21  order -- if you don't sit down and further define these

22  issues, then I'm just going to order that you produce somebody

23  on all these data sets and be prepared to answer only A

24  through F, okay?  And see what you get, Mr. Haviland, and I

25  don't think you are going to get what you want.

1       MR. HAVILAND:  So, Judge, we had a meet-and-confer,

2  and we spent a long time, and frankly this meet-and-confer

3  process is a broken system because what we get is associates

4  who have no knowledge and no information.

5       THE COURT:  Ms. McCaffrey --

6       MR. HAVILAND:  And then it goes to Ms. McCaffrey and

7  she writes a letter.

8       THE COURT:  -- and Mr. Haviland are going to meet and

9  confer in a conference room --

10       MR. HAVILAND:  I welcome that.  I welcome that.

11       THE COURT:  -- and not by phone.

12       MS. MCCAFFREY:  I have been on this meet-and-confer,

13  Your Honor, and Mr. Haviland is getting this a little

14  confused.

15       THE COURT:  No, it is just you two in a conference

16  room.  I mean, you are here.  Why don't you go to the

17  conference room right now and sit down and talk about it

18  because either this gets more specific or somebody sits in a

19  deposition and answers B through F for each one of these data

20  dumps, and neither of you are going to get what you want.  So

21  it would just seem to me that that's the way that this should

22  be done.

23       How much time do you think you need, the two of you,

24  to meet and talk this through?

25       MR. HAVILAND:  So, Judge, I have done this many times

1    in my career, and I want to be clear what my intention is

2    coming out.  We asked topics 1 through 14.  These are the

3    issues --

4              THE COURT:  I haven't gotten to all those topics yet.

5              MR. HAVILAND:  But what I'm saying, Judge, that's the

6    flashlight that I'm looking to have answered when I go into

7    those data sets, okay?  I don't know that the series of API,

8    and there is a lot of them, relate to this.  I don't know that

9    because it's Acthar data, but we don't know when it says

10   "patient" is it sales data or is it something else.  Is it

11   medical?  Because if it relates to the patient's medical

12   condition, then we are not interested in it for purposes of

13   this 30(b)(6).

14             MS. MCCAFFREY:  Your Honor, this exactly explains

15   what the problem is.  Plaintiff hasn't done their own

16   homework.  They are not even opening these databases and

17   attempting to understand what --

18             MR. HAVILAND:  Judge, we absolutely have, and my

19   expert filed a report --

20             MS. MCCAFFREY:  So I am happy --

21             THE REPORTER:  Please, one at a time.

22             THE COURT:  Stop.  One at a time.

23             MR. HAVILAND:  My expert filed a report based upon

24   what he believed it was because they didn't want to put it out

25   before the deadline.  That was two months before the deadline,

1  Judge.

2          THE COURT:  Listen, we are not going to get heated

3  about this because if we are, we will just stop, and I will

4  just enter a ruling in writing, and neither of you will get

5  what you want.

6          MS. MCCAFFREY:  Your Honor, we welcome the

7  opportunity to meet and confer.  We provided a reasonable

8  proposal back to plaintiff.  They sat on that proposal.

9          THE COURT:  No, your proposal was not reasonable.

10         MS. MCCAFFREY:  Then, Judge --

11         THE COURT:  It was not reasonable.  It was not.  He

12  is entitled to ask what he wants, not what you want to give

13  him.

14         MS. MCCAFFREY:  And I'm not suggesting that, Judge,

15  but I am suggesting, and Judge Johnston has been clear, we

16  need more than what is here.

17         THE COURT:  Absolutely.

18         MS. MCCAFFREY:  And so I'm happy to sit down and meet

19  and confer.

20         THE COURT:  Which is what I'm trying to get the

21  parties to do, or I will just strike it, and you can start all

22  over again, Mr. Haviland, because this is not an appropriate

23  30(b)(6).

24         MR. HAVILAND:  Judge, I don't know how you could do

25  it any differently.  You ask for sales, discounts, rebates as

1    a generic category, and then you point the defendant to their

2    data set.  What more can I do without having a data

3    dictionary, which I'm shocked that a company, the largest PBM

4    in America, has no way to understand.  If the CEO said, as

5    Your Honor is saying, "What does this mean?", he can't get the

6    answer because they don't maintain any type of data

7    dictionary.

8           You mean to tell me Tim Wentworth can't get the

9    answer to that question?  He can't get it because they don't

10   maintain it?  I don't believe that, Judge, because I know what

11   they do with the information and how they use it, and we are

12   going to see it in an expert report.  I'm going to circle this

13   part of the transcript.  We are going to see it in an expert

14   report where some of these data sets are going to be utilized

15   like rebates.  They are going to say, "Oh, the net price, you

16   have got to take into account the rebate."  Where is the

17   rebate here, Judge?  I can't find it.

18          THE COURT:  Give me an example of some of the

19   questions you would ask if I allowed this to go forward.  You

20   have got your witness.  Tell me what you would ask.

21          MR. HAVILAND:  Okay.  Let's start with where I just

22   left off, the rebate analysis.  So there is a document,

23   0814774, rebate change analysis summary with price increases

24   from 2013, okay?  2013.

25          THE COURT:  Okay.  I'm with you.

1          MR. HAVILAND:  I'm taking it at face value.

2          "Mr. Witness, let me first ask you is this a data set

3     that deals with rebates generally?

4          "Yes, up to 2013.

5          "Okay.  What about after that?  Was there some change

6     at the company?  Do you no longer maintain that?  Because

7     clearly, there is rebates.  How would you go look at it?  Is

8     there something else that I'm not seeing here," just so I get

9     a lay of the land, before I even get into the data set,

10    because I have a data set that says it ends in 2013.  This

11    case comes all the way through to 2022.  So then I will go

12    into the flashlight and start asking about that data set.

13          Now, it is a rebate change analysis.  Is it only

14    looking at where the rebate that is either provided by

15    contract or otherwise has been altered, changed?  How do I get

16    to see the actual rebate as a static number going back to the

17    time when that payor got it?  I'm trying to work through that

18    data set to understand how this company, which processes

19    rebates every day -- they sell to my clients, the class -- the

20    fact that the PBM beats up on drug companies to give rebates.

21    It's their sales pitch.

22          So this is something they know, Judge, because they

23    are constantly telling my clients -- they actually can tell

24    one of my clients how much money they save them on a rebate on

25    an annualized basis.  If they can put that in one summary

1    slide, there is data to back it up.  And does this data set do

2    that?  And I can only do what you do, Judge.  I look through

3    here.  I don't see rebate.  I'm looking, trying to find the

4    word "rebate".

5            Oh, no, here is another one, okay.  And then I go to

6    last one, 4838429:  ESI, rebate data, 2014_2019.

7            "Sir, is this the data set that picked up from the

8    one we just looked at?  Okay.  Now, this one, sir, does not

9    say change.  So is this the static look of a rebate, looking

10   at what was paid, or is it only looking at alterations?"

11           And then I go back and say:  "Well, where is the

12   static data set for 2013 and before?"

13           That's how that deposition would go, Judge.  And by

14   the way, that topic, that topic, is over at No. 11, who got

15   the rebates, who paid the rebates, how the rebates were

16   quantified.  They are all in the general topic, trying to go

17   to the data set to understand the fact of a rebate and who got

18   it so that it can be quantified for purposes of a report.

19           THE COURT:  Okay.  So what Mr. Haviland is saying is

20   the topics that he is going to ask with respect to each of the

21   data sets are listed in 1 through 14.  Does that help you?

22           MS. MCCAFFREY:  Judge, no.  I mean, I can try to go

23   back, Judge, and, for example, find which records it applies

24   to, for example, but what Mr. Haviland just described, for

25   example, of adding up and figuring out where all the rebates

1    went, that's expert testimony.  That is not appropriate for

2    30(b)(6) testimony.

3           Now, if we are talking about A, so subtopic A, the

4    15, if he is asking in each of these spreadsheets whether I

5    see total dollar volume-sales of Acthar, for example, I can

6    say, "Go to XYZ spreadsheet.  You are looking at columns D,

7    EE, X," whatever.

8           I am sure that we can do that.  We can provide it in

9    writing.  It is what I suggested two months ago.  That

10   at least will get somewhat closer, I think, to what he is

11   looking for and what he is describing.

12          If his concern is what our experts are doing with

13   this data, then maybe the best course is to wait until after

14   the expert reports come in.  I don't know if -- that's another

15   option to alleviate his concerns that they need to understand

16   the data sets our experts are relying on.  I don't know what

17   those sets are at this point.  It is certainly some subset of

18   this, if not all of it.

19          But if the question is for A, the record layout or

20   legend for each data set or alternatively some sort of written

21   description of which record layout you go to for the

22   identities of third party payors, the identities of patients,

23   I can get that.  I can find that.

24          THE COURT:  Would the questions be something along

25   the lines, Mr. Haviland, of "Tell me which of the 53 data sets

1   contain the total dollar volume of sales for Acthar by year,

2   by indication, and by state?"

3       MR. HAVILAND:  Your Honor, sometimes you do a better

4   job as an advocate than I.  I went right to my example, but

5   that is the headline.  I would start with those topics, and

6   "If you were me or you were my expert, where would you go

7   look?  And if not these, then which?"

8       THE COURT:  All right.  So I'm going to allow the

9   deposition to proceed with respect to questioning the witness

10  and selecting a witness and preparing him to address where

11  within those 53 data sets the information in 1 through 14 can

12  be found.  I'm also going to allow Mr. Haviland, then, to

13  question the witness on the questions listed in A through F.

14  I don't know -- I will allow him to ask G.  I don't know

15  how -- certainly this person would not be required to go and

16  ask how people outside of Express Scripts use it, but to the

17  extent he has knowledge without having to do some sort of

18  independent research, he would have to respond to that.

19      MR. HAVILAND:  Judge, just so you know, that is only

20  intended -- sometimes they outsource those functions.  We just

21  didn't want it to be -- if there is an accounting firm or

22  someone else that is doing the data crunch, we just want to

23  know because that is potentially a third party subpoena.

24      THE COURT:  To the extent, Ms. McCaffrey, that you

25  can get some sort of a dictionary, record layout, or legend

1  for each data set prior to the deposition, within seven days

2  before the date of the deposition, please get him whatever you

3  can in writing to attempt to streamline that.

4          MS. MCCAFFREY:  Understood, Your Honor.

5          THE COURT:  All right.  So that --

6          MR. HAVILAND:  Your Honor, just one caveat.  I

7  apologize.  But, again, we attempted to grab the data sets we

8  are aware of.  If there is another, and in the

9  interrogatories, they identify others, I just don't want it to

10 be those 53 because if the witness says, "Well, we have them,

11 Mr. Haviland" --

12         MS. MCCAFFREY:  Well, Judge --

13         THE COURT:  No, I agree with you, Ms. McCaffrey.  I

14 understand the argument.  I too said I don't understand what

15 16 and 17 are.

16         MR. HAVILAND:  Judge, I can read you the

17 interrogatory.

18         THE COURT:  I know, I know, but I haven't ruled on

19 the interrogatories or what needs to be produced, and if you

20 want to wait and not do your 30(b)(6) until all written

21 discovery is done, then we will have a definitive, but I

22 cannot ask her to produce somebody prepared to discuss

23 documents that haven't been produced yet.

24         MR. HAVILAND:  That's fine.  We will take the

25 deposition.

1  THE COURT:  All right.  So that's my understanding of

2  how 1 through 14 is going to be dealt with in this 30(b)(6)

3  deposition, is that those requests are going to be aimed at

4  how would I find that information in those data sets.

5  MS. MCCAFFREY:  Yes.  To be clear, how we are going

6  to find the data, yes.

7  THE COURT:  Right, as well as once those are

8  answered, then those follow-up questions that he has listed

9  here.

10  MS. MCCAFFREY:  Well, Judge, I will try, but I'm

11  telling you right now that this is not -- that's expert.  That

12  is, these are data sets.  Experts, what they do is they go in,

13  they pull them out, they run different tables, different

14  analyses.  I mean, I'm concerned here that what Mr. Haviland

15  is asking us to do is to provide expert testimony via a

16  30(b)(6).

