**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| **CITY OF ROCKFORD** *on behalf of itself and all others similarly situated*, | |
| Plaintiff, | Civil Action No.: 3:17-cv-50107 |
| v. | District Judge Iain D. Johnston |
| **MALLINCKRODT ARD, INC.,** *formally known as* **QUESTCOR PHARMACEUTICALS, INC.; MALLINCKRODT PLC; EXPRESS SCRIPTS HOLDING COMPANY; EXPRESS SCRIPTS, INC.; CURASCRIPT, INC.,** *doing business as* **CURASCRIPT, SD; ACCREDO HEALTH GROUP, INC.,** *and* **UNITED BIOSOURCE CORPORATION** | Magistrate Judge Lisa A. Jensen |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
***RENEWED* MOTION FOR CLASS CERTIFICATION**
<u>**AS TO THE EXPRESS SCRIPTS DEFENDANTS**</u>

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT………………………………………….……….1

II.    RELEVANT FACTUAL BACKGOUND……………………………………………..2

    A.  The Exclusive Specialty Distribution Arrangement for Acthar………………………2

    B.  The Synacthen and BioVectra Acquisitions………………………………………..6

III.    ARGUMENT………………………………………………………………...…8

    A.  The Court's Inquiry on Class Certification…………………………………………8

    B.  The Proposed Class Satisfy the Rule 23 Prerequisites………………………………..9

        1.  Standards for class certification…………………………………………9

        2.  The proposed classes satisfy the Rule 23(a) prerequisites………………………..9

            a.  The proposed Classes, as defined, are readily ascertainable…………………9

            b.  The Class members are sufficiently numerous……………………………...10

            c.  Common questions of law and fact exist under Fed. R. Civ. P 23(a)(2)…….10

            d.  The requirement of typicality is satisfied………………………………….……12

            e.  The proposed Class representatives are adequate…………………………....12

        3.  Certification Is Appropriate Under Rule 23(b)…………………………………..13

            a.  The proposed Classes satisfy Rule 23(b)(2)…………………………..…..13

            b.  The proposed Classes satisfy Rule 23(b)(3)…………………………..…..14

                i.  Predominance is easily satisfied………………………………..14

                ii.  Class certification is a superior litigation device……………………15

IV.    CONCLUSION…………………………………………………………….……15

i

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997) ............................................................................................... 14

*Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*,
 568 U.S. 455 (2013) ......................................................................................... 11, 8

*Arreloa v. Godinez*,
 546 F.3d 788 (7th Cir. 2008) ................................................................................. 14

*Beacon v. SpeedyPC Software*,
 907 F.3d 1018 (7th Cir. 2018) ..................................................................... 2, 8, 15

*Bzdawka v. Milwaukee Cty.*,
 239 F.R.D. 469 (E.D. Wis. 2006) .................................................................. 10, 12

*Chevalier v. Baird Savings Sav. Assoc.*,
 72 F.R.D. 140 (E.D. PA. 1976) ............................................................................. 11

*Eggleston v. Chi. Journeyman Plumbers' Local Union No. 130*,
 657 F.2d 890 (7th Cir. 1981) ............................................................................ 12-13

*Erwin v. Os Rest. Servs., Inc.*,
 632 F.3d 971 (7th Cir. 2011) ................................................................................... 8

*Hawaii v. Standard Oil Co. of Cal.*,
 405 U.S. 251 (1972) ................................................................................................. 9

*Hubler v. Chevrolet, Inc. v. Gen. Motors Corp.*,
 193 F.R.D. 574 (S.D. Ind. 2000) .......................................................................... 10

*In re Corrugated Container Antitrust Litig.*,
 642 F.2d 195 (5th Cir. 1981) ................................................................................. 13

*In re Epipen Mktg. Sales Practices & Antitrust Litig.*,
 2020 U.S. Dist. LEXIS 40789 (D. Kan. Mar. 10, 2020) .................................... 2, 9

*In re Ready-Mixed Concrete Antitrust Litig.*,
 261 F.R.D. 154 (S.D. Ind. 2009) ....................................................... 11, 12, 14, 15

*In re Syngenta AG MIR 162 Corn Litig.*,
 2016 U.S. Dist. LEXIS 132549, 2016 WL 5371856 (D. Kan. Sept. 26, 2016) ...... 9

*Johns v. DeLeonardis*,
 145 F.R.D. 480 (N.D. Ill. 1992) ............................................................................ 11

*Keele v. Wexler*,
 149 F.3d 589 (7th Cir. 1998) ................................................................................. 12

*McMahon v. LVNV Funding*,
    807 F.3d 872 (7th Cir. 2015) ............................................... 11

*Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811) (7th Cir. 2012)............. 9, 14, 15

*Mullins v. Direct Digital, LLC,* 795 F.3d 654 (7th Cir. 2015) ................................. 9, 11

*Paper Systems, Inc. v. Mitsubishi Corp.*,
    193 F.R.D. 601 (E.D.Wis. 2000) ......................................... 10

*Reiter v. Sonotone Corp.*,
    442 U.S. 330 (1979) .......................................................... 9

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992) ............................................ 12

