# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      WESTERN DIVISION

 3   CITY OF ROCKFORD,              )  Docket No. 17 CV 50107
                                    )
 4                 Plaintiff,       )  Rockford, Illinois
                                    )  Thursday, June 22, 2023
 5     v.                           )  1:00 o'clock p.m.
                                    )
 6   MALLINCKRODT ARD, INC.,        )
     et al.,                        )
 7                                  )
                   Defendants.      )
 8                                  )
                      TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE LISA A. JENSEN

10   APPEARANCES:

11   For the Plaintiffs         HAVILAND HUGHES
     City of Rockford and       (201 South Maple Avenue,
12   the Class:                  Suite 110,
                                 Ambler, PA  19002) by
13                              MR. DONALD E. HAVILAND, JR.

14   For the Defendants:        QUINN EMANUEL URQUHART &
                                SULLIVAN, LLP
15                              (1300 I Street NW,
                                 Suite 900,
16                               Washington, DC  20005) by
                                MS. MEGHAN A. MCCAFFREY
17
     Court Reporter:           Heather M. Perkins-Reiva
18                             327 South Church Street
                               Rockford, IL  61101
19                             (779)772-8309

20

21

22

23

24

25
```

1          THE CLERK:  Now calling case number 17 CV 50107, *City*

2  *of Rockford v. Mallinckrodt ARD Incorporated, et al.*

3          THE COURT:  May I have the appearance of the parties,

4  please, starting with the plaintiff?

5          MR. HAVILAND:  Good afternoon, Your Honor.  Don

6  Haviland from Haviland Hughes for the City of Rockford.

7          THE COURT:  Good afternoon.

8          MR. HAVILAND:  Good afternoon.

9          MS. MCCAFFREY:  Good afternoon, Your Honor.  Meghan

10  McCaffrey from Quinn Emanuel on behalf of Express Scripts.

11          THE COURT:  Okay.  Good afternoon.

12          MS. MCCAFFREY:  Good afternoon, Your Honor.

13          THE COURT:  Okay.  Thank you for making yourselves

14  available.

15          I wanted to try to nip this in the bud as soon as I

16  could to avoid any unnecessary briefing if possible, further

17  briefing on this, and so I wanted a bit of clarification and

18  also to make some points clear in case there was any

19  misunderstanding.

20          It appears very clear to me when I go back and read

21  my statements at the hearing when I ordered production of the

22  13 documents in camera as well as portions of the privilege

23  log justifying withholding any documents related to the

24  contract drafts between Mallinckrodt and the defendant that

25  all parties knew exactly what it was that I was ordering.

1          Let me just start with Mr. Haviland's argument that I

2    misunderstood the motion.  It's very clear to me that the

3    motion raised two issues.

4          One was the attempt to claw back the 13 documents

5    that were turned over that the defendants alleged contained

6    privileged attorney-client information.  I reviewed the cover

7    letters attached to those and made a determination that those

8    clearly were documents, internal drafts, that were exchanged

9    between the client and the client's attorneys.

10          I also questioned the defendants during the hearing

11    before I ordered production of the -- in camera production of

12    the cover letters for the 13 documents.  I also questioned the

13    defendants about whether they had produced drafts of the

14    contracts that had been exchanged between the defendants and

15    Mallinckrodt.

16          I was told some conflicting information.  First, I

17    was told that that wasn't part of the motion, and then I

18    corrected -- I think it was -- Mr. Soyfer and told him that I

19    did read the motion to clearly cover drafts of contract

20    agreements and that I thought that the defendants clearly knew

21    that because they were arguing that any request was untimely

22    and so forth.

23          So then we went on to Mr. Soyfer's statement where he

24    says, "To the extent that drafts were exchanged with

25    Mallinckrodt that do reflect legal as opposed to business

revisions and comments and strategy, the privilege there would be preserved by the common interest doctrine because, first of all, Mallinckrodt and Express Scripts were obviously co-defendants in this action which centers around the distribution agreement from 2007, and more recently Rockford has focused on the negotiations around the distribution agreement and sought discovery into that."

