UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

- - - - - - - - - - - - - - - -

CITY OF ROCKFORD,                Case No. 3:17-cv-50107

            Plaintiff,

                        VIDEOTAPED
    v.                DEPOSITION OF:
                        DR. STEVEN MILLER

MALLINCKRODT ARD INC.,
et al.,                          SEPTEMBER 15, 2022
                        9:02 a.m.

            Defendants.

- - - - - - - - - - - - - - - -

SERIES 17-03-615, a           Case No. 3:20-cv-50056
designated series of MSP
RECOVERY CLAIMS, SERIES
LLC, et al.,

            Plaintiffs,

    v.

EXPRESS SCRIPTS INC., et al.,

            Defendants.

- - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF

DR. STEVEN MILLER, before Alexis A. Jensen, RPR,

CRR, and a Certified Court Reporter, at Hilton

St. Louis Airport, 10330 Natural Bridge Road,

St. Louis, Missouri, on Thursday,

September 15, 2022, commencing at approximately

9:02 a.m., pursuant to Notice.

JOSEPH ALBANESE, JR., CSR
250 Washington Avenue
Toms River, New Jersey 08753
Telephone (732) 244-6100
Fax (732) 286-6316

1   A P P E A R A N C E S:

2

3       HAVILAND HUGHES
        BY:  DONALD E. HAVILAND, ESQ.
        201 South Maple Way
4       Suite 110
        Ambler, Pennsylvania  19002
5       215.609.4661
        haviland@havilandhughes.com
6       Counsel for the City of Rockford and the Class

7

8       QUINN EMANUEL URQUHART & SULLIVAN, LLP
        BY:  KEITH H. FORST, ESQ.
             J. MATTHEW HAMANN, ESQ.
9       1300 I Street, NW
        Washington, D.C.  20005
10      202.538.8162
        keithforst@quinnemanuel.com
11      matthewhamann@quinnemanuel.com
        Counsel for the Express Scripts Entities

12

13      MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC
        BY:  ANNA HIGGINS, ESQ.
14      27 W. Monroe Street
        Suite 2100
15      Chicago, Illinois  60606
        312.593.3354
16      ahiggins@milberg.com
        Counsel for the MSP Plaintiffs

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES CONTINUED:

 2

     BARTIMUS FRICKLETON ROBERTSON RADER
 3   BY:  JAMES BARTIMUS, ESQ.
          ANTHONY DEWITT, ESQ.
 4   4000 W 114th St
     Suite 310
 5   Leawood, Kansas  66211
     913.266.2300
 6   jb@bflawfirm.com
     ald@bflawfirm.com
 7   Counsel for the MSP Plaintiffs

 8

 9   Also present:  Urmila Baumann, Associate Chief
                    Counsel, Express Scripts
10                  Nathan Arndt, Videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                     I N D E X

2    WITNESS

3    DR. STEVEN MILLER

4

5    EXAMINATION

6    BY MR. HAVILAND, page 8
     BY MR. HUNDLEY, page 300
7

8    EXHIBITS:

9    01    Dr. Miller's signature page for
           confidentiality order, page 10
10
     02    MNK04024815-16, page 28
11
     03    MNK00081796-98, page 78
12
     04    Questcor Press Release, 8/27/07, page 78
13
     05    MNK00082108, page 82
14
     06    ExpressScripts0578988, page 85
15
     07    ExpressScripts5500329-31, page 96
16
     08    ExpressScripts5478859-60, page 102
17
     09    ExpressScripts0837581-83, page 115
18
     10    ExpressScripts4932466-90, page 118
19
     11    ExpressScripts0511827-29, page 126
20
     12    ExpressScripts5769673-74, page 150
21
     13    ExpressScripts5566025-33, page 150
22
     14    ExpressScripts4990395-98, page 154
23
     15    ExpressScripts0834559, page 162
24

25

Page 5

1    EXHIBITS CONTINUED:

2
     16    ExpressScripts4856396-400, page 164
3
     17    ExpressScripts0982536-37, page 168
4
     18    ExpressScripts0992149-52, page 186
5
     19    ExpressScripts5768881-82, page 195
6
     20    ExpressScripts0837545-47, page 207
7
     21    Emails, 6/5/17, page 219
8
     22    ExpressScripts0837549-50, page 230
9
     23    ExpressScripts0959385, page 235
10
     24    ExpressScripts5353147, page 237
11
     25    ExpressScripts0834253-65, page 240
12
     26    ExpressScripts5484513-14, page 246
13
     27    ExpressScripts1096837-41, page 255
14
     28    Emails, 5/21/18, page 280
15
     29    ExpressScripts4848402-06, page 284
16
     30    ExpressScripts0000434-49, page 290
17
     31    ExpressScripts0515829, page 301
18
     32    ExpressScripts0975522-23, page 304
19

20

21

22

23

24

25

1           THE VIDEOGRAPHER:  We are now on

2     the record.  This is the deposition of

3     Dr. Steve Miller in the matter of City of

4     Rockford versus Mallinckrodt ARD, et al.

5     This deposition is being held at the

6     Hilton St. Louis Airport, 10330

7     Natural Bridge Road, St. Louis, Missouri.

8           Today's date is September 15th,

9     2022, and the time is 9:02 a.m.  My name

10    is Nathan Arndt.  I'm the videographer.

11    The court reporter is Alexis Jensen.

12          Counselors, will you please

13    introduce yourselves and affiliations for

14    the record, and the witness will be sworn

15    in.

16          MR. HAVILAND:  This is Don Haviland

17    from Haviland Hughes, Counsel for the City

18    of Rockford and the Class.

19          MR. FORST:  Good morning.

20    Keith Forst with Quinn Emanuel Urquhart --

21    oh, I'm sorry.  I --

22          MR. HAVILAND:  We have other

23    Plaintiffs' Counsel.

24          MR. FORST:  Go ahead.  I'm sorry.

25          MS. HIGGINS:  Good morning.

```
1          Anna Higgins, from Milberg, on behalf of

2          the MSP Series Plaintiffs.

3               MR. FORST:  And, again,

4          Keith Forst, with Quinn Emanuel Urquhart &

5          Sullivan, on behalf of the witness and

6          Defendants Express Scripts Entities.

7               MR. BARTIMUS:  James Bartimus on

8          behalf of the City of Rockford.

9               MR. HAMANN:  Yes, I'm

10     Matt Hamann --

11              MR. DEWITT:  Anthony DeWitt on

12         behalf of the City of Rockford.

13              MR. HAVILAND:  Oh, we have a crowd.

14     Okay.  Anyone else for Rockford?

15              MR. HAMANN:  Anyone else?

16              MR. HAVILAND:  Yeah.  Okay.

17              MR. HAMANN:  All right.  You also

18         have Matt Hamann, from Quinn Emanuel, on

19         behalf of the Express Scripts Entities.

20              MS. BAUMANN:  Urmila Paranjpe

21         Baumann, Associate Chief Counsel for

22         Litigation, on behalf of the Express

23         Scripts Entities.

24              MR. HAVILAND:  All right.  We

25         ready?
```

1          Good morning, Dr. Miller.

2          (Discussion held off the record.)

3          DR. STEVEN MILLER,

4     having been called as a witness, being

5     duly sworn, testified as follows:

6               EXAMINATION

7  BY MR. HAVILAND:

8     Q     Once again, good morning,

9  Dr. Miller.

10 A     Good morning.

11    Q     My name is Don Haviland, and I'm

12 a -- a lawyer for the City of Rockford in a case

13 that was filed against Mallinckrodt and

14 Express Scripts way back in April of 2017.

15          I -- you understand you're

16 appearing today to give a deposition, right?

17 A     Correct.

18    Q     Have you ever been deposed before,

19 sir?

20 A     Yes, sir.

21    Q     In the last 10 years?

22 A     No, sir.

23    Q     Okay.  In your capacity as an

24 employee of Express Scripts?

25 A     No, sir.

1          Q      Okay.  I assume your esteemed

2    Counsel here has gone over the -- the general

3    guidelines.  We're in a conference room here in

4    St. Louis.  We have a stenographer that's taking

5    down the written transcription.  So, the room

6    doesn't have very good acoustics, but I will keep

7    my voice up.

8                 So, if you don't understand or hear

9    a question, just ask me.  I want to have a very

10   clear record with you, so you understand what I'm

11   asking, and I understand what you're answering.

12                Is that fair?

13   A      Great.

14         Q      If you need to take a break,

15   consult with Counsel, you can do that at any

16   time.  I ask you to give me a heads-up and try

17   not to do that during a pending question, so that

18   we can take reasonable breaks, and we'll -- we'll

19   try to do something in about an hour or so.

20                Alrighty?

21   A      Thank you.

22         Q      Preliminarily, I want to show you

23   what was signed this morning.  It's an

24   acknowledgment of the Confidentiality Order.

25   I've marked that as Miller Exhibit 1.  And just,

1    if you can, sir, identify your signature.

2              (Exhibit 1 was marked.)

3              THE DEPONENT:  That's -- that's my

4        signature.

5    BY MR. HAVILAND:

6        Q     Okay.  Perfect.  Thank you.  And

7    that's just dealing with the issue of some of the

8    material that was produced by the Defendants in

9    this case was deemed confidential.  All right.

10             You are no longer employed by

11   Express Scripts?

12   A     I consult for Cigna.

13       Q     Cigna.  Okay.  Do you have a title?

14   A     I'm a consultant to Cigna.

15       Q     Okay.  When did you take that role

16   on; after the merger or sometime after that?

17   A     On January 1st, I stepped down from my

18   full-time position as executive vice president

19   and chief clinical officer for Cigna.

20       Q     If you could just keep your voice

21   up a little bit, that's -- it's tailing off at

22   the end.

23   A     Oh, sorry.

24       Q     That's okay.  I'm a few feet away

25   from you, so I'll try to monitor what I'm

1   hearing.  I'm sure the video's picking it up,

2   but...

3                  So you were the executive vice

4   president up until December of 2021?

5   A      Yes, correct.

6          Q      Okay.  And then you took on this

7   consulting role at Cigna, right?

8   A      Correct.

9          Q      All right.  Do you have any other

10  employment outside of your consultancy?

11  A      No, sir.

12         Q      Okay.  Let's take a -- a moment

13  just to acquaint you to the jury.

14                  You are -- you go by

15  Dr. Steve Miller, correct?

16  A      Correct.

17         Q      And the doctor is what; a doctorate

18  in?

19  A      MD.

20         Q      You're an MD.  Okay.  When did you

21  graduate medical school, sir?

22  A      In 1983.

23         Q      Okay.  Where'd you go?

24  A      University of Missouri, Kansas City.

25         Q      Okay.  There's a fellow Lion there

1   that'll want to have a chat with you later.  He's

2   from Kansas City himself, so...

3                    All right.  And then walk me

4   briefly through your history from graduating

5   medical school, and -- and get me to Express

6   Scripts, if you can.

7   A     Yeah.  So, my first position after medical

8   school was an intern at the University of

9   Colorado, Denver.  Stayed there as a medical

10  resident.  Stayed on as faculty for a year after

11  that.

12                   In 1988, I moved to Washington

13  University in St. Louis, where I was a kidney and

14  transplant fellow.  I stayed on the faculty there

15  for 17 years, rising through the ranks, becoming

16  the chief medical officer for Washington

17  University and Barnes-Jewish Hospital.  A basic

18  scientist by training, I had a laboratory, doing

19  drug discovery.  I have many patents, many

20  publications.

21                   In 2005, was recruited to Express

22  Scripts, and came there, stayed with them through

23  the Cigna merger, as the executive vice -- or the

24  executive vice president and chief medical

25  officer -- or chief medical officer for Express

1  Scripts.  When Cigna bought Express Scripts, I

2  was asked to be the chief clinical officer for

3  both companies.  I stayed on for an additional

4  three years post the merger, as the chief

5  clinical officer -- the executive vice president

6  and chief clinical officer for Cigna.

7          Q       Was there a -- a change in

8  responsibility or function between chief medical

9  officer and chief clinical officer?

10  A       Yes.  So, previously, I was responsible

11  just for the PBM, which was primarily focused on

12  pharmaceuticals.  Obviously, Cigna is a health

13  plan, and so I took responsibility for the health

14  plan, still overseeing the PBM.  But also, you

15  know, Cigna is an international health plan, so

16  we're in 30 different countries and the

17  United States.

18          Q       Okay.  So, I want to start in 2005.

19                  Have you always had the role as a

20  medical officer within Express Scripts?

21  A       So, my first position when I came to

22  Express Scripts was as -- I was the vice

23  president of product, and stayed in that role for

24  about the first year and a half or so, before I

25  became the chief clinical officer.

```
 1          Q       Okay.  So, to about --

 2     A    Chief medical officer.

 3          Q       -- mid '06?

 4     A    Correct.

 5          Q       Okay.  And then you transitioned,

 6     was it, over to --

 7     A    Got promoted to the senior vice president

 8     and chief medical officer.

 9          Q       In about the middle of '06?

10     A    Correct.

11          Q       Okay.  And then did your role

12     essentially stay the same, but grow in

13     responsibility?

14     A    So, I was no longer -- so, Express Scripts

15     had never had a chief medical officer.  When I

16     was recruited, that was the vision for the

17     position, but -- and they didn't -- it was

18     somewhat of a nebulous job description.  So what

19     I did is I actually went to all the areas of

20     Express Scripts to see how I could add value to

21     them.

22                  So HR, how can I add value to our

23     own employee health benefits?  For sales and

24     account management, how can I support you in the

25     sales effort?  For legal, how can I be of help
```

1    to -- to their area?  For government affairs, how

2    can I support them?  And so, I quickly was able

3    to establish the ability to help many of the

4    different areas within Express Scripts.

5         Q     All right.  Did you also get

6    involved in any of the business development

7    functions?

8    A     Yes.

9         Q     Okay.  And it's very difficult to

10   kind of pinpoint in time the business

11   development, but you're familiar with a gentleman

12   by the name of Rob Osborne?

13   A     Yes.

14        Q     Okay.  And I know he had a title of

15   business development and kind of oversaw

16   CuraScript and then later Accredo, when there was

17   the Medco merger.

18             And did you -- did you have any

19   interface with Mr. Osborne and his group?

20   A     Yes.

21        Q     Okay.  In what way -- ways?

22   A     So, like every other area, if there was

23   ways I could support them, I would.  You know,

24   they were really about drug access, and so -- and

25   at the time, as you know, or shortly thereafter,

1    Express Scripts acquired CuraScript, and so I

2    supported the -- the due diligence of CuraScript

3    and the integration of the company.

4            Q       All right.  And -- and we -- we

5    call it CuraScript, but it's also Priority

6    Healthcare, right?

7    A       Priority was one of the acquisions of

8    CuraScript.

9            Q       Right.  And then later on, when ESI

10   merged with Medco, it took on a -- similar

11   companies to what was already in the portfolio,

12   one of which was Accredo?

13   A       Correct.

14                   MR. FORST:  Objection to the form.

15                   You can answer.

16   BY MR. HAVILAND:

17           Q       Is that right?

18   A       Yes.

19           Q       Yeah, I'm not going to -- we've

20   talked to other company executives about these

21   issues.  I'm just trying to orient ourselves and

22   your role as -- as kind of a consultant to all

23   those different areas, right?

24                   MR. FORST:  Objection to the form.

25                   You can answer.

Page 17

1                    THE DEPONENT:  Oh.  Yes, so I

2          attempted to aid any of the departments

3          where I could be of value.

4    BY MR. HAVILAND:

5          Q     Okay.  Let's -- let's talk a little

6    bit about Express Scripts.  And obviously, I'm

7    limiting myself to the time you were there, from

8    2005 to the time you -- well, you're still

9    consulting at -- at Cigna, correct?

10   A     I still consult at Cigna, correct.

11         Q     So, you still have some consultant

12   role with respect to the PBM as it exists within

13   the Cigna company, right?

14   A     So, yeah, I still, when asked, would --

15   you know, would be happy to help if -- if there's

16   services needed at Express Scripts.

17         Q     What's the mission of Express

18   Scripts?

19   A     It's to make drugs more affordable for

20   Americans.

21         Q     Okay.  How do they do that?

22   A     So, we primarily do it by several

23   mechanisms.  So, making sure the patient's

24   getting the right drug at the right time through

25   the right channels, at -- in the most affordable

1   way.  We drive better care through adherence.

2   So, we have clinical programs that help assist

3   patients in their care.  And so those are the

4   primarily -- primary ways in which we assist

5   patients to get to the right drugs at the lowest

6   costs.

7        Q     What does ESI do to help drive down

8   the cost of prescription drugs?

9   A     So, one of the -- there are -- there's

10  essentially no other entities in the US

11  marketplace that work to drive down the costs of

12  drugs.  Initially, our biggest lever was the

13  ability to move people from branded drugs to

14  generic drugs.  And so, that was extremely

15  valuable, because generic drugs are often much

16  more inexpensive than the branded product, but

17  equally efficacious.

18                And then, for the times where there

19  are no generics, if there's competition, there's

20  brands that compete in a category, we can pit

21  them against them, and hopefully get to the

22  lowest price.

23        Q     What about specialty drugs, what

24  are specialty drugs?

25  A     So, specialty drugs is a category of

1   drugs.  Usually, they are very expensive.  They

2   usually have special handling requirements.  They

3   often are more toxic, and so they're not

4   routinely handled by retail pharmacists.  And so,

5   specialty drugs is a class of drugs that

6   represents 2 to 4 percent of dispenses, but are

7   now up to almost 50 percent of the cost of

8   healthcare -- of pharmaceuticals care.

9        Q    Can I get those statistics again?

10  2 to 4 percent --

11  A    So, 2 to 4 percent of the population uses

12  a specialty medication, depending on the

13  population you're looking at; and it's currently

14  about 50 percent of pharmaceutical spend.

15       Q    That's astounding, isn't it?

16  A    It's very -- yes.

17       Q    And that's grown over time since

18  you started at Express Scripts, right?

19  A    Correct.

20       Q    And it's grown as a function of

21  drugs being called speciality and then moved out

22  of general wholesale distribution?

23  A    That's a minor component to it.  It's the

24  innovation that's occurred in pharmaceuticals, so

25  the number of new products that come to the

1    marketplace.  If you look at FDA approvals over

2    the last decade, the FDA approves more specialty

3    drugs than it does what are called the

4    traditional oral solid drugs.

5                    And so, that's where --

6                    (Reporter clarification.)

7                    THE DEPONENT:  The traditional oral

8    solid drugs for, like, diabetes, high blood

9    pressure, things like that.

10                   And so, the real innovation in

11   pharmaceuticals has been -- and their business

12   model has been focused on creating new specialty

13   drugs.

14   BY MR. HAVILAND:

15        Q     You -- you said that there's a

16   minor subset of specialty --

17   A     There are some drugs that have --

18        Q     Can I just -- sir?

19   A     Yeah.

20        Q     I actually had a thought that I

21   wanted to convey to you.

22   A     Oh, sorry.  Okay.

23        Q     It's the first time, and I asked --

24   I didn't give you this instruction.  If we could

25   just have good pace, a couple of seconds, I'll

Page 21

1   finish my question, and that way we won't talk

2   over each other, and Alexis here has to get us

3   both down.  So, I appreciate your willingness to

4   answer.  Let me just reorient the question.

5                 This category called "specialty,"

6   that didn't exist when you got out of medical

7   school, did it?

8   A       I don't know.

9        Q       Do you know what makes a drug,

10  special, who determines that it's a specialty

11  drug versus a brand or generic?

12  A       So, the government actually has a

13  definition for specialty drugs, and so for the

14  government, it's any drug that is priced at over

15  $500.

16          Q       Okay.  It's based upon price?

17  A       For the government, yeah.

18          Q       What about the commercial

19  marketplace, how is specialty determined?

20  A       So, as we -- as I said previously, we look

21  at specialty drugs as high-priced drugs that

22  often require special handling or instructions or

23  have a big teaching component for the patient or

24  have more toxicities.

25          Q       Okay.  You'd agree with me, apart

Page 22

1    from innovative medications that are launched

2    once they're discovered and put out in the

3    marketplace as innovative in terms of healthcare

4    treatment, there is a -- a grouping of specialty

5    drugs that are older, some call them orphan

6    drugs, they treat very limited patient

7    populations, and they've been around for a while?

8    A      Yeah, so orphan drugs have a specific

9    definition also.

10          Q      Okay.

11   A      It's drugs that are designed for

12   populations of less than 200,000 people.

13          Q      And are the drugs that treat that

14   limited patient population in those disease

15   states for which they treat, are they called

16   orphan drugs?

17                 MR. FORST:  I'll just object to the

18          form.

19   BY MR. HAVILAND:

20          Q      Yeah, I just want to understand the

21   definition that you just gave us.  Is it strictly

22   based upon population -- patient population?

23   A      Yes, because -- as far as I understand,

24   because there's actually tax implications for the

25   developers of those drugs by getting the orphan

1    designation.  So, when you file at the FDA, you

2    file to be an orphan product.

3           Q      And that, like some patent

4    protection, gives the manufacturer of those

5    orphan drugs some limited period of exclusivity,

6    right?

7    A      That's correct.

8           Q      About seven years?

9    A      I can't tell you precisely.  I don't know.

10          Q      Okay.  That's fair.  And, sir, I

11   only want to know what you know today, okay?  I

12   don't want you to speculate, hypothesize.  If you

13   have a thought that's based upon your experience,

14   I -- I welcome it, but I know what you've done,

15   and I know what you do.  We have a lot of your

16   writings, including some emails to your wife

17   while she was teaching, but I hope to just talk

18   to you today and elicit your testimony and get

19   you out of here, okay?

20   A      Great.

21          Q      So, let's keep delving down in the

22   area of specialty drugs.

23                 So, it -- it exists as a class

24   designation for drugs outside of branded and

25   generic, right?

Page 24

1   A       Correct.

2           Q       And so the jury's watching this,

3   and -- and I always try to help them understand

4   what you and I might know better.

5                   So, a branded drug would be

6   something like Lipitor that people take, a

7   statin, right?

8   A       Um-hmm.

9           Q       Is that a yes?

10                  (Reporter clarification.)

11                  THE DEPONENT:  Yes.

12  BY MR. HAVILAND:

13          Q       I should have said that you always

14  have to answer verbally too.

15                  So, the jury would know when they

16  get a prescription for a statin that says

17  "Lipitor," they go in, and they would see the

18  manufacturer that make the branded drug, "I'm

19  getting Lipitor," right?

20  A       Correct.

21          Q       There's also generic versions of

22  some branded drugs, right?

23  A       Correct.

24          Q       And as you pointed out, they're

25  cheaper?

1    A      Correct.

2            Q      And some payers will prefer and --

3    and sometimes mandate generic substitution to

4    save cost, right?

5    A      Correct.

6            Q      All right.  We have this group of

7    specialty drugs, which, as you point out, has

8    some special handling characteristics and treats

9    a very small portion of the population, 2 to 4

10   percent, right?

11   A      Correct.

12           Q      And it's also defined by high cost?

13   A      Correct.

14           Q      The government says $500, but some

15   of those costs range into the hundreds of

16   thousands of dollars for a treatment regimen,

17   right?

18   A      Now millions.

19           Q      Now millions, that's right.

20                  Spinraza, $750,000, right?

21   A      Well, there's now a new gene therapy for

22   $2.8 million.

23           Q      Yeah.  It's -- it's really getting

24   out of control, isn't it, Doctor?

25                  MR. FORST:  Objection to the form.

Page 26

1                    THE DEPONENT:  It's a challenge for

2         everyone.

3    BY MR. HAVILAND:

4         Q       Yeah.  I mean, could you imagine a

5    small municipality or health plan having to pay

6    $2 million for one -- one beneficiary?  It could

7    bankrupt plans, you'd agree?

8    A        Correct.

9         Q       So, one of the things that Express

10   Scripts tries to do is tamp down on that -- that

11   cost, right?

12   A        Correct.

13        Q       And specifically in the area of

14   specialty, after you came to Express Scripts,

15   Express Scripts acquired CuraScript, which had a

16   specialty distribution arm, right?

17   A        Correct.

18        Q       And -- and so the jury understands,

19   that's a distributor, a -- a warehouse, and then

20   a distribution function, for specialty drugs,

21   right?

22   A        Correct.

23        Q       May have some cold storage, but may

24   have just some general storage within a

25   warehouse, right?

1    A       I've never been to their warehouse.

2            Q       Nor have I, but that's what I've

3    heard.

4                    And then specialty distributors, in

5    the case of CuraScript, will distribute out to

6    specialty pharmacies, right?

7    A       I -- their -- I assume that could be their

8    customers, but hospitals, doctors' offices,

9    others could be their customers.

10           Q       I'll tell you what, I'm going to

11   show you a document, just so we can kind of

12   orient ourselves about the product flow, and see

13   if you recognize the graphic as something that's

14   familiar to you.

15                   As I said, I wasn't going to use a

16   lot of documents, but sometimes I think it'd be

17   helpful to use one or two, so you can kind of

18   see -- we've gotten a lot of information in this

19   lawsuit, so the information is helpful to us and

20   the jury to understand what we're speaking about.

21                   So, I'm going to mark as Exhibit 2

22   to your deposition a document that I'm sure you

23   haven't seen before.  So, I want you to take a

24   moment, and I'm going to look at the graphic on

25   the page 2, and I'll read into the record, once I

1    give your Counsel a copy of it.

2              MR. HAVILAND:  I apologize now, I

3         only have one of some of these things, but

4         I do have other copies.

5              (Exhibit 2 was marked.)

6    BY MR. HAVILAND:

7         Q    So, I'm going to call these

8    exhibits, Dr. Miller, Miller Exhibits [sic] 1, we

9    just marked.  This is 2.  For the record, Miller

10   Exhibit 2 is a Mallinckrodt-produced document,

11   with the Bates number -- and, sir, I'll be

12   referring to that in the lower corner.  It's

13   really the best way to understand documents

14   produced in litigation.  In the lower right, it

15   says, MNK, showing that it was produced by

16   Mallinckrodt, 04024815 through 16.

17              This document was prepared by

18   Steve Cartt on -- on or around June 29th, 2007,

19   and it was sent to senior executives within

20   Questcor at the time.  You'll see the email says,

21   Dear Board Members, attached is a diagram

22   outlining our new Acthar distribution system.

23              Do you see that reference?

24              Just in the email, I'm just making

25   sure you're following with me.

Page 29

1    A    Yes.

2         Q    All right.  He says, Please use

3    this as a reference during Monday's update on the

4    specialty pharmacy transition.  We'll be happy to

5    go through this and answer any questions the

6    Board of Directors may have.

7              Do you see that?

8    A    Yes, sir.

9         Q    On the -- on the following page is

10   a graphic for this new Acthar distribution

11   system.  I like this document, because it's

12   simple.  It -- it shows the product flow of

13   Acthar after Questcor contracted with CuraScript

14   to relaunch Acthar back in 2007.

15              Are you familiar with that re- --

16              MR. FORST:  Objection to the

17         characterization of the document.  It --

18              MR. HAVILAND:  Hold on.  Hold on,

19         Counsel.  You can't cut off my --

20              MR. FORST:  You can't testify.

21              MR. HAVILAND:  Well, you can't cut

22         off my question.

23              MR. FORST:  Are you asking what the

24         document says?

25              MR. HAVILAND:  This is not going to

```
1      go well --
2              MR. FORST:  It wasn't a question.
3              MR. HAVILAND:  It's not going to go
4      well if I can't finish my question.
5              MR. FORST:  Even if you talk
6      louder, it's not going to deter me.  I'm
7      just saying --
8              MR. HAVILAND:  Well, I wasn't done.
9              MR. FORST:  But you're --
10             MR. HAVILAND:  I'm going to ask him
11     again --
12             MR. FORST:  -- you're describing
13     the document.
14             MR. HAVILAND:  Yes, I am.
15             MR. FORST:  Are you asking him if
16     he's seen it, what it shows, or are you
17     testifying?  I just want to be clear.
18             MR. HAVILAND:  This is going to be
19     very simple.
20             MR. FORST:  All right.
21             MR. HAVILAND:  I'm going to ask
22     questions.
23             MR. FORST:  Okay.
24             MR. HAVILAND:  You can object.  And
25     if you speak, we're going to go really
```

1          long, and we're going to come back.

2                    MR. FORST:  That's fine.  We will

3          do those things.  I'll defend the

4          deposition, but I just said let's ask

5          questions, not give testimony.

6     BY MR. HAVILAND:

7          Q     Dr. Miller, again, if you don't

8     understand my questions, I want you to tell me

9     so, and answer only the questions you understand,

10    because I want to know what you know.

11                   Now, you have had an opportunity,

12    sir, to review this document; have you not?

13                   You've had an opportunity to see

14    the graphic on page 2, right?

15    A     Correct.

16         Q     You were at Express Scripts,

17    overseeing, consulting, working with, folks

18    within CuraScript, including Rob Osborne, in

19    2007, right?

20                   MR. FORST:  Objection to the form.

21                   THE DEPONENT:  It's a large

22         company.  I offered to assist these

23         people, but I would not characterize it as

24         I was overseeing their function.

25    BY MR. HAVILAND:

1          Q       Okay.  But if they needed consult

2     from a gentleman of your experience, they would

3     seek it, and at times, you would give it, right?

4                    MR. FORST:  Object -- objection,

5            calls for speculation, vague, ambiguous.

6     BY MR. HAVILAND:

7          Q       All those things, but go ahead.

8                    MR. FORST:  And more.

9                    But you can answer.

10                   THE DEPONENT:  I -- I was available

11           if they sought me out.

12    BY MR. HAVILAND:

13         Q       All right.  You were familiar, sir,

14    with the fact that CuraScript contracted with

15    Questcor for the exclusive distribution of

16    Acthar?

17    A       I was not.

18         Q       You were not.

19                  You were not in 2007?

20    A       No.

21         Q       Did you ever become aware of the

22    fact that CuraScript contracted with Questcor for

23    the exclusive distribution of Acthar?

24    A       Later on, I became aware that we were the

25    exclusive distributor of Acthar.

1          Q       Tell me the context in which you

2     learned that fact.

3     A       It was probably later in the middle of --

4     probably in the mid '20s -- 2010s, when actually

5     the -- it may have been when either the investor

6     community or others started questioning us about

7     it, probably after the litigation was filed.

8          Q       The Rockford litigation?

9     A       That's the only litigation I'm familiar

10    with.  I -- yes.

11         Q       Well, I'm only asking, because

12    there's a lot of litigation involving Acthar.

13    A       Yeah, but --

14         Q       You're referring to the Rockford

15    lawsuit in your answer?

16    A       I believe so.

17         Q       You're not referring to the Federal

18    Trade Commission lawsuit against Mallinckrodt

19    that preceded the Acthar lawsuit -- lawsuit?

20    A       No.

21         Q       You're not referring to the DOJ

22    investigation lawsuit in Philadelphia for

23    marketing and sales practices?

24    A       No.

25         Q       Okay.  So, you learned about the

Page 34

1    fact that Express Scripts, CuraScript, had an

2    exclusive distribution arrangement for Acthar

3    with Questcor that later became Mallinckrodt

4    after the Rockford lawsuit; is that fair?

5    A       I believe that's true.

6            Q       Okay.  And do you recall who told

7    you that?

8    A       No.

9            Q       All right.  Do you recall the

10   general context in which you learned that fact?

11   A       At the time, there were lots of articles

12   in the press and others, and so it was -- so, I

13   think I came about the information mainly of the

14   general lay -- like any general lay public would.

15           Q       And I had the pleasure of

16   Mr. Henry's company yesterday in Minneapolis, so

17   we went over a series of media pieces from -- we

18   only looked at 2014, after the Mallinckrodt

19   merger with Questcor, but we reviewed those media

20   pieces.  And I won't do that with you.  I

21   actually -- I have them in another place.

22                   But you were familiar with the fact

23   that Mr. Henry, who was the head of

24   communications, would push out to leading

25   executives, including yourself, with FYI,

1    articles that involved Acthar, Mallinckrodt and,

2    at times, lawsuits?

3                    MR. FORST:  Objection to the form.

4                    THE DEPONENT:  So, I was familiar

5            with the drug.  Familiarity with the drug

6            precedes actually even coming to Express

7            Scripts.  Familiar with some of the price

8            hikes they had taken, but I was not -- was

9            not aware of their contractual

10           arrangements with our company.

11   BY MR. HAVILAND:

12       Q      Until after the Rockford lawsuit,

13   when you became familiar, either through some

14   media pieces or otherwise, right?

15   A      I believe so.

16       Q      Well, let's talk about your

17   familiarity with the drug.

18                   That was while you were a

19   practicing physician?

20   A      It started in medical school.

21       Q      Okay.  What did you learn in

22   medical school?

23   A      So, during pediatric rotation, when we'd

24   see someone with infantile spasm, it was the drug

25   of choice for treating infantile spasm.

1        Q       And did you know what the cost was

2    at that time?

3    A       No idea.

4        Q       Okay.  You -- you've come to learn,

5    have you not, that prior to Questcor acquiring

6    the product, it cost about $50, right?

7    A       Correct.

8        Q       And after Questcor acquired the

9    product, they raised the price?

10   A       Correct.

11       Q       You've also come to learn that, in

12   2007, when Questcor contracted with CuraScript,

13   the price was raised even more, right?

14                   MR. FORST:  Objection, lack of

15           foundation, calls for speculation.

16                   THE DEPONENT:  I --

17   BY MR. HAVILAND:

18       Q       Go ahead.

19   A       So, I was -- I was vaguely aware that the

20   price of -- of this drug was substantially higher

21   than when it was launched, and obviously found

22   that problematic for our clients.

23       Q       Did you ever investigate why the

24   price was raised?

25   A       No.

Page 37

1        Q        Okay.  Did you ever come to learn
2    that the price was raised in 2007 after
3    CuraScript entered into a series of contracts for
4    the exclusive distribution of Acthar with
5    Questcor?
6    A        No.
7                 MR. FORST:  Objection to the form.
8    BY MR. HAVILAND:
9        Q        All right.  The exhibit that I put
10   in front of you, sir, has a -- shows a
11   distribution model, and if you could turn to that
12   page, this -- again, this is a Mallinckrodt
13   document, and on page 3, you see how it has "MD"
14   at the top?
15   A        Yes, sir.
16       Q        It says, Prescription called in.
17                Do you see that?
18   A        Yes, sir.
19       Q        And you're familiar with that?  You
20   were a practicing physician for a while.
21                When you were prescribing a drug to
22   a patient, you'd write a prescription, right?
23   A        Correct.
24       Q        It's what doctors do every day?
25   A        Correct.

1          Q       And then a patient will take that

2   prescription, in the case of a pharmacy pill, to

3   CVS, Walgreens, and they'd fill that

4   prescription, right?

5   A       Correct.

6          Q       And that applies for brands and

7   generics, right?

8   A       Correct.

9          Q       With specialty, however -- and

10  you're familiar with this in your old Express

11  Scripts -- it doesn't work that way, right?

12              The specialty pharmacy isn't a

13  brick-and-mortar place a patient can walk into,

14  right?

15  A       It's a brick-and-mortar place, but they

16  don't --

17         Q       Fair enough.

18  A       -- but it's not -- but patients do not

19  come to the specialty pharmacy.

20         Q       In the specialty drug arena,

21  specialty pharmacies actually distribute the drug

22  sometimes to the patient's home to

23  self-administer, right?

24  A       Correct.

25         Q       In the case of Acthar, it's a

1    self-administered drug?

