# EXHIBIT A

# UNITED STATES DISTRICT COURT
### for the
Northern District of Illinois

| | | |
|---|---|---|
| THE CITY OF ROCKFORD | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. 3:17-CV-50107 |
| MALLINCKRODT ARD, INC., et al. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Latham & Watkins
330 North Wabash Avenue, Suite 2800
Chicago, IL 606*n*

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached

| Place: Haviland Hughes, 124 South Maple Way, Suite 220 Ambler, PA 19002 | Date and Time: August 25, 2023 at 5:00PM EST |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 08/11/2023

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* City of Rockford
_____, who issues or requests this subpoena, are:

Haviland Hughes, 124 S. Maple Way, Suite 220, Ambler, PA 19002, 2156094661, haviland@havilandhughes.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 3:17-CV-50107

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*

on *(date)*                    .

    ❐ I served the subpoena by delivering a copy to the named person as follows:

_____

_____ on *(date)* _____ ; or

    ❐ I returned the subpoena unexecuted because:

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person

(i) is a party or a party's officer; or

(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:

(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT "A"

## DEFINITIONS

The term "**Acthar**" shall be construed to mean the prescription drug for humans with the proprietary name H.P. Acthar® Gel approved by the Food and Drug Administration ("FDA") under Application Number NDA022432 and presently sold with the product NDC of either 630004-8710 or 63004-7731, in any quantity and form it is or has been sold, and under any NDC or other FDA registration it has been sold.

The term "**City of Rockford**" or "**Rockford**" shall be construed to mean the Plaintiff, City of Rockford, Illinois.

The term "**communication**" shall be construed to mean the written transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

The term "**Debtors**" shall mean the Debtors in the Mallinckrodt bankruptcy (defined below) and listed at http://restructuring.primeclerk.com/Mallinckrodt.

The term "**document**" is used in the broadest sense allowable under the Federal Rules of Civil Procedure, and shall be construed to mean any written (handwritten or otherwise), printed, graphic, or recorded matter, and any other material constituting the recording of data or information upon or within any tangible thing, however produced, reproduced, or stored (whether electronic, magnetic, print, digital, audio, video, analog, optical, etc.), including all drafts and originals, all identical and non-identical copies, and electronic information created in or on, or stored in or on, any computer, personal data assistant, or any other electronic devices. Document includes electronically stored information, ie. any information or data that is generated, received, processed or recorded by computers or other electronic devices.

The term "**Express Scripts Entities**" shall be construed to mean the Defendants Express Scripts Holding Company, Express Scripts, Inc., CuraScript, Inc., Accredo Health Group, Inc., Priority Healthcare Distribution, Inc., and United BioSource LLC (f/k/a United BioSource Corporation).

The term "**including**" shall be construed to mean "including but not limited to" as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside its scope.

The term "**Mallinckrodt**" shall be construed to mean the Defendants Mallinckrodt plc and Mallinckrodt ARD, Inc., as well as Mallinckrodt ARD, LLC and Questcor Pharmaceuticals Inc.

The term "**Mallinckrodt bankruptcy**" means the jointly administered cases in *In re Mallinckrodt plc, et. al.*, Bankr. D.Del., Case No. 20-12522 (JTD), including all related adversary and foreign (Irish) proceedings and appeals.

The term "**meeting**" means, without limitation, any assembly, convocation, encounter or contemporaneous presence of two or more persons for any purpose, whether planned, arranged, scheduled or not.

The term "**person**" means, without limitation, any natural person, corporation, partnership, proprietorship, joint venture, association, governmental body (including, without limitation, any Government Entity defined herein), insurance entity, any group, or any other form of public or private business, non-business or legal entity.

The term "**relating to**" shall be construed to mean concerning, referring to, describing, constituting, mentioning, summarizing, demonstrating, containing, showing, comprising, embodying, mentioning, discussing, commenting on, consisting of, reflecting, tending to prove or disprove, or explaining.

The term "**Wholesale Product Purchase Agreement**" shall be construed to mean any versions, drafts, redlines, track changes, edits, forms, formats of the proposed agreement between Priority Healthcare Distribution, Inc., doing business as CuraScript SD Specialty Distribution and Mallinckrodt ARD, LLC, which is attached hereto as Exhibit "A".

The terms "**you**" and "**your**" shall be construed to mean the party receiving this subpoena, and all of its employees, attorneys, shareholders, members, non-equity partners, Of Counsels, associates, paralegals, secretaries and advisors.

## INSTRUCTIONS

In responding to the Subpoena, please produce all documents reasonably available to you or in your possession, custody, or control, wherever located, including those in the possession of your employees, officers, directors, representatives, or agents. If available documents involving additional steps to retrieve, such steps should be made known to Plaintiff to address.

Unless otherwise specified, the documents requested are those that were prepared, written, sent, dated, received, applicable, or in effect at any time from January 1, 2007 through the date of these Requests (the "**relevant time period**").

All documents that are responsive, in whole or in part, to any portion of the Requests shall be produced in their entirety, including all attachments and enclosures. If any responsive document contains both privileged and non-privileged materials, produce the entire document with the privileged material redacted and the fact of the redaction clearly indicated.

If any document or portion of a document is withheld or redacted on the basis of any asserted privilege, in lieu of the withheld information, in accordance with Federal Rule of Civil Procedure 45(e)(2), please provide a written statement or schedule indicating:

    a. the type of document, e.g., letter or memorandum;
    b. the general subject matter of the document;
    c. the date of the document;

d. the author, addresses, and all recipients of the document, including, where not otherwise apparent, the relationships of all authors and recipients to each other, along with their titles and affiliations; and

e. a description of the claimed basis for the asserted immunity.

Responsive documents should be produced in the manner in which they were kept in the ordinary course of business, and should not be shuffled or otherwise rearranged. Documents that, in their original condition, were stapled, clipped, or otherwise fastened together shall be produced in a form indicating their connection. If a document or group of documents is taken from a file folder, file drawer, file box, or notebook, please include a copy of the file label. Documents should be labeled to reflect the particular Requests to which they are responsive.

For electronically stored information, unless otherwise agreed, you shall produce all metadata and produce all documents in their currently stored form.

In construing a Request, "and" and "or" are not intended as words of limitation. Requests formed in the disjunctive should also be read in the conjunctive and vice versa. Similarly, the singular includes the plural and the plural includes the singular. Any verbs in the present tense should be read to include the past, future, and imperfect tenses.

Your obligation to respond to each of these Requests shall be a continuing one. If after responding to any Request, you obtain or become aware of additional information responsive to any Request, you must supplement your response immediately.

## <u>REQUESTS</u>

1.      Please produce all communications between any of the Express Scripts Entities and the Debtors or Mallinckrodt regarding the Wholesale Product Purchase Agreement (Ex. A).

2.      Please produce all communications between any of the Express Scripts Entities and the Debtors or Mallinckrodt regarding the June 29, 2007 Agreement and amendments thereto (produced at Express Scripts0000230-245 and MNK00000001-16).

3.      Please produce all documents referring to or relating to the Wholesale Product Purchase Agreement (Ex. A).

4.      Please produce all documents referring to or relating to the June 29, 2007 Agreement and amendments thereto (produced at Express Scripts0000230-245 and MNK00000001-16).

5.      Please produce all documents related to or referring to the negotiations between any of the Express Scripts Entities, including those of its legal counsel, and the Debtors or Mallinckrodt, including those of its legal counsel, regarding the Wholesale Product Purchase Agreement (Ex. A).

6.     Please produce all documents related to or referring to the negotiations between any of the Express Scripts Entities, including those of its legal counsel, and the Debtors or Mallinckrodt, including those of its legal counsel, regarding the June 29, 2007 Agreement and amendments thereto (produced at Express Scripts0000230-245 and MNK00000001-16).

7.     Please produce all documents related to or referring to drafts of the Wholesale Product Purchase Agreement (Ex. A).

8.     Please produce all documents related to or referring to drafts of the June 29, 2007 Agreement and amendments thereto (produced at Express Scripts0000230-245 and MNK00000001-16).

9.     Please produce all documents related to or referring to those referenced by the Honorable Lisa Jensen in ECF No. 860, *City of Rockford v. Mallinckrodt ARD, Inc., et al., 3:17-CV-50107* (USDC Northern District of Illinois, Western Division).

10.    Please produce all documents, including all negotiations between You and the Express Scripts Entities and/or any of their agents, attorneys, consultants or representatives regarding the Wholesale Product Purchase Agreement (Ex. A).

11.    Please produce all documents, including all negotiations between You and the Express Scripts Entities and/or any of their agents, attorneys, consultants or representatives regarding the June 29, 2007 Agreement and amendments thereto (produced at Express Scripts0000230-245 and MNK00000001-16).

12.    Please produce any and all communications regarding any version of the Wholesale Product Purchase Agreement or the June 29, 2007 Agreement and amendments thereto (produced at Express Scripts0000230-245 and MNK00000001-16) between You and any representative, shareholder, associate or employee of Quinn Emanuel Urguhart & Sullivan, LLP, including but not limited to Meghan McCaffrey, Esquire (meghanmccaffrey@quinnemanuel.com), Eric Lyttle, Esquire (ericlyttle@quinnemanuel.com), Mike Lyle, Esquire (mikelyle@quinnemanuel.com), John Schaeffer, Esquire (johnshaffer@quinnemanuel.com), Matthew Hamann, Esquire (matthewhamann@quinnemanuel.com), Chase Burrell, Esquire (chaseburrell@quinnemanuel.com), Sarah Heaton Concannon, Esquire (sarahconcannon@quinnemanuel.com), Mike Bonnano, Esquire (mikebonanno@quinnemanuel.com), Keith Forst, Esquire (keithforst@quinnemanuel.com), Asher Griffin, Esquire (ashergriffin@quinnemmanuel.com), Michael Soyfer, Esquire (michaelsoyfer@quinnemanuel.com) and Samuel Johnson, Esquire (samueljohnson@quinnemanuel.com.

