**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

|  |  |
|---|---|
| CITY OF ROCKFORD,<br><br>                    Plaintiff,<br><br>       v.<br><br>MALLINCKRODT ARD, INC., *et al.*,<br><br>                  Defendants. | Case No. 3:17-cv-50107<br><br>District Judge Iain D. Johnston<br><br>Magistrate Judge Lisa A. Jensen<br><br>**ORAL ARGUMENT REQUESTED** |

**EXPRESS SCRIPTS ENTITIES' MOTION TO EXCLUDE
<u>EXPERT TESTIMONY OF PROFESSOR WILLIAM COMANOR</u>**

## TABLE OF CONTENTS

Page

I. Prof. Comanor's proposed economic model violates Rule 702. ...................................... 3

    A. Prof. Comanor does not reliably calculate the quantity of Acthar that would have been sold in the but-for world.................................................................. 4

    B. Prof. Comanor does not provide a reliable methodology or sufficient facts or data to determine the pass-through rate for indirect purchaser class members................................................................................................................ 10

    C. Prof. Comanor's damages model is unreliable because it cannot distinguish between price increases caused by lawful conduct as opposed to price increases caused by unlawful conduct. ............................................................. 11

II. Mere promises by Prof. Comanor that he will use additional, undisclosed data and methods to fix the flaws in his methodology after class certification cannot save his opinions..................................................................................................................... 14

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*American Honda Motor Co. v. Allen*,
  600 F.3d 813 (7th Cir. 2010) ....................................................................2, 15

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*
  152 F.3d 588 (7th Cir. 1998) ............................................................11, 12, 13

*In re Broiler Chicken Antitrust Litig.*,
  2018 WL 3398141 (N.D. Ill. July 12, 2018) ................................................ 10

*Cates v. Whirlpool Corp.*,
  2017 WL 1862640 (N.D. Ill. May 9, 2017) ................................................. 15

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ........................................................................................ 2

*Conrad v. Jimmy John's Franchise*, LLC,
  2021 WL 1736887 (S.D. Ill. May 3, 2021) ................................................... 6

*Conrad v. Jimmy John's Franchise, LLC*,
  2021 WL 718320 (S.D. Ill. Feb. 24, 2021) ...............................................3, 8

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993) ...................................................................................... 2

*Eli Lilly & Co. v. Comm'r*,
  856 F.2d 855 (7th Cir. 1988) ........................................................................ 4

*Eli Lilly & Co. v. Comm'r of Internal Revenue*,
  84 T.C. 996 (1985) ........................................................................................ 4

*Fishman v. Estate of Wirtz*,
  807 F.2d 520 (7th Cir. 1986) ...................................................................... 11

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
  2017 WL 1196990 (N.D. Ill. Mar. 31, 2017) ..........................................10, 15

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ..................................................................................4, 14

*Gopalratnam v. Hewlett-Packard Co.*,
  877 F.3d 771 (7th Cir. 2017) ........................................................................ 2

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) ..............................................................10, 15

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*
  221 F. Supp. 3d 1033 (N.D. Ind. 2016) ...................................................... 13

*Hostetler v. Johnson Controls, Inc.*,
  2018 WL 3868848 (N.D. Ind. Aug. 15, 2018) ............................................ 14

*Hostetler v. Johnson Controls, Inc.*,
  2020 WL 5959811 (N.D. Ind. Oct. 8, 2020) ...................................................................4, 6

*Isaksen v. Vermont Castings, Inc.*,
  825 F.2d 1158 (7th Cir. 1987) ......................................................................................... 13

*Bowman ex rel. J.B. v. Int'l Bus. Machines Corp.*,
  2013 WL 12290828 (S.D. Ind. Aug. 16, 2013) ................................................................. 3

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ........................................................................................................... 4

*Lang v. Kohl's Food Stores, Inc.*,
  217 F.3d 919 (7th Cir. 2000) ............................................................................................. 4

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ............................................................................................. 2

*Morr v. Plains All Am. Pipeline, L.P.*,
  2021 WL 4478660 (S.D. Ill. Sept. 30, 2021) .............................................................14, 15

*Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*,
  574 F. Supp. 457 (M.D. Pa. 1983) .................................................................................... 4

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm.
  Co. Ltd.*,
  2023 WL 4191651 (C.D. Cal. May 24, 2023) ................................................................. 15