17  MR. HAVILAND:  Judge, they have an expert deadline --

18  THE COURT:  Let me stop it.  Let me stop it.

19  That's not what he is doing because if he were doing

20  that, he would be having you produce someone to tell you.  He

21  would be asking you to produce someone to tell him the amount

22  of money that your client received from Acthar as a result of

23  rebates, the amount of money that your client -- he is not

24  asking that.  He is asking -- and I'm not allowing him to ask

25  that.

1        He is asking you to produce someone to tell him where

2   within these data sets would I go if I wanted to find out the

3   amount of money that your client makes from Acthar as a result

4   of inflation protection, and then he can take that information

5   and put it to his own experts to do the analysis.

6        MS. MCCAFFREY:  Okay.  So just to clarify --

7        THE COURT:  Do you see the difference, Mr. Haviland?

8        MR. HAVILAND:  I do, Your Honor.

9        THE COURT:  I agree with you.

10       You cannot ask her people to do that kind of

11   analysis.  You can gather the information, and that's what I'm

12   letting you do.

13       MR. HAVILAND:  And, Judge, I only want to know what

14   the companies know.  When they hire a high-priced expert to

15   come in and analyze it -- they are going to do that.  That is

16   going to come in November.

17       THE COURT:  And you are going to do it too.  You just

18   want to get the information.

19       MR. HAVILAND:  I just want my guy and my people to

20   have the same access that they have.

21       THE COURT:  Understood.  So that's what we are doing

22   here.  So that takes us 16 and 17, I'm not allowing.

23       Express Scripts' divestiture of UBC in 2017,

24   Mr. Haviland provided the specific questions and issues he

25   wants to ask with respect to that topic.

1          Ms. McCaffrey, in Exhibit D, which is his letter, he

2  says specifically what he wants.

3          MS. MCCAFFREY:  Right, which actually expanded the

4  topic.  So he has now asked for the --

5          THE COURT:  I'm going to allow it.  I'm going to

6  allow it limited to what he says he wants to question them

7  about in that paragraph.

8          MS. MCCAFFREY:  Okay.  Nothing more, Your Honor?

9          THE COURT:  Nothing more.

10          MS. MCCAFFREY:  Because the UBC -- okay, all right,

11  got it.

12          THE COURT:  Right, because he has to make it

13  specific.

14          MS. MCCAFFREY:  I understand.

15          THE COURT:  He made it specific.  You now know what

16  to prepare your folks on.

17          MS. MCCAFFREY:  Okay.

18          THE COURT:  The same thing with respect to the

19  Mallinckrodt Acthar business topics 1 through 5.  Mr. Haviland

20  has indicated he wants to know what Express Scripts' entities

21  knew about it, when they knew about it, and what they did with

22  such knowledge.  You need to prepare your folks to answer

23  those questions with respect to those five topics, okay?

24          MS. MCCAFFREY:  Yes, Your Honor.

25          May I make any argument against that?

1        THE COURT:  Go ahead.

2        MS. MCCAFFREY:  Okay.  No, I just -- the way these

3   topics are drafted, Mallinckrodt's acquisition of Questcor,

4   Mallinckrodt's acquisition of BioVecta, the sale of BioVecta,

5   Mallinckrodt's acquisition of the Synacthen license,

6   Mallinckrodt's return, this is not even directed at Express

7   Scripts.  This is directed at Mallinckrodt.

8        THE COURT:  No, he wants to know what your clients

9   knew about that.

10        MS. MCCAFFREY:  Well, that is not what the --

11        THE COURT:  Well, he has clarified that, so that's

12   why I'm saying -- just remember that's what the

13   meet-and-confer is for, right?  You meet and confer, and he

14   clarifies.

15        MS. MCCAFFREY:  Yes, but the meet-and-confer seems to

16   be that Mr. Haviland continues to get whatever he wants, but I

17   understand.  I will happily prepare --

18        MR. HAVILAND:  Your Honor, we want to know what the

19   defendant knew.

20        THE COURT:  Well, Ms. McCaffrey --

21        MR. HAVILAND:  That's it.

22        THE COURT:  -- you are not actually arguing to me

23   that it is not relevant what your client knew about these

24   topics?

25        MS. MCCAFFREY:  I am not arguing, but I am going to

1    say I don't -- like if he wants testimony that says they

2    didn't know anything until it was public, then that's fine,

3    but we will prepare a witness to testify on those topics, Your

4    Honor.

5          THE COURT:  All right.  Now, we get to the issue of

6    the bankruptcy, and I am not going to allow this because this

7    is not an appropriate way to structure a -- I mean, you don't

8    ask someone to be prepared to testify as to documents.  You

9    have to be specific about what you want to know about those

10   documents, and this is just not appropriate.

11         Ms. McCaffrey has offered to prepare someone to

12   testify on the topics of the negotiation between Mallinckrodt

13   and CuraScript regarding the revised wholesale product

14   purchase agreement and the termination of CuraScript's

15   wholesale purchase agreement.  It would seem to me, based on

16   what you told me last time, Mr. Haviland, that those are two

17   topics you are interested in.

18         MR. HAVILAND:  They are, Your Honor, but let me just

19   preface this whole bankruptcy, and the way I thought about it

20   this morning was these companies got married in 2007, and they

21   are getting divorced, and a divorce is not so linear.  It is

22   not just one event.  It is usually a bunch of issues.  And

23   what we have seen here and we learned last week for the first

24   time, this company decided, as this marriage was unraveling,

25   to sign a contract with a competitor, ANI Pharma, for the

1  exclusive distribution of that product.

2          Now, Judge, I have asked that question in

3  interrogatories, document requests, and it is yet to be

4  answered, until the end of the deposition.  The witness

5  says -- and I have a standard, "Is there anything else you

6  want to tell me?"

7          He says, "Well, yeah, I want to tell you about ANI

8  Pharmaceuticals and the fact we have an exclusive agreement,"

9  at the end of a six-hour deposition.  That's not how it is

10  supposed to work, Your Honor.  And that's why we want to know,

11  as they were going through this divorce, when did that happen

12  because clearly Mallinckrodt said, at the end, "Enough.  We

13  are done with you.  We are going somewhere else."

14          THE COURT:  Well, you are going to get that if she

15  prepares someone to answer your questions on those topics,

16  okay?

17          MR. HAVILAND:  Okay.

18          THE COURT:  You will get that, and then we don't have

19  to be going document by document.

20          So you understand, Ms. McCaffrey, that you are going

21  to -- that I'm ordering your proposal is what --

22          MS. MCCAFFREY:  Yes, Your Honor, I understand.

23          THE COURT:  Okay.  That is the extent of the issues

24  with respect to the 30(b)(6).

25          Are we going to have a problem with respect to

1   getting dates for those or chronology for when in the course

2   of the discovery that is going to happen?

3          MS. MCCAFFREY:  No, Your Honor.

4          MR. HAVILAND:  Judge, I would ask that that happen in

5   the month of August because we are within 90 days.  The

6   schedule is filling up a lot.  September and October, it

7   always happens, are becoming the default.

8          I wanted to tell you at the beginning here that we

9   have been working very cooperatively with Mr. Shapland on

10  Mallinckrodt's scheduling issues that were the subject of our

11  Friday filing.  So I'm only asking, and we can get to this in

12  a moment, because we are populating the schedule with those

13  issues -- this issue has been out here, Judge, since May -- I

14  would like to have it done in August.

15         THE COURT:  But I haven't ruled on it until now, and

16  now Ms. McCaffrey knows what she has got to prepare her folks

17  on, and it is not a small task.  It is not a small task.  So I

18  would like to see that get done --

19         MS. MCCAFFREY:  Your Honor --

20         THE COURT:  Go ahead.

21         MS. MCCAFFREY:  I'm sorry to interrupt.  I apologize.

22  I just wanted to flag.

23         Some of this may also be answered by fact witnesses,

24  so that's where I need to go through and look at the

25  depositions because, for example, Nicole Hebbert, who is a UBC

1    employee, may be best positioned to testify as a fact witness

2    and then provide 30(b)(6) testimony on the data.  So that's

3    where there is a struggle here.  Some of these may be answered

4    by fact witnesses.  I will work and we will identify that with

5    the plaintiffs if that is the case, but I just want to flag

6    that right now.

7              THE COURT:  Work it out, Mr. Haviland.  You are going

8    to get the information.

9              MR. HAVILAND:  Judge, I just want a date certain.

10   That's all we want, a date certain.

11             THE COURT:  Work it out.  I hope I don't have to

12   enter a date certain, but I would expect that it would get

13   done so that we are going to meet that October deadline.

14             All right.  Did I hear you say you worked out the

15   issues with Mallinckrodt on the depositions?

16             MR. HAVILAND:  Kind of, Judge, and I know

17   Mr. Shapland wants to come up, but let me just -- that's fine.

18             We were talking with Mr. Shapland since the time the

19   stay was lifted about how to deal with the eventual status of

20   Mallinckrodt as a third party, and I will say he is amicable

21   to work with.  We filed the motion because we hadn't made

22   progress.  I think we crossed paths.  He had sent a late

23   Friday email after hours that we didn't see that made

24   proposals in there.  He also committed to working

25   cooperatively for dates for a number of witnesses.  There is a

1   few.  The apex witnesses, he wants to get placeholders, hold

2   that.  We had another nice conversation again in the hallway

3   about the two issues in our motion.

4       Documents, I understand he is sending a whole volume

5   to our vendor.  We agreed to look at and next week meet and

6   confer again about whether we want supplementation to the

7   present, and, if so, what will that be.  We are going to

8   discuss, hopefully, narrow tranches of that.  Mr. Shapland has

9   reserved rights on that issue.  But as to depositions, I think

10   we are going to get there.  He has committed to telling us who

11   his firm is representing and who it is not.  We have got

12   some third party practice to engage in.

13       But I would ask that the motion be adjourned.  I know

14   counsel would like it taken down, but our concern is making

15   sure that if we have this agreement, we can come back because

16   we are inside of 90 days, and we are going to need the ability

17   to get to the Court.

18       THE COURT:  I would ask that you withdraw it with

19   leave to refile it, and I have already read it, so it is not

20   like you couldn't refile it and couldn't notice it up within

21   five days.

22       MR. HAVILAND:  We will do that, Judge.

23       THE COURT:  But I will say that there are a whole

24   host of depositions here that need to get done, and so I would

25   like to see the schedule in place and start ticking those off

1    as soon as possible.

2          MR. SHAPLAND:  Yes, Your Honor.  We fully understand

3    that.  Our goal is to get these depositions done by the

4    discovery cutoff.

5          THE COURT:  All right.

6          MR. SHAPLAND:  There is no dispute about that.

7          Mr. Haviland had informed the Court that we had not

8    provided dates for witnesses at a time when he hadn't even

9    told us who he wanted to depose.  The second we got that

10    information, we have been working as quickly as we can to get

11    those done.  I think we have established whether we represent

12    or won't represent all of the folks on his list except for one

13    who we haven't heard from.  We will finish that up.  We have

14    proposed dates as to about half of those whom we represent,

15    and we are working on dates for the rest.

16          I anticipate potentially having a dispute over two

17    issues that were raised in the motion to compel, and I would

18    like to preview those for the Court now.

19          THE COURT:  Okay.

20          MR. SHAPLAND:  One of which probably relates to a

21    motion that is going to be argued next, and so maybe I will

22    hold those comments.

23          But with respect to the witnesses, Mr. Haviland has

24    proposed deposing five people who were deposed in the

25    bankruptcy.  He had notice and an opportunity to participate

1   in those.  He only participated in one.  He did so for limited

2   purposes.  The depositions were open for deposition on these

3   claims.  He chose not to participate in those depositions and

4   ask questions related to the Acthar claims.

5           What we are asking, in light of that, is simply that

6   he review the transcripts, and then he can come to us with a

7   set of topics that he would either like to re-cover or that

8   weren't covered that he believes need to be covered and a

9   proposal on how long those depositions should be in light of

10  the fact that these people have already been deposed on these

11  issues.

12          Now, that's our ask to Mr. Haviland.  He is

13  considering it, I believe.  I have provided some further

14  nuance on this point in that three of these people are now

15  former employees.  They don't necessarily have the same

16  interests that I have and that the company has, Mallinckrodt,

17  in cooperating at the level we are.  They may be resistant.