*Ruiz v. Stewart Assocs., Inc.*,
    171 F.R.D. 238 (N.D. Ill. 1997) ......................................... 12

*Scholes v. Stone, McGuire & Benjamin*,
    143 F.R.D. 181 (N.D. Ill. 1992) (certifying class between 129 and 300 members) ......... 10, 11

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...................................................... 11, 14

**Rules**

Fed. Rule Civ. Proc. 23 ..................................................... 11, 12, 13, 14, 15, 2, 7, 8, 9

# I.     PRELIMINARY STATEMENT

Plaintiff, the City of Rockford ("Rockford"), hereby renews[1] its Motion for Class Certification per this Court's direction.[2] Rockford seeks certification of two classes of similarly situated Acthar purchasers: (1) a Class of direct purchasers from ESI (**DPP Class**), and (2) a Class of indirect purchasers from CVS/Caremark (**IPP Class**).[3] Rockford further seeks certification of a Declaratory and Injunctive Relief Class (**Injunction Class**) and a Class of select common issues (**Issues Class**). Rockford's amended class definition was not opposed by ESI (ECF No. 780) and removes beneficiaries. *See* proposed form of Order filed herewith.

This case involves an alleged antitrust conspiracy between the manufacturer and seller of a 1952 drug, H.P. Acthar Gel© ("Acthar"), Mallinckrodt[4], and one of the largest pharmacy benefits managers (PBMs) in the country, Express Scripts.[5] In 2015, Rockford paid nearly

---

[1] Rockford's prior Motion was filed July 18, 2022 pursuant to the Court's operative scheduling order. EFC No. 601. The prior Motion was stricken. Jan 12, 2023 Hrg. Tr. at 14:19-20, 21:10-11 ("My point was to strike the class cert …, striking without prejudice the class cert…".)

[2] Rockford is mindful of this Court's stearn admonition about the length and breadth of briefs. Jan 12, 2023 Hrg. Tr. at 4:19-24 ("[T]here will be an order today that says all filings are limited to 15 pages. No exceptions. And going forward, that doesn't mean you mess with the margins, you change the font type, you put everything in footnotes, you give me reams of appendixes or appendices. Fifteen pages. I have had my fill.")

[3] Declaration of William H. Platt, II ("**Platt Decl.**"), attaching as **Exhibit "B"** a chart of state antitrust repealer laws for the four states where Acument Global resides and does business: Belvedere, Illinois, Sterling Heights, Michigan, Spencer, Tennessee and Burbank, California. *See* https://www.acument.com/home/northamericalocations/; *see also*, SAC ¶¶ 21.

[4] "**Mallinckrodt**", or **MNK** for short, refers to Mallinckrodt ARD Inc., formally known as Questcor Pharmaceuticals, Inc. (**QCor**), and its parent company, Mallinckrodt plc.

[5] **Express Scripts**", or **ESI** for short, refers to Defendants Express Scripts Holding Company and Express Scripts, Inc. their three (3) wholly-owned subsidiaries, CuraScript, Inc., doing business as CuraScript, SD ("**CuraScript SD**"), CuraScript Specialty Pharmacy ("**CuraScript SP**") n/k/a Accredo Health Group Inc. ("**Accredo**") and United BioSource Corporation ("**UBC**").

$500,000 for Acthar to treat the infant children of two Rockford employees, both afflicted with rare diseases for which Acthar was indicated. Rockford contends that it would have paid significantly less for Acthar but for the anticompetitive conduct of MNK and ESI.

## II.    RELEVANT FACTUAL BACKGROUND

The evidence of the MNK-ESI conspiracy to raise and fix the price of Acthar, and to enhance the Acthar monopoly, is overwhelming. Rockford has reviewed and culled over 20 million pages of defense documents, and has taken 43 depositions of MNK and ESI witnesses.[6] While a full examination of such record is not required for class certification[7], Rockford's initial proffer, including the Expert Report of economist Dr. William S. Comanor,[8] provides this Court with ample evidence to show that proof of the antitrust issues at trial will be through common evidence. Such evidence more than satisfies the rigorous scrutiny required under Rule 23.

### A.  The Exclusive Specialty Distribution Arrangement for Acthar

On August 24, 2007, QCor and ESI conspired to raise the list price of Acthar by 1,400%, from $1,650 to $23,269, causing the end-payor price to be increased to $29,086 -- an extraordinary price increase by any measure for an existing prescription drug product on the

---

[6] In an effort to avoid further dispute with ESI over what is and is not relevant to Rockford's Motion, to avoid any claim of right to a "sur-reply" brief (Jan 12, 2023 Hrg. Tr. at 14:13-20), and to provide ESI and this Court with the full context of relevant testimony relied upon by Rockford, Plaintiff has included the full minuscript transcripts of the depositions of relevant witnesses, along with the relevant deposition exhibits, as part of the Platt Declaration.