Based on that, I said, "Okay.  So here is what I want," and that's when I instructed Mr. Soyfer that in addition to the cover letters to the 13 clawed-back documents, I wanted every indication in defendant's privilege log where they withheld those drafts based on that common interest privilege.  So I think that it's very clear that that is what I was asking for.

To the extent that there would have been entries in the privilege log where those drafts either sent by Ms. McCaffrey to some Quinn Emanuel lawyer or whether sent by someone else from defendant's counsel to someone at Mallinckrodt, to the extent that those were withheld, I would have expected that they would have been on the privilege log. I could have found out which ones were withheld.  They would have been presented to me in camera, and I would have ruled upon that.

What I was told was that no documents were withheld, and I have a letter from Ms. McCaffrey where she basically

1  says, "In other words, the Express Scripts entities have not

2  withheld as privileged any drafts of the wholesale purchase

3  agreement provided to and/or received from Mallinckrodt."

4         Now, that made me scratch my head a bit because I had

5  Mr. Soyfer telling me that to the extent that those drafts

6  contained information that might be privileged by this common

7  interest doctrine that they would have been entitled to have

8  been withheld.  However, I assumed, based on Ms. McCaffrey's

9  representation, that perhaps Mr. Soyfer was wrong, and they,

10 in fact, did not withhold any.  So given that representation,

11 if no such documents were withheld, that means that all the

12 documents, all the drafts of the documents between

13 Mallinckrodt and defendant, whether through counsel or

14 otherwise, had been turned over.

15        Is that, in fact, correct, Ms. McCaffrey?

16        MS. MCCAFFREY:  Your Honor, so I just want to make

17 sure that I'm understanding the question.

18        Is the question that any draft communications or

19 draft of the revision to the CSD distribution agreement

20 exchanged between counsel for Express Scripts and counsel for

21 Mallinckrodt?  Is your question if those documents were

22 produced?

23        THE COURT:  Yes.  That was my question all along.

24        MS. MCCAFFREY:  No, Your Honor.  Those documents have

25 not been produced.  Those are outside counsel files.

1          Any documents that are in Express Scripts' files and

2     that were with Express Scripts' custodians, those have been

3     produced, as reflected in the letter, which is what we

4     understood.  We did not understand the order to be going so

5     far as to be going through the custodial files of outside

6     counsel in this litigation.

7          THE COURT:  Well, why would you have to go through

8     custodial files of outside counsel, Ms. McCaffrey, if you are

9     representing -- you and your colleagues are representing the

10    defendant who was a party to the negotiation?  You would go to

11    your files, which are, in essence, an extension of your

12    client's files, which would be part of my order, right?

13         MS. MCCAFFREY:  Your Honor --

14         THE COURT:  It is sort of game playing.  It is sort

15    of game playing, Ms. McCaffrey, when you tell me that you have

16    turned over all drafts of the wholesale purchase agreement

17    that were provided to and/or received from Mallinckrodt.  That

18    includes within your files, right?  Because you are an

19    extension of your client.  So that is very frustrating to me.

20         I would not say that this is a situation that

21    requires reconsideration because based on the information I

22    was provided that I assumed was accurate, I ruled accordingly.

23    But it seems to me that what you told me -- well, it doesn't

24    seem -- you're now telling me was inaccurate.

25              Tell me why you are not required as counsel for

Express Scripts to turn over any communications concerning drafts of the wholesale product purchase agreement that were provided and/or received from Mallinckrodt?

MS. MCCAFFREY: Your Honor, any communication between Express Scripts' counsel were with counsel for Mallinckrodt in connection with the CSD distribution agreement that is the underpinning of this case and that they were co-defendants with us in this case at this time. We, Quinn Emanuel, as counsel for Express Scripts in this litigation, were not communicating with any Mallinckrodt businesspeople or anything like that; it was their outside counsel, and those discussions would be privileged under common interest, which is where I think Mr. Soyfer was --

THE COURT: Right, right, right. And that's your argument. So I said provide me all the entries in your privilege log where you identify that you are withholding those communications based on that privilege, and once you identified those, I would ask you to produce those to me in camera, and I would make a decision whether that privilege is valid or not. But instead of telling me that, Ms. McCaffrey, you told me you didn't withhold any such documents.