2    A      Correct.

3           Q      So, the graphic here shows that a

4    physician would call in a script -- I'm going to

5    skip over the hub for a moment that's depicted

6    here, but if you could look down to

7    CuraScript SP, you were familiar, back in 2007,

8    that Express Scripts had acquired and then owned

9    a specialty pharmacy by the name of CuraScript

10   Specialty Pharmacy, right?

11   A      Correct.

12              MR. FORST:  Object -- let me

13          just -- wait a beat, so I can get some of

14          these -- I can have a bunch of questions

15          ruled on.

16              MR. HAVILAND:  That's fine.

17              THE DEPONENT:  Sorry.

18              MR. FORST:  So, objection to the

19          form.

20              But you can answer.

21   BY MR. HAVILAND:

22          Q      And that entity was in the business

23   of fulfilling prescriptions of specialty

24   medications, right?

25   A      Correct.

1      Q      Including Acthar?

2    A      Correct.

3      Q      All right.  And if you go back to

4    the graphic, you see from the box that says,

5    CuraScript SP, there's an arrow down that says,

6    Patient.

7              Do you see that?

8              MR. FORST:  Again, objection, lack

9        of foundation.

10             But you can answer.

11    BY MR. HAVILAND:

12      Q      I only asked, do you see that?

13    A      Yes, sir.

14      Q      And that's familiar to you, sir,

15    that in the area of specialty drugs, specialty

16    pharmacies will sometimes send the medication

17    directly to the patient's home to

18    self-administer, right?

19    A      Correct.

20      Q      There's no middleman; it goes from

21    the manufacturer to the specialty pharmacy --

22    we'll get to that in a moment -- and then it's

23    dispensed directly to the patient, in the case of

24    Acthar, right?

25    A      I -- I believe that's how it works, yes.

Page 41

```
 1        Q      Now, when you were a practicing

 2   physician, you would administer it in the

 3   hospital setting, I assume?

 4   A      My practice was all university-based.

 5        Q      Okay.  And if a -- if a mother

 6   presented in the hospital and had a child that

 7   had infantile spasms, the hospital would

 8   administer Acthar to that child in the hospital

 9   setting, correct?

10   A      Correct.

11              MR. FORST:  Object -- object to the

12         form.

13   BY MR. HAVILAND:

14        Q      And you'll see in the graphic

15   there's a hospital box there.  It's a circle.

16   And that's directly beneath, CuraScript Specialty

17   Distribution.

18              Do you see that?

19   A      Correct.

20        Q      Okay.  And when you were practicing

21   in the hospital setting, sir, you didn't have to

22   go to CuraScript to get the drug; you'd just go

23   to the hospital dispensary, right?

24              MR. FORST:  Objection, vague,

25         ambiguous, calls for speculation.
```

Page 42

1                     THE DEPONENT:  So, I don't know

2          where the hospital got the medication

3          from.

4     BY MR. HAVILAND:

5          Q      My point was a little different.

6                 If you had a child with IS, and --

7     can you describe that disease state for the jury

8     to understand what that is.

9     A      So, it's a horrible complication that

10    children, predominantly under the age of 2, but

11    it can be up to the age of 5, get, where they

12    have seizures that, if uncontrolled, lead to

13    long-term deleterious effects for neurologic

14    development.

15         Q      So, it's like an epileptic seizure,

16    but for an infant, right?

17    A      Correct.

18         Q      And it's -- it's -- the infant

19    doesn't -- is too young to know what's happening,

20    right?

21    A      Correct.

22                     MR. FORST:  Objection to the form.

23                     THE DEPONENT:  Correct.

24    BY MR. HAVILAND:

25         Q      So, the parents are the ones that

1    the physician talks to about using Acthar to

2    treat that, right?

3    A       Correct.

4            Q       And patients -- or the parents are

5    relying upon the doctor to prescribe the

6    appropriate therapy, correct?

7    A       Correct.

8            Q       And Acthar has treated infantile

9    spasms for 60 years?  70 years?

10   A       It's been in the market since the early

11   '50s.

12                   (Reporter clarification.)

13                   THE DEPONENT:  It has been in the

14                   market since the early '50s, I believe.

15   BY MR. HAVILAND:

16           Q       And Acthar is ACTH, right?

17   A       It is an ACTH preparation.

18           Q       Okay.  And what do you mean by

19   that?

20   A       So, Acthar is made from the pituitaries of

21   pigs, and so through a proprietary process, they

22   prepare an ACTH-type formula.

23           Q       So, the ACTH, the active ingredient

24   in Acthar, comes from a pig's pituitary gland?

25   A       Correct.

1      Q      So, it's a biologic?

2   A      Correct.

3      Q      It's not something that comes out

4   of a lab, like some other innovative medications?

5   A      It's --

6             MR. FORST:  Objection to the form.

7             THE DEPONENT:  They all come out of

8         labs, so --

9   BY MR. HAVILAND:

10     Q      But I'm saying the active

11  ingredient in the ACTH in Acthar is porcine; it

12  comes from a pig?

13  A      It comes from a pig, and it's a protein,

14  unlike a chemical medication.

15     Q      Right.  The -- the difference would

16  be a synthetic ACTH like Synacthen, right?

17            MR. FORST:  Objection to the form.

18            THE DEPONENT:  They -- in this

19        country, they're not equivalent.

20  BY MR. HAVILAND:

21     Q      Why do you say that?

22  A      The FDA has never approved a generic to

23  Acthar.

24     Q      Well, that's a different question,

25  sir.

1           The FDA has never approved a

2    generic of Acthar, which is the porcine biologic

3    product that we've been talking about, right?

4    A     They've never approved an alternative to

5    Acthar.

6           Q     Okay.  So, it's in a -- a class of

7    drugs of the -- by itself?

8    A     Yes.

9           Q     All right.  So, you have spoken

10   about Acthar at times, and sometimes you've been

11   asked about Acthar.  And there was an occasion,

12   sir, where you were with Everett Neville, when

13   the comment was made that, Acthar is not worth

14   what Express Scripts is charging for it.

15               Do you recall that?

16               MR. FORST:  Objection to the form,

17          lack of foundation.

18               THE DEPONENT:  So, Acthar, for many

19          indications, is not worth what they're

20          charging for it, correct.

21   BY MR. HAVILAND:

22          Q     That's not quite what was said

23   during the Citibank conference, right?

24               MR. FORST:  Objection to the form,

25          foundation.

1              THE DEPONENT:  I would have to see

2         the -- I'd have to see what was said to

3         comment on that.

4    BY MR. HAVILAND:

5         Q     Well, do you recall the conference,

6    the Citibank conference?

7    A     I recall the Citibank conference, yes.

8         Q     You were with Everett Neville?

9    A     Yes.

10        Q     Anyone else from the company?

11   A     There were dozens of people there.

12        Q     Okay.  And during a Q&A,

13   Mr. Neville said that, I don't think it's worth

14   it.  I think Dr. Miller would agree.

15              Do you recall that?

16              MR. FORST:  Objection to the form,

17         lack of foundation.

18   BY MR. HAVILAND:

19        Q     We can go to the transcript.  I

20   just want to know what you remember, sir, before

21   I try to --

22   A     So, I don't remember the --

23              MR. FORST:  Okay.  Let me just

24         object.

25              THE DEPONENT:  Yes.  Sorry.

Page 47

1           MR. FORST:  Objection to the form,

2      lack of foundation.

3           THE DEPONENT:  So, I don't remember

4      the specifics of the conversation.

5  BY MR. HAVILAND:

6      Q     Okay.  You do recall that comment

7  being made, though?

8           MR. FORST:  Objection to the form,

9      asked and answered.

10          THE DEPONENT:  I recall comments

11     that were similar to that, but not -- I

12     don't know the exact comments that were

13     made.

14 BY MR. HAVILAND:

15     Q     Okay.  And what was your takeaway

16 about those comments?

17          Did you agree that Acthar was not

18 worth what Express Scripts was charging for it?

19          MR. FORST:  Objection to the form,

20     foundation.

21          THE DEPONENT:  So, Acthar has

22     limited utilization.  For most of the

23     indications that they're listed for, it is

24     not of much value.  There are better

25     drugs.  For a couple of indications, it's

1          still the leading product, and -- and

2          so -- but it's -- you know, it's priced

3          very aggressively, and so I was very clear

4          about not appreciating the price.

5    BY MR. HAVILAND:

6          Q     And what are the indications

7    that -- you say it's limited utilization for most

8    indications.

9                What are you referring to?

10   A     So, they have some 17 or 19 potential

11   indications.  For almost all of those, it's a

12   poor choice.  For a couple indications,

13   especially infantile spasm, it's still one of the

14   leading drugs for treating infantile spasm, even

15   in the year 2022.

16         Q     So, by your answer, are you

17   suggesting that Acthar is worth what Express

18   Scripts charges for it for infantile spasms?

19               MR. FORST:  Objection to the form

20         of the question.

21               THE DEPONENT:  So, we don't -- we

22         attempt to evaluate if drugs are, quote,

23         "worth what they're charged," but

24         that's -- to be very honest, it's mostly

25         opinion.  It's not -- there is very --

Page 49

```
1              it's very difficult to put a value on

2              drugs.

3                   So, there are organizations that

4              actually attempt to do that, and we work

5              with those organizations, but the

6              marketplace determines the value of

7              products.

8    BY MR. HAVILAND:

9         Q    Well, Express Scripts is the

10   largest pharmacy benefit manager in the

11   marketplace, right?

12   A    No.

13        Q    It's not?

14   A    CVS is.

15        Q    Oh, today they are, right.  There

16   was a time when Express Scripts was the biggest?

17   A    I believe so, yes.

18        Q    That's why time matters.  We have

19   to decide what time we're talking about with all

20   the mergers and acquisition.

21                   The role of PBMs, though, as a

22   middleman, is to try to leverage that buying

23   power, representing all the payers and health

24   plans, to try to get lower costs, right?

25                   MR. FORST:  Objection to the form.
```

1                    THE DEPONENT:  So, we aggregate

2          membership with the -- so that we actually

3          put more leverage and -- upon the

4          pharmaceutical industry, correct.

5    BY MR. HAVILAND:

6          Q      Yesterday, when I asked similar

7    questions of Mr. Henry about how Express Scripts

8    tries to drove -- drive lower costs and make

9    medicines more affordable, he said there were two

10   principle functions, and I want to see if you

11   agree.

12                 The first is through direct

13   contracting with pharmaceutical companies and

14   trying to extract lower prices or price

15   concessions; and the second was utilization

16   management.

17                 Do you generally agree with that?

18                 MR. FORST:  Objection to the form.

19        Again, lack of foundation.

20                 THE DEPONENT:  Yes.

21   BY MR. HAVILAND:

22        Q      All right.  And I know you've

23   already given me some information about the

24   latter, utilization management, in terms of

25   making sure that drugs are not overly prescribed

Page 51

1    for uses and -- and areas that they may not be as

2    efficacious.  I want to focus on the first part

3    of it and understand what you know about Express

4    Scripts' role in negotiating with pharma for

5    lower prices.

6                    Can you answer that?

7                    MR. FORST:  Objection to the form.

8          Was there a question?

9                    THE DEPONENT:  What's the question?

10   BY MR. HAVILAND:

11        Q     So, I -- I thought what Mr. Henry

12   said yesterday was very helpful in terms of kind

13   of putting into buckets the ways in which Express

14   Scripts can try to make drugs more affordable.

15                    And, obviously, beneath these

16   buckets, there's a lot to it, but in the first

17   way, it's through direct pharmaceutical

18   negotiations and contracting with drug companies,

19   right?

20   A     Correct.

21        Q     The second way is the broad group

22   of utilization management, and there, you've got

23   formulary controls, step therapies, prior

24   authorizations, exclusions, edits, a host of

25   things that we'll talk about a little later.

Page 52

1              But you generally agree there are

2    those two tools that PBMs have?

3    A      Those are the major two, yes.  Correct.

4          Q      Okay.  And I want to know what you

5    know about the first tool and how Express

6    Scripts, during the time that you've been with

7    Express Scripts, now Cigna, has used that tool in

8    negotiations with pharmaceutical companies to

9    drive lower costs.

10   A      Great.

11         Q      Okay.

12   A      So, there are -- when a drug comes to the

13   market, they're placed in one of three buckets.

14   There are drugs that are called clinical

15   includes.  These are drugs that you have to have

16   on a formulary.  There's no alternative to them.

17   And so in those particular cases -- and that's

18   about 15 percent of drugs -- we become a price

19   acceptor, because we have no leverage on those

20   drugs.

21              On the other extreme, there are

22   what are called clinical excludes.  These are

23   drugs that are on the marketplace, but have no

24   role in modern therapy.  So, these are often

25   older drugs that haven't been withdrawn from the

1    marketplace.  So, I'll give you an example.

2    Aldomet, it's an old anti-hypertensive drug.  You

3    have to take it three times a day, it has lots of

4    side effects, and so there is no reason for

5    someone to prescribe Aldomet.  Less than 1

6    percent of drugs fit into that category.

7         Q      Okay.

8    A      85 percent of drugs are what are called

9    clinically optional, and that is these are drugs

10   where there is -- there could be a competitor to

11   those drugs, we can pit them against each other,

12   and that's where we can get the majority of the

13   savings for patients and plan sponsors, because

14   that's where we can get the pharmaceutical

15   companies to negotiate on price.

16        Q      Where do you fit Acthar in those

17   three buckets?

18   A      So, Acthar, for the majority of its time,

19   has been in the clinical include.  It was

20   something you had to have on a formulary.

21        Q      And you say "majority."  Has that

22   changed?

23   A      It was changed in I believe 2017 or 2018.

24        Q      '17 or '18, you said?

25   A      Yeah, I'd have to look at the documents.

Page 54

1          Q      And why was it changed?

2     A      It was changed initially in our Medicare

3     formulary, and the reason was, for adults, they

4     don't -- adults don't have infantile spasm, and

5     for adults, there were better drugs for all the

6     indications for adults.

7          Q      Including multiple sclerosis?

8     A      Including multiple sclerosis.

9          Q      Okay.  And what about in the

10    commercial payer side?

11    A      So, the commercial payer side, I believe,

12    lacked -- I don't know what its status is today

13    in the commercial payer side, because they have

14    infants, and so I don't know what the current

15    status is there.  But I know in the Medicare, we

16    made that change.

17         Q      And -- and you say "that change."

18                Was that a change by the Pharmacy

19    and Therapeutics Committee of Express Scripts?

20    A      Correct.

21         Q      Okay.  And let's -- let's explore

22    that a little bit.  It's sometimes also known as

23    a P&T Committee?

24    A      Correct.

25         Q      So, if I use "P&T," you'll know

1   that's the Pharmacy and Therapeutics Committee?

2   A     Yes, sir.

3         Q     And what's their function?

4   A     So, in Express Scripts, we have a

5   completely independent Pharmacy and Therapeutics

6   Committee.  We're very proud that it's been

7   recognized as the gold standard by which you

8   should do this, because it's a -- of its

9   independence.  We do not even chose the members

10  of committee.

11              So, the committee is made up of

12  specialists across all -- almost all the areas in

13  healthcare.  They evaluate drugs totally

14  financially blind, and their role is to come up

15  with a formulary of listed drugs that would allow

16  doctors to treat essentially any condition that

17  they encounter.

18        Q     Okay.  There is an interface

19  between the company and the P&T Committee, and

20  specifically I'm thinking of Mr. Behm?

21  A     Correct.  So, Andy oversees OCEP, the

22  Office --

23        Q     You're going to have to help us

24  with that one.

25  A     The Office of Clinical Evaluation and

1    Policy.  They prepare the information for the

2    P&T Committee.  So, they gather the FDA filings,

3    studies, all the information that they can, so

4    that the P&T Committee can opine on the relevance

5    of the drug.

6            Q      Okay.  And is it accurate that the

7    product of the -- so, OCEP is an Express Scripts

8    branch, right?

9    A      It's a -- part of our organization, yes.

10           Q      Yeah.  The committee -- the

11   P&T Committee is this independent organization,

12   right?

13   A      Correct.

14           Q      And other than Mr. Behm, does he

15   have folks within his group that are part of the

16   interface of OCEP with the -- with the committee?

17   A      Yeah.  So, they staff the committee.

18           Q      What do you mean by that?

19   A      They're the ones providing -- they produce

20   monographs of the drugs for the committee to have

21   the information they need to make their

22   determination.

23           Q      Okay.  And the determinations of

24   the P&T Committee, as overseen by OCEP, is that

25   what determines where drugs fall in these three

Page 57

1    buckets; clinical includes, clinical optional,

2    or --

3    A      Yes, it is the P&T Committee that

4    determines their designation.

5         Q      Okay.

6               MR. FORST:  Dr. Miller, just wait

7         for Don to finish his question.

8               THE DEPONENT:  Sorry.

9    BY MR. HAVILAND:

10        Q      Yeah, I was actually looking for a

11   third bucket, but thank you.  It's -- it was

12   includes, excludes, and optional.  Sometimes I

13   can't read my own left-handed writing here.

14               And so, sometime in '17 or '18 --

15   you're not sure what year -- Acthar was moved

16   from one bucket to another.

17               Can you tell the jury what -- how

18   that shift happened.

19   A      So, there are many different formularies.

20   There are commercial formularies, Medicare

21   formularies.  And so, on the Medicare formulary,

22   which is just, you know, for the most part,

23   adults, seniors, it -- I know it was shifted at

24   that point in time.

25        Q      I just want to be clear, too, from

Page 58

1    an include to exclude or optional?

2    A      Optional.

3           Q      It went to optional.  Okay.

4                  And that was for the government,

5    Medicare?

6    A      The government's the payer in Medicare.

7           Q      Right.

8                  (Reporter clarification.)

9                  THE DEPONENT:  The government is

10          the payer in Medicare.

11   BY MR. HAVILAND:

12          Q      And that's largely because Medicare

13   doesn't have infants?

14   A      Correct.

15          Q      Yeah.  And was there a similar

16   shift, or at least change in policy, in the

17   commercial payer side with respect to

18   formularies, given that there was this shift in

19   Medicare?

20                 MR. FORST:  Objection, asked and

21          answered.

22                 THE DEPONENT:  You -- I do not

23          know.

24   BY MR. HAVILAND:

25          Q      Okay.  Do you know what drove that

1    decision to change?

2              Help me with -- when I asked you

3    about the -- the -- just the market and the -- we

4    were working through the PBMs, what do you call

5    these three buckets?

6              In terms of the designations, it's

7    a way to ascribe a drug to a different class;

8    include, exclude, or optional?

9              MR. FORST:  Objection to the form.

10   BY MR. HAVILAND:

11        Q    I'm just trying to have a better

12   term of art to say than the "three buckets."

13              These are the designations that are

14   used by the PBM to sort drugs?

15   A    They're used by OCEP to sort drugs.

16        Q    Oh, okay.  That -- now, I get it.

17   So, this is -- these are OCEP designations for

18   drugs?

19   A    Correct.

20        Q    And do they review the whole

21   universe of drugs out there in terms of trying to

22   bucket them?

23   A    I probably can't give you -- I -- it's

24   probably a better question for Andy Behm, who

25   oversees the process.

1          Q     I have him next week -- or the week

2     after.  That's fair.  And if you don't know, sir,

3     it's -- it's fine.  I do want to make sure that I

4     exhaust your -- your knowledge, but there may be

5     others who know more.

6               So, you don't know if, at the time

7     the change from include -- and I just -- I have

8     to be clear, because I'm not yet.

9               Was the change in designation in

10    the Medicare formulary to -- from include to

11    exclude --

12               MR. FORST:  Objection.

13    BY MR. HAVILAND:

14         Q     -- or optional?

15    A     It was from include to optional.

16         Q     Okay.  What does "optional" mean?

17    A     That means there are competitive products,

18    and those can be pitted against each other.

19         Q     Okay.  And optional applies to a

20    drug regardless of who's paying for it, right?

21    A     No.

22         Q     It doesn't?

23    A     Different formularies for different

24    payers.

25         Q     No, I'm -- I'm -- I'm saying, when

1    you say that they're -- it's designated optional,

2    because there's other competitive agents that are

3    better, that applies to the drug, not necessarily

4    who's paying for it?

5                    MR. FORST:  Objection to the form.

6                    THE DEPONENT:  It applies to the

7          drug on that formulary.

8    BY MR. HAVILAND:

9         Q    Right.  So Acthar, as optional, the

10   committee and OCEP recognize that there are

11   better treatments for certain indications than

12   Acthar?

13                   MR. FORST:  Objection,

14         mischaracterizes testimony.

15   BY MR. HAVILAND:

16        Q    You can answer.

17   A    So, it may be that they're either better,

18   because they're more cost effective; or better,

19   because they are more clinically effective.

20        Q    Well, the P&T Committee doesn't

21   look at cost, sir, right?

22   A    So, the OCEP and the P&T Committee develop

23   a formulary.  It goes to another committee that

24   applies a price component, called the VAC

25   committee, the Value Assessment Committee.

1   They're the ones that actually add a financial

2   lens.  So, the P&T Committee never sees financial

3   information.  It goes to this separate committee

4   called the VAC committee.  The VAC --

5           Q     You're saying V-A-C?

6   A       VAC, Value Assessment Committee.  They add

7   a financial lens to it, and then it comes back to

8   the P&T Committee to be -- get formal approval.

9           Q     So, what does the P&T Committee see

10  after the VAC has done its assessment?

11  A       A list of drugs with the -- essentially

12  the question of, Can any doctor treat any illness

13  that they may encounter with this list of drugs?

14          Q     And they're just listed blind to

15  cost?

16  A       Yes, sir.

17          Q     They're not ranked?

18  A       Just blind to cost.

19          Q     Okay.  And then how does the VAC

20  assessment and the P&T Committee assessment get

21  put together in terms of Express Scripts

22  formularies for Medicare or the private

23  commercial payers?

24  A       So then the OCEP committee -- or the OCEP

25  group puts together a formulary document that is

Page 63

1    syndicated through to the appropriate parts of

2    the organization.

3         Q     I see.  And then they're offered to

4    commercial payers to accept the formulary

5    recommendation?

6    A     So, the commercial payers, and there are,

7    like I said, many different types of formularies.

8         Q     Sure.  Okay.  The VAC assessment --

9    the Value Assessment Committee, is there someone

10   who headed that up?

11   A     Yes.

12              MR. FORST:  Objection, time frame.

13              MR. HAVILAND:  Yeah, we're going to

14        get there.

15   BY MR. HAVILAND:

16        Q     So, do you know who it is

17   presently?

18   A     I could guess, but I don't know for sure.

19        Q     What's the first time you remember

20   someone who headed that group?

21   A     When I came to the organization in 2005,

22   there were people who had -- it's always had

23   someone who's headed the group.

24        Q     I'm just looking for a name, sir.

25   A     Oh.

Page 64

1           Q        I've seen VAC, and you finally put

2   some teeth to what it is.

3   A        Yeah, I can't -- I mean --

4           Q        It's not Andy Behm?

5   A        No.

6           Q        Okay.  And it's an actual committee

7   within what area of Express Scripts?

8   A        So, OCEP reports to Andy.  Andy reports up

9   to me.  The VAC committee sits within the supply

10  chain of the organization.

11          Q        Procurement?

12  A        We call it supply chain.

13          Q        Mr. Neville's group?

14          MR. FORST:  Object to the form.

15          THE DEPONENT:  It depends on which

16          time frame.

17  BY MR. HAVILAND:

18          Q        Okay.  Was the VAC committee part

19  of the supply chain group headed by Mr. Neville

20  back in 2017, 2018?

21  A        I would have to reference documents.  I

22  don't know off the top of my head.

23          Q        Okay.  Well, you -- and I'm only

24  going to go to the time prior to the end of '21,

25  when Mr. Wentworth was the CEO.  And really, it's

1   easier even before Cigna, because now you have

2   Evernorth, and you have some overlays.  It gets a

3   little complicated.

4              So, when -- when the PBM was a

5   stand-alone business, with Mr. Wentworth as the

6   CEO, you were a direct report?

7   A    Yes, sir.

8        Q    Mr. Neville was?

9   A    Yes, sir.

10       Q    Glen Stettin was?

11  A    Yes.

12       Q    And others?  There was a leadership

13  group that all reported up into Mr. Wentworth,

14  right?

15  A    Correct.

16       Q    And supply chain was a function

17  within Express Scripts that had a lead that

18  reported up to Mr. Wentworth, right?

19  A    Correct.

20       Q    And is it accurate that Mr. Neville

21  held that position at some point in time?

22  A    Correct.

23       Q    Okay.  And I know when you changed,

24  and then you changed business functions, it gets

25  complicated?

Page 66

1     A       Yes.

2                     MR. HAVILAND:  All right.  Who

3             knows what time it is?  Because I don't

4             want to go too long in our first --

5                     MR. FORST:  It's been about an

6             hour.

7                     MR. HAVILAND:  Just let me finish

8             up with a couple questions, we'll take a

9             break.  All right?

10    BY MR. HAVILAND:

11            Q       Circling back to the -- the two

12    tools that a PBM like Express Scripts uses to

13    drive lower costs, what do you know about what

14    Express Scripts has done to try to drive down the

15    cost of Acthar either with Questcor or

16    Mallinckrodt?

17                    And in answering my question, sir,

18    I -- I don't want to shade into utilization

19    management controls, prior authorization, things

20    like that, because I only want you to focus on

21    that tool, that tool, and how, if at all, to your

22    knowledge, has the PBM used its power to directly

23    negotiate with Mallinckrodt and Questcor to drive

24    down lower costs of Acthar?

25                    MR. FORST:  Objection to the form.

```
 1                  Again, you can answer however you
 2          best think it needs to be answered.
 3                  THE DEPONENT:  So when you think
 4          about the lever of competitive drugs,
 5          being able to compete against another
 6          product, because of the designation of
 7          clinical include, there -- it means there
 8          is no competitive product.  We have almost
 9          no -- essentially no capability to compete
10          the price down lower.
11                  So, then we can -- and this is --
12          sort of gets away from your question
13          slightly in that, so then the best tool we
14          have for our clients is utilization
15          management, making sure it's only utilized
16          in the most appropriate circumstances.
17                  And then a third thing that we've
18          done is -- and probably uniquely us, is
19          that we've tried to use the bully pulpit
20          to bring this to light and put pressure on
21          companies.
22    BY MR. HAVILAND:
23          Q    By that, you mean media exposure
24    and commentary?
25    A    Yep.
```

Page 68

1                          MR. HAVILAND:  Okay.  The first

2                 break in the morning is important for

3                 everyone, so why don't we take our first

4                 break, and we'll be back in about 10

5                 minutes or so.

6                          (Discussion held off the record.)

7                          THE VIDEOGRAPHER:  We're going off

8                 the record at 10:01 a.m.

9                          (Break taken.)

10                         THE VIDEOGRAPHER:  We are back on

11                the record at 10:14 a.m.

12     BY MR. HAVILAND:

13          Q     Dr. Miller, before the break, I had

14     asked you to tell me what you knew about how, if

15     at all, Express Scripts used its power as a PBM

16     to negotiate a lower price for Acthar directly

17     with Mallinckrodt or Questcor, and you gave me

18     three responses.  You said, number one, there's

19     no competitive product like Acthar, and I'll get

20     to your other two responses, sir.

21                         And by that answer, do you agree

22     with me that, at no point in time, to your

23     knowledge, did anyone from Express Scripts in

24     negotiations with Questcor or Mallinckrodt seek

25     to lower the price of Acthar?

Page 69

1                    MR. FORST:  Objection to the form.

2                    THE DEPONENT:  I have no idea.

3      BY MR. HAVILAND:

4           Q      You have no knowledge of whether

5      that ever happened?

6      A      Correct.

7           Q      Knowing what you know about Acthar

8      and the number of times it was brought up in the

9      media in your presence, did you ever ask anyone

10     at Express Scripts, Have we ever sought to get

11     Questcor or Mallinckrodt to lower the price?

12     A      I'm not in the supply chain, so I don't

13     deal with those negotiations.  I assume they do

14     their job to the best of their ability.

15          Q      So, that wasn't my question, sir.

16     I just wanted to know if, in your role of being

17     the chief medical officer of the company, and

18     having interface with multiple functions within

19     Express Scripts, did you ever ask whomever had

20     the ability to do something in terms of lowering

21     the price directly with the manufacturer, did you

22     ever ask, Have we, Express Scripts, ever gone to

23     Questcor or Mallinckrodt and sought to lower the

24     price of Acthar?

25                   MR. FORST:  Objection, lack of

1           foundation, assumes facts not in evidence,

2           calls for speculation.

3                   THE DEPONENT:  So, I can tell you

4           specifically for me, knowing there was no

5           competitive products, and that that was

6           not a viable lever, that's why I was very

7           vocal in using the bully pulpit to try to

8           pressure them to lower the price, which

9           may or may not be effective, but that's,

10          in my role, the most effective thing I can

11          do is to make sure, A, we have the

12          appropriate utilization management, and B,

13          that we made it publicly clear that the

14          price was egregious.

15   BY MR. HAVILAND:

16          Q       Okay.  And they're the two other

17   aspects to your answer, when I asked what has

18   Express Scripts done to use its power to

19   negotiate a lower price; utilization management

20   and the bully pulpit in the media.

21                  But I want to know specifically,

22   sir, if you ever said to anyone, Mr. Wentworth,

23   Mr. Neville, Rob Osborne, anyone in the

24   organization, Have we ever gone to the

25   manufacturer and asked for a lower price?

1  A      I'm -- I never have asked that about any

2  drug.

3         Q      Okay.  Is it because it's just not

4  what you do, or is it something else?

5  A      It's because that's what the company does

6  every day.

7         Q      But you don't do that?

8  A      I said that's what the company does every

9  day --

10         Q      Right.

11  A      -- but it's not what I do specifically.

12         Q      It's not what you do, right.  I'll

13  get to the bully pulpit in a moment.

14              That's just using public exposure

15  to try to get the manufacturer to do the right

16  thing, right?

17              MR. FORST:  Objection to the form.

18              THE DEPONENT:  That'd be the

19         intent, yes.

20  BY MR. HAVILAND:

21         Q      And in your entire time at Express

22  Scripts, the price of Acthar has never gone down?

23  A      No.

24         Q      All right.  So, the bully pulpit

25  has not worked?

1          MR. FORST:  Objection.

2          THE DEPONENT:  Don't know.  I don't

3      know what the price would be absent the

4      bully pulpit.

5  BY MR. HAVILAND:

6      Q     Oh, you think it might be even

7  higher?

8  A      Potentially.

9      Q     Okay.  And I asked you what you

10  knew about how the product is distributed and how

11  it's priced, and I realize that's not your direct

12  role, but in your efforts to try to get some

13  affordable lever for Acthar, did you come to

14  learn that Express Scripts has exclusive

15  distribution rights and preferred pharmacy rights

16  for Acthar?

17  A      I'm aware of that now, but I was not aware

18  of that then.

19      Q     Knowing what you know -- and when

20  you say "now," it's back when you learned about

21  in the context of the -- the media that you

22  described there?  You don't mean now, 2022; you

23  knew that fact some time ago?

24  A      Correct.

25      Q     Right.  Did you learn that

1   CuraScript Specialty Distribution had an

2   exclusive distribution contract with Questcor and

3   then Mallinckrodt that gave it the ability to not

4   approve a price increase in writing?

5                   MR. FORST:  Objection to the form,

6           lack of foundation, calls for a legal

7           conclusion.

8                   THE DEPONENT:  I have no idea

9           what's in the contract.

10  BY MR. HAVILAND:

11      Q    Okay.  And again, did you ever ask

12  anyone within Express Scripts, Do we have the

13  power, through our exclusive distribution

14  arrangement -- let me just back that up.

15                  Acthar is not the only product that

16  CuraScripts has exclusive distribution rights

17  for, right?

18                  MR. FORST:  Objection to the form.

19                  THE DEPONENT:  Correct.

20  BY MR. HAVILAND:

21      Q    I've talked to Ms. Johnston,

22  JPL (phonetic) Johnston, the former president.

23                  You were familiar with her?

24  A    Yes.

25      Q    I've talked to Earl English, her

Page 74

1    successor.

2                   You were familiar with him?

3    A    Yes.

4         Q    And I've talked to Bill Shirey, the

5    current president of CuraScript.

6                   Do you know him?

7    A    Yes.

8         Q    All right.  And each of those

9    executives confirmed that at no time did

10   CuraScript Specialty Distribution say no to a

11   price increase by Questcor or Mallinckrodt.

12                  Does that surprise you?

13                  MR. FORST:  Objection to the

14        testimony, lack of foundation, calls for

15        speculation.

16                  THE DEPONENT:  I don't -- you know,

17        I -- it's -- you know, they do their job.

18        I do my job.  I can't really speculate on

19        what --

20   BY MR. HAVILAND:

21        Q    You're familiar with the fact that

22   there's more than 30 exclusive specialty drugs in

23   the portfolio of CuraScript now, right?

24   A    Yes.  I mean, we're very proud that we

25   provide a service where people seek us out to

Page 75

1    distribute their products.

2         Q      And those exclusive drugs are some

3    of the most expensive specialty drugs; are they

4    not?

5    A      That's correct.

6         Q      Have you ever inquired as to

7    whether or not it's a function of the exclusivity

8    that is keeping the prices high?

9    A      So, sometimes the FDA requires

10   exclusivity, because the drug is so -- has

11   special requirements for -- I'll give you an

12   example.  Xyrem's a drug for narcolepsy.  There

13   has to be a registry of every physician that

14   prescribes it.  So, the FDA has deemed it

15   appropriate that it's exclusively distributed.

16              There are other drugs, because of

17   handling requirements, training requirements,

18   registry requirements, other things, and so

19   there's a variety of reasons by which drugs are

20   handled or provided exclusively through one

21   distributor.

22        Q      Well, in the case of Acthar, sir,

23   before you came to the company, and even from '05

24   and '07, you were aware, were you not, that it

25   was widely distributed?

1   A      I --

2                    MR. FORST:  Objection to the form.

3                    THE DEPONENT:  I was not aware.

4   BY MR. HAVILAND:

5        Q      Okay.  Did you come to learn that

6   fact?

7                    MR. FORST:  Objection to the form.

8                    THE DEPONENT:  Just now.

9   BY MR. HAVILAND:

10       Q      Well, by definition, if CuraScript

11  got the exclusive rights, which you testified you

12  learned, there was a time where it didn't have

13  exclusivity, right?

14  A      But it -- I do not know if they were in

15  a -- with an exclusive distributor prior to that

16  and switched distributors.

17       Q      Okay.  And you don't know how your

18  hospital was able to acquire the product when you

19  were dispensing it to patients?

20  A      I --

21                   MR. FORST:  Object -- objection to

22       the form of the question.

23                   THE DEPONENT:  I do not.

24  BY MR. HAVILAND:

25       Q      Okay.  Did you ever encounter a

Page 77

1   situation where there was a delay in being able

2   to administer Acthar to a baby?

3   A       I've never prescribed Acthar.

4          Q      Oh, I thought you did.

5   A       No, I said I was a medical student.  I had

6   seen babies on Acthar.  I never prescribed

7   Acthar.

8          Q      I see.  As a medical student, you

9   saw infants with infantile spasms that got

10  Acthar?

11  A       Correct.

12         Q      You never, yourself, prescribed it?

13  A       I'm not a pediatrician, and don't --

14         Q      Fair enough.  While you were a

15  student, did you notice that there was any

16  appreciable delay in being able to get that

17  medication for the baby?