13.    Please produce any and all communications regarding any version of the Wholesale Product Purchase Agreement or the June 29, 2007 Agreement and amendments thereto

(produced at Express Scripts0000230-245 and MNK00000001-16) between You and any representative, shareholder, associate or employee of any Express Scripts Entities, including but not limited to Urmila Baumann, Esquire (UPBaumann@express-scripts.com).

**HAVILAND HUGHES**

BY:  *s/ Donald E. Haviland, Jr.*
      Donald E. Haviland, Jr.

# EXHIBIT A

**WHOLESALE PRODUCT PURCHASE AGREEMENT**

**THIS WHOLESALE PRODUCT PURCHASE AGREEMENT** (the "Agreement") is made this ___ day of _____, 2021, (the "Effective Date") by and between **Priority Healthcare Distribution, Inc.**, doing business as CuraScript SD Specialty Distribution, a Florida corporation having offices at 255 Technology Park, Lake Mary, Florida 32746 ("Distributor"), and Mallinckrodt ARD LLC, a California limited liability company having offices at [__], New Jersey 07921 ("Company"). Distributor and Company are each referred to in this Agreement as a "Party," collectively, the "Parties."

**WHEREAS**, Company manufactures, markets and sells certain pharmaceutical or biologic products; and

**WHEREAS**, Distributor wholesales certain products to its customers, which include specialty pharmacies, physicians, physician group practices, and certain health care institutions and facilities located in the United States and Puerto Rico; and

**WHEREAS**, the Parties desire to enter into this Agreement because Company desires to retain Distributor to provide exclusive distribution services for Company's pharmaceutical or biological products. Notwithstanding the foregoing this exclusivity shall not apply to purchases by Veteran's Affairs, such purchases shall be governed by the Veteran's Affairs Prime Vendor Program (as defined in Section 7.1);

**NOW THEREFORE**, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## PRODUCTS AND SERVICES

**1.1**  **PRODUCT.** This Agreement governs Distributor's distribution of those Company products set forth in **EXHIBIT A** ("Product" or "Products"), which is attached hereto and incorporated by reference herein and which may be modified from time to time by the Parties upon written mutual consent.

**1.2**  **ORDERS.** Distributor will supply purchase orders to Company on a mutually acceptable form through electronic data interface ("EDI") or via fax, email, or telephone. Distributor shall be entitled to purchase Product for any of its locations as set forth in **Exhibit F** (the "Distribution Centers") and transfer Product between those locations. Distributor shall manage inventory levels to the following locations: 80% Grove City, OH, and 10% for each Tempe, AZ and Memphis, TN.

**1.3**  **REPORTS.** Distributor will provide Company with data reports as specified on **EXHIBIT D**, which is attached hereto and incorporated by reference herein. The Parties intend that these reports will comply with all applicable laws, statutes, regulations, and rules (and reasonable interpretations thereof and guidance related thereto) (collectively, "Applicable Laws"). In the event of any inconsistency between the data file layouts set forth in **EXHIBIT D** and any Applicable Laws, Distributor shall be entitled to unilaterally modify the data reports without notice to, or consent from, Company, in a manner consistent with Applicable Law. If Company requests additional report fields, changes to the report fields, or data configurations not specified on **EXHIBIT D** that require significant changes, Distributor shall notify Company of any additional fees pursuant to Section 2.4 below. If Company agrees to proceed, the Parties will execute an amendment to authorize such work and amend **EXHIBIT D**.

Reports prepared by Distributor for Company under or in connection with this Agreement, whether manually, through automated report generation processes, or through an established interface or electronic data interchange, whether in a standard format or tailored to meet Company's

1

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

requirements, and whether provided for an additional fee or at no charge, are part of Distributor's records, and Distributor retains exclusive ownership thereof and the data contained therein.

Distributor grants Company a non-exclusive, non-transferable, royalty-free license to use such reports for Company's regulatory compliance and internal business purposes, subject to Company's compliance with all privacy, marketing, and other Applicable Laws. Company is expressly prohibited from selling, renting, licensing, or otherwise making available the reports or the data contained therein to data aggregators or other third parties, whether on a standalone basis or aggregated with other data. Notwithstanding the foregoing or any other provision of this Agreement, Company shall have the right to disclose the Reports, solely for the purposes set forth in this section 1.3 to (i) Affiliates, or (ii) a third party vendor providing services to Company; provided, however, that Company has a written agreement with such vendor including confidentiality, privacy, and use obligations that are as restrictive as those set forth in this Agreement.

UNLESS OTHERWISE MUTUALLY AGREED TO BY THE PARTIES IN WRITING, DISTRIBUTOR OFFERS THE DATA AS-IS AND MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND CONCERNING THE DATA, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTIBILITY, FITNESS FOR A PARTICULAR PURPOSE, THE ABSENCE OF LATENT OR OTHER DEFECTS, ACCURACY, OR THE PRESENCE OR ABSENCE OF ERRORS, WHETHER OR NOT DISCOVERABLE. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO SUCH EXCLUSION MAY NOT APPLY TO YOU. EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE LAW, IN NO EVENT WILL DISTRIBUTOR BE LIABLE TO YOU ON ANY LEGAL THEORY FOR ANY SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR EXEMPLARY DAMAGES ARISING OUT OF THIS AGREEMENT OR THE USE OF THE DATA, EVEN IF DISTRIBUTOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

*Galileo® Reporting Services and Dashboard.* Company shall have access to data via the Galileo Web Reporting portal platform. The data available through the portal will include historical and real-time sales and order information, in addition to real-time inventory-on-hand data. Distributor represents and warrants that Distributor has the right to provide Company with such access. The Galileo® Sales and Inventory Management Dashboard shall be implemented as of the Effective Date. Company agrees to limit such use to those purposes expressly authorized by Distributor. Company further agrees to comply, and cause its end users to comply, with Distributor's terms of use, privacy policy, and similar posted terms for such information systems, which terms supplement this Agreement (except to the extent in conflict with the provisions hereof).

*Galileo® Fees.* Manufacturer shall pay Distributor a base monthly fee of one thousand dollars ($1,000) for the Standard Galileo® Reporting Suite (includes 867 and 852) and five (5) user IDs. Additional user IDs may be requested at any time by Manufacturer for an additional monthly fee of one-hundred dollars ($100) per user ID. The base monthly fee and any additional monthly fees for additional IDs shall collectively represent the "Data Reporting Fee." In the event that Company is unable to access data through the Standard Galileo® Reporting Suite for any portion of any month due to the fact such Standard Galileo® Reporting Suite is not functioning properly or any act or omission of Distributor, the Data Reporting Fee for that month will be reduced by a percentage consistent with the percentage of time in the month that Company was unable to access the data. Distributor shall invoice Company monthly, and Company shall pay such invoices within thirty (30) business days of receipt.

2

***FOIA NOTICE**: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

**1.4**   **EVIDENCE OF PEDIGREE.** In accordance with, and to the extent required by, Applicable Law, Distributor shall create and maintain all records, manifests, or other documentation, in electronic and/or written form, necessary to evidence the pedigree (i.e., a record of each distribution) of any Products purchased from Company and shipped, resold, or provided to another distributor or customer.

**1.5**   **ADDITIONAL SERVICES.** In addition to Distributor's standard services, Distributor will perform those additional services set forth in **Error! Reference source not found.**, which is attached hereto and incorporated by reference herein (the "Services").

**1.6**   **DELIVERY OF PRODUCT.**

(a) *Risk of Loss.* Purchase orders for Product should be submitted to the person designated on **EXHIBIT A**. All deliveries of Product will be Free On Board, Distributor's designated facility, as defined below. For purposes of this subsection, the term "Free On Board, Distributor's designated facility" means that Company shall: (i) bear all costs associated with shipping Products to Distributor's designated facility; (ii) bear the risk of loss until Distributor's designated facility takes possession of the Product, which Product must be in new and acceptable condition upon receipt by Distributor; and (iii) be responsible for insuring Products while in transit. Distributor shall be entitled to designate more than one of its facilities for receipt of the Product.

(b) *Inspection of Product.* Distributor shall examine the Product upon delivery at Distributor's facility and shall notify Company of any non-delivery of a portion of the shipment or any defect in any of the Product that is reasonably discoverable upon visual inspection of the Product. Within thirty (30) business days after Distributor's receipt of the Product, Distributor shall furnish to Company a description of the nature of any reasonably discoverable defect or shortage. Upon discovery, at any time, of any latent Product defects that existed when Product was delivered to Distributor's facility, Distributor shall furnish to Company a description of the latent defect. Upon receipt of notice of any defect or shortage, Company shall promptly replace any defective or shorted Product, or issue Distributor a full credit for such defective or shorted Product, as appropriate under the circumstances. In the absence of a written notice from Distributor to Company in accordance with the terms of this subsection, a shipment of the Product shall be deemed to have been delivered and accepted by Distributor as complete and in satisfactory condition as to defects reasonably discoverable upon visual inspection. Distributor shall, at Company's expense, follow Company's instructions to permit Company's inspection of the defective Product or to facilitate the return to Company (or Company's third party disposal company) any of the defective Product delivered to Distributor.