*Paper Sys. Inc. v. Mitsubishi*,
  193 F.R.D. 601 (E.D. Wisc. May 5, 2000) ...................................................................... 12

*Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*,
  100 F. App'x 296 (5th Cir. 2004) .................................................................................... 15

*Reed v. Advoc. Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009) ..................................................................................7, 8, 9

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
  969 F.2d 410 (7th Cir. 1992) ......................................................................................11, 12

*Second Amend. Arms v. City of Chicago*,
  2020 WL 1157347 (N.D. Ill. Mar. 10, 2020) ................................................................... 5

*Sturgis v. R & L Carriers, Inc.*,
  554 F. Supp. 3d 976 (N.D. Ind. 2021) ............................................................................. 4

*Sun Dun, Inc. of Wash. v. Coca-Cola Co.*,
  770 F. Supp. 285 (D. Md. 1991) ....................................................................................... 4

*Target Mkt. Pub., Inc. v. ADVO, Inc.*,
  136 F.3d 1139 (7th Cir. 1998) .......................................................................................... 5

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ........................................................................................................... 2

*C.W. ex rel. Wood v. Textron, Inc.*,
  807 F.3d 827 (7th Cir. 2015) ............................................................................................. 4

**<u>Rules and Regulations</u>**

Federal Rule of Evidence 702 ......................................................................1, 2, 3, 9, 10, 11, 14

## PRELIMINARY STATEMENT

The expert opinions offered by Plaintiff Rockford in support of its motion for class certification should be excluded because the economic model offered by its expert, Professor Comanor ("Prof. Comanor"), fails to meet the standards for admissibility under Federal Rule of Evidence 702 ("Rule 702"). There are three fatal defects in Prof. Comanor's work:

*First*, Prof. Comanor does not reliably calculate the quantity of Acthar that would have been sold absent the alleged conspiracy between Express Scripts, Inc. ("ESI") and Mallinckrodt. His model admittedly includes two contradictory assumptions: 1) that absent the alleged conspiracy the same number of vials of Acthar would have been dispensed to patients and 2) that absent the alleged conspiracy fewer vials of Acthar would have been dispensed to patients. Prof. Comanor's model also cannot account for the effect of purchasing restrictions that he and Plaintiff claim would have reduced Acthar sales absent the alleged conspiracy. Prof. Comanor's model is therefore doubly unreliable because it contradicts both itself and Plaintiff's claimed theory of liability.

*Second*, Prof. Comanor has not even attempted to calculate the pass-through rate required to estimate damages for the putative indirect purchaser class. He provides no methodology, no facts, and no data to satisfy this prerequisite for issuing an expert opinion on damages in an indirect purchaser case.

*Third*, Prof. Comanor's model cannot distinguish between price increases caused by lawful, as opposed to unlawful, conduct. His model impermissibly attributes to the alleged conspiracy the entirety of all price increases during the class period (in excess of his chosen measure of inflation), without any attempt to correct for any portion of those price increases caused by Mallinckrodt's legal exercise of market power.

1

The Express Scripts entities respectfully submit that these defects, individually and collectively, render Prof. Comanor's work inherently unreliable and inadmissible.

## LEGAL STANDARD

Under Rule 702, a court may only admit an expert opinion if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The party seeking to introduce expert witness testimony, Plaintiff here, "bears the burden of demonstrating that the expert witness testimony satisfies the *Daubert* standard." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017) (cleaned up).

"When an expert's report or testimony is 'critical to class certification,' . . . a district court must make a conclusive ruling on any challenge to that expert's qualifications or submissions **before it may rule on a motion for class certification**." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012) (emphasis added) (quoting *American Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010)). Prof. Comanor's opinions are critical to Plaintiff's motion for class certification.[1] *See* Pl. Mem. Law Supp. Class Cert. 2, 3, 7, 11, 14 (ECF 825-1).[2]

---

[1] The Supreme Court has repeatedly emphasized that deciding class certification requires "rigorous analysis" and that class certification is not possible without a rigorous economic model demonstrating individualized issues of injury and damages do not predominate. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011).

[2] Plaintiffs served Prof. Comanor's final report in support of class certification on August 9, 2023. Now that Professor Comanor has disclosed the entirety of his opinions in support of class certification, the issue of excluding those unreliable opinions is ripe for decision. *See Messner*, 669 F.3d at 812. Indeed, Defendants have filed this motion 22 days later, which is less than the 30 days Plaintiffs took to file their *Daubert* motion against Defendant's expert, Dr. Israel. There was no date set for Daubert motions in the applicable scheduling order regarding class certification.