18  These three formers may be a little less eager to just simply

19  submit themselves to a wide-open deposition without this

20  process, and I believe that this process that I'm asking for

21  will help us communicate with these people who are going to be

22  our clients, who are our clients, with respect to why it is a

23  good thing to cooperate.

24          So that's what we are asking for on the witnesses,

25  and if all we wind up with is, "No, I'm going to depose them

1    on whatever I want and for however long I want," we may be

2    back here in short order with some kind of dispute depending

3    on how particularly these three formers feel about that,

4    right?

5          THE COURT:  Well, I'm not so concerned about how they

6    feel about it because whatever my ruling is, a subpoena is

7    going to be issued, and they are going to have to come in and

8    tell me how they feel about it.

9          MR. SHAPLAND:  I agree.  That's what I'm saying.  We

10   might be here with me telling you how they feel about it,

11   whereas if we get engagement on this process, talking about

12   what it is that these depositions are supposed to cover that

13   wasn't covered in prior depositions during the bankruptcy on

14   these topics, then I think it might be --

15         THE COURT:  I think it is worth working out.  It

16   sounds to me like you have got a good chance of working it

17   out.  I'm not going to tell you how I would rule on either of

18   these motions because I might not have to make that decision.

19   So work it out, but you are going to have to work it out

20   quickly, and if you can't come to a resolution, bring it back

21   to me.  I will rule quickly because I want these deps done.

22         MR. HAVILAND:  Judge, let me just respond briefly

23   on --

24         THE COURT:  No, there is nothing to respond to.

25         MR. HAVILAND:  Well, I just want to be clear, Judge,

1    the depositions weren't taken in this case.

2         THE COURT:  I understand.  They were taken in the

3    bankruptcy case.

4         MR. HAVILAND:  They were taken by parties that were

5    not adverse.  My client's claims weren't objected to.

6         THE COURT:  I haven't read the depositions.  I don't

7    know anything about what the parameters were.

8         MR. HAVILAND:  They are truly depositions in another

9    matter --

10        THE COURT:  Right.

11        MR. HAVILAND:  -- and the issues in this case were

12   not part of the examination.

13        THE COURT:  So work it out.

14        MR. HAVILAND:  So I committed to Mr. Shapland to

15   review them and see, and we have done this hundreds of times.

16        THE COURT:  Well, it is to your advantage.  You have

17   got a hundred --

18        MR. HAVILAND:  It will streamline, absolutely.

19        THE COURT:  -- depositions.

20        MR. HAVILAND:  I have committed to that and then to

21   try to work to streamline the examination using prior

22   testimony.

23        THE COURT:  Sounds good.

24        MR. SHAPLAND:  Your Honor, with respect to the

25   depositions, I'm anxious to provide him the transcripts.  I

1    have just been waiting for an agreement that the

2    confidentiality designations made in the bankruptcy will be

3    effective with regard to similar protections that are afforded

4    under the protective order in this case.

5         MR. HAVILAND:  Just with the proviso, Judge, that

6    they are not depositions in this case.  To confidentiality,

7    absolutely, we have no problem with keeping the confidence of

8    the company.

9         So Express Scripts did a number of examinations, real

10   quick ones, and so that was not part of an adversarial

11   process, and we don't want that coming in here --

12        THE COURT:  Right.  There might be all you need to

13   know was already asked, and you can check those folks off.  If

14   you read them over, and there is five more things you need to

15   know, boom, that's good too.  So it is just good practice.

16        MR. HAVILAND:  And I'm just confident we are going to

17   be able to work this out with Mr. Shapland.

18        MR. SHAPLAND:  Yes.

19        So do I have an agreement from Mr. Haviland that the

20   confidentiality designations made in the bankruptcy with

21   respect to these transcripts --

22        THE COURT:  I think he just said that, right?

23        MR. HAVILAND:  That's right.

24        THE COURT:  Good.  Okay.

25        MR. SHAPLAND:  So the other topic is documents, and I

1   will just put a pin in that because I believe my issue

2   overlaps with the debate we are going to have with respect to

3   how far do we have to come to the present with respect to

4   document productions.

5          THE COURT:  And I do think your issue is different

6   than Express Scripts' issue somewhat, but you guys can try to

7   work it out.  I mean, you had told me before when you were

8   still in the case that you were willing to turn over the

9   documents and there were a bunch of bankruptcy documents.  It

10  sounded to me like you were willing to turn it all over.

11         MR. SHAPLAND:  Yes, yes, we are, and we have done

12  almost all of that to this point.  We are winding up another

13  production.

14         THE COURT:  All right.  All right.

15         MR. SHAPLAND:  That takes us all the way up to

16  September of 2021.  So the question is, and my concern is,

17  whether we have an additional obligation to produce documents

18  from that point all the way up to May of 2022.

19         THE COURT:  All right.

20         MR. SHAPLAND:  Now, with respect to that, all we have

21  from Mr. Haviland is a blanket "Update your entire production

22  all the way to May of 2022."

23         My view would be, first, that documents that are

24  dated so far to the present aren't relevant.  This is about a

25  conspiracy that supposedly occurred in 2007, and so much has

1    happened since then.  If you presume, if you permit that that

2    allegation of conspiracy is plausible at that point in time,

3    so much has happened since then, points along the way where

4    that conspiracy is clearly over such that documents that are

5    about the divorce, so to say, with respect to the exclusive

6    distribution agreement have nothing to do with this case

7    because it wasn't just the exclusive distribution agreement

8    that got Mr. Haviland past the pleading hurdle in this case,

9    it was coupled, supposedly, with some allegation of a

10   conspiracy between Questcor executives in 2007 and ESI to

11   inflate the price of Acthar.

12          Since that time, Questcor was sold, entirely new

13   ownership, new management.  Since that time, Mallinckrodt

14   divested its rights to Synacthen; ESI changed its prior

15   authorization policies with respect to Acthar; Mallinckrodt

16   went into bankruptcy, and, again, has entirely new ownership.

17   So much has happened since that supposed 2007 conspiracy that

18   documents in this last little tranche from October 2021 to the

19   present simply aren't necessary for Mr. Haviland to prove his

20   claims.

21          MR. HAVILAND:  Judge, we had a really nice

22   conversation in the hallway, but I think we forgot about it,

23   and that was simply that I was willing to look at the

24   documents being turned over, and on much I agree, that the

25   Questcor situation was well-discovered.  Questcor actually

1    wasn't sold.  I know Mr. Shapland misspoke.  It was merged

2    into Mallinckrodt.  It is the same entity.  It was actually

3    called Questcor for a time.

4          MR. SHAPLAND:  New ownership.

5          MR. HAVILAND:  But what so much has happened is the

6    divorce, and I believe we are at the point of September of

7    '21, that was clarified for us, and we probably have this

8    tranche.

9          THE COURT:  What was September of '21?

10         MR. HAVILAND:  That's when they stopped producing

11   documents.

12         THE COURT:  Oh, that's right.

13         MR. SHAPLAND:  The bankruptcy productions kind of

14   take us up to that point in time.

15         THE COURT:  Okay.

16         MR. HAVILAND:  And, Judge, what is important about

17   that is at that point, these parties were both arguing to

18   Judge Dorsey, "We want you to approve this new contract,"

19   which is attached to their pleading, and the judge didn't do

20   that.  He didn't make findings.  So how we got from that point

21   to the point where Mallinckrodt decides "We are done with

22   CuraScript," that's what I raised with Mr. Shapland, that's

23   what we are going to raise in our corporate designee, and

24   that -- I don't know who the custodians are.  I can't imagine

25   that involves a whole lot of people.

1         THE COURT:  Well, that's the point that we are going

2  to discuss with Express Scripts, which is I understand that

3  you have a specific set of issues you want updates on, which

4  could well tailor your additional searches from rerun every

5  search term to every custodian to look for these things on

6  these topics.

7         MR. HAVILAND:  Yes.

8         THE COURT:  And I think Mr. Haviland understands that

9  that's the way I'm looking to go.  I told him that the last

10  time we argued this issue.  So it would be in both parties'

11  best interest to focus on what are the topics you think

12  occurred, and you have already told me what they are, between

13  2021 and 2022 and see what documents you have on those things.

14         MR. SHAPLAND:  Yes, Your Honor.  I stated my position

15  that I don't think those documents are relevant, but I'm not

16  here to -- our intent is not to stand on principle.  What we

17  need from Mr. Haviland is a refined request.  Right now the

18  only thing we have is "Update your entire production."

19         THE COURT:  Right, right.

20         MR. SHAPLAND:  And if we get something specific,

21  something that is practical, rather than fight it out, we'll

22  just implement the request and move on with our lives.  That

23  would be our preference.  We don't have that yet.  I'm here

24  just to tell you that with respect to this motion that you

25  read and he filed, that's one concern I have, and potentially

 1    we could be back here.

 2              THE COURT:  It's a concern I have too.

 3              MR. SHAPLAND:  Yes, yes.  Thank you.

 4              MR. HAVILAND:  We committed to next week, Judge.  If

 5    we have the documents, and I believe we do, we need some time

 6    to digest it, and then we will come back with a proposal to

 7    Mr. Shapland.

 8              THE COURT:  All right.  Sounds good.

 9              MR. SHAPLAND:  All right.  Thank you, Your Honor.

10              THE COURT:  Thank you.

11              Okay.  The last one, I think, and that is this issue

12    of the updating the documents.

13              So I don't know if what you want is what you say you

14    want, Mr. Haviland.

15              MR. HAVILAND:  So, Judge, their reply --

16              THE COURT:  If what you say you want -- I don't

17    understand.  You didn't do what I asked you to do.  I

18    understand you limited it.  Let me just -- like I said, I

19    don't want to -- I have taken so much briefing on this.  I

20    don't want it argued from the beginning.  I know the issue

21    intimately here, okay?

22              When you asked before to have the defendants rerun

23    all their searches for all the search terms against all the

24    custodians from 2019 to the present, I said that's too broad

25    given the burden, the expense, the proportionality, and the

1   lack of relevance, and I said figure out what you think has

2   happened between 2019 to the present that would be relevant to

3   your case, and you told me three topics.  You listed them for

4   me.  I went over them again yesterday.  I went over them again

5   today about the three topics you think would be relevant,

6   okay?

7           So now I'm scratching my head.  Were those three

8   topics even in the search terms that you originally proposed?

9   So how would even rerunning --

10          MR. HAVILAND:  Judge, let me just explain to you --

11          THE COURT:  -- those search terms even give you that?

12          MR. HAVILAND:  -- the problem of a request for

13  production, and we have the fifth request which goes through

14  these issues ad nauseum, and I can walk through that.  It

15  wasn't responded to.

16          THE COURT:  I have seen it.  I have seen that.

17          MR. HAVILAND:  And that's part of our motion because

18  Your Honor said, "Why didn't you move on that?"

19          THE COURT:  I know.

20          MR. HAVILAND:  But let me just address your question.

21          As to the first, second, third, fourth, Express

22  Scripts didn't go and look in each custodial file for the

23  contract documents as to this.  They ran search terms.  They

24  took the entire universe and created search terms.  So they

25  are now --

1        THE COURT:  And just they turned over everything?

2  They had to crossmatch what they got to what you asked for.

3        MR. HAVILAND:  So, Judge, up to April of 2017, I

4  believe so, but as the record shows, as the record shows,

5  Mallinckrodt and Express Scripts decided that the cutoff would

6  be the complaint.

7        Now, we learn through the briefing, and we learned it

8  only through the briefing, that because Judge Tolliver in a

9  case involving a breach of contract in Philadelphia ordered

10  them to produce documents in July of 2019, they decided to

11  update as to some but not all because not all the custodians

12  in that case are relevant to this case.  In fact, there are

13  some that aren't.  Michael Aschi, Monica Holmes, Paul Grew

14  have nothing to do with the issues here.  They are the account

15  reps for the client there.

16        So in response to a court order, they went from April

17  of 2017 to April of 2019.  Your Honor queried back in June, "I

18  don't know if they have done that to everybody," and I still

19  don't know that.

20        So what we are asking is that they do the job that

21  they keep saying that they did, that they ran these search

22  terms as to these custodians.