[7] "To determine whether plaintiffs have met their burden of affirmatively demonstrating compliance with Rule 23's requirements, the court 'must accept the substantive allegations of the complaint as true.'" *In re Epipen Mktg. Sales Practices & Antitrust Litig.*, 2020 U.S. Dist. LEXIS 40789 at *28, n. 2 (D. Kan. Mar. 10, 2020) ("*Epipen*"); *see also, Beacon v. SpeedyPC Software*, 907 F.3d 1018, 1025 (7th Cir. 2018) (class certification is not the time for a "dress rehearsal for the trial on the merits") (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811) (7th Cir. 2012).

[8] Platt Decl. **Ex. "A"** (Comanor Report).

market for 65 years.[9] But, there is nothing extraordinary about Acthar.[10] Shortly after Rockford sued in April 2017, ESI's senior management conceded, "it's a pretty poor drug with very limited need…. I think Steve [Miller] and I would both agree, and I think everybody in our company would agree, that the product is vastly overpriced for the value."[11]

To accomplish this extraordinary pricing feat, "unheard of really before [QCor and ESI] did it",[12] QCor's self-described "second ranking executive officer and key architect"[13], COO Steve Cartt, devised an "orphan pricing strategy" for Acthar,[14] premised on restricting the output of Acthar in order to raise its price. QCor accomplished this feat by "conver[ting] to closed distribution"[15] and granting ESI/Curascript exclusive distribution rights to Acthar, removing all existing inventories of Acthar from the wholesale channel,[16] and coordinating a planned, massive price increase. This exclusive specialty distribution model involved channeling all Acthar prescriptions through an "Acthar Support and Access Program" (ASAP) (SAC at ¶¶ 50-54, and

---

[9] Second Amended Complaint (**SAC**) (ECF No. 98) at ¶¶ 8, 20, 80, 90; s*ee also*, Comanor Report at 53-55 (Platt Decl. Ex. "A").
**Ex. "C"** (MNK00081775-76, MNK0081778, MNK00081781-82, MNK00081792-93).
[10] The parties do not dispute that Acthar is created by the fluid extracted from the pituitary glands of pigs, has been on the market since 1952, and has experienced no change in the product composition or features (other than the price) in the intervening 71 years. *Compare* SAC ¶¶ 40 *with* MNK Answer (ECF No. 204) at ¶¶ 40; Platt Decl. **Ex. "H"** (MNK00006706-6736 at 6709).
[11] Platt Decl. **Ex. "D"** (ExpressScripts5482856-2880 at 2869).
[12] Platt Decl. **Ex. "E"** (MNK02598731-8734 at 8731).
[13] Platt Decl. **Ex. "F"** (MNK04830196-208 at 201).
[14] Platt Decl. **Ex. "G"** (MNK00082251, MNK000001890-1961 at 2251 (Cartt: Board member "Greg [LaPointe] and I came up with this idea independently essentially at the same time…").
[15] Platt Decl. **Ex. "I"** (ExpressScripts0937998-8011 at 8000) ("Curascript will work with Questcor to implement a strategy to convert Acthar Gel from an open access distribution model, to a tightly controlled distribution process"); 8001 ("Curascript is uniquely positioned to provide a 'one stop shop' for Questcor to meet the Acthar brand's unique requirements"); SAC at ¶¶ 58-63 (describing ESI's "integrated service model").
[16] SAC at ¶¶ 46-75 (describing Mallinckrodt's adoption of a "new strategy" for Acthar in 2007). Platt Decl. **Ex. "J"** (MNK00081698-99, MNK00081719 ["prior to the price increase we will continue to keep inventories in the channel artificially low").

Ex. A)) run by an ESI-owned "hub" (Healthbridge/UBC), distributing all Acthar through an ESI-owned 3PL (Curascript 3PL), an ESI owned specialty distributor (Curascript SD), and an ESI-owned specialty pharmacy (Curascript SP).[17]

ESI proposed to MNK from the outset of their discussions "to lock down distribution and pull inventory from wholesalers" in order to provide "greatest control of the product in [a] concentrated prescriber base" and "limit[ing] high cost product in the channel."[18] Such control was directly tied to the ability to raise Acthar's price.[19] ESI then marketed Acthar's successful model to other companies in an effort to make Curascript a profitable business, including to Shkreli's Retrophin for Daraprim, touting "we know this model well".[20] Since 2007, ESI has built a multi-billion dollar specialty distribution business centered around pulling retail pharmacy drugs, like Acthar, off the pharmacy shelves and "re-launching" them as so-called "specialty drugs" by simply limiting distribution and raising the prices.[21]

---

[17] Platt Decl. **Ex. "K"** (MNK04024815-16) (chart provide by Cartt to QCor Board). Virtually every defense witness asked agreed that this chart accurately depicts the exclusive distribution model put in place in 2007. *E.g.*, Platt Decl. **Ex. "L"** (ESI's Kevin Cast Dep. Tr. at 37:1-38:14); **Ex. "M"** (ESI's Rob Osborne Dep. Tr. at 40:17-44:6); **Ex. "N"** (ESI's Melissa Beatty Dep. Tr. at 18:14-20:9); **Ex. "O"** (ESI's Everette Neville Dep. Tr. at 25:11- ); **Ex. "P"** (MNK's Jason Camp Dep Tr. at 54:17-60:20, 84:6-85:19).