MS. MCCAFFREY: Your Honor, there was no intent to misrepresent anything to the Court. We understood that the scope of the order related to the productions in this case and the custodians in this case. Attorneys for Quinn Emanuel or

1   attorneys for Mallinckrodt, who we obviously do not have

2   control of their documents, or attorneys, in-house attorneys,

3   for Express Scripts, for example, are not custodians in this

4   case.  There was no intent, Your Honor, to ever make a

5   misrepresentation to the Court over what was going on.

6          We went through our privilege log, which was provided

7   in December in subsequent revision, and understood that that

8   was the scope of the order and that that's what we were

9   required to do.  I apologize if we misunderstood that, Your

10  Honor, but we understood that the scope of the order was

11  related to the discovery and the documents in this case, and

12  at no point in time did we understand that outside counsel's

13  files, my files, the files from my law firm, our

14  communications with our co-defendant's counsel in this case

15  were subject to discovery.

16         THE COURT:  Ms. McCaffrey, when you were

17  corresponding with Mallinckrodt's attorneys about the proposed

18  revisions to the wholesale product purchase agreement, are you

19  saying you were corresponding with them in some capacity other

20  than as counsel for the defendants in this case?

21         MS. MCCAFFREY:  No, Your Honor, of course I'm

22  corresponding with the co-defendant's -- with counsel

23  representing my co-defendant in this case.  I don't think

24  that's revolutionary.

25         THE COURT:  It's not revolutionary.  But if you are

1   withholding those documents based on a common interest

2   privilege, is it not customary to put those on a privilege

3   log?

4           MS. MCCAFFREY:  If we were custodians in this case,

5   Your Honor.  I never understood any Court order to require the

6   addition of Quinn Emanuel attorneys as custodians in this

7   case.  That's what this would have required.  If we were

8   logging privileged communications, this would require to go

9   into the attorney files and the communications of Quinn

10  Emanuel attorneys representing Express Scripts in this

11  litigation to pull their custodial files and then log our

12  communications with co-defendant's counsel, and we never

13  understood that Quinn Emanuel attorneys were added as

14  custodians in this case.

15          THE COURT:  All right.  Let me hear from

16  Mr. Haviland.

17          MR. HAVILAND:  So, Your Honor, you can understand

18  why, when Your Honor asked me point blank how it is we don't

19  know whether we have these documents, I said I don't know what

20  I don't know, and what we now have clarity on, thanks to Your

21  Honor's questioning at the hearing and then the later letter,

22  is that these documents were never produced, they were never

23  included on a log, and we don't have them.  I think we now

24  have those three facts, and what Rockford is faced with is a

25  donut hole in the evidence and a significant one.

1        The last communication that Ms. McCaffrey identified

2   to the Court and to Rockford with a draft is from June 29,

3   2021.  We have a substantial period of time until the

4   September 27, 2021, filing with the bankruptcy judge wherein

5   both Mallinckrodt and Express Scripts asked that judge to

6   predetermine the antitrust effect of an unsigned agreement.

7   The designee, whom I deposed on the Court's order, and I

8   pointed this out to you on reconsideration because I didn't

9   expect the Court pored over the transcript in the initial

10  motion as it wasn't necessary at the time, but now it is

11  pretty clear, the witness didn't know beyond the fact that the

12  lawyers were negotiating that contract.