18                MR. FORST:  Objection to the form.

19                THE DEPONENT:  As a student, I

20         would have no clue if there was a delay in

21         getting a medication to a -- a patient.

22  BY MR. HAVILAND:

23         Q      Well, you might know if the mother

24  was upset after four days, wouldn't you, sir?

25  A       I didn't -- you know, when you're on a

Page 78

1    pediatric rotation, you're not doing continuity

2    of care in an intensive care unit, so I would --

3    I would have no clue.

4         Q     So, the situation you described,

5    where the FDA mandates exclusivity, you agree

6    with me that doesn't apply to Acthar?

7    A     I believe not.

8         Q     Acthar is simply a drug where

9    there's some special handling requirements?

10                MR. FORST:  Objection to the form.

11                THE DEPONENT:  I don't even -- I

12           don't know.  It's not my area of

13           expertise.

14   BY MR. HAVILAND:

15        Q     So, you can't describe what's

16   special about the distribution of Acthar as

17   opposed to any other drug; is that fair?

18   A     Correct.

19        Q     All right.  I'm going to mark, as

20   Exhibits 3 and 4 to your deposition, sir, two

21   media pieces.

22                (Exhibits 3 and 4 were marked.)

23                MR. FORST:  Which one is which?

24   BY MR. HAVILAND:

25        Q     Dr. Miller, the first exhibit, the

Page 79

1    article with the press release from Questcor, is

2    Exhibit 3 to your deposition.

3                    MR. HAVILAND:  For those on the

4            Zoom, it's Bates-numbered MNK0081796

5            through 798; and the second is a Business

6            Wire release that does not have Bates

7            numbers.  It's a public document.

8    BY MR. HAVILAND:

9            Q     Do you recall seeing any press

10   releases about the relaunch of Acthar by Questcor

11   in 2007?

12   A      No.

13           Q     I'm going to focus on the --

14   Exhibit 3, which is the Questcor release, only

15   because it has the Bates number.  I believe that

16   the Business Wire is identical to what was

17   released by Questcor.  If you follow with me,

18   sir, I'm just going to skip through a couple

19   places.

20                    You see it was released on

21   August 27, 2007?

22   A      Yes, sir.

23           Q     There's a general description of

24   Acthar.  If you go down to where it says, Don M.

25   Bailey.  Let me know when you have that.

Page 80

```
 1   A      Yes, sir.

 2          Q      "Questcor's interim president" --

 3   let me stop there.

 4                 Did you ever meet Mr. Bailey?

 5   A      Not that I remember.

 6          Q      Okay.  "Don Bailey commented, The

 7   goal of Questcor's new strategy is to make

 8   manufacturing and distribution of Acthar

 9   economically viable on a stand-alone basis, so

10   that Questcor can continue to ensure the

11   availability of Acthar for those patients who

12   need it most and fund projects, which can --

13   which can contribute to the growth of the

14   company."

15                 Did I read that correctly?

16   A      Yes.

17          Q      And if you skip down with me, sir,

18   there's a paragraph that reads, The

19   implementation.  Let me know when you have that.

20                 It's about a third of the way.

21   A      Yes.  Got it.

22          Q      Okay.  "The implementation of this

23   new strategy includes a change in the method of

24   distribution for Acthar and a significant

25   increase in the treatment costs."
```

Page 81

1                    Do you see that?

2    A      Yes.

3          Q      You were aware, were you not, of

4    the significant increase in the treatment cost

5    for Acthar; were you not?

6                    MR. FORST:  Objection to the form

7            of the question.

8                    THE DEPONENT:  I knew that Acthar

9            was expensive.  I did not know about

10           increases in cost at the time.

11   BY MR. HAVILAND:

12         Q      And you didn't know that it was a

13   strategy of Questcor to change the distribution

14   of Acthar in order to raise the treatment cost to

15   fund future projects at the company?

16                   MR. FORST:  Objection,

17           mischaracterizes the document, but asked

18           and answered.

19                   THE DEPONENT:  Nope.

20   BY MR. HAVILAND:

21         Q      Okay.  And other than learning

22   later, while at Express Scripts, is it fair to

23   say you didn't know in 2007 that CuraScript

24   played a role in assisting Questcor to change its

25   distribution of Acthar; is that fair?

Page 82

1                    MR. FORST:  Objection to the form.

2                    THE DEPONENT:  Correct.

3    BY MR. HAVILAND:

4         Q     All right.  I'm going to show you

5    another document from that time frame.

6                    Do you remember Jerry Carino?

7    A     Yes.

8         Q     Who was he?  And this is in '07,

9    sir.

10   A     You know, I don't know exactly what

11   Jerry's role was.  I just remember the name from

12   CuraScript.

13        Q     Sure.  I'm going to show you what

14   I've marked as Exhibit 5 to the deposition.

15   A     Thank you.

16                   (Exhibit 5 was marked.)

17                   MR. HAVILAND:  There you are.

18   BY MR. HAVILAND:

19        Q     Exhibit 5 is the Bates number

20   MNK00082108.  It's an email from Steve Cartt to

21   Jerry Carino of Express Scripts, with a carbon

22   copy to Rob Osborne and Greg Isaak.  We've talked

23   about Mr. Osborne.

24                   Do you know who Greg Isaak was?

25   A     No.

Page 83

1        Q     Okay.  I believe, from his email,

2    he worked with HealthBridge.

3              Were you familiar with the hub

4    operation that Express Scripts owned called

5    Health- -- Healthbridge?

6    A     Yes.

7        Q     All right.  Obviously, Mr. Osborne

8    was with CuraScript.  In this email -- and this

9    is a few months after the relaunch that we looked

10   at as described in the press -- the August 27

11   press release in Exhibits 3 and 4.

12             November 9, 2007, Mr. Cartt says,

13   Dear Jerry, when we met in person in Braintree --

14   and that -- that's where Healthbridge was

15   located, right, sir, in Massachusetts?

16   A     I believe so, correct.

17       Q     "When we met in person in Braintree

18   several weeks back, you had said to let you know

19   if I needed anything regarding our account at

20   Healthbridge.  I think we are now at the point

21   where I need your help.  As Rob or Greg can tell

22   you, we haven't been satisfied with

23   Healthbridge's performance overall and seem to

24   have hit a wall in terms of improving the

25   processing of referrals for our lead product,

Page 84

1   Acthar Gel.  By the way, following the price

2   increase, of -- Acthar is on a 100 million annual

3   run rate, so this product is becoming far larger

4   than any of us had originally expected.

5   Therefore, as I'm sure you would agree, the

6   demands on all of us are higher to deliver

7   performance."

8              And then briefly, the following

9   paragraph, he says, We feel the only way to get

10  the referral turnaround times down to where we

11  need them, two to three days, instead of the

12  current four days, may be well to move the hub to

13  Orlando and made it -- make it part of the SP.

14             And I think that refers to

15  specialty pharmacy.  Seeing this email written by

16  Questcor's Steve Cartt to some folks at Express

17  Scripts, were you aware that, after the change in

18  distribution, there was a change in the

19  turnaround times for Acthar getting to patients?

20  A       No.

21             MR. FORST:  Objection.

22  BY MR. HAVILAND:

23      Q       Okay.  Were you privy to any

24  discussions about what Express Scripts was doing

25  to address that within its organization, whether

Page 85

1    to move the hub from Massachusetts to CuraScript

2    in Florida or anything else?

3    A      No.

4          Q      Okay.  You see that, after the

5    price increase, which you see took place in

6    August, Mr. Cartt estimates that Acthar was on a

7    100 million annual run.

8                Do you see that?

9    A      Yes.

10         Q      That's a significant amount of

11   money, is it not, sir?

12               MR. FORST:  Objection to the form.

13               THE DEPONENT:  Yes.

14   BY MR. HAVILAND:

15         Q      I'm going to show you Rob Osborne's

16   notes after that email.  This is Exhibit 6 to

17   your deposition, sir.

18               (Exhibit 6 was marked.)

19   BY MR. HAVILAND:

20         Q      We -- we've spoken to Mr. Osborne a

21   couple times in this case, and I'll -- I'll

22   represent, for the record, this comes from his

23   files.  This is a series of bullet points

24   prepared by him.

25               MR. FORST:  Okay.  But before the

Page 86

1         question, I'll just object to the

2         characterization of the timing and what

3         these reflect, lack of foundation.

4    BY MR. HAVILAND:

5         Q    So, Dr. Miller, you'll see at the

6    top, the first bullet says, Thanks for joining us

7    a day earlier.  I'll skip through what he says

8    about the organization.

9              Bullet two, We do want to keep the

10   program and work with you.

11             Bullet seven reads, We went into

12   the negotiation -- let me know when you have

13   that, sir.

14   A    Mm-hmm.

15        Q    "We went into the negotiation of

16   the specialty distribution fee knowing that a

17   price increase was probably coming and that it

18   would be significant towards orphan drug pricing.

19   I am very familiar with orphan drug pricing, as I

20   have contract recently with Genzyme, Alexion,

21   Celgene, and a couple more biotech that are

22   coming out with orphan drugs.  From past

23   experience, I figured 6 to 7K per syringe,

24   4.5 percent on 6K, $270."

25             Did I read that correctly?

Page 87

1   A      Yes.

2           Q      And then the last I'm going to read

3   to you is the bullet following, We were

4   surprised, as was the market, at the price

5   increase, and as such, the 4.5 percent

6   distribution fee was more significant.  I guess

7   we got paid nicely for the five contracts that we

8   implemented in 2.5 months, and it should be noted

9   that we worked hard during this time, and it

10  should be noted that this strategy did let your

11  revenue go from about 15 million to 100 million.

12  As you know, this is huge.

13                  Did I read that correctly?

14  A      Yes.

15          Q      Mr. Osborne's view of the situation

16  was that the revenue of Acthar went from

17  15 million to 100 million which is reflected in

18  Mr. Cartt's email; you'd agree?

19                  MR. FORST:  Objection to the

20          characterization, lack of foundation.

21                  THE DEPONENT:  Yeah, I'm not sure

22          what expertise I'm adding to this, but

23          you're reading correctly.

24  BY MR. HAVILAND:

25          Q      Thank you.  And we can do some

1    math, sir.

2                    Four and a half percent on

3    100 million would be about 4.5 million; would it

4    not?

5    A      Yes.

6        Q      So, CuraScript S- -- SD made a

7    significant amount of money by participating with

8    Questcor in the rebranding and relaunch of

9    Acthar; did it not?

10                   MR. FORST:  Objection to the form

11           of the question.

12                   THE DEPONENT:  I don't -- I do not

13           know.

14   BY MR. HAVILAND:

15       Q      Well, when you came to the company

16   in 2005, sir, did you seek to investigate whether

17   or not Express Scripts was involved with drug

18   companies in allowing them to adopt orphan drug

19   pricing models to raise the price of older

20   medications for limited patient populations?

21                   MR. FORST:  Objection to the form.

22                   THE DEPONENT:  No.

23   BY MR. HAVILAND:

24       Q      Genzyme is one such older drug; is

25   it not?

Page 89

1    A        Genzyme is a pharmaceutical company, it's

2    not a drug.

3        Q        I'm sorry.  You're correct.  He

4    references contracts with Genzyme, Alexion, and

5    Celgene, right?

6    A        Correct.

7        Q        You were aware, were you not, that

8    CuraScript ultimately got the rights to

9    distribute Genzyme drugs, right?

10                MR. FORST:  Objection to the form.

11                THE DEPONENT:  I do not know

12           specifics of what contracts they hold.

13   BY MR. HAVILAND:

14       Q        So, you don't know if CuraScript

15   had exclusive distribution contracts with

16   Genzyme, Alexion, or Celgene, or any other

17   company?

18   A        Correct.

19       Q        Okay.  When you became aware of the

20   significant increase in the price of Acthar, and

21   given your role as the chief medical officer,

22   with the ability to interface with CuraScript,

23   Accredo, and the CuraScript Specialty Pharmacy,

24   the PBM, and even the hub -- we didn't talk about

25   the hub.

1              Did you interface with the hub?

2    A      I don't recall ever interfacing with the

3    hub.

4              Q      Okay.  It was part of the

5    organization, though?

6    A      Correct.

7              Q      Okay.  Did you ever say, as the

8    chief medical officer, that, I've seen Acthar

9    from the time I was a medical student, and what

10   can we as a company do to try to lower the price

11   of this drug that appears to keep going up and up

12   and up?

13   A      No.

14             Q      All right.  So, you'd agree with me

15   that the lever Express Scripts has to sit down

16   and negotiate, as Mr. Osborne did on behalf of

17   CuraScript, that lever to try to drive a lower

18   price was never utilized by Express Scripts,

19   right?

20             MR. FORST:  Objection to the form.

21             THE DEPONENT:  I don't know.

22   BY MR. HAVILAND:

23             Q      You have no knowledge that it was

24   ever used as a lever with Questcor and

25   Mallinckrodt, correct?

Page 91

```
 1    A       I do not know.

 2            Q       Right.  All right.  Now, let's

 3    change gears a little bit.  Express Scripts has

 4    sought to go after drug companies that take older

 5    medications, limit distribution, and then reprice

 6    them?

 7    A       Yes.

 8                    MR. FORST:  Just wait for a

 9            question.  I don't think that was a

10            question.

11    BY MR. HAVILAND:

12            Q       That was a good pause, though.

13    A       I'm sorry.

14            Q       I appreciate the pace.

15                    Specifically, sir, you got a lot of

16    credit for what happened with Daraprim, you're

17    familiar?

18    A       I don't know if I got any credit.  I got a

19    lot -- there was a lot of comment.

20            Q       We won't talk about Mr. Shkreli's

21    comment to you, but you were in -- in the

22    audience with Mr. Henry when you asked the

23    question of Mr. Shkreli; did you not?

24    A       So, I was at the Forbes conference.  I

25    gave a presentation at the Forbes conference, and
```

1    so did Mr. Shkreli, and I asked a question of

2    Mr. Shkreli.

3         Q      What specifically was your question

4    to Mr. Shkreli?

5    A      I don't remember the exact question.

6         Q      It had to do with his pricing for

7    Daraprim; did it not?

8    A      Yeah, I know it had to do with the

9    pricing, but I don't know the specific of the

10   question.

11        Q      Well, I think Mr. Henry's take on

12   it was you asked about why he raised the price so

13   much for Daraprim?

14   A      I find -- I question -- as you know, as

15   you've -- I'm sure you've done your homework --

16   I've questioned the price of a lot of drugs over

17   time.

18        Q      And there, you went after

19   Mr. Shkreli who was -- at the time, was the CEO

20   of Turing, right?

21   A      Correct.

22        Q      And then, he said back to you -- I

23   won't paraphrase how he said it, but he said to

24   you, Your company has been begging for my

25   business, or words to that effect, right?

Page 93

1   A       Um-hmm.

2               (Reporter clarification.)

3               THE DEPONENT:  Yes.

4   BY MR. HAVILAND:

5       Q      And after that, a reporter asked

6   you to fact-check his statement that Express

7   Scripts was begging for business, and

8   specifically whether or not there was email

9   exchanges about that.

10              Do you recall that?

11  A      So, I was -- I was unaware of our

12  contracting attempts with Turing, so I was -- I

13  would have had to have sought out help.

14      Q      You came to learn that there were

15  attempts by Express Scripts to contract with

16  Turing for the exclusive rights to Daraprim,

17  right?

18  A      Correct.

19      Q      And you became aware that

20  Mr. Osborne, the individual who negotiated the

21  exclusive rights to Acthar with Questcor, was

22  also negotiating with Mr. Shkreli and Turing to

23  get the exclusive rights to Daraprim, right?

24  A      I became aware that, yeah, Mr. Osborne

25  was -- was the one who was negotiating with

Page 94

1    Turing, correct.

2         Q    At the time you asked that question

3    of Mr. Shkreli, you didn't know that fact,

4    though?

5    A    Correct.

6         Q    All right.  And did you in fact go

7    back and try to fact-check whether Shkreli was

8    right that -- whether or not "begging" is the

9    right word -- Express Scripts was attempting to

10   get the business of Turing for Daraprim?

11   A    I went back to find out what our

12   relationship was with Turing, correct.

13        Q    What did you learn?

14   A    I learned that we were trying to negotiate

15   to -- at some point in time, we had been

16   negotiating to try to be the distributor for

17   Turing.

18        Q    And did that surprise you, sir?

19   A    No.

20        Q    Okay.  Did you come to learn what

21   prices were being discussed with Turing by

22   Mr. Osborne and Express Scripts?

23   A    No.

24        Q    Would it surprise you to learn that

25   the prices being discussed were higher than

1    Shkreli and Turing actually raised the price to,

2    750?

3                    MR. FORST:  Objection to the form,

4            foundation.

5                    THE DEPONENT:  Like I said, I was

6            unaware of the -- those -- the

7            discussions.  I tend -- I do not know

8            the -- I don't participate in the

9            discussions of the contracts for the --

10           for the access side of the business.  It's

11           not -- it's not my --

12   BY MR. HAVILAND:

13           Q     I get that, sir.

14   A       -- area.

15                   MR. FORST:  Don, let -- let -- let

16           him finish.

17                   MR. HAVILAND:  I didn't know I was

18           cutting him, sir.  It's fine.  I didn't

19           know I was cutting him off.  I looked

20           down.

21                   MR. FORST:  Okay.

22   BY MR. HAVILAND:

23           Q     I apologize, Dr. Miller.  You can

24   finish.

25   A       It's just not my area.  So, I have a --

Page 96

1    had a big responsibility, and I worked very hard

2    on my area of the company, and as a senior member

3    of the company, would see rollups of the results

4    from other parts of the company, but the

5    specifics of their operations were left to the

6    operators of those areas.

7                    (Discussion held off the record.)

8    BY MR. HAVILAND:

9         Q     Dr. Miller, I'm going to show you

10   what I'm marking as Exhibit 7 to your deposition.

11   It was marked yesterday, at the deposition of

12   Brian Henry, as Exhibit 11.

13                   (Exhibit 7 was marked.)

14   BY MR. HAVILAND:

15        Q     And you'll see it's an email sent

16   by Mr. Henry to you and others.

17   A        Thank you.

18        Q     So it's Exhibit 7 to this

19   deposition, Exhibit 11 to the Henry deposition.

20   Take a moment to review it, sir.  You'll see, in

21   the Monday, November 30, email thread to the

22   executive group -- I think Mr. Henry called it

23   the leadership group, he says, FYI, tonight at

24   11:01 p.m. CT, we will issue the release below

25   announcing our partnership with Imprimis

1    Pharmaceuticals to broaden access to a less

2    expensive alternative to Daraprim.  We plan to do

3    embargo interviews today with Dr. Miller so that

4    media outlets can have the story out at our

5    embargo time.

6                    Did I read that correctly?

7    A      Yes.

8           Q      And you're familiar with the press

9    release that follows, right?

10   A      Yes.

11          Q      And it announced that, in fact,

12   Express Scripts, the PBM, went out into the

13   market face [sic] -- place and found a partner at

14   Imprimis to produce a lower-cost equivalent to

15   Daraprim, right?

16   A      No.

17          Q      Well, that's what it says, sir.

18   A      Well, yeah --

19          Q      Let me just -- let me read it

20   first.

21   A      Well, let me just --

22          Q      Well, let me just read it first,

23   and then you can comment.

24                    MR. FORST:  Don, you asked a

25          question --

1              MR. HAVILAND:  Let me just read it

2       first.

3              MR. FORST:  No, no, you asked a

4       question.  He was answering it.

5              MR. HAVILAND:  It's withdrawn.

6       It's withdrawn.

7              MR. FORST:  Okay.  So you're going

8       to ask another question?

9              MR. HAVILAND:  I am.

10             MR. FORST:  Okay.  Then withdraw

11      it.  Don't get mad.  There was a question

12      pending.  He was trying to answer it.  I

13      don't know why you're frustrated.

14             MR. HAVILAND:  I'm not.

15             MR. FORST:  Okay.

16             MR. HAVILAND:  It's withdrawn,

17      Counsel.

18             MR. FORST:  Okay.

19             MR. HAVILAND:  Thank you.

20             MR. FORST:  Good.

21   BY MR. HAVILAND:

22      Q    Dr. Miller, Express Scripts

23   announced to the world, on November 30, 2015,

24   that, Express Script today announced it will

25   partner with Imprimis Pharmaceuticals to drive

1    access to a low-cost equivalent to Daraprim, a

2    drug for the treatment of toxoplasmosis that has

3    recently -- been recently priced out of reach for

4    people with HIV, pregnant women, and others with

5    weakened immune systems.

6              Did I read that correctly?

7    A    Yes.  Yes.

8         Q    Then the next page, in a press

9    release announced to the world, Imprimis is

10   offering a compound oral formulation of

11   pyrimethamine -- did I say that correctly?

12   A    Pyrimethamine.

13        Q    Pyrimethamine -- and leucovorin, a

14   form of folic acid, for as low as $1 per capsule

15   for people whose pharmacy benefit is managed by

16   Express Scripts.  While the 62-year-old Daraprim

17   was priced $13.50 per pill earlier this year, its

18   owner, Turing Pharmaceuticals, made the decision

19   in September to increase the price to $750 per

20   pill.

21             Do you see that?

22   A    Yes.

23        Q    And then you're quoted, sir, in the

24   article several times, right?

25   A    Yes.

Page 100

1          Q     And I assume that corporate

2    communications ran those quotes by you before

3    they used them in their press release, right?

4    A     Yes.

5          Q     And so they're accurate?

6    A     Yes.

7          Q     All right.  And after this

8    announcement happened, you went on interviews --

9    they were described as embargo interviews -- on

10   behalf of the company, right?

11   A     Yes.

12         Q     So you became the focus of the

13   media's attention on this issue; is that fair?

14   A     Correct.

15         Q     And you were prepared for those

16   interviews in terms of what the company's

17   position was; were you not?

18   A     Yes.

19         Q     And walk me from this release back

20   in time to when Express Scripts decided to go out

21   into the marketplace and develop with Imprimis a

22   lower-cost alternative to Daraprim?

23               MR. FORST:  Objection, assumes

24         facts not in evidence.

25               THE DEPONENT:  So, actually, we did

```
1            not go into the marketplace.  Imprimis
2            actually came to us with this idea.  So,
3            we evaluated the idea, and because of the
4            nature of Daraprim, we thought that this
5            actually could be viable.  So, we both
6            vetted this clinically, legally, and --
7            and were able to figure out how to do
8            this.
9    BY MR. HAVILAND:
10           Q      And it was viable clinically, and
11   it was cheaper, right?
12   A      Well, it was viably -- viable clinically
13   and by the FDA, and it was less expensive,
14   correct.
15           Q      And Express Scripts then made the
16   drug available to its contracted plans through
17   their compound aspect of their formularies,
18   correct?
19   A      Not exactly.
20           Q      All right.  How was it done?
21   A      Express Scripts had -- allowed Imprimis to
22   be the provider within our network for this
23   product.
24           Q      Okay.  So existing contracted
25   health plans would immediately have the ability
```

Page 102

1    to cover and pay for this alternative to

2    Daraprim?

3    A       Correct.

4            Q       And Express Scripts, in fact, went

5    out into the marketplace and promoted the

6    alternative to the physician community, correct?

7    A       Correct.

8            Q       And it did that to counteract

9    Shkreli's price increase; did it not?

10   A       Correct.

11           Q       And I'm going to show you an email

12   from one plan.  It happens to be a client of my

13   law firm.  It happens to be a plaintiff in a

14   lawsuit against Express Scripts.  This is

15   Exhibit 8 to your deposition, sir.

16                   MR. HAVILAND:  For those on the

17   record, it's ExpressScripts5478859 through 860.

18                   (Exhibit 8 was marked.)

19   BY MR. HAVILAND:

20           Q       If you go to the first page, sir --

21   it's always best to read emails from the bottom

22   up -- I'll represent to you John Heenan is the

23   plan administrator of International Union of

24   Operating Engineers, Local 542.  As I

25   represented, they have instituted a lawsuit

1    against Express Scripts in suburban Philadelphia

2    for Acthar.  In October of 2015, Mr. Heenan

3    writes to Michael Aschi.

4                    Do you know who that was?

5    A     No.

6           Q     Okay.  He's in the sales

7    organization.  He was the account rep for fund at

8    the time.  "How do we block Turing's drug and

9    promote Imprimis to our member?"

10                   Do you see that?

11   A     Yes.

12          Q     And then above that, do you know

13   who Hiten Patadia is?

14   A     I do not.

15          Q     I'm sorry?

16   A     I do not.

17          Q     I'm sorry, I just didn't hear you.

18                   She writes back to Mr. Heenan, Hi,

19   John, I remember this question from a few months

20   ago, and I'm sure you've seen some headlines

21   in -- in the recent news.  ESI has established

22   access for the compound made by Imprimis.

23                   So, as of December 3rd and the

24   press release, everything was in place for plans

25   like Local 542 to get Acthar -- or to get

Page 104

1   Daraprim for its members, this alternative, and

2   cover it, right?

3   A      Correct.

4              MR. FORST:  Objection to the form.

5   BY MR. HAVILAND:

6      Q      And that was done in the span of a

7   couple of months, right?

8   A      Yes.

9      Q      Imprimis had the agent available,

10  right?

11  A      Yes.

12     Q      The folks in procurement and

13  contracting did what they needed to do to get

14  Express Scripts access to the medication so it

15  could be fulfilled to members that are contracted

16  through health plans, right?

17  A      Yes.

18     Q      And then it was ultimately covered

19  and pushed out into the marketplace by Express

20  Scripts to the physician community, right?

21  A      Yes.

22     Q      And this -- Patadia says, I would

23  just like to let you know that there is no

24  special enrollment that the fund has to complete.

25  Your members will have access to the cheaper

1    alternative.  Physicians that have prescribed

2    Daraprim over the last 12 months will be sent a

3    proactive fact form informing them about our

4    decision.

5                     So, in fact, Express Scripts went

6    back and looked at utilization and targeted those

7    physicians that had already prescribed Daraprim

8    to let them know there was a cheaper alternative,

9    right?

10   A       Correct.

11           Q       And why'd they do that?

12   A       Because the -- they were going to be using

13   an alternative form, and it's appropriate for the

14   physicians to know that.

15           Q       And it's an appropriate thing, if

16   you're looking to get -- drive lower costs, to go

17   to those physicians that are already prescribing

18   the medication to let them know there's an

19   alternative, right?

20   A       Yes.

21           Q       And then there's an announcement,

22   if you go to the first page -- well, before that,

23   Mr. Heenan says, Why can't it work like mandatory

24   generic?  They can get the drug, but have to pay

25   the difference?  Or add it to the step therapy

1    list?

2                    Do you see that?

3    A      Yes.

4          Q      Ms. Patadia says, Great question,

5    John.  Express Scripts is not blocking the brand

6    or -- and/or advising the physician to utilize

7    the compound.  And then -- then she, I think,

8    puts this piece of the press release out there.

9                    Do you see that?

10   A      Yes.

11         Q      So, in fact, there was no edits,

12   prior authorization, or -- or UM -- utilization

13   management restriction put on Daraprim, right?

14   A      I can't -- I don't know what the --

15         Q      Okay.  That's fair.  But

16   alternatively, with this new compound agent, it

17   was promoted out, and Express Scripts made --

18   took the steps necessary as a PBM so the

19   contracted plans could get access to it and pay

20   for it at the cheaper level, right?

21   A      That's correct.

22         Q      Now, that was Daraprim, sir.

23                    And did you come to learn that

24   Imprimis had also -- came to Express Scripts and

25   said that they could do the same thing with

1   Acthar?

2   A      Yes.

3          Q      What do you recall about that?

4   A      It's not viable.

5          Q      Well, that's -- that's your

6   opinion.

7                 What do you recall about what they

8   said?

9   A      So, Mark Baum, the CEO of Imprimis,

10  suggested that and some other drugs that he

11  had -- he believed he could make suitable

12  alternatives.

13         Q      You didn't believe him?

14  A      As the chief medical officer, there's a

15  huge difference between Daraprim and Acthar that

16  makes it non-viable for Acthar.

17         Q      Why is it not viable?

18  A      Well, as we've already talked about,

19  Daraprim is a simple chemical, and so taking that

20  simple chemical and compounding it for

21  availability for patients is relatively easy.

22                Number two is, because we added the

23  leucovorin to it, it was within FDA guidelines

24  for us to use.  Without the leucovorin, we could

25  not have used the -- even a Daraprim compound,

1   because the requirements of the FDA is that you

2   cannot use a compound with a --

3   commercially-available products available.

4           Number three is, the number of

5   patients that were on Daraprim, exceedingly

6   small, and so you can do individual compounds for

7   individual patients, and so it's not

8   manufacturing, again, meeting the good graces of

9   the FDA.

10      Q       And why is that not viable in

11  Acthar?

12  A       Number one is, Acthar is a protein, and so

13  protein is a really complex structure.  Remember,

14  it's not just the amino acid sequence.  It's even

15  the folding of the protein.  And so, you cannot

16  be assured that what -- taking ACTH and putting

17  it in a compound would have the same

18  bioavailability and the same actions as the

19  manufactured product.

20          Second is, because he -- because

21  the manufactured product is on the marketplace,

22  the FDA would take a dim view of this.

23          And third, because of the volumes,

24  they would probably be making it in batches,

25  which means they're manufacturing, and you're not

1   allowed to manufacture in the compounding

2   business.

3        Q      Well, let's break that down.

4              Acthar is approved for infantile

5   spasms by the FDA, correct?

6   A     Acthar is, yes.

7        Q      Yes.  It has a limited approval for

8   acute exacerbations of multiple sclerosis?

9   A     And infantile spasms, correct.

10       Q      Right.  Infantile spasms, and it

11  has a secondary approval for acute exacerbations

12  of MS?

13  A     Correct.

14       Q      A flare?

15  A     Correct.

16       Q      Just an incident; it's not a

17  disease-modifying therapy; it only helps to abate

18  the symptoms of the flare, right?

19  A     Correct.

20       Q      You would expect a very limited

21  prescription, one-and-done to abate the symptoms,

22  right?

23  A     Correct.

24       Q      So, it's a -- it's a very narrow

25  indication for multiple sclerosis, right?

1   A       Yes.

2            Q       And as you testified previously,

3   there are 17 or 18 other indications in the

4   label, but they are not FDA-approved, right?

5   A       Correct.

6            Q       They are simply acknowledged as

7   indicated for potential use by the physician

8   community, right?

9   A       That's correct.

10           Q       And that's an important

11  distinction, right?  There's FDA-approved, as

12  you're pointing out with this situation with

13  Imprimis, and you have FDA approval for Acthar

14  for IS and acute exacerbations of MS, right?

15  A       Correct.

16           Q       All the other indications are only

17  indicated for use, right?

18  A       And that's why we have utilization

19  management for those.

20           Q       Okay.  And that's why, you'd agree

21  with me, the FDA wouldn't take a position in

22  terms of use of a drug outside of its FDA

23  approval?

24  A       I'm not --

25           Q       Well, for a physician that wants to

1    write a script of Acthar for rheumatoid

2    arthritis, right, physicians can do off-label

3    prescriptions all the time, right?

4    A      That's correct.

5         Q      In fact, for the better part of its

6    history, Acthar was an off-label medication for

7    infantile spasms; was it not?

8    A      I don't know.

9         Q      Well, it wasn't approved until

10   2010, right?

11              MR. FORST:  Objection to the form.

12              THE DEPONENT:  I don't know the --

13        I don't know the history of the approval.

14   BY MR. HAVILAND:

15        Q      You know it was approved at one

16   point in time --

17   A      So, the FDA initially reviewed it in 1952,

18   but I don't know what the FDA actions subsequent

19   to that are.

20        Q      Okay.  Did you come to learn that

21   it was approved by the FDA at some subsequent

22   time?

23   A      So, I know that the label, which I don't

24   know when it was generated, has it approved for

25   infantile spasm and for flare -- you know, for

1    episodes of -- exacerbations of MS.

2          Q      And the label then just deals with

3    indications and uses for other diseases, right?

4    A      Correct, which is quirky, because we don't

5    see that with many labels.

6          Q      Right.  And it's a -- it's a

7    quirkiness of the fact that this is such an old

8    medication, right?

9    A      It was before effectiveness was a

10   requirement of the FDA.

11         Q      Right.  The FDA never determined

12   effectiveness of Acthar for any use outside of IS

13   and acute exacerbations of MS?

14   A      That's correct.

15         Q      In fact, the original label had

16   treatment for migraine headaches; did you know

17   that?

18   A      No.

19         Q      It had treatment for delirium

20   tremens by alcoholics; did you know that?

21   A      No.

22         Q      But you are aware the FDA never

23   studied effectiveness of Acthar for any of those

24   other indicated potential uses?

25   A      Until 1962, the FDA didn't look at

1    effectiveness.

2         Q       Right.  And there's a class of

3    medications that preceded the FDA; Acthar's one

4    of them?

5    A     Correct.

6         Q       Daraprim is one of them; it was

7    around before the FDA, right?

8              MR. FORST:  Objection to the form,

9         calls for speculation.

10   BY MR. HAVILAND:

11        Q       I'm -- do you know?

12   A     I don't know.

13        Q       Okay.  Did Express Scripts ever

14   take any sample quantities of the Imprimis

15   product that it was developing as an alternative

16   to Acthar and test it?

17             MR. FORST:  Objection, assumes

18        facts not in evidence.

19             THE DEPONENT:  So, I can tell you

20        that there is -- we have no capacity to

21        test it.  It's irrelevant what the testing

22        is, because until the FDA would have

23        approved the protein product, it wouldn't

24        be suitable for us to use on our patients.

25   BY MR. HAVILAND:

Page 114

1          Q      Are you saying that -- did Imprimis

2    ever go to the FDA and get approval for Acthar?

3    A      I know that the -- Imprimis talked with

4    the FDA.  To this date, there is no Imprimis

5    FDA-approved product for use in substitute to

6    Acthar.

7          Q      Do you recall Mr. Baum asking

8    Express Scripts specifically to support it in its

9    effort to get FDA approval?

10   A      I do not recall specifically Mark asking

11   us to support his effort.

12         Q      You don't?  You don't recall him

13   asking for financial support to help bring the

14   product to market and get FDA approval?

15   A      I know that there were communications with

16   our company about them when they wanted to spin

17   out the product.  Those were in later years, but

18   as you know, that's not what we do.  We do not

19   create our own products.

20         Q      Well, you went out and contracted

21   with Imprimis to bring their product to market

22   with Daraprim, right?

23   A      Because it was a simple product that was

24   safe to -- for them to create and did not run

25   afoul of the FDA.

1      Q      You agree that the patient

2  population for the approved uses of Acthar is

3  narrower than the indicated uses that it's

4  marketed for?

5  A      That is correct.

6      Q      You never explored with Imprimis

7  developing an alternative to Acthar strictly to

8  treat IS and acute exacerbations of MS; is that

9  fair?

10  A      That would require a clinical trial of

11  their product, and that was not -- we -- we did

12  not deem that feasible.

13      Q      I'm going to show you what I'm

14  marking as Exhibit 9 to your deposition.

15              (Exhibit 9 was marked.)

16  BY MR. HAVILAND:

17      Q      Before I get to that exhibit,

18  you're -- you're familiar with Mark Baum, the CEO

19  of Imprimis, right?

20  A      Yes.

21      Q      You had interactions with him?

22  A      Yes.

23      Q      I noticed you're not on all the

24  emails exchanges; you're on some.