(c) *No Alteration.* Distributor will not alter the Product packaging without Company's consent (except to remove the Product from the shipping containers) and will not alter the Product labeling.

(d) *Product Returns.* All Product returns shall be made in accordance with Company's standard returns policy in effect, which is attached hereto as EXHIBIT C and incorporated by reference herein. Distributor will be entitled to replacement Product for all Product returned in accordance with Company's standard returns policy at no additional cost to Distributor. Notwithstanding anything herein to the contrary, all Product returns made in conjunction with this Agreement will be made on behalf of Distributor by Distributor's designated third party product returns company ("Returns Agent"). If Distributor returns Product for any reason within ninety (90) days before termination of this Agreement, Company will pay any reimbursement associated with Product returns directly to Distributor and not to the Returns Agent. All fees associated

3

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

with the use of the Returns Agent's services will be paid by Distributor and not Company. The destruction of Product made in conjunction with the Agreement will be done on behalf of Distributor by Distributor's designated third party product destruction company. Distributor is to obtain approval from Company to destroy any returned Product. All fees associated with the use of the third party's services will be paid by Distributor and not Company. If Products are damaged upon receipt by Distributor then Distributor shall notify Company within thirty (30) days of receipt of such damaged Products. Distributor will send the damaged Products to the Returns Agent from which the Products were purchased. Company's sole obligation with respect to returned Products shall be replace at no additional cost to Distributor. The Services Fee associated with the services for Product Returns and Product Destruction by Distributor are as follows:

Per each unit      $5.50
Destruction fees are pass through plus 25% handling fees
Freight Frees are Pass through plus 10% handling fees
Freight Charges for Distributor Customer/Client Pick up of expired product: $95.00 per occurrence.

Services for Product Returns and Product Destruction include product inspection, handling, log of receipt, administration, returns processing, destruction processing, and storage.

**1.7**    **DIVERSION.** Distributor shall promptly notify Company upon learning of any activity that appears to illegally divert any Products. Company shall promptly notify Distributor if Company becomes aware of any diverted Product.

**1.8**    **ADVERSE EVENT REPORTING.** Distributor will not be responsible for United States Food and Drug Administration ("FDA") reporting of adverse events. Distributor shall notify Company using the contact information set forth in Section 7.5 and Distributor's standard form within one (1) business day of any Product adverse event complaint from a third party being reported to Distributor that meets the definition of a serious adverse event for purposes of FDA MedWatch reporting.

**1.9**    **PRODUCT PROMOTION; MATERIALS.** Distributor will not promote Company's Products. Accordingly, Distributor shall not distribute or generate any promotional material containing claims relating to Product. Distributor may, however, provide its customers with educational information concerning Product.

Company represents and warrants that any materials relating to Product(s) that it provides to Distributor: (a) are limited to communications that are intended to describe the Product(s) or provide important Product-related information; (b) if required under Applicable Law, have received all appropriate regulatory approvals prior to use (e.g., FDA approval); and (c) do not involve the counseling or promotion of any off-label use.

**1.10**   **SALES OUTSIDE THE UNITED STATES.** Distributor agrees not to distribute or sell Products outside of the United States, its territories or possessions, unless otherwise agreed to between the Parties in a written amendment to this Agreement.

**1.11**   **SUSPENSION OF DISTRIBUTION AND RECALL.**

(a) *Suspension of Distribution.* If, for good reason and with written notification, Company requests that Distributor suspend distribution of any Product, Distributor shall use commercially reasonable efforts to suspend its distribution of such Product. If the suspension continues for more than six (6) weeks, Company will repurchase the Product held in inventory by Distributor

4

*FOIA NOTICE*: *This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

at the Product Price, as defined in Section 2.1(a), paid for such Product by Distributor, and Distributor shall have the right to terminate this Agreement for material breach under Section 3.2(c)(vi) of this Agreement. All such repurchased Product shall be returned to Company at Company's expense.

(b) *Recalls.* Company shall promptly notify Distributor of any recalls initiated by Company or required by the FDA. Company shall provide Distributor a third party (e.g., UPS or FedEx) billing number for shipping of recalled Products to Company (or Company's designated agent) at Company's expense. Distributor shall provide to Company the names and addresses of customers that may have received recalled Products. Company shall be responsible for the mailing, shipping, and reasonable administrative expenses incurred by Distributor in connection with the recall. In addition, Company shall pay the cost of replacement Product for Distributor's customers. To the extent the recall is caused by a willful or negligent act or willful or negligent omission, or breach of material terms of the Agreement, by Distributor, Distributor shall reimburse Company for reasonable, actual costs and/or expenses reasonably expended by Company as a consequence of the recall to the extent pertaining to Product distributed pursuant to this Agreement.

(c) *Records of Recalls.* Distributor shall maintain for two (2) years after termination or expiration of this Agreement such information as is reasonably required in the event of a Product recall after termination or expiration of this Agreement, and shall make such information available to Company, at Company's expense, in the event of such a recall.

(d) *Investigations.* Distributor shall use its commercially reasonable efforts to cooperate with Company in investigating any Product failure that resulted in the need for a recall and any reasonable costs involved with such investigation will be paid by Company.

## ARTICLE II
## PRICES, FEES, AND PAYMENT

**2.1    PRODUCT PRICING.**

(a) *Product Price.* The price Distributor will pay Company for Products is Company's published Wholesale Acquisition Cost (the "Product Price").

(b) *Resale Price.* Distributor shall, in its sole discretion, determine the price at which it sells Products to its customers. This shall include the right to charge for any business fees or expenses related to the sale of Products.

(c) *Shelf Stock Adjustments.* In the event of a Product price decrease, Company agrees to provide Distributor with a shelf stock adjustment for a maximum of 1,500 vials of Product inventories held by Distributor upon any decrease in price. The shelf stock adjustment payable hereunder shall be calculated by determining the price difference between the Product Price Distributor paid for the inventoried Product and the new Product Price, and then multiplying the resulting price difference by the amount of Product held by Distributor. Company shall pay Distributor any shelf stock adjustment payable hereunder within thirty (30) calendar days of the effective price decrease. Shelf Stock Adjustments shall not apply to Distributor's corporate affiliates.

(d) *Shelf Stock Adjustments - Price Increases.* Distributor shall be entitled to retain up to 1,500 vials at any lower, pre-Product price increase price, and such vials will not be subject to credit and rebill. Company shall provide Distributor with at least two (2) business days advance written notice prior to any Product Price increase. Any inventories held by Distributor greater

5

*FOIA NOTICE*: *This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C.* § *552(b)(4) and 45 C.F.R. Part 5.*

than 1,500 vials ("Excess Inventory") at the time of a price increase shall be subject to credit and rebill to the new Product Price. Amounts due to Company shall be calculated by subtracting the current net price minus the net price multiplied by the Excess inventory number of vials. Distributor shall pay Company any Shelf Stock Adjustment hereunder within thirty (30) calendar days of the effective price increase.

**2.2**    **PAYMENT TERMS.** All of Company's undisputed invoices for Product shall be due and payable by Distributor within thirty (30) days after receipt by Distributor.

**2.3**    **CHARGEBACKS.** Company will accept chargebacks in accordance with the Chargeback Policy set forth in **EXHIBIT E**.

**2.4**    **DATA REPORT MODIFICATIONS.** Company shall pay Distributor a programming fee of $185 per hour for such programming for any changes to the data specifications set forth on **EXHIBIT D**, including the addition of reporting fields, changes to the report fields, or data configurations not specified on **EXHIBIT D**; provided, however, that Distributor shall provide Company with a proposal of the scope of work, which proposal shall be mutually agreed by Company and Distributor before Distributor initiates such IT development and/or programming work.

**2.5**    **FEES FOR ADDITIONAL SERVICES.**

(a)    *Services Fee.* In consideration for Distributor's performance of the Services, Company shall pay Distributor a fee (the "Services Fee") equal to one percent (1%) of the published wholesale acquisition cost for the Product when the Product was purchased by Distributor. The Service Fee shall be offset against each invoice as compensation for Distributor's specialty distribution services, which include, but are not necessarily limited to: specialized customer service, Product handling, inventory management, order intake and processing (including card transaction, if applicable), Product shipping, chargeback processing, and provision of standard distribution data (the "Services").

(b)    *Late Fee.* Payment of the Services Fee other than as stated herein will result in a late payment fee equal to eighteen percent (18%) per annum (or the maximum amount permissible under Applicable Law, if lower) for every invoice or statement past due. The late payment fee shall be calculated on the basis of a 365-day year for the actual number of days elapsed between the date upon which payment was due and the date upon which payment is made. Company agrees to pay reasonable attorney fees and expenses incurred by Distributor in enforcing its right of collection.

(c)    *Upward Adjustment to Galileo® Fee.* On the first anniversary of the Effective Date, and each anniversary thereafter, Distributor shall be entitled to increase the *Galileo®* Fee by up to the percentage increase to the Consumer Price Index for Medical Care Services, as published by the U.S. Department of Labor, Bureau of Labor Statistics for such 12 month period. Distributor shall notify Company in writing within thirty (30) days after the effective time of any such increase in the Services Fee.