## ARGUMENT

### I.     Prof. Comanor's proposed economic model violates Rule 702.

Prof. Comanor has created an economic model of a "but-for world" in which the alleged anticompetitive conduct did not occur. Ex. 1 at 57 (July 18, 2022 Expert Report of William S. Comanor); Ex. 2 at 93:16–94:10 (September 13, 2022 Deposition of William S. Comanor). His model purports to compare prices that class members actually paid for individual vials of Acthar sold during the alleged anticompetitive conspiracy to the prices his model estimates they would have paid in the but-for world. Ex. 1 at 57; Ex. 2 at 93:16–94:10. Prof. Comanor proposes to use this model to calculate damages on a "per-vial basis." Ex. 2 at 69:24–70:13, 140:2–7; *see also* Ex. 1 at 60–62. To do this, he compares the price of each vial sold to a class member to the competitive price they would have paid for the vials of Acthar they would have bought absent the alleged conspiracy (*i.e.*, in the but-for world). Ex. 1 at 60–62. Then, to calculate damages, he plans to apply that price difference to the number of vials sold to class members during the class period. *Id.* at 62.

Using a but-for world is a generally accepted way to estimate damages. *See, e.g.*, *Bowman ex rel. J.B. v. Int'l Bus. Machines Corp.*, 2013 WL 12290828, at *6 (S.D. Ind. Aug. 16, 2013). But Rule 702 requires not only that experts use reliable principles and methods, they must also "reliably appl[y] the principles and methods to the facts of the case." Fed. R. Evid. 702. Courts must be wary of experts that attempt to "employ [a] reliable methodology in an unreliable way." *Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 718320, at *16 (S.D. Ill. Feb. 24, 2021). That is precisely what Prof. Comanor has done here.

An expert's "work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is

---

Docket Entry (ECF No. 814).

not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). "Even if eminently qualified, experts cannot offer opinions based solely on their say-so (what lawyers call *ipse dixit*)." *Sturgis v. R & L Carriers, Inc.*, 554 F. Supp. 3d 976, 981 (N.D. Ind. 2021) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999)); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Notably, at least three courts have previously rejected Prof. Comanor's similarly unsupported opinions. *Sun Dun, Inc. of Wash. v. Coca-Cola Co.*, 770 F. Supp. 285, 287 (D. Md. 1991) ("Dr. Comanor's opinions appear unsupported, unprecedented and unconvincing."); *Pa. Dental Ass'n v. Med. Serv. Ass'n of Pa.*, 574 F. Supp. 457, 472 (M.D. Pa. 1983) (rejecting "the highly speculative affidavit of Dr. Comanor, which itself is not based upon facts of record"); *Eli Lilly & Co. v. Comm'r of Internal Revenue*, 84 T.C. 996, 1147 (1985) (rejecting Prof. Comanor's pricing opinion for having "overlooked a significant factor in reaching his conclusion"), *aff'd in relevant part by Eli Lilly & Co. v. Comm'r*, 856 F.2d 855 (7th Cir. 1988).

### A.  Prof. Comanor does not reliably calculate the quantity of Acthar that would have been sold in the but-for world.

The first fatal flaw in Prof. Comanor's expert opinion is that he does not reliably calculate the quantity of Acthar that would have been sold in his but-for world. "The district court is the gatekeeper of expert testimony" and the Seventh Circuit has stressed that "the key to the gate . . . is the soundness and care with which the expert arrived at her opinion." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015). Prof. Comanor's opinion about the quantity of Acthar that class members would have received in the but-for world is unsound.

### 1.  Prof. Comanor relies on two contradictory assumptions about the quantity of Acthar that would have been sold absent the alleged conspiracy.

Prof. Comanor's but-for world suffers from a methodological flaw: it rests on two contradictory assumptions. An expert's use of a model that "rests on two contradictory assumptions . . . is fatal to the reliability of her opinion." *Hostetler v. Johnson Controls, Inc.*, 2020

4

WL 5959811, at *10 (N.D. Ind. Oct. 8, 2020); *see also Second Amend. Arms v. City of Chicago*, 2020 WL 1157347, at *9 (N.D. Ill. Mar. 10, 2020) (unreasonable assumptions render an expert opinion unreliable) (citing *Target Mkt. Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1144 (7th Cir. 1998)).