23        Now, let me stop.

24        MS. MCCAFFREY:  May I respond to that?

25        MR. HAVILAND:  Your Honor, I will simplify this.

1            THE COURT:  I want to get your response because I

2    have a lot of issues here.

3            MR. HAVILAND:  I will simplify this.  There were 60

4    custodians.

5            THE COURT:  I know, and you have limited it down to

6    12.  I have got that.

7            MR. HAVILAND:  Right, of 20.

8            THE COURT:  You want them to run all the search terms

9    against the 12 custodians who are going to be deposed.

10           MR. HAVILAND:  Judge, I don't even know --

11           THE COURT:  Doesn't that -- let me stop.

12           Doesn't that --

13           MR. HAVILAND:  But I don't even know that the

14   contract search terms need to be run.

15           THE COURT:  Well, that's what I asked you to do.

16           MR. HAVILAND:  But, Judge, this is the problem.  I

17   get on a phone call with an associate who has no authority to

18   talk, and then I get a letter that makes a proposal.  This is

19   what happened.  They went from seven, to three, to none.  They

20   didn't say, "Oh, Your Honor, yes, I want to try to moot this

21   issue."  They went from seven, to three, to none.

22           Now they say to you in their papers, "Shut it down,

23   end the discovery, end it," despite the fact we have until

24   October.

25           THE COURT:  We are not going to end discovery.

1          MR. HAVILAND:  But that's where we went, Judge,

2     seven, to three, to none.  I countered at 12.

3          THE COURT:  Twelve?  Twelve what?

4          MR. HAVILAND:  Twelve custodians who are being

5     deposed.

6          THE COURT:  There is 12 custodians being deposed.  My

7     understanding, and I thought Ms. McCaffrey had a good

8     proposal, was to take those three topic areas that you had

9     told me about, and she proposed -- you may not -- you may

10    think there is some additional terms, but she said Acthar;

11    ACTH; Mallinckrodt, the two spellings; Synacthen; Novartis

12    within ten of license; Retrophin; ANI Pharmaceuticals; ANI

13    Pharma; and wholesale product purchase and agreement or

14    contract.  So it would seem to me that those search terms

15    would get at those three topic areas that you are concerned

16    about.

17         MR. HAVILAND:  They wouldn't, Judge, because what she

18    took out was, and I have my -- it's an email from defense

19    counsel.  It is Exhibit M to my declaration, which lays out

20    the 60 custodians and all the search terms, and what counsel

21    did was remove corticotropin, adrenocorticotropic,

22    melanocortin, all the generic names which would have gotten us

23    how this company looks at the market, the product market, are

24    they looking at generic competitors, and that underlies this

25    entire case.  When I spoke to you about ANI, it was an

1    example, and ironically when I said "ANI," no one for the

2    defense stood up and said, "Judge, we really want you to know

3    we have a contract with them as of 2021."

4           THE COURT:  Will your search terms, the original

5    search terms that have been searched for, the -- was it 60 or

6    whatever?

7           MS. MCCAFFREY:  There are 117 search terms.

8           MR. HAVILAND:  Your Honor, I will simplify it.  1

9    through 52 relate to contracts, not the contract.

10           If counsel actually got on the phone call and wanted

11    to walk through and have a conversation, this is what I would

12    have said:  "1 to 52, you don't have to run, but everything

13    else after, with the exception of the folks that are no longer

14    around."  Steve Cartt was with Questcor, out.  Moosehead,

15    zodiac, out.

16           But the ones we want, Judge, are the ones about the

17    drugs.  Eighty-three to 91 cover the market, okay?

18           THE COURT:  Eighty-three through 91?

19           MR. HAVILAND:  Yes.

20           And the pricing terms, 100 through 102, 117.  All

21    these other -- I'm sorry -- we have the witnesses too.  We

22    have Mr. O'Neill, 114.  The other people are gone from the

23    company, Judge.

24           MS. MCCAFFREY:  Judge, this is the problem.  This is

25    the first time we are hearing this.

```
 1            MR. HAVILAND:  No, this is not the problem because,
 2   Judge, Ms. McCaffrey doesn't get on the calls.  She doesn't
 3   get on the calls.
 4            THE COURT:  Mr. Haviland, I'm not going to --
 5            MR. HAVILAND:  Judge, I just -- I don't --
 6            THE COURT:  I'm just not.  I mean, we are trying to
 7   resolve these issues.  There is no reason to lose your temper.
 8   I mean, there just really isn't.
 9            MR. HAVILAND:  It is very frustrating, Judge.
10            THE COURT:  Well, I have been very frustrated too.
11            MR. HAVILAND:  Your Honor, I remember something you
12   told us a long time ago.  "Mr. Haviland, when I practiced, I
13   put it in writing."  And you have seen that.  And the
14   interrogatories, I took the time -- I manage a law
15   firm -- myself, Judge, and went through every interrogatory to
16   tell them their issues.  Did I get a response back?  Two
17   paragraphs:  "We will think about it."  But that was my
18   meet-and-confer, Judge.
19            Instead of getting on the phone call with associates
20   who have no authority to say anything, other than "We will
21   take it back," I took the time, as Your Honor suggested, to
22   put it in a letter, and you just saw what we did on the
23   corporate designee.  We did it with interrogatories, and we
24   have done it with the documents.  But we cannot get there
25   because the fifth request, they say, "Forget it."
```

1    MS. MCCAFFREY:  Judge --

2    THE COURT:  Right now I want to talk about updating

3 the searches through the present.

4    Your ask to me, Mr. Haviland, was to run all of the

5 search terms across 12 custodians who will be deposed, and,

6 Ms. McCaffrey, that list is in his motion.

7    MS. MCCAFFREY:  But that's not an -- this is the

8 problem.  This isn't accurate.  Mr. Seiz is not a custodian.

9 They dropped asking for him as a custodian in July of 2020.

10 There is another, Brian Vanderpool, they moved to compel him

11 as a custodian.  That motion to compel was denied in 2020.

12    So this isn't limiting, and I don't even

13 know -- there are custodians on here who we have not agreed to

14 on deposition dates.  This is an incomplete list --

15    THE COURT:  Well, these are --

16    MS. MCCAFFREY:  -- of the custodians being deposed.

17    THE COURT:  These are the folks he wants.

18    MS. MCCAFFREY:  But am I being asked to add

19 custodians right now, Judge, that were already denied on

20 reasonable grounds, on a case that occurred in 2007?

21    THE COURT:  Okay.  I --

22    MR. HAVILAND:  So, Judge --

23    THE COURT:  Nope, nope, nope.  I'm talking.

24    He wanted you to run all the search terms against 60

25 custodians -- just let me finish -- I said no.  He came back,

1   and now he is saying he wants you to run, I guess he is

2   saying, all the search terms against these 12 custodians,

3   okay?  I understand what you are saying.

4         I think Mr. Haviland is saying he really doesn't want

5   all the search terms run, that that should have been whittled

6   down, which is what I asked to be done, and it wasn't.

7         So what I'm going to ask that the two of you do,

8   while I take a break, is go into one of the conference rooms

9   and come up with, out of the 60 terms, which of the terms -- I

10   think Mr. Haviland is saying he is willing to whittle that

11   down.

12         If those search terms are whittled down to only the

13   terms that would be relevant to the case and aren't, as we

14   talked about before, something that would not have occurred

15   after 2017 because the issue was over with, why would it be

16   onerous to run those terms against these specific, if I

17   limited it to just these 12, no more?

18         MS. MCCAFFREY:  Well, first of all, these are two new

19   custodians.  I don't have custodial documents for two new

20   custodians.  They are not relevant to this case.  They were

21   already denied or dropped.  They have already conceded that.

22         THE COURT:  Who are they?

23         MS. MCCAFFREY:  Seiz and Vanderpool.

24         But also, Judge, this is -- I apologize at my

25   frustration, but I find this frustrating because this motion

1    to compel was a copy-and-paste of what they came into court

2    two months ago and asked for, and they are asking for the same

3    thing and ostensibly limiting it to custodians who are

4    deponents, and maybe now he is saying he only wants these 12,

5    but the 12 aren't limiting because now I'm getting asked to

6    add two additional deponents in here as well and getting asked

7    to run search terms and produce in response to all of these

8    RFPs, which he even has previously conceded are not relevant

9    to whatever happened after 2019, and there is a discovery

10   cutoff date that is reasonable and appropriate, and we have

11   provided a reasonable and proportionate option in terms of

12   supplementing of additional discovery from 2019 through April

13   of 2022.  Those are the same categories that he has talked

14   about.  The search terms that we are proposing will capture

15   the categories of information that he has identified as well

16   as the custodians, the proposed custodians, that we run

17   against.

18          Right now, if I'm being asked to run, ostensibly,

19   60-plus search terms against at least ten custodians, I don't

20   know what that burden is.  Based on past practice, it is going

21   to be significant.  It's a lot.  And I cannot represent to the

22   Court right now what that is because I haven't gone and

23   collected these documents because we haven't been required to.

24   We have been clear that we cut it off in 2019.  We have

25   produced hundreds of thousands of documents that postdate this

1   complaint and go through 2019 on all the custodians who were

2   at Express Scripts up through 2019.

3          So I will work on this, but, Judge, this is -- if

4   past practice is any indication, these are broad search terms,

5   and we were agreeing to run those terms to try to close out

6   discovery, and my concern is that even if we limit it to ten,

7   we are still looking at a significant burden that is, in the

8   proportionality, just not fair here, particularly when we are

9   talking about three -- he has only ever identified three

10  discrete categories, and we have agreed to supplement on those

11  three discrete categories.

12         MR. HAVILAND:  Your Honor, I would ask for two

13  things:  One, an affidavit, as you have required of Rockford,

14  that says what counsel says at the podium, that they have done

15  what they say they have done as to all the custodians and

16  search terms, so we are not debating this anymore, because,

17  Your Honor --

18         MS. MCCAFFREY:  Mr. Haviland has not ever

19  demonstrated that we have failed to meet our discovery

20  obligations.

21         MR. HAVILAND:  Your Honor, when I go into the data

22  set --

23         MS. MCCAFFREY:  An affidavit is not appropriate.

24         MR. HAVILAND:  -- when I go into the data set, we see

25  huge gaps.  Mr. Osborne, a deponent, we see no documents

 1   before 2012, Judge.

 2              MS. MCCAFFREY:  He has used those in depositions.

 3              MR. HAVILAND:  From Mallinckrodt.

 4              THE COURT:  So I want to hear the proposal.

 5              MR. HAVILAND:  From Mallinckrodt.

 6              What I want is an affidavit, similar to Rockford --

 7              THE COURT:  Saying that they have run all the search

 8   terms against all the custodians through April of 2019?

 9              MR. HAVILAND:  Against all the custodians, and they

10   have produced as responsive to those terms or put them on a

11   privilege log.

12              THE COURT:  Or what?

13              MR. HAVILAND:  Or put them on a privilege log if they

14   are privileged and they claim privilege.  But to know that the

15   production is completed as counsel has --

16              THE COURT:  Through April of 2019?

17              MR. HAVILAND:  Right, as to all of them, and then the

18   issue is coming forward.

19              THE COURT:  Okay.  That's what we have been talking

20   about.

21              MR. HAVILAND:  As to that, we have been talking past

22   each other because we don't even know that we have what they

23   say up until April of 2019.

24              THE COURT:  I believe that you have that, and I'm

25   going to have her provide an affidavit.

1      MR. HAVILAND:  Perfect.

2      MS. MCCAFFREY:  Your Honor, I have to say I'm happy

3  to provide that affidavit, but plaintiff has not demonstrated

4  that we have in any way, shape, or form not met our discovery

5  obligations in this case through April of 2019.  Even what he

6  just said right now is wrong.  He has used countless documents

7  dated between 2007 and 2019 in depositions in this case.

8      MR. HAVILAND:  From Mallinckrodt, Judge, from

9  Mallinckrodt.

10      MS. MCCAFFREY:  So Mr. Haviland needs to know what's

11  in their own production, and his failure to do that should not

12  fall back on my client.

13      So we will make this declaration, Judge.  This is the

14  first time this has ever been raised.  It was raised in a

15  reply that was not even authorized and was the only time

16  counsel ever raised anything substantive in terms of a

17  response on this motion to compel.