[18] Platt Decl. **Ex. "Q"** (ExpressScripts0578764); **Ex. "R"** (MNK02629360-9389 at 9370, 9377).

[19] Platt Decl. **Ex. "S"** (MNK03138060) (ESI's Rob Osborne to QCor's Steve Cartt advising to pay "particular notice to price increases and returns" under paragraph 5 of the proposed new distribution agreement); **Ex. "T"** (MNK00081659-60) (Osborne to Cartt further advising that CSD's President is concerned about the risk of Acthar's price increase); **Ex. "J"** ("prior to price increase we will continue to keep inventories in the channel artificially low"); **Ex. "BB"** (MNK's Hugh O'Neill Dep. Tr. at 184:5-14) ("The price adjustment was driven based on moving it to a rare disease pricing model, … you need to change the distribution…").

[20] Platt Decl. **Ex. "U"** (ExpressScripts5478495-96).

[21] Platt Decl. **Ex. "U"** (ExpressScripts5478495 (Daraprim), **Ex "V"** (ExpressScripts5960934-35) Humatin): **Ex "W"** (ESI's Andy Behm Dep. Tr. at 31:13-34:8, 301:4-13, 305:10-307:10, 309:10-13); Ex. "L" (Cast Dep at 103:1-104:17 (discussing how Acthar and Serostim were both "moved from open to close[d distribution]" in conjunction with price increases); 119:24-25 (ESI's determination of whether to call drugs "specialty" is "more of an art than science").

On June 14, 2007, ESI sent QCor the first draft of an "Exclusive Wholesale Product Purchase Agreement" (the "Agreement"), giving ESI direct control over the price of Acthar through the following, unambiguous provision to which QCor agreed:[22]

> Should it be determined that a pricing adjustment is required, both Company [Questcor] and Distributor [Curascript] agree to **work together on a suitable price**.  Company agrees to implement any pricing adjustment made hereunder within five (5) business days **when a pricing change is agreed upon in writing** between Company and Distributor.

Paragraph 5(c) gave ESI the unprecedented[23] power to say "no" to any MNK proposed price increase throughout the relevant time period, but it never did so.[24] Instead, ESI agreed to the "tremendous" [25] August 2007 price increase because ESI was getting 4.5% of the higher Acthar price under the Agreement. ESI then agreed to every price increase thereafter, from 2010 through February 2022 (while MNK was in bankruptcy).[26]

In other words, ESI and MNK agreed to fix the price of Acthar. **ESI agreed to such price increases because ESI makes more money when the prices of Acthar go up**. ESI

---

[22] Platt Decl. **Ex. "S"** (MNK03138060) (email re first draft); **Ex. "Y"** (ExpressScripts0000230-245) (final). Multiple witnesses testified that QCor made no change to paragraph 5(c) proposed by ESI.  *E.g.,* Platt Decl. Ex. "M" (Osborne Dep. Tr. at 44:12-50:11); **Ex. "Z"** (MNK's counsel Mike Mulroy Dep. Tr. at 345:22-347:20).

[23] The Court will recall MNK's counsel repeatedly telling it that the Agreement was a "simple distribution contract", "just a routine, run-of-the-mill distribution agreement" about which MNK was "confident the court is going to find" is perfectly legal. *E.g*., Platt Decl. **Ex. "AA"** (July 22, 2019 Hrg. Tr. at 13:11-16). The overwhelming evidence has proven otherwise, with every witness asked testifying they had never seen anything like paragraph 5(c) of the Agreement. *E.g.,* Platt Decl. **Ex. "BB"** (MNK's Hugh O'Neill Dep. Tr. at 185-86).

[24] Multiple witnesses with knowledge agreed that ESI never said "no" to any Acthar price increase, despite being given advance written notice thereof pursuant to the Agreement.  *E.g.,* Platt Decl. Ex. "N" (Beatty Dep. Tr. at 207:6-10, 214:13-15, 217:21-25; 231:5-11, 254:1-6)

[25] Platt Decl. **Ex. "BB"** (O'Neill Dep. Tr. at 183:15-17); **Ex. "CC"** (ESI CEO Tim Wentworth Dep Tr. at 300:13-16 ("it was an egregiously high price"), 80:2 ("massive"), 81:12-18 ("outrageous").

[26] Platt Decl. Ex. "N" (Beatty Dep. Tr. at 197-254 (discussing MNK price increase notifications to ESI and ESI's failure to push back on any price increase).

created a "cash cow"[27] from which it shares in the Acthar monopoly profits to the tune of over $3,000 per prescription[28] and $13 million per year (nearly the entire 2006 Acthar revenue).[29]

However, ESI's desire for exclusive control over Acthar was not without substantial risk. Holding a large inventory of product at such a high price could cause ESI to lose money if the product was not sold.[30] Such risks materialized in the immediate aftermath of the August 2007 price increase.[31] But, QCor took the further unprecedented step of guaranteeing ESI's losses.[32]

Importantly, the language in paragraph 5(c) of Agreement remained in full force and effect until April 2022,[33] when MNK ended its exclusive distribution arrangement with ESI due Rockford's constant pressure and after the Bankruptcy Judge refused to make antitrust findings, they required to avoid this Court. Two critical things happened thereafter: (1) ESI contracted with a direct competitor to MNK (ANI) to distribute its FDA-approved ACTH product, corticotropin gel, and (2) the price of Acthar plummeted by more than 45%. NewCo MNK admitted this month its Acthar sales have plummeted due to this new competition for Acthar.