13       And it's a significant event, Your Honor, because as

14  you well know, when you get to February 2022, Mallinckrodt

15  decided to end the distribution arrangement with Express

16  Scripts, and Express Scripts wasn't happy about that, and, in

17  fact, Express Scripts then pushed and lowered the price of

18  Acthar by nearly 50 percent.  So we are going to --

19       THE COURT:  So I'm not saying, Mr. Haviland --

20       MR. HAVILAND:  So, Judge, I'm just going to --

21       THE COURT:  I'm not saying, Mr. Haviland -- we have

22  already hashed that out, okay?  What I'm saying -- what I'm

23  trying to figure out here is Ms. McCaffrey's argument that

24  requests for drafts of the proposed new product purchase

25  agreement, if it's being negotiated by Ms. McCaffrey on behalf

1    of the defendant with an attorney -- first of all, I don't

2    know how an agreement ever gets negotiated for the majority of

3    the situations where the negotiations aren't taking place

4    between the attorneys, okay?

5              MR. HAVILAND:  I agree, Your Honor, and you made that

6    clear.

7              THE COURT:  I mean, we talked about that.  I don't

8    know, Ms. McCaffrey, I don't remember if you were at the

9    hearing, but there were a host of your colleagues from your

10   law firm at the hearing where I went through the whole, like I

11   was instructing people who had never been involved in a big

12   business deal before about how, when you are talking with your

13   own clients about what the next round of redlines should look

14   like, that information is privileged, but when you send those

15   redlines with a cover letter to your opponent in the business

16   deal that that is not privileged, okay?

17             MS. MCCAFFREY:  Your Honor --

18             THE COURT:  It was very, very clear.  So I don't

19   understand how there was any miscommunication.

20             Go ahead.

21             MS. MCCAFFREY:  Your Honor, if I may, we are not

22   negotiating an entire distribution agreement.  That's very

23   clear from the documents that have been produced in the case

24   and which the plaintiff's attorneys spent an entire day

25   harassing a 30(b)(6) witness on, to the point we had to pull

1    it and stop the deposition because it was so harassing.   Okay.

2    We went back.  We performed the deposition.

3         We were involved in negotiating discrete elements

4    because of active litigation, this litigation, because of

5    other litigation.  That is protected by the common interest

6    privilege, and more importantly, Judge --

7         THE COURT:  Then put it on a privilege document --

8         MS. MCCAFFREY:  But, Your Honor, we are not

9    custodians.  We are not custodians in this case.  And

10   Mr. Haviland raised this with the Court back in the summer of

11   2022, and we talked about this in the summer of 2022, Your

12   Honor, and you said, "If you want those communications, you

13   need to file a motion to compel," and they didn't do it.

14        MR. HAVILAND:  So, Your Honor, let me speak to the

15   custodian issue.

16        MS. MCCAFFREY:  No.  Let me finish, please.  I would

17   like to finish, please.  Please do not interrupt me,

18   Mr. Haviland.

19        MR. HAVILAND:  Go right ahead, counsel.  Go right

20   ahead, Ms. McCaffrey.  Go right ahead.

21        MS. MCCAFFREY:  We have had many discussions about

22   this with the Court, Judge, and the plaintiff sat on it, and

23   now they have waited, and at no point in time has outside

24   counsel in this litigation been custodians, so their

25   communications should never have been logged.  It would be the

1    same thing as asking Mr. Haviland if he is producing a

2    communication and privilege log with his communications with

3    MSP, for example, or with his communications with his

4    co-counsel on the plaintiff's side of their case.  It is the

5    same thing.

6         MR. HAVILAND:  Your Honor, it is apples and oranges.

7    What Ms. McCaffrey's law firm is doing is negotiating a

8    contract on behalf of her client.  My law firm has never done

9    that for the City of Rockford.

10        Now, let me speak to the issue of custodians because

11   Your Honor knows well when you took over this litigation in

12   2019 the issue of contracts was foremost, and one of the

13   issues was contract custodians.  Your Honor will remember that

14   well.  And we negotiated and spoke with defense counsel about

15   who were the contract custodians and not once did counsel say

16   it was members of her law firm.