25              You've had email exchanges where

1    you were copied with Mr. Baum at Imprimis?

2    A      I -- I -- I know I had emails with -- that

3    I was on with Mark, correct.

4         Q      All right.  Well, here's one such

5    email where you're in the thread.  So, let me

6    show you Exhibit 9.

7    A      Great.

8         Q      For the record, Exhibit 9 to the

9    Miller deposition is ExpressScripts0837581

10   through 7583.  As with all emails, sir, it's

11   easier to go from the back to front, Mr. Baum's

12   email to you and Wendy Barnes of

13   June 5, 2017.

14            Do you see that?

15   A      Yes, sir.

16        Q      And who's Wendy Barnes?

17   A      So Wendy was in our network contracting

18   group.

19        Q      So, she would be someone who would

20   be able to speak to the issue of whether or not a

21   drug could be put out in a network?

22            MR. FORST:  Objection to the form.

23   BY MR. HAVILAND:

24        Q      Help me with network contracting.

25   I'm not clear on what that --

1    A     So, she contracts with pharmaceutical

2    companies and pharmacies for products.

3         Q     I see.  Okay.  So, she -- she has a

4    hybrid role between pharma contracting and

5    pharmacy contracting?

6    A     I don't know specifically what her

7    bailiwick is --

8         Q     That's fair.

9    A     -- but she's in the supply chain group.

10        Q     Do you remember this email, sir?

11   A     I -- seeing the email, yes, I remember it.

12        Q     All right.  Well, let's take a

13   moment and review it.  It's written directly to

14   you --

15   A     Yep.

16        Q     -- because Mr. Baum says, Steve.

17              That's you, right?

18   A     Yes.

19        Q     "I hope all is well with -- I hope

20   all is well for you and ESI.  We are working with

21   your colleagues at Accredo on a small project."

22              Let me stop there.  I have the

23   documents, but you're familiar with the fact

24   that, in addition to Daraprim, Express Scripts

25   contracted with Imprimis to bring an alternative

Page 118

1    leuprolide product, the brand agent is Lupron,

2    that treats prostate cancer, right?

3    A      I'm -- I'm familiar with the contract.  I

4    did not know that.

5              Q      You're familiar with the contract.

6              You didn't know what?

7    A      I didn't -- I'm not familiar with the

8    leuprolide discussions.

9              Q      You are or are not?

10   A      I'm not familiar with --

11             Q      Oh, I'm sorry.  I didn't know that

12   you were or were not?

13   A      I am not.

14             Q      Okay.  We'll get to that.

15   A      Okay.

16             Q      Well, let me do that first, because

17   he's keying off of that.

18   A      Yep.

19             Q      And I want to show you that first.

20   I'm going to show you what I've marked as

21   Exhibit 10 to your deposition.

22             (Exhibit 10 was marked.)

23   BY MR. HAVILAND:

24             Q      It's hard getting around that.

25   There (handing).  Exhibit 10 to the Miller

1   deposition is ExpressScripts4932466 through 2490.

2   As I said, sir, you're not copied on all the

3   exchanges, and this is one of them.  This

4   precedes the email that we're looking at, though,

5   by a few months.

6                   So, you see in the email thread

7   from Bill Martin -- who was the head of Accredo

8   at the time, May of 2017?

9                   MR. FORST:  You're free to

10          familiarize yourself.

11  BY MR. HAVILAND:

12      Q     Yeah, absolutely.  I just want to

13  know you're familiar with Mr. Martin, who was the

14  president of Accredo -- vice president, right?

15  A       Vice president, correct.

16      Q     Okay.  I'm not going to ask you

17  about the contract.  I'm going to ask you about

18  the email threads, just to orient you about this

19  subject matter.  The email goes on for quite a

20  number of pages, so if you can go to the Bates

21  number that ends 2470.  Let me know when you have

22  that.

23  A       Got it.

24      Q     Yep.  And you can read as much as

25  you need coming up.  As I said, I don't believe

1    you're copied on this thread.  The first email

2    from Ben Slen.

3                   Who's he?

4    A      Ben is a -- one of our employees in

5    Accredo Health.

6         Q      Okay.  He's writing back to

7    Mark Baum -- we've talked about -- and a

8    Gary Seelhorst at Imprimis.

9                   Do you know who he was?

10   A      No.

11        Q      Okay.  And they say -- Mr. Slen

12   says, We have a pressing need for a compound

13   leuprolide for our Freedom Fertility Pharmacy.

14                   Do you see that?

15   A      Yes.

16        Q      And then coming forward, there's

17   some discussions about talking back and forth.

18   On 469, the facing page, Mr. Baum writes back,

19   Ben, we appreciate the opportunity to work with

20   you on this solution and hopefully others.  I

21   have asked our team to make this a priority, and

22   I think you will be pleased not only with our

23   quality products and pricing, but, more

24   importantly, our ability to provide outstanding

25   service.  Have a great weekend.

Page 121

1               Do you see that?

2      A      Yes.

3            Q      And then coming forward, there's

4      a -- a lengthier email at 468, and now we're into

5      April of 2017, from Mr. Baum.

6                  Do you see that "strictly

7      confidential"?

8      A      Yes.

9            Q      "I trust we are moving forward on

10     the leuprolide."

11                 Do you see that?

12     A      Yes.

13           Q      And on the facing page, it makes

14     reference to the attachment of the contract -- a

15     redlined contract, and as I said, I'm not going

16     to go over that, but if you go to page 241,

17     you'll see there's a Pharmacy Transfer Agreement

18     created for Freedom Fertility Pharmacy and

19     Imprimis.

20                 Do you see that?

21     A      Yes.

22           Q      As I said, I'm not concerned about

23     the contract history.  This email from April 6,

24     2017 -- and I'm back on page 2468, sir -- it keys

25     off this discussion about the leuprolide

Page 122

1    alternative, and in the second paragraph, it

2    says, I spoke to our team today.

3                    Do you see that?

4    A       Yes.

5            Q       "I spoke to our team today, and it

6    crossed my mind that our corticotropin

7    formulation alternative to HP Acthar Gel may

8    be -- might be much more valuable to you than

9    leuprolide.  Previously, we decided to not make

10   our corticotropin available to any of our PBM

11   relationships and to instead develop it as an

12   FDA-approved product.  That said, if you had an

13   interest and would get behind it, we would

14   consider making it initially available to

15   Accredo.

16                   Do you see that?

17   A       Yes.

18           Q       So at this point in time, Mr. Baum

19   is suggesting to Express Scripts that they have a

20   product they're looking to advance for FDA

21   approval, but they, in fact, have a product?

22                   MR. FORST:  Objection to the form.

23                   THE DEPONENT:  He believes he has a

24           product.

25   BY MR. HAVILAND:

1      Q      Okay.  Well, he says to the folks

2  in this email "our product," and he talks about

3  developing it as an FDA-approved product.

4             Then there's a lengthy discussion

5  here, and I want to go to the part where it says,

6  Imprimis ACTH product description.

7             Are you there?

8  A      Yes.

9      Q      He goes on to talk about, The

10  porcine product, which is HP Acthar Gel.  He

11  describes it's amino chain 39.

12  A      Um-hmm.

13      Q      And then he says, Imprimis has

14  developed a stable 39 chain amino acid peptide

15  that is chemically synthesized rather than from

16  porcine pig source, but identical in biological

17  activity.

18             Do you see that?

19  A      I see that.

20      Q      So, he's suggesting that they're

21  not trying to replicate the pig product; they're

22  looking to do a chemically-synthesized product

23  that would be similar, right?

24  A      Correct, which would require FDA approval.

25      Q      Okay.  But he is suggesting that

1    that's what they're doing, right, sir?

2    A      Um-hmm.

3              (Reporter clarification.)

4              THE DEPONENT:  Yes.

5    BY MR. HAVILAND:

6        Q      And did you know in this time

7    frame, in 2017, that they had such product and

8    they were developing it for FDA approval?

9              MR. FORST:  Objection to the form.

10             THE DEPONENT:  I knew that they had

11         a product, and we had told them it has to

12         be FDA-approved.

13   BY MR. HAVILAND:

14       Q      And that was it?

15   A      Mark, you know, was very excited about his

16   product.  We had tremendous interest in it, if

17   they could get it FDA-approved.

18       Q      Okay.  Express Scripts was not

19   interested in an alternative to Acthar with

20   Imprimis if it was not FDA-approved; is that

21   fair?

22   A      We -- because of the complexity of the

23   products, this is different than a chemical.

24   This is a protein, and proteins are not just

25   amino acids, but there's protein folding.  And so

1    knowing the biologic activity of a protein, it is

2    really crucial to making sure that we're giving

3    bioequivalent products to our patients.  So we

4    were interested, but cautious.

5         Q    Sir, you said, We are giving

6    bioequivalent products to our patients.

7              Express Scripts doesn't administer

8    products to patients?

9    A    We help facilitate products getting to

10   patients.

11        Q    Physicians administer products to

12   patients?

13   A    That's correct.

14        Q    Express Scripts is a PBM?

15   A    Correct.

16        Q    It manages relationships, and it

17   manages utilization, but it doesn't administer

18   products to patients, right?

19   A    That's incorrect.  We have -- through our

20   subsidiaries, we have nursing staff that goes out

21   to homes that administers products.

22        Q    Not Acthar, sir?

23   A    I don't know about Acthar.

24        Q    Is it possible that Express Scripts

25   has a branch that's administering Acthar to

Page 126

1    patients?

2    A       I would have to -- we do home

3    administration of medications, and under certain

4    circumstances, patients aren't able to even give

5    themselves self-injectables, and so we assist

6    that.

7           Q       Let me show you what I've marked as

8    Exhibit 11 to your deposition, and then I want to

9    come back to 9, okay?

10   A       Yeah.

11          Q       Exhibit 11 is further in the email

12   thread than what we just looked at as Exhibit 10.

13                  (Exhibit 11 was marked.)

14   BY MR. HAVILAND:

15          Q       And you'll see it's a different

16   series of emails.  As I said, these discussions

17   tend to go around different facets of the

18   company.  If you go the email from Ben Slen,

19   April 28, 2017, on page 828.

20                  Do you have that, sir?

21   A       Yes, sir.

22          Q       Mr. Slen writes to Mark Baum and

23   team, and there's a number of Imprimis people,

24   Looking forward to meeting you all in person in

25   San Diego next week.

1               Did you attend that meeting?

2    A     No.

3         Q     All right.  "In terms of agenda,"

4    he says, "I was hoping we could spend some time

5    on, one, the leuprolide contract and next steps;

6    two, CuraScript Specialty Distribution supply

7    agreement/Avastin; three, additional

8    opportunities; and, four, facility tour."

9               Do you see that?

10   A     Yes.

11        Q     Did Express Scripts contract for a

12   supply of Avastin through Imprimis?

13   A     I have no --

14              MR. FORST:  Objection to the form.

15              THE DEPONENT:  I have no idea.

16   BY MR. HAVILAND:

17        Q     All right.  The leuprolide contract

18   and distribution through Freedom Fertility, do

19   you know if that leuprolide alternative was

20   FDA-approved?

21   A     I have -- I'm totally unaware of all

22   those.

23        Q     Well, Lupron's FDA-approved; is it

24   not?

25   A     Lupron's FDA-approved.

1          Q     So, wouldn't the same concerns

2    apply in terms of Express Scripts wanting to have

3    an FDA-approved product as an alternative to an

4    FDA-approved product?

5    A     I can't --

6               MR. FORST:  Let me just object,

7         calls for speculation, vague and

8         ambiguous.

9               THE DEPONENT:  Yeah, I can't

10        comment.  I know nothing about this, so --

11   BY MR. HAVILAND:

12        Q     Well, you do know that Lupron

13   treats prostate cancer, right?

14   A     Um-hmm.

15        Q     Yes?

16   A     Yes.

17        Q     It's a brand, right?

18   A     Yes.

19        Q     It's covered by Express Scripts as

20   a specialty, right?

21   A     Yes.

22        Q     It's high-priced?

23   A     Yes.

24        Q     Imprimis, from these documents,

25   spoke directly with Express Scripts folks about

Page 129

1    doing a -- a leuprolide alternative, right?

2                    MR. FORST:  Objection to the form.

3                    THE DEPONENT:  It appears so.

4    BY MR. HAVILAND:

5         Q     And you don't know whether or not

6    that leuprolide alternative was, in fact,

7    FDA-approved, right?

8    A     This never --

9                    MR. FORST:  Objection, asked and

10            answered.

11                    THE DEPONENT:  This has never come

12            before me.  I do not know anything about

13            this.

14    BY MR. HAVILAND:

15        Q     Okay.  But the concern you raised

16    about FDA-approved medications being sponsored,

17    covered, or otherwise addressed by Express

18    Scripts with Imprimis would apply equally to

19    Lupron as it does to Acthar; does it not?

20    A     And we should --

21                    MR. FORST:  Objection to the form.

22                    THE DEPONENT:  We have an

23            obligation to make sure our patients get

24            high-quality products, and -- and so, when

25            I'm aware of these things, the -- the --

1          especially protein products that are

2          complicated, we need to be, you know,

3          assured that they are the quality that we

4          can stand behind, and most of -- you know,

5          that would usually require FDA approval.

6     BY MR. HAVILAND:

7          Q     So, let's go back to Exhibit 11,

8     and then I want to go to Exhibit 9.

9                After the discussion about that

10    meeting, Mr. Baum writes back on the face page,

11    which is 11827.

12    A     Which -- are we still with 11?

13         Q     Yeah.  Exhibit 11, Mark Baum's

14    email to Ben Slen and others --

15    A     Got it.

16         Q     -- on May 3rd.

17    A     Got it.

18         Q     Got that?

19    A     Yes.

20         Q     "Ben, just a note to thank you and

21    your team for making the trip to San Diego."  So

22    apparently the meeting happened.  "We felt it was

23    a very productive meeting, and we will be working

24    on the agreement modifications, as well as the

25    action items we discussed to move forward with

1    the leuprolide acetate business.  In thinking

2    about our approach with a product like

3    corticotropin" -- that's Acthar, right?

4    A     Yes.

5         Q      -- "it occurred that if there is an

6    interest on your side, it might be best to

7    consider a program in terms of focusing on 100

8    percent access for your patients where the

9    branded alternative is not covered."

10              Do you see that?

11   A     Yes.

12        Q      "Rather than moving market share

13   from a reference drug to the compound

14   alternative, perhaps a supplementary co-pay waive

15   program to promote access to these single-source

16   branded products where insurance carriers would

17   otherwise deny coverage, or, when appropriate,

18   the physicians decides to write the alternative."

19              Do you see that?

20   A     Yes.

21        Q      So, he has suggested that instead

22   of having this alternative to Acthar compete with

23   or try to take away prescriptions for IS and MS,

24   you focus on the other areas where Acthar is

25   being prescribed at a high price, right?

1    A     That appears to be what he's implying,

2    correct.

3         Q     And Mr. Slen writes back that,

4    Stephanie and I had a good discussion with

5    Mark Baum.

6              Do you know who Stephanie was?

7    A    Yes.

8         Q    Who's that?

9    A    Stephanie Uder is one of our employees.  I

10   don't know which department she was working in at

11   the time.

12        Q    Okay.  And then Mr. Slen writes

13   that, The meeting took place yesterday.  We

14   continue to move forward on the leuprolide

15   arrangement.  They are reworking a contract for

16   us.  And that's leuprolide.

17             Skipping down, Mr. Slen writes, We

18   also discussed several other potential

19   opportunities -- I'm not going to get these names

20   right -- Xiaflex, Thiola, Avastin, Makena, and

21   Acthar.

22             Do you see those?

23   A    Yes.

24        Q    Thiola is a Shkreli drug, right?

25   A    I don't know.  I don't know who makes

Page 133

1    Thiola.

2         Q      Okay.  Do you know the company

3    Retrophin?

4    A      Yes.

5         Q      Do you recall that they --

6    there was a time when Mr. Shkreli was the CEO of

7    Retrophin; do you recall that?

8    A      Oh, yeah.

9         Q      All right.  In fact, Mr. Shkreli's

10   company sued over the Synacthen acquisition.

11                 Were you aware of that?

12   A      I'm unfamiliar with all that.

13        Q      Did Express Scripts ever explore a

14   low-cost alternative to Thiola with Imprimis?

15   A      I do not know.

16        Q      Okay.  This email by Mr. Slen --

17   I'm just going to skip down.  You can read the

18   whole thing, sir, the one -- I want to read where

19   he says, The one that is the biggest opportunity,

20   but also has the most potential issues, is their

21   corticotropin product to compete with Acthar.

22   The opportunity that seems like it could be

23   easiest after leuprolide is Thiola.

24                 Do you see that?

25   A      Yes.

1           Q       And you don't know, as you sit

2    here, whether or not Express Scripts pursued an

3    alternative product to Thiola to compete with

4    that high-priced product?

5    A       I do not.

6           Q       All right.  Let's go back.  So, now

7    we have context that was outside of your

8    discussions.  I want to go back to Exhibit 9 --

9    A       Sure.

10          Q       -- which follows these April and

11   May emails.

12                  You're in the thread that is

13   June 26; do you see that?

14   A       Yep.

15          Q       So, let's go back to where I was

16   reading.

17   A       June 26th.

18          Q       Yeah, you're on the June 5 email,

19   and that's where I was reading.  Thank you.  So

20   it's Exhibit 9, ExpressScripts Bates ending in

21   7582.

22   A       Yes.

23          Q       Mr. Baum's email; do you have that?

24   A       Yes, sir.

25          Q       Okay.  And I had veered away when I

1    read the part where Mr. Baum says, We are working

2    with you colleagues at Accredo on a small

3    project.

4                    Now you have a sense of what the

5    project was, right?

6                    MR. FORST:  Objection to the form

7         and characterization, lack of foundation.

8                    MR. HAVILAND:  He calls it a

9         project.

10                   THE DEPONENT:  Okay.

11   BY MR. HAVILAND:

12        Q     "But I wanted to reach out on a

13   different subject.  We are spinning out a company

14   called Eton Pharmaceuticals.  Eton will develop

15   and commercialize, among other drug assets, a

16   viable competitor to Acthar.  Here are a few

17   points of information."

18                   Do you see that?

19   A     Yes, sir.

20        Q     And then he describes their

21   formulation.

22                   Do you see that?

23   A     Yes.

24        Q     He says, We have completed a

25   six-month stability study for based on -- study

1    for based on the USP monograph.

2                  And such a study is necessary to

3    begin the process of FDA approval; is it not?

4    A      Correct.

5         Q      He then says, In addition to the

6    technical achievement -- that he describes

7    above -- he says, of stabilizing a potent

8    non-gelatin preservative-free synthetic 39 chain

9    corticotropin formulation -- that's a

10   tongue-twister -- we have engaged a former deputy

11   director at the FDA's Office of Generic Drugs to

12   help design a clinical development program, which

13   should allow us to get to market fairly soon.

14                  Do you see that?

15   A      Yes.

16        Q      Then he goes on to say that, We

17   believe our formulation will compete with Acthar

18   and offer competition in a market in need of

19   competition, right?

20   A      Yes.

21        Q       Now, is it your testimony that,

22   after getting this email, you did not pursue

23   further opportunities with Imprimis to bring a

24   lower-cost alternative to market, because you

25   were awaiting FDA approval?

1              MR. FORST:  Objection to the form.

2              THE DEPONENT:  We, you know, found

3         this interesting, but Mark understood our

4         need for FDA approval, and our belief is

5         this is going to require a clinical trial,

6         and that is not going to be quickly done.

7    BY MR. HAVILAND:

8         Q     So, in answer to my question, there

9    was no effort to further pursue a lower-cost

10   Acthar alternative through Imprimis, because

11   Express Scripts was requiring an FDA-approved

12   product?

13   A     We don't require -- we -- we are

14   interested in products that can be competitors,

15   and in this particular case, it was my belief

16   that we were going to need to have an

17   FDA-approved product.

18        Q     And do you have that same belief as

19   to other high-priced specialty drugs in terms of

20   their alternative medications to treat diseases?

21             MR. FORST:  Objection to the form.

22             THE DEPONENT:  Yeah.  So, you know,

23        it's a case-by-case basis.  It's what --

24        you know, it's the areas that I get

25        involved with, and -- well, you know,

Page 138

1       almost -- so, we actually, as the FDA, are

2       very cautious when it comes to

3       compounding.  The compounding industry

4       has, as you know, had its own problems,

5       but we actually have parts of our business

6       where compounding's important, like

7       infertility.

8            And so -- but, you know, patients'

9       safety is really important.  There's a lot

10      of high-priced drugs.  There's a lot of

11      drugs I wish there were alternatives to,

12      but we also have to make sure they're safe

13      products.

14  BY MR. HAVILAND:

15      Q    Is there no alternative to Acthar

16  today?

17  A    For infantile spasm?  Not that I'm aware

18  of in the United States.

19      Q    How about for acute exacerbations

20  of MS?

21  A    There are drugs that work I believe better

22  than Acthar.

23      Q    And what has Express Scripts done

24  to utilize that fact, that there are cheaper

25  better alternatives to acute exacerbations, to

1    drive a lower cost of Acthar for MS?

2    A       So, we put utilization management in front

3    of those requests, but that's -- you know, but we

4    do not have the leverage of a competitive

5    product.

6           Q       You have the leverage of

7    competitive alternative agents to treat the

8    disease --

9    A       For MS, correct.

10          Q       Yes.  And, sir, you've been a -- a

11   big advocate of indication-specific pricing; have

12   you not?

13   A       I would love to make indication-based

14   pricing work, yes.

15          Q       And did you ever talk to

16   Mallinckrodt about that?

17   A       So, what we've done for indication-based

18   pricing is I've explored it with some of the

19   leading, sort of, healthcare economists.  We've

20   never been able to actually make it work.  We've

21   talked to pharmaceutical companies about it.

22   They're not interested.  So, the best example I

23   can give you is, in cancer, we -- we've

24   explored -- there's a --

25          Q       Oops.

Page 140

1    A      So, in cancer, we've taken drugs where

2    they've tried it in different cancers.  We've

3    seen the difference in survival.  So, there's one

4    drug used for pancreatic cancer.  It extends your

5    survival by 12 days.  So, they have an FDA label

6    for pancreatic cancer.

7                    That same drug, used in lung

8    cancer, extends your life by five months.  So,

9    we've tried to say, Can we pay differentially

10   based on the survivals?  The pharmaceutical

11   companies are not interested in pursuing that.

12        Q      Because they like the one high

13   price?

14   A      Because it will hurt their Medicaid best

15   price.

16        Q      That's one factor, but they don't

17   want to lower the price across the disease

18   states?

19   A      Well, the pharmaceutical companies never

20   want to lower their prices, so they don't

21   voluntarily lower prices.

22        Q      So, this idea that you came up with

23   was to look at drugs, especially high-priced

24   drugs, and look at the value proposition -- my

25   words -- across the spectrum of indications for

Page 141

1   which it can be used, right?

2   A      Yes.

3          Q      And realizing that there are some

4   uses that are higher value than others, have what

5   you said was differential pricing?

6   A      Correct.

7          Q      And differential pricing is a

8   competitive force in the marketplace that will

9   drive down --

10  A      Could be.

11         Q      -- prices?

12                Could be.  But you've never

13  succeeded?

14  A      No.

15         Q      The pharmaceutical industry's not

16  interested?

17  A      Correct.

18                MR. HAVILAND:  Let's take a break.

19                THE VIDEOGRAPHER:  Okay.  Going --

20         we're going off the record at 11:26 a.m.

21                (Break taken.)

22                THE VIDEOGRAPHER:  We are back on

23         the record at 11:49 a.m.

24  BY MR. HAVILAND:

25         Q      Dr. Miller, are you familiar with

1    the Drug Trend Report that's put out by

2    Express Scripts annually?

3    A       Yes.

4            Q       And -- and tell the jury what --

5    what that is.

6    A       So we, on an annual basis, put out a

7    report that characterizes how drugs are being

8    used in the United States and what the trend is

9    for all the different classes.

10           Q       And it's -- it's a high-level look

11   at drugs that are covered on Express Scripts

12   formularies; is that fair?

13   A       It actually includes even things not

14   covered on our formulary, but it's a high-level

15   look at the -- how drugs are being utilized in

16   the United States.

17           Q       And it also tracks cost trends?

18   A       Yes.

19           Q       Okay.  And so you're -- you're

20   able, through that, to look at trends in costs of

21   specialty medications, among others, right?

22   A       Correct.

23           Q       All right.  Do you have any role in

24   the drug report -- did you, in the past?

25   A       Yeah.  In given years, I have been one of

1    the reviewers for the Drug Trend Report.

2         Q    Okay.  Did there ever come a time

3    that -- that Express Scripts focused upon what

4    I'll call really high-cost drugs in terms of ones

5    that were multiple percentages higher, like

6    hundreds of percents higher year over year?

7    A    So, I forgot what they -- so we've --

8    we've focused on, you know, high-cost drugs and

9    also high-spending patients, so called super

10   spenders.

11                   (Reporter clarification.)

12   BY MR. HAVILAND:

13        Q    And is that element in the Drug

14   Trend Report, to -- to your knowledge?

15   A    It has been included in -- it's not a

16   feature that's included year over year, but it's

17   been included in some, yes.

18        Q    So, we looked at a document

19   yesterday with Mr. Henry.  You're not copied on

20   it, but I want to show it to you.  It's -- it's

21   in that period of time when you were looking at

22   Daraprim and the alternative in -- in the fall of

23   2015.  I'm going to show it to your counsel.

24                   Unfortunately, I only have one

25   copy.  I should have got a copy of it from there.

Page 144

1   I've got a copy for your counsel of -- of the

2   other stuff I want to use, but this is really

3   just to ask you a follow-up to the question I

4   just did.

5               MR. HAVILAND:  It is marked as

6           Henry Exhibit 12, ExpressScripts5769673 to

7           9674.  There's an email from an analyst

8           that I'm just going to generally orient

9           the witness to, but I'm really concerned

10          with Glen Stettin's approach as a member

11          of the leadership, if you want to take a

12          look at that.

13              Oh, I'm sorry, I did get a copy of

14          it.  I thought that was one, but there was

15          another copy of it.  My apologies.  Oh,

16          they didn't do the two sides.

17              MR. FORST:  Wait a second -- yeah.

18  BY MR. HAVILAND:

19      Q     Well, let me just read it.  I'm not

20  concerned -- apparently, some lower-level analyst

21  within the company had written to some folks in

22  his organization.  I think the highest was

23  Mr. Stettin.  And the -- the Re line is, The old

24  drug Daraprim cost increase of 5,500.

25              You can read it yourself, sir, but

Page 145

1   the email says -- his name is Jason Glanville.

2   Just for those who don't have a copy, it says,

3   Some of you may know me.  Some of you may not.  I

4   am part of the pharmacy system BAT -- and I think

5   that's just a -- a data group within the company,

6   according to Mr. Henry -- and I have dearly --

7   dearly-held belief in holistic affordable

8   healthcare.  Over the weekend, a dismal industry

9   event occurred, where the cost of a 62-year-old

10  medication called Daraprim increased 5,500

11  percent, from 13.50 to 750 per pill.

12              And he says what it's used for.

13  And then he says, What makes me absolutely

14  disgusted is that Daraprim is a legacy medication

15  that has already increased over 1,300 percent

16  from $1 to $13 in the last decade.

17              Then he asks, Is there an

18  opportunity to leverage our Sovaldi approach with

19  pricing and formulary to negotiate a cheaper

20  Daraprim source or alternative for our patients?

21              That then goes up to Mr. Stettin --

22              MR. HAVILAND:  And this is the

23          part, Counsel, you have.

24  BY MR. HAVILAND:

25          Q    Mr. Stettin says, Daraprim is just

```
 1   one of several older medications for which a
 2   manufacturer has cornered the market and raised
 3   the price to seemingly egregious levels.  Are
 4   each of you satisfied we are doing what we need
 5   to do to protect our clients and patients from
 6   gouging while capturing value for Express
 7   Scripts?  Is it worth pulling together the list
 8   of worst offenders?
 9              And then that goes up to
10   Mr. Kautzner, who talks about various things, and
11   then finally, Mr. Stettin writes to Mr. Kautzner,
12   and he ccs Mr. Henry, which is how he came in,
13   Can I trouble you for a list of top offenders?
14              And when I was asking about the
15   Drug Trend Report, do you recall that the
16   company, in relation to the Daraprim situation --
17   Shkreli raising the price and coming up with a
18   cheaper alternative -- put together a list of top
19   offenders, here described as folks who cornered
20   the market and raised the prices of drugs to
21   seemingly egregious levels?
22   A     I -- I --
23              MR. FORST:  Just objection to the
24        form.
25              THE DEPONENT:  I don't remember.
```

Page 147

1  BY MR. HAVILAND:

2          Q      Okay.  Express Scripts has had the

3  capability to do such an analysis with the data

4  that it has; you'd agree?

5                  MR. FORST:  Objection to the form.

6                  THE DEPONENT:  Most likely, yes.

7  BY MR. HAVILAND:

8          Q      It tracks drug trends and prices?

9  A      Yeah.

10         Q      And if it wanted to look at, you

11 know, drugs with a certain level of price

12 increase over time, it could do that?

13 A      Yes.

14         Q      Do you recall in any of the

15 discussions you had with the folks who were

16 dealing with the Daraprim solution -- and,

17 obviously, it went up to Mr. Wentworth.  He gave

18 some commentary.  You did a lot of talks about

19 it.

20                 Do you recall anyone saying, We

21 should use this opportunity to look at not just

22 what happened Shkreli's Daraprim, but other drugs

23 like it in terms of its older profile, but now

24 being, they say, cornered the market and the

25 price increased?

1    A       Yeah, we're constantly looking for

2    opportunities to knock down the prices of drugs,

3    and so -- and as you've pointed out, we've tried

4    to be very innovative in those approaches.  So,

5    this is what we do.  We try to -- we're always

6    looking for opportunities.

7           Q       Well, I get that, sir.  I -- what

8    I'm concerned and asking about is, it seems like

9    Mr. Stettin -- and why don't you tell the jury

10   what his role was as a direct report to

11   Mr. Wentworth.

12   A       So, he's over innovation.

13          Q       Okay.

14   A       In our innovation laboratory.

15          Q       So, he would have the visuals of

16   what's --

17   A       His --

18          Q       -- in the portfolio of drugs and

19   then what's potentially out there?

20   A       His group creates the Drug Trend Report.

21          Q       Oh, so he does have the data?

22   A       Um-hmm.

23          Q       Yeah.  And if you wanted to do

24   this -- what he calls the list of top offenders,

25   it could be done, right?

1   A       Correct.

2           Q       And with the -- with the thing that

3   happened with Shkreli's drug going up 5,500

4   percent, do you recall that that was a -- a

5   wake-up call for -- for the PBM to be more

6   proactive about going after these older

7   medications for which manufacturers are raising

8   the prices?

9   A       You know, I think that it was just yet

10  another egregious episode.  Egregious episodes in

11  the pharmaceutical industry occur all the time,

12  and so, obviously, from -- you know, from this

13  memo, it looks like they're reexamining those

14  things, correct.

15          Q       All right.  You don't recall a

16  particular hit list of top offenders being

17  circulated; is that fair?

18  A       You know, it could have been done.  I

19  could have even seen it.  I just don't recall it.

20          Q       All right.  I'm going to show you

21  what was previously marked as Exhibit --

22                  MR. HAVILAND:  Did I mark that one?

23  I don't know that I did?

24                  MR. FORST:  No, you didn't.

25                  MR. HAVILAND:  So, it was marked as

```
 1   Henry -- thank you -- Henry Exhibit 12.  It just

 2   so happens to be Exhibit 12 to your deposition.

 3                   (Exhibit 12 was marked.)

 4                   (Discussion held off the record.)

 5                   MR. HAMANN:  Don, I think it's

 6           Exhibit 13.

 7                   (Discussion held off the record.)

 8                   MR. HAVILAND:  No, it was Henry 12,

 9           and now it's Miller 12, just so we have a

10           clear record.  So just put it in the pile

11           there.

12   BY MR. HAVILAND:

13        Q    Well, we're at that point where

14   we're going in two different directions now.  So,

15   I'm going to show you, sir, what I've marked as

16   Henry Exhibit 5.  That will be Exhibit 13 to your

17   deposition.

18                   (Exhibit 13 was marked.)

19                   (Discussion held off the record.)

20                   MR. HAVILAND:  Here's your copy

21           actually.  I'm only going to ask about the

22           facing emails.  For the record, folks,

23           Henry Exhibit 5 is now Miller Exhibit 13,

24           ExpressScripts5566025 through 6033.

25   BY MR. HAVILAND:
```

1          Q      It's a series of emails.  There's a

2   lot of heavy redaction here, with some in-house

3   counsel commentary.  It's an article in the

4   thread for Lynnette Lopez, Business Insider, and

5   then I'm most concerned about the exchange with

6   Brian Henry.

7                   And, sir, if you have that exhibit

8   in front of you, I want to orient you to where

9   you come in on this.  The date is April 12, 2018.

10  Mr. Henry says, I'll forward it to Steve.

11                  Do you see that at the very top?

12  A      Which -- the first page?

13         Q      It's the thick --

14  A      Oh, yeah, right.

15         Q      The very -- thread email at the top

16  from Brian Henry to Jen Luddy says, I'll forward

17  it to Steve.

18                  Do you see that?

19  A      Yes.

20         Q      Mr. Henry said yesterday that he

21  intended to forward this to you,

22  Dr. Steve Miller, okay?

23                  And -- and the thread -- I'm not,

24  as I said, concerned about the articles that

25  much.  There -- we spent some time yesterday

Page 152

1   going over with Mr. Henry articles in the press

2   about Acthar, and there -- there was a number.

3                 Here, in the middle of the thread,

4   Jen Luddy writes on April 12 to Brian Henry and

5   others, do you see, Updated story?

6   A       Um-hmm.

7                 (Reporter clarification.)

8                 THE DEPONENT:  Yes.

9   BY MR. HAVILAND:

10      Q       I'll read for the record, Also, I

11  talked with Clark Bitney.  He's all good.  Just

12  needs talking-points, which I will send.  He said

13  at one point there was talk about us doing to

14  Acthar what we did to Daraprim.  All caps, How

15  awesome would it be if we made that happen?  It

16  would so put Lynette in her place.  I think

17  they're referring to the reporter from Business

18  Insider.

19                And then Mr. Henry writes back,

20  Tell him they need to make that happen, whatever

21  it takes.

22                Do you see that?

23  A       Yes.

24      Q       Then Jen Luddy says, He -- I think

25  they're referring to Mr. Bitney.

1              Do you know who Bitney is,

2    Mr. Bitney?

3    A      No.

4         Q      All right, He said he heard a

5    rumor.  I think it's a conversation with Steve to

6    see if that is possible.

7              And then Mr. Henry says, I'll

8    forward it to Steve.  Why not ask?

9              Do you see that?

10   A      Yes.

11        Q      So, this is after the emails we

12   looked at from 2015, where the issue of the

13   Daraprim solution, and then into 2017.  Here we

14   are in 2018, the issues come up again in the

15   context of some media coverage.

16              And do you recall the

17   communications folks coming to you and asking

18   specifically, Is it possible to do a

19   Daraprim-like solution, and would the company do

20   whatever it takes to make it happen?

21   A      Don't remember.

22        Q      You don't remember?

23              Did the company do whatever it

24   takes to bring -- bring about a Daraprim-like

25   solution for Acthar?