## ARTICLE III
## TERM AND TERMINATION

**3.1**    **TERM.** Unless and until this Agreement is terminated as provided for herein, this Agreement shall have a term of one (1) year, commencing on the Effective Date. Following the initial term, this Agreement shall be renewed automatically for additional one-year terms unless either Party shall

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

have given the other written notice of non-renewal at least sixty (60) days prior to the expiration of the then current term.

**3.2**   **TERMINATION.** This Agreement is made in good faith based on the assumption that early termination shall not be required. Notwithstanding the foregoing, early termination shall be permissible as follows:

(a)   By either Party with ninety (90) days' written notice for any reason.

(b)   Immediately by either Party if such Party provided written notice detailing a material breach of this Agreement and the breaching Party failed to cure the breach within thirty (30) days of the date of the notice.

(c)   Immediately with written notice, by either Party, except that only Distributor may terminate this Agreement with respect to subsection (vi), in the event that:

    (i)   the other Party shall file any petition under any bankruptcy, reorganization, insolvency or moratorium laws, or any other law or laws for the relief of or in relation to the relief of debtors;

    (ii)   there shall be filed against the other Party any involuntary petition under any bankruptcy statute or a receiver or trustee shall be appointed to take possession of all or a substantial part of the assets of the Party that has not been dismissed or terminated within sixty (60) days of the date of such filing or appointment;

    (iii)   the other Party shall make a general assignment for the benefit of creditors or shall become unable, or admit in writing its inability, to meet its obligations as they mature;

    (iv)   the other Party shall institute any proceedings for liquidation or the winding up of its business other than for purposes of reorganization, consolidation, or merger;

    (v)   the other Party's financial condition shall become such as to endanger completion of its performance in accordance with the terms and conditions of this Agreement;

    (vi)   Company suspends distribution of Products for more than six (6) weeks pursuant to Section 1.11(a); or

    (vii)   the other Party is unable to perform its duties for a period of thirty (30) days pursuant to Section 7.13.

Immediately upon notification by either Party if the terms of this Agreement are determined by either Party in good faith to be inconsistent with any Applicable Law, or upon a change in law pursuant to Section 7.14.

## ARTICLE IV
## CONFIDENTIALITY AND DATA

**4.1**   **CONFIDENTIALITY.** Each Party shall take all reasonable actions and do all things reasonably necessary to ensure that any information contained in this Agreement, as well as any information that is disclosed by one Party ("Disclosing Party") to the other (Receiving Party") under this Agreement (in any case, "Confidential Information") shall not be disclosed or used for purposes outside this Agreement. The foregoing prohibition shall not apply to disclosures: (a) to the receiving Party's attorney or accountant; (b) made pursuant to a request from a legal or regulatory authority; (c) by the Receiving Party to its Affiliate, as defined below (provided such Affiliate is subject to the confidentiality restrictions herein), and for the purpose of this section "Affiliate" shall mean an entity in which the Receiving Party maintains an ownership position or an entity under common ownership or control with the Receiving Party; or (d) that are required pursuant to a court order or by law. The foregoing prohibition shall not apply to information that: (i) a Party can show it

7

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

knew prior to disclosure without obligation of confidentiality; (ii) is or becomes public knowledge through no fault of said Party; or (iii) is lawfully disclosed by a third party under no obligation of confidentiality. This Section 4.1 shall survive any termination of this Agreement for a period of five (5) years thereafter. Each Party shall either return to the other Party, or destroy, all Confidential Information received hereunder upon the expiration or termination of this Agreement, except that each Party may retain one (1) copy of such Confidential Information in order to satisfy any future legal obligations it may have. Notwithstanding anything to the contrary contained herein, if reasonably necessary, Distributor shall be permitted to disclose to potential and existing customers of Distributor (and any potential purchaser of Distributor) the general terms of this Agreement.

4.2     Notwithstanding anything to the contrary in this Agreement, Distributor shall be entitled to sell its purchasing data, which may include data relating to the Product, to third parties (e.g., IMS or NDC). Company acknowledges and agrees that Distributor shall have the exclusive right to retain all such fees earned by Distributor as a result of any such sale.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

5.1     **STATUTORY AND REGULATORY COMPLIANCE.** Distributor and Company shall comply with all Applicable Laws governing their activities related to this Agreement, including without limitation, laws related to fraud and abuse, false claims, privacy, provision of samples, and prohibition on kickbacks. Without limiting the generality of the foregoing, the Parties further agree as follows:

(a) *Discounts/Rebates.* Although Distributor does not submit claims or requests for payment to Medicare or Medicaid, the Parties have structured any discounts and rebates under this Agreement in a manner consistent with the applicable characteristics of the statutory discount exception (42 U.S.C. § 1320a-7b(b)(3)(A)) and the discount safe harbor (42 C.F.R. § 1001.952(h)). The terms pursuant to which any discount or rebate will be paid are fixed and are set forth in this Agreement and the attached Exhibits. This Agreement is not dependent on, and does not operate in conjunction with, either explicitly or implicitly, any other arrangement or agreement between Company and Distributor or either Party's Affiliates. Company represents and warrants that: (i) it will refrain from doing anything that would impede Distributor from meeting any reporting obligations Distributor may have under Applicable Law; (ii) it will comply with all reporting requirements for pharmaceutical manufacturers under all Federal health care programs and, in particular, will include any and all discounts and rebates paid hereunder in its calculations of "average manufacturer price" or "best price" under the Medicaid drug rebate program, and in the calculations of "average sales price" under Medicare, to the extent applicable; (iii) it will properly report the existence of the discounts/rebates on the invoices or statements submitted by Company to Distributor; and (iv) no discount/rebate paid pursuant to this Agreement is intended in any way as a discount related to a drug formulary or drug formulary activities and no discount/rebate has been negotiated or discussed between the Parties in connection with any such drug formulary or formulary activities. To the extent required under Applicable Law, Distributor will report the discounts/rebates to appropriate Federal health care programs, and will, upon the request of a governmental agency, including the Secretary of Health and Human Services or a state healthcare agency, disclose information regarding the discounts/rebates to the requesting agency.

(b) *Services Fee.* Company represents and warrants that: (i) it has engaged Distributor to perform bona fide, legitimate, reasonable, and necessary Services; (ii) the Services are not intended to serve, either directly or indirectly, as a means of marketing the Product; (iii) the Services do not involve the counseling or promotion of any off-label use of the Products or a business

8

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

arrangement or other activity that violates any Applicable Laws; (iv) the Service Fees do not constitute a discount and Company will properly report such Service Fees in accordance with Applicable Law; (v) the Service Fees are not intended in any way as remuneration for referrals or for other business generated; (vi) the Service Fees represent fair market value for the services based on arms-length negotiations; (vii) both the methodology for calculating and the amount of Service Fees offered by Company to Distributor in connection with this Agreement are substantially similar to the methodology and amount offered by Company to other similar entities for substantially similar services (viii) the Service Fee paid pursuant to this Agreement are not intended as payments related to a drug formulary or drug formulary activities and have not been negotiated or discussed between the Parties in connection with any such drug formulary or formulary activities; and (ix) the Service Fees paid pursuant to this Agreement is not intended as payments to influence any other relationship between the Company and Distributor or either Party's Affiliates.

(c) *Compliance With Drug Distribution Laws.* By executing this Agreement, Company hereby designates Distributor, and Distributor accepts such designation, as an authorized distributor of record for the Products for purposes of the Parties' compliance with the Prescription Drug Marketing Act of 1987, as amended by the Prescription Drug Amendments of 1992 and the Drug Quality and Security Act of 2013 (DQSA), including the Drug Supply Chain Security Act (DSCSA), and as may be further amended from time to time, and any and all other applicable laws and regulations requiring the same or similar designation as an authorized pharmacy of record or authorized distributor of record. Company and Distributor represent and warrant that, to their knowledge, they are authorized trading partners under the DQSA and a Party that experiences a change in its authorized status will notify the other Party in writing promptly. Company agrees to provide any documentation of Distributor's authorized status and documentation of and statements relating to pharmaceutical transactions as may be reasonably requested by Distributor as necessary for compliance with Applicable Laws.

(d) *Regulatory Approvals.* Company represents and warrants that it has received all applicable regulatory and statutory approvals in order for it to lawfully distribute the Product(s) to Distributor hereunder. Upon request by Distributor, Company and AmerisourceBergen-ICS (Company 3PL), will provide necessary documentation and information related to licensure status with individual states to ship or distribute Product to Distribution Centers.

(e) *FDA Compliance.* Company hereby represents that, at the time of commercial sale of the Product, Company will have received clearance from FDA to market the Product in the United States. In the event FDA or any other governmental entity withdraws its marketing clearance for the Product, Company shall promptly notify Distributor. Furthermore, Company represents and warrants that, at the time of shipment or delivery from Company, the Products (i) shall not be adulterated, misbranded, or otherwise prohibited within the meaning of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. 301 *et seq.*, as amended, and in effect at the time of shipment or delivery ("FFDCA") or within the meaning of any Applicable Law in which the definition of adulteration or misbranding are substantially the same as those contained in the FFDCA; and (ii) shall not be merchandise that may not be introduced or delivered for introduction into interstate commerce under the provisions of Sections 301, 404 or 505 of the FFDCA (21 U.S.C.A. 331, 344 and 355).