Prof. Comanor's model assumes that the quantity of Acthar sold in the but-for world both would have remained the same as and been lower than the quantity sold in the real world. First, Prof. Comanor assumes that every patient who received Acthar in the real world would have still received Acthar in the but-for world (*i.e.*, the world that would exist absent the conspiracy). Ex. 2 169:18–170:22. Thus, for the purpose of counting the vials sold in the but-for world, Prof. Comanor's model assumes the but-for quantity sold would have been ***exactly the same*** as the actual quantity sold. *Id.* Second, Prof. Comanor asserts that absent the alleged conspiracy ESI would have "contested" the high price of Acthar by implementing "utilization management" policies,[3] including "prior authorization policies," which would have restricted the quantity of Acthar dispensed to patients. *See* Ex. 2 at 172:17–23; Ex. 1 at 37–39; Ex. 3 at 15–16. Thus, for the purpose of modeling the competitive price per vial, Prof. Comanor's model assumes the quantity of Acthar sold to class members in the but-for world would have been ***lower than*** the actual quantity sold.

---

[3] Prof. Comanor asserts that there were multiple forms of purchasing restrictions that ESI did not implement due to the alleged conspiracy. Ex. 1 at 38–39 (step therapy algorithm); Ex. 2 at 172:17–174:25; Ex. 3 at 15–16 (August 9, 2023 Rebuttal Report of William S. Comanor) (formulary management) (citing Ex. 4 at 50–52 (September 15, 2022 Deposition of Dr. Steven Miller) (testifying that step therapies and formulary management are forms of utilization management, like prior authorizations)). All of these assumed restrictions have the same effect on Prof. Comanor's model: they reduce the quantity of Acthar sold in the but-for world as compared to the quantity sold in actuality.

The Acthar purchases made by Rockford provide a case study of how problematic Prof. Comanor's assumptions become. In 2014, ESI presented Rockford with a recommended Acthar prior authorization policy. Ex. 5 at -983 (ExpressScripts5038975); Ex. 6 at 71:3–74:19 (January 17, 2023 Deposition of Tamara Rykiel). The recommended Acthar prior authorization policy only allowed prescription benefits coverage for members being treated for Infantile Spasms or acute exacerbations of Multiple Sclerosis. Ex. 7 at -206 (ExpressScripts0515204). Rockford rejected that recommendation. *See* Ex. 6 at 58:6–59:17, 73:3–74:19. The next year, in 2015, Rockford paid a prescription claim for Acthar for a beneficiary who had a different condition, Opsoclonus Myoclonus Syndrome, which would not have been covered had Rockford adopted ESI's recommendation. *See* Ex. 8 at -154 (RCBCO0001154). In other words, had ESI somehow forced Rockford to follow the recommended prior authorization policy, as Prof. Comanor assumes would have been the case in the but-for world (*see* Ex. 2 at 172:17–174:25), Rockford would not have bought those vials of Acthar in 2015. Yet the model estimates the damages Rockford incurred on a per-vial basis, under the assumption that Rockford would have still bought the same number of vials absent the conspiracy as it bought in 2015. As a result, Prof. Comanor's model calculates that Rockford overpaid for the same Acthar vials barred by the recommended prior authorization policies he assumes would have been in place in the but-for world.

The Court should not admit an economic model that rests on two mutually exclusive assumptions, *see Hostetler*, 2020 WL 5959811, at *10, let alone one that also cannot reliably calculate damages for the putative class representative. *See Conrad v. Jimmy John's Franchise, LLC*, 2021 WL 1736887, at *2 (S.D. Ill. May 3, 2021) (finding that an expert's model that could not reliably calculate damages for the putative class representative was inadmissible at the class certification stage).

6

2.   <u>Prof. Comanor does not provide a reliable methodology for calculating the quantity of Acthar vials that would have been sold in the but-for world.</u>

Even if the Court wanted to look past Prof. Comanor's contradictory assumptions, he also fails to identify any methodology for determining which class members would have bought fewer (or no) vials of Acthar in the but-for world due to the restrictive policies he assumes would have been in place. Without this, his model is not "a reliable formula for calculating damages." *See Reed v. Advoc. Health Care*, 268 F.R.D. 573, 584 (N.D. Ill. 2009).