18      THE COURT:  I agree.  I'm frustrated with

19  Mr. Haviland.

20      MR. HAVILAND:  We should have an affidavit, Judge.

21  Let's just have an affidavit.

22      THE COURT:  It would seem to me, Ms. McCaffrey, that

23  this is an easy out, right?

24      MS. MCCAFFREY:  It is, Judge, but I have got to tell

25  you I'm sick of getting accused of something that is

1    completely untrue.

2         THE COURT:  I'm not accusing you of anything.  I

3    believe you when you tell me that, when you tell me you have

4    produced everything through 2019, and that is why I am

5    questioning Mr. Haviland on why he wants all the additional

6    things he is saying.

7         So if the affidavit satisfies Mr. Haviland that you

8    produced everything through 2019, and we are going to limit

9    anything in the future to something very discrete, it would

10   seem to me it's a win for you, right?

11        MS. MCCAFFREY:  I would be happy to get this closed

12   out, Judge.  I agree 100 percent.

13        THE COURT:  Okay.  All right.  So affidavit --

14        MR. HAVILAND:  Judge, my proposal, and I can give it

15   to you right now -- I'm sorry -- the affidavit, yes.

16        THE COURT:  You should have given us this proposal a

17   long time ago, Mr. Haviland.  It is very frustrating for me.

18   Look at this.  Look at what you are asking me to do.  And we

19   haven't even gotten to the interrogatories, which, you know,

20   I'm going to try to bite my tongue.

21        But what's your proposal?

22        MR. HAVILAND:  That they run No. 11 without "and

23   agree or contract."  It should be the "wholesale product

24   purchase," which is the name of the agreement in this case,

25   and the witness, who is the president of the company, said it

1    is the only one, No. 11.

2           MS. MCCAFFREY:  We have already proposed that.

3           THE COURT:  No. 11?

4           MR. MCCAFFREY:  I don't know.  He is going through

5    search terms.  I assume he is going through search terms.

6           MR. HAVILAND:  I will read them into the record:

7    "Wholesale product purchase," in quotes, that's it.  It is

8    Exhibit M --

9           THE COURT:  So you want them to run "wholesale

10   product purchase" --

11          MR. HAVILAND:  Against those 12 custodians.

12          THE COURT:  -- against the 12 custodians?

13          MS. MCCAFFREY:  There aren't 12 custodians, Judge.

14          MR. HAVILAND:  We will get to that in a moment.

15          MS. MCCAFFREY:  Am I asking to add two custodians?

16          THE COURT:  That's all you want them to do?

17          MR. HAVILAND:  No, I'm going to give you the list,

18   Judge.

19          THE COURT:  Oh, I thought that was it.

20          MR. HAVILAND:  I'm sorry.  I have the finite list.

21   While we are speaking, instead of going into the conference

22   room, I can do it right here.

23          Nos. 53 through 63, which are the variations of

24   Acthar, Mallinckrodt, and Questcor.

25          THE COURT:  Okay.

1          MR. HAVILAND:  Nos. 76 and 77, which deal with

2    pricing.

3          Nos. 83 to 91, which relate to my client and the

4    various drugs that compete with Acthar.

5          And then finally on the last page, again Exhibit M,

6    100 through 102, which, again, are variations of pricing.

7          Now, I would ask that 102 not be limited to just

8    Daraprim and Imprimis, and here is why:  I want Imprimis run

9    separately because Imprimis reached out -- this is all in our

10   expert report and our class cert papers, Judge, and I want to

11   say only because they produced documents in April of '22 that

12   Your Honor ordered two years ago.  Imprimis offered to do to

13   Acthar what they did to Daraprim.  So I would like Daraprim

14   and Imprimis as separate terms.

15         And finally, two witnesses, Mark Trudeau and Hugh

16   O'Neill, but variations of those so that we are not just

17   limited to Hugh O'Neill.  We would ask that their email

18   addresses be run, and we are happy to supply those.

19         And the last one is 117, orphan drug strategy, and

20   that's it.

21         We have taken out -- of 117, I have got maybe 20 that

22   get to the issues from 2019 to the divorce.

23         MS. MCCAFFREY:  That's about 35 search terms, Judge.

24         MR. HAVILAND:  Judge --

25         MS. MCCAFFREY:  I have the -- this would have been

1    helpful to have had before.  I will take a look at this.  I

2    don't know what the burden is and what this is going to

3    return.  I do not think that these are getting at what is

4    actually relevant that occurred post-2019, but I understand,

5    Your Honor.  I will take this back.  I will see what we can

6    do.

7              I will add, if the request is to add two custodians,

8    this motion to compel provides no basis to add them as

9    custodians.  They should not be added as custodians, and that

10   will significantly increase the burden.

11             THE COURT:  Why are the -- tell me again.  One is

12   Brian Seiz, and who is the other one?

13             MS. MCCAFFREY:  Brian Seiz and Brian Vanderpool, so

14   two Brians.

15             MR. HAVILAND:  Well, Judge, the latter one, you will

16   recall, we did have a hearing on, and Your Honor denied

17   without prejudice.

18             THE COURT:  I think I said no.

19             MR. HAVILAND:  Yes.  We now know more about him

20   because of the late production that we got.  Mr. Seiz

21   succeeded Mr. Wentworth as the president and became the head

22   of Accredo.  He wasn't a known quantity to us when we were

23   negotiating this.  But, Judge, I go back to the original

24   disclosure of 14 custodians.

25             MS. MCCAFFREY:  Judge --

1          MR. HAVILAND:  Excuse me.

2          They were not on there.  Seiz we noticed in 2019,

3     September 2019, duces tecum.  There was no objection.  They

4     have taken the position that they don't have to produce

5     documents for somebody duces tecum.  But just before they went

6     into bankruptcy, we noticed his deposition duces tecum and

7     asked that he be one of our deponents.  We are only asking for

8     20 deponents, Judge, 20.

9          THE COURT:  Ms. McCaffrey, help me understand.

10          MS. MCCAFFREY:  Yes.

11          THE COURT:  So if these two folks -- and I just want

12     to talk about the burden, not the relevance.

13          MS. MCCAFFREY:  I understand.

14          THE COURT:  If these two folks were not identified

15     originally, but now you are being asked to run these limited

16     search terms from April 19th to the present, how is that -- I

17     mean, how is running it against new custodians any more

18     burdensome than, say, somebody who has already been

19     identified?

20          MS. MCCAFFREY:  I just don't know, and personally, I

21     think it is burdensome to be adding yet another two additional

22     custodians that they have already walked from, but I can't

23     give you numbers around that, Judge.

24          So I will work with my client to see what we can do,

25     but I certainly think to the extent, which is what

1    Mr. Haviland asked for before, that he is asking that we run

2    the full set of search terms and produce all of the files

3    going back to whenever --

4            THE COURT:  No.

5            MS. MCCAFFREY:  -- on these custodians --

6            THE COURT:  I don't think that is what he is asking.

7    That's not what he is getting.  He is getting April 2019 to

8    the present, these search terms that he just read into the

9    record for these 12 custodians.

10           MS. MCCAFFREY:  Here is the only other struggle that

11   I have, Judge.  What his proposed order requests is that all

12   of these documents be produced five days in advance of

13   deposition.  I don't know if we can do that because plaintiff

14   sat on this for so long.  So I'm struggling with

15   how -- because we are committing to meeting the deadlines in

16   this case.  The parties committed to do that back in 2017 in

17   the ESI protocol.  So I will work with my client and see what

18   we can do, but we have got these depositions going in four to

19   six weeks.  This is an extremely tight turnaround that my

20   client is having to bear the burden of to do an expedited

21   collection and review because of plaintiff's delay on this.

22           MR. HAVILAND:  Judge, these folks were noticed in

23   2019.

24           THE COURT:  Mr. Haviland, it is not your turn to

25   talk.

1          MS. MCCAFFREY:  I will also say that to the extent I

2     need to respond to the 2019 notice, those actually were

3     quashed by the Court in 2020 because plaintiffs noticed well

4     over 50 depositions of which this was a set.  So that is an

5     issue for another day, Judge, but that's not my concern, and I

6     don't want this deposition schedule to get off.

7          So we will do what we can.  I don't know that I can

8     make it happen five days in advance of deposition, and I don't

9     think that is a fair burden for my client to have to do,

10    particularly given the marginal relevance of documents between

11    2019 and 2022 on a case that is about a 2007 alleged

12    conspiracy.

13         THE COURT:  Well, it is about a conspiracy that

14    continued, Ms. McCaffrey, so I don't agree that nothing that

15    happened after the complaint is not relevant.  It is a

16    continuing violation is what they are alleging, anyway, and

17    there may well be things that people talked about or

18    corresponded about after 2007 or 2017 that are relevant to

19    something that happened in the past.  So I'm not willing to

20    say that nothing is relevant.

21         I think we have made some significant progress here

22    because what he was asking for is way overbroad, and we have

23    limited it now from 60 custodians to ten current custodians

24    and two new custodians.  I don't know how burdensome or how

25    time consuming this is going to be, but it is certainly well

1    less than it originally was.

2          So if you come back to me after you talk to your IT

3    folks and you say, "This is going to take me six weeks to do,"

4    well, then, I don't know, then do I move the discovery

5    deadlines back?  I don't want to do that.

6          MS. MCCAFFREY:  No, Judge, that should not happen,

7    and I will tell you why it shouldn't happen.  We made them a

8    proposal on this back in June.  They sat on that for six

9    weeks, Judge.  So any delay here lays at plaintiff's feet.

10   None of these deadlines need to be kicked, let alone the

11   depositions.  They have the relevant documents.

12         We will do what we can to meet and to try to get

13   productions in, but this delay, if there is any delay, should

14   not rest at Express Scripts' feet.  Moreover, Express Scripts

15   should not be prejudiced by further kicking out these

16   deadlines at this point.  It is time to get to the merits.

17         THE COURT:  I tend to agree with you, Ms. McCaffrey.

18         MR. HAVILAND:  Judge, the electronic discovery

19   protocol requires them, when they say "burden," and counsel

20   has repeatedly said -- they say it is burden.  They have yet

21   to run any term against any custodian to quantify that.

22         THE COURT:  Well, I think that there is a certain

23   amount of burden that goes without saying, right?  So if you

24   ask somebody to run 45 search terms against 12 folks and turn

25   those documents around, segregated and corresponding to

1  discovery requests, and get those to you in two weeks, I don't

2  think I need an affidavit on burden to tell you that that is

3  too burdensome, okay?

4        So I think that a lot of what Ms. McCaffrey is saying

5  rings true.  You have gotten my ruling on what I'm requiring

6  to be done.  I would like a status report from you.

7        MS. MCCAFFREY:  Yes, Your Honor.

8        THE COURT:  How soon do you think you can get me a

9  meaningful status report on when this could be done?

10        MS. MCCAFFREY:  Can I -- I think I need two to three

11  weeks just because of the collection.  The client still isn't

12  in the office, so everything has to be remotely.  Three weeks,

13  and I will try to get it in earlier, Judge.  I will literally

14  walk out of here and call the client and see what we can get

15  started on, if that's okay.  And to be clear, if I'm

16  collecting, we will also be running the search -- three weeks,

17  Judge, if that's possible.

18        THE COURT:  Three weeks for a status report --

19        MS. MCCAFFREY:  Yes, Your Honor.

20        THE COURT:  -- on where you are on the production.

21        MS. MCCAFFREY:  Yes, Your Honor.

22        THE COURT:  All right.  That's done.

23        Mr. Haviland, I cannot do something like you are

24  asking me, which is rule that the defendants answer

25  interrogatories -- the fifth request for production because,

1   as I read through those requests for production, they have

2   responded.  They may not have turned over any documents, but

3   they have voiced objections.  They have said what their

4   objections are and why.

5        I don't know your response to their objections yet,

6   and I have given you discovery 101 early in this case, which

7   is if you want me to rule on specific objections, you tell me

8   which objections you want me to rule on, and you tell me why

9   the objections need to be overruled.

10        I'm not just going to go through, pick up 193 item

11   requests to produce and say "answer these" when there are

12   objections there.  So that request is denied without prejudice

13   to putting together something cogent, okay?