### B. The Synacthen and BioVectra Acquisitions

Apart from the exclusive distribution arrangement through Curascript, MNK took other steps to preserve and protect its Acthar monopoly. In 2013, QCor acquired Synacthen, the only

---

[27] Platt Decl. **Ex. "DD"** (MNK_OCC&UCC_00164665-66).

[28] Platt Decl. **Ex. "EE"** (ExpressScripts0522296-97) (Acthar "is our most profitable drug")

[29] Platt Decl. **Ex. "FF"** (ExpressScripts0834241-42)

[30] ESI told QCor "we do not know the market demand once the distribution channel is changed and the price increase goes into place. There is a good deal of uncertainty at launch of this new program. With the price increase, just a 10 vial situation could lead to a risk exposure of $200,000 of which this is a very large risk that SD is not at all comfortable especially with the above market factors." Platt Decl. **Exhibit "T"** (MNK00081659-660).

[31] Platt Decl. **Ex. "GG"** (QCor00103581-82).

[32] Platt Decl. **Ex. "HH"** (ExpressScripts1108893-96) (Third Amendment to Agreement, codifying ESP program as a "Temporary Rebate Program" or "TRP"); **Ex. "L"** (ESI's Kevin Cast Dep. Tr. at 81-88 (describing ESP program).

[33] Platt Decl. **Ex. "X"** (ExpressScripts1108961-62) (noting par. 5(c) "survives").

identified competitive threat to Acthar at the time (the "Synacthen Acquisition"). SAC ¶¶ 104-110. The same year, QCor also acquired BioVectra, the only supplier of the active pharmaceutical ingredient (API) for Acthar (the "BioVectra Acquisition"). Investors lauded these moves as "mak[ing] potential generic competition less likely" due to the "significant barriers to entry" they posed.[34] Specifically, "[t]he transaction removes an overhang from the possibility of franchise erosion due to future competition from Synacthen formulations…". *Id*.

In the face of MNK's aggressive moves to restrain competition in the ACTH market, ESI did nothing, even when pressed.[35] ESI never sought to lower Acthar's price until MNK dumped it as the exclusive distributor. ESI never used its exclusive distribution of Acthar competitor Sabril (vigabatrin) since 2009 to drive down the price of Acthar for IS patients. ESI never used MNK's ownership of Synacthen in 2013 to drive down the price of Acthar. ESI never accepted the repeated offers of Imprimis[36] -- the contract manufacturer who created the $1 Daraprim pill for ESI teach the infamous Martin Shkreli a lesson about ESI's power in the marketplace[37] -- to do the "same thing with Acthar", *id*., despite the "cost per vial [being] $1,000". Ex. "N".

---

[34] Platt Decl. **Ex. "II"** (MNK05218157-177 at 165).

[35] Platt Decl. **Ex. "JJ"** (ExpressScripts4856386-89)

[36] *E.g*., Platt Decl. at **Exhibit "KK"** (ExpressScripts0722408-409) ("Confidentially, a single Acthar alternative is coming soon. If there is an interest in these and other single active compounded alternatives, please let me know."); **Ex. "LL"** (ExpressScripts0837581-583 at 582) ("We are spinning out a company called Eton Pharmaceuticals. Eton will develop and commercialize … a viable competitor to Acthar."); **Ex. "MM"** (ExpressScripts0983153-3154) (Imprimis CEO Baum wrote after *60 Minutes*, "because this morning we received a couple of inquiries from clinical consultants at ESI for our corticotropin injection alternative to Acthar Gel and the possibility of once again, collaborating with you to bring down ever rising drug costs."); **Ex. "NN"** (ExpressScripts0983294) (Synacthen proposal).

[37] Dr. Comanor describes this as a "classic example" where ESI "contests excessive prices for off-patented drugs". Platt Decl. **Ex. B**, Comanor Report at 39-40. ESI claims it "took bold action and came up with a unique solution." It "partnered with Imprimis …to expand access to its $1/pill alternative to Daraprim. **Ex. "OO"** (ExpressScripts5501601-1610, at 715).

7

The evidence will also show that ESI never used any of its PBM "tools" to drive a lower price for Acthar, including its power of formulary placement or exclusion, utilization management (including step therapy and prior authorization) or aggressive rebates. Instead, ESI permitted its co-conspirator MNK to draw upon its vast "cash hoard" to pay nearly 10 times what Martin Shkreli's Retrophin had agreed to pay for Synacthen, only to put it on the shelf. SAC ¶¶ 104-110, 127-154, 226-231, Exhibit C. In 2020, just before filing for bankruptcy, MNK simply surrendered the Synacthen license back to Novartis after having paid nearly $300 million.