17        In fact, as Your Honor will remember, three witnesses

18   were identified from Express Scripts:  Earl English, Rob

19   Osborne, and Christie Vivod, and I personally, Your Honor,

20   deposed every one of them, and none of them could answer the

21   questions that I posed to the designee.

22        MS. MCCAFFREY:  That is wrong.

23        MR. HAVILAND:  Let me finish.

24        Because, Your Honor, I invite you to read that

25   transcript, and I invite you to read what counsel did

repeatedly, instructing a witness who is sitting as a designee

to not answer questions about the preparation and the

information that she had, Judge.  She had information about

the negotiations that she was not permitted to share on

grounds of privilege, and I didn't want to have to explain to

Ms. McCaffrey how the rule works.  In fact, it was harassing.

What was harassing was every time I would ask a factual

question, there was an instruction or an interference, and the

little information we got, Your Honor, is what I revealed in

our motion to reconsider, that the witness finally was able to

answer "I don't know, Mr. Haviland.  Ask Ms. McCaffrey."

            MS. MCCAFFREY:  You know what --

            THE COURT:  Let me -- let me --

            MR. HAVILAND:  And the position that counsel is

taking -- excuse me -- I'm almost finished -- that they can

come into their client's situation and negotiate a contract

and ask a federal judge to bless it is not antitrust, and

protect that as privileged but not indicate ever to anyone

that that happened or ever log it, is offensive.

            THE COURT:  Well, I don't know if it is offensive.  I

want to know if it's appropriate and in accord with the law,

and I don't believe that it is, but I'm willing to take a

small amount of briefing on it because I want to make sure.

            I mean, first of all, I am very concerned with the

letter that I got from Ms. McCaffrey because it did not

address the question that I asked.  It would be one thing to
say, "We never entered any communications between our law firm
and a law firm representing Mallinckrodt because we did not
believe that to be part of the" whatever, but you didn't.  You
simply told me that you have not withheld as privileged any
drafts of the wholesale product purchase agreement, when you
keep referring back to the fact that you didn't have to turn
them over because of the shared interest exception, which is
really sort of talking out of both sides of your mouth, and
I'm not happy with that.  A little more transparency would
have distilled the issue, and we could have had this briefing
on the issue of whether you were required to put in a
privilege log before I ruled on the ultimate issue, rather
than having to go back and do it now.

        I don't believe that this is really a motion to
reconsider so much as it is -- I mean, what I had, a
recitation that everything had been turned over, would make
the issue of whether I needed to compel them to turn over
anything more moot because they were making a statement that
they had turned everything over.

        If, as we know now, they may not have turned
everything over, and there may be a reason why they didn't
turn it over, and they are going to try to tell me that, I
don't know, Mr. Haviland, what --

        MS. MCCAFFREY:  Your Honor, the motion --

1     MR. HAVILAND:  Your Honor, I think that maybe --

2     MS. MCCAFFREY:  Your Honor, I would like an

3  opportunity to respond since it's addressed to me.

4     MR. HAVILAND:  I'm sorry, Your Honor.  I thought you

5  asked me a question, but Ms. McCaffrey --

6     THE COURT:  You may.  You may.  You will.  But let me

7  just ask Mr. Haviland because it's his motion.

8     MR. HAVILAND:  Your Honor, I agree with you, and I

9  hope you can appreciate that it is always a difficult task as

10 an advocate to ask the Court to reconsider because, of

11 necessity, we are asking the Court to acknowledge a

12 misapprehension, and we tried to find where we think that

13 happened, and I think we know now where that happened.

14     Now, the issue is not one of a renewed motion to

15 compel because Your Honor can probably count the number of

16 times we have moved to compel on these issues.  The issue is

17 now one of candor to the tribunal and the fact that none of us

18 have known until this moment what counsel did, and whether

19 that gets converted to a motion to set for sanctions or

20 something else, I don't think the Court has to write any

21 further.  You have been transparent and clear what your

22 expectations have been.  We understood those and we read your

23 order the same.  The disconnect has come from defense counsel.