1           MR. FORST:  Objection to the form

2      of the question.

3           THE DEPONENT:  I believe we

4      evaluated it and did not find a viable

5      alternative.

6  BY MR. HAVILAND:

7      Q     In your mind, you -- the company

8  did whatever it takes?

9      A     Correct.

10     Q     All right.  Shortly after this

11  email thread, do you recall that 60 Minutes did a

12  piece involving Mallinckrodt, Express Scripts,

13  and Acthar?

14     A     Yes.

15     Q     There was a series of transmittals

16  from Mr. Henry that I won't ask you about, but

17  you were carbon-copied as part of the leadership

18  on those, and I want to talk to you about what

19  happened after.

20          So I'm going to mark as

21  Exhibit 14 to your deposition this email from

22  Brian Henry.

23          (Exhibit 14 was marked.)

24          MR. HAVILAND:  For the record,

25      Exhibit 14 to the Miller deposition is

1          ExpressScripts4990395 through 0398.

2     BY MR. HAVILAND:

3          Q     If you follow the thread, sir,

4     you'll see there's a -- embedded in the email is

5     a part of the CBS News release on the Rockford

6     story that they did, Why Does Your Prescription

7     Cost So Much?  There are some significant

8     redactions here, but Mr. Henry forwarded on May

9     the 4th, which was before the program aired, an

10    email to you and others about this -- the piece.

11              Do you recall receiving notice that

12    60 Minutes was going to do a piece?

13    A     Yes.

14         Q     Did you sit in any meetings with

15    executives prior to the piece happening?

16    A     Not that I recall.

17         Q     Okay.  Did you watch the program?

18    A     I watched it afterwards.  So, they sent a

19    link out, and I watched it on the link.

20         Q     So, it was after the Sunday night

21    airing of it?

22    A     Correct.

23         Q     Okay.  And where did you watch it?

24    A     I can't recall.  I don't know.

25         Q     Were you alone?  Were you with

1   others?

2   A       I suspect I was in my office, but I don't

3   know.

4           Q       And what was your reaction to it?

5   A       You know, like -- you know, Mallinckrodt's

6   behavior was egregious, it's horrible, and, you

7   know, I believe that we were mischaracterized in

8   the story.

9           Q       Okay.  What happened after that?

10  Did you raise your concerns about the story with

11  anyone at Express Scripts?

12  A       Obviously, there was a lot of concern

13  going around the entire executive team, and, you

14  know, we had discussions about the -- you know,

15  about the story.

16          Q       Tell me about those that you were

17  privy to.

18  A       You know, I think most of them were how do

19  we -- how do we get our side of the story out

20  there to demonstrate that we've done what we were

21  supposed to do to control the price of the drug,

22  and to make clear to the marketplace that

23  pharmaceutical companies are responsible for the

24  price of their drugs.  They set the price,

25  and -- and so making sure that the facts of the

Page 157

1    case are actually known.

2        Q    Were you aware that the producer

3    had reached out previously and asked

4    Express Scripts to do an on-air interview?

5    A    I was not.

6        Q    Did anyone ever say to you that

7    there was an opportunity to do an on-air

8    interview?

9    A    I don't recall.

10       Q    Would you have been willing to do

11   one?

12   A    If my company advised -- you know, if

13   they -- if comms and the rest -- and legal and

14   everyone who we usually have, you know, opine on

15   these things thought it was appropriate, I'd be

16   happy to represent the company.

17       Q    Nobody ever came to you and said

18   that they wanted you to do that, though?

19   A    Not that I recall.

20       Q    Okay.  After the story aired, there

21   were some further email threads about some of the

22   issues that were raised, and in this particular

23   thread, it's actually keying off a comment that

24   Jennifer Luddy equated to Mr. Wentworth, where he

25   asked, is it possible to do a Daraprim-like

Page 158

1    solution.

2                    You're familiar with that request?

3    A     Yes.

4         Q     Okay.  And then that got pushed out

5    to you.  I -- I think this version is just

6    redacted.  Counsel, actually then produced some

7    of the underlying emails, so we saw that request

8    by Mr. Wentworth, and this may be where it came

9    to your attention.

10                   But you'll see, Mr. Wentworth, in

11   this thread, the night of May 6th, says to

12   Mr. Henry, "The one thing in the story that I

13   wonder if we can't hit more directly is that they

14   give us credit for the generic alternative to

15   Martin Shkreli's drug --

16                   And it misspells his name, and

17   that's not surprising.  It's one of those names

18   you can't quite -- quite grab.  He says

19   "Sktellis."  I think it's "Shkreli."

20                   -- "and say we could have done the

21   same thing given that there is a generic

22   available in Canada.  I don't believe that's so,

23   and if there's a simple and clear why of saying

24   why we and the FDA have not allowed that to

25   happen, that could be good."

Page 159

1              Do you know what he's referring to

2    with the "generic available in Canada"?

3    A      I believe it's --

4         Q      Synacthen?

5    A      -- Synacthen that's available in Canada.

6         Q      We'll come back to that.  I really

7    want to just focus on the part about the

8    alternative to Shkreli's drug.  As I said,

9    there's another email, and I can show it to you.

10   Why don't I do that now, just so you can see it.

11   I don't have to remark it, but -- like I said, it

12   gets difficult to track these emails that run

13   different in directions within the company.

14              (Discussion held off the record.)

15   BY MR. HAVILAND:

16        Q      You're not on the email, which is

17   one of the reasons I didn't have it in your

18   packet, but you were then looped in by

19   Brian Henry, so I'll show you this email.

20              It's the unredacted thread from

21   Brian Henry, and feel free to look at as much as

22   you like.  What I'm getting to is the --

23   Jennifer Luddy's report at -- it says 1:00 a.m.

24   Mr. Henry said, with all the time differences,

25   it's probably not 1:00 a.m., but she wrote to

1   Adam Kautzner, Andy Behm, Clark Bitney, and

2   Brian Henry.

3                   I'll read it into the record, and

4   then I'll show it to you, Hi, if you haven't

5   heard, the 60 Minutes piece ran this evening.

6   Synopsis below, and our updated response is

7   attached.  Thanks again for your help with the

8   initial draft a few months ago.  The lawyer for

9   Rockford, Illinois suggested in the piece that we

10  could have/should have found a way to do $1

11  alternative to Acthar, similar to what we did

12  with Daraprim.  Tim is asking us if that is

13  possible.  Clark, I recall you saying we explored

14  this, but is it possible?  Tim, also is wondering

15  if we are able to get Synacthen?  The story says

16  Mallinckrodt owns it in the US, but that it's

17  available in Canada for $33.  Appreciate the

18  guidance here.

19                  If you could just take a moment to

20  review that.  I don't believe you ever got that

21  email, sir.  Do you recall if you did?

22  A       Don't recall.

23          Q       Okay.  You did get the thread from

24  Brian Henry forwarding what Mr. Wentworth said?

25  A       Right.

1          Q       And you understood that

2     Mr. Wentworth was asking two questions; one, was

3     there something Express Scripts could do to try

4     to get Synacthen, right?

5     A       Um-hmm.

6                  (Reporter clarification.)

7                  THE DEPONENT:  Yes.

8     BY MR. HAVILAND:

9          Q       Secondly, is there something it

10    can -- the company can do to create a

11    Daraprim-like solution, right?

12    A       Correct.

13         Q       All right.  Let's focus on that

14    latter question.  Exhibit 14, which is in front

15    of you, is an email to you.  Take a look at that

16    one.

17    A       Okay.

18         Q       After what I read from

19    Mr. Wentworth, Mr. Henry writes, I think that

20    it's complicated, but I do wonder if we can do

21    something akin to Daraprim here.

22                 Do you see that?

23    A       Yes.

24         Q       And then I have your response --

25    and I'm doing this only because the response

Page 162

1    doesn't have that thread in it for some reason.

2    I'm marking as Exhibit 15 to your deposition,

3    sir, what I believe is your email response.

4                   (Exhibit 15 was marked.)

5                   MR. HAVILAND:  I actually have a

6           lot of copies of this.  I do not know why,

7           but here you are (handing).

8    BY MR. HAVILAND:

9           Q      Exhibit 15, Dr. Miller, is

10   ExpressScripts0834559.  You were using

11   BlackBerry.  I'm -- I'm proud of you.  I still

12   do.

13   A      Actually not.  It's the -- they have the

14   operating system, but it's not a BlackBerry.

15          Q      Is that right?

16   A      Correct.

17          Q      I still have mine.

18   A      Apparently, BlackBerry is very secure.

19          Q      Well, I still have mine.

20                 But I -- I believe this is the

21   response.  Sometimes when emails get produced, it

22   just gets cut off.  But do you recognize this as

23   the email you sent back to Mr. Henry?

24   A      I believe so.

25          Q      Okay.  And why don't you read for

1    piece, and we, like any prudent company,

2    re-reviewed all of our opportunities to make a

3    difference here, and also our response, and the

4    alternative to Acthar is still not available in

5    the marketplace today, even all these years

6    later, and it was not -- not available then.

7         Q      Let me show you that same thread

8    with Andy Behm's -- Behm -- it's Behm, right?

9    A      Behm.

10        Q      His input.  I only have my pink

11   highlight.  I don't think we had enough copies

12   yesterday, so let me show it to your Counsel.  So

13   again, it's the same series of emails.

14              "I think it's complicated,"

15   Mr. Henry says; your response; and this is

16   Mr. Behm's response.  It might have been

17   3:30 a.m.  We're getting pretty late in the --

18   early or late in the morning.  It depends on your

19   perspective, "We never discussed a lower-cost

20   version of Acthar Gel with Imprimis," and then he

21   goes on to talk about some searches.

22              I'll actually put a sticker on that

23   for Exhibit 16, thank you, so we can keep a clean

24   record here.

25              (Exhibit 16 was marked.)

1    BY MR. HAVILAND:

2         Q     Miller Exhibit 16 is Express

3    Scripts Bates number 4856396 through 6400.

4              Do you see Andy Behm's response

5    there --

6    A    Yes.

7         Q     -- Dr. Miller?

8    A    Yes.

9         Q     Now, he says, We never discussed a

10   lower-cost version of Acthar Gel with Imprimis.

11             You, in fact, did?

12   A    I don't know who he's referring to as

13   "we."

14        Q     Okay.

15   A    I don't know if this is just him and his

16   group --

17        Q     Sure.

18   A    -- or -- and so -- but as you can see from

19   other emails, we were having discussions with

20   Imprimis about Acthar Gel.

21        Q     Well, he then goes on to say he did

22   some Internet searches, and he found an article

23   from Mr. Baum saying that they were working on a

24   synthetically-produced product alternative.

25             Do you see that?

1    A       Correct.

2            Q       And then he talks about some June

3    2017 press releases, including the spinoff of

4    Eton that we saw in the earlier email, right?

5    A       Correct.

6            Q       Did you talk to Mr. Behm about what

7    you knew about that spinoff in the email that you

8    had in June of 2017?

9    A       I don't remember any conversation like

10   that.

11           Q       Okay.  He doesn't seem to have

12   familiarity with the discussions that you were

13   having with Mr. Baum?

14   A       Yeah, which doesn't surprise me.

15           Q       Because he's in the P&T group?

16   A       He's in the OCEP group, and this is a

17   network pharmacy product issue, so it's with the

18   supply chain.

19           Q       Well, he would have optics into

20   whether or not OCEP would consider an

21   alternative, and then would that ultimately go to

22   a P&T Committee for review?

23                   MR. FORST:  Objection to the form.

24                   THE DEPONENT:  This is -- you know,

25           so what happens in the trade group is much

1           different than what he does, and so --

2                (Reporter clarification.)

3                THE DEPONENT:  -- in the trade

4           group is much different than what he does,

5           and so, I'm not sure if anyone included

6           him in the conversations.

7    BY MR. HAVILAND:

8        Q     Well, he was looped into this

9    thread, and my question is more focused on what

10   input he was providing.

11               Would any alternative product that

12   Express Scripts would sponsor to its contracted

13   health plans, would that have to go though OCEP

14   for review?

15               MR. FORST:  Objection to the form,

16          assumes facts not in evidence.

17               THE DEPONENT:  Yeah, I mean, if

18          a -- if any product is going to get on our

19          formulary, it has to go through OCEP.

20   BY MR. HAVILAND:

21       Q     I think you said "yeah" real quick,

22   so the answer is --

23   A     Yes, if any product is going to get on our

24   formulary, it has to go through OCEP.

25       Q     Okay.  So, if there is this

1   consideration of whether or not an alternative

2   product's going to be considered, and you had

3   reported previously you worked with the

4   compounder, Mr. Behm would have input in terms of

5   whether or not -- whether and to what extent OCEP

6   and a P&T Committee would have to look at that,

7   fair?

8                    MR. FORST:  Objection,

9           mischaracterizes the document and prior

10          testimony, calls for speculation.

11  BY MR. HAVILAND:

12          Q       You can answer.

13  A       There -- you know, Andy is involved in a

14  narrow area of the company, and he gets pulled in

15  when appropriate, and so, you know, I don't

16  believe he was pulled in, because it wasn't

17  appropriate.

18          Q       Well, after this email, you had an

19  email with Mr. Behm on the 8th.  Let me show you

20  that.

21  A       Okay.

22                  (Exhibit 17 was marked.)

23  BY MR. HAVILAND:

24          Q       Exhibit 17 to your deposition, sir,

25  is ExpressScripts Bates number 0982536 to 537.

1    Let's work from the bottom up.  Starting at the

2    bottom of the page, Mark Baum of Imprimis wrote

3    on Monday, May 7, after 60 Minutes, to

4    Wendy Barnes and cc'd two of his folks, I assume;

5    do you see that?

6                    And you described Wendy Barnes

7    previously, right?

8    A       Um-hmm.

9            Q       Yes?

10   A       Yes.

11           Q       "Wendy, I hope this email finds you

12   well.  We are still growing nicely.  We just

13   completed our fourth full year of operations.

14   Not bad for an all-cash business.  I write this

15   morning we received -- I write because this

16   morning we received a couple of inquiries from

17   clinical consultants at ESI for our corticotropin

18   injection alternative to Acthar Gel."

19                   Do you know what that's referring

20   to in terms of who the clinical consultants were?

21   A       No idea.

22           Q       Would they be -- they'd be under

23   your group, though?

24   A       No.

25           Q       Where would they be?

1   A     Sales and account management have lots of

2   pharmacists that work for them as clinical

3   consultants to clients.

4         Q     Okay.

5   A     They don't report up to me.

6         Q     So you don't know who within ESI

7   reached out to Imprimis?

8   A     Correct.

9         Q     Okay.  He says that he got

10  inquiries about the, Possibility of once again

11  collaborating with you to bring down ever-rising

12  drug costs.  This is the same formulation we had

13  discussed a couple of years ago and that we

14  mentioned again last year as an investment

15  opportunity in what has now become Eton

16  Pharmaceuticals.

17             And I didn't ask you about that.

18  Previously I -- I said, were you aware that

19  Imprimis was looking for a -- an investment,

20  looking for money from Express Scripts to help

21  bring about this spinoff company and -- and what

22  it was about, Eton Pharmaceuticals.

23             Do you recall that?

24  A     Yes.

25        Q     And -- and Express Scripts never

1    agreed to that investment, right?

2    A      It was not interested in investing.

3          Q      Okay.  He then says, While we've

4    been working with your team on several

5    offerings -- and we've seen that, obviously

6    Daraprim, we saw leuprolide -- to date, adoption

7    has been insignificant.  We created these

8    formulations with the best of intentions, to

9    ensure patient access to important and sometimes

10   life-saving therapies.  Our objective in this

11   regard has been perfectly aligned with that of

12   ESI.  While we've remained -- while we have been

13   and remain committed to caring for our patient

14   population, it has been a challenge for us to

15   gain broader acceptance without support from

16   PBMs.  If there is an interest to leverage the

17   work we have done together to date on the

18   corticotropin formulation and others, we would

19   appreciate some level of commitment to drive the

20   adoption of our portfolio, all the while

21   realizing huge savings to you and the clients you

22   serve.

23                And then he goes on to talk about

24   the Acthar Gel alternative that we spoke about,

25   and then some others.

Page 172

1              Do you see that?

2    A      Yes.

3         Q      He says, This product alone would

4    save tens of millions of dollars.

5              Do you see that?

6    A      Yes.

7         Q      That was sent to Wendy, and then

8    Wendy sends it to -- she sends a response back,

9    and then ultimately it gets to you, I believe,

10   from Andy Behm; do you agree?

11   A      Yes.

12        Q      And this is Tuesday, May 8th, at

13   about 7:00 at night, right?

14   A      Yes.

15        Q      Andy Behm says -- do you need to

16   take that?

17   A      I'd love to, if possible.

18              (Discussion held off the record.)

19              THE VIDEOGRAPHER:  We are going off

20        the record at 12:21 p.m.

21              (Break taken.)

22              THE VIDEOGRAPHER:  We are back on

23        the record at 12:23 p.m.

24   BY MR. HAVILAND:

25        Q      All right.  Dr. Miller, we were

1   looking at the email thread after 60 Minutes that

2   began with Mr. Baum reading -- reaching out to

3   Wendy Barnes at Express Scripts.  It went up

4   through Wendy to Andy Behm and others.  She

5   wrote -- cc'ing -- or writing back to Mr. Baum,

6   but cc'ing Mr. Behm, Mark, great to hear from

7   you.  I've added Adam Kautzner and Andy Behm to

8   my response, so they can address a joint

9   opportunity.

10              I asked you why Mr. Behm would be

11  involved, because it seemed to be Wendy [sic]

12  thought that their input would be important?

13  A     Yep, she thought so.

14       Q     Okay.  And then she's transitioned

15  over to ValoremRx.

16              Mr. Behm then says, Steve, Need

17  your help and guidance on this.  See below.  It

18  looks like Mark Behm is interested in talking

19  again, though I get the sense he is looking for a

20  financial.  Right?

21  A     Correct.

22       Q     When you sat with Mr. Wentworth,

23  okay, and you talked about his two questions, and

24  the one that asked about doing a Daraprim-like

25  solution, did you raise with him that Imprimis

1    was looking for some sort of financial support to

2    help develop an alternative product to Acthar?

3                    MR. FORST:  Objection to the form.

4                    THE DEPONENT:  Yeah, I don't

5            remember specifically talking about the

6            financials.  I know that, you know, just

7            as Mark identified in his email, no PBM

8            had adopted their product, because their

9            product's not viable, and so we continue

10           to not believe they have a viable product.

11   BY MR. HAVILAND:

12           Q     Well, and we've talked about that,

13   and I understand your position and Express

14   Scripts' --

15   A     It's just not mine.  It's everyone's

16   who's -- Mark has reached out to probably lots of

17   people at this point in time, because that's what

18   he does, and no one's adopting his solution, that

19   I'm aware of.

20           Q     Because it had not been

21   FDA-approved at that point, right?

22   A     I can't tell you why others have not

23   adopted it.

24           Q     Right.

25   A     I can just say that he, you know -- and

Page 175

1    you'd have to obviously talk to Mark about it if

2    he's had any success in the marketplace, but I'm

3    unaware of any major payer adopting their

4    product.

5         Q      Well, how could a payer contracting

6    with Express Scripts adopt a product if they

7    don't know about it from Express Scripts?

8    A      Because Mark probably went to United, CVS,

9    Aetna --

10        Q      Do you know that, sir?  I don't

11   want you speculate.

12             MR. FORST:  Can you let him finish?

13        Just --

14             MR. HAVILAND:  No, he said

15        "probably."

16             MR. FORST:  It doesn't -- it

17        doesn't matter --

18             MR. HAVILAND:  It does matter.

19             MR. FORST:  -- if he's speculating.

20        He can finish the thing --

21   BY MR. HAVILAND:

22        Q      Go ahead.

23             MR. FORST:  -- and then you can

24        follow up.

25   BY MR. HAVILAND:

1          Q      You can speculate.

2                 MR. FORST:  All right.

3                 THE DEPONENT:  But we are unaware

4          of any payer that is using an alternative

5          to Acthar, and there are a lot of

6          alternative payers in the country that

7          don't use Express Scripts.

8     BY MR. HAVILAND:

9          Q      You don't have any personal

10    knowledge of whether or not Imprimis reached out

11    to CVS Caremark?

12    A      I have no personal knowledge.

13         Q      You have no personal knowledge of

14    whether Imprimis reached out to OptumRx?

15    A      Correct.

16         Q      You have no personal knowledge

17    whether Imprimis reached out to any other PBM?

18    A      That's correct.

19         Q      Express Scripts' position was it

20    wasn't going to adopt an alternative to Acthar

21    from Imprimis or Eton because it was not

22    FDA-approved?

23                MR. FORST:  Objection to the form.

24                THE DEPONENT:  We -- we were not

25         adopting the alternative that they've come

Page 177

1           forward with to us.

2    BY MR. HAVILAND:

3           Q       Because it was not FDA-approved?

4    A      Because we did not believe it's of the

5    clinical quality that's required for our patients

6    to get it.

7           Q       But you never tested it?

8    A      We don't test drugs.

9           Q       You never asked any independent

10   entity that tests drugs to test it?

11   A      That is correct.

12          Q       Okay.  And so you don't know

13   whether it was viable or not?

14               MR. FORST:  Objection to the form.

15               THE DEPONENT:  The -- if you

16          understand how drugs are brought to

17          market, you would know that a clinical

18          trial would be required for this, and

19          there was no clinical trial data ever

20          presented to us.

21   BY MR. HAVILAND:

22          Q       What clinical trial was done for

23   the alternative to Daraprim?

24   A      So Daraprim, the -- the drug, because it's

25   a chemical product, it's identical to what was in

1    the marketplace, plus the leucovorin.

2         Q      That wasn't my question, sir.  Let

3    me ask it again.

4                What clinical trial was done for

5    the alternative to Daraprim that Express Scripts

6    partnered with Imprimis to bring to market?

7    A      Because of the nature of the product,

8    there -- it did not require a clinical trial, but

9    I am unaware of any clinical trial.

10        Q      So, there was no clinical trial for

11   the Daraprim alternative that Express Scripts

12   brought to market with Imprimis, correct?

13   A      Correct.

14        Q      All right.  And it's your opinion

15   that there would need to be a clinical trial

16   before any alternative to Acthar could be brought

17   to market --

18   A      Correct, because --

19        Q      -- with Imprimis?

20   A      -- that's a biologic.

21        Q      Okay.  Because it's a biologic,

22   right?

23   A      Correct.

24        Q      But Mr. Baum has said theirs --

25   theirs is a Synacthen product, sir, right?

Page 179

1    A      So, it's a -- it's still 39 amino acids.

2    So, a biologic is not just because a biologic is

3    obtained from living cells.  A biologic is a

4    protein product.  And so he has a protein drug.

5    Protein drugs are susceptible to not just their

6    chain integrity, but their folding and other

7    properties, and so this has been part of the

8    difficulty.

9               We would love for there to be an

10   alternative to Acthar on the marketplace.  We've

11   been innovative in many other drugs on trying to

12   lower price.  And so, I would be thrilled to have

13   a lower-price alternative to Acthar.  It doesn't

14   exist at this point in time, and it didn't exist

15   then.

16        Q      Well, it exists in the world; does

17   it not, sir?

18   A      I don't know that.

19        Q      Synacthen?

20   A      I don't know how the FDA views Synacthen

21   in comparison to Acthar Gel.

22        Q      You just brought it back to the

23   United States, sir.  I said it exists in the

24   world.

25               You know that Synacthen is approved

1    in Europe and Canada for the treatment of

2    diseases for which Acthar treats, correct?

3    A      That is correct.

4           Q      It was also $33 in Canada?

5    A      That is correct.

6           Q      And you knew that the owner of

7    Synacthen was the same company that owned Acthar?

8    A      I've been made aware of it through this

9    case.

10          Q      When did Express Scripts ever sit

11   down and leverage the fact that that product was

12   available in Canada through the same manufacturer

13   to try to get Mallinckrodt to do the right thing

14   to lower the price of Acthar?

15   A      So, I am unaware of any discussions about

16   Synacthen and its impact on the price of Acthar.

17          Q      But you agree with me that that is

18   an ability of the Express Scripts PBM to say to

19   the manufacturer, You have a competitive agent in

20   your portfolio, and we, the PBM, can use that

21   fact as leverage to try to get you to do the

22   right thing --

23   A      That's not --

24                 MR. FORST:  Just let him finish.

25                 Let him finish.

Page 181

1   BY MR. HAVILAND:

2         Q       -- but your testimony, sir, is that

3   it never happened, right?

4                 MR. FORST:  Objection to the form.

5                 THE DEPONENT:  It's not a relevant

6         fact, because it's not available in the

7         United States.

8   BY MR. HAVILAND:

9         Q       You're not aware that pharmacies

10  have brought Synacthen to the United States for

11  treatment of patients?

12  A       So, individuals can go to Canada to get

13  drugs, they can re-import, but I'm unaware that

14  pharmacies can re-import from Canada.

15        Q       You're not aware that a -- a

16  pharmacy named Caligor was bringing Synacthen

17  into the United States?

18  A       I'm not aware of that.

19        Q       Never heard of that?

20  A       Never heard of that.

21        Q       Okay.  And you're suggesting that

22  the largest PBM at the time, Express Scripts,

23  would have no way of being able to bring a

24  Canadian-approved product to treat patients in

25  the United States?

Page 182

```
1    A      So, there's laws that govern the

2    importation by both individuals and by

3    pharmacies.  The laws I'm aware of, it would not

4    be legal for us to bring the product into the

5    marketplace.

6          Q      What did Express Scripts do at any

7    time with Mallinckrodt to inspire it to try to

8    bring Synacthen to market in the United States?

9                MR. FORST:  Objection, calls for

10               speculation, vague and ambiguous --

11               THE DEPONENT:  As you know, I --

12               MR. FORST:  Let me just get out --

13               our the host of objections that are

14               warranted.

15               Vague and ambiguous, "inspire,"

16               calls for speculation, asked and answered.

17               You can go ahead.

18               THE DEPONENT:  So, I'm not involved

19               in negotiations with Mallinckrodt.  I'm

20               unaware of what they did.

21   BY MR. HAVILAND:

22         Q      Well, sir, the CEO asked a pointed

23   question of the leadership, including yourself,

24   after 60 Minutes about Synacthen.

25               Did you respond to him?
```

Page 183

1    A      As you can see from my responses, they are

2    mostly around the Acthar alternative.

3         Q      Well, that was the Daraprim

4    solution with Imprimis.

5              Did you answer the CEO's question

6    about if anything would be done with Synacthen?

7    A      I did not.

8         Q      Do you know if anybody did?

9    A      I do not know.

10             MR. HAVILAND:  Okay.  Why don't we

11        take a lunch break.

12             (Discussion held off the record.)

13             THE VIDEOGRAPHER:  We are going off

14        the record at 12:33 p.m.

15             (Break taken.)

16             THE VIDEOGRAPHER:  We are back on

17        the record at 1:22 p.m.

18   BY MR. HAVILAND:

19        Q      Dr. Miller, is there available

20   today a competitive drug or agent that can treat

21   disease states that Acthar currently treats?

22             MR. FORST:  Objection to the form.

23             THE DEPONENT:  So, there's no

24        direct competitor that I know of for

25        infantile spasms.  There's better drugs

Page 184

1              for many of the other indications, and I

2              believe even better drugs than for

3              exacerbations of MS.

4    BY MR. HAVILAND:

5         Q      So, let's talk about Sabril,

6    vigabatrin.

7    A      Unfamiliar with it.

8         Q      You don't know what that is?

9    A      No.

10        Q      You don't know what it treats?

11   A      No, sir.

12        Q      Were you aware that CuraScript has

13   the exclusive distribution arrangement for

14   Sabril?

15   A      Don't know what it is; haven't heard of

16   it.

17        Q      Okay.  Are you aware that a company

18   called Assertio is developing a treatment for

19   infantile spasms?

20   A      Nope.

21        Q      That was never brought to your

22   attention?

23   A      I'm unaware of it.

24        Q      So, I'm seeing Andy Behm on a lot

25   of these emails, and what I'm trying to

Page 185

1   understand, sir, is just within the organization,

2   he plainly had a broader role than just the OCEP

3   group, because he's looped in on discussions

4   about competitive agents in the marketplace.

5   A       No, the --

6           Q       I want to -- I just -- I want to

7   understand what you understand his role to be in

8   relation to yours because I may just ask him the

9   questions on what he's copied, but you're the

10  medical director, and I want to know your

11  interface with him.

12  A       Yeah, so --

13                  MR. FORST:  Again, I don't think

14          the -- there's a question.

15  BY MR. HAVILAND:

16          Q       Yeah, it was.  I want to know your

17  interface with Mr. Behm.

18                  MR. FORST:  That's kind of a

19          statement, "I want to know."  Are you

20          asking him what his interface is --

21                  MR. HAVILAND:  I'll ask it the way

22          you like it, Counsel.

23                  MR. FORST:  Okay.  Okay.

24  BY MR. HAVILAND:

25          Q       Dr. Miller, can you please tell me

1  your interface with Mr. Behm.

2  A    Yeah.  So, Andy's a direct report of mine.

3  He is over OCEP.  OCEP actually has a function

4  where they file the pipeline and patent.  So,

5  they actually meet with pharmaceutical companies

6  when products are in development to hear about

7  what's in their pipeline.

8      Q    Perfect.  So, he reports to you,

9  and you reported to Mr. Wentworth when he was the

10 CEO, correct?

11 A    Correct.

12     Q    Alrighty.  And in that direct

13 report function, you never came to learn that

14 Mr. Behm was evaluating a competitive agent to

15 Acthar being developed by Assertio, Cosyntropin?

16 A    I think to say he was evaluating it is

17 probably a mischaracterization.  He is learning

18 about the product from the pharmaceutical

19 manufacturer.

20     Q    Well, he's talking about price, so

21 let's take a look at Exhibit 18, which is

22 ExpressScripts0992149 through 2152.

23              (Exhibit 18 was marked.)

24 BY MR. HAVILAND:

25     Q    I'll give you that copy first, sir.

1    I don't believe you're copied on it, but --

2              MR. HAVILAND:  And, Counsel, the

3    copy I'm going to give you has a friendly

4    highlight.  I don't know what the highlight is,

5    but that's yours.

6              MR. FORST:  This is 18?

7              MR. HAVILAND:  18.

8    BY MR. HAVILAND:

9         Q    So, if you can go to the beginning,

10   sir, you'll see it begins with an email from a

11   Lance Helsel at Accredo to Mary Dorholt?

12   A    Um-hmm.

13        Q    Either of those folks in your

14   practice group?

15   A    I do not believe so.

16        Q    Okay.  Ms. Dorholt was a PharmD in

17   the clinical practice group; do you see that?

18   A    Yes.

19        Q    That's in Accredo?

20   A    I believe so.

21        Q    All right.  And the -- the Re line

22   is, Assertio Cosyntropin depot.

23              Do you see that?

24   A    Yes.

25        Q    And TRC, they're the resource

1    centers within Accredo?

2    A      The therapeutic resource centers within

3    Accredo.

4           Q      And there's one for specialty,

5    where Acthar is, right -- I'm sorry, there's one

6    for rare disease, which is where Acthar is

7    treated?

8    A      I believe that's true.

9           Q      So, if you come forward in the

10   thread, at the bottom of page 151,

11   Aimee Tharaldson says, We are tracking this.

12          Do you see that?  I'm on the bottom

13   of page 151.

14   A      151.  Yep.

15          Q      And she's talking about, Not

16   previously on the report, I will add it to the

17   supplement list.

18          Do you see that?

19   A      Yes.

20          Q      Are you aware of any branch of

21   Express Scripts tracking products in development

22   that compete with approved products in any way?

23               MR. FORST:  Objection to the form.

24               THE DEPONENT:  So, the pipeline

25          patent group tracks lots of products, both

Page 189

1          specialty and non-specialty, puts out a

2          report.  I'm even copied on the report,

3          but I usually don't even read the report.

4    BY MR. HAVILAND:

5          Q     So, Mary Dorholt, after that -- and

6    we're in February 2019, just a couple of years

7    ago -- I'm still on page 151 -- she writes back,

8    Need your read on TRC assignment.  Is this truly

9    rare or endocrine?  Will it be parallel to

10   Acthar?

11                Do you see that?

12   A     Yes.

13         Q     So, it looks like this product in

14   development has gotten to the point where Accredo

15   is looking to assign it to a particular TRC,

16   right?

17                MR. FORST:  Objection to the form,

18         lack of foundation, calls for speculation,

19         mischaracterizes the document.

20                THE DEPONENT:  The -- it looks like

21         someone at the TRCs is asking that

22         question, yes.

23   BY MR. HAVILAND:

24         Q     And -- and looking at this email so

25   far, it's not refreshing your recollection that

Page 190

1  anyone came to you, the chief medical officer,

2  and asked your view about Assertio's product; is

3  that fair?

4  A      I've never seen these and -- and never

5  heard about the product.

6        Q      Well, if you go to page 150, which

7  is the facing page, to where we are, at the

8  bottom, it says, Stefanie and Tim, from

9  Aimee Tharaldson, Do you have any cost estimates

10 for Cosyntropin Depot?  We're bringing this drug

11 to a specialty advisory board in a couple of

12 weeks.

13              Do you know what that's referring

14 to?

15 A      Yes, we have a -- as it describes, we have

16 a specialty advisory board that looks at products

17 in the pipeline.

18       Q      Okay.  And -- and is that in your

19 group?

20 A      No.

21       Q      Where does that sit?

22 A      I believe it's within Accredo.

23       Q      All right.  "I'm hesitant to

24 estimate that it will be similar to Acthar," and

25 she gives an estimate of 580,000 per year.  Then

Page 191

1    there's a screenshot from an investor

2    presentation, 2018.

3                    Do you see that?

4    A      Yes.

5            Q      And then the screenshot says,

6    Corcitropin Synthetic ACTH Depot, a Real

7    Alternative to Acthar Gel.

8                    Do you see that?

9    A      Yes.

10           Q      And then coming forward, there's a

11   press release, September 4, 2019, announcing

12   submission; do you see that?  I'm at the bottom

13   of page 149.

14   A       It says, Press release announcement, yes.

15           Q      Yep.  And then above that, somebody

16   named Craig Reno is providing some cost

17   information, $127.90 per .25 milligram dose.

18                    Do you see that?

19   A       Um-hmm.

20                    (Reporter clarification.)

21                    THE DEPONENT:  Yes.

22   BY MR. HAVILAND:

23           Q      And he's also done some math here

24   that there were a total of 176 claims.

25                    You'd agree that the product would

Page 192

1    have to be on the market and being covered by

2    Express Scripts and paid for by plans for Express

3    Scripts to have claim data, right?

4              MR. FORST:  Objection to the form

5         of the question.

6              THE DEPONENT:  I don't know what

7         he -- what the -- what -- the study he was

8         running.

9    BY MR. HAVILAND:

10        Q     Well, just as a general matter, a

11   PBM would not have claims data if it wasn't an

12   approved product being dispensed and paid for,

13   right?

14              MR. FORST:  Objection to the form.

15              THE DEPONENT:  It looks like some

16        product was evaluated and had claims,

17        correct.

18   BY MR. HAVILAND:

19        Q     Okay.  He says 176 claims totaling

20   $23,900 in AWP; do you see that?