**5.2 FEDERAL PROGRAMS.** Company represents, warrants, and certifies that neither it nor any of its principals were or are debarred, suspended, proposed for debarment, otherwise determined to be ineligible to participate in Federal health care programs (as that term is defined in 42 U.S.C. 1320a-7b(f)), convicted of a criminal offense related to the provision of health care items or services, or currently the subject of any Office of Inspector General investigation (collectively, an "Adverse

9

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C.* § *552(b)(4) and 45 C.F.R. Part 5.*

Enforcement Action"). Company shall notify Distributor immediately if Company or any of its principals becomes the subject of an Adverse Enforcement Action.

**ARTICLE VI**
**INDEMNIFICATION, LIMITATION OF LIABILITY, AND INSURANCE**

**6.1    MUTUAL INDEMNIFICATION.**

(a) *Distributor Indemnification.* Distributor will indemnify, defend, and hold Company and its affiliates, officers, directors, agents and employees harmless from and against any loss, cost, damage, expense, or other liability, including, without limitation, reasonable costs and attorney fees (collectively, "Damages") incurred in connection with any and all actual or threatened third party claims, suits, investigations, enforcement actions, or any other judicial or quasi-judicial proceeding ("Claims") arising out of (i) Distributor's negligent, grossly negligent, or reckless acts or omissions, or intentional or willful misconduct, or (ii) Distributor's breach of this Agreement. Distributor shall have no obligation to indemnify Company in connection with any Claims or Damages caused by or based upon Company's negligence, gross negligence, reckless misconduct, intentional misconduct, willful misconduct, breach of this Agreement, or violation of applicable law or regulation in connection with this Agreement or its performance hereunder, except to the extent that a court determines that such Claims or Damages were caused by Distributor's negligence, gross negligence, reckless misconduct, intentional misconduct, willful misconduct, breach of this Agreement, or violation of applicable law or regulation in connection with this Agreement or its performance hereunder.  Nothing herein shall limit any rights Company may have to contribution, subrogation, or similar rights under applicable law.

(b) *Company Indemnification.* Company will indemnify, defend, and hold Distributor and its affiliates, officers, directors, agents and employees harmless from and against any Damages incurred in connection with any and all Claims arising out of (i) Company's manufacturing or marketing of the Products or any harm caused to a third party resulting from the Products; (ii) any recall, quarantine, warning, or withdrawal of any Products; (iii) Company's negligent, grossly negligent, or reckless acts or omissions, or intentional or willful misconduct; or (iv) Company's breach of this Agreement. Company shall have no obligation to indemnify Distributor in connection with any Claims or Damages caused by or based upon Distributor's negligence, gross negligence, reckless misconduct, intentional misconduct, willful misconduct, breach of this Agreement, or violation of applicable law or regulation in connection with this Agreement or its performance hereunder, except (1) as provided in Section 6.1(f), and (2) to the extent that a court determines that such Claims or Damages were caused by Company's negligence, gross negligence, reckless misconduct, intentional misconduct, willful misconduct, breach of this Agreement, or violation of applicable law or regulation in connection with this Agreement or its performance hereunder.  Nothing herein shall limit any rights Distributor may have to contribution, subrogation, or similar rights under applicable law.

(c) *Infringement Indemnity.* Company shall indemnify, defend, and hold Distributor, its Affiliates, and their directors, officers, employees, agents, sub-distributors, and clients harmless from and against any claim or allegation that (i) any Product or component thereof, (ii) the manufacture, offer for sale, sale, distribution, import, export, or use of any Product as contemplated hereby, or (iii) any Mark, information, or material made available by Company under or in connection with this Agreement, infringes, misappropriates, or otherwise violates (whether on a direct, contributory, or vicarious liability basis) a third party's patents, copyrights, trade secrets, trademarks, privacy, publicity, or other intellectual property or proprietary rights.

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

(d) *Notification.* As a condition of indemnification, the Party seeking indemnification shall notify, to the extent possible under Applicable Law, the indemnifying Party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder. The indemnifying Party shall have a right to participate in the defense of such Claim, and the Parties will cooperate in good faith in such defense. No Party shall have an obligation to indemnify the other Party as described herein with respect to any Claim settled without the mutual written consent of both Parties, which consent shall not be unreasonably withheld.

(e) Notwithstanding anything to the contrary in this Agreement, no Party shall have any obligation to indemnify the other Party with respect to any Claim in connection with any claims, proceedings, actions, or litigations brought against either Party only to the extent such claims, proceedings, actions, or litigations are based on Product delivered prior to October 12, 2020. For the avoidance of doubt, this Section 6.1(e) shall not apply to any claims, proceedings, actions or litigations brought against either Party with respect to Product delivered on or after October 12, 2020.

(f) To the extent any claim, proceeding, action, or litigation is brought or maintained against Distributor or its affiliates after Company's emergence from chapter 11 bankruptcy protection (i.e., plan effective date) that is substantially similar to, relating to, arising out of, or in connection with the litigation matters included at **Exhibit G** to this Agreement and based on Product delivered after October 12, 2020, Company will reimburse 50% of Distributor's or its affiliates' reasonable, documented, outside counsel attorneys' fees and expenses in connection with such claim, proceeding, action, or litigation to the extent incurred by Distributor after confirmation of Company's chapter 11 plan of reorganization. Above such amount, Company will have no obligation to indemnify Distributor for attorneys' fees and expenses with respect to any claim, proceeding, action or litigation. Company and Distributor shall in good faith determine the proration of fees and expenses in any such litigation brought or maintained after Company's emergence from chapter 11 that covers Product delivered before and after October 12, 2020. Distributor and its affiliates shall maintain control of defense of any indemnified claim, proceeding, action, or litigation.

**6.2** **LIMITATION OF LIABILITY.** In no event shall either Party be liable to the other under this Agreement for any special, incidental, indirect, exemplary, or consequential damages, whether based on breach of contract, warranty, tort (including negligence), lost profits or savings, punitive damages, injury to reputation, loss of customers or business, product liability, or otherwise, regardless of whether such Party has been advised of the possibility of such damage. The Parties acknowledge and agree that the foregoing limitations of liability are a condition and material consideration for their entry into this Agreement.

**6.3** **INSURANCE.** Distributor and Company shall maintain such policies of general liability, professional liability, and other insurance of the types and in amounts customarily carried by their respective businesses. Notwithstanding the foregoing, Company shall, at a minimum, maintain throughout the term of this Agreement commercial products liability coverage, either through commercial insurance or a self-insured retention pool, in an amount no less than ten million dollars ($10,000,000). Each Party shall provide the other with reasonable proof of insurance upon written request.

### ARTICLE VII
### GENERAL TERMS

**7.1** **NON-EXCLUSIVITY.** Nothing herein shall be construed to limit Distributor from entering into other agreements with other manufacturers or wholesalers that allow Distributor to distribute or wholesale products that compete with Company's Products. Distributor is the exclusive distributor

11

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

of Product, notwithstanding the foregoing the Wholesale Product Purchase Agreement shall not apply to purchases by Veteran's Affairs which shall be governed by the Veteran's Affairs Prime Vendor Program. The Parties hereby agree that Company may enter into an agreement with the mutually agreed upon distributor of pharmaceutical products that service the Veterans Affairs Prime Vendor Program ("PPV Entities"). PPV Entities are set forth in Attachment 1 hereto, incorporated by reference into this Agreement.

**7.2**    **RESERVATION OF RIGHTS**. Each Party reserves all right, title, and interest in and to its patents, copyrights, trade secrets, know-how, and other intellectual property used, disclosed, or made available under or in connection with this Agreement. All rights and licenses to intellectual property not granted by a Party to the other Party under this Agreement are reserved by the first Party and its suppliers.

**7.3**    **INTELLECTUAL PROPERTY.** Each Party reserves all right, title, and interest in and to its company, product, and service names, logos, brands, trademarks, service marks, trade dress, and other proprietary designations (collectively, "Marks"). Company is authorized to list Distributor by name (non-logo) in Company's standard online and print listings of specialty pharmacies, and Distributor is authorized to list Company and the Products (by name or logo) in Distributor's standard online and print listings of manufacturers and products. All use of a Party's Mark's is and shall remain subject to such Party's reasonable quality control and brand usage guidelines. All goodwill arising from use of a Party's Marks shall inure exclusively to such Party's benefit.

Additionally, in furtherance of Distributor's authorized sale, distribution and dispense of the Products, Distributor is authorized to reproduce the content, graphics, and other materials pertaining to the Products supplied or made available by Company in Distributor's starter kits, communication letters, and other educational information, and to use the corresponding Company and Product Marks in connection therewith.

Upon the other Party's reasonable, written request, each Party agrees to provide the other Party with samples of any materials using the other Party's Marks. Manufacturer will provide a high quality Product image in mutually agreed upon format for customer website use.

**7.4**    **LITIGATION COOPERATION.** Company agrees to reasonably cooperate in the defense or prosecution of any litigation matter or proceeding against Distributor and/or the Parties as co-defendants, whether already instituted or that may be instituted hereafter, relating to, arising out of, or in connection with the litigation matters included at **Exhibit G** to this Agreement. For the purposes of this Section 7.4 only, Company (as used herein) shall include Company and/or or any person or entity controlling, controlled by, under common control with, or otherwise associated with, directly or indirectly, Company.

For the avoidance of doubt, any litigation matter or proceeding, as referred to herein, includes but is not limited to, the litigation matters included at **Exhibit G** to this Agreement, and any other litigation matters, proceedings, or claims made by any person on the basis of allegations that are substantially similar to, relate to, arise out of, or are in connection with **Exhibit G**.