As noted above, Prof. Comanor's model assumes that, but for the alleged conspiracy, ESI would have somehow restricted the sales of Acthar using prior authorization policies and other methods. While he acknowledges that ESI recommended the implementation of prior authorizations, he claims these steps were not "sufficient to lead Questcor to refrain from further price increases." Ex. 1 at 38–39, 41, 52–53; Ex. 2 at 124:24–126:6. He asserts that absent the alleged conspiracy ESI would have imposed prior authorization policies that would have restricted access to Acthar to only patients with infantile spasms ("IS") or acute exacerbations of multiple sclerosis ("MS") or patient-specific "special cases." Ex. 2 at 173:18–175:4.

Prof. Comanor provides no methodology (let alone a reliable one) for identifying which Acthar vials would not have been bought in his but-for world under his assumed prior authorization policies. He flatly rejected the possibility that only patients being treated for IS or acute exacerbations of MS would have been covered under his assumed prior authorization polices, saying this was "too sharp a boundary." *Id.* at 174:4–25. Instead, he posited there would be a "special cases" exception that would allow other additional, currently unknown patients to also get their Acthar prescriptions in the but-for world. *Id.* When asked how one could determine which patients would have still been covered for Acthar pursuant to the prior authorization policies he assumes would have existed in the but-for world, he responded, "I can't answer that question right

7

now. I'm not a physician." *Id.* at 174:4–175:4. He could not point to any specific evidence that he would use to determine what a more effective ESI prior authorization policy would have looked like. *Id.* at 109:24–110:23. Prof. Comanor also concedes he cannot answer whether ESI even has the ability to force its clients to adopt prior authorization policies at all. *Id.* at 112:10–113:5. He has no reliable way to ascertain which class members would have adopted the more restrictive policies he assumes ESI would have imposed in the but-for world. Instead, he simply asserts that "[f]or the most part [PBM clients] will follow the recommendations of their [PBM]" and that they would not "uniformly ignore" ESI, but "[t]hat doesn't mean it can't happen once in a while." *Id.* at 121:11–122:1.

Prof. Comanor's model bears a striking resemblance to a flawed damages model that another court in this district rejected as unreliable at the class certification stage.[4] *See Reed*, 268 F.R.D. at 584. In *Reed*, the plaintiffs' economist attempted to model a but-for world where the alleged anticompetitive conspiracy (in that case a conspiracy to suppress wages) did not exist and to use that but-for world to determine damages. *Id.* Specifically, the expert sought to compare the price nurses were paid for their work (wages) in the but-for world to the price the nurses were actually paid for their work. *Id.* The district court in *Reed* deemed the proffered model unreliable because by calculating an average but-for price for nurse wages, it failed to account for individual differences among the nurses whose wages were allegedly suppressed. *Id.* at 595. The court rejected that model because of the "fundamental flaw" that "[e]ven if one assumes the [actual price] was [affected] by the alleged conspiracy, that would not mean that all members of the proposed class suffered a reduced wage or that any reduction for an individual nurse could be

---

[4] District courts often reject expert opinions as unreliable when denying class certification without ruling on pending *Daubert* challenges, as denying certification has the same practical effect as excluding the expert. *See, e.g.*, *Reed*, 268 F.R.D. at 594; *Conrad*, 2021 WL 718320, at *16.

calculated in a formulaic way by common proof." *Id.* at 591 (finding the model did "not indicate whether each putative class member suffered harm from the alleged conspiracy" and was "not a methodology common to the class that [could] determine impact with respect to each class member."). This, the district court explained, meant that use of the model would necessitate individualized damages inquiries, "which could mean as many as 19,000 mini-trials." *Id.* at 595.

Prof. Comanor's model presents the same problem. In Prof. Comanor's but-for world, mandatory prior authorization policies would have meant that some (currently unknown) number of patients would have been rejected for coverage by their benefits plans, causing fewer Acthar vials to have been sold in the but-for world than the real world. There is no way to reliably ascertain how, across the thousands of Acthar prescriptions written during the class period, an individual physician would determine whether an individual patient would have been covered for Acthar under Prof. Comanor's prior authorization policy and, for those patients not covered, what treatment the patient would have received instead. As a result, even if the Court assumes the vials sold in the but-for world were sold at lower prices than the actual vials, Prof. Comanor still provides no way to reliably determine: 1) which patients in the but-for world would have been rejected under his assumed prior authorization policies and not received Acthar; 2) what treatment those patients would have received instead; and 3) if a patient was overcharged for Acthar, as compared to the charge for the treatment the patient would have received in the but-for world.