14        MR. HAVILAND:  I will have something to you in a

15   week, Your Honor, because --

16        THE COURT:  Good.

17        MR. HAVILAND:  -- these were served on June 6th,

18   boilerplate objections, which go -- and Your Honor pointed

19   this out in June:  These questions go to the heart of the

20   matter.  Now, they have said, "We have already given you the

21   documents," or sometimes they just, tongue-in-cheek, "We are

22   not going to give it to you."

23        I want to give you an example.  They produced an

24   expert report --

25        THE COURT:  Let me just tell you one thing.  I did

 1   not -- I knew that you had them, but you didn't bring them to

 2   my attention -- I saw them attached somewhere else -- that you

 3   had sent out this fifth request for production.  I did not sit

 4   and go through it.  I didn't because it wasn't in front of me,

 5   but I knew it had to do with bankruptcy documents.

 6          When I looked at the 193 requests that you are

 7   making, I haven't decided one way or the other, but I have

 8   never insinuated to anybody that I think all of those are

 9   proper or that any of them are proper.  I simply said that

10   would be a succinct way to get at these new discrete topics

11   that you want.  Whether you need 193 document productions to

12   get at these discrete topics, you know, I have a gut reaction

13   to that, but I'm not going to rule on it because there is

14   nothing in front of me, okay?

15          MR. HAVILAND:  It couldn't have been in the June

16   hearing, Judge, because they didn't serve the answers until

17   the day before.  So we made reference to it because when the

18   Court was asking about post-complaint and this whole

19   arbitrary -- arbitrary -- selection of a date cutoff -- Your

20   Honor said it, and that's what it is -- they just chose it;

21   they unilaterally said, "We are not going to produce documents

22   after the complaint" -- we had served these --

23          THE COURT:  It seems to me that that fifth request to

24   produce deals with bankruptcy.  Again, I didn't study it

25   because there was 193 there, right?  I think they deal

1    predominately with the bankruptcy documents, don't they?

2         MR. HAVILAND:  What they deal with, Judge, is the

3    contract, drafts of contract, the new proposed contract.

4         THE COURT:  Right, everything that came out of the

5    bankruptcy.

6         MR. HAVILAND:  Everything in the divorce.

7         THE COURT:  Right.  Absolutely.  Okay.

8         So I understand that.  That's all new information,

9    and I do think that that, to the extent those are relevant,

10   that that is the way to get at this new information, but I

11   think 193 is -- you know, I just think you guys need to work

12   that out somehow and bring to me what your issues are.

13        MS. MCCAFFREY:  Judge, we will respond to that.  The

14   bankruptcy is not relevant.  If he files a motion to compel,

15   we will provide the basis for that, Your Honor.

16        THE COURT:  Let me tell you -- I'm just going to give

17   you a brief overview.  I think that there are certain parts of

18   the bankruptcy -- information that came out of the bankruptcy

19   that are relevant, and I think you have hit on them.

20        MS. MCCAFFREY:  Yes, we have.

21        THE COURT:  You have agreed to give them the

22   testimony on these two, negotiation of your old contract and

23   the negotiation surrounding the new contract or information

24   you have on the new contract.

25        Now, I don't know if there are other things that came

1    out of the bankruptcy that might be relevant because I'm not

2    involved in the bankruptcy, okay?  But I would think that to

3    the extent that there are things that go to your client's

4    involvement with Mallinckrodt such that you were intimately

5    involved with their decisions on Acthar pricing, that could be

6    relevant.  I don't know if these documents say that.

7           MS. MCCAFFREY:  But, Your Honor, that's not -- first

8    of all, that's not even what these requests -- look, we will

9    respond to an actual motion to compel.  That's not what those

10   were.  That's not what this is about.  I'm struggling with how

11   that, then, overlays with the full supplementation of all the

12   four other requests for production that we are now producing.

13   It all seems duplicative to me at this point.  We will take a

14   look.  We will see what we can do.  So I will provide Your

15   Honor with our bases for why all of that, but except to what

16   we have talked about is irrelevant.

17          THE COURT:  Right.  Many of those things may be

18   relevant, I don't know, but --

19          MR. HAVILAND:  Judge --

20          THE COURT:  -- there needs to be -- there definitely

21   needs to be a meet-and-confer about this, and I don't know

22   that there has been, and by a meet-and-confer, I mean each one

23   of these requests, why it's relevant, and, you know, something

24   other --

25          MR. HAVILAND:  We will do that.

1           THE COURT:  Okay.

2           MR. HAVILAND:  So let me just say, Judge, that these

3    parties tried to get an Article I judge to moot this case.

4           THE COURT:  I know.  I have heard that.  I am

5    intimately familiar --

6           MR. HAVILAND:  They tried to get the bankruptcy

7    judge, and --

8           THE COURT:  -- with what they asked.

9           MR. HAVILAND:  -- they failed.  So how they got to

10   that failure is how we get to the end of this case.

11          THE COURT:  But here is the thing, Mr. Haviland:  I

12   understand you believe deeply in your case.  Defense counsel

13   believes deeply in her case, okay?  What you are doing that is

14   frustrating me and that is not in you or your client's best

15   interests is you are asking me to do your work, and I am not

16   going to do your work.

17          You did not sit down with defense counsel and go

18   through those interrogatories or those requests to produce and

19   limit them to a succinct number of interrogatories or requests

20   to produce that you want me to rule on and why I should

21   overrule the objections.

22          I'm not going to do your work for you, and if you

23   don't do it, we are going to move on to the next issue.

24   That's what frustrates me.

25          MR. HAVILAND:  I will sit down with Ms. McCaffrey for

1     as long as it takes to go through every one of these requests

2     and explain our position and have her explain her objections.

3     We will codify that in a mutual submission, and then we will

4     move if appropriate.

5          THE COURT:  Right, and I can sit here and I can go

6     through them, one, two, three, four; overruled, sustained,

7     overruled, sustained.

8          MS. MCCAFFREY:  Well, hopefully, it is not through

9     193, Judge, but we will see what we can do.

10          MR. HAVILAND:  Well, we are going to go through them

11     all, Judge.

12          THE COURT:  Well, you are going to go through all of

13     them, but I certainly hope that there is going to be some

14     agreement on some of them.  I have already indicated

15     essentially what I think is relevant from that, but my ears

16     are open once the work is put into it.

17          I looked at the joint statement that the parties

18     filed on the depositions.  It looks like we are starting.  We

19     had a July 26th deposition of Mr. Shirey.  It looks like we

20     have got something scheduled to go August 18th.

21          MR. HAVILAND:  Right.

22          THE COURT:  And I want the parties to stick to that.

23     It looked like there were some open issues.

24          MS. MCCAFFREY:  I think there are two, Judge.

25          One is with respect to, I think the day we submitted

1    this filing, plaintiff identified an additional nine witnesses

2    that it is seeking to depose.  We had understood and asked

3    plaintiff to provide the complete list of witnesses it

4    intended to depose back in end of April, early May, and we got

5    nine additional witnesses July 20th, when this was filed.

6         This is turning into extremely burdensome,

7    particularly, Judge, because plaintiffs are limited to 50

8    depositions in the case.  When you combine that with the

9    depositions that have already occurred, as well as the

10    depositions of Mallinckrodt, there is no way we are under the

11    50 limit right now.  So I guess we are asking for guidance

12    from the Court here.

13         We understood that plaintiff was expected to provide

14    everything they wanted so that we could get the schedule

15    nailed down.  Nine new additional witnesses is going to be

16    difficult.

17         MR. HAVILAND:  Judge, they are not new.  In December

18    of 2019, we gave this defendant a list in a long -- and, by

19    the way, we are not asking for all those deponents.  What we

20    did is we gave defense counsel the senior people, Mr. Paz,

21    Mr. Wentworth, Mr. Neville, so that they could get working on

22    that schedule because they are the apex.  Your Honor has heard

23    that argument, how difficult it is to schedule those.

24         What you had is after we finished our class cert,

25    which was a mammoth test to get done, we gave them the

1    complete list of the 20.  Now, they are not new.  They were

2    always deponents that were noticed and properly -- by the way,

3    they were scheduled, Judge, before COVID.  They were

4    scheduled.  And you heard from Mr. Shapland.  He is working

5    cooperatively on that same list.  We are working with him to

6    winnow that down to the extent folks have left.  But none of

7    these people are new, Judge.

8            THE COURT:  There is 20 deponents for Express Scripts

9    defendants?

10           MR. HAVILAND:  Yes, there are the 12 we talked

11   about --

12           THE COURT:  Right.  And then there is eight more?

13           MR. HAVILAND:  -- and eight formers.

14           THE COURT:  All right.  So there is 20.

15           Were those, in fact, scheduled before COVID?

16           MS. MCCAFFREY:  No, they weren't.  They weren't.

17           THE COURT:  Did you have the list of 20 before?

18           MS. MCCAFFREY:  They provided a list in December of

19   2019, Judge, if you remember.  There were like 50-something

20   witnesses.

21           THE COURT:  Right, and we had to cut them down.

22           MS. MCCAFFREY:  And we had to cut them down.  These

23   people weren't on that list.  So what we went back to -- and,

24   frankly, okay, December 2019, plaintiff's counsel is telling

25   you this is a whole new case.  When we sent them a note in

1    April, consistent with Your Honor's order that we get depos

2    scheduled, and we say who do you want to depose, they didn't

3    identify these people.

4         So I don't know why they weren't identified then,

5    which is making it difficult.  This is 20 -- I think 22 grand

6    total that I think we are looking for.  Obviously, the

7    30(b)(6) is separate.  There have already been 13 depositions?

8              MR. HAVILAND:  Four.

9              MS. MCCAFFREY:  Sorry?

10             Thirteen-something, around 13 depositions that

11   occurred prior to COVID.  And then we have got -- I think

12   there are close to 29 Mallinckrodt witnesses that we are

13   talking about.

14             So we are supposed to be at 50.  We asked them to

15   give the full list.  They don't give it until after

16   this -- you know, right when this filing is going in, and now

17   we are kind of between a rock and a hard place.

18             THE COURT:  Well, it is limited to 50, Mr. Haviland.

19             MR. HAVILAND:  Right.

20             THE COURT:  And so you better make sure that between

21   Mallinckrodt and Express Scripts it is 50.

22             MR. HAVILAND:  We understand that.

23             THE COURT:  And we have got 20 here that go all the

24   way up to October 20th.  You know, to the extent that those

25   additional -- what are they, eight?

1          MS. MCCAFFREY:  Nine.

2          THE COURT:  -- nine, that those additional nine fit

3    within your 50 total, I mean, there is only so many days

4    between now and October 18th.

5          MR. HAVILAND:  Judge, there was seven that we gave

6    them after we filed our class.  I don't know where they get

7    nine.  It is seven that were on the original list.  But it's

8    20.  It's 20.

9          And, Judge, Judge Johnston spent an entire day with

10   the parties working out limits, 50.  Seventy-five

11   interrogatories we are going to get to.  And we are governed

12   by that.

13         THE COURT:  Okay.  Good.

14         MR. HAVILAND:  So for Express Scripts to be pointing

15   to another now third party and saying, "Hey, what we work out

16   there," we know what the limit is.

17         THE COURT:  Perfect.

18         MS. MCCAFFREY:  But the limit is 50.  If you take

19   into this along with what he is noticing with Mallinckrodt, we

20   are over 50.

21         THE COURT:  Yes, it does seem like it.

22         MS. MCCAFFREY:  We are definitely over 50.

23         MR. HAVILAND:  Judge, I will tell you it is 25 and

24   25, and let me tell you how because it is simple math.  Here

25   is who we deposed from Express Scripts:  Earl English, Nick

1   Black, Beth Wright, Bill Shirey last week.  That is four.  The

2   corporate designee is five.  Twenty, 25.  We may have 25 or

3   less with Mr. Shapland.  I don't know whether we are going to

4   get there, but we have 25.

5          MS. MCCAFFREY:  He has proposed 29.

6          MR. HAVILAND:  But, Judge, as Mr. Shapland pointed

7   out, he doesn't represent folks --

8          MS. MCCAFFREY:  Judge --

9          MR. HAVILAND:  Excuse me.  Can I finish?

10         Third party practice is going to implicate whether or

11  not we are going to pursue.  I have listened to Mr. Shapland

12  because he calls me and tells me his problems, as we have with

13  one of our witnesses who just doesn't want to be bothered, and

14  we have told defense counsel, "You are going to have to

15  subpoena them."  But at some point, counsel have to make that

16  call.  If Mr. Shapland says, "These folks are beyond the

17  pale," we will have to decide whether we pursue that in the

18  next 90 days.  But we have said 25 for them, and I don't know

19  that we get to 25 with Mr. Shapland, but that's for them and

20  another day.  But to say that we are at 50, we are not at 50.