### III.  ARGUMENT
#### A.  <u>The Court's Inquiry on Class Certification.</u>

Under Rule 23, the Court conducts a threshold inquiry to determine if the "four universal requirements for class actions"[38] in Rule 23(a) are satisfied. Fed. R. Civ. Proc. 23(a). The Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Erwin v. Os Rest. Servs., Inc.*, 632 F.3d 971, 976 (7ᵗʰ Cir. 2011). "Merits questions may be considered … only to the extent … that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, *Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). However, "[a]t this early stage of the litigation, the merits are not on the table." *Beacon*, 907 F.3d at 1025.

While it is Plaintiff's "burden of showing that each requirement is met by a preponderance of the evidence", *Beacon*, 907 F.3d at 1025 (*citing Steimel v. Wernet*, 823 F.3d 902, 917 (7ᵗʰ Cir. 2016)), it "need not make that showing to a degree of absolute certainty. It is sufficient if each disputed [Rule 23] requirement has been proven by a preponderance of

---

[38] *Beacon*, 907 F.3d at 1025.

evidence." *Messner,* 699 F.3d at 811. Here, the proposed Classes easily satisfy the requirements

of Rule 23(a) and Rules 23(b)(2), (b)(3) and (c)(4) in this antitrust conspiracy case.

      **B.  The Proposed Class Satisfy the Rule 23 Prerequisites.**
          **1.  Standards for class certification**

The United States Supreme Court recognized long ago that class actions play an

important role in enforcing the antitrust laws. *See Reiter v. Sonotone Corp*., 442 U.S. 330, 344

(1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266 (1972).

          **2.  The proposed classes satisfy the Rule 23(a) prerequisites.**
            **a.  The proposed Classes, as defined, are readily ascertainable.**

Unlike the courts in other circuits, the Court of Appeals for the Seventh Circuit does not

specifically require a determination of ascertainability of the proposed classes as a "separate and

distinct requirement for class certification under Rule 23(b)(3)." *Epipen*, 2020 U.S. Dist. LEXIS

40789 at *51 (noting such question is "unsettled", except in the Seventh Circuit).  In *Mullins*, the

Seventh Circuit "criticized and rejected" the "heightened standard for ascertainability" applied

by other courts and "declined to follow this path." *Mullins v. Direct Digital, LLC,* 795 F.3d 654,

658, 659 (7th Cir. 2015).  Instead, the Court reaffirmed the Circuit's standing precedent applying

a "weak" version of ascertainability.  *In re Syngenta AG MIR 162 Corn Litig*., 2016 U.S. Dist.

LEXIS 132549, 2016 WL 5371856, at *2-3 (D. Kan. Sept. 26, 2016). This test requires that "the

class definition must not be too vague, the class must not be defined by subjective criteria, and

the class must not be defined in terms of success on the merits." *Id*. at *2.

Here, the proposed Classes satisfy the *Mullins* criteria as they are based on objective

criteria, *ie*. each one defines a class member as a TPP who paid all or part of the purchase price

of Acthar during a specific date range, they are not impermissibly vague, and they are not

defined in terms of success on the merits."  *See Epipen*, 2020 U.S. Dist. LEXIS 40789 at *57.

Further, the purchasers of Acthar are well known to MNK and ESI, who have made it a core part

of their businesses to know just who purchases prescription drugs and at what price. In the

bankruptcy, MNK represented that it provided direct mail notice to *Rockford* Class members.[39]

### b. The Class members are sufficiently numerous.

A class must be so numerous as to make joinder of all parties "impracticable". Fed. R.

Civ. P. 23(a)(1). Indeed, "[t]he Supreme Court has observed that potential claimants in antitrust

actions will often be so numerous that joinder of all is impracticable and that a class action will

therefore be necessary." *Paper Systems, Inc. v. Mitsubishi Corp.*, 193 F.R.D. 601, 604 (E.D.Wis.

2000) (*citing Illinois Brick Co. v. Illinois*, 431 U.S. 720, 739 (1977)). Joinder is impracticable if

it "would be difficult or inconvenient". *Bzdawka v. Milwaukee Cty.*, 239 F.R.D. 469, 474 (E.D.

Wis. 2006). In making this determination, courts consider the number of class members and

"common sense assumptions." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 184

(N.D. Ill. 1992) (certifying class between 129 and 300 members); *see also, Hubler v. Chevrolet,

Inc. v. Gen. Motors Corp.*, 193 F.R.D. 574, 577 (S.D. Ind. 2000) (40 members); *Bzdawka*, 238

F.R.D. at 474 (same). Where people do not reside near each other, as here, courts tend to

consider class members' joinder impracticable. *See Paper Systems, Inc.*, 193 F.R.D. at 604

(*citing Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986)).

Here, thousands of Class members are dispersed throughout the Class jurisdictions. SAC

¶ 166. ESI has conceded that the Class of TPPs numbers in the "thousands".