24     And I don't want to bother Judge Johnston with these

25 issues, but unfortunately we are in a real tough position here

1    because it is almost --

2            THE COURT:  Well, you are not going to --

3            MR. HAVILAND:  I'm sorry, Your Honor.

4            THE COURT:  I'm just saying you can file something

5    with Judge Johnston, but you are not going to get -- I mean,

6    you are going to wait in line for your answer.  So feel free

7    to do that.

8            But I guess what I'm saying is to the extent there

9    needs to be a decision on discovery issues, which is my

10   purview, I would like some briefing and justification for the

11   position that Ms. McCaffrey is giving me because I am

12   unfamiliar with the authority that she is arguing, that in

13   response to a judge's order, that she not, you know, provide

14   that information to me.

15           MS. MCCAFFREY:  Your Honor --

16           THE COURT:  Go ahead.

17           MS. MCCAFFREY:  Your Honor, I will start this by

18   again apologizing to the Court.  I believed that I was being

19   fully transparent with the Court, and I am so sick of

20   sanctions being thrown about as if they are nothing, and I

21   know that is not coming from the Court, but my correspondence

22   to the Court was an understanding that I was providing you

23   with the information that was requested.  I apologize if there

24   was a misunderstanding.

25           If there was a misunderstanding, I'm frankly

1  surprised we had to wait this long to hear about it from

2  Mr. Haviland.  But now that it is clarified, we would like the

3  opportunity to respond, Judge.

4          We were not negotiating a contract.  The

5  communications between Mallinckrodt and Express Scripts have

6  been produced around the negotiation of the contract.  There

7  was a discussion around indemnity, which Mr. Haviland is aware

8  of because it came up in a 30(b)(6) deposition with defense

9  counsel of our co-defendant.  We did not understand the

10 Court's order to be requiring the addition of Quinn Emanuel

11 outside attorneys as custodial collections, requiring a

12 privilege log in this case.

13         So I apologize.  We would appreciate the opportunity

14 to address the Court's concerns because we do believe that

15 this is all protected and privileged and none of it should be

16 logged or produced.  But we welcome that opportunity, Judge,

17 and I apologize again.  There was never any intent to make any

18 misrepresentation, Your Honor.  That was never the intent.

19         THE COURT:  All right.  So here is what we are going

20 to do.  We are going to get some authority from Ms. McCaffrey

21 for why the negotiation of a part of the wholesale product

22 purchase agreement, which is at issue in this case and was

23 part of the Court's order, that correspondence relating to

24 drafts of the wholesale product purchase agreement exchanged

25 between the defendant and Mallinckrodt, and that would include

 1   those things that were sent from Mallinckrodt's attorneys to

 2   Express Scripts' attorneys or from Express Scripts' attorneys

 3   to Mallinckrodt's attorneys, why you believe that those

 4   correspondence did not need to be logged on the privilege log

 5   to the extent they were being withheld.

 6          MS. MCCAFFREY:  Your Honor, if I may clarify that

 7   slightly because I would -- I do not -- I would not

 8   characterize these as negotiations.  The negotiations between

 9   Express Scripts and Mallinckrodt have been produced.  There

10   were discussions between counsel for Express Scripts and

11   counsel for Mallinckrodt relating to indemnification.  I

12   acknowledge that's what the discussions were that were

13   relating to those issues.  Those were the discussions.  So

14   with that clarification, Your Honor, we will provide that

15   briefing.

16          MR. HAVILAND:  Your Honor, if I may --

17          THE COURT:  No.  Wait one minute.

18          MR. HAVILAND:  Sorry.

19          THE COURT:  So when Mr. Haviland says that -- and I'm

20   looking at your letter, Ms. McCaffrey, and you are detailing

21   examples of emails that were attached to drafts that were

22   produced.  The last one is July 30th of 2021.  And I think

23   Mr. Haviland had raised a concern that there was nothing after

24   that date, when he understood the negotiations to continue,

25   until a final version was sent to Mallinckrodt and then

1  ultimately turned down.