21   A     Yes.

22        Q     AWP is the average wholesale

23   price --

24   A     Correct.

25        Q     -- for the drug?

Page 193

1    A       Correct.

2            Q       And that's the price that payers

3    pay, right?

4    A       Generally.

5            Q       Well, wholesalers, pharmacies, pay

6    the WAC price, right?

7    A       The -- the average wholesale price is --

8    it's a bit more complicated than that, but yes.

9            Q       I asked about the AWP.

10           My second question was, you're

11   aware that wholesalers and pharmacies pay a

12   WAC-based price?

13   A       Right.

14           Q       Do you know the relationship

15   between the AWP and the WAC?

16   A       I am -- it's not my baliwick.  I can't

17   tell you the exact --

18           Q       You don't get into that level of

19   detail of pharmaceutical pricing?

20   A       No.

21           Q       All right.  And then the final of

22   the thread is asking whether the manufacturer's

23   studying for infantile spasms, and

24   Aimee Tharaldson says, It's in development.  The

25   trial is expected in 2021.

1                    Do you see that?  Top of the email.

2    A      "It's also in development," yes.  Yes, I

3    see that.

4         Q      And so, reviewing this email from

5    the Accredo folks, it doesn't -- nothing strikes

6    as familiar to you in terms of anyone bringing

7    the issue of Cosyntropin Depot's availability to

8    your desk; is that fair?

9    A      Correct.

10                   MR. FORST:  Objection,

11              mischaracterizes the document.

12   BY MR. HAVILAND:

13        Q      All right.  Are you aware there's a

14   product called Cortrophin Gel currently in the

15   marketplace?

16   A      Again, unaware.

17        Q      You're not aware?

18   A      Correct.

19        Q      It's after the lunch break.  I want

20   to make sure I keep my voice up and yours.

21                   Well, Mr. Osborne announced in

22   2021 -- and I reviewed with Mr. Martin and

23   Mr. Shirey -- that Express Scripts had won the

24   exclusive, he says, gig for corticotropin gel

25   produced by ANI Pharmaceuticals.

1                    You were unaware of that?

2    A     I'm unaware of that.

3          Q     Are you aware that CuraScript

4    Specialty Distribution currently has a contract

5    with ANI Pharmaceuticals for the exclusive

6    distribution of corticotropin gel?

7    A     Unaware of it.

8                    MR. FORST:  Objection, assumes

9              facts not in evidence.

10                   MR. HAVILAND:  Well, we'll see

11             about that.

12   BY MR. HAVILAND:

13         Q     Let's mark Exhibit 19.

14             (Exhibit 19 was marked.)

15             MR. FORST:  We will.

16                   MR. HAVILAND:  We will.  We have a

17             contract.

18                   MR. FORST:  You know, that's part

19             of, you know, laying the foundation before

20             you ask the question.

21                   MR. HAVILAND:  Well, you ask first,

22             and then you lay the foundation.  This is

23             Exhibit 19.

24                   MR. FORST:  Well, I don't know.

25                   MR. HAVILAND:  You do it your way,

1          and I do it mine.

2                    MR. FORST:  Yeah, well, there's a

3          right way.

4                    MR. HAVILAND:  Well, you can go

5          teach law school.

6                    MR. FORST:  I do.

7                    MR. HAVILAND:  Good.  Wonderful.

8          I'm sure the Virginians love it.

9     BY MR. HAVILAND:

10          Q     Exhibit 19, sir, I don't think

11     you're copied on it, but let me take a moment to

12     see if you are.

13                    Do you know who Steve Brown is?

14     A     No.

15          Q     Okay.  Do you recognize the people

16     on the email thread?

17     A     Some of them.

18          Q     Who do you recognize?

19     A     Let's see, Bill Martin --

20                    (Reporter clarification.)

21                    THE DEPONENT:  Rob Osborne,

22     Emily Vonder Haar.

23                    (Discussion held off the record.)

24     BY MR. HAVILAND:

25          Q     Sorry, Doctor.  So, my question was

1    more focused on -- obviously, you know

2    Mr. Osborne.

3                    Anyone in your group at the time in

4    2021 -- I know you transitioned over to Cigna,

5    and are currently a consultant.  This is the end

6    of your tenure as an employee of Cigna, right?

7    A      That's correct.

8           Q      All right.

9    A      This is nine days before I finished.

10          Q      Okay.  Anyone you recognize that

11   was in your practice group that got this email?

12   A      No.

13          Q      Steve Brown, his title on the back

14   page says he's the director of pharma

15   contracting; do you see that?

16   A      Yes.

17          Q      And that's the group that actually

18   contracts with pharmaceutical companies, right?

19   A      Yes.

20          Q      And there is an actual agreement

21   that I utilized with Mr. Shirey at his

22   deposition, but you'll see the PDF attachment

23   says, 2021 Pharmacy Product Purchase and Services

24   Agreement.

25                    Do you see that?

Page 198

1   A      Yes.

2          Q      And there's some highlights given

3   by Mr. Brown.  The client was ANI

4   Pharmaceuticals; do you see that?

5   A      Yes.

6          Q      The brand/generic name of the

7   product was Corticotropin [sic] Gel, repository

8   corticotropin injection, right?

9   A      Correct.

10         Q      And that's similar to Acthar,

11  correct?

12                MR. FORST:  Objection to the form.

13                THE DEPONENT:  I don't know.

14  BY MR. HAVILAND:

15         Q      Well, you know that Acthar's an

16  ACTH?

17  A      Yes.

18         Q      You know it's corticotropin?

19  A      Yes.

20         Q      And you know it's injected?

21  A      Yes.

22         Q      So it's similar to Acthar?

23  A      I -- I don't know -- I have no data about

24  if it's compared directly to Acthar or not.

25         Q      Okay.  The summary says, A new

1   agreement that provides access to this recently

2   FDA-approved product.

3               You have no reason to dispute that

4   the FDA did not approve ANI's corticotropin gel,

5   right?

6               MR. FORST:  Objection to the form.

7               THE DEPONENT:  Yes, according to

8        this.

9   BY MR. HAVILAND:

10       Q     Okay.  Well, accepting the Express

11  Scripts document as true, the pharma contracting,

12  what do you know of the PBM did to go back to

13  Mallinckrodt, who holds Acthar, to extract the

14  lower price for Acthar now that there was a

15  competitive agent in the marketplace approved by

16  the FDA?

17              MR. FORST:  Objection, assumes

18       facts not in evidence, lack of foundation,

19       calls for speculation.

20  BY MR. HAVILAND:

21       Q     What do you know, sir?

22  A     Nothing.

23       Q     Nothing?  I'm sorry?

24  A     Nothing.

25       Q     Did you know that your company was

Page 200

1    negotiating a contract for a competitive agent to

2    Acthar before you left?

3                   MR. FORST:  Objection, assumes

4          facts not in evidence, lack of foundation,

5          asked and answered.

6                   THE DEPONENT:  I know nothing about

7          this.

8    BY MR. HAVILAND:

9          Q    Okay.  And no one came to you, in

10   your capacity as the senior vice president in

11   clinical, to ask your opinion about this product

12   or what the company could do to try to lower --

13                  MR. FORST:  Don, he said at this

14         point in time he knows nothing about this

15         five times.

16                  MR. HAVILAND:  Excuse me, I haven't

17         finished.

18                  MR. FORST:  Asked and answered.

19                  MR. HAVILAND:  Well, you can say

20         that when I'm done, Counsel.

21                  MR. FORST:  I'm just saying, this

22         is a waste --

23                  MR. HAVILAND:  You're cutting me

24         off, and you're being rude and impolite.

25                  MR. FORST:  No, I'm not.

Page 201

1            MR. HAVILAND:  Yeah, you are.

2            MR. FORST:  How many times do you

3      want to ask the same question?

4            MR. HAVILAND:  So, do you want to

5      teach your students that?  I'm going to

6      ask the question.  You can object, but

7      we're going to do it the right way.

8            MR. FORST:  All right.  But we need

9      to move along.

10            MR. HAVILAND:  Let's do it the

11      right way.

12            MR. FORST:  He says, I know

13      nothing --

14            MR. HAVILAND:  Let's do it the

15      right way.

16            MR. FORST:  -- I know nothing about

17      this, and we're going to ask five more

18      questions.

19            MR. HAVILAND:  Let's keep going,

20      because we'll keep going here, sir.

21            MR. FORST:  Okay.

22            MR. HAVILAND:  All the time that he

23      takes does not --

24            MR. FORST:  It's not going to --

25            MR. HAVILAND:  -- come off my time,

Page 202

1      okay?

2            MR. FORST:  -- deter me.  It's not

3      going to deter us.

4            MR. HAVILAND:  You can do whatever

5      you want.

6            MR. FORST:  You're wasting time by

7      asking questions --

8            MR. HAVILAND:  No, I'm not.

9            MR. FORST:  -- that have been

10     answered.

11           MR. HAVILAND:  I know you don't

12     like it, but I'm going to ask them.

13           MR. FORST:  No, I don't mind it.

14     You're wasting your own time.  I'm saying

15     let's get to things where he has knowledge

16     of.  This is yet another document he's not

17     on.  It's probably 15 of today.

18           MR. HAVILAND:  Are you done?  You

19     want to keep going?  You want to put him

20     on a meter?

21           MR. FORST:  I don't know what that

22     means.

23           MR. HAVILAND:  Are you done?

24           MR. FORST:  I mean, ask the

25     question; you'll get the same answer.

1             MR. HAVILAND:  Are you done?

2             MR. FORST:  I'm waiting for the

3      question.

4             MR. HAVILAND:  Are you finished?

5             MR. FORST:  I'm done until the

6      question.

7             MR. HAVILAND:  I want to make sure

8      you have your opportunity to object your

9      speaking objection.

10            MR. FORST:  Okay.  I'm objecting,

11     asked and answered.

12            MR. HAVILAND:  Perfect.

13  BY MR. FORST:

14     Q     Dr. Miller, a very simple question

15  for you.

16            This is before you left the

17  company, right?  December 21, 2021, right?

18  A     I'm -- at this point in time, I changed --

19  I'm with Cigna, in my responsibility to Cigna.

20     Q     But Express Scripts is still a

21  subsidiary PBM within Cigna for which you had

22  some involvement throughout your tenure at

23  Express Scripts, correct?

24  A     Correct.  Correct.

25     Q     Okay.  And you said you are unaware

1    that Express Scripts was in active negotiations

2    to contract for a competitive agent to Acthar,

3    correct?

4                    MR. FORST:  Objection, assumes

5            facts not in evidence, lack of foundation,

6            asked and answered.

7                    THE DEPONENT:  Correct.

8    BY MR. HAVILAND:

9        Q    Okay.  And my question to you, sir,

10   is, you have no knowledge, right, from the time

11   that you were an active employee -- and I'm only

12   going to go up to the end of 2021 at this point,

13   right -- of any effort by Express Scripts or

14   Cigna to go back to Mallinckrodt, the

15   manufacturer of Acthar, to negotiate a lower

16   price for Acthar, using the tool that we talked

17   about this morning, having in the marketplace a

18   competitive agent to Acthar, FDA-approved, you

19   have no knowledge that that was ever done, right?

20   A    I have --

21                   MR. FORST:  Objection -- objection,

22           vague and ambiguous, asked and answered,

23           lack of foundation.

24   BY MR. HAVILAND:

25       Q    Go ahead.

Page 205

1    A      I -- I don't know what anyone has done

2    with this information.

3           Q      You have no knowledge of efforts to

4    reach out to Mallinckrodt, correct?

5    A      I don't know if they have or have not,

6    correct.

7           Q      All right.  After you transitioned

8    to your role as a consultant in 2022, have you

9    obtained knowledge that Express Scripts or Cigna

10   have gone back to Mallinckrodt, using the fact

11   that it now has a contract to distribute ANI

12   Pharmaceutical's product, to lower the price of

13   Acthar?

14                 MR. FORST:  Objection, assumes

15           facts not in evidence, lack of foundation,

16           and asked and answered multiple times.

17   BY MR. HAVILAND:

18           Q      You can answer.

19   A      All right.  So, I -- as a consultant to

20   the company, I would have -- this is not under my

21   purview.  I have no knowledge.

22           Q      Okay.  What is your current

23   purview, sir?

24   A      I do special projects with the company.

25           Q      For instance?

1    A       We have a project called The Future of

2    Healthcare.

3            Q       Okay.  No special project where

4    you're looking at high-cost specialty medications

5    and ways to bring down the costs, right?

6    A       No.

7            Q       All right.  After 60 Minutes took

8    place, do you recall the company changing the

9    prior authorization for Acthar?

10   A       I think we discussed this previously.  I

11   think they -- they review their criteria on an

12   annual basis, and I think our Medicare criteria

13   changed.

14           Q       Well, I don't think I mentioned

15   prior authorization, sir.  I think this is the

16   first time.

17                   You said earlier in response to my

18   question that the coverage criteria was reviewed,

19   and the coverage criteria was changed for

20   Medicare, right?

21   A       The -- where the drug was placed in

22   formulary changed from include -- for Medicare

23   formulary changed from include to optional.

24           Q       All right.  That's a coverage

25   issue, where it's placed in terms of the

Page 207

1    formulary position?

2    A       Correct.  It -- often, with coverage

3    changes, become changes in utilization

4    management.

5            Q       That's a separate issue, though,

6    you'd agree?

7    A       Correct.

8            Q       And are you aware that there was a

9    change in the prior authorization policy at

10   Express Scripts after 60 Minutes with respect to

11   Acthar?

12   A       No.

13           Q       All right.  Let's go back to a

14   subject from this morning.  You had wanted to

15   see, I think, the transcript and the comments,

16   and I want to go back to the Citibank situation

17   and make sure I have a clear record on that in

18   terms of what you said, what your position was at

19   the time and after.

20                   I'm going to go ahead and mark this

21   into the record as Exhibit 20.  It was previously

22   marked as Henry Exhibit 32.  I'm just going to

23   write Miller 20.

24                   (Exhibit 20 was marked.)

25   BY MR. HAVILAND:

1          Q       There's the exhibit, sir.

2     A       Thanks.

3               MR. FORST:   Thank you.

4               MR. HAVILAND:   Yep.  If you don't

5          mind my little note about Citibank, you

6          can have that one (handing).

7     BY MR. HAVILAND:

8          Q       Dr. Miller, do you see Exhibit 32

9     [sic]?  For the record, it's

10    ExpressScripts0834225 through 4227.  It's an

11    email from --

12    A       I don't see --

13         Q       Sorry?  Yeah, it's -- the thread

14    starts with Brian Henry.  I'm not clear who he

15    sent it to.  Well, let's -- let's start at the

16    beginning.  It's actually begun with a piece by

17    Lynnette Lopez at Business Insider.

18               Do you see that on page 2?

19    A       Yes.  Yep.

20         Q       June 5th.  And the reporter writes,

21    We are working to publish a story on comments

22    Everett Neville, ESRX Senior Vice President,

23    Supply Chain and Specialty, and Dr. Steve Miller,

24    ESRX Chief Medical Officer, made Re the company's

25    relationships with Acthar.  I've pasted the

Page 209

1    comments we're highlighting below.  They're very

2    critical of Acthar and its efficacy.  A few

3    questions.

4                    I'll skip those for the moment.

5    You see down the -- the bottom, it says, and

6    she's attempting to quote, Everett Neville,

7    senior vice president of supply chain and

8    specialty, and she repeats, Everett Neville is

9    responsible for all aspects of supply chain and

10   specialty business, and then has quotes that

11   she's ascribing to you.

12                    Do you see that?

13   A      The ones at the very bottom?

14        Q      Yeah.  So let's just go through

15   them --

16   A      Yes.

17        Q      -- because I think Mr. Neville had

18   comments, and you had comments.

19                    Is it accurate Mr. Neville said ---

20   and -- and what Mr. Henry did, he sent the

21   transcript, but it's a little -- little difficult

22   to read.

23                    Mr. Neville said, I don't think

24   it's a very great -- it's a petty poor drug with

25   a very limited need, and certainly Steve could

Page 210

1    comment -- that's you, Dr. Miller?

2    A      Yes.

3         Q      -- completely, you know, and,

4    Steve, you could chime in here too, but I think

5    Steve and I would both agree, and I think

6    everybody in our company would agree, that the

7    product is vastly overpriced for the value.

8              Did I read that correctly?

9    A      Yes.

10        Q      He then finally says, I personally

11   told their management team that the drug was

12   hugely overpriced.  I know Steve has as well.

13              Do you see that?

14   A      Yes.

15        Q      Now, they were comments made by

16   Mr. Neville at the conference, right?

17   A      Yes.

18        Q      Now, let's just unpack that before

19   you -- before we go to your comments.

20              Did you agree, when Mr. Neville

21   said you would likely agree, that it's a pretty

22   poor drug with very limited need?

23   A      That's correct.

24        Q      Okay.  You also agreed with his

25   statement that it's hugely overpriced?

1    A      That is correct.

2           Q      Now, did you, in fact, as he says

3    you might have, personally tell Mallinckrodt's

4    management team that their drug is hugely

5    overpriced?

6    A      Their management team has heard directly

7    from me, and I believe it was at one of our

8    conferences, because they were also a client of

9    ours, that their drug was -- that -- I use this

10   as an example of an overpriced drug.

11          Q      So, you met with Mallinckrodt

12   management directly and told them that Acthar is

13   overpriced?

14   A      No, I presented at our Outcomes

15   Conference, of which they were in attendance --

16   representatives of Mallinckrodt were in

17   attendance, and told them that it was overpriced.

18          Q      This is the annual conference that

19   Express Scripts puts on for its clients?

20   A      Correct.

21          Q      You presented Colo outbreak

22   sessions at those -- at that conference?

23   A      I presented at both the main part of the

24   conference and in the Colos.

25          Q      And in what year was this where you

Page 212

1   made the comments with Mallinckrodt in the

2   audience?

3   A      I don't -- I can't tell you which year it

4   was.

5        Q      Well, this email's from June 5,

6   2017.  It's a couple months after the Rockford

7   lawsuit was filed.

8               So was it before that, was it in

9   the spring meeting?

10  A      It could have been years before.

11       Q      Do you have prepared comments?

12  A      I never have prepared comments.

13       Q      Okay.  Is there a transcript of

14  your comments from those conferences?

15  A      Not that I'm aware of.

16       Q      Okay.  So it's a live setting, you

17  don't have notes.  You just presented, and you

18  said, Acthar is hugely overpriced?

19  A      I -- not -- I don't know if I used those

20  words.

21       Q      Okay.

22  A      I used -- used Acthar and other drugs as

23  examples of pharmaceutical egregious pricing.

24       Q      Okay.  And you know that

25  Mallinckrodt executives were in the audience?

1   A      Yes.

2          Q      Who?

3   A      I don't know -- I shouldn't say

4   "executives."  I know Mallinckrodt

5   representatives come to those conferences.

6          Q      I want to know if you know if

7   Mallinckrodt executives were in the audience when

8   you made those comments.

9   A      I don't know.  I doubt it, because we

10  don't get executives to those conferences.

11         Q      Who comes to the conferences?

12  A      It's usually the people that manage --

13  it's HR people from those companies and sometimes

14  the account managers.

15         Q      And are they management teams?

16  A      I don't -- I don't know their status

17  within the company.

18         Q      Well, Mr. Neville says, I

19  personally told their management team.  I know

20  Steve has as well.

21                When did that happen?

22  A      I believe that their management team has

23  probably heard it indirectly through these

24  people, but I have not specifically talked to

25  their management.

1          Q       Okay.  So, Mr. --

2     A     I -- I did have a meeting at some point in

3     time with their chief medical officer.

4          Q       Mr. Romano?

5     A     Mr. Romano.

6          Q       Dr. Romano?

7     A     Dr. Romano.

8          Q       When did that happen?

9     A     Again, I can't tell -- I don't know the

10    specific date.

11         Q       It would be helpful, sir, just to

12    orient it around some timeline.

13    A     I -- I would love to give you a more

14    specific -- I just -- these are -- I work on lots

15    of drugs with lots of companies.  I speak to lots

16    of chief medical officers and other, you know,

17    management.  I just can't help you with the

18    specifics on the time.

19         Q       You do -- all right.  Whatever the

20    date was, you met with Dr. Romano?

21    A     I have met with Dr. Romano.

22         Q       More than once?

23    A     Only once.

24         Q       And do you remember the context?

25    A     I believe they were coming to our site for

1    a tour of our innovation lab.

2            Q       Okay.  And that's the lab Mr. Henry

3    said is a -- it's actually not a lab that

4    develops like with beakers.  It's an innovation

5    lab to think about issues?

6    A       It's about data science.

7            Q       The data center is also there?

8    A       How would you -- it's not quite a data

9    center.  It's -- what we do is it's a way to

10   visualize data.  The data exists elsewhere.  It's

11   to be able to put data up in a visual way for

12   clients and others to better understand what's

13   happening in drug prices, what's happening to

14   disease in the community, you know, how our

15   services can assist them.

16           Q       And why was Mallinckrodt invited on

17   this particular day?

18   A       Because Mallinckrodt also was a client of

19   Express Scripts.

20           Q       So pharma companies come to the

21   innovation lab?

22   A       All the time.

23           Q       Okay.  I didn't understand that

24   when I asked Mr. Henry.  He said it was more

25   health plan-focused in terms of the payers --

Page 216

1  A     Well, there --

2              MR. FORST:  Let him finish the

3         question, Dr. Miller.

4  BY MR. HAVILAND:

5         Q     -- but other companies come as

6  well?

7  A     So, we have lots of pharma company

8  clients, and many of them send the HR department

9  side of their companies to our innovation lab.

10        Q     What do you recall about this

11 meeting with the Mallinckrodt folks?

12 A     I know they came.  I know that -- I

13 remember that they were unhappy with the -- that

14 I had been vocally critical of their product,

15 and -- and that's the main thing I remember from

16 the meeting.

17        Q     Well, other than the -- this oral

18 report you gave at one of these Express Scripts

19 meetings, the first time I see you in the record

20 publicly speaking about Acthar and its price is

21 this Citibank conference.

22              Did you speak publicly, and it was

23 reflected in print prior to that?

24 A     Not that's reflected in print that I know

25 of, but I have -- I give dozens of talks each

1    year, and I frequently talk about egregious

2    pricing.  That's what I do, and -- and Acthar was

3    one of the examples I would frequently used.

4         Q      And you don't ever take notes, and

5    you don't ever -- well, you do do PowerPoints.  I

6    have PowerPoints.

7    A      I do PowerPoints, but I speak

8    extemporaneously for a reason.  So, I never use

9    notes, because the presentations come off better

10   when you are extemporaneous, at least I belive

11   so, and so there is no notes I use.

12        Q      So, you're saying you've been a

13   vocal critic of Acthar --

14   A      I've been a vocal critic -- I'm sorry.

15        Q      Yeah, I just want to orient the

16   question to a time.

17               That you were a vocal critic of

18   Acthar's pricing prior to June 2017 after the

19   Rockford lawsuit?

20   A      Yes.

21        Q      Okay.  And do you know how far back

22   in time you were a vocal critic?

23   A      You know, I -- again, I've been a vocal

24   critic of pharmaceutical companies from almost

25   day one of my coming to the company and have

Page 218

1    criticized many, many different drugs, including

2    Acthar, but I can't give you a precise time of

3    when I started --

4           Q      Well, this particular --

5    A       -- when I talked about them.

6           Q      Sorry.  This particular criticism

7    got the ire of management at Mallinckrodt; you're

8    aware of that?

9    A       Yes.

10          Q      Okay.  Did you speak with

11   Dr. Romano?

12   A       I don't remember the date of when I spoke

13   to Dr. Romano, because the only time I spoke to

14   him was in the -- when they came to the

15   innovation lab.

16          Q      I'm going to show you a document

17   that was produced by Mallinckrodt in this case

18   for some reason.  It's -- it's an odd printout.

19   It didn't print the Bates number.  Let me see if

20   I have that.  I don't think I have that from

21   Henry's.  Let me show it to your counsel first.

22                 It's an email thread involving

23   Brian Henry that then goes out to Everett Neville

24   and you and Tim Wentworth, and it concludes with

25   an email from Everett Neville to Brian Henry.

Page 219

1   I'm going to show it to your counsel before I

2   show it to you, and I'm going to read for the

3   record.

4              This is Exhibit 20?

5              (Discussion held off the record.)

6              MR. HAVILAND:  Oh, I had marked it.

7         My apologies.  It was marked as

8         Exhibit 33, and now it's 21.  There we go.

9         Oh, this is the Henry exhibit.  It was

10        marked as Henry Exhibit 33.  It's now

11        Miller Exhibit 21.

12             (Exhibit 21 was marked.)

13  BY MR. HAVILAND:

14        Q     Let me read for the record.  This

15  is June 5, sir, the same time as the email thread

16  that we're looking at.  The conference was the

17  day before, I presume.  Ms. Lopez's email is at

18  7:30 a.m.  Well, it was obviously before, because

19  she knew what you said.

20  A     Okay.

21        Q     This is the same day as that email

22  we looked at with the transcript.  Mr. Henry

23  says, FYI, I spoke to my counterpart at

24  Mallinckrodt just now.  As you might guess, they

25  were surprised by the comments in the Citi

Page 220

1    report.  They also mentioned that Everett and

2    Steve's counterparts might be reaching out to

3    them either today or tomorrow.

4                    And it's your testimony that didn't

5    happen?

6    A      I don't remember that happening.

7           Q      Okay.  Well, you do remember the

8    innovation lab --

9    A      I just --

10          Q      -- and it wasn't --

11   A      I remember -- yeah, the one encounter at

12   the innovation lab.

13          Q      Yeah, but that wasn't in relation

14   to the Citibank commentary.

15   A      I don't know its relationship to the

16   Citibank commentary.

17          Q      Well, do you recall at the

18   innovation lab meeting, Dr. Romano raised your

19   comments with you?

20   A      I -- at the innovation lab meeting, I know

21   Dr. Romano made it clear that he not -- they

22   were -- Mallinckrodt was not pleased with our

23   criticizing the price.

24          Q      Okay.  And you don't know if that

25   was directly relating to this Citibank

Page 221

1    conference, right?

2    A    I -- I cannot tell you if it's from other

3    comments I've made in other settings or from the

4    Citibank.

5         Q    Okay.  Reading further Mr. Henry's

6    email, They were concerned that there was a

7    difference of opinion between what we have been

8    talking about and what was said at Citi.

9              Do you see that?

10   A    I don't see that.

11        Q    I'm in the fifth line down.  It was

12   the end of the sentence I started to read.

13   They -- Mallinckrodt -- also mentioned that

14   Everett and Steve's counterparts might be

15   reaching out to them today or tomorrow, as they

16   were concerned that there was a difference of

17   opinion between what we have been talking about

18   and what was said at Citi.

19              Do you see that?

20   A    Yes.

21        Q    So Mr. Henry, speaking to his

22   counterpart at Mallinckrodt, was reporting to

23   you, Mr. Neville, and the CEO that their view was

24   your comments were inconsistent with what you had

25   been talking about previously?

Page 222

1    A       I don't know who "we" is.

2           Q       Okay.  It goes on further,

3    Primarily they say their investors are concerned

4    that we may be moving away from them or not

5    providing access to the drug in the future.  She

6    also indicated that Mark Trudeau may reach out to

7    Tim at some point.  I don't know if that will

8    happen, but it may.

9                   Do you know if that happened?

10   A       I do not know.

11          Q       Do you know if Mr. Neville's

12   counterpart reached out to him?

13   A       I do not know.

14          Q       He then says further, She asked

15   that in the future, if we are asked about Acthar

16   Gel, we refrain from commenting about it.  I

17   explained that we would prefer not to talk about

18   it, however, we do get asked about it at investor

19   conferences and elsewhere.  We would much prefer

20   to talk about our core growth strategy and how we

21   are delivering value.

22                  Do you see that?

23   A       Yes.

24          Q       And then that thread goes up, and

25   Mr. Neville says to Mr. Henry, you, and

1    Mr. Wentworth, Did you provide the full

2    transcript?  Not that they will like it, but the

3    context is important.

4              Do you see that?

5    A    Yes.

6         Q    Mr. Henry says, They do have it.

7    They were concerned about your and Steve's

8    comments about high pricing and a perceived lack

9    of value and that, quote, we have told them that,

10   close quote, language.

11             Do you see that?

12   A    Yes.

13        Q    It seems to me, reading this,

14   Mr. Henry is saying that Mallinckrodt doesn't

15   agree that you have told them in the past that

16   you believe their product is high-priced?

17             MR. FORST:  Objection, calls for

18        speculation, mischaracterizes the

19        document.

20             THE DEPONENT:  Yeah, I don't know

21        what Mallinckrodt believes or not.  I

22        just -- I can read these just like you do,

23        but I'm not -- you'll have to ask the

24        people directly involved with Mallinckrodt

25        what they believe.  I don't --

1    BY MR. HAVILAND:

2         Q      Well, I am going to do that, sir.

3    A      Good.

4         Q      And Mr. Henry described himself as

5    the eyes, ears, and mouth of the company, who is

6    the head of communications at this time, right?

7    A      Yes.

8         Q      And part of his role was to listen

9    to what the media was saying, right?

10   A      Um-hmm.

11        Q      Yes?

12               (Reporter clarification.)

13               THE DEPONENT:  Yes.

14   BY MR. HAVILAND:

15        Q      And then vet that within the

16   organization, and he would typically do that with

17   leadership through his FYI emails we've seen,

18   right?

19               MR. FORST:  Objection to the form.

20               You can answer.

21               THE DEPONENT:  Yes.

22   BY MR. HAVILAND:

23        Q      So, he would take media commentary

24   that involves Express Scripts, and at times

25   involved Express Scripts, Mallinckrodt, and

1   Acthar, and he would send that out to you and

2   others in the organization, right?

3   A      Correct.

4          Q      And then he would talk amongst the

5   leadership, to the extent it's necessary, to

6   formulate whether or not there'd be a response,

7   and if so, what that response would be, and

8   you -- you have been contacted at times about

9   that?

10  A      Correct.

11         Q      And do you recall any time when you

12  said to Mr. Henry, I want you to put out there

13  that I say that Acthar is high-priced?

14               MR. FORST:  Objection to the form

15          of the question.

16               THE DEPONENT:  I have never

17          specifically said that to Brian.  I think,

18          as these emails even indicate, I have made

19          it very clear I was unhappy with the price

20          of Acthar.  I've said so publicly, and

21          obviously Mallinckrodt does not like us

22          saying that.

23  BY MR. HAVILAND:

24         Q      Okay.  And then at some point, you

25  had a meeting with them at the innovation lab,

1    and you were there, right?

2    A      Yes.

3           Q      Okay.  Do you recall who else was

4    there from Express Scripts?

5    A      I do not.

6           Q      Do you recall who was -- you said

7    Dr. Romano was there?

8    A      I just remember that's when I met

9    Dr. Romano.

10          Q      First and only time?

11   A      I believe so.

12          Q      Ever talked to him on the phone?

13   A      I may have talked to him on the phone

14   once.

15          Q      About?

16   A      I just -- I believe I would -- I believe I

17   may have talked to him prior to their visit, just

18   about the upcoming visit.

19          Q      Okay.  I'm just pointing out, sir,

20   that we have no written record of this meeting

21   ever happening, either from Mallinckrodt or

22   Express Scripts.  So, I want to know what you

23   know about it.  Not saying it didn't happen, but

24   you had a conversation about the meeting.  The

25   meeting took place.

Page 227

1                    Did you ever email Dr. Romano?

2     A     All my emails have been made available.

3           Q     Okay.  So, you didn't?

4     A     I don't remember ever emailing him, no.

5           Q     Okay.  And what specifically do you

6     recall about what happened at the innovation lab

7     meeting?

8     A     I only remember that -- the only thing

9     that stuck out to me that I remember is that they

10    did not like our publicly talking about the

11    price -- the high price of their drugs, and that

12    they were upset about it.

13          Q     Was there another purpose of the

14    innovation lab meeting?

15    A     The purpose is -- when we have clients in,

16    is to show them our capabilities, and so -- you

17    know, like I said, we've had dozens and dozens,

18    if not hundreds, of these meetings with clients,

19    and so, they -- they usually don't stand out in

20    my mind as anything memorable.

21          Q     Do you recall raising with them the

22    indication-specific pricing model that you were

23    working on?

24    A     I've never spoken to them about that that

25    I remember.

1       Q       Well, I see an acknowledgement at

2   the CEO level of Mallinckrodt about that.

3               Did you ever talk to Mark Trudeau

4   directly about it?

5   A       I've never talked to Mark -- oh.

6               MR. FORST:  Let me just object to

7           the characterization as lack of

8           foundation, assumes facts not in evidence.

9   BY MR. HAVILAND:

10      Q       That's fine.

11  A       I've never spoken with Mark Trudeau.

12      Q       Did you speak to Tim Wentworth

13  about a meeting he had with Mark Trudeau, and

14  specifically about your indication-specific

15  pricing model.

16  A       Not that I remember.

17      Q       Okay.  And other than their telling

18  you and saying they were unhappy of your

19  criticizing their product, what else was

20  discussed at the innovation lab meeting?

21  A       Like I said, I can't remember any of

22  the -- anything else that stuck in my mind.  It

23  was just --

24      Q       You remember that, though?

25  A       Yeah, because that's -- you know -- you

Page 229

1  know, clearly, when you've upset your client, you

2  remember who -- you know, them being upset.

3      Q     Okay.  And did they say they were

4  going to do anything about it?

5  A     I don't remember.  I don't -- I -- no, I

6  don't remember anything about that.

7      Q     And after that meeting and

8  conversation, did you observe that Mallinckrodt

9  was doing anything to change the relationship

10  with Express Scripts, either with CuraScript,

11  Accredo, the hub, or the PBM?

12  A     I was unaware of any change in the

13  relationship.

14      Q     Okay.  So, despite the -- your

15  comments and that meeting where they said they

16  were not happy with them, to your knowledge,

17  there was no change in the business relationship

18  between the two companies in any facet that I

19  described?

20              MR. FORST:  Objection, asked and

21          answered.

22              THE DEPONENT:  I'm unaware of any

23          changes.

24  BY MR. HAVILAND:

25      Q     All right.  After the City of

Page 230

```
1    Rockford filed suit against Express Scripts,

2    there was an effort to figure out how much money

3    the various Express Scripts entities make off of

4    Acthar.

5                    Do you recall that?

6    A       No.

7            Q       Dr. Miller, I'm going to show you

8    what I've marked as Exhibit 22.  It's

9    ExpressScripts0837549 to 550.

10                   (Exhibit 22 was marked.)

11                   MR. FORST:  Thank you.

12   BY MR. HAVILAND:

13           Q       You'll see you're copied on the

14   email.

15   A       Yep.

16           Q       And it -- it generated originally

17   from Jennifer Luddy to Brian Henry from an email

18   from Andrew Left of Citron Research.

19                   Do you see that on the back side?

20   A       Yes.

21           Q       And Mr. Left asks, How much does

22   Express Scripts make off each bottle of Acthar?

23                   Do you see that?

24   A       Yes.

25           Q       And he says, I want to be accurate
```

Page 231

1    in light of recent comments made by Dr. Miller.

2    Does the company plan on modifying its

3    relationship with Acthar, not on the PBM side,

4    but on the pharmacy side?

5                    Do you see that?

6    A      Yes.

7          Q      And this is the same day as the

8    emails we were looking at after the Citibank

9    conference where you made those comments, right?