Company agrees to use all reasonable best efforts to cooperate in all material respects with respect to any litigation matter or proceeding, including without limitation by making available, upon Distributor's reasonable request, Company's former, current, and/or future directors, officers, employees, other personnel and agents, and any books, records or other documents within their respective possession, custody, or control, or that Company otherwise has the ability to make available, to the extent that such person or books, records, or other documents are reasonably required or appropriate in connection with any litigation matter or proceeding. The obligation of

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

Company to use reasonable best efforts to make available directors, officers, employees, and other personnel and agents and to make available books, records, or other documents is intended to be interpreted in a manner so as to facilitate cooperation between Company and Distributor with respect to any litigation matter or proceeding, and shall include without limitation the obligation to use reasonable best efforts to avoid, limit, or mitigate scheduling conflicts for such directors, officers, employees, and other personnel and agents.

**7.5**    **NOTICE.** Any notice, demand, request, consent, or approval required or permitted hereunder shall be in writing and shall be delivered: (a) personally; (b) by certified mail, return receipt requested, postage prepaid; (c) by facsimile transmission; or (d) by overnight courier by a nationally recognized courier service, to the address indicated below or to such other address as may be designated in writing by each Party from time to time.

*If to Company:*

Mallinckrodt ARD LLC
1425 U.S. Route 206
Bedminster, New Jersey 07921
Attn: VP, Strategic Pricing and Contracting

*With a copy to:*

Mallinckrodt ARD LLC
1425 U.S. Route 206
Bedminster, New Jersey 07921
Attn: SVP, Chief Compliance Officer

*If to Distributor:*

Express Scripts, Inc.
c/o Priority Healthcare Distribution, Inc.
One Express Way
St. Louis, MO 63121
Attn: Legal Department

*With a copy to:*

Priority Healthcare Distribution, Inc.
255 Technology Park Drive
Lake Mary, FL 32746
Attn: General Manager

All such communications shall be deemed to have been received by the intended recipient: (i) on the day actually received if delivered personally; (ii) five (5) business days following deposit in the United States Mail if sent by certified mail; (iii) upon confirmation of receipt of a facsimile transmission if sent by facsimile; or (iv) on the next business day if sent by overnight courier.

**7.6**    **SEVERABILITY.** In the event any portion of this Agreement not material to the remaining portions hereof shall be held illegal, void, or ineffective, the remaining portions hereof shall remain in full force and effect. Subject to the consent of both Parties, such consent not to be unreasonably withheld, if any of the terms or provisions of this Agreement are in conflict with any Applicable Laws, then such terms or provisions shall be deemed inoperative to the extent that they may conflict with such Applicable Laws and shall be deemed to be modified to conform to such Applicable Laws.

13

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

**7.7    AUDIT.** No more than once during any twelve (12) month period during the term of this Agreement and for one hundred eighty (180) days thereafter, either Party shall permit a certified public accountant, engaged by the auditing Party and reasonably acceptable to the other Party ("Auditor") to audit the other's records relating to the twelve (12) month period preceding the date when the audit is conducted. Such audit shall be limited to tracking of rebates, data reports, chargeback reports and quality and compliance review. If either Party elects to conduct an audit, the other Party agrees to make available upon thirty (30) days' advance written notice, accompanied by a detailed scope during normal business hours, such documents and personnel in a manner as not to unduly interfere with the audited Party's operations. If any audit reveals (a) an error in the calculation, reporting, or payment of any rebates; or (b) that an overcharge or undercharge incurred, in the case of an error by either Party, such Party shall provide a written response or explanation, correct any error, and remit any monies due within thirty (30) days after receiving notice of the error or overcharge.  Any Auditor hired by either Party must both enter into a confidentiality agreement executed by both Parties and be retained on an hourly or fixed rate basis, and not a contingency basis. Each Party shall pay their respective expenses associated with the audit. Audits during the months of December and January are excluded, unless the request is related to an inspection by a government regulator.

**7.8    ENTIRE AGREEMENT.** With regard to the issues addressed herein, this Agreement and the Exhibits attached hereto contain the entire agreement and understanding of the Parties, and supersede any and all prior agreements and understandings regarding the same subject matter.

**7.9    AMENDMENT.** No amendment, modification, revision, representation, warranty, promise or waiver of or to this Agreement shall be effective unless the same shall be in writing and signed by both Parties. Notwithstanding the foregoing **Exhibit A** (solely as related to WAC Product Price) and **Exhibit C** (Returned Goods Policy) may be modified with a written notification from Company to Distributor. Upon the effective date of the change, the Exhibit(s) will be deemed amended to reflect such change.

**7.10   COUNTERPARTS.** This Agreement may be executed in any number of counterparts, all of which together shall constitute one and the same instrument.

**7.11   ASSIGNMENT.** Neither Party may assign this Agreement without the written consent of the other; provided, however, that Distributor may assign this Agreement to any entity that, directly or indirectly, wholly owns or controls Distributor or any affiliate that is, directly or indirectly, wholly owned or controlled by any entity that, directly or indirectly, wholly owns or controls Distributor.

**7.12   DELEGATION OF RESPONSIBILITIES.** Distributor may engage a third party to conduct certain administrative functions on its behalf and may subcontract portions of certain limited functions and responsibilities of this Agreement, including, but not limited to, data compilation and reporting services, financial accounting and processing services, or any other function relating to any of Distributor's obligations set forth herein. Company agrees to cooperate with Distributor's reasonable requests relating to Distributor's engagement of any such third party. Such third party must perform in a manner conforming to this Agreement and will be bound by confidentiality restrictions no less restrictive than are set forth in Section 4.1 of this Agreement. Distributor shall retain full responsibility and liability for the performance of any subcontracted service.

**7.13   FORCE MAJEURE.** Notwithstanding anything to the contrary herein, neither Party shall be liable in any manner for any delay to perform its obligations under this Agreement where the cause of such delay is beyond a Party's reasonable control, including, without limitation, any delay or failure due to strikes, labor disputes, riots, earthquakes, storms, hurricanes, floods or other extreme weather

14

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

conditions, fires, explosions, acts of God, embargoes, war or other outbreak of hostilities, government acts or regulations, or the failure or inability of carriers, suppliers, delivery services, or telecommunications providers to provide services necessary to enable a Party to perform its obligations hereunder. In such event, the Parties agree to use their best efforts to resume performance as soon as reasonably possible under the circumstances giving rise to the Party's failure to perform, provided, however, if performance is not restored within thirty (30) calendar days, either Party may terminate this Agreement pursuant to Section 3.2(c)(vii).

**7.14**   **CHANGE IN LAW.** If, subsequent to the Effective Date (a) there is a change to any existing Applicable Laws; (b) any Applicable Law is promulgated, enacted, enforced, or otherwise applied; or (c) any decree, order, judgment, or permanent injunction is entered or enforced by any court of competent jurisdiction or any other government agency relating to the terms of this Agreement, which in the good faith opinion of Company or Distributor adversely and materially affects or will adversely and materially affect its business by reason of the terms of this Agreement, the affected Party shall notify the other Party in writing and the Parties will promptly negotiate alternative terms that would not adversely and materially affect the affected Party's business, and that would, subject to Applicable Law, provide reasonably equivalent benefits to both Parties as the modified or deleted terms. If the Parties do not so reach a mutually satisfactory agreement within thirty (30) days after notice from the affected Party, the relevant adverse terms may be terminated or, if the relevant adverse terms are material to the overall Agreement, the Agreement may be terminated pursuant to Section 3.20.

**7.15**   **WAIVER.** No waiver of any term of this Agreement shall be valid unless waived in writing and signed by the Party against whom the waiver is sought. The failure of either Party to require performance by the other Party of any provision of this Agreement shall not affect, in any way, the right to require such performance at any time thereafter.

**7.16**   **INDEPENDENT CONTRACTORS.** Nothing in this Agreement is intended to create any relationship between Distributor and Company other than as independent contractors and neither Party, nor any of their employees, staff, agents, officers, or directors shall be construed to be the agent, fiduciary, employee, or representative of the other.

**7.17**   **CHOICE OF LAW.** This Agreement and performance of the obligations hereunder, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to the conflicts of laws provision therein.

**7.18**   **SURVIVAL.** The confidentiality and indemnification obligations described in this Agreement shall survive the termination of this Agreement. These ongoing obligations shall be binding upon both Parties regardless of the reason for the termination of this Agreement.

**7.19**   **THIRD PARTY BENEFICIARIES.** This Agreement is not a third party beneficiary contract, and, therefore, there are no third party beneficiaries to this Agreement.