Like the faulty model in *Reed*, Prof. Comanor's model would require thousands of mini-trials to determine whether each class member would have received all, some, or none of the vials in the but-for world that they received in the real world. Thus, Prof. Comanor "fails to satisfy the third prong of Rule 702" because "he has not applied econometric principles and methods reliably to the facts of this case." *See Reed*, 268 F.R.D. at 594.

**B. Prof. Comanor does not provide a reliable methodology or sufficient facts or data to determine the pass-through rate for indirect purchaser class members.**

To calculate damages for the indirect purchaser class members, Prof. Comanor requires an additional input into his model: a "pass-through rate." "By definition, indirect purchasers must prove that an overcharge was levied on direct purchasers of defendants' products, who then passed all or some of that overcharge through to the indirect purchasers." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 502 (N.D. Cal. 2008). Prof. Comanor provides no methodology whatsoever and identifies no data at all that would allow him to calculate a pass-through rate for the indirect purchaser class here.

Calculating a pass-through rate is a critical feature of any indirect purchaser damages model. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 2018 WL 3398141, at *2 (N.D. Ill. July 12, 2018) (indirect purchaser classes must "prov[e] that some part of any price increase faced by the DPPs was passed through to members of the putative IPP classes."); *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *29 (N.D. Ill. Mar. 31, 2017) (finding the failure to identify appropriate pass-through rates "raises reliability and relevance concerns under Rule 702").

Prof. Comanor has not even attempted to identify the methodology or data he would use to calculate a pass-through rate or rates for the indirect purchaser class and its members—let alone demonstrate how it could be done reliably. When asked about his familiarity with the concept of a pass-through rate, Prof. Comanor testified, "You know, I haven't dealt with that issue in a good while" and "I cannot remember the substance of it." Ex. 2 at 178:15–23. Despite his hazy memory of the basic concept, Prof. Comanor then asserted he need "[n]ot necessarily" determine a pass-through rate to accurately measure damages sustained by an indirect purchaser. *Id.* at 179:22–180:3. When pressed to explain what circumstances would allow him to skip this legally required

step, however, he retreated, testifying, "I need to think more about that before I give you an answer." *Id.* at 180:4–14.

Prof. Comanor cannot simply put off answering the critical questions of how he would determine a pass-through rate here and what data he would use to do it. He needed to have provided the Court with reliable principles or methods and sufficient facts or data to determine appropriate pass-through rates. *See* Fed. R. Evid. 702. He has not.

### C. Prof. Comanor's damages model is unreliable because it cannot distinguish between price increases caused by lawful conduct as opposed to price increases caused by unlawful conduct.

Prof. Comanor's damages model does not distinguish between price increases caused by lawful instead of unlawful conduct. A valid damages model must be able to separate out the effects of lawful from unlawful conduct. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic* 152 F.3d 588, 593 (7th Cir. 1998); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415–16 (7th Cir. 1992).

As a threshold matter, while Prof. Comanor proposes to employ a "yardstick" approach to calculating damages here, he fails to reliably apply that methodology to the facts at hand. A "yardstick" as defined by the Seventh Circuit, "link[s] the plaintiff's experience in a hypothetical free market to the experience of a **comparable firm** in the actual free market." *Fishman v. Estate of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986) (emphasis added); *see also Blue Cross & Blue Shield*, 152 F.3d at 592–93. Prof. Comanor calculates the supposedly competitive price of Acthar in his but-for world by simply inflating the pre-class period price of Acthar using the inflation rate of his chosen "yardstick," a price index called the Pharmaceutical Preparation Manufacturing Index ("PPMI"). Ex. 3 at 28–30. But Prof. Comanor never establishes that using a price index as an inflation rate in the but-for world—or the PPMI price index specifically—accounts for any "nonconspiratorial factors likely to have made the prices charged by the [defendant] higher than

the [yardstick price]." *See Blue Cross & Blue Shield*, 152 F.3d at 593. Indeed, Professor Comanor's use of a price index as a yardstick without any correction for other factors stands in contrast to the well-recognized method of using regression analysis to control for such factors. *See e.g., Paper Sys. Inc. v. Mitsubishi*, 193 F.R.D. 601, 615–16 (E.D. Wisc. May 5, 2000). Further, at his deposition, Prof. Comanor could not remember what products the PPMI index includes in it, the methodology used to create it, or any other potential indices he considered using as a yardstick instead. Ex. 2 at 165:20–168:4.