21  We have had four Express Scripts depositions, four.

22         MS. MCCAFFREY:  Well, but this is the problem.  He

23  keeps on defining it as Express Scripts.  He is limited to 50,

24  regardless of who the depositions are, Judge.  That's my

25  concern.

1          MR. HAVILAND:  No, that's not the case, Judge.  We

2   have third party practice.  Judge Johnston was very clear that

3   the party burden -- the party burden -- was 50.  If we have to

4   go out and get a third party subpoena of a consultant, whether

5   or not we take that deposition -- I can go back and read the

6   order -- it's 50 because these parties argued that it was a

7   party burden.

8          MS. MCCAFFREY:  It is 50 depositions per group,

9   Judge.  Each group was defined:  Plaintiffs, Mallinckrodt,

10  Express Scripts.  Each group gets 50.

11         THE COURT:  Yes, I thought we went through this

12  already.  I went back and read that --

13         MS. MCCAFFREY:  You did in December.  I can refer you

14  to it, Judge.

15         THE COURT:  I went back and read the transcript.  I

16  actually talked to Judge Johnston, too, and said, "What did

17  you mean when you said that?"  And he said, "I meant what I

18  said."

19         MS. MCCAFFREY:  Exactly.  It's at 307.  You ruled on

20  it February 7th, 2020.

21         THE COURT:  Yes.

22         MR. HAVILAND:  Judge, we are counting against the 50

23  that haven't been committed to.

24         THE COURT:  Right.

25         MR. HAVILAND:  Okay.  So we are not there yet.  I

1   guarantee you if we get to 49, one of these counsel is going

2   to say we are at 49.

3           MR. SHAPLAND:  And just for the record, Your Honor, I

4   appreciate the point that Mr. Haviland just made.  He hasn't

5   taken the depositions of the 29 individuals he has asked for

6   among former and current Mallinckrodt executives and board

7   members, but that's the number.  Twenty-nine are on the list

8   right now, and six occurred before the bankruptcy.  Six

9   Mallinckrodt folks have been deposed.  So, you know, from the

10  Mallinckrodt side of things, we are at 35, talking about

11  reaching all the way up to 35.

12          THE COURT:  Which may be another reason why you just

13  want to accept the transcripts on those.

14          MR. HAVILAND:  Sorry?

15          MS. MCCAFFREY:  Judge --

16          MR. HAVILAND:  And we might, Judge.  Look, that's a

17  reality, yes.

18          MS. MCCAFFREY:  If I may, so I understand your ruling

19  on this, Judge, to be to try to figure out if we can get dates

20  for these witnesses.  We will try to do that.

21          The second issue relates to Mr. Osborne.  Mr. Osborne

22  has been deposed by plaintiff's counsel two times, so over 14

23  hours.  There was an agreement at the end of the last

24  deposition in the fall of 2020 that Mr. Osborne would be made

25  available for an additional two hours of deposition.

1   Mr. Osborne has since left CuraScript, so he is no longer with

2   the company.  He has moved over to Switzerland.  He is working

3   for a new company.  He has agreed to come to London, which

4   helps -- frankly, helps plaintiffs because, if not, he has got

5   to go through the Hague in Switzerland and to sit for two

6   hours of deposition per our agreement.  Plaintiff's counsel

7   has not committed to limit the deposition to two hours.

8            THE COURT:  It is limited to two hours.

9            MS. MCCAFFREY:  Thank you.

10            MR. HAVILAND:  Your Honor, we want his custodial file

11   so we can do it in two hours because Mr. Osborne was pointed

12   by the president of CuraScript as the guy who knows about

13   these divorce issues.

14            MS. MCCAFFREY:  So, Judge, here is the other problem.

15   This is the problem with the proposal.  You know who is not on

16   his 12 custodians that he identified?  Mr. Osborne.  This is

17   what I'm concerned about.

18            MR. HAVILAND:  Twenty-one then.

19            MS. MCCAFFREY:  So now I have got to add another one

20   to the list of people.  I'm worried we are going to be coming

21   back.

22            THE COURT:  We are not running search terms against

23   Mr. Osborne because he is -- or is he on the list of who you

24   asked?

25            MS. MCCAFFREY:  He is not.

 1          THE COURT:  He is not on the 12, so we are not

 2    running search terms on that.

 3          MR. HAVILAND:  Beautiful.

 4          THE COURT:  We can't keep moving the goalposts.  I

 5    mean, if you wanted him, why wasn't he on the list?

 6          MR. HAVILAND:  It was an oversight, Judge.  We are

 7    really busy, and Mr. Osborne --

 8          THE COURT:  So am I.

 9          MR. HAVILAND:  -- is out of the queue now.  So there

10    we go.

11          THE COURT:  I mean, certainly to the extent there are

12    questions about --

13          MR. HAVILAND:  The reason why it was an oversight,

14    Judge, and I want it to be clear, because he is still under

15    oath.  To say that we have to go into the Hague, the

16    deposition did not conclude.  What we were giving defense

17    counsel was a list of the folks that had not been deposed --

18          MS. MCCAFFREY:  Judge --

19          MR. HAVILAND:  -- and that's why that list was

20    important to get those deposed.  Counsel freely reached out,

21    realizing that there was a commitment to bring him back

22    because we didn't complete.  He wasn't deposed twice.  He was

23    deposed once.  He was deposed in Local 542 about the issues in

24    that case.  He was deposed once here, and we didn't finish,

25    and we had told counsel we wanted two days.

1          MS. MCCAFFREY:  No.  Judge --

2          THE COURT:  Does Mr. Osborne have intimate knowledge

3    about the renegotiation of these contracts?

4          MS. MCCAFFREY:  Yes.  This is the problem, Judge.  He

5    was a custodian we proposed to give them to supplement in May.

6    They rejected that, okay?  And he has already sat for a

7    deposition for 14 hours.  We have agreed to coordinate

8    discovery across the cases, Judge.  Counsel is on the record

9    on that back in 2019.  So he has had 14 hours.

10         There was an agreement at the end of the last one to

11   give two hours.  Mr. Haviland is on record as agreeing to

12   those two hours.  Mr. Osborne, yes, he is certainly relevant

13   to the purpose of the CuraScript -- the termination of the

14   CuraScript relationship, for lack of a better term, but that's

15   the problem with this scattershot approach and a reply that

16   I'm concerned about.  We had already proposed Mr. Osborne

17   because we were looking to identify the discrete set of

18   relevant custodians, and plaintiff said no, and this is what

19   they have come back on.  So do they want to drop another

20   witness?

21         MR. HAVILAND:  He is the one that they identified.

22   Last week the president said you have to talk to him, but we

23   won't get his documents.

24         MS. MCCAFFREY:  Well, then why wasn't he included in

25   this list, Judge?  He can drop another custodian.

1      MR. HAVILAND:  I can explain why.  We were giving

2 them the list of the folks that had not been deposed before,

3 not somebody that was attached already for deposition.

4      MS. MCCAFFREY:  That is not what this says.

5      MR. HAVILAND:  He was coming back by agreement.  He

6 was coming back by agreement, and now he is in Switzerland,

7 and they are going to say we are going to the Hague?

8      THE COURT:  He is coming to London.

9      I still don't understand how you are getting

10 documents related to the two agreements.  Are they covered by

11 the search terms?

12      MR. HAVILAND:  Well, not if they don't search

13 Osborne.

14      THE COURT:  Well, even if you search Osborne, are the

15 existing search terms going to pick up?

16      MS. MCCAFFREY:  The "wholesale product" search term

17 may get it, Judge.  "Acthar," obviously.  I mean, this is the

18 drug that is distributed under it.

19      MR. HAVILAND:  And "Mallinckrodt."

20      MS. MCCAFFREY:  Again, we need a proposal to get

21 this.  Two months, Judge.

22      THE COURT:  "Acthar" is in the agreement?

23      MS. MCCAFFREY:  I believe "Acthar" is in the

24 agreement.

25      THE COURT:  So it will be there.

1        MS. MCCAFFREY:  It should be there, Judge, as well as

2    the actual -- it is "wholesale product" whatever.  That's the

3    title of this contract.

4        MR. HAVILAND:  And, Your Honor, Mr. Osborne has left

5    the company, as have a number of other witnesses.  So the

6    burden is finite.  These folks left in 2020, 2021.  So it is

7    not like they have got a current file.  They are going to a

8    closed-out file to pull those documents, and Mr. Osborne

9    should be included or we are wasting our time.

10        MS. MCCAFFREY:  So now we are adding more custodians.

11        MR. HAVILAND:  No, Judge, it is covered by our

12    document requests, okay?  It is covered by our document

13    requests.  We have a standing document request.  I will never

14    forget the first day Judge Johnston asked, "What do you want,

15    Mr. Haviland?"  And I said, "I want the contract documents."

16        MS. MCCAFFREY:  He has the contract, Judge --

17        MR. HAVILAND:  And they were ordered -- no, no, we

18    had an order of this Court that the contract documents related

19    to that contract be produced, and that's an ongoing

20    obligation.  We don't have to chase custodians.  If he is the

21    guy, then they should produce him.

22        THE COURT:  Yes, if he is the guy that was involved

23    in renegotiating or attempting to renegotiate that contract, I

24    don't think we can --

25        MS. MCCAFFREY:  Judge --

1      THE COURT:  I thought you said he was?

2      MS. MCCAFFREY:  He was one of them.  He was one of

3  them, and the others are included here.  Christie Vivod, for

4  example, was also involved in the negotiations around this

5  contract.  So he is not the guy.  There are several people

6  that are already here but --

7      MR. HAVILAND:  Mr. Shirey testified last week he is

8  the guy.  He is the president.  He said he is the guy.

9      THE COURT:  I don't know if he is the guy or not, but

10  he knows about the renegotiation of the contract.  So get the

11  documents related to the renegotiation.

12      MS. MCCAFFREY:  The renegotiation of the contract.

13  So any production from Mr. Osborne is limited to the

14  renegotiation of the contract?

15      THE COURT:  Yes.

16      MS. MCCAFFREY:  Understood.

17      THE COURT:  All right.  Anything else?

18      What do we do about a -- do we want to schedule a

19  next in-person?

20      MR. HAVILAND:  So, Your Honor, we do have our rog

21  issue that was included in our motion to compel.

22      MS. MCCAFFREY:  I understood that to be denied.

23      THE COURT:  I'm denying it because you didn't do what

24  you need to do.  So you can bring --

25      MR. HAVILAND:  On the interrogs?

1      THE COURT:  I mean, I am denying it without prejudice

2  to re-bring it once you have a meet-and-confer and you outline

3  for me why I should overrule whatever objections you can't

4  agree on, right?

5      MR. HAVILAND:  I'm sorry, Judge, I thought that was

6  the fifth request for production.

7      THE COURT:  It is all of them, right?

8      So my understanding about the interrogatories, are

9  you asking me to just order that they update, or are you

10  asking me to overrule objections?

11      MR. HAVILAND:  Yes.  So we want responses, Judge.  I

12  have a letter attached to my affidavit as Exhibit P, which

13  takes all their objections.  It is a six-page letter.  It

14  walks through them.  It points out to the Court how the

15  interrogatories we are asking are the same ones they asked of

16  my client that we agreed to update and did.  I don't know what

17  more I can do.  As to the -- and I can tell you what the

18  letter says.  As to the burden objection --

19      THE COURT:  Which --

20      MR. HAVILAND:  Exhibit P to my affidavit.

21      THE COURT:  Exhibit E to the --

22      MR. HAVILAND:  P -- I'm sorry -- as in Paul.

23      THE COURT:  Let me get to it.

24      MS. MCCAFFREY:  Judge, I want to be clear.  What we

25  actually responded to Mr. Haviland was that we provided these

1   responses and objections in July of 2020.  Plaintiff raised a

2   dispute with them in response to our request and

3   identification of their deficient interrogatory responses.