### c. Common questions of law and fact exist under Fed. R. Civ. P 23(a)(2).

Commonality requires a legal or factual question common to the class. A single common

---

[39] Bankr. D. Del., Case No. 20-12522, Dkt. No. 592 at 1 n.2; Dkt. No. 2164 at ¶¶ 27-35 ("actual
and constructive notice was provided").

question of law *or* fact "capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke" -- is sufficient. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). It does not require that all questions of law or fact be identical "but merely that the class claims arise out of the same legal or remedial theory." *Johns v. DeLeonardi*s, 145 F.R.D. 480, 483 (N.D. Ill. 1992); *see also, Amgen*, 568 U.S. at 469 ("Rule 23(b)(3) [] does *not* require that each elemen[t] of [a] claim be susceptible to classwide proof")(brackets added); *Mullins*, 795 F.3d at 673 (same).

Commonality is easily met in antitrust cases,[40] because the members "'have a shared interest in attempting to prove that Defendants engaged in a conspiracy to fix, raise, and maintain the prices' of the product." *In re Ready-Mixed Concrete Antitrust Litig*., 261 F.R.D. 154, 167 (S.D. Ind. 2009) (quotation omitted). As such, courts within this Circuit have aptly characterized commonality as a "'low hurdle' easily surmounted." *Scholes v. Stone, McGuire & Benjamin*, 143 F.R.D. 181, 185 (N.D. Ill. 1992); *McMahon v. LVNV Funding*, 807 F.3d 872, 876 (7th Cir. 2015); *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 800 (7th Cir. 2013).

Rockford's core allegation is that ESI and MNK violated the antitrust laws by forming and operating a vertical conspiracy to raise and fix the prices of Acthar, to reduce output, to eliminate competition in the ACTH market, and to monopolize the market for all ACTH products. *See* SAC ¶ 171 a-s (listing common questions), 207, 201, 230, 246-248; *see generally*, Comanor Report. Because all of the Class members' claims arise from the same set of facts and

---

[40] *See Chevalier v. Baird Savings Sav. Assoc.*, 72 F.R.D. 140 (E.D. PA. 1976) ("[W]e note that in section 1 Sherman Act cases, the existence *vel non* of a conspiracy has been recognized as an overriding issue common to the plaintiff class.") (citing *State of Illinois v. Harper & Row Publishers, Inc.*, 301 F.Supp. 484, 488 (N.D.Ill. 1969)). In the *Harper & Row* case, this Court observed, "[t]he single most important issue is whether the defendants' conspiratorial agreements actually existed. Offering the same facts, all class members will strive to establish a national conspiracy among" the defendants. *Id*.

rest on the same legal theory, they have "a shared interest in attempting to prove" Defendants' alleged conspiracy. *Ready-Mixed Concrete*, 261 F.R.D. at 167.

### d.     The requirement of typicality is satisfied.

Claims of the class representatives must be typical of all class members' claims. Fed. R. Civ. P. 23(a)(3). The issue of typicality "is closely related to the preceding question of commonality." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *Bzdawka*, 238 F.R.D. at 475. Typicality does not require the claims be identical, only substantially similar. *Ruiz v. Stewart Assocs., Inc.*, 171 F.R.D. 238, 242 (N.D. Ill. 1997). A "'plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory.'" *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). "Typicality in the antitrust context will be established by plaintiffs and all class members alleging the same antitrust violation by the defendant." *Ready-Mixed Concrete*, 261 F.R.D. at 168.

Rockford and Acument both allege (and must prove) the same antitrust violations that absent Class Members must prove: the existence, operation, and effects of the vertical conspiracy to raise and fix Acthar prices. Because these claims arise out of the same alleged anticompetitive conduct, allege the same kind of harm, are based on the same legal theories, and will require the same kinds of evidence to prove, Rule 23(a)(3)'s typicality requirement is satisfied.

### e.   The proposed Class representatives are adequate.

Rule 23(a)'s adequacy prong requires Plaintiff to "fairly and adequately protect the interests of the class." This requirement insists that Plaintiff have no conflicting interests with other class members and that they retain adequate counsel. *See Eggleston v. Chi. Journeyman*

*Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981). Where the plaintiff and the class seek the common goal of obtaining the largest possible recovery, their interests necessarily do not conflict. *In re Corrugated Container Antitrust Litig*., 642 F.2d 195, 208 (5th Cir. 1981).

The City of Rockford has championed the rights of Acthar purchasers since April 2017, when it was the first TPP in the country to sue. Since then, Rockford's goal has been to do everything required to maximize Class members' recovery. Rockford produced over 100,000 pages of documents in discovery, a dozen employees for deposition (a mayors) and fought MNK and ESI through the pandemic and bankruptcy to ensure this case would see a jury. Indeed, Rockford alone caused MNK to abandon its unlawful, exclusive distribution arrangement with ESI. As a result, Rockford has no interests antagonistic to those of the Class.

 "An order that certifies a class action … must appoint class counsel under Rule 23(g). Fed. R. Civ. P. 23(e)(1)(B). In appointing class counsel, courts should consider the Rule 23(g) factors. *See* Fed. R. Civ. P. 23(g)(1)(A). Here, Rockford's counsel includes a team of extraordinary lawyers from Haviland Hughes, Bartimus Frickleton, The Beasley Firm, and Ciardi, Ciardi and Astin, led by the highly engaged Rockford City Solicitor's office. *See* Platt Decl, **Ex. "PP"** (attaching firm biographies). The dedicated work of these lawyers demonstrates their continued fitness to serve.