2         With the exception of internal email discussions,

3  have all of the actual drafts of the agreement been provided,

4  including any drafts that would have been exchanged after

5  July 30th of 2021?

6         MS. MCCAFFREY:  Well, one, as a threshold matter,

7  Your Honor, I'm actually not sure that the record reflects

8  what Mr. Haviland believes happened.  I don't know that any

9  witness has actually stated that, and I don't know that that

10  is, in fact, accurate.

11         The final draft of the contract was obviously filed

12  publicly on the docket.  That contract was never entered into.

13  No Acthar was ever distributed under it.  But that was filed

14  on the docket, and I'm pretty sure that Mr. Haviland --

15         THE COURT:  Yes, I agree.

16         MS. MCCAFFREY:  That was later in the year.  I think

17  it was early 2022, Your Honor.

18         THE COURT:  And I'm not holding you to an exact date,

19  but what he is saying is -- I think he is saying that he does

20  not have any drafts of the product purchase agreement from the

21  one you reference in your letter, the last one, which is

22  July 30, 2021, until that final agreement was put on the

23  docket in late '21 or early '22, which would mean that there

24  was, roughly, six months worth of potential negotiation or

25  potential back-and-forth on redlines of the drafts that may

1    have occurred that weren't turned over.

2          And what I'm trying to find out is, separate and

3    apart from this issue of discussions between counsel on some

4    discrete issue, were there additional redlines exchanged after

5    the July 30th, 2021, document that you reference in your

6    letter.

7          MS. MCCAFFREY:  I don't know, Your Honor.  I would

8    have to go back and look at that.  I'm not sitting with the

9    timeline here.  I think Mr. Haviland is speculating as to

10   additional negotiations that went on, and I'm pretty sure that

11   this was a subject of the 30(b)(6) testimony.  But I'm not

12   sure, Your Honor.  I will have to go back.  And I don't want

13   to make any misrepresentations or representations, one way or

14   the other, to the Court.  I would need to go back and confirm.

15         The documents referenced in the letter are the

16   additional drafts that we identified.  I don't know if these

17   contain all of them, Your Honor.  And I know that there were

18   drafts that were obviously used in the 30(b)(6) depositions,

19   including questioning by plaintiff's counsel that was saying

20   that the last draft that they were questioning on represented

21   and matched up with the final version that was filed, I

22   believe, but I have to go back and look at that, Judge.

23         THE COURT:  Okay.

24         MS. MCCAFFREY:  I cannot tell you one way or another

25   sitting here.

1    THE COURT:  I just wanted to make sure there wasn't

2  some other issue here, okay?  And there may be two issues.

3         MR. HAVILAND:  Your Honor --

4    THE COURT:  I'm talking, Mr. Haviland.  I'm talking.

5  Let me finish my thought.

6         MR. HAVILAND:  Thank you.

7    THE COURT:  There may be two issues.  One is have all

8  the actual drafts of the product purchase agreement been

9  produced, and then, secondly, have the correspondence between

10  counsel about those drafts been produced.  Those would seem to

11  me to be two separate issues, okay?  So I want you to address

12  both of those in your briefing, okay?

13         MS. MCCAFFREY:  I understand, Your Honor, yes.

14    THE COURT:  All right.  Go ahead, Mr. Haviland.

15    MR. HAVILAND:  Thank you, Your Honor.

16    And as to that second issue, counsel is right that we

17  marked and examined with the witness drafts that came after

18  the July 2021.  Your Honor allowed the defendants to claw

19  those back, obviously seeing in camera a cover email.  But you

20  have the evidence in front of you that drafts were generated

21  because the witness agreed that there was a negotiation about

22  several provisions, and I will just focus on the indemnity.