10   A      Correct.

11         Q      And then Mr. Neville -- well,

12   Mr. Henry has a comment, he says, Appreciate

13   guidance.  That's when you're copied on.  Neville

14   says, I'll defer to Ben.  Practically, it's about

15   $1 million rebate keep.

16                    Do you see that?

17   A      Yes.

18         Q      Did you understand that to mean

19   that's the money that the PBM makes off rebates

20   for Acthar?

21   A      Well, they -- while I'm copied on these

22   things, I didn't -- I don't have much

23   recollection of this.  I don't know what

24   Everett's -- what Everett's [sic] means by that.

25         Q      Well, Left is writing because he's

Page 232

1    keying off the comments you made and Mr. Neville

2    made about the value of Acthar.  He's asked

3    specifically about how much Express Scripts makes

4    off each vial, specifically, United Bio,

5    CuraScript, and Accredo.  Mr. Neville writes

6    back, It's a $1 million rebate keep.

7              The PBM gets rebates, right?

8    A    That's correct.

9         Q    And then if you go up, Mr. Neville

10   says -- oh, I'm sorry, Mr. English writes, I've

11   provided talking-points to Ben in the past,

12   However, I'm forecasting 8.7 million in gross

13   margin in 2017 at CuraScript.

14             Do you see that?

15   A    Yes.

16        Q    He would know that, because he was

17   the president at the time?

18   A    Correct.

19        Q    And then if you go up even further,

20   Ben Bier says, In 2016 CuraScript Distribution

21   had 7.3 million in gross margin, and 4.1 --

22   4.4 million in EBITDA.  Same time period in 2016,

23   Accredo made less than 2 million, UBC earned

24   about 6 million, with the majority from the

25   reimbursement hub.  And he says, When you add the

1   rebates in, it equates to approximately

2   13 million in total for the enterprise.

3              Do you see that?

4   A     Yes.

5        Q     You had no reason to dispute that

6   these folks that were weighing in didn't know

7   what they were talking about in terms of monies

8   made by the various arms of Express Scripts off

9   Acthar, right?

10             MR. FORST:  Objection to the form

11        of the question, lack of foundation.

12             THE DEPONENT:  Again, outside my

13        domain, but I have no reason to believe

14        they don't have their numbers right.

15   BY MR. HAVILAND:

16        Q     Well, and when Mr. Henry wants to

17   get an answer and ask for guidance --

18   A     Um-hmm.

19        Q     -- he wants to get it from the

20   people that know, right?

21             MR. FORST:  Objection to the form.

22   BY MR. HAVILAND:

23        Q     Is that right?

24   A     Assume so, yep.

25        Q     And you would expect that the folks

Page 234

1    responding, Mr. Neville and Mr. Bier, are going

2    to give accurate information back, right?

3                    MR. FORST:  Objection.

4                    THE DEPONENT:  Correct.

5    BY MR. HAVILAND:

6        Q    And so, you have no reason to

7    dispute that, in 2016, Express Scripts made about

8    13 million off of Acthar?

9                    MR. FORST:  Objection, foundation,

10           calls for speculation.

11                   THE DEPONENT:  That's what the

12           documents seem to indicate.

13   BY MR. HAVILAND:

14       Q    Okay.  And do you know what was

15   done with this information?  Was it shared

16   publicly?

17   A     I have no idea.

18       Q    Okay.  Did you ever see in the

19   public, Express Scripts telling the public, We

20   make $13 million off of Acthar?

21                   MR. FORST:  Objection to the form.

22                   THE DEPONENT:  Don't recall ever

23           seeing that.

24   BY MR. HAVILAND:

25       Q    Okay.  And you don't know what came

1    of that thread after you were copied on it; is

2    that fair?

3    A      Correct.

4           Q      Were you aware of how

5    Express Scripts coordinated its public messages

6    with Mallinckrodt?

7                  MR. FORST:  Objection to the form.

8                  THE DEPONENT:  I'm unaware of any

9           coordination with Mallinckrodt.

10   BY MR. HAVILAND:

11          Q      Let me show you what I'm going to

12   mark as Exhibit 23.

13                 (Exhibit 23 was marked.)

14   BY MR. HAVILAND:

15          Q      Exhibit 23 to your deposition, sir,

16   is --

17   A      Yep.

18          Q      -- Bates number

19   ExpressScripts0959385.  You see it's

20   June 5, 2017.  It's a little later in the day

21   from the thread we just looked at.

22                 Mr. Henry writes, This is how

23   Mallinckrodt proposes to explain to its investors

24   the relationship with us.  Let me know if you

25   have any edits.

Page 236

```
 1                    Do you see that?

 2    A      Yes.

 3           Q      And then there's a description

 4    there about Express Scripts:  Mallinckrodt has

 5    several distinct arm's-length contracts for

 6    services with Express Scripts subsidiaries for

 7    Acthar, CuraScript, Accredo, United BioSource,

 8    right?

 9    A      Yes.

10           Q      And you weren't involved directly,

11    as I can see, in this.

12                  You weren't -- you have no personal

13    knowledge of how Express Scripts coordinated

14    responses to media inquiries with Mallinckrodt;

15    is that fair?

16                  MR. FORST:  Objection, assumes

17           facts not in evidence, mischaracterizes

18           the document, foundation.

19                  THE DEPONENT:  Correct.

20    BY MR. HAVILAND:

21           Q      A little after those emails,

22    Mr. Wentworth had a conversation with

23    Mr. Trudeau.

24                  Are you aware of that?

25    A      No.
```

1           Q       I'll show you what I've marked as

2    Exhibit 24 to your deposition, Dr. Miller.

3                   (Exhibit 24 was marked.)

4    BY MR. HAVILAND:

5           Q       Exhibit 24 is Bates-numbered

6    ExpressScripts5353147.  You'll see the thread is

7    from a Meredith Fischer, who Mr. Henry identified

8    as his counterpart over at Mallinckrodt.  She

9    writes to Mr. Henry and cc'ing -- and cc'ing some

10   folks within Mallinckrodt.  It says, Follow-up to

11   Wentworth/Trudeau conversation.

12                  Do you see that Re line there?

13   A      Yes.

14          Q       "Morning, Brian, hope all is well.

15   Just spoke to Mark Trudeau, who had concluded a

16   call with Tim related to our shared interests and

17   challenges with Andrew Left.  He said they had a

18   great call, and they're not only aligned about

19   the value and importance we mutually place on the

20   relationship between our companies, but agreed

21   that they, themselves, and our team should be

22   tightly aligned on mutual messages when at the

23   upcoming Goldman conference.  To that end, Tim

24   suggested it would be good to work with you to

25   provide your guys a set of talking-points on

1    Mallinckrodt and the context of Acthar."

2              Do you see that?

3    A    Yes.

4         Q    You're not copied in this thread,

5    nor the one that Mr. Henry sent to the CEO.

6              Were you made aware that there had

7    been this direct conversation between the CEOs

8    about the shared interests and challenges and

9    alignment between the companies?

10             MR. FORST:  Objection, asked and

11        answered.

12             THE DEPONENT:  I do not remember

13        any of this, no.

14   BY MR. HAVILAND:

15        Q    Were you at the Goldman conference?

16   A    No.

17        Q    Do you know if, at any point during

18   the conversations between the CEOs, the issue of

19   your comments of -- about Acthar during the

20   Citibank conference came up?

21             MR. FORST:  Objection, asked and

22        answered.

23             THE DEPONENT:  Don't know.

24   BY MR. HAVILAND:

25        Q    And, sir, when I say "do you know,"

Page 239

1    I want to know if you know.  That's all.

2    A      I said that.  I don't --

3          Q      Okay.

4    A      I don't know.

5          Q      That's fair.  I realize it's above

6    your pay grade.

7                  We're dealing with the CEOs, right?

8                  MR. FORST:  Well, let's not harass

9          the witness and be condescending.

10                 MR. HAVILAND:  I'm not harassing

11         the witness, sir.

12                 MR. FORST:  A little bit.  Again,

13         he said he's not aware of the

14         conversations.  Then you're asking him

15         about the specifications of the

16         conversations.  It's --

17                 MR. HAVILAND:  I'm going to keep --

18                 MR. FORST:  -- mind-boggling.

19                 MR. HAVILAND:  I'm going to keep

20         going, all right?

21   BY MR. HAVILAND:

22         Q      Because, sir, the jury can see what

23   I'm doing.  The jury sees that Mr. Henry looped

24   you in --

25                 MR. FORST:  That's --

1    BY MR. HAVILAND:

2         Q    -- to conversations --

3              MR. FORST:  -- not a question.

4    BY MR. HAVILAND:

5         Q    -- asked your opinion, and then

6    another conversation took place between the CEOs.

7              You've testified you've had

8    conversations with Mr. Wentworth, right?

9    A    Correct.

10        Q    But you did not have a conversation

11   with Mr. Wentworth at this time in relation to

12   your comments at Citibank or otherwise, right?

13   A    Not that I remember.

14        Q    Okay.  That's all I want to know.

15   A    Yes.

16        Q    And Mr. Wentworth never reached out

17   to you to talk to you about your comments you

18   made at the Citibank conference, right?

19   A    Not that I remember.

20        Q    Fair enough.  Okay.  I'm going to

21   show you what I'm going to mark as -- oh,

22   shoot -- Exhibit 25 to your deposition.

23              (Exhibit 25 was marked.)

24   BY MR. HAVILAND:

25        Q    There you go, Dr. Miller.

1    A      Thank you.

2          Q      Exhibit 25, Dr. Miller, is an

3    Express Scripts document, ExpressScripts0834253

4    through 4265.  There's a foundation because

5    you're on it, sir.

6                Do you see that?

7    A      Yes.

8          Q      Ben Bier writes to Tim Wentworth,

9    you, and others on June 12, about a week after

10   the emails we just looked at, Express Scripts

11   questions at the Goldman Sachs conference and

12   Acthar talking-points.

13               Do you see that?

14   A      Yes.

15         Q      "Tim, attached is the Q&A we've

16   developed for your fireside chat at the

17   Goldman Sachs conference on Tuesday."

18               Again, you did not attend that?

19   A      Correct.

20         Q      And you didn't talk to the CEO

21   about it, right?

22   A      Not that I remember.

23         Q      "I've also attached some proposed

24   talking-points related to Acthar to the extent

25   that questions are brought up at any of our three

Page 242

1    investor conferences this week.  Let me know if

2    you'd like -- if you'd like to get time together

3    with the group tomorrow to discuss either of the

4    attached documents."

5                I don't know the group he's

6    referring to, but you never get -- did get

7    together in a group setting with the CEO about

8    the Goldman conference, right?

9    A      I did not.

10        Q      And the talking-points, sir, you

11   can see talk about the, Product attributes.

12               Do you see that?

13   A      Yep.

14        Q      Services we provide; the PAP

15   program; income received by Express Scripts at

16   UBC based on the number of employees; Acthar is

17   immaterial to our company's financials, and our

18   practice is to not disclose specific terms.

19               Do you see that?

20   A      Yes.

21        Q      And then, We also provide wholesale

22   distribution services for Mallinckrodt.

23               Do you see that?

24   A      Yes.

25        Q      It doesn't say "exclusive," does

1    it, sir?

2    A       No.

3            Q       And then it says, Contracts and

4    services provided to Mallinckrodt are not unique;

5    they are standard in the industry.

6                    Do you see that?

7    A       Yes.

8            Q       Do you agree with that?

9    A       Don't know.

10           Q       No -- no basis to agree or

11   disagree?

12   A       Correct.

13           Q       Okay.  Acthar pricing:  Since 1998,

14   the unit cost of AWP for Acthar has increased on

15   average 36 percent per year.

16                   Do you see that?

17   A       Yes.

18           Q       And, As a PBM, we cannot support

19   price increases on any drug above the rate that

20   is standard for medical inflation.

21                   Is that referring to the medical

22   pharma CPI, to your knowledge?

23   A       I believe so.

24           Q       And that's -- that's a rate that

25   Express Scripts accepts as a reasonable rate of

Page 244

1    inflation for pharmaceutical products?

2    A      It's a -- it's the rate that they

3    historically increase at.

4          Q      Well, and that's what I'm trying to

5    get at.  This seems to be keying off, as a PBM,

6    Express Scripts can't support increases above

7    that; Express Scripts accepts the pharma CPI rate

8    of about 5 to 7 percent; 5 to 7 percent is a

9    reasonable inflation rate.

10               Is that fair?

11   A      That's what our drugs are usually

12   subjected to, correct.

13         Q      Okay.  And this doesn't say

14   anything than report on the increase over time,

15   and as -- as a PBM, we can't support price

16   increases over the medical inflation rate, right?

17               MR. FORST:  Objection to the form.

18               THE DEPONENT:  It says, As a PBM,

19         we cannot support drug -- price increases

20         on any drug above the rate that is

21         standard for medical inflation.

22   BY MR. HAVILAND:

23         Q      I don't see anywhere here where the

24   talking-points say that Express Scripts is

25   accusing Mallinckrodt of having a high --

Page 245

1    high-priced -- price for Acthar.

2              MR. FORST:  Just -- I'd wait for a

3         question.

4    BY MR. HAVILAND:

5         Q    Well, you said it at a conference,

6    and did you tell Mr. Wentworth that, You -- you

7    should say it too?

8    A    I was not involved in these preparations.

9         Q    Okay.  So, that conversation did

10   not happen, right?

11   A    I was not involved in these preparations.

12        Q    You were copied on them, but they

13   didn't loop you in to the ultimate preparations

14   of Mr. Wentworth's appearance, correct?

15   A    Correct.

16              MR. HAVILAND:  Are we at an hour

17        yet, because I want to --

18              MR. FORST:  We are.

19              MR. HAVILAND:  -- move to a

20        different topic?

21              MR. HAVILAND:  All right.  Let's

22        take a break.

23              MR. FORST:  Let's do it.

24              THE VIDEOGRAPHER:  We are going off

25        the record at 2:22 p.m.

1                    (Break taken.)

2                    THE VIDEOGRAPHER:  We are back on

3         the record at 2:34 p.m.

4    BY MR. HAVILAND:

5         Q     Dr. Miller, I'm going to mark as

6    Exhibit 26 to your deposition what I previously

7    marked at Mr. Henry's deposition as Exhibit 8.

8                    (Exhibit 26 was marked.)

9    BY MR. HAVILAND:

10        Q     The exhibit's ExpressScripts5484513

11   to 4514.  I'm handing that to you now, sir.

12   A     Thank you.

13        Q     Yep.  You'll see it's an email

14   thread.  You're not copied on it, but you are the

15   direct subject of it, sir.

16                    Earlier we talked about the

17   national meeting of Express Scripts and the

18   separate meetings called Colos, right?

19   A     Correct.

20        Q     Mr. Henry told me a little bit

21   about that, but this particular email thread is

22   in relation to the -- the May 28 meeting.  I

23   think it was around the middle of the month.

24                    Do you recall?

25   A     I don't remember the exact dates, no.

Page 247

```
 1          Q       Okay.  Well, there was a meeting

 2    that occurred after the 60 Minutes piece, and I

 3    think this email goes to it, because it's

 4    discussing whether or not you or someone else

 5    should address it.

 6                   And if you go to Kelly Glogovac's

 7    email?

 8    A       Yep.

 9          Q       Is it right that Ms. Glogovac and

10    Ms. Thimangu helped prepare you for these

11    meetings?

12    A       Yes.

13          Q       All right.  And the subject is the,

14    Colos, Dr. Miller topics.

15                   And so just so the jury's clear,

16    there's the national meeting where you talk,

17    other executives talk, but then there's these

18    breakout meetings with individual clients?

19    A       They're not individual -- so, they're

20    clients grouped by common themes, like labor

21    clients or commercial clients, military,

22    government, those type of clients.

23          Q       Got it.  And in the thread, you'll

24    see the NDPC?

25    A       Right.
```

1          Q       What does that stand for?

2    A      The National -- National Drug Purchasing

3    Coalition.

4          Q       And that's a group of businesses?

5    A      It's commercial clients that have created

6    a buying group.

7          Q       Not labor, not municipality;

8    it's -- it's businesses?

9    A      I believe so.

10         Q       Okay.  And the CBA beneath that?

11   A      CBA -- how quickly I forget these things.

12         Q       And then there's the PBMC?

13   A      Yeah, the Pharmacy Benefits Management

14   Coalition, so these are also -- they're different

15   business groups that --

16         Q       Who have aligned in a buying

17   coalition?

18   A      Correct.

19         Q       And you would occasionally be

20   invited to go speak at -- at these -- to these

21   folks as an adjunct to the national meeting?

22   A      Correct.

23         Q       So, in this email from Kelly to

24   Rachel -- and you're not copied on it, you're

25   spoken about -- Kelly says, Hi, Rachel, per our

Page 249

1    discussion today, I received some feedback from

2    the Colo leads on what they're -- on what they're

3    like -- what they'd like Dr. Miller to cover

4    during the Colo meeting.

5                    Do you see that?

6    A       Yes.

7            Q       "I did say he will do the same

8    presentation across all groups."

9                    Do you see that?

10   A       Yep.

11           Q       And then it's kind of broken down.

12   There's some general topics.  The third bullet, I

13   was thinking about incorporating the 60 Minutes

14   thing into Tim's talking-points.

15                   Would that have been

16   Tim Wentworth's talking-points?

17   A       I believe so.

18           Q       Do you recall this particular

19   meeting and whether or not you or Mr. Wentworth

20   addressed the 60 Minutes thing?

21   A       I can't -- I don't remember.

22           Q       Well, she seems to be trying to

23   figure that out before they work with you whether

24   it would be in Tim's talking-points or whether it

25   would be a Dr. Miller thing.

Page 250

1              Do you see that?

2    A    Yes.

3         Q    And you just don't recall how that

4    broke down, who did what?

5    A    I don't recall.

6         Q    All right.  Under the NDPC buying

7    group -- and what I -- how I'm reading this, you

8    tell me if -- if my understanding's wrong, Kelly

9    and Rachel are trying to identify topics that

10   these groups want to discuss in the Colo

11   breakouts with you or sometimes just generally,

12   right?

13             MR. FORST:  Objection to the form

14        of the question.

15   BY MR. HAVILAND:

16        Q    Is that how you're reading it?

17   A    It appears that way, yes.

18        Q    And NDPC wanted to talk about drug

19   pricing strategies in light of Acthar and

20   President Trump's drug pricing announcement.

21             Do you see that?

22   A    Yes.

23        Q    They also wanted to talk about

24   excluding rare disease drugs with poor value,

25   right?

1   A       Yes.

2           Q       And is that the phenomena you

3   talked about when you talked about the three

4   buckets, that -- that the PBM will actually

5   exclude older medications that don't have value,

6   or is that something else?

7   A       That's something else.

8           Q       What's Exondys 51?

9   A       Exondys 51 was -- is a drug for spinal

10  muscular atrophy.

11          Q       And is that something the PBM

12  considered excluding?

13  A       We did exclude.

14          Q       You excluded it from formularies?

15  A       I believe so.

16          Q       All right.  So, it wasn't put on a

17  tier; it was just excluded entirely?

18  A       I believe it was excluded.

19          Q       Why?

20  A       It doesn't work.

21          Q       Why doesn't it work?

22  A       I don't know why it doesn't work.

23          Q       So, what does it treat?

24  A       Spinal muscular atrophy.

25          Q       Okay.  It says, Poor value.

1                        How did you -- how did the PBM come

2    to learn that it didn't work?

3    A        Because when you look at the data, they --

4    they were allowed to use surrogate endpoints.

5    They looked at dystrophin mRNA as an endpoint.

6    So, they didn't look at a clinical endpoint.  And

7    when you look at these -- the kids with this type

8    of muscular dystrophy, it did not improve their

9    performance.

10        Q        So, the PBM decided to exclude it

11    from all formularies?

12    A        I believe so.

13        Q        Okay.  I won't ask you about

14    SafeGuard Oncology or the AUM.  We've talked

15    about that with others.

16                The CBA wanted to talk about

17    orphaned drugs and particularly Strensiq.

18                Do you see that?

19    A        Let's see, where?  At the --

20        Q        Bottom.

21    A        Oh, yes.  Okay.

22        Q        Is it right that that drug was

23    2 million a year?

24    A        Yes, and I'm blanking on what Strensiq

25    treats, but I remember -- yes.

1          Q       And is that a covered drug?

2    A       Strensiq was a covered product.

3          Q       Is there any competitor to it?

4    A       I would have to look it up to -- I don't

5    remember off the top of my head.

6          Q       Okay.  Obviously, the coalition --

7    the buying coalition was concerned about it,

8    right?

9    A       They're concerned about expensive drugs.

10         Q       On bullet point 4, What is ESI

11   doing about high-cost meds?

12             Do you see that?

13   A       Yep.

14         Q       "Not sure if this is Dr. Miller or

15   someone else."

16             Was it you?

17             MR. FORST:  Objection to the form.

18   BY MR. HAVILAND:

19         Q       Do you know if you spoke to the CBA

20   about high-cost drugs after 60 Minutes?

21   A       I speak about high-cost drugs in almost

22   every presentation.

23         Q       Well, specifically, because I --

24   you know, this case brought by the City of

25   Rockford is on behalf of payers.  Some of the

1    members of these buying groups may be in the

2    Class, and so I'd like to know if you spoke to

3    members of the Class about the 60 Minutes piece;

4    and then, specifically, what ESI is doing about

5    high-cost medications in light of the 60 Minutes

6    piece?

7    A      Yeah, so --

8                 MR. FORST:  Objection to the -- let

9           me just object to the buildup to that

10          question.

11                (Reporter clarification.)

12                MR. FORST:  Object to the -- the

13          form of the question.  You can just mark

14          that down, Alexis, thank you.

15                THE DEPONENT:  So, I've been

16          speaking about the problem of high-cost

17          drugs for my entire career with

18          Express Scripts.  60 Minutes did not

19          change that.  I continue to speak about

20          the high cost of medications and

21          strategies we have either put in place, or

22          tried to put in place, or have

23          contemplated, but I cannot tell you

24          specifically what my talk was at this

25          meeting.

```
 1   BY MR. HAVILAND:

 2        Q      And you don't recall if you

 3   specifically spoke about the 60 Minutes piece and

 4   how it painted ESI poorly in relation to Acthar;

 5   is that correct?

 6   A      Correct.

 7        Q      A few weeks after the 60 Minutes

 8   piece -- and we've touched on this a little bit,

 9   I want to make sure my understanding is correct.

10   I'm going to go ahead and mark as Exhibit -- I

11   think we're up to 27; is that right?

12   A      Correct.

13        Q      Thank you.  I have such pile in

14   front of me.

15                Miller 27 is previously

16   Henry Exhibit 10, sir.

17                (Exhibit 27 was marked.)

18                (Discussion held off the record.)

19   BY MR. HAVILAND:

20        Q      ExpressScripts Exhibit Number [sic]

21   1096837 through 6841.  I understand Jason Dohm --

22   is that how you pronounce it, D-o-h-m?

23   A      Yes, that's correct.

24        Q      He's within Andy's group beneath

25   you, correct?
```

1    A     I don't believe so.  I think Jason may

2    have been on the VAC committee --

3              Q     Okay.

4    A     -- within -- it's --

5                    (Reporter clarification.)

6                    MR. HAVILAND:  VAC.

7                    THE DEPONENT:  Dohm, on the VAC,

8         V-A-C, committee, which was in the supply

9         chain group.

10   BY MR. HAVILAND:

11             Q     Okay.  That's over in Mr. Neville's

12   group at this time, right?

13   A     That'd be correct.

14             Q     All right.  Let's go to the

15   beginning of the email, which is -- the substance

16   is at 6840.  There's an email from

17   Scott McCutcheon, Friday, May 11, 2018, which is

18   the Friday after the 60 Minutes piece.

19                    Do you have that?

20   A     Yes.

21             Q     Acthar discussion, and it looks

22   like there's a WebEx meeting.

23                    Do you recall getting into a WebEx

24   meeting after 60 Minutes to talk about coming up

25   with a strategy so more clients could have a

1  prior authorization?

2  A      No.

3       Q      Okay.  Do you see what I just read

4  there, Leadership has asked we come up with an

5  Acthar strategy, so more clients have the PA.  We

6  need to determine if we can add to a PA list or

7  package and the implications and operational

8  challenges; do you see that?

9  A      Yes.

10      Q      If you turn the page, and if you

11  can go to, sir, Scott McCutcheon's next email,

12  May 11, at 2:16.  So, it's the same day.  It's

13  about an hour after the -- the WebEx was set to

14  end.

15              Do you have that email at 2:8- --

16  2:16?

17  A      Yes.

18      Q      He talks about who's attending, but

19  then embedded in there is an email from

20  Glen Stettin from the day before, May 10, 2018.

21              Do you have that on page 6839?

22  A      Yes.

23      Q      Mr. Stettin says, Thank you

24  Snezana.

25              And who is Snezana Mahon?

Page 258

1   A       Snezana Mahon is someone who worked in
2   Glen's shop for product development.
3           Q       David Queller?
4   A       He was the head of sales and account
5   management.
6           Q       He's the SAM head?
7   A       Yes.
8           Q       All right.  So, Mr. Stettin writes
9   back to those two individuals, Here is what I'd
10  like to do next -- are you with me?
11  A       Yes.
12          Q       -- add Acthar to all UM bundles --
13  that's utilization management, right?
14  A       Yes.
15          Q       -- so that it is automatically
16  included in all the clients who participate with
17  us.
18                  And then if you skip down to
19  bullet three?
20  A       Yes.
21          Q       "I have discussed with Brian Seiz
22  and Dr. Steve" -- that would be you?
23  A       Correct.
24          Q       -- "both of whom concur with this
25  approach."

Page 259

1                    Do you see that?

2   A      Yes.

3          Q      And did you concur with the

4   approach that was reflected as a leadership

5   decision to add Acthar to all UM bundles for

6   participating clients with Express Scripts?

7   A      I believe I did.

8          Q      All right.  And was it done, sir?

9   A      I do not know.

10         Q      Who would know that?

11  A      Probably Dr. Stettin.

12         Q      Dr. Stettin.  What is the name of

13  his group again?

14  A      Glen was over innovation something -- I

15  can't remember his -- he was the senior VP for

16  innovation, I think.

17         Q      Is he still with the company?

18  A      Yes, he is.

19         Q      What's his title today?

20  Functionally, what does he do?

21  A      Probably -- I believe pretty much the same

22  thing still.

23         Q      Okay.  So, you concurred in the

24  decision that's reflected as a leadership

25  decision to add an Acthar PA to all utilization

Page 260

1    management for contracted clients, right?

2    A      To all those who accept the bundles.

3           Q      Right.  You know, though, that

4    utilization management does not automatically

5    include an Acthar prior authorization?

6    A      Correct.

7           Q      It's an adjunct that payers have to

8    pay separately for?

9    A      So, plan sponsors choose how much

10   utilization management they want for their plans,

11   and we try to do our best to accommodate their

12   needs.

13          Q      Well, Express Scripts offers this

14   utilization bundle, right?

15   A      Correct.

16          Q      And then it offers these a la carte

17   pieces to add into the bundle, right?

18   A      Correct.

19          Q      And one a la carte piece is a -- an

20   adjunct prior authorization that includes Acthar?

21   A      Correct.

22          Q      And you would agree that plan

23   sponsors don't have the ability to understand all

24   that Express Scripts understands about

25   prescription drugs?

Page 261

1              MR. FORST:  Objection to the form,
2         calls for speculation.
3              THE DEPONENT:  So, our clients vary
4         in their sophistication when it comes to
5         what they desire, and we don't completely
6         understand their business like they
7         understand their own business.
8              So, when they're trying to achieve
9         their objectives for their employees, we
10        try to be flexible and help them the best
11        way we can.
12   BY MR. HAVILAND:
13        Q     You would agree that the health
14   plan clients of Express Scripts rely upon Express
15   Scripts' advice in deciding what drugs to cover,
16   and if covered, how to treat them, whether --
17   A     Yeah, health --
18        Q     I'm sorry -- whether with
19   utilization management or otherwise, right?
20              MR. FORST:  Objection to the form,
21         calls for speculation.
22              THE DEPONENT:  So, you're talking
23         about health plans or commercial clients,
24         or --
25   BY MR. HAVILAND:

Page 262

1         Q       Well, that's a fair point.  So, I'm

2    talking about health plans.  Obviously, you've

3    got Home Depot, You've got major corporations.

4    We saw an email the other day --

5    A       Yep.

6         Q       -- that Sanofi is a client.  That's

7    a drug company.

8    A       Yeah, no, we've identified that we

9    represent many of the drug companies.

10        Q       Yeah, yeah.  And they actually had

11   an Acthar spend and contacted Express Scripts and

12   complained about it, but you've got a big drug

13   company that obviously understands pharma.

14   They're a drug company.

15                But then you have smaller plans,

16   like the City of Rockford, right?

17   A       Um-hmm.

18        Q       Yes?

19   A       Yes.

20        Q       And smaller plans, like the City of

21   Rockford, don't have the resources or knowledge

22   that Express Scripts does about prescription

23   drugs, you'd agree?

24   A       Generally --

25                MR. FORST:  Objection.

1                    THE DEPONENT:  Generally, yes.

2    BY MR. HAVILAND:

3         Q      And one of the reasons why small

4    plans, like the City of Rockford, go to

5    Express Scripts is for its expertise?

6                    MR. FORST:  Objection to the form,

7              calls for speculation.

8                    THE DEPONENT:  I -- I assume so,

9              correct.

10   BY MR. HAVILAND:

11        Q      And small plans like that would

12   rely upon, generally, Express Scripts' expertise

13   and recommendations in deciding the formulary

14   composition and whether or not to have

15   utilization management?

16   A      So, we -- we counsel all these plans on

17   what we believe is in the their best interests.

18        Q      And according to what was happening

19   after 60 Minutes, there was some portion of the

20   clients that did not have a prior authorization

21   in place for Acthar, right?

22   A      That's correct.

23        Q      And leadership decided to just

24   include it in all the UM bundles and not have it

25   be an a la carte purchase, correct?

1   A       Correct.

2           Q       And that would be a benefit to

3   plans?

4   A       It may be a benefit to plans.  Plans --

5           Q       Well, they're getting something for

6   free, right, they're getting the PA without

7   having to pay the adjunct charge of it, right?

8   A       The plans choose what they want to do

9   based on their own philosophy.  So, some plans

10  want no disruption.  They're willing to pay for

11  high-priced drugs, because they'd rather have

12  their members being able to access anything

13  they'd like.

14                  There are other plans that,

15  whatever utilization management tool we have,

16  because financially they can't afford to have any

17  excess spend.  And so, it -- it's very dependent

18  on a plan's own philosophy.

19          Q       Well, let's focus on the issue at

20  hand, and that is the decision by leadership, in

21  which you concurred, to make a prior

22  authorization available to all contracted

23  clients.

24                  In the email that we're reading

25  from, Mr. McCutcheon's email, he's got a bullet

1    point that says, Concerns?

2    A      Um-hmm.

3           Q      Do you see that?

4    A      Yes.

5           Q      Does the proposal and sudden change

6    to add and push out PA, at no charge, make ESI

7    appear to admit -- admitting we were do -- we

8    were wrong?

9                  Do you see that?

10   A      Yes.

11          Q      And that was a concern, because ESI

12   had been charging plans -- and it says later,

13   2 pennies per member per month.

14                 Do you see that?

15   A      Yes.

16          Q      And that's how Express Scripts

17   looks at these things when it tells clients, It's

18   going to cost 2 cents per member, per month to

19   have this prior authorization, right?

20   A      Correct.

21          Q      And those pennies, small, become

22   billions of dollars to Express Scripts, right?

23   A      I -- I -- I don't know the math there.

24          Q      Well, you know Express Scripts

25   makes over $100 billion?

Page 266

1    A       $100 billion?

2            Q       Yes, sir.

3    A       I do not know that.

4            Q       You don't know it is the largest --

5    20th largest company in America?

6    A       I do not know we make $100 billion.

7            Q       Well --

8    A       Are you talking about revenue, or are you

9    talking about --

10           Q       I'm talking about, when you look at

11   Fortune 500 companies, that Express Scripts was

12   the 20th largest corporation in America in 2018.

13                   Does that surprise you?

14   A       No, that part doesn't surprise me at all.

15           Q       Okay.  So -- and it's $100 billion

16   in revenue, sir.  $100 billion.

17                   MR. FORST:  That's not -- not a

18           question.

19                   THE DEPONENT:  It's --

20                   MR. FORST:  Just wait for a

21           question.

22                   THE DEPONENT:  All right.

23   BY MR. HAVILAND:

24           Q       You're not surprised to know that

25   the company you work for is the 20th largest in

1    America?

2    A      Correct.

3           Q      All right.  And the way it makes

4    that money is through these services fees and --

5    and other ways that we won't get into, it makes

6    money out of CuraScript, Accredo, and UBC, and

7    we've covered that a little bit, right?

8                  MR. FORST:  Objection to the form

9           of the question, vague, ambiguous.

10                 THE DEPONENT:  Yes, we've discussed

11          that.

12   BY MR. HAVILAND:

13          Q      Yeah, we saw the $13 million math.

14                 The PBM, however, sir, just so the

15   jury's clear about it, it makes money through the

16   services it provides to the plans; consultation,

17   putting plan designs together, creating

18   formularies, utilization management, and other

19   services, right?

20   A      Correct.

21          Q      And so, when the ad hoc PA for

22   Acthar, and I'm in the -- under, Considerations,

23   the circle, AUM Package Savings Erosion, ad hoc

24   PA cost equals $0.02 PM/PM -- and that stands for

25   per member, per month, right?

Page 268

1    A      Correct.

2           Q      Because Express Scripts goes to

3    plan clients and says, We look at your spend, in

4    terms of your members, per member, per month,

5    right?

6                       MR. FORST:  Objection --

7                       THE DEPONENT:  Correct.

8                       MR. FORST:  -- to the form.

9    BY MR. HAVILAND:

10          Q      And this utilization management

11   tool that you described for us this morning, sir,

12   right?

13   A      Um-hmm.

14          Q      Remember, you said, direct

15   contracting, and you said, utilization

16   management, and you said, the media, and we've

17   covered -- we've covered the media, and we

18   covered direct contracting.

19                  This is utilization management,

20   right?

21   A      Correct.

22          Q      And prior authorization is a form

23   of utilization management?

24   A      Correct.

25          Q      It's not free?

Page 269

1    A      Correct.

2           Q      Express Scripts charges plan

3    clients for that service, right?

4    A      Correct.

5           Q      And in this case, the ad -- the ad

6    hoc PA, because it wasn't in general utilization

7    management bundles, was costing plans who elected

8    to have it 2 cents per member, per month, right?

9    A      That's what this appears to say.

10          Q      Right.  But not everybody had that,

11   correct?

12   A      Correct.

13          Q      And after 60 Minutes, leadership

14   made a decision, in which you concurred, to just

15   give everybody the Acthar PA without any

16   additional cost; isn't that correct?

17   A      What I concurred with was adding it to the

18   bundle, correct.

19          Q      Right.  And that pushed out the

20   Acthar PA to every plan contracted with

21   Express Scripts for utilization management,

22   correct?

23   A      I don't think that's correct.

24          Q      What's wrong about that?

25   A      People still have to opt into the bundles.

1    Not everyone takes the bundles.

2         Q     No, I thought I put it in my

3    question -- I appreciate the clarification -- if

4    a plan had the bundle, but didn't have the ad hoc

5    PA, leadership said, Give it to everybody who has

6    the bundle?