**7.20**   **PARENT GUARANTY.** On or before the Effective Date, Company's ultimate corporate parent shall deliver to Distributor a guaranty of payment and performance of any and all obligations to Distributor under this Agreement, in the form of **Exhibit H** to this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

**IN WITNESS WHEREOF**, the undersigned, duly authorized, has executed this Agreement, effective as of the Effective Date.

| **PRIORITY HEALTHCARE DISTRIBUTION, INC.** | **MALLINCKRODT ARD LLC** |
|---|---|
| By: _____ | By: _____ |
| Print Name: _____ | Print Name: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

16

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

| PRODUCT | NDC | STRENGTH | SIZE | PRODUCT PRICE (WAC) | |
|---|---|---|---|---|---|
| Acthar® Gel | 63004-8710-01 | 80 U/mL | 5 ml | WAC | |
| | | | | | |

All purchase orders should be submitted to:

**Mallinckrodt Customer Service (c/o ICS)**
Phone: 888-678-7830
Fax: 888-678-7831
AA-ICS-QuestCororders@absg.com

**Or**

**Christian Carrier**
Senior Account Manager
AmerisourceBergen-ICS
Work: 469-365-7706 | Cell: 469-400-9713 | Fax: (844) 378-4981
Christian.Carrier@ICSconnect.com

17

**FOIA NOTICE**: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.

## EMERGENCY ORDER PROCEDURES

THE FOLLOWING PROVIDES THE MUTUALLY AGREED-UPON PLAN OUTLINE FOR ACTHAR GEL EMERGENCY SHIPMENT PROCEDURES.

1. Request received from the entity requesting the emergency order ("Account").
2. Confirm that request is a true emergency by asking customer if they understand the order/reorder process.
3. If not a true emergency customer will be instructed to call back during the next business day.
4. If true emergency order will be accepted and customer will be informed;
   (i) only one (1) emergency order will be allowed per customer PER YEAR without additional charge and all standard future orders should be placed during regular business hours.
   (ii) subsequent emergency orders will be assessed a $500 fee per details in "notes" section below
5. Information documented and validated in the emergency order activity report which is attached below.
6. Distributor provides Account with information on other accounts near the Account that may provide immediate replacement opportunities.
7. In parallel, Distributor contacts courier with specific requirements.
8. Courier determines most expeditious method to ensure timely delivery which may include any or all of the following methods:
   A. Hot shot – package driven to destination.
   B. Aircraft – package flown to destination – next flight out.
      - Courier associate flies with package.
      - Accompanies package from airport to destination.
9. Confirmation of delivery sent to Distributor.
10. Process complete – request closed.
11. Distributor to provide emergency order activity report to Company within one (1) business day of receiving any emergency shipment requests.
12. Emergency order activity report is attached. (attach a copy)

NOTES:
- Distributor will invoice customer the next business day. If customer does not remit payment after Distributor's usual and customary collection efforts, Company will promptly replace Product to Distributor at no cost to Distributor.
- The emergency order process is for weekends and holidays only.
- On a weekly basis, Distributor to provide personnel who may be taking emergency orders with updated list of active hospital accounts and their recent ordering history.
- All emergency orders will incur a $500 emergency delivery fee, to be invoiced to the account placing the emergency order. This fee will be waived for the initial emergency order for an account. Following this initial emergency order, any subsequent emergency orders by the same account will be billed this $500 fee. If this fee is collected by Distributor, it will be credited to Company.
- All courier charges billed to Distributor will be passed through to Company.
- Company will be billed a two hundred and fifty U.S. dollar ($250.00) fee per emergency order.
- All of Distributor invoices for emergency orders shall be due and payable by Company within thirty (30) business days, after receipt by Company. Invoices shall be paid by Company in the form of a check payable to CuraScript SD Specialty Distribution.

**FOIA NOTICE**: *This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

# ACTHAR GEL EMERGENCY ORDER DOCUMENT

*This form will serve as documentation of all data in the event of a request for an emergency shipment request for Acthar Gel.*

Date: _____ Time: _____ Requested By: _____

Requestor's Contact Information (Pager/Phone/Cell/e-mail):

_____   _____

_____

| **BILL TO:** | **SHIP TO:** |
|---|---|
| Name: _____ | Name: |
| Address: _____ | Address: |

License #: _____    State Issued: _____

Order Quantity: **Always 1 Vial**    P.O. #: _____

Expected Delivery Time/Date: _____

## Special Delivery Instructions (Bldg/Wing/Floor/Station/Room)

_____

_____

_____

## REASON FOR EMERGENCY

_____

_____

_____

4

19

*FOIA NOTICE*: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.

## SHIPMENT INFORMATION

Carrier: _____ Method of Transport: _____

Contact Name: _____ Pick-up Time/Date: _____

Delivery Commitment – Date: _____ Time: _____

Transporter Contact Information

Name: _____ Cell: _____ Pager: _____

## CURASCRIPT

Coordinator Name: _____ Title: _____

Signature: _____

## EXHIBIT C
## RETURNED GOODS POLICY

Distributor may return Products which are damaged by Distributor. Distributor may return (i) Products with less than one (1) month remaining before expiration and (ii) expired Products up to three (3) months past expiration. Company's sole obligation in all cases shall be supply of replacement Product.

Additionally, Company shall provide Distributor replacement Product for the below circumstances;

    i.   **Natural Disasters**. Natural disaster such as a fire, hurricane, flood, or tornado.

In the event that notice of Agreement termination is given by either party or Company notifies Distributor of Product discontinuation ("Eligible Credit Events"), the parties will cooperate to permit Distributor to sell units remaining in inventory and minimize Product returns to Company. Following the effective date of any Eligible Credit Events, Distributor may return Products and Company will promptly pay Distributor in U.S. dollars and not with replacement Product. Any returns outside of this policy must be authorized by Company. **This Returned Goods Policy is subject to change**

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

**by Company. Company will notify Distributor with three (3) days prior notice to other parties.**

### ii.    Product Replacement.

Distributor may receive replacement vials for product that is ineligible for replacement or return under this Returned Goods Policy due to circumstances outside of Distributor's control (i.e., carrier loss/damage). Replacement may be considered by both parties in good faith on a case-by-case basis. At a minimum, Distributor may receive replacement for up to five (5) vials annually.

_FOIA NOTICE_: **This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.**

BUSINESS OBJECTS DATA SPECIFICATIONS

SHIPMENT

| Field Name | Data Type | Required | Description |
|---|---|---|---|
| Ship Date | Date | Y | MMDDYYYY |
| Quantity Shipped | Numeric | Y | Including negative quantities |
| Customer # | Numeric | Y | CSD Ship To Account # |
| Ship to Name | Varchar | Y | |
| Ship to Address #1 | Varchar | Y | |
| Ship to Address #2 | Varchar | N | Field labeled "Additional Heading" |
| Ship to City | Varchar | Y | |
| Ship to State | Varchar | Y | |
| Ship to Zip | Numeric | Y | 5 digits only |
| Ship to Phone | Varchar | N | |
| Bill to Name | Varchar | Y | |
| Bill to Address #1 | Varchar | Y | |
| Bill to Address #2 | Varchar | N | Field labeled "Additional Heading" |
| Bill to City | Varchar | Y | |
| Bill to State | Varchar | Y | |
| Bill to Zip | Numeric | Y | 5 digits only |
| NDC Number | Varchar | Y | |
| HIN # | Varchar | N | |
| DEA# | Varchar | N | |
| NPI # | Varchar | N | |
| Warehouse | Varchar | Y | Warehouse location shipped from |
| Lot# | Varchar | Y | |
| Lot Expiration Date | Varchar | Y | |
| Invoice # | Numeric | Y | Document # |
| Order # | Numeric | Y | |

| | |
|---|---|
| **Format** | Excel |
| **Frequency** | Daily, Weekly & Monthly |
| **Distribution** | sFTP or Secure email |
| **Products to Report** | TBD |
| **File Name** | CURASCRIPT_SD_SHIPMENT_*DRUGXXXX*_YYYY-MM-DD-HH-MM-SS.XLS (daily) |
| **Other** | Include column headings in report |
| | Report shipments from all shipping locations |
| **Special Note** | When distributing via Secure Email, Date format is limited to YYYY-MM-DD-HH-MM-SS |

22

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

**INVENTORY**

| Field Name | Data Type | Required | Description |
|---|---|---|---|
| NDC # | Varchar | Y | |
| Drug Name | Varchar | Y | |
| Reporting Period Start Date | Date | Y | MMDDYYYY |
| Reporting Period End Date | Date | Y | MMDDYYYY |
| Reporting Date | Date | Y | MMDDYYYY |
| Warehouse Name | Varchar | Y | |
| Quantity On Hand | Numeric | Y | If none then "0" |
| Quantity Received | Numeric | Y | If none then "0" |
| Quantity On Order | Numeric | Y | If none then "0" |
| Quantity Adjustment | Numeric | Y | If none then "0"; include negative quantity |
| Quantity Shipped | Numeric | Y | If none then "0" |
| Quantity Transferred | Numeric | Y | If none then "0" |
| Quantity Returned | Numeric | Y | If none then "0" |

| | |
|---|---|
| **Format** | Excel |
| **Frequency** | Daily, Weekly & Monthly |
| **Distribution** | sFTP or Secure email |
| **Products to Report** | TBD |
| **File Name** | CURASCRIPT_SD_INVENTORY_*DRUGXXXX*_YYYY-MM-DD-HH-MM-SS.XLS |
| **Other** | Include column headings in report |
| **Special Note** | Report inventory for all shipping locations |
| | When distributing via Secure Email, Date format is limited to YYYY-MM-DD-HH-MM-SS |

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

## Exhibit E
### Chargeback Policy

**The Parties agree as follows regarding chargeback activities:**

### 1. General.

*Direct Customers.* Distributor will recognize and administer contracts between Company and Company's customers, members, contracted Group Purchasing Organizations ("GPOs") including GPO contracts negotiated on behalf of GPO members (each a "Direct Customer") pursuant to which the Direct Customer may purchase certain Products at pricing terms that have been established through contracts between Company and the Direct Customer (or the Direct Customer's purchasing agent) (referred to below as a "Direct Customer Contract"), subject to: (i) Distributor 's right to charge prices that differ (e.g., higher prices) from such Direct Customer's contracted cost; (ii) Distributor's right to impose charges (e.g., shipping, special handling, non-standard unit orders, etc.) payable by the Direct Customer; (iii) the continued validity of such Direct Customer Contracts; and (iv) in accordance with applicable law and this policy. The amount of a chargeback hereunder shall be calculated by subtracting the stated contract cost listed in the Direct Customer Contract (which Company acknowledges might not equal the Direct Customer's actual purchase price), from the Company's published Wholesale Acquisition Cost ("WAC") at the time when the Direct Customer purchased Product.