Crucially, Prof. Comanor's use of the PPMI as a yardstick "fail[s] to correct for the effect of market share on [Acthar's] prices." *See Blue Cross & Blue Shield*, 152 F.3d at 593. There is no dispute that Mallinckrodt, through its ownership of Acthar, has enjoyed lawful monopoly power in the ACTH market since Mallinckrodt first acquired Acthar in 2001 and continues to have monopoly power today. *See* Second Am. Compl. ¶¶ 3–4 (ECF 98) ("Mallinckrodt acquired its Acthar monopoly in 2001 . . . . This case does not seek to challenge the lawfulness of Mallinckrodt's monopoly."); Ex. 1 at 14–15; Ex. 2 at 102:7–20 ("Acthar is the only seller in the recognized ACTH market currently. . . . They have monopoly power without question."). Professor Comanor's model, however, cannot separate out the portion of price increases during the class period that was caused by Mallinckrodt's admittedly pre-existing (and still existing), legal monopoly power. Indeed, Prof. Comanor specifically states that he did not have to do this:

> [M]onopoly power is commonly measured by the price effects resulting from an **array of causative factors** all presumed to have an impact. **They include not only the presence or absence of rival products** [(*i.e.*, monopoly power)] but also the willingness of large buyers to accept or contest the prices charged for specific products; and it is clearly impracticable to separate them out . . . . [T]hese causative factors are hardly divisible.

Ex. 3 at 24 (emphasis added); *see also* Ex. 1 at 60–62 (providing two example damages calculations). This failure to distinguish between price effects of lawful versus unlawful monopoly power renders his model fundamentally unreliable. *See Schiller*, 969 F.2d at 415–16 ("The expert

should have tried to separate the damages that resulted from the lawful [conduct]—from the damages that resulted from particular forms of misconduct allegedly committed by [the defendant] . . . . No such effort was made."); *Blue Cross & Blue Shield*, 152 F.3d at 593.

The decision in *Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.* provides an apt comparison. 221 F. Supp. 3d 1033 (N.D. Ind. 2016). There, the district court excluded a damages model as unreliable because the expert's opinion required accepting that the effect of the allegedly unlawful conduct was "however big it needs to be to result in [the expert's] damages figure." *Id.* at 1039. Prof. Comanor's damages calculation does the same thing. He concludes that the anticompetitive effect of the alleged conspiracy invariably accounts for all the price increases (in excess of inflation) between 2007 and 2022—despite the existence of Mallinckrodt's pre-existing monopoly power and regardless of what conduct was part of the conspiracy. *See* Ex. 2 at 142:19–143:9, 145:1–18, 156:21–158:15 (repeating that he cannot account for which allegedly conspiratorial conduct accounts for which portion of the damages estimate). At bottom, Prof. Comanor's opinion is that the anticompetitive effect of the alleged conspiracy is however big it needs to be to account for the entire difference between his chosen inflation rate and the actual prices charged for Acthar during the class period. "That sort of analytical gap is unacceptable under *Joiner*, and cannot be excused merely because this is an antitrust case." *Gumwood*, 221 F. Supp. 3d at 1039 (citing *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987) ("*Post hoc ergo propter hoc* is not a valid methodology . . . . We do not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct.")).

## II. Mere promises by Prof. Comanor that he will use additional, undisclosed data and methods to fix the flaws in his methodology after class certification cannot save his opinions.

Prof. Comanor attempts to brush aside the defects in his model by promising to fix them later, using as-yet undisclosed methodologies and unknown data. An expert's "conclusory 'promise' of a reliable damages model . . . does not pass muster under Rule 702 and *Daubert*." *Morr v. Plains All Am. Pipeline, L.P.*, 2021 WL 4478660, at *6 (S.D. Ill. Sept. 30, 2021); *see also, e.g.*, *Hostetler v. Johnson Controls, Inc.*, 2018 WL 3868848, at *3 (N.D. Ind. Aug. 15, 2018) (striking an expert at the class certification stage because the expert "did not cite any methodology connecting those facts to her conclusion, and an expert's own say-so does not suffice.") (citing *Joiner*, 522 U.S. at 138).

***First***, after being confronted at his deposition with his contradictory assumption that the quantity of Acthar sold in his but-for world equaled the quantity actually sold, Prof. Comanor backpedaled and tried to put the issue off until after class certification, testifying,

> Let me revise that. Let me revise that. That's a current presumption. But to go further than a presumption would require the analysis to be contained in a merits report, which, as I have said many times, we have not done. So that's our current presumption, subject to work to -- exploratory work in a merits report when and if I'm assigned to do that.

Ex. 2 at 169:24–170:14.

***Second***, regarding pass-through rates, after admitting he has not "dealt with that issue in a good while" (*id.* at 178:15–23), he then attempted to put off the requirement of identifying a methodology to calculate a pass-through rate until a later merits report. *Id.* at 181:10–24 ("That analysis would be made in a merits report, not in a class cert report.").

***Third***, he took a similar tack when confronted with his model's inability to distinguish damages caused by unlawful conduct from damages caused by lawful conduct. At his deposition, he stated that his "final measure of damages" would be "a mosaic" that is "created by various

14

streams," but admitted, "There's nothing at this stage where I have estimated the relative importance of the different contributory streams and whether or not one stream might expand if another stream was contracted." *Id.* at 144:2–145:18. He then hedged, admitting that this "might be a relevant issue in a merit report," but was adamant that he has not done this analysis at this stage. *Id.* at 144:2–145:18, 146:15–147:4.

Prof. Comanor cannot fill the holes in his methodology with mere promises that he will later incorporate additional, undisclosed methodologies. District courts have repeatedly rejected attempts to proffer such half-baked expert opinions in the class certification context. *See, e.g.*, *Morr*, 2021 WL 4478660, at *5–6; *Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *13 (N.D. Ill. May 9, 2017); *Fluidmaster*, 2017 WL 1196990, at *29; *Graphics Processing Units*, 253 F.R.D. at 496–97; *see also Piggly Wiggly Clarksville, Inc. v. Interstate Brands Corp.*, 100 F. App'x 296, 299 (5th Cir. 2004) (affirming rejection of a proffered regression model when "[t]he expert did not offer a formula based on regression analysis, but merely opined that one could be found").

Prof. Comanor was deposed last year and has since filed **two** versions of his rebuttal report, but his analysis remains fundamentally unreliable. While Prof. Comanor attempts to avoid addressing each of the three flaws identified above until after class certification, Plaintiff cannot kick the can down the road when it comes to proving Prof. Comanor's expert opinions are reliable. *See Am. Honda*, 600 F.3d at 819; *see also Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*, 2023 WL 4191651, at *25 (C.D. Cal. May 24, 2023) (finding Prof. Comanor's "mere proposal" of a method for calculating damages was not sufficient at the class certification stage, because he failed to "apply the methodologies to the facts and data in this case to show that they are consistent with Plaintiffs' theory of liability").

The ESI Entities respectfully request Prof. Comanor's expert testimony be excluded.

Dated: August 31, 2023      Respectfully Submitted,

*/s/ Eric C. Lyttle*

Michael J. Lyle, Esq. (ARDC #6199227)
Eric C. Lyttle, Esq. (*pro hac vice*)
Meghan A. McCaffrey, Esq. (*pro hac vice*)
Michael D. Bonanno, Esq. (*pro hac vice*)
J. Matthew Hamann, Esq. (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, DC 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
mikelyle@quinnemanuel.com
ericlyttle@quinnemanuel.com
meghanmccaffrey@quinnemanuel.com
mikebonanno@quinnemanuel.com
matthewhamann@quinnemanuel.com

Jan H. Ohlander, Esq. (ARDC #3124934)
RENO & ZAHM, LLP
2902 McFarland Rd., Suite 400
Rockford, IL 61107
Tel: (815) 987-4050
Fax: (815) 987-4092
jho@renozahm.com

*Attorneys for Defendants ESI Holding Co., ESI, Inc.,
CuraScript, Inc. d/b/a CuraScript, SD, Accredo Health
Group, Inc., and United BioSource Corp. n/k/a United
BioSource LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2023 a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Eric C. Lyttle*
_____

Eric C. Lyttle