4   They demanded supplementation within a couple of days.

5           What we told them we would do is we would look at

6   these interrogatories.  We would look to see what could or

7   could not be supplemented.  We anticipated that much of this

8   was going to be -- would relate to expert discovery and expert

9   reports in this case and that likely the appropriate approach

10  here would be to supplement the interrogatory responses once

11  we have served our expert report, which is exactly what

12  plaintiffs themselves did --

13          MR. HAVILAND:  In November, Judge, in November.

14          MS. MCCAFFREY:  -- the difference being that

15  plaintiff's counsel provided a response, recognized they were

16  deficient almost as soon as they were provided and provided an

17  updated response a month later, after their expert report was

18  filed.

19          MR. HAVILAND:  Judge, I don't --

20          MS. MCCAFFREY:  What I anticipate our position being,

21  again, we are talking 40 -- 51 interrogatories --

22          THE COURT:  Let me get to them first.  I'm trying

23  to -- where are the --

24          MR. HAVILAND:  So, Your Honor, Exhibit G is the

25  actual responses, G as in George, and P is my letter.  We have

1    75 interrogatories ordered by the Court.  They have not

2    answered -- have not answered -- 35 of them.

3             THE COURT:  Okay.  They haven't answered them

4    because they --

5             MR. HAVILAND:  Objected.

6             THE COURT:  -- objected.

7             I'm now at the --

8             MR. HAVILAND:  But I addressed -- so we had a

9    meet-and-confer at the same time that the claimed deficiencies

10   of my client's response were directed, and we agreed to answer

11   the questions and did.

12            What they have not done is committing to amend any.

13   We are hearing, "Wait till November, after the close of

14   discovery, when we get an expert report."

15            MS. MCCAFFREY:  That's actually not what we said.

16            MR. HAVILAND:  It would take away the device of the

17   interrogatory that the Court gave us.  These questions go to

18   the heart of the matter, Judge.  They go to -- and I can walk

19   through them.

20            THE COURT:  No.  Okay.  Here is the thing --

21            MR. HAVILAND:  And their responses just --

22            THE COURT:  -- I started going through these.  I do

23   agree that these need to be updated, that a number of these

24   issues are issues that Mr. Haviland identified as information

25   he was -- I mean, I just took a look at a couple of them, and

1    I didn't even get through all of them.  I flagged them.

2         All drugs that competed with Acthar during the

3    relevant time period, I thought Mr. Haviland had said that

4    there was some developments in that recently with respect --

5         MR. HAVILAND:  Yes, they signed a contract.  Judge,

6    that answer is deficient because it says there is none.

7         MS. MCCAFFREY:  Judge --

8         MR. HAVILAND:  So it has to be updated.

9         MS. MCCAFFREY:  Judge, we haven't refused to answer

10   these.  I have said give me an opportunity.  That's it.

11   That's all we are asking for.

12        THE COURT:  Right.  So that's my point is that I

13   don't think this is ripe to discuss, the interrogatories, the

14   requests to produce.  I want a meet-and-confer.  I have said

15   it before.  I'm saying it again.  I want a meet-and-confer on

16   them.  To the extent that defendants are going to stand on

17   their objections, I want you to file a motion telling me why

18   the objections are inappropriate.

19        MR. HAVILAND:  We will do it again, Judge.

20        THE COURT:  Well, you haven't done it yet,

21   Mr. Haviland.

22        MR. HAVILAND:  Judge, my July 20th letter lays out

23   the meet-and-confer.  It is right there.  I am going to do it

24   again.  We will do it again.  We will go through every single

25   objection.  I couldn't have done it better.  Burdensome, we

1    explained why they haven't articulated it.  We are asking

2    questions of four entities.  That's for them to decide.  It's

3    all here.  It is the subject of expert testimony.

4         Let me just touch that one.  They filed an expert

5    report in bankruptcy.  We have asked about that.

6         THE COURT:  It is not the subject of expert

7    testimony.  It is not.  That is not --

8         MR. HAVILAND:  I'm sorry?

9         THE COURT:  I'm saying that it's not the subject of

10   expert testimony.  You are entitled to get those answers.  You

11   are going to have a meet-and-confer.  I'm going to hear why

12   some of these things are not appropriate or whatever, and I'm

13   going to rule on it, but it is not teed up the way it should

14   be.  End of story.

15        All right.  Are we going to do another in-person?

16        MS. MCCAFFREY:  Judge, I think there is one other

17   issue.

18        MR. LYTTLE:  Your Honor, just two quick issues.  I

19   know it has been a long day.

20        Number one, there is a suggestion about the

21   depositions from the bankruptcy case.  We, obviously, think

22   those are fully admissible at trial.  I don't expect you to

23   rule on that.  I just want the record clear that you have made

24   no ruling at trial on the admissibility of those depositions

25   taken in the bankruptcy court.

1          THE COURT:  I have never even seen them, so --

2          MR. LYTTLE:  Thank you.

3          MR. HAVILAND:  And we object, Judge.  Just so the

4    record is clear, we object to that.

5          MR. LYTTLE:  The second point, Your Honor, is we are

6    trying to find a deposition date for their class cert expert,

7    and we proposed a couple of dates in mid-August.  Mr. Haviland

8    came back.  I guess those didn't work.  He proposed some dates

9    at the end of August.  Those don't work for us because of

10   vacations and a 20th wedding anniversary, Your Honor.  So I

11   would like to -- well, I think we are going to continue to

12   work on that.  I'm not asking to rule.  But there is a cutoff

13   for that, I believe, at the end of August.  If that date slips

14   into September, which is fine with us, are you okay with the

15   parties by consent agreeing to depose Dr. Comanor -- am I

16   saying that right?

17         MR. HAVILAND:  Comanor.

18         MR. LYTTLE:  -- Comanor in September?

19         THE COURT:  I don't have a problem with that.

20         MR. HAVILAND:  So, Your Honor, here is the issue.  We

21   have given them the entire week of the end of August.

22   Dr. Comanor teaches at the UCLA, and the moment you turn the

23   calendar, everything changes.  I haven't asked him about

24   September because of the cutoff.  I have no problem with

25   giving them that entire week, but Dr. Comanor doesn't have the

1    flexibility as a teaching professor in September.

2            If they were to propose -- so I responded back -- I

3    don't know why we are doing this on the record -- and gave

4    them an entire week, a whole week, to pick a date, and they

5    couldn't pick one.

6            THE COURT:  That's in August?  Because he is going on

7    vacation for his wedding anniversary.

8            MR. HAVILAND:  I get that, Judge, but I didn't hear

9    that.  I didn't hear that.

10           THE COURT:  Well, you heard it now.

11           MR. LYTTLE:  Your Honor, I think we actually have

12   accepted September 2nd, which is actually in that week.  So I

13   haven't heard back.  Maybe we have got an agreement.  That

14   would be great.

15           MR. HAVILAND:  I didn't talk to the professor about

16   September 2nd.

17           THE COURT:  So remember -- do you guys remember --

18           MR. LYTTLE:  You just said the entire week.

19           THE COURT:  Stop.

20           I'm going to end our little session here with sort of

21   a little tip, okay?

22           Do you remember the minute entry that Judge Johnston

23   entered when he started reviewing some of this?

24           MR. HAVILAND:  I do.

25           THE COURT:  He basically said he is going to come in

1    here, and he is going to -- I mean, all it is going to take is

2    for me to show him the transcript of what goes on in this, and

3    you are going to have a district judge calling you in, and

4    this is going to stop.  You are going to get no more rulings

5    from me.  You are going to get no more rulings from anyone.

6    He will stop it.  And I don't know if either side wants that.

7           But I mean this is becoming really, really

8    ridiculous -- I mean, ridiculous -- that two firms like this

9    behave like this.  I have never seen it before.  And it is

10   going to stop because my patience is running out.  I mean, I

11   am pretty willing to assist the parties in resolving issues,

12   but being thrown this kind of stuff -- people filing things

13   without leave of Court, people disregarding what I say -- I

14   mean, at some point, my patience will run out, and then this

15   whole exercise will stop for both sides.

16          So you guys need to step back, step down, and think

17   about if that's what you really want because it can't

18   continue.  I am not going to sit here and look through 196

19   interrogatories and rule on every single one.  I'm just not

20   going to do it, and I don't know of any judge that would do

21   that without specific objections and case law citations and

22   several meet-and-confers in person where the two main parties

23   are meeting, not associates, and trying to resolve it.  That's

24   all I'm going to say on it.

25          I'm going to set a next status for a month.  If the

105

1   parties need to come in sooner, let me know.

2           MS. MCCAFFREY:  Is that the 7th, Judge?

3           THE COURT:  I'm just looking to see if we can do the

4   7th.

5           I cannot do the 7th.

6           We can do it Thursday, the 8th, Veronica, at 11:00?

7           THE CLERK:  Yes, we can do that, Your Honor.

8           MS. MCCAFFREY:  That's fine for us.

9           THE COURT:  That may be a day you guys have already

10  set for depositions.

11          MS. MCCAFFREY:  We actually do.  We have got a

12  deposition on September 8th in St. Louis.

13          THE COURT:  Well, let's not do that, then.  I don't

14  want to --

15          MS. MCCAFFREY:  Well, there are also lots of

16  attorneys.  So I imagine --

17          MR. HAVILAND:  I don't know if that is a Rockford

18  witness, in which case we would be here.

19          MS. MCCAFFREY:  No, it is Bill Martin in St. Louis.

20          THE COURT:  I could do Friday, the 9th.

21          MS. MCCAFFREY:  That's fine.

22          MR. HAVILAND:  Let me just check, Judge.

23          THE COURT:  And we don't need to do an in-person if

24  there is -- I mean, we can wait and schedule it if there is

25  something that needs to be argued.

 1           MR. PLATT:  Your Honor, may I make a suggestion?  I

 2    know that we have like three or four Rockford witnesses being

 3    deposed the week of the 20th of September.

 4           MR. HAVILAND:  That's late.

 5           MS. MCCAFFREY:  That's late.

 6           MR. PLATT:  But if it is necessary, and we can't -- I

 7    mean, I don't know if you want to have it in-person.  If you

 8    want to have it over the phone instead, it would save --

 9           THE COURT:  I just don't want to get into a situation

10    where we are having a long argument on written discovery.  I

11    don't want to do that over the phone.  That is just too

12    difficult.

13           If we are just going to have a status and we are not

14    going to be arguing motions, there is no reason to do it in

15    person.  So I don't want to set these things up to make -- you

16    guys already have a completely full schedule on this case.

17    I'm willing to hold off --

18           MR. HAVILAND:  Judge, the week of the 29th is open.

19    I mean, that's --

20           THE COURT:  I'm sorry?

21           MR. HAVILAND:  The 29th, there is nothing scheduled.

22           THE COURT:  The 29th of when?

23           MR. HAVILAND:  August.

24           THE COURT:  I'm out that week.  Sorry.

25           MS. MCCAFFREY:  Judge, to credit your point, how

1  about why don't we aim for September 9th.  Maybe we can

2  try -- hopefully, we will resolve the issues, and if there are

3  limited disputes, maybe we can do it over the phone.

4          THE COURT:  Absolutely.

5          MS. MCCAFFREY:  And then if we are not able to do

6  that, Mr. Platt is correct, there will be some contingent here

7  in Rockford in person in September that if we need any further

8  additional guidance from the Court, maybe we can do it in

9  person at that point.

10          THE COURT:  Let's do a placeholder for September 9th,

11  for a next status, at 11:00 o'clock.  The parties will let me

12  know no later than the 6th whether they want to do that in

13  person or by telephone, and you can just file something or let

14  Veronica know.

15          MS. MCCAFFREY:  Okay.

16          THE COURT:  Okay.

17          MR. HAVILAND:  Thank you, Your Honor.

18          MS. MCCAFFREY:  Thank you, Your Honor.

19          MR. PLATT:  Thank you.

20     (Which were all the proceedings heard.)

21                          CERTIFICATE

22     I certify that the foregoing is a correct transcript from

23  the record of proceedings in the above-entitled matter.

24  */s/Heather M. Perkins-Reiva*          *August 8, 2022*
    _____          _____

25  Heather M. Perkins-Reiva                    Date
    Official Court Reporter