### 3. Certification Is Appropriate Under Rule 23(b)
#### a. The proposed Classes satisfy Rule 23(b)(2)

To satisfy Rule 23(b)(2), Plaintiff must show that there is a risk of inconsistent adjudications such that certification of one or more classes in this Court is appropriate. Here, in seeking transfer of these actions and in opposing Rockford's JMPL petition, ESI conceded that such risk of inconsistent adjudications exists.

### b. The proposed Classes satisfy Rule 23(b)(3)

Plaintiff must show common questions of law or fact "predominate over any questions affecting only individual members," and class treatment will be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### i. Predominance is easily satisfied.

Rule 23(b)(3)'s predominance element "is satisfied when 'common questions represent a significant aspect of [a] case and ... can be resolved for all members of [a] class in a single adjudication.'" *Messner*, 669 F.3d at 815. The late Ruth Bader Ginsburg wrote for a unanimous Supreme Court that "[p]redominance is a test readily met in certain cases alleging ... violations of ... antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).[41]

Whether ESI engaged in an illegal price-fixing conspiracy is a common question that can be proven with evidence common as to all Class members. *Dukes*, 564 U.S. at 350. "'The weight of authority in antitrust cases indicates that the existence of a conspiracy in restraint of trade is [an issue] that is common to all potential plaintiffs.'" *Ready-Mixed Concrete*, 261 F.R.D. at 168. To prove the conspiracy at trial, Rockford will present overwhelming, common evidence (summarized herein) of the "new strategy" for Acthar, codified by agreements, to move Acthar to an exclusive specialty distribution model in order to raise the Acthar prices. Because all Class members paid inflated prices set by MNK and ESI, the predominance of common issues is straightforward.[42] "[C]ommon evidence and common methodology to prove a class's claims is

---

[41] The Seventh Circuit "understand[s] that comment to mean that careful application of Rule 23 is necessary in antitrust cases, as in all cases, and that in antitrust cases, Rule 23, when applied rigorously, will frequently lead to certification." *Messner*, 669 F.3d at 815.

[42] *See generally* Comanor Report at Platt Decl. Ex. "B". It is "well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815; *Arreloa v. Godinez*, 546 F.3d 788, 801 (7th Cir. 2008).

sufficient to support a finding of predominance on the issue of antitrust impact for certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 819.

### ii. Class certification is a superior litigation device.

Rule 23(b)(3) also requires "that class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). When "common questions are found to predominate, then courts also generally have ruled that the second prerequisite of Rule 23(b)(3) – that the class suit be superior to any other available means of settling the controversy – is satisfied in the context of an antitrust action." *Ready-Mixed Concrete*, 261 F.R.D. at 173. Class certification in this case would be far superior to any other procedure available for the treatment of the issues. ESI and MNK have both argued that transfer of all actions to one forum was preferable to multiple, individual lawsuits.

## IV. CONCLUSION

Chief Judge Wood's admonition seems particularly *apropos* to this case:

> Defendants spend much time and money fighting Rule 23 certifications to the hilt. Yet "certification is largely independent of the merits ... and a certified class can go down in flames on the merits." We say this not to imply that the merits in this case favor either party, but simply to remind defendants that the class-action glass is sometimes half-full: dismissed claims of a certified class end litigation once and for all. That, after all, is why settlement classes are so popular.

*Beacon*, 907 F.3d at 1031. ESI has claimed for years Rockford's claims have no merit. Now, it can prove it is right, in this court. ECF No. 534 at 11 (ESI sought "*one* court for resolution.").

For these reasons, the Court should grant Rockford's Motion.

Dated: May 26, 2023

Respectfully submitted,
*s/ Donald E. Haviland, Jr.*
Donald E. Haviland, Jr., Esq. (*pro hac vice*)
William H. Platt II, Esq. (*pro hac vice*)
**HAVILAND HUGHES**
124 South Maple Ave., Suite 220
Ambler, Pennsylvania 19002

Nicholas O. Meyer, Esq., Legal Director
Ifeanyi C. Mogbana, Esq., City Attorney
**CITY OF ROCKFORD**
425 East State Street, 7th Floor
Rockford, Illinois 61104-1068

James Bartimus, Esq. (*pro hac vice*)
Anthony DeWitt, Esq., (*pro hac vice*)
**BARTIMUS, FRICKLETON, ROBERTSON, RADAR PC**
11150 Overbrook Road, Suite 200
Leawood, Kansas 66211

Dion G. Rassias, Esq. (*pro hac vice*)
Jillian E. Johnston, Esq. *(pro hac vice)*
**THE BEASLEY FIRM, LLC**
1125 Walnut Street
Philadelphia, PA 19107

Albert A. Ciardi, III, Esquire (*pro hac vice*)
**CIARDI CIARDI & ASTIN**
1905 Spruce Street
Philadelphia, PA 19103

*Attorneys for Plaintiff,*
*the City of Rockford, and the Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 26, 2023, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Donald E. Haviland, Jr.*
Donald E. Haviland, Jr.