23  The final says 50 percent, but we saw a draft that said 75,

24  and another said 25, and obviously that shows negotiations to

25  get to a center position.  We have none of those drafts.  What

1  we had was what we were given, we used with the witness, but

2  that has been clawed back.  So now there is --

3          THE COURT:  Yes, I mean --

4          MR. HAVILAND:  And now there's a problem, Judge, that

5  the witness --

6          THE COURT:  Yes, I see the problem.  I exactly see

7  the problem.

8          MR. HAVILAND:  Okay.

9          THE COURT:  So to the extent that Mr. Haviland is

10  relying on a document that is produced inadvertently, but

11  there is no -- that is a privileged document that is produced

12  inadvertently, but there was a non-privileged document,

13  meaning the version that was sent from Mallinckrodt to the

14  defendant or from defendant to Mallinckrodt, and that wasn't

15  turned over, then how would he be able to question the witness

16  about that?  So that's what I need to know.

17          MS. MCCAFFREY:  Your Honor --

18          THE COURT:  Go ahead.

19          MS. MCCAFFREY:  I apologize, Your Honor.  I didn't

20  mean to interrupt.  I really apologize.

21          THE COURT:  No.  Go ahead.  What is your -- do you

22  have an answer to that?

23          MS. MCCAFFREY:  No.  I will go back and I will look

24  at it, but that just confirms that we produced what we had.

25  And I apologize if there is some misunderstanding.  We will

1    address the two issues raised by the Court.  I just -- no, I

2    won't talk about the timeline, Your Honor, until I have that

3    nailed down.  I would rather -- we will take that opportunity

4    to look into this, and we will update the Court accordingly,

5    as you have requested and ordered.

6            I apologize.  You don't request.  You order.  I

7    apologize, Your Honor.

8            THE COURT:  How much time do you need to do that?

9            MS. MCCAFFREY:  Your Honor, if I could have two

10   weeks, that would be ideal.  I don't know if that is okay with

11   the Court.

12           THE COURT:  That's fine.

13           MS. MCCAFFREY:  Two weeks would be ideal if we can.

14           THE COURT:  Fourteen days, yes, that's fine.

15   Fourteen days to do that.

16           And then you are going to want to reply to that,

17   Mr. Haviland?

18           MR. HAVILAND:  I would hope not, Judge, but I would

19   like a placeholder.  So, yes, if we could have -- I don't know

20   how deep into the summer we are looking here.  It is just

21   things get difficult, as you can imagine.  So I think that

22   puts their brief after the July 4th holiday.

23           THE COURT:  Yes.

24           MR. HAVILAND:  We probably don't need more than a

25   week.  I would like to get this resolved.

1    THE COURT:  Seven days.  Okay.  So seven days
2  thereafter to get a reply.

3    And then I'm going to have to see.  I don't know if
4  that is going to resolve the issue or if I'm going to have to
5  look at something in camera.  I just don't know.  So I have
6  got to see what's contained in Ms. McCaffrey's response, and
7  maybe that puts it to bed, maybe it opens a whole different
8  can of worms.  I don't know.  But I wish it was -- like I
9  said, I wish this had been raised before.

10    So as it is, I guess we will enter and continue the
11  motion until we get this follow-up information.  I don't know.
12  This is a brief within a brief?

13    MR. HAVILAND:  Well, I think it would be a response,
14  Judge, to our motion, whatever you cast it --

15    THE COURT:  Yes, okay.  We will call it a response
16  and then a reply, and then we will rule accordingly, okay?

17    MR. HAVILAND:  Thank you, Your Honor.

18    MS. MCCAFFREY:  Thank you, Your Honor.

19    (Which were all the proceedings heard.)

20                            CERTIFICATE

21    I certify that the foregoing is a correct transcript from

22  the record of proceedings in the above-entitled matter.

23  /s/Heather M. Perkins-Reiva            June 23, 2023

24  _____    _____
    Heather M. Perkins-Reiva                    Date
25  Official Court Reporter