7    A     Correct.

8         Q     And that was a substantial quantity

9    of people that didn't have the Acthar PA?

10   A     I --

11               MR. FORST:  Objection to the form.

12               THE DEPONENT:  I don't have -- I

13        can't quantify that for you.

14   BY MR. HAVILAND:

15        Q     Well, it was done in the email,

16   sir.

17   A     Okay.

18        Q     Pulling the value from the

19   adjunctive PA to the limited PA -- and that's

20   just one of the bundles, right?

21               The limited PA is part of the AUM,

22   which is the larger utilization management

23   program --

24   A     Um-hmm.

25        Q     -- by Express Scripts, right?

1    A      Yes.

2           Q      Pulling the adjunctive to limited

3    reduces the value of the adjunctive and increases

4    the limited result, so what -- what's happening

5    here is the business folks at the PBM are looking

6    at implementing this decision of leadership to

7    push out the Acthar PA as part of these bundles,

8    and -- and the implication is it's going to

9    lessen the values of other bundles and lessen the

10   value of the adjunct -- they call it the ad hoc

11   PA, right?

12   A      Correct.

13           MR. FORST:  Objection to the form.

14   BY MR. HAVILAND:

15           Q      And it says --

16           MR. FORST:  Let me just get in the

17           objection --

18           THE DEPONENT:  I'm sorry.

19           MR. FORST:  -- between the question

20           and answer.

21   BY MR. HAVILAND:

22           Q      It says the result is to, Decrease

23   the value to step up to a more restricted

24   package, right?

25   A      Correct.

Page 272

1        Q      Because the general utilization

2   bundle doesn't have all these bells and whistles,

3   right?

4                    MR. FORST:  Objection to the form.

5                    THE DEPONENT:  Yeah, I'm not sure

6          characterizing it as bells and whistles

7          is --

8   BY MR. HAVILAND:

9        Q      It doesn't have all the prior

10  authorization policies that are out there to deal

11  with high-cost drugs?

12  A      Correct.

13       Q      Plans have to step up, and there's

14  a chart somewhere that shows a -- a line going

15  up, as you add these different bundles, you're

16  getting more and more prior authorization

17  protection, right?

18  A      That is correct.

19       Q      But if you move the Acthar prior

20  authorization down into general utilization --

21  utilization, you're enhancing the value of

22  utilization for -- for no additional cost, but

23  you're diluting the value of more restricted

24  prior authorizations up the ladder, right?

25  A       Correct.

1          Q       So, that's what this is doing, it's

2    looking at that analysis, and there's a bullet

3    here that says, Greater than approximately

4    2 million lives with the Acthar PA.

5                    Do you see that?

6    A      Yes.

7          Q       That -- that's a small portion of

8    the patient population covered by Acthar -- or

9    Express Scripts as a PBM, right?

10   A       That is correct.

11         Q       And so, the analysis goes on and

12   looks at the implications to Express Scripts of

13   that decision and implementing that decision,

14   you'd agree?

15   A      It looks at some of the implications,

16   correct.

17         Q       And you would assume, by those that

18   are all copied here, that they were knowledgeable

19   about the subject matter, so that Mr. Stettin

20   could put together a listing of concerns,

21   considerations, results, and timing, right?

22                  MR. FORST:  Objection to the form.

23                  THE DEPONENT:  That appears to be

24        what this is about, yes.

25   BY MR. HAVILAND:

Page 274

1          Q       And you weren't brought into those

2    details when they said that Dr. Steve concurred;

3    you were just asked, generally, Do you concur

4    with the idea of giving out this Acthar PA for

5    free?

6    A       Correct.

7          Q       All right.  And you don't know if

8    it was implemented?

9    A       Correct.

10         Q       So, let's follow the thread.  And I

11   realize, sir, you weren't copied on it, but you

12   were mentioned in the thread.  So, they did come

13   out to you and -- and get your opinion --

14   A       Um-hmm.

15         Q       -- and you provided that, yes?

16   A       Correct.

17                 MR. FORST:  Objection -- well,

18         again, objection to the form.

19                 MR. HAVILAND:  Yeah, I'm sorry, our

20         pace has -- has hopped up a little bit

21         here.

22   BY MR. HAVILAND:

23         Q       So, if you go with me to 838,

24   Mr. McCutcheon's May 24, 2018 email.

25                 You with me?

1   A      Yes.

2           Q      To Kelcey Blair and Jason Martin.

3                  Do you know who they are?

4   A      I know who Kelcey is.  I don't believe I

5   know Jason.

6           Q      They work for the PBM?

7   A      Yes, they do.

8           Q      And he's asking, Do we have any

9   updates on progress of research and feasibility

10  of adding an age edit to the PA and tightening

11  criteria?

12                 Do you see that?

13  A      Yes.

14          Q      And there's a question earlier from

15  Katie Kirk about age edits below that.

16                 Do you see that?

17  A      Yes.

18          Q      And if you go to the face page, I

19  want to go to Mr. McCutcheon's email from

20  Thursday at 9:00 a.m.

21                 Do you see that?  It's in the

22  center.

23  A      Yes.

24          Q      He says, I'm sitting with Andy at

25  the airport.

1                    Do you see that?

2    A     Yes.

3          Q     That's Andy Behm?

4    A     I assume so.

5          Q     "P&T has ruled optional, so Andy is

6    recommending blocking and using current PA

7    criteria as exception criteria."

8                 I think earlier today, this is what

9    you described about changing the coverage policy

10   for Acthar to make it optional, right?

11   A     The -- the bucketing of Acthar to the

12   optional -- that it's an optional product.

13         Q     Okay.  And that was done, the

14   decision was made with respect to the Medicare

15   formulary, right?

16   A     Yeah, I -- I do not know what formulary

17   they're talking about here.  So, that would be --

18   have to be addressed with Andy.

19         Q     I -- I'll do that, but you do

20   recall that it was done in the context of the

21   Medicare formulary?

22   A     Yes.

23         Q     And you described, because they all

24   have babies that are covered under Medicare,

25   right?

1    A       Right.

2            Q       If you look above that,

3    Kelcey Blair says, If P&T has changed their

4    parameter, Jason, I assume this would go back to

5    VAC.  He says, Yes, we'll be reviewing during our

6    annual review.

7                    You told me what the VAC was.  I

8    appreciate that, because I didn't know what that

9    reference was.

10                   That is the -- the cost arm that

11   evaluates a cost element of a decision,

12   independent from the P&T?

13   A       Correct.

14           Q       All right.  And so, they would look

15   at that decision -- that coverage decision and do

16   their cost analysis?

17   A       It's not a cost analysis of what a -- the

18   functions of Express Scripts.  They do a value

19   assessment of the product.

20           Q       What I'm trying to understand is,

21   you know, Acthar is such an old medication, and

22   the value assessment was done a long time ago in

23   terms of coverage.

24   A       It's reviewed annually.

25           Q       Okay.  All drugs are reviewed

1   annually?

2   A       I believe so.

3          Q       Okay.  So, if there's a change in

4   coverage criteria, even for the government, that

5   would go back to VAC.  And he -- and she says,

6   Jason says it will be done on the annual review,

7   right?

8   A       Yes.

9          Q       And that's how you understand that

10  works?

11  A       Yes.

12         Q       And do you know, if, in fact -- so,

13  we know that P&T ruled optional in Medicare,

14  right?

15  A       That's correct.

16         Q       You don't know if the P&T Committee

17  ruled optional in the commercial plans, right?

18  A       Or any other formulary.

19         Q       You don't know that?

20  A       Correct.

21         Q       All right.  The email from

22  Scott McCutcheon says, Andy is recommending

23  blocking.

24                  What -- what is that referring to?

25                  MR. FORST:  Objection, calls for

1        speculation.

2               THE DEPONENT:  So, when you move a

3        drug from include to optional, you still

4        want to make sure you're controlling

5        utilization.  So, that's where you may

6        want to make sure that there's a PA, for

7        instance, that only people with infantile

8        spasm or MS exacerbations are getting the

9        drug.

10  BY MR. HAVILAND:

11     Q    And that is done as an edit at the

12  pharmacy level, right?

13  A    That is done -- so, prior authorization is

14  done at the pharmacy level.

15     Q    Yes.  For a pill dispensed at the

16  pharmacy, that'd actually pop up on the screen

17  for the pharmacy that there was some edit there

18  that -- something more that needs to be done

19  before the script gets filled?

20  A    That's correct.

21     Q    In the specialty arena, it's done

22  through a more convoluted process, through prior

23  authorization review, clinical review, and the

24  like, right?

25  A    That's correct.

1        Q       Similar, but different type of

2    pharmacy operation, right?

3    A       Correct.

4        Q       And so, in the specialty pharmacy

5    arena, would you still have a block and then a

6    review to see if it would be allowed as optional?

7    A       I would have to defer to people who are

8    more expert.

9        Q       Okay.  You don't know how --

10   functionally how that works.  Okay.

11                   And -- and I do want to make sure

12   I'm asking all you know.  I'll tell you what, I

13   have a couple of other emails where you're

14   involved with Andy --

15   A       Um-hmm.

16       Q       -- so let's go through those, and

17   then I'll make sure I've gotten what I can get on

18   this subject for what you know.

19                   So, we're up to number 28.

20                   (Exhibit 28 is marked.)

21   BY MR. HAVILAND:

22       Q       This is Exhibit 28.  I don't know

23   why this doesn't have Bates numbers on it.  It

24   was a -- it comes from the Express Scripts

25   production.

Page 281

1                    MR. HAVILAND:  For those on the

2          Zoom, it doesn't have Bates numbers on it.

3    BY MR. HAVILAND:

4          Q     It is an email thread between

5    Andy Behm and Dr. Miller, dated May 21, 2018.

6    So, it's a couple of days before the Jason Dohm

7    thread of the 24th and the leadership decision

8    that was made May 11.  So, we're -- we're in that

9    window, Doctor.  You'll see Mr. Behm writes, P&T

10   decision from last week, see below.

11                   Do you see that?

12   A     Yes.

13         Q     And the email -- what's embedded in

14   the email says, Proprietary and confidential, do

15   not distribute.

16                   You had access to P&T decisions,

17   right?

18   A     Yes.

19         Q     As the clinical head?

20   A     Um-hmm.

21         Q     Yes?

22   A     Yes.

23         Q     Obviously, Mr. Behm did, because he

24   ran the group that monitored the P&T inside

25   Express Scripts, right?

1   A       Correct.

2           Q       Do you know who else got

3   dissemination of this type of information from

4   P&T?

5   A       I don't -- you'd have to ask Andy.  I

6   can't give you the -- what their distribution is.

7           Q       Okay.  He doesn't make direct

8   reference to the subject we're talking about here

9   with Acthar, but if you go into the email, he

10  says, Here are the parameters established at the

11  May 27, 2018 ESI National P&T Committee Meeting.

12                  And that's -- is it always a

13  national meeting?

14  A       ESI National P&T is.  So, there's more

15  than one P&T.  A subgroup of the national P&T is

16  the Medicare P&T.

17          Q       Okay.  And then is there one for

18  commercial?

19  A       The national P&T is for overseas

20  commercial.

21          Q       I see.  Government's a subset?

22  A       Medicare's a subset.

23          Q       Under the bottom, it says, Existing

24  medications, Acthar changed from include to

25  optional.

```
 1                    And that's what you described for

 2   us, right?

 3   A        Correct.

 4        Q        And so, just so we can nail this

 5   down, sir, does this pinpoint in your mind that

 6   that decision to change to optional was done at

 7   this national meeting, May 17, 2018, and you

 8   learned about the decision through this email

 9   from Andy Behm?

10   A        That would be correct.

11        Q        All right.  Now, I want to --

12   A        But, again, just to be clear, I don't know

13   if this is pertaining to the Medicare formulary

14   or the commercial formularies.

15        Q        Yeah, and I don't have anything

16   further --

17   A        Yep.

18        Q        -- to show you, sir, that you're

19   on.

20   A        Right.

21        Q        I believe we have your emails --

22   entire from this time, but I -- that's all I

23   have, so --

24   A        Yep.

25        Q        -- if you don't remember, that's
```

Page 284

1    all I can add.

2    A      Yep.

3         Q      All right.  I do have one more

4    subject from this time period I want to ask you

5    about.  It's just after 60 Minutes, but it

6    relates to a different subject matter.

7                   I'm going to mark this as

8    Exhibit 29.

9                   (Exhibit 29 was marked.)

10   BY MR. HAVILAND:

11        Q      It was previously marked as

12   Henry Exhibit 9.  Exhibit Miller 29 is

13   ExpressScripts4848402 through 8406.

14                  Just to orient ourselves, we looked

15   at some of these emails earlier, sir.  If you go

16   to 8406, you'll see the CBS News piece about

17   60 Minutes.  And then you'll come forward, you'll

18   see some of the Brian Henry emails, somewhat

19   redacted.

20                  I just want to bring you forward to

21   the second page at 8403, there's a new email that

22   picks ups after Brian Henry's email from the

23   night of 60 Minutes.  Adam Kautzner to

24   Jason Dohm, Not sure what we are doing on rates.

25                  And then right above there, there's

Page 285

1    an email from Mr. Dohm that says, Is there -- is

2    this an opportunity to obtain a better rate from

3    Mallinckrodt?

4              Do you see that?

5    A     Yes.

6         Q     And I asked you, was there ever an

7    opportunity taken to talk to Mallinckrodt about

8    rates?

9              And I want to see if you -- this

10   helps to refresh your recollection about a

11   subject you know.  If not, that's fine.

12             Jason Dohm -- so, Mr. Henry thought

13   there was a time when he was in your group under

14   Mr. Behm, but then he was also in pharma

15   contracting at one point.

16             Do you know where he was at this

17   time?

18   A     This would be -- he would be in supply

19   chain at this time.

20        Q     Under Mr. Neville, yes?

21   A     Yes.

22        Q     How about Michael Rothrock?

23   A     I believe he is also in supply chain.

24        Q     And Jeffrey Todd [sic]?

25   A     Same.

Page 286

1          Q      Todd Jeffrey.

2                 All right.  So, then his question

3     goes to -- from Michael Rothrock to Todd Jeffrey,

4     You and Tom may want to discuss if this opens up

5     any additional rebates options on Acthar Gel.

6                 Dohm then asks, What other drugs

7     does Mallinckrodt manufacture?  Can we apply

8     pressure to their other product line?

9                 Todd Jeffrey says, Acthar is the

10    only rebated product -- product under contract.

11    Tom -- I think that's Tom Abson -- Any other

12    intel here?

13                And then Mr. Dohm says, I will

14    determine if they have any non-contracted drugs

15    we could exclude.

16                Do you see that?

17    A      Yes.

18          Q      We touched upon this, but I wanted

19    to make sure I understood your understanding

20    about it.

21                One way that the PBM can control

22    costs and reduce costs with a manufacturer is by

23    looking at its book of drugs and saying, We're

24    going to treat this particular drug one way and

25    another drug a different way under formulary

Page 287

1    controls and otherwise, right?

2    A      Yes.

3           Q      Mallinckrodt doesn't just make

4    Acthar, right?

5    A      Correct.

6           Q      In fact, Mallinckrodt was -- maybe

7    still is -- the largest manufacturer of generic

8    opioids; did you know that?

9    A      I knew they made generic opioids.

10          Q      They've since settled, and they've

11   gone through bankruptcy, and all sorts of things.

12                 But when the folks in this thread

13   are talking about, Can Express Scripts apply

14   pressure to their other product line, they would

15   be looking at products other than Acthar in terms

16   of bringing pressure to the manufacturer to do

17   something on rates for Acthar, right?

18   A      The job -- their job is, each and every

19   day, to look to see how they can lower drug

20   prices, and this would be one mechanism by which

21   they could lower drug prices, or potentially.

22          Q      And do you know if, in fact, the

23   folks in this group ever went to Mallinckrodt --

24   hold on -- after 60 Minutes and applied pressure

25   through their other product lines, either opioids

1    or some of their other branded products, in order

2    to extract pricing concessions for Acthar?

3    A      And as I've stated before, I do not.

4          Q      Okay.  It's fair to ask, because

5    this is right in the wheelhouse where you are

6    copied on some emails, but -- and did you know at

7    the time that Acthar was a rebated product?

8    A      I do not know the financial relationships

9    with these drugs.

10         Q      Okay.  Do you know when the rebate

11   came about?

12   A      Again --

13                MR. FORST:  Objection, asked and

14         answered.

15                THE DEPONENT:  -- I do not know.

16   BY MR. HAVILAND:

17         Q      Well, let me show you a document,

18   and see if we -- there's something more to talk

19   about.

20                (Discussion held off the record.)

21   BY MR. HAVILAND:

22         Q      All right.  You are familiar,

23   though, sir, that Express Scripts has a Preferred

24   Savings Grid Rebate Program; are you not?

25   A      Yes.

Page 289

1          Q       And that's one way the PBM

2     contracts with pharma to get financial value back

3     for its plans, right?

4     A       Correct.

5          Q       Through rebates?

6     A       Correct.

7          Q       Okay.  And just so the jury's

8     clear, that's different from the price being

9     charged; the price charged is the price charged;

10    whether it's discounted or not, we can leave

11    aside.

12                 A rebate is money that comes back

13    later after the expenditure's been made, right?

14    A       That's correct.

15         Q       Okay.  I -- I just don't want to

16    assume that they understand what we're talking

17    about.

18                 And so this Preferred Savings Grid

19    is a program that's offered to a whole host of

20    pharma companies to participate with Express

21    Scripts and provide rebates for their products,

22    right?

23    A       That is correct.

24         Q       And some or all of those rebates

25    might be passed on to the plans, but that's a

Page 290

1    different issue?

2    A      That's correct.

3           Q      Okay.  Let me mark, as Exhibit 30

4    to your deposition, an amendment to a rebate

5    contract between Mallinckrodt and Express

6    Scripts, and it's signed by Adam [sic] Adamcik,

7    who was the vice president of pharma strategy and

8    contracting at the time.

9                  (Exhibit 30 was marked.)

10   BY MR. HAVILAND:

11          Q      Take a moment and see if you've

12   seen that before today.  If you haven't, that's

13   fine.  I'm going to ask you a question.

14   A      Never seen it.

15          Q      And you don't get involved in -- in

16   pharma contracting, reviewing contracts, right?

17   A      No, sir.

18          Q      Mr. Adamcik, that's his role?

19   A      That's correct.

20          Q      He's a direct report to

21   Mr. Wentworth at this time?

22   A      That is -- I believe he's a direct report

23   to Everett Neville at this time.

24          Q      I see.  Because there's a point

25   where Neville came in and then reported -- he had

1   folks reporting up to him before it went up to

2   Mr. Wentworth, right?

3   A      So, Ed is -- this is a group within supply

4   chain.

5          Q      I see.  Okay.  I didn't know that.

6                 The contracting group was part of

7   supply chain; is that right?

8   A      I believe so, unless specialty -- yeah, I

9   mean, this is Express Scripts, so this would be

10  part of supply chain.

11         Q      Okay.  This is an amendment to

12  another agreement I'm not going to show you.  I

13  wanted to show you the amendment, because it's --

14  it relates to the issue we're talking about.  If

15  you'll turn to page 2 of it, you'll see that

16  it -- it only relates to Acthar.

17                Do you see that?  It is really hard

18  to read.  Do you see the rebate program

19  commercial?

20  A      Yes.

21                MR. FORST:  Okay.  I'm just -- I'm

22         just going to lodge a standing objection,

23         foundation.

24                MR. HAVILAND:  You can have it.

25                For the record, I'm sorry, this

1          is -- Exhibit 30 is ExpressScripts0000434

2          through 449.  This is a contract that was

3          produced by Express Scripts very early on

4          in the case.  It's Number 400.

5     BY MR. HAVILAND:

6          Q     Do you see how, on page 2, it's

7     relating to Acthar?

8     A     Yes.

9          Q     And the exhibit -- Attachment A-2

10    to Exhibit A has an HP Acthar Gel Model Policy.

11             Do you see that reference --

12    A     Exhibit --

13         Q     -- at page 3 of the document?

14    A     Yes.

15         Q     And then if you turn with me, sir,

16    there is a statement that says, HP Acthar Gel

17    Model Policy Language Guidance.

18             Do you have that?  It's at

19    Bates number 437.

20    A     Yes, sir.

21         Q     Okay.  And then this -- this policy

22    goes on through the end of the document, all the

23    way through to 449.  I only want to focus on the

24    couple of lines with you.

25             You see that the model policy

Page 293

1    language in the first full paragraph says, Acthar

2    is approved by the US Food and Drug

3    Administration for 19 indications; do you see

4    that?

5    A     Yes.

6          Q     We talked this morning.  That --

7    that's not accurate, right, it's approved for two

8    indications?

9    A     That's -- you're correct.

10         Q     And then if you skip down, it says,

11   Please note that this model policy includes a

12   whole bunch of things, in terms of therapies and

13   so on.

14               I just want to get to the third

15   page, which says -- at 438, and then it -- it

16   goes through the various indications and uses.

17   If you go to the top, it's page 2, it says,

18   Effective date, HP Acthar Gel, Acthar, is

19   approved by the FDA and is a covered therapy for

20   the following indications and uses.

21               You with me?

22   A     Yes.

23         Q     And then it lists infantile spasms,

24   right?

25   A     Yes.

```
 1           Q       Acute exacerbations of MS?

 2    A      Yes.

 3           Q       And -- and we agree that they are

 4    FDA-approved indications, right?

 5    A      Um-hmm.

 6           Q       Yes?

 7    A      Yes.

 8           Q       And then proteinuria and nephrotic

 9    syndrome; did I say that correctly?

10    A      Proteinuria and nephrotic syndrome,

11    correct.

12           Q       That is not an approved --

13    FDA-approved indication for Acthar, correct?

14    A      Correct.

15           Q       And then on the next page,

16    dermatomyositis/polymyositis, I think that's

17    DM/PM, right?

18                   I like the shorthands better,

19    but -- I can't pronounce these, but what -- what

20    is that disease?

21    A      So, these are -- myositis is inflammation

22    of the muscles, and so this is dermatomyositis.

23    It's skin and muscle inflammation; or

24    polymyositis is when there's multiple muscles

25    that are inflamed.
```

Page 295

1          Q       Okay.  And Acthar is not approved

2    by the FDA for that disease, correct?

3    A       Correct.

4          Q       Rheumatoid arthritis, or RA I like

5    to call it, Acthar is not approved for that

6    either?

7    A       Correct.

8          Q       Systemic lupus, Acthar is not

9    approved for that?

10   A       Correct.

11         Q       Ophthalmic -- eye -- eye

12   conditions, right?

13   A       Correct.

14         Q       Acthar is not approved for that?

15   A       Correct.

16         Q       Sarcoidosis, is that correct?

17   A       Sarcoidosis, yes.

18         Q       I'm getting there.

19   A       Yep.

20         Q       I don't even play a doctor on TV.

21               Sarcoidosis is a -- that's not

22   approved for Acthar, right?

23   A       Correct.

24         Q       And then the rest.

25               And -- and, sir, did anybody come

Page 296

1    to you and ask your opinion about whether or not

2    the PBM should be requiring plans to cover a host

3    of nonFDA-approved indications for Acthar as a

4    condition for getting a rebate?

5                    MR. FORST:  Objection to the form.

6                    THE DEPONENT:  This is totally

7            outside my area.  I don't know the

8            relevance of the document or the -- these

9            are contracts that are better, you know --

10           these questions better suited for the

11           teams that make these contracts.

12   BY MR. HAVILAND:

13       Q     And I -- I'm going to have an

14   opportunity --

15   A     Yep.

16       Q     -- with Mr. Adamcik and some

17   others.  I just want to make clear, because

18   you're the chief medical officer --

19   A     Correct.

20       Q     -- you understand the medicine,

21   right?

22   A     Correct.

23       Q      There was some issue yesterday.

24               Is there anyone above you in the

25   hierarchy of Express Scripts, and I'm just going

Page 297

1    back to pre-Cigna, that -- that understands the

2    clinical medical aspects of the drugs better than

3    you?

4    A    So, I think I would be arrogant for me to

5    say I understand the clinical evidence --

6         Q    That's fair.

7    A    -- of the drugs better than anyone.

8         Q    But --

9    A    But there is -- but I report to

10   Mr. Wentworth, and Mr. Wentworth --

11        Q    Yeah.

12   A    -- has less understanding than me, so...

13        Q    Fair enough.  He'd looked to you

14   for that type of information, right?

15   A    Correct.

16        Q    All right.  And when the company

17   had you go out and speak about these issues, the

18   company recognized that you knew what you were

19   talking about?

20   A    Hopefully.

21             MR. FORST:  Objection to the form.

22             MR. HAVILAND:  Okay.  Let's take a

23        break, and I'm going to go through this

24        stack, which I didn't get to do at lunch,

25        and try to get it down to something that I

Page 298

1         can get through, and then we're going to

2         finish up at the next break, okay?

3                MR. FORST:  Okay.

4                MR. HAVILAND:  Thank you.

5                THE VIDEOGRAPHER:  We are going off

6         the record at 3:22 p.m.

7                (Break taken.)

8                THE VIDEOGRAPHER:  We are back on

9         the record at 3:40 p.m.

10  BY MR. HAVILAND:

11        Q    So, Dr. Miller, I have no further

12  questions.  I have a bunch of subjects that I --

13  I might have covered with you, but I do want to

14  ask you before we break.

15              You're still employed as a

16  consultant, right?

17  A     To Cigna, yes.

18        Q    And do you have an expectation

19  you'll continue as a consultant through this

20  year?

21  A     I believe I'll be -- my contract is

22  through December 31st.

23        Q    Okay.  So, you have a contractual

24  obligation.  And do you expect after that, you'll

25  be done?

Page 299

1    A     Most likely.

2          Q     Okay.  I don't want your personal

3    address.  I know you put your business address.

4                What -- what city and state do you

5    live in, sir?

6    A     I live here in St. Louis.

7          Q     You live in St. Louis.  Okay.

8                And you've lived there for a while?

9    A     30 some odd years, yes.

10         Q     No expectation of moving?

11   A     No.

12         Q     Okay.  Well, with that, I have no

13   further questions, and I appreciate your time

14   today.

15   A     Thank you very much.

16         Q     I said I would try to be judicious,

17   and --

18   A     Yep.

19         Q     -- I know at times we weren't, but

20   we've gotten to good place.

21               MR. HAVILAND:  So, I would ask

22         that, if Counsel has questions following

23         my examination, we close the Rockford

24         record, and then I would tender the

25         witness.

Page 300

```
 1              MR. FORST:  No questions.
 2              MR. HAVILAND:  Okay.  Anna, you're
 3         up.
 4              MS. HIGGINS:  Dr. Miller, good
 5         afternoon.  I will make this quick.
 6              Actually, I'm going to send these
 7         exhibits to Matt real quick.  I just got
 8         his email.  One second.  I'm sorry, I
 9         apologize, it's a little clunky by Zoom,
10         but I will make this as quick as possible,
11         so that you can get out of here.
12                      EXAMINATION
13    BY MS. HIGGINS:
14         Q    So, I just have a few follow-up
15    questions to what Mr. Haviland asked,
16    specifically kind of to just try to nail down
17    some -- some timelines based on what you've
18    already testified to.
19              So, I'm going to pull up --
20    actually, let me go ahead and do this.  So,
21    earlier, do you recall that you testified that
22    you met with Dr. Steve Romano from Mallinckrodt?
23    Do you recall testifying to that?
24    A    Yes.
25         Q    Okay.  And you -- do you recall
```

Page 301

1   testifying that you may have spoken to him on the

2   phone at some point in time?

3   A      Yes.

4          Q      Okay.  So, I'm going to mark as

5   Exhibit 31 ExpressScripts0515829.  I'll screen

6   share it with you.

7                  (Exhibit 31 was marked.)

8                  MR. HAVILAND:  Anna -- Anna, I just

9           added the reporter to my reply, so if you

10          want to use that thread, it will take care

11          of one extra step.

12                 MS. HIGGINS:  I'm sorry, sorry.

13          The sound quality is a little rough.

14                 MR. HAVILAND:  I just put Alexis on

15          my email, so you have the court reporter.

16                 MS. HIGGINS:  Thank you.  Okay.

17          Sorry.

18   BY MS. HIGGINS:

19          Q      Dr. Miller, can you see my screen?

20   Do you see an email?

21   A      Yes.

22          Q      Okay.  So, this is an email, we're

23   going to start at the bottom here and scroll down

24   to the bottom.  It's an email from Steven Romano

25   to you, dated November 20th, 2015.  And I'm just

1   going to read quickly from the second paragraph

2   here.

3            It says, My understanding is that

4   you have some questions regarding several of our

5   products, including Acthar, and this was an

6   opportunity for us to consider how best

7   Mallinckrodt could address those questions or

8   concerns.  I was hoping to get a sense -- better

9   sense of any specific product issues, so we could

10  then address in a small face-to-face meeting with

11  me and perhaps several of my scientists and

12  clinicians.  Given the proximities of our

13  company's headquarters, that could likely be

14  easily accommodated by both sides.

15           Dr. Miller, does this refresh your

16  memory about the timing of when you may have met

17  with Dr. Romano?

18  A    This would be -- this would probably help

19  my memory, yes.

20       Q    Okay.  So, you believe that your

21  meeting with Dr. Romano would have been after

22  November 20th, 2015?

23  A    That would probably be correct, yes.

24       Q    Okay.  And in this email, it says

25  that you -- he was -- he was made aware that you

1    may have some questions regarding several of

2    their products, including Acthar.

3              Do you have any recollection of

4    what your questions would have been?

5    A     I think -- I think this was his kind way,

6    but you'd have to ask him, of asking why I think

7    their drug isn't very good.

8         Q     Okay.  All right.  Moving on.  Oh,

9    I'm sorry, let me go back to this for a second.

10   Okay.

11             And earlier, Dr. Miller, you

12   testified that Acthar was changed from clinical

13   include to clinical optional at some point; is

14   that right?

15   A     On the -- that I'm aware of, on the

16   Medicare formulary.

17        Q     Medicare formulary.  Okay.

18             And Mr. Haviland showed you a few

19   exhibits, specifically Exhibit 27 and 28, that

20   indicated it was changed in -- to optional in

21   2018.

22             Do you recall that?

23   A     I believe I -- I saw those exhibits.  I

24   don't know if that is when it was made optional

25   in the Medicare formulary or if it's subsequently

1   been made optional in other formularies.

2        Q     Okay.  Thank you.  I'm going to

3   mark, as Exhibit 32, ExpressScripts0975522.

4              Dr. Miller, can you see this email

5   from Andrew Behm --

6   A     Yep.

7        Q     -- to David Whitrap?

8   A     Yes.

9              (Exhibit 32 was marked.)

10  BY MR. HAVILAND:

11       Q     Okay.  It's dated November 9th,

12  2015.  And if you look at the second paragraph,

13  it says, On the Medicare Part D side, again,

14  confidentially, we flipped Acthar to optional

15  status approximately two years ago.

16             So, based on this email, would that

17  indicate that the Medicare status was flipped to

18  optional in 2013?

19  A     That's -- that is possible.

20       Q     Okay.  I think I only have one more

21  question for you.  Previously, you discussed with

22  Mr. Haviland, in 2018, that Express Scripts

23  wanted to add the Acthar prior authorization to

24  the UM bundles.

25             Does that -- do you recall that?

1    A      I recall that discussion, yes.

2           Q      Okay.  Do you know if that was

3    applied to the Medicare plans as well, or was it

4    only for commercial?

5    A      I can't give you -- I don't know the

6    specifics.

7           MS. HIGGINS:  Okay.  Thank you.

8        Those are -- that's all my questions.

9           THE DEPONENT:  Thank you.

10          MR. HAVILAND:  Okay.  Dr. Miller,

11       you're done.

12          MR. FORST:  Yeah, no more -- no

13       questions from us.

14          THE VIDEOGRAPHER:  We are going

15       off -- we are going off the record at

16       3:47 p.m.

17          MR. HAMANN:  We would like

18       definitely the rough and the standing

19       order.

20          (Deposition recessed at 3:51 p.m.)

21                  - - - -

22

23

24

25

1              C E R T I F I C A T E

2

3         I, Alexis A. Jensen, RPR, CRR, a

4    Certified Shorthand Reporter, do hereby certify

5    that prior to the commencement of the

6    examination, DR. STEVEN MILLER was duly sworn by

7    me to testify to the truth, the whole truth, and

8    nothing but the truth.

9         I DO FURTHER CERTIFY that the foregoing

10   is a true and accurate transcript of the

11   deposition of said witness who was first duly

12   sworn by me on the date and place hereinbefore

13   set forth.

14        I FURTHER CERTIFY that I am neither

15   attorney nor counsel for, nor related to or

16   employed by, any of the parties to the action in

17   which this deposition was taken, and further that

18   I am not a relative or employee of any attorney

19   or counsel employed in this action, nor am I

20   financially interested in this case.

21

22        _____

23        Alexis A. Jensen
          Notary Public
24        My Commission Expires 01/31/23
     Dated: _____
25

Page 307

1                    INSTRUCTIONS TO WITNESS

2

3          Read your deposition over carefully.  It

4    is your right to read your deposition and make

5    changes in form or substance.  You should assign

6    a reason in the appropriate column on the errata

7    sheet for any change made.

8          After making any change in form or

9    substance, and which have been noted on the

10   following errata sheet, along with the reason for

11   any change, sign your name on the errata sheet

12   and date it.

13         Then sign your deposition at the end of

14   your testimony in the space provided.  You are

15   signing it subject to the changes you have made

16   in the errata sheet, which will be attached to

17   the deposition before filing.  You must sign it

18   in front of a witness.  The witness need not be a

19   notary public.  Any competent adult may witness

20   your signature.

21         Return the original errata sheet to the

22   court reporter promptly!  Court rules require

23   filing within 30 days after you receive the

24   deposition.

25

```
 1                           ERRATA SHEET

 2      PAGE   LINE   CHANGE                REASON FOR CHANGE

 3      _____  _____  _____  _____

 4      _____  _____  _____  _____

 5      _____  _____  _____  _____

 6      _____  _____  _____  _____

 7      _____  _____  _____  _____

 8      _____  _____  _____  _____

 9      _____  _____  _____  _____

10      _____  _____  _____  _____

11      _____  _____  _____  _____

12      _____  _____  _____  _____

13      _____  _____  _____  _____

14      _____  _____  _____  _____

15      _____  _____  _____  _____

16      _____  _____  _____  _____

17      _____  _____  _____  _____

18      _____  _____  _____  _____

19      _____  _____  _____  _____

20      _____  _____  _____  _____

21      _____  _____  _____  _____

22      _____  _____  _____  _____

23      _____  _____  _____  _____

24      _____  _____  _____  _____

25
```

1                          SIGNATURE PAGE

2                               OF

3                        DR. STEVEN MILLER

4

5          I hereby acknowledge that I have read the

6   aforementioned deposition, dated September 15,

7   2022, and that the same is a true and correct

8   transcription of the answers given by me to the

9   questions propounded, except for the changes, if

10  any, noted on the attached errata sheet.

11

12  SIGNATURE:

13  _____

14

15  WITNESSED BY:

16  _____

17

18  DATE:

19  _____

20

21

22

23

24

25

```
 1                        LAWYER'S NOTES

 2     Page   Line

 3     _____  _____   _____

 4     _____  _____   _____

 5     _____  _____   _____

 6     _____  _____   _____

 7     _____  _____   _____

 8     _____  _____   _____

 9     _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25
```