*Indirect Customers.* With respect to customers of Company that are not Direct Customers ("Indirect Customers"), pursuant to which the Indirect Customer may purchase certain Products at pricing terms set forth in **Exhibit A** (referred to below as a "Indirect Customer Contract"), subject to: (i) Distributor 's right to charge prices that differ (e.g., higher prices) from such Indirect Customer's contracted cost; (ii) Distributor's right to impose charges (e.g., shipping, special handling, non-standard unit orders, etc.) payable by the Indirect Customer; (iii) the continued validity of such Indirect Customer Contracts; and (iv) in accordance with applicable law and this policy. The amount of a chargeback hereunder shall be calculated by subtracting the stated contract cost listed in the Indirect Customer Contract (which Company acknowledges might not equal the Indirect Customer's actual purchase price), from the Company's published Wholesale Acquisition Cost ("WAC") at the time when the Indirect Customer purchased Product. All contract pricing and membership additions and/or deletions should be sent to Distributor at ContractAdmin@CuraScript.com , until EDI 845 has been set-up.

All chargeback credit memos and reconciliation reports should be sent to Distributor at ChargebackAdmin@CuraScript.com, until EDI 849 has been set-up. Chargeback resubmissions will be sent via email in Excel format.

### 2. Chargeback report.

Distributor shall submit chargebacks to Company at least monthly. Original chargeback reports must be received from Distributor within ninety (90) days of the Customers' sales transaction date. Company reserves the right to deny any chargebacks submitted later than ninety (90) days following the date of sale. In the event that new information surfaces that causes corrections or adjustments to prior sales, Distributor may reopen and resubmit chargeback claims within one hundred eighty (180) days of the original sale date to Customer or as otherwise may be required in a government contract.

24

***FOIA NOTICE**: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C.§ 552(b)(4) and 45 C.F.R. Part 5.*

The chargeback report shall include the information detailed below, as appropriate, as to each sale made to any Contract Customer. Electronic Data Interchange (EDI) is the preferred method of Chargeback Report submission. New EDI set-up requires testing prior to implementation, and may take as long as ninety (90) days to complete. In the interim period, and if Company is unable to support EDI transmissions for an unknown period of time, Company will accept Distributor's systematic secured email manual chargeback in the format included below. For submission of manual chargebacks, Company shall provide one email address to which Distributor will submit the manual chargeback report. Distributor may, from time to time, update the manual chargeback report without prior notice to, or approval from, Company.

      a.   Distributors debit memo number
      b.   Distributors name and unique facility identifier
      c.   Contract Customer's name
      d.   Customer DEA or HIN number
      e.   Company's contract number
      f.   Distributors invoice number
      g.   Distributors invoice date
      h.   Product(s) NDC number
      i.   Units shipped (returned)
      j.   Company's WAC unit cost
      k.   Company's contract unit cost
      l.   Extended chargeback amount

## 3. Issuance of Credit.

Chargebacks shall be credited, as appropriate, to Distributor within fourteen (14) days following Distributors submission of a claim. If Company does not issue payment for submitted chargeback claims within forty-five (45) days from Company's receipt of chargeback, Distributor shall have the right, upon notice to Company, to deduct the original chargeback claim from any amounts owed by Distributor to Company. Credit Memo's issued for Chargeback payment will include a reconciliation report, in substantially the same format in which the original chargeback was transmitted, notifying Distributor of claims credited, adjusted and denied along with industry standard reason codes. Legitimate chargeback reconciliation issues should be resolved as soon as practicable with each Party responding to the other within forty-five (45) days following receipt of documentation supporting those issues. If Company does not issue payment for Distributor's resubmitted chargeback claims within sixty (60) days, Distributor shall have the right, upon notice to Company, to deduct the resubmitted chargeback claim from any amounts owed by Distributor to Company.

## 4. Chargeback Reversal on Contract Customer Returns

Distributor will submit to Company, at least monthly, all negative chargeback claims relative to product returns from the customer to the Distributor for which chargeback claims had previously been submitted and credited.

## 5. Chargeback Audits

Upon thirty (30) days prior written notice and during normal business hours, Distributor will permit auditing of their chargeback records, solely at Company's expense. The audit shall take place at

25

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

Distributor's business office during Distributor's normal business hours. If performed by a third party, the audit shall be subject to the confidentiality terms set forth in the Agreement. The period of the audit shall not exceed the twelve (12) months prior to the date of Company's notification of intent to perform the audit.

### 6. Contract Updates.

Company shall notify Distributor of any Contract pricing or Customer eligibility changes, including but not limited to: new Customer contracts, contract updates, pricing changes, customer additions or deletions, by sending such notifications to contractadmin@curascript.com, no less than five (5) business days prior to the effective date of the change/update. Chargebacks issued as a result of Company's failure to provide timely updates will be paid by Company without dispute.

### 7. Negative Chargebacks.

Should Distributor issue a credit to a Direct or Indirect Customer related to a prior sale of Product(s) under contract (for which Distributor previously billed and collected a chargeback from Company), the chargeback will be reversed and remitted to Company under the following terms and conditions:

(1) Distributor must receive back from the Direct or Indirect Customer merchantable product (i.e., Distributor must be able to return the item to its inventory for resale in the ordinary course of its business without special preparation, testing, handling or expense); and

(2) The Direct or Indirect Customer's return of the Product must be due to an order or other error (i.e., item or quantity shipped did not match the item or quantity ordered.)

## MANUAL CHARGEBACK REPORT



**FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.**

Distributor shall manage inventory levels to the following locations: 80% Grove City, OH, and 10% for each Tempe, AZ and Memphis, TN.

Priority Healthcare Distribution Inc.
2297 Southwest Blvd., Suite D
Grove City, OH  43123
614-539-8074 (Phone)
614-539-2798 (Fax)
DEA # RP0334540
HIN # K771N1N00

Priority Healthcare Distribution Inc.
2040 W. Rio Salado Parkway, Suite 101A
Tempe, AZ   85281
480-403-3689 (Phone)
480-403-3672 (Fax)
HIN#   J343K1E00

Priority Healthcare Distribution, Inc.
1680 Century Center Parkway, Ste 8
Memphis, TN  38134
877-900-9223
866-628-8942 (Fax)
DEA # RP0511267

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C. § 552(b)(4) and 45 C.F.R. Part 5.*

*City of Rockford v. Mallinckrodt ARD, Inc., et al.*, Case No. 3:17-cv-50107 (N.D. Ill.)

*MSP Recovery Claims, Series LLC, et al. v. Mallinckrodt ARD, Inc., et al.*, Case No. 3:20-cv-50056 (N.D. Ill.)

*Steamfitters Local Union 420 v. Mallinckrodt ARD, LLC, et al.*, Case No. 2:19-cv-03047 (E.D. Pa.)

*Int'l Union of Operating Eng'rs Local 542 v. Mallinckrodt ARD, Inc., et al.*, Case No. 1:21-00647 (D. Del.)

*Acument Global Techs. v. Mallinckrodt ARD, Inc., et al.*, Case No. 2:21-2024 (W.D. Tenn.)

*Plumbers & Pipefitters Local 322 of S.N.J. v. Mallinckrodt ARD, LLC, et al.*, Case No. 1:20-cv-00188 (D.N.J.)

*Law Enforcement Health Benefits, Inc. v. Trudeau, et al.*, Case No. 3:21-cv-50215 (N.D. Ill.)

**_FOIA NOTICE_**: **_This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C._** § **_552(b)(4) and 45 C.F.R. Part 5._**

**EXHIBIT H**
**FORM OF PARENT GUARANTY**


**[To be provided]**

*FOIA NOTICE: This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C.* § *552(b)(4) and 45 C.F.R. Part 5.*

**ATTACHMENT 1**

**PPV ENTITIES**

Dept. of Veterans Affairs (VA)

Authorized State Veterans Homes (SVH)

Dept. of Health and Human Services (HHS), Program Support Center,

Supply Service Center (SSC), Perry Point, MD

Dept. of Health and Human Services Indian Health Service (IHS)

Immigration Health Service Corps (IHSC) (Modification P0003)

Department of Homeland Security (DHS)

Bureau of Prisons (BOP)

Howard University (HOW)

Public Health Service (PHS), (Saipan, Commonwealth of Northern Mariana Island)

Federal Health Care Centers (FHCC)

Peace Corps (PC)

VA Commercial Repackaging Contractor

A complete listing of PPV Entities is available at: http://www.va.gov/oal/business/nc/ppv.asp

*FOIA NOTICE*: *This document contains proprietary and confidential information including internal policies, trade secrets, and commercial and financial information, any and all of which are protected from disclosure under the Freedom of Information Act (FOIA), pursuant to 5 U.S.C.* § *552(b)(4) and 45 C.F.R. Part 